**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **ARTHUR T. WATSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **CV-2007-520-WHA** |
| **ALABAMA FARMERS COOPERATIVE, INC.,** | ) | |
| **d/b/a BONNIE PLANT FARMS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**BONNIE PLANT FARMS' BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

COMES NOW defendant Alabama Farmers Cooperative d/b/a Bonnie Plant Farms ("Bonnie Plant" or "Bonnie"),[1] and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves the Court to enter summary judgment in its favor and against plaintiff on all claims. As demonstrated below, there are no genuine issues of material fact, and Bonnie is therefore entitled to judgment as a matter of law.

## I.     INTRODUCTION

Plaintiff in this ADEA case is a sixty-three (63) year-old salesman currently employed with Bonnie who -- incredibly -- has brought this lawsuit claiming that Joe Stuart, plaintiff's sixty-five (65) year-old supervisor and friend since college, has discriminated against plaintiff because of his age. Plaintiff's claims of discrimination have no support in the facts or the law. To the contrary, it is undisputed that all employment actions taken against plaintiff were taken for legitimate, non-discriminatory and non-retaliatory reasons -- namely, plaintiff's poor job

---

[1]     Bonnie Plant Farms is a division of Alabama Farmers Cooperative.  For purposes of clarity in this brief, the defendant will simply be referred to as "Bonnie Plant" or "Bonnie."

performance. Thus, plaintiff's claims for discrimination and retaliation are due to be dismissed as a matter of law.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   Bonnie Plant

1.     Bonnie Plant is a business based in Union Springs, Alabama that grows and sells plants in forty-eight states across the country. (Trussell Depo., p. 8:8-13).[2]

2.     Bonnie sells its plants to "chain stores" such as Wal-Mart, Lowe's and Home Depot, and also to "independent stores" such as farm supply stores, florists, and service stations. (Alley Depo., p. 86:1-21).[3]

3.     The plant business is seasonal, and in some areas of the country Bonnie sells plants only during the Spring growing season, while other areas of the country have Spring and Fall seasons. (Branum Depo., pp. 13:22-14:5).[4]

4.     Although the growing seasons vary by location, the Spring season generally runs from January or February to early July, and the Fall season runs from approximately September through October. (Branum Depo., pp. 12:22-13:18; Alley Depo., p. 84:18-22).

5.     Bonnie employs several hundred "route salesmen" who, operating from "stations" scattered across the country, drive Bonnie trucks and actually sell and deliver plants to the customers. (Trussell Depo., p. 31:3-9; Alley Depo., pp. 13:22-14:10; Gatlin Depo., p. 9:15-19).[5]

---

[2]     The Deposition of Charlie Trussell is attached as Ex. 1 to Bonnie Plant Farms' Evidentiary Submission.

[3]     The Deposition of Adam Alley is attached as Ex. 2 to Bonnie Plant Farms' Evidentiary Submission.

[4]     The Deposition of Les Branum is attached as Ex. 3 to Bonnie Plant Farms' Evidentiary Submission.

[5]     The Deposition of Tate Gatlin is attached as Ex. 4 to Bonnie Plant Farms' Evidentiary Submission.

6.      Each station is supervised by a Station Manager. (Trussell Depo., pp. 13:22-14:23).  For his or her particular area, the Station Manager oversees the growing of the plants in greenhouses and their subsequent distribution to Bonnie's customers.  (Trussell Depo., pp. 13:22-14:23).  The Station Manager also supervises the route salesmen who operate from that station. (Trussell Depo., pp. 13:22-14:3).

7.      Joe Stuart, who works out of Union Springs, is Bonnie's National Sales Manager, and he oversees the route salesmen and Station Managers.  (Stuart Depo., pp. 7:15-8:11).[6]

**B.    Duties Of Route Salesmen**

8.      Being a route salesman requires hard physical work and long hours. (Trussell Depo., pp. 26:20-27:5, 46:16-47:6).

9.      Among other things, route salesmen must load and unload their truck throughout the day, check on plant inventory in the stores on their route, stock the stores with new plants, and remove plants that are overgrown or cannot be sold.  (Trussell Depo., pp. 46:16-47:6; Stuart Depo., pp. 13:23-14:20; Pltf. Depo., p. 135:6-9;[7] Route Salesman Job Description).[8]

10.     Although the number varies, routes may have up to thirty-five (35) stores. (Branum Depo., p. 21:11-14).  The composition of routes (*i.e.* the actual stores serviced on a route) changes often, with stores frequently added or removed.  (Pltf. Depo., pp. 29:20-30:11; Alley Depo. p. 64:2-14; Stuart Depo., pp. 21:18-22:19).

---

[6]      The Deposition of Joe Stuart is attached as Ex. 5 to Bonnie Plant Farms' Evidentiary Submission.

[7]      The Deposition of Plaintiff is attached as Ex. 6 to Bonnie Plant Farms' Evidentiary Submission.

[8]      The Route Salesman Job Description is attached as Ex. 7 to Bonnie Plant Farms' Evidentiary Submission.

11.   Route salesmen must visit each chain store on their route twice a week and must visit high volume stores everyday.  (Alley Depo., pp. 91:19-92:3; Branum Depo., pp. 38:20-39:1).

12.   In addition to the physical labor, route salesmen are salesmen, and they must actually sell the plants to the customers.  (Alley Depo., p. 14:5-10).  Route salesmen must meet with the customer contacts at the stores and maintain good business relationships.  (Stuart Depo., pp. 13:23-14:20; Route Salesman Job Description).

13.   Plants are sold on consignment, with route salesmen paid only for what is actually sold.  (Trussell Depo., pp. 19:5-20:16).

14.   Route salesmen are paid a commission based on their collected sales for the season.  (Branum Depo., pp. 16:17-17:20; Alley Depo., pp. 62:21-63:4).  They also get a bi-weekly draw, which is offset against their commission.  (Branum Depo., p. 16:17-22; Alley Depo., pp. 62:21-63:4).  Thus, if a route salesman does not have good sales numbers, he could finish the season owing money to the company. (Alley Depo., p. 63:5-8; Trussell Depo., p. 57:14-17).

15.   A route salesman's sales performance affects not only his compensation, but also the Station Manager's compensation.  (Pltf. Depo., pp. 163:19-164:3).  As plaintiff testified, if a route salesman has low sales, that is "money out of the [Station Manager's] pocket."  (Pltf. Depo., pp. 163:19-164:3).

16.   At the end of each season, the Station Manager reviews the performance of his route salesmen, discussing with the employee his or her strengths and weaknesses.  (Alley Depo., p. 30:21-31:9).  There is no written evaluation. (Alley Depo., p. 30:21-23; Stuart Depo, pp. 17:19-18:3).

17.    Also at the end of each season, route salesmen are laid off, at which point they are eligible for unemployment benefits until the next growing season begins and they return to work. (Branum Depo., p. 18:13-17).

**C.    Plaintiff's Background And Health Problems**

18.    Plaintiff is a route salesman with Bonnie.  (Pltf. Depo., p. 99:4-7).

19.    Plaintiff was born in early 1945 and is now sixty-three (63) years old.  (Pltf. Depo., p. 19:11-13).  He lives in Glenwood, Alabama.  (Pltf. Depo., p. 9:18-23).

20.    Plaintiff has worked as a route salesman for Bonnie for the past fifteen (15) years, and before that worked as a route salesman for Joe Stuart for about ten (10) years when Stuart owned his own plant business.  (Pltf. Depo., pp. 11:12-12:22; Stuart Depo., pp. 9:18-10:4).

21.    Plaintiff and Stuart have known each other since they played football together at Troy State.  (Stuart Depo., p. 11:1-8).  Stuart was born in early 1943, and is now sixty-five (65) years old.  (Stuart Depo., p. 9:1-4; Pltf. Depo., p. 47:11-13).

22.    Plaintiff weighs approximately 330 pounds.  (Pltf. Depo., p. 165:1-7).  He is a diabetic and also has heart problems, high blood pressure, blood-clotting problems, and problems with his nerves.  (Pltf. Depo., pp. 156:12-160:2).

23.    Plaintiff has mentioned to numerous people that the only reason he continues working for Bonnie is for his health insurance.  (Pltf. Depo., pp. 85:21-87:16).

**D.    Plaintiff's Route In Texas, And His Request For An Easier Route**

24.    During the 1990's and up until 2003, plaintiff worked a sales route in New Summerfield, Texas.  (Pltf. Depo., pp. 14:10-15:6).  This is a route plaintiff worked when he worked for Stuart's plant business, and plaintiff remained on this route after Stuart's business was sold to Bonnie.  (Pltf. Depo.,  pp. 14:10-15:6).

25.    Because of its southern location, the New Summerfield route has both a Spring and a Fall season.  (Pltf. Depo., pp. 17:17-18:9, 167:4-11).  Although plaintiff has always lived in Alabama, he would travel to New Summerfield and work his route during the Spring and Fall, and return to Alabama during his months off.  (Pltf. Depo., p. 10:13-20).

26.    Plaintiff admits that during the years he worked the Texas route, there were "great changes" in the route from year to year, and the composition of the route changed "many times." (Pltf. Depo., pp. 15:7-16:15).

27.    In 2003, when he was fifty-eight (58) years old, plaintiff requested to swap routes with a Bonnie salesman working in Bells, Tennessee.  (Pltf. Depo., pp. 16:20-18:2).

28.    Plaintiff wanted to swap routes because Bells does not have a Fall growing season, unlike New Summerfield.  (Pltf. Depo., pp. 17:17-18:9, 167:4-11).  Plaintiff did not want to continue working during the Fall.  (Pltf. Depo., pp. 17:17-18:9).

29.    The New Summerfield route was hard on plaintiff because of his physical condition, and he thought the Bells route would be "easier on him."  (Pltf. Depo., pp. 17:1-9, 230:8-14).  When asked why he wanted a less demanding route, plaintiff testified:

> Well, my knee had wore out, and that's the reason you replace them.  I had bone spurs in my feet that I had removed.  And the hours and time in those trucks are hard on your body.

(Pltf. Depo., p. 19:14-20).

30.    Plaintiff understood that not working a Fall route would cut into his income, but he simply planned to draw unemployment during the Fall.  (Pltf. Depo., p. 167:16-20; Stuart Depo., pp. 15:19-16:8).

31.    Plaintiff's request to change routes was approved by Stuart and Adam Alley, the Station Manager in Bells.  (Pltf. Depo., pp. 18:13-20:20).  Plaintiff testified that Stuart approved

the swap with no questions asked, and that Alley also agreed and "thought it might be a good swap." (Pltf. Depo., pp. 20:12-22:13).

**E.**     **Bells, Tennessee**

32.     Plaintiff began working in Bells and worked that route for the Spring seasons in 2004 and 2005. (Alley Depo., p. 15:10-16).

33.     Plaintiff had numerous problems in Bells; for example, the products at the stores on his route were often in disarray, his stores were not kept neat, he did not remove trash, he did not remove plants that were not selling, and he did not keep his truck clean. (Alley Depo., pp. 33:2-34:4, 40:7-17, 50:23-51:12).

34.     Alley received numerous complaints from plaintiff's customers, including complaints regarding bad or overgrown plants that plaintiff had not removed from the stores and replaced with plants that could actually be sold. (Alley Depo., pp. 41:9-42:7).

35.     Alley complained to Stuart about plaintiff's job performance. (Stuart Depo., pp. 25:6-21, 41:9-43:10). Also, as National Sales Manager, Stuart got complaints directly from customers in Bells, most of which related to the fact that plaintiff was not working the stores on a timely basis. (Stuart Depo., pp. 25:6-21, 41:9-43:10). Customers also complained that they would see plaintiff asleep in his truck rather than inside working the store and meeting with the customer. (Stuart Depo., p. 41:9-14). Two of the customers that complained directly to Stuart were Boswell Feed & Seed in Summerville, Tennessee and Farmers Co-op in Selmer, Tennessee. (Stuart Depo., pp. 41:9-43:10).

36.     Plaintiff admits it is hard for him to ride in trucks. (Pltf. Depo., pp. 33:13-34:2, 165:16-21). Plaintiff can get in and out of a truck, but only "with difficulty," and not like most people can. (Pltf. Depo., pp. 136:9-37:1). He cannot get up on the back of the truck to inspect

the load.  (Pltf. Depo., pp. 135:16-37:1).  Plaintiff also has problems lifting things above chest level.  (Pltf. Depo., pp. 161:5-9).

37.    Alley testified that he warned plaintiff numerous times about his performance.  (Alley Depo., pp. 31:10-18, 51:13-52:2).  Alley testified that he told plaintiff in 2005 that if he did not improve, Alley would request that he not be brought back to Bells the following season.  (Alley Depo., pp. 51:13-52:2).

38.    The problems with plaintiff's job performance were handled verbally.  (Alley Depo., p. 40:2-6).  Alley has never disciplined anyone in writing.  (Alley Depo., p. 37:16-21).

39.    Plaintiff made no improvement.  (Alley Depo., pp. 33:2-34:4).

40.    In addition to plaintiff's failure to perform the physical duties of the job and the complaints from customers, plaintiff's sales in 2004 were less than what the previous salesman in Bells had collected in 2003. (Alley Depo. pp. 42:21-43:4).  The sales for the Bells route in 2003 were $263,171.61, whereas plaintiff's sales in 2004 decreased to $253,704.27.  (Plaintiff's Spring 2004 Commission Sheet; [9] Luther Stuart's Spring 2003 Commission Sheet).[10]  In 2005, after his drop in sales, plaintiff's sales increased to $302,703.95.  (Plaintiff's Spring 2005 Commission Sheet).[11]

41.    It is rare for sales to decrease from the previous year.  (Stuart Depo., p. 24:2-10).

42.    Because of plaintiff's poor job performance, which included, among other things, his not keeping his stores neat or properly stocked with plants, and complaints from customers,

---

[9]    Plaintiff's Spring 2004 Commission Sheet is attached as Ex. 8 to Bonnie Plant Farms' Evidentiary Submission.

[10]    Luther Stuart's Spring 2003 Commission Sheet is attached as Ex. 9 to Bonnie Plant Farms' Evidentiary Submission.

[11]    Plaintiff's Spring 2005 Commission Sheet is attached as Ex. 10 to Bonnie Plant Farms' Evidentiary Submission.

Alley asked Stuart in the Fall of 2005 that plaintiff not be returned to Bells for the 2006 season. (Alley Depo. p. 50:8-14; Stuart Depo. pp. 32:1-33:15).

43.    Stuart decided not to send plaintiff back to Bells and in approximately November of 2005 informed plaintiff that he would not be going back in 2006.  (Pltf. Depo., pp. 42:21-44:18, 109:2-9).

44.    Stuart told plaintiff he would try to help find him some place to work so that he could stay on the company's insurance, as plaintiff had said he was simply working for the insurance.  (Stuart Depo. p. 34:6-17; Pltf. Depo., p. 46:16-22).

45.    Stuart never said anything about plaintiff's age, nor did anyone else at Bonnie. (Pltf. Depo., pp. 51:18-52:3).  Plaintiff testified as follows:

> Q:    Well, Mr. Stewart didn't tell you that age had anything to do with not sending you back to Bells, did he?
>
> A:    No, sir, he didn't.  He didn't tell me that.
>
> Q:    Did anybody else tell you that?
>
> A:    No, sir….

(Pltf. Depo., pp. 51:21- 52:1).

46.    In December of 2005, after the decision had been made that plaintiff would not return to Bells, Alley offered Les Branum the Bells route (which plaintiff had previously worked) for the 2006 season.  (Branum Depo., p. 28:11-15).  Branum had previously worked a different route at Bells under Alley's supervision.  (Branum Depo. p. 15:7-10).  Branum was twenty-nine (29) years old when he accepted the Bells route.  (Branum Depo., p. 7:3-5).  When Branum changed routes, his previous Bells route was taken over by Jerry Brogland, who was approximately sixty (60) years old.  (Alley Depo. p. 55:8-16; Stuart Depo. p. 66:1-5).

47.     Branum's sales on the Bells route in 2006 were $378,622.05.   (Les Branum's Spring 2006 Commission Sheet).[12]   Thus, Branum's sales his first year in Bells were approximately 44% higher than plaintiff's sales in 2004, the first year he worked in Bells.  (Les Branum's Spring 2006 Commission Sheet; Plaintiff's Spring 2004 Commission Sheet).

48.     In 2007, Branum's sales for the Bells route were $405,355.03. (Les Branum's Spring 2007 Commission Sheet).[13] Thus, Branum's sales his second year in Bells were approximately 34% higher than plaintiff's sales in 2005, the second year he worked in Bells. (Les Branum's Spring 2007 Commission Sheet; Plaintiff's Spring 2005 Commission Sheet).

## F.     Donaldsonville, Louisiana

49.     When the decision was made in the Fall of 2005 that plaintiff would not be returned to Bells, there were no open sales routes.  (Stuart Depo., p. 65:14-20).

50.     Also in the Fall of 2005 near the time the decision was made that plaintiff would not return to Bells due to his poor job performance, plaintiff had knee replacement surgery. (Pltf. Depo., pp. 23:15-24:18).  He also had surgery for bone spurs in his neck, and surgery on both feet to remove born spurs.  (Pltf. Depo., pp. 23:15-24:18).  Plaintiff's surgeries rendered him unable to work.  (Pltf. Depo., pp. 124:21-125:22, 226:10-27:17).  At Bonnie's sales meeting in December 2005, plaintiff was completely unable to participate in a fitness for duty test Bonnie had for all its route salesmen.  (Pltf. Depo., pp. 113:13-115:8).  Plaintiff was not released back to work until February 2006.  (Pltf. Depo., pp. 124:21-125:22, 226:10-27:17).

---

[12]     Les Branum's Spring 2006 Commission Sheet is attached as Ex. 11 to Bonnie Plant Farms' Evidentiary Submission.

[13]     Les Branum's Spring 2007 Commission Sheet is attached as Ex. 12 to Bonnie Plant Farms' Evidentiary Submission.

51.    Stuart tried to find some type of work for plaintiff, and <u>created</u> a job for him in Donaldsonville, Louisiana.   (Pltf. Depo., pp. 46:16-22, 65:16-21; Stuart Depo. p. 34:6-17). Stuart testified as follows:

> I told [plaintiff] I would try to find him something and try to help him out where he could stay on the insurance.  That's what he requested he wanted to do, that he was just working for the insurance, and I said well, I will try to find him something, so -- and that's how we tried to create a route down in Donaldsonville, Louisiana, just so [plaintiff] would have a job.

(Stuart Depo. p. 34:6-17).

52.    Stuart called Charlie Trussell, the Station Manager in Donaldsonville.  (Trussell Depo., p. 29:9-20).  Trussell was sixty-four (64) years old.  (Trussell Depo., p. 7:20-22).

53.    Stuart told Trussell he was trying to find work for plaintiff, and wanted to try to create a job for him in Donaldsonville.  (Trussell Depo., p. 29:9-20).  Trussell testified:

> Q:    Okay.  Well, how was [plaintiff] assigned to you, that is, who did it?
>
> A:    Joe Stuart called and asked me and I told him send him down there, we'd try to give him something to do.
>
> Q:    Okay.  Do you remember your conversation with Joe?
>
> A:    Yeah.  Joe said we needed to try to keep the boy on the payroll so he would be able to have some insurance.  And I -- I thought it was mighty nice of Joe to do that.

(Trussell Depo., p. 29:9-20).

54.    In response to Stuart's efforts, plaintiff told Stuart he was glad to get the work. (Pltf. Depo., p. 99:11-18).

55.    Plaintiff went to Donaldsonville around February 2006 and worked there for approximately three (3) weeks.  (Trussell Depo., p. 28:3-10).

56.    Plaintiff was not assigned a particular sales route.  (Pltf. Depo., p. 66:22-23).

57.    Plaintiff essentially rode around trying to open up new business, but he did not have much success.  (Trussell Depo., pp. 38:13-42:5).

58.    After plaintiff had been in Donaldsonville for about three (3) weeks, Stuart called and said a sales route had become available in Jasper, Alabama.  (Trussell Depo., pp., 42:22-43:15).  A route salesman in Jasper had quit, and Stuart was giving the open route to plaintiff.  (Trussell Depo., p. 43:9-15; Stuart Depo. pp. 45:20-46:17).

59.    Stuart offered the Jasper route to plaintiff because it was an opportunity for him to make more money.  (Stuart Depo. pp. 45:20-46:17).  Plaintiff was "tickled to death" with the offer, and he accepted it.  (Stuart Depo., p. 46:11-20).

60.    No one replaced plaintiff when he left Donaldsonville. (Trussell Depo., p. 45:2-4).

**G.    Jasper, Alabama**

61.    Joey Padgett was the Station Manager in Jasper in 2006.  (Padgett Depo., p. 13:10-13).[14]  Padgett was forty-four (44) years old at the time.  (Padgett Depo., p. 37:19-20).

62.    Padgett had previously called Bonnie's home office to report that one of his route salesmen, Thomas Heath, had quit in the middle of the season and to ask the home office if someone could come to Jasper to finish the route for the season.  (Padgett Depo., pp. 21:15-17, 25:9-17, 42:20-43:2).

63.    Plaintiff arrived in Jasper toward the end of March 2006 and worked there until the season ended.  (Padgett Depo., pp. 13:10-14:2, 23:9-24:12).

64.    During plaintiff's time in Jasper, numerous customers called Padgett to complain about his job performance.  (Padgett Depo., p. 30:12-19).  Customers complained that they had

---

[14]    The Deposition of Joey Padgett is attached as Ex. 13 to Bonnie Plant Farms' Evidentiary Submission.

not seen plaintiff in a long time and that they were therefore out of certain types of plants. (Padgett Depo., p. 31:11-22).

65.    Padgett has never had customers complain about a salesman as much as plaintiff's customers complained.  (Padgett Depo., pp. 31:23-32:5).

66.    When customers would call Padgett with a complaint, Padgett would take down the complaint on a notepad and pass it along to plaintiff.  (Padgett Depo., pp. 30:20-34:2).

67.    Plaintiff admits Padgett criticized aspects of his performance, and admits the criticism was "very much so justified."  (Pltf. Depo., p. 195:13-17).

68.    After plaintiff filled-in for the second half of the 2006 season, Padgett expressed that he did not want plaintiff back for the next season.  (Stuart Depo., p. 60:10-18).

69.    Padgett later hired Chris Sparks, who was approximately thirty-five (35) years old, to work the Jasper route.  (Padgett Depo. pp. 28:16-19).  For Spring 2007, Sparks' sales on the Jasper route were $20,000 to $30,000 higher than the sales for 2006.  (Padgett Depo., pp. 28:23-29:9).

## H.    Beeville, Texas

70.    After the 2006 season ended in Jasper, Stuart found a route for plaintiff in Beeville, Texas for Spring 2007.  (Pltf. Depo., p. 93:12-13).

71.    Plaintiff again told Stuart he was glad to get the work, and he accepted the route. (Pltf. Depo., p. 99:4-10).   To this day, plaintiff is still working the route in Beeville.  (Stuart Depo., 46:18-20).

72.    Customers have complained about plaintiff's job performance in Beeville to Stuart and the Station Manager, Chris Hall.  (Stuart Depo., pp. 61:3-18, 70:15-23).

73.    Plaintiff admits Hall has counseled him about his job performance.  (Pltf. Depo., pp. 188:16-189:10).  When asked whether Hall's criticisms were unjustified, plaintiff testified: "[n]ot one that I can think of."  (Pltf. Depo., p. 189:8-10).

74.    Plaintiff admits that when he came to Birmingham for his deposition in this case, he neglected to tell Hall that he would be gone and failed to make arrangements for anyone to run the route in his absence.  (Pltf. Depo., pp. 90:9-91:21).

75.    Plaintiff ended up owing the company money after the Spring 2007 season in Beeville because his commissions were less than his bi-weekly draws.  (Pltf. Depo., pp. 105:16-106:1).

76.    Plaintiff currently owes Bonnie more than $10,000.00, but Bonnie has not tried to recover that money.  (Pltf. Depo., p. 108:12-17).

77.    Bonnie has kept plaintiff's health insurance in force even though he owes the company money.  (Pltf. Depo., pp. 78:23-79:2, 108:18-109:1).

I.    **Plaintiff's "Complaints" Of Alleged Discrimination**

78.    At some point after he discovered he was not going back to Bells (which was also during the time he was unable to work because of his physical condition), plaintiff consulted with his cousin, Albert Adams, who is a lawyer.  (Pltf. Depo., pp. 110:2-112:4).

79.    Together, plaintiff and Mr. Adams composed a letter to Bonnie dated January 10, 2006 in which plaintiff claimed he could not "understand why my Tennessee route is being given to someone else, unless it is because I turn 61 years old on January 12, 2006."  (Pltf. Depo. pp. 110:2-112:4; 01/10/06 Letter).[15]

80.    The letter was addressed to Tate Gatlin only.  (Pltf. Depo., p. 120:6-16).

---

[15]    The 01/10/06 Letter is attached as Ex. 14 to Bonnie Plant Farms' Evidentiary Submission.

81.    Gatlin, who is Bonnie's Safety Director, works in Union Springs but in a different facility than Joe Stuart.  (Pltf. Depo. pp. 112:11-14; Gatlin Depo., p. 21:10-14).

82.    Gatlin has nothing to do with assigning route salesmen to particular routes and has never been plaintiff's supervisor.  (Pltf. Depo., pp. 112:11-14, 119:23-20:5; Gatlin Depo., p. 24:13-19).[16]

83.    Plaintiff physically handed a copy of the January 10, 2006 letter to Gatlin.  (Pltf. Depo., p. 112:5-10).

84.    Stuart was not in the office at the time.  (Pltf. Depo., pp. 112:5-10).  Stuart never saw the letter.  (Stuart Depo., pp. 35:19-38:13).

85.    Prior to the January 10, 2006 letter, plaintiff had not complained to anyone at Bonnie about alleged age discrimination.  (Pltf. Depo., p. 110:10-17).

86.    On approximately February 2, 2006, plaintiff returned to Gatlin's office with another letter, which was also drafted by his lawyer. (Pltf. Depo., pp. 121:13-122:15; 02/02/06 Letter).[17]

87.    In this letter, plaintiff wrote that his physician had recently released him to return to work.  (02/02/06 Letter).  Plaintiff had been unable to work since his surgeries in the Summer of 2005.  (Pltf. Depo., pp. 124:21-125:22, 226:10-27:17).  Plaintiff also asked in the letter to be returned to his Tennessee route and threatened that "[i]f you do not put me to work, I am going to find a lawyer because I believe you are discriminating against me because of my age." (02/02/06 Letter).

---

[16]    Gatlin is the individual who drafted Bonnie's position statement in response to plaintiff's EEOC charge, but he had no involvement in any of the job assignments at issue in the case.

[17]    The 02/02/06 Letter is attached as Ex. 15 to Bonnie Plant Farms' Evidentiary Submission.

88.    Plaintiff hand-delivered a copy of the February 2, 2006 letter to Gatlin.  (Pltf. Depo., pp. 121-22).  Although the letter says "cc: Joe Stuart," plaintiff brought only one copy of the letter.  (Pltf. Depo., pp. 122:2-10).

89.    Stuart was not in the office when plaintiff delivered this second letter.  (Pltf. Depo., p. 122:2-5).  Stuart never saw this letter either.  (Stuart Depo., pp. 35:19-38:13).

90.    Not only did Stuart (plaintiff's 65-year-old supervisor who handled the route assignments) never see these letters, but he did not even know that plaintiff had delivered them nor that plaintiff and his lawyer were apparently alleging age discrimination.  (Stuart Depo., pp. 35:19-38:13).  Nor did Adam Alley or Joey Padgett know of these letters.  (Alley Depo., pp. 53:20-54:5, 59:18-21; Padgett Depo., pp. 41:17-42:1).

**J.    Ages Of Other Route Salesman**

91.    Plaintiff admits there are numerous route salesmen with Bonnie who are older than he and others who are his same age.  (Pltf. Depo., pp. 54:1-16, 62:23-65:15).

92.    The salesmen who work under Adam Alley's supervision in Bells vary in age, with numerous of them being plaintiff's age or close thereto: Stanley Johnson is approximately 50 years old; Willie Hughes is approximately 56 or 57 years old; James Decouto is in his 40's; Johnny Roy Fendelson, who was recently promoted, is approximately 61 or 62 years old; Michael Phillips is approximately 28 years old; Tony Brown is over 60 years old; Les Branum is 31 years old; Pat Gaines is approximately 50 years old; and Jerry Brogland is approximately 60 years old.  (Alley Depo. pp. 24:10-27:23, 55:8-19).

93.    Just recently, Stuart hired a route salesman named Dana Edwards who is sixty-one (61) years old, and another named Doodle Barnett, who is sixty-eight (68) years old.  (Stuart Depo., pp. 53:4-54:6).

94.    Since 2005, Bonnie has hired forty-nine (49) route salesmen who, **at the time they were hired**, were fifty (50) years old or older.  (Johnson Decl.¶ 3).[18]

95.    Plaintiff does not know of anyone else at Bonnie who he thinks has been discriminated against on the basis of age.  (Pltf. Depo., p. 129:19-23).

96.    Plaintiff has no explanation as to why Bonnie would allegedly discriminate against him because of his age.  (Pltf. Depo., pp. 127:10-129:18).  He testified as follows:

> Q:    Well, why do you think -- if, in fact, the company has discriminated against you, Terry Watson, on the basis of your age, why do you think you have been singled out for this treatment?

> A:    I have no way to know.  And I -- it's probably a good thing that I don't know the answer to that question.

> Q:    You don't have any opinion as to why the company would single you out to discriminate against you on the basis of age?

> A:    If I formed an opinion, it wouldn't be good for the person I formed it -- I formed it against.  So, I choose to just sit and listen and see what to do.

> Q:    Well, would it be fair to say, then, that you don't have an opinion as to why the company would single you out for age discrimination?

> A:    [It] sure would.  I have no idea why they picked me out to discriminate against me.

(Pltf. Depo., pp. 128:19-129:18).

---

[18]    The Declaration of Tina Johnson is attached as Ex. 16 to Bonnie Plant Farms' Evidentiary Submission.

## III.    ARGUMENT[19]

### A.    Plaintiff's Discrimination Claim Fails As A Matter Of Law

An ADEA plaintiff can attempt to establish his claim through direct evidence, statistical evidence, or circumstantial evidence.  Kilpatrick v. Tyson Foods, Inc., 2008 WL 624032, at *1 (11th Cir. Mar. 10, 2008); Standifer v. Sonic-Williams Motors, LLC, 401 F. Supp. 2d 1205, 1215 (N.D. Ala. 2005).  Plaintiff in this case has no direct evidence, no statistical evidence, and no circumstantial evidence to support his claim.  In any event, plaintiff cannot rebut Bonnie's legitimate, non-discriminatory reasons for its employment decisions.  For these reasons, his discrimination claim fails as a matter of law.

### 1.    Plaintiff Has No Direct Evidence Of Age Discrimination

Direct evidence is evidence that "if believed, proves the existence of a fact in issue without inference or presumption."  Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997)).  Such evidence would include any blatant remark "which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999).  Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, constitute direct evidence.  Roberts v. Design & Mfg. Servs., Inc., 167 Fed. Appx.

---

[19]    As the Court is aware, summary judgment is proper under Fed. R. Civ. P. 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Id. at 249.  Further, mere conclusory opinions will not defeat a properly supported motion for summary judgment, and inferences based upon speculation and conjecture will not suffice to create a question of material fact.  Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480 (11th Cir. 1995).

82, 85 (11th Cir. 2006) (no direct evidence of age discrimination, as supervisor "never stated that he was going to fire [the plaintiff] because he was too old"). Plaintiff has no such evidence.

        **2.**      **<u>Plaintiff Has No Statistical Evidence Of Age Discrimination</u>**

Plaintiff also has no statistical evidence of age discrimination. In fact, given the ages of the salesmen who run the routes in Bells and the number of individuals over fifty (50) and sixty (60) years old who Bonnie hires as route salesmen, the statistical evidence affirmatively **<u>disproves</u>** plaintiff's theory of age discrimination. (See Pltf. Depo., pp. 54:1-16, 62:23-65:15; Stuart Depo. pp. 53:4-54:6; Alley Depo. pp. 24:10-27:23, 55:8-19; Johnson Decl. ¶ 3). Plaintiff's admission that he knows of **<u>no one</u>** else at Bonnie who he thinks has been discriminated against on the basis of age is also telling, as is the fact that Stuart, the decisionmaker, is two (2) years older than plaintiff. (Pltf. Depo., p. 129:19-23). In sum, the statistical evidence clearly does not support plaintiff's claim. <u>See generally</u> <u>Wheeles v. Nelson's Elec. Motor Servs.</u>, 2008 WL 2358734, at *10 (M.D. Ala. Jun. 6, 2008) ("Wheeles also does nothing to address Defendant's assertion that the majority of the office [personnel] still retained are within the age protected class.").

        **3.**      **<u>Plaintiff Cannot Establish Age Discrimination Based On Circumstantial Evidence</u>**

Because he otherwise has no evidence of discrimination, plaintiff must follow the four-part <u>McDonnell Douglas</u> test in an attempt to make out a prima face case of age discrimination. <u>See</u> <u>Baker v. Sears, Roebuck & Co.</u>, 903 F.2d 1515, 1519 (11th Cir. 1990). Under that test, plaintiff must show that: (1) he is over 40 years old; (2) he was qualified for the position; (3) an adverse employment action was taken against him; and (4) his position was filled by someone outside the protected class or he was treated less favorably than a similarly situated individual outside the class. <u>See</u> <u>Carter v. City of Miami</u>, 870 F.2d 578, 582 (11th Cir. 1989); <u>Turley v. SCI</u>

of Alabama, 190 Fed. Appx. 844, 847 (11th Cir. 2006). If a plaintiff establishes a prima facie case, then the shifting burdens of production enunciated in McDonnell Douglas apply, with "the ultimate burden of persuasion always [lying] with the employee." Standifer v. Sonic-Williams Motors, LLC, 401 F. Supp. 2d 1205, 1216 (N.D. Ala. 2005); Baker, 903 F.2d at 1519.

Here, although plaintiff's Complaint is unclear, it appears he is upset primarily because he was not returned to the route in Bells, yet there is no evidence to support his allegation that Stuart's decision not to return plaintiff to Bells had anything to do with plaintiff's age. Nor, to the extent plaintiff is complaining about subsequent employment decisions, is there evidence to support the theory that Stuart made such decisions because of age-related animus. Summary judgment in Bonnie's favor is therefore due to be granted.

a. <strong><u>Bonnie Is Entitled To Summary Judgment With Respect To Plaintiff's Move From Bells To Donalsonville</u></strong>

As an initial matter, any claim plaintiff makes related to the decision not to return him to Bells is time-barred. Plaintiff may not seek to recover for events that occurred more than 180 days before his EEOC charge was filed. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) (stating that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"); see also Smithers v. Wynne, No. 07-11945, 2008 WL 53245, at *1 (11th Cir. Jan. 4, 2008). Here, plaintiff admits he was told during the first week of November 2005 that he would not be returning to Bells. However, plaintiff did not file his EEOC Charge until June 6, 2006.[20] This was approximately seven (7) months -- *i.e.*, well over 180 days -- after plaintiff was

---

[20]    Plaintiff's EEOC Charge is attached is attached as Ex. 17 to Bonnie Plant Farms' Evidentiary Submission.

informed of the decision.  Thus, any claim related to this decision is time-barred.  See <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 258-59 (1980); <u>Calhoun v. Federal Nat'l Mortgage Ass'n</u>, 823 F. 2d 451, 455-56 (11th Cir. 1987) (180-day period began to run when plaintiff received notice of the defendant's intent to terminate his employment); <u>Welty v. S.F. & G., Inc.</u>, 605 F. Supp. 1548, 1554-57 (N.D. Ala. 1985) (same).

Even if plaintiff's claim with regard to Bells were not time-barred, plaintiff could not establish a prima facie case of age discrimination.

### i.    <u>Plaintiff Was Not Qualified For The Job</u>

Plaintiff cannot establish a prima facie case because the undisputed evidence is that he was not qualified for the position when Stuart made the decision that he would not return to Bells.  Plaintiff acknowledges that Stuart had informed him of the decision by November 2005. (Pltf. Depo., pp. 42:21-44:18, 109:2-9).  Plaintiff also acknowledges that he was not released to return to work at that time.  (Pltf. Depo., pp. 124:21-125:22, 226:10-227:17).  Specifically, plaintiff had recently undergone multiple surgeries (including knee replacement surgery and surgery on his neck and both feet), which rendered him unable to work.  (Pltf. Depo., pp. 124:21-125:22, 226:10-227:17).  Plaintiff was not released back to work until February 2006.  (Pltf. Depo., pp. 124:21-125:22, 226:10-27:17).  Indeed, the February 2006 letter that plaintiff delivered to Tate Gatlin confirms that he had not previously been released to work.  (02/02/06 Letter).  Thus, at the time the decision was made regarding the Bells route, plaintiff could not perform the job of a route salesman, was therefore not qualified for the job, and cannot establish a prima facie case.  See, e.g., <u>Barket v. Nextira One</u>, 72 Fed. Appx. 508, 511 (8th Cir. 2003) (plaintiff could not establish that he was qualified for the job when he "conceded during his deposition that at the time of his termination he could not and was not performing the essential

duties of the job."); <u>Hypes v. First Commerce Corp.</u>, 3 F.Supp.2d 712, 723 (E.D. La. 1996), <u>aff'd</u>, 134 F.3d 721 (5th Cir. 1998).

> ### ii.    <u>Plaintiff Was Moved From Bells For Legitimate, Non-Discriminatory Reasons</u>

Even if plaintiff could establish a prima facie case, which he cannot do, his claim would still fail because Bonnie had legitimate, non-discriminatory reasons for its decision not to return plaintiff to Bells.  As described in detail above above, plaintiff had numerous problems there, including the fact that the products at the stores on his route were often in disarray, his stores were not kept neat, he did not pick-up trash as he should have, he did not remove plants that were not selling, and he did not keep his truck clean.  (Alley Depo., pp. 33:2-34:4, 40:7-17, 50:23-51:12).  Alley, the Station Manager, received numerous complaints from plaintiff's customers. (Alley Depo., pp. 41:9-42:7)  Stuart himself fielded complaints from plaintiff's customers, most of which related to the fact that plaintiff was not working the stores in a timely manner and was leaving them without plants to sell.  (Stuart Depo., pp. 25:6-21 41:9-43:10). Plaintiff's customers also told Stuart that they would see plaintiff asleep outside in the truck. (Stuart Depo., p. 41:9-14)  Perhaps it was because plaintiff was not working his stores properly and in a timely manner that his sales for Bells in 2004 were **<u>less</u>** than what the previous salesman had sold in 2003, which is a very rare occurrence. (Alley Depo. pp. 42:21-43:4; Stuart Depo., p. 24:2-10).  In any event, the problems with plaintiff's job performance were -- without question -- legitimate, non-discriminatory reasons for Stuart to take the actions he took, and Stuart was entitled to act on those complaints even if plaintiff disputes that they were justified.  <u>See, e.g.</u>,

Schweers v. Best Buy, Inc., 132 Fed. Appx. 322, 324-25 (11th Cir. May 24, 2005); Thomas v. Aventis Pharmaceutical, Inc., 177 Fed. Appx. 54, 57 (11th Cir. Apr. 18, 2006).[21]

### iii.    Plaintiff Has No Evidence Of Pretext

Plaintiff's claim also fails because he cannot show pretext.  "A plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason" so long as "the reason is one that might motivate a reasonable employer." Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).  Further, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'"  Robinson v. LaFarge North America, Inc., 240 Fed. Appx. 824, 827 (11th Cir. 2007) (citing cases); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) (noting that federal courts do not sit as super-personnel departments, and that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). As demonstrated below, there is no evidence of pretext that would cast doubt on Bonnie's legitimate, non-discriminatory reasons for its decision not to return plaintiff to Bells.

First, plaintiff has no comparator evidence that would show pretext.  Although the Bells route was taken over by Les Branum, who was twenty-nine (29) years old, plaintiff has no evidence that Branum or any other route salesmen was similarly-situated to plaintiff yet treated better.  Specifically, plaintiff has no evidence that substantially younger employees had similar

---

[21]    Here, there was no formal system for written discipline or review.  (Alley Depo., pp. 30:21-23, 37:16-21; Stuart Depo, pp. 17:19-18:3).  Thus, that Alley and Stuart counseled and criticized plaintiff orally rather than in writing does not affect the legal analysis in this case.  See Wascura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001) (recognizing that lack of complaints or disciplinary reports in personnel file may theoretically support finding of pretext, but finding no pretext where there was no formal review process for employees in plaintiff's position); see also Hammons v. Computer Programs & Systems, Inc., 2006 WL 3627117, at *13 (S.D. Ala. 2006).

customer complaints, similar sales numbers, and similar performance problems, yet were treated differently. This is fatal to plaintiff's claim. See Johnson v. Atlanta Indep. Sch. Sys., 137 Fed. Appx. 311, 314 (11th Cir. 2005) (affirming summary judgment for the employer where the evidence before the district court was that there was "no other teacher who: (1) was…less than 40 years old; (2) had a similar history of documented performance deficiencies; and (3) was given opportunities and resources to improve, similar to those received by [plaintiff], but did not, and was still retained."); Aventis Pharmaceutical, 177 Fed. Appx. at 57 ("[Plaintiff] claimed generally that other people were committing the same work-rule violations as he was, [but] he did not identify specific employees outside his protected class who engaged in similar acts but were not similarly treated. In short, [plaintiff] failed to come forward with sufficient evidence to permit a reasonable factfinder to conclude that the reasons given by [the employer] were not the real reasons for the adverse employment decision.").

Not only does plaintiff lack comparator evidence, but his entire theory of discrimination in this case defies logic. Namely, it makes no sense that plaintiff would suffer discrimination at the hands of Joe Stuart. As an initial matter, Stuart is two (2) years older than plaintiff. This is persuasive and compelling evidence that no age discrimination occurred. See Henry v. Jefferson County Pers. Bd., 519 F. Supp. 2d 1171, 1187 (N.D. Ala. 2007) ("The Eleventh Circuit has noted that an employee 'face[s] a difficult burden' of showing discriminatory motive in an age discrimination case when the primary decisionmaker was 'well over age forty and within the class of persons protected by the ADEA.'") (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991)).

Further, given all the things Stuart has done for plaintiff over the years, there is a strong "same actor" inference here that thoroughly destroys any pretext argument. For example, when

plaintiff, at the age of fifty-eight (58), requested a different route that would be easier on him, Stuart approved the request. After plaintiff's problems in Bells, Stuart created a job for plaintiff in Donaldsonville so plaintiff would not lose his insurance. When a route came open in Jasper, Stuart offered it to plaintiff so he could have a chance to make more money. When plaintiff finished filling-in on the Jasper route, 65-year-old Stuart found plaintiff a route in Beeville, Texas. Stuart is still working to keep plaintiff on the payroll despite performance problems that plaintiff admits are justified. In sum, the same individual against whom plaintiff asserts discrimination is the one who has continually helped plaintiff find places to work so that he can stay on the payroll and keep his health insurance. This undisputed evidence refutes plaintiff's allegation that Stuart discriminated against him because of his age. See Grossmann v. Dillard Dep't Stores, Inc., 109 F.3d 457, 459 (8th Cir. 1997) (stating that the plaintiff's contention that the decisionmaker who had hired her had "suddenly turned against older workers four years" after he had hired her and discharged her due to age discrimination was "more than reasonable people can swallow"); Barket, 72 Fed. Appx. at 511 (affirming summary judgment where the evidence was that "the same decision-makers that terminated [the plaintiff] had diligently worked to keep him on the payroll only a short time before."); see also Dingman v. Delta Health Group, Inc., 26 F. Supp. 2d 1349, 1354-55 (S.D. Fla. 1998).

Finally, the fact that Bonnie hires and employs so many individuals in the protected age group is further evidence that plaintiff has not been discriminated against because of his age and further disproves any allegation that Bonnie's proffered reasons are pretext. See Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991) ("In short, employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing."); Strohmeyer v. International Broth. of Painters & Allied Trades, 989 F.Supp. 455, 460 (W.D.N.Y. 1997) (same).

### b.   Bonnie Is Entitled To Summary Judgment With Respect To Plaintiff's Move From Donaldsonville To Jasper

As noted above, the gist of plaintiff's Complaint is that he is upset because he was not returned to Bells.  However, to the extent plaintiff is also claiming that his transfer from Donaldsonville to Jasper was discriminatory, such a claim fails for multiple, similar reasons.

First, plaintiff was not replaced with someone outside the protected class when he left Donaldsonville.  (Trussell Depo., p. 45:2-4).  Thus, any claim related to this transfer fails as a matter of law.  See, e.g., Hudson v. Shaw Environmental & Infrastructure, Inc., 2008 WL 596762, at *2 (11th Cir. Mar. 6, 2008) ("Hudson failed to establish a prima facie case of age discrimination with respect to his termination because he failed to refute Shaw's evidence showing that his position had not been replaced.  Accordingly, Hudson failed to establish a prima facie case for discriminatory termination because he was not replaced by a person outside the protected class.").

Second, plaintiff cannot show that his transfer from Donaldsonville to Jasper was an adverse employment action, as he must in order to establish a prima facie case of discrimination.  See, e.g., Turley v. SCI of Alabama, 190 Fed. Appx. 844, 847 (11th Cir. 2006).  "[A]n employee's transfer from one position to another, even when the transfer is involuntary, is not necessarily an adverse employment action."  Scarborough v. Mineta, 2006 WL 931859, at *7 (N.D. Fla. Apr. 10, 2006) (citing Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1454 (11th Cir. 1998)).  Rather, "an employee's transfer constitutes an adverse employment action only if a reasonable person in [the plaintiff's] position would have found the transfer to be adverse under all the facts and circumstances."  Id.  Here, plaintiff was not assigned a particular sales route while he was in Donaldsonville and was not eligible for commissions; the Jasper route, on the other hand, offered him the ability to make commissions.  (Pltf. Depo., p. 66:22-23; Stuart Depo.

pp. 45:20-46:17).  The undisputed evidence is that Stuart offered the Jasper route to plaintiff because it was an opportunity for plaintiff to make **more** money, and plaintiff was very appreciative of the offer.  (Stuart Depo., pp. 45:20-46:17).  As a matter of law, then, the move from Donaldsonville to Jasper was not an adverse employment action.

Finally, as with plaintiff's other moves, Bonnie's decision was legitimate and non-discriminatory and plaintiff lacks evidence of pretext.  It is ridiculous enough that plaintiff claims to have been discriminated against by Joe Stuart, his friend since college with whom he had worked for twenty-five years (25) and who is two (2) years older than he.  It further strains credulity to think that Stuart and Charlie Trussell, the Station Manager in Donaldsonville who is also in his mid-sixties, for some reason conspired to move plaintiff from Donaldsonville because of his age.  Such a theory is simply not believable.  See Phillips v. Aaron Rents, Inc., 262 Fed. Appx. 202, 210 (11th Cir. 2008) ("Phillips failed to offer any evidence that Aaron's true reason for terminating him was based on his age.  Phillips admitted that he was never told that he was terminated due to his age, and he offered no basis for a belief that the Aaron decision-makers were biased against him due to his age.").

### c.    Bonnie Is Entitled To Summary Judgment With Respect To Plaintiff's Move From Jasper To Beeville

Assuming plaintiff is claiming his transfer from Jasper to Beeville was based on his age, this claim fails as well.  First, plaintiff cannot show that this move amounted to an adverse employment action.  A transfer constitutes an adverse employment action only if a reasonable person would have found the transfer to be adverse under all the facts and circumstances. Scarborough, 2006 WL 931859, at *7.  Plaintiff was assigned to Jasper only temporarily because the former route salesman there had quit in the middle of the season, and the Station Manager needed someone to fill in.  (Padgett Depo., pp. 21:14-17, 42:20-43:2).  After the 2006 season

ended in Jasper, however, Stuart found a route for plaintiff in Beeville.  (Pltf. Depo., p. 93:12-13).  Plaintiff was glad that Stuart had found him a route to work.  (Pltf. Depo., p. 99:11-18).  Unlike the route in Jasper, the Beeville route was not just a temporary, fill-in position; rather, it is a route that plaintiff still works to this day.  (Padgett Depo., pp. 42:20-43:2; Stuart Depo., p. 46:18-20).  The move from Jasper to Beeville simply cannot be considered (and was not considered by plaintiff) to be an adverse employment action.

Regardless, any claim regarding this move fails because Bonnie had legitimate, non-discriminatory reasons for its actions: plaintiff's poor job performance.  Various customers called Padgett to complain about plaintiff, especially the fact that plaintiff was not working the stores and keeping them supplied with product.  (Padgett Depo., pp. 30:12-31:22).  In fact, Padgett had never had so many complaints about a salesman.  (Padgett Depo., pp. 31:23-32:5).  Plaintiff himself admits that Padgett criticized his performance, and that the criticism was "very much so justified."  (Pltf. Depo., p. 195:13-17).  Plaintiff has no evidence that Bonnie's proffered reasons for the move were merely pretext for age discrimination.

## B.    Plaintiff's Retaliation Claim Fails As A Matter Of Law[22]

A plaintiff alleging retaliation under the ADEA must establish a prima facie case consisting of three elements: (1) that the plaintiff engaged in statutorily protected conduct; (2) that the plaintiff suffered an action that a reasonable employee would find to be materially adverse; and (3) a causal link between the two events.  Bothwell v. RMC Ewell, Inc., 2008 WL 2123340, at *3 (11th Cir. May 21, 2008); Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th

---

[22]    To the extent plaintiff is pursuing a retaliation claim, he is limited to a claim under the opposition clause.  He cannot seek relief under the participation clause because there was no pending EEOC investigation at the time he and his lawyer drafted and delivered the letters to Gatlin.  EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000); McShane v. U.S. Attorney General, 144 Fed. Appx. 779, 789-90 (11th Cir. 2005).

Cir. 2002). If the plaintiff makes out a prima facie case of retaliation, the employer has the burden of articulating a legitimate nondiscriminatory reason for the challenged employment decision. <u>Williams</u>, 303 F.3d at 1291. The plaintiff, to prevail, then must submit evidence of pretext designed to mask retaliation. <u>Id</u>.

1. **<u>Plaintiff's Move From Bells To Donaldsonville Was Not Causally Related To Any Protected Conduct, Nor Is There Any Evidence Of Pretext</u>**[23]

Plaintiff has no evidence of any causal connection between his complaints of age discrimination and his move from Bells to Donaldsonville. Plaintiff therefore cannot establish a prima facie case of retaliation as a matter of law.

First, and most importantly, the decision to move plaintiff from Bells was made **before** plaintiff even complained of discrimination. (Pltf. Depo., pp. 42:21-44:18, 109:2-9, 110:6-9). Thus, there could have been no causal connection between the two events. <u>See</u> <u>Vinnett v. General Elec. Co.</u>, 2008 WL 834456, at *5 (11th Cir. Mar. 31, 2008) ("There is [] a lack of a causal connection when an employer makes a decision before the protected activity occurs and then proceeds with that decision.").

Further, Stuart did not even know of plaintiff's complaints of alleged age discrimination. (Stuart Depo., pp. 35:19-38:13). The law is clear that a plaintiff simply cannot prove retaliation when the alleged retaliator had no knowledge of the protected activity. <u>Brochu v. City of Riviera Beach</u>, 303 F.3d 1144, 1155-56 (11th Cir. 2002); <u>Raney v. Vinson Guard Serv.</u>, 120 F.3d 1192, 1197-98 (11th Cir. 1997). Plaintiff's retaliation claim fails for this additional reason.

---

[23]    For purposes of this motion, Bonnie assumes that the letters plaintiff and his lawyer drafted constitute "protected conduct."

Finally, even if plaintiff were able to establish a prima facie case of retaliation, his claim would fail because he has no evidence of pretext to rebut Bonnie's legitimate, non-discriminatory and non-retaliatory reasons for its actions, as set forth in detail above.

### 2.     Plaintiff's Retaliation Claim Also Fails With Respect To Any Subsequent Employment Actions Taken Toward Him

To the extent plaintiff claims that any subsequent employment actions were done in retaliation for his complaints of discrimination, his claim fails for reasons already discussed. First, plaintiff has no evidence that Stuart even knew of any protected activity at the time he made the employment decisions. Second, as discussed above, plaintiff's moves from Donaldsonville to Jasper, and subsequently from Jasper to Beeville, were not adverse employment actions. Third, as also discussed above, Bonnie had legitimate, non-discriminatory and non-retaliatory reasons for its actions. Fourth, and finally, plaintiff has no evidence of pretext.

### IV.     CONCLUSION

For all of the foregoing reasons, Bonnie respectfully requests that the Court enter summary judgment in its favor, dismiss plaintiff's claims in their entirety, and tax costs against plaintiff.

Respectfully submitted,

s/ Graham Gerhardt
Dent M. Morton (MOR058)
K. Bryance Metheny (MET011)
Graham W. Gerhardt (GER014)
Attorneys for Defendant

**OF COUNSEL**:

**BURR & FORMAN LLP**
3400 Wachovia Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100


## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system on the following CM/ECF participants, on this the 26th day of June, 2008:

          Albert Holman Adams, Jr.
          Albert H Adams, Jr., PC
          P. O. Box 670
          Eufaula, AL  36072-0670

          Jerry Dean Roberson
          3765 Kincross Drive
          P.O. Box 380487
          Birmingham, AL 35238

                        s/ Graham Gerhardt _____
                        OF COUNSEL