## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **ARTHUR T. WATSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| **v.** | ) | **2:07-cv-520-WHA** |
| | ) | |
| **ALABAMA FARMERS** | ) | |
| **COOPERATIVE, INC. d/b/a** | ) | |
| **BONNIE PLANT FARMS,** | ) | |
| | ) | |
| **Defendant.** | | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

This is an age discrimination and retaliation case brought by Plaintiff Terry Watson ("Plaintiff") against his employer Defendant, Alabama Farmers Cooperative, Inc., d/b/a Bonnie Plant Farms, (hereinafter "Defendant"), a corporation located in Union Springs, Alabama. Watson has worked in the plant business for twenty-five years, ten years for Joe Stuart's company and for fifteen years after Bonnie Plant Farms acquired Stuart's company. (Plaintiff Depo., pp. 11:12-12:23; Stuart Depo., pp. 9:18-10:4). Before 2006, Watson only had two routes. (Plaintiff Depo., pp. 14:10-15:6). His first was in Beeville, Texas for approximately twenty-two years.(Plaintiff Depo., pp. 14:10-15:6). In the Spring of 2004, Watson swapped routes with Butch Stuart, because Watson was going to require a knee replacement. (Plaintiff Depo., pp. 17:7-18:9). The Bells, Tennessee route only worked a Spring growing season while the Texas route had a fall season. (Plaintiff Depo., pp. 17:7-

18:9 , 167:4-11).  Watson worked 2004 and 2005 in Bells, Tennessee, but after his complaint of age discrimination in 2005, Watson has been assigned to three different routes. (Alley Depo., p. 15:10-16; Plaintiff Depo., pp. 44:14-50:20).  Since his complaints, he has lost commissions, earned less income and lost other employment benefits. (Plaintiff Depo., p. 70:3-16; Stuart Depo., pp. 47:13-17, 57:15-59:4).

Watson has made four complaints of age discrimination.  His first was an internal complaint in November 2005, when he told Joe Stuart, National Sales Manager, that he thought the reason he was not sent back to Bells, TN was age discrimination. (Plaintiff's Depo., pp. 44:10-50:20).  Then he provided two letters alleging age discrimination to Tate Gatlin, Safety Director.  (Pl's Ex. 11; Pl's Ex. 12).  These occurred on January 10, 2006 and February 2, 2006.  (Pl's Ex. 11; Pl's Ex. 12). He was assigned to Donaldsonville, Louisiana after these three complaints.  Then he filed his EEOC charge on June 6, 2006.  (Pl's Ex. 8). He was then transferred from Jasper to Beeville, Texas.

Bonnie's articulated reason for the first transfer, in its EEOC response, was that Watson failed to attend its annual sales meeting in 2005.  (Pl's Ex. 9).  Watson testified in his deposition that he did attend the meeting.  (Plaintiff's Depo., p. 171:1-5).  Bonnie then changed its articulated reason to poor job performance and customer complaints.  (Stuart's Depo., pp. 40:1-43:10).  Watson has refuted these reasons.  (Pl's Ex. 13; Pl's Ex. 14).

## II.    PLAINTIFF'S STATEMENT OF FACTS

1.    Bonnie Plant is a business based in Union Springs, Alabama that grows and

sells plants in forty-eight states across the country. (Trussell Depo., p. 8:8-13).

2.    Bonnie sells its plants to "chain stores" such as Wal-Mart, Lowe's and Home Depot, and also to "independent stores" such as farm supply stores, florists, and service stations. (Alley Depo., p. 86:1-21).

3.    The plant business is seasonal, and in some areas of the country Bonnie sells plants only during the Spring growing season, while other areas of the country have Spring and Fall seasons. (Branum Depo., pp. 13:22-14:5).

4.    Although the growing seasons vary by location, the Spring season generally runs from January or February to early July, and the Fall season runs from approximately September through October. (Branum Depo., pp. 12:22-13:18; Alley Depo., p. 84:18-22).

5.    Bonnie employs over 460 "route salesmen" who, operating from "stations" scattered across the country, drive Bonnie trucks and actually sell and deliver plants to the customers. (Trussell Depo., p. 31:3-9; Alley Depo., pp. 13:22-14:10; Gatlin Depo., p. 9:15-19; Stuart Depo., p. 48:8-13).

6.    Each station is supervised by a Station Manager. (Trussell Depo., pp. 13:22-14:23). For his or her particular area, the Station Manager oversees the growing of the plants in greenhouses and their subsequent distribution to Bonnie's customers. (Trussell Depo., pp. 13:22-14:23). The Station Manager also supervises the route salesmen who operate from that station. (Trussell Depo., pp. 13:22-14:3).

7.    Joe Stuart, who works out of Union Springs, is Bonnie's National Sales

Manager, and he oversees the route salesmen and Station Managers. (Stuart Depo., pp. 7:15-8:11).

8.      Although the number varies, routes may have up to thirty-five (35) stores. (Branum Depo., p. 21:11-14). The composition of routes (i.e. the actual stores serviced on a route) changes often, with stores frequently added or removed. (Plaintiff Depo., pp. 29:20-30:11; Alley Depo. p. 64:2-14; Stuart Depo., pp. 21:18-22:19).

9.      Plants are sold on consignment, with route salesmen paid only for what is actually sold. (Trussell Depo., pp. 19:5-20:16).

10.      Route salesmen are paid a commission based on their collected sales for the season. (Branum Depo., pp. 16:17-17:20; Alley Depo., pp. 62:21-63:4). They also get a bi-weekly draw, which is offset against their commission. (Branum Depo., p. 16:17-22; Alley Depo., pp. 62:21-63:4). Thus, if a route salesman does not have good sales numbers, he could finish the season owing money to the company. (Alley Depo., p. 63:5-8; Trussell Depo., p. 57:14-17).

11.      There are no written job evaluations for route salesmen to rate their performance. (Alley Depo., p. 30:21-23; Stuart Depo, pp. 17:19-18:3).

12.      At the end of each season, route salesmen are laid off, so they can draw unemployment benefits until the next growing season begins and they return to work. (Branum Depo., p. 18:13-17).

13.      Plaintiff has worked as a route salesman with Bonnie Plant Farms for fifteen

years. (Plaintiff Depo., p. 11:12-12:22).

14.    Plaintiff was born in early 1945 and is now sixty-three (63) years old. (Plaintiff Depo., p. 19:11-13). He lives in Glenwood, Alabama. (Plaintiff Depo., p. 9:18-23).

15.    Plaintiff has worked as a route salesman for Bonnie for the past fifteen (15) years, and before that worked as a route salesman for Joe Stuart for about ten (10) years when Stuart owned his own plant business. (Plaintiff Depo., pp. 11:12-12:22; Stuart Depo., pp. 9:18-10:4).

16.    Joe Stuart, national sales manager, admits that there are no Bonnie Plant documents which support his claim of poor work performance for Watson.  (Stuart Depo., pp. 25:22-26:8).  Stuart testified that Watson has worked for him for twenty-five years and was doing a satisfactory job. (Stuart Depo., p. 17:11-18).

17.    During the 1990's and up until 2003, plaintiff worked a sales route in New Summerfield, Texas. (Plaintiff Depo., pp. 14:10-15:6).  This is a route plaintiff worked when he worked for Stuart's plant business, and plaintiff remained on this route after Stuart's business was sold to Bonnie. (Plaintiff Depo., pp. 14:10-15:6).

18.    Because of its southern location, the New Summerfield route has both a Spring and a Fall season. (Plaintiff Depo., pp. 17:17-18:9; 167:4-11). Although plaintiff has always lived  Alabama, he would travel to New Summerfield and work his route during the Spring and Fall, and return to Alabama during his months off. (Plaintiff Depo., p. 10:13-20).

19.    During the years he worked the Texas route, there were "great changes" in the

route from year to year, and the composition of the route changed "many times." (Plaintiff Depo., pp. 15:7-16:15).

20.     In 2003, when he was fifty-eight (58) years old, plaintiff requested to swap routes with a Bonnie salesman working in Bells, Tennessee. (Plaintiff Depo., pp. 16:20-18:2).

21.     Plaintiff wanted to swap routes because Bells does not have a Fall growing season, unlike New Summerfield. (Plaintiff Depo., pp. 17:17-18:9; 167:4-11). Plaintiff did not want to continue working during the Fall. (Plaintiff Depo., pp. 17:17-18:9).

22.     Plaintiff's request to change routes was approved by Stuart and Adam Alley, the Station Manager in Bells. (Plaintiff Depo., pp. 18:13-20:20). Plaintiff testified that Stuart approved   the swap with no questions asked, and that Alley also agreed and "thought it might be a good swap." (Plaintiff Depo., pp. 20:12-22:13).

23.     Plaintiff began working in Bells and worked that route for the Spring seasons in 2004 and 2005. (Alley Depo., p. 15:10-16).  After he worked the Spring season in 2005 in Bells, Tennessee, Watson underwent knee replacement surgery and also had some bone spurs removed from his feet.  (Plaintiff Depo., pp. 122:22-124:5).

24.     The growing season in Bells, TN started in February each year.  (Plaintiff's Depo., p. 25:1-14).

25.     Watson's doctor had released him to full duty prior to the Bells, TN growing season.  (Plaintiff's Depo., p. 26:1-19; Pl's Ex. 16).

26.     While Watson worked under Alley's supervision in 2004-2005, Alley was never critical of Watson's job performance directly to him.  (Plaintiff Depo., pp. 40:2-16, 42:7-20).

27.     Joe Stuart never told Watson that Alley did not want him back.  (Stuart Depo., pp. 33:1-34:5).

28.     Stuart made the decision to reassign Watson, but he claims the decision had nothing to do with Watson's age or health.  (Stuart Depo., p. 40:1-8).

29.     Stuart's decision to reassign Watson was only concerned with customer complaints.  (Stuart Depo., pp. 40:1-43:10).

30.     Stuart claims he got complaints from Boswell Feed and Seed in Selmer, TN and the Farmer's Co-Op in Selmer TN.  (Stuart Depo., pp. 40:1-43:10).

31.     Bobby Winders, a Farmer Co-Op employee in Selmer, TN who has responsibility over Bonnie route salesmen, states in his declaration that he had no complaints about Watson and he knows nothing that would support Stuart's testimony.  (Pl's Ex. 13, Declaration of Winders).

32.     David Boswell, of Boswell Feed & Seed in Selmer, TN, said Watson's job performance was not better or worse than any other salesman and the only complaint they had called in was being out of plants which has happened before and after Watson worked there.  (Pl's Ex. 14, Declaration of Boswell).

33.     Watson was never made aware of any customer complaints.  (Plaintiff's Depo.,

p. 149:5-12).

34.    Stuart claims customers complained that Watson slept in his truck.  (Stuart Depo., p. 41:9-14).

35.    Watson denies ever sleeping in his truck.  (Plaintiff Depo., p. 90:1-8).

36.    In November of 2005, Watson met with Joe Stuart in Union Springs. (Plaintiff Depo., pp. 44:14-50:20).  Stuart advised Watson he was not going back to Bells, Tennessee claiming that "it just didn't work out".  (Plaintiff Depo., pp. 44:14-50:20). Watson made a complaint of age discrimination at this meeting and was told by Stuart that Stuart would help him fill out disability papers.  (Plaintiff Depo., pp. 44:14-50:20).

37.    After Watson's surgery, he attended the national sales meeting for Bonnie Plant Farms in Auburn during the fall of 2005.  (Plaintiff Depo., p. 171:1-5).

38.    At the annual sales meeting, arrangements were made for Watson to meet with a physical therapist.  (Gatlin Depo., p. 17:9-18:1).  Watson met with the therapist and a fitness for duty report was provided to Bonnie Plant of that exam.  (Gatlin Depo., p. 17:9-19:23; Pl's Ex. 15).

39.    Watson was replaced on the Bells, Tennessee route by Les Branham, a twenty-nine year old employee, who began working it in the Spring of 2006.  (Branham Depo., p. 7:3-5).

40.    After Watson's oral complaint of age discrimination to Stuart, and after Watson had delivered two letters to Tate Gatlin, Safety Director,  alleging age discrimination

on January 10, 2000 and February 2, 2006, Watson was transferred to Donaldsonville, Louisiana by Stuart. (Plaintiff Depo., p. 110:2-116:9; Stuart Depo., pp. 34:14-36:21).

41.    In Donaldsonville, Watson did not have a normal route, but was calling on customers seeking their business. (Plaintiff Depo., p. 66:2-23). Watson did not receive any commissions for 2006 but only a draw. (Plaintiff Depo., pp. 66:2-70:16). After working three weeks in Donaldsonville, Stuart transferred Watson to a sales route that had become available in Jasper, Alabama. (Trussell Depo., p. 42:22-43:15). A route salesman in Jasper had quit, and Stuart assigned the open route to Plaintiff. (Trussell Depo., p. 43:9-15; Stuart Depo., p. 45:20-46:17).

42.    No one replaced plaintiff when he left Donaldsonville, as Stuart "created" a position for him. (Trussell Depo., p. 45:2-4; Stuart Depo., p. 34:6-17).

43.    Joey Padgett was the Station Manager in Jasper in 2006. (Padgett Depo., p. 13:10-13). Padgett was forty-four (44) years old at the time. (Padgett Depo., p. 37:19-20).

44.    Padgett had previously called Bonnie's home office to report that one of his route salesmen, Thomas Heath, had quit in the middle of the season and to ask the home office if someone could come to Jasper to finish the route for the season. (Padgett Depo., pp. 21:15-17, 25:9-17, 42:20-43:2).

45.    Plaintiff arrived in Jasper toward the end of March 2006 and worked there until the season ended. (Padgett Depo., pp. 13:10-14:2, 23:9-24:12).

46.    Padgett later hired Chris Sparks, who was approximately thirty-five (35) years

old, to work the Jasper route replacing Watson. (Padgett Depo. pp. 28:16-19).

47.    Padgett never criticized Plaintiff's work performance in Jasper other than to advise him to leave more six packs with customers, which Watson did. (Plaintiff Depo., pp. 84:2-8; 195:8-23).

48.    After the 2006 season ended in Jasper, Stuart assigned Plaintiff a route in Beeville, Texas for Spring 2007. (Plaintiff Depo., p. 93:12-13).

49.    Today, plaintiff is still assigned to the route in Beeville. (Stuart Depo., p. 46:18-20).

50.    Plaintiff's supervisor in Beeville is Chris Hall. (Plaintiff's Depo., p. 188:10-18).

51.    Hall has only criticized Plaintiff's failure to get all his assigned schools and churches signed up on a Bonnie program. (Plaintiff's Depo., pp. 187:11-189:7).

## III.    ARGUMENT

### A.    Watson has Proved a Prima Facie Case of Age Discrimination

Watson has provided evidence to meet his burden of establishing a prima facie case  through one of the methodologies accepted by this Court for ADEA claims.

The Supreme Court has emphasized that a plaintiff''s burden in establishing a prima facie case "is not onerous;" it serves only to "eliminate] the most common nondiscriminatory reasons" for the challenged action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); see also *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir 1997)

("demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination"). The Eleventh Circuit has "generally eschew[ed] an overly strict formulation of the elements of a prima facie case." *Maddow v. Proctor & Gamble Co.*, 107 F.3d 846, 851 (11th Cir. 1997); see also *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996) (emphasizing that "any prima facie case test must be flexible").

The Eleventh Circuit stated:

> We have repeatedly emphasized that the requisite showings that make up a prima facie case are not meant to be rigid or inflexible. In cases where the evidence does not fit neatly into the classic prima facie case formula, for example, we have stated that "[a] prima facie case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.''"

*Schoenfield v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

In the typical discrimination case, a Plaintiff establishes a prima facie by showing that he was a member of a protected class, was qualified for the job, was transferred to another position, and was replaced by someone outside the protected group. See *Zuben v. Air Products & Chemicals, Inc*., 129 F.3d 1453, 1457 (11th Cir 1997); see also *Benson v. Tocco, Inc*., 113 F.3d 1203, 1207-08 (11th Cir. 1997).

Here Terry Watson has established his prima facie case by showing he was a member of a protected class.  In 2005, Watson was sixty (60) years old.  His protected class is

comprised of workers over age forty (40). He has met the first element under any age discrimination test.

Watson was qualified for the job. He had worked the job satisfactorily for approximately 23-24 years at the time that he was transferred. He had increased sales on his route over $50,000.00 comparing 2004 to 2005. (Pl's Ex. 18; Pl's Ex. 19). Watson had been released without restrictions by his physician, (Pl's Ex. 16), and Stuart claims that the transfer was not related to any health issues.(Stuart Depo., p. 40:1-8).

Plaintiff was transferred from the Bells, TN route to a "created" position in Donaldsonville, Louisiana. This element again is undisputed. Stuart admits that he made the decision to transfer Watson to Donaldsonville, a job that was "created" for Watson and one that did not offer him the opportunity to earn commissions. (Stuart Depo., pp. 34:6-17; 46:21-47:18). Obviously, this transfer was harmful to Watson's opportunity to earn money. One only had to compare the commissions and earnings of Les Branham, the twenty-nine (29) year old who replaced Watson in Bells, TN. (Pl's Ex. 20; Pl's Ex. 21). Furthermore, Bells is near Nashville which is one of the fastest growing areas in the country. It only makes sense that more stores, particularly chain stores are coming on line in the Bell, TN area and that sales would be growing at rapid rate.

Watson meets the fourth element by showing that he was replaced in Tennessee by twenty-nine (29) year old Les Branham. Branham was obviously outside Watson's protected class, as he is under age forty (40). Furthermore, after Watson was transferred again from

Jasper in 2006 he was replaced with a thirty-five (35) year old, Chris Sparks. Sparks also is an individual outside the protected group.

Thus, Watson has clearly established a prima facie case of age discrimination. This requires the defendant under a *McDonnell Douglas* circumstantial evidence burden shifting case to articulate a legitimate nondiscriminatory reason for his transfer. The reasons articulated by Stuart are that Watson was not performing his job and had numerous customer complaints. Watson has proven these reasons to be false, to the extent possible. (<u>Please see Watson's argument below regarding pretext</u>).

**B.    Watson Has Demonstrated Evidence of Pretext**

Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered at summary judgement is whether the plaintiff's evidence has placed material facts at issue. *Farley v. Nationwide Mutual Insurance Co.*, 197 F. 3d 1322, at 1337 (11th Cir. 1999), quoting *Hairston v. Gainesville Sun Publishing Co.*, 9 F. 3d 913, 921 (11th Cir. 1993).

The burden on Watson is only to show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's articulated legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence. *Combs v. Plantation Patterns*, 106 F. 3d 1519, 1528 (11th Cir. 1997). Watson has clearly met his burden of proving pretext.

Watson's most compelling evidence of pretext is that Bonnie's articulated reasons for

his transfers have evolved from the day Bonnie responded to his EEOC charge (Pl's Ex. 9), compared with what it now states in this litigation. The differing reasons given by Bonnie is evidence of pretext. *Payne v. Norwest Corp*. 113 F. 3d 1079 (9th Cir. 1997). *Accord; United States v. City of Phoenix*, 75 FEP 1633 (D. Arizona, 1997). Bonnie told the EEOC that the only reason for Watson's transfer was his failure to attend the annual sales meeting in the fall of 2005. (Pl's Ex. 9). This response was provided by Tate Gatlin and the H.R. Director, Tina Johnson. (Stuart Depo., pp. 55:1-56:5). Joe Stuart was also consulted about Watson's EEOC charge. (Stuart Depo., pp. 55:23-56:5).

Terry Watson was deposed and testified that he did attend the annual sales meeting in Auburn in 2005 and that the Bonnie EEOC response was a lie. (Plaintiff Depo., pp. 170:13-171:5). After Watson's deposition, Bonnie changed its articulated reason to poor job performance and customer complaints, items it failed to mention in the EEOC response.

In this lawsuit, Bonnie claims that the reason for the Watson transfers was poor job performance and customer complaints. However, Bonnie has failed to offer any document that corroborates the self serving testimony of Joe Stuart and Adam Alley regarding this alleged poor performance. (Stuart's Depo., pp. 25:22-26:8). In fact, the customer complaints that Bonnie specifically references have been shown by Watson to be false. One need only examine the declarations of David Boswell, (Pl's Ex. 14), and Bobby Winders, (Pl's Ex. 13), to see that the stated reasons given by Bonnie for Watson's transfer have been shown to be false. There are no written complaints by customers and Bonnie Plant has failed to offer any

shred of documentary evidence, any negative job evaluation, any write-up, any performance improvement plan, any photograph, or any written statement by any customer in support of its contention Watson was not performing satisfactorily.  Such a baseless contention is unworthy of credence.  Watson was never counseled regarding his job performance.  (Pl's Ex. 10).  Watson has demonstrated that the articulated reason given by Bonnie for his transfers are false.  Watson is entitled to a jury trial as he has demonstrated genuine issues of material fact surrounding Bonnie's contentions.

A reasonable jury could believe that these reasons are just made up out of thin air, having no corroboration.  They are only the naked assertions of Joe Stuart and Adam Alley. This is insufficient under *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), as they need not be believed by a reasonable jury.

Watson has denied that Alley had any criticism of his job performance.  (Plaintiff Depo., pp. 40;2-16; 42:7-20).  Watson increased sales on his Bells route by over $50,000.00 from 2004 to 2005. (Pl's Ex. 18; Pl's Ex. 19).   Watson knows of no salesman who was transferred after such a large sales increase  in his route, and Bonnie has identified no comparable transfer out of its 462 salesmen. (Plaintiff's Depo., p. 53; 4-23).   It seems odd that a twenty-five year employee would have his job performance drop so drastically so close temporally to his complaints of age discrimination, and so close in time to a $50,000.00 annual sales increase.

Because Bonnie has no documentary evidence, it tries to create some by offering sales

figures of other salesman who also worked some of the same routes as Plaintiff.  Bonnie tries to argue that these documents prove Plaintiff was underperforming. However, the documents are almost meaningless.  They try to argue that Chris Sparks, the thirty-five (35) year old who replaced Watson in Jasper sold more than Watson.  (Padgett Depo., pp. 28:23-29:9).  But Watson only worked in Jasper for a portion of the spring season, arriving well after the season started.

There are multitude of reasons why such comparisons are not apples to apples.  The routes change every year as Bonnie is constantly realigning them, adding and deleting stores. Plant prices change and increased prices mean higher sales figures for the same volume. Bonnie has also changed how it pays, going from paying for deliveries by salesmen to only paying for collections by salesmen.  All these things can influence sales. No negative inference can be drawn by a reasonable jury from these figures that Watson's performance was substandard.

## C.    Watson Has Proven a Retaliation Claim

ADEA provides protection against retaliation for those who oppose unlawful employment practices.  (See § 4(d) of the ADEA).  A plaintiff bringing a retaliation claim may establish a prima facie case by showing that:

(1).    The Plaintiff engaged in a statutorily protected activity;

(2).    The employer took an adverse employment action;

(3).    There is a causal connection between the protected activity and the adverse

action.

*Wideman v. WalMart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir. 1998).

The filing of internal complaints to supervisors alleging ageist disparate treatment in assignments is likewise a protected activity.  See *Carr v. Stillwaters Development Company, L.P.*, 83 F 2nd 1269(M. D. Ala.1999), holding that "voicing one's concerns about discrimination to one's superiors, ..., is protected activity".  See *Rollins v. Florida Department of Law Enforcement*, 868 F. 2nd 397, 400 (11th Cir. 1989). ("The protection afforded by the statute [Title VII] is not limited to individuals who have filed formal complaints, but extends as well to those...... who informally voice complaints to their superiors or use their employers' internal grievance procedures").  See also *Rose v. Port Authority of New York*, 13 F. Supp. 2d 516, 522 (S.D. NY 1998).

Watson has made four complaints of age discrimination, and three of those complaints are in writing and the oral one is acknowledged by Joe Stuart.  (Pl's Ex. 8; Pl's Ex. 11; Pl's Ex. 12; Stuart Depo., p. 57:2-7).  Watson's complaint came after he had increased sales over $50,000.00 on his route, (even though he had accounts taken away from him in 2005).  (Pl's Ex. 10, Declaration of Watson).  He was told by Stuart that he would not go back to the Bells, TN route, because it was "just not working out".  (Plaintiff's Depo., pp. 44:10-50:20).  Watson complained that he thought it was age discrimination.  (Plaintiff's Depo., pp. 44:10-50:20).  Clearly Watson has demonstrated that he engaged in protected activity before he was transferred to Donaldsonville, Louisiana.

Watson has also met the second prong of retaliation, as he has sustained an adverse action, namely his transfer and reassignment.  What constitutes an adverse employment action was clearly defined in *Bass v. Board of County Commissioners*, 265 F. 3d 1095 (11th Cir. 2001):

> "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that <u>alters the employee's compensation</u>, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or <u>adversely affects</u> his or her <u>status as an employee</u>." *Gupta v. Florida Board of Regions*, 212 F. 3d 571, 587 (11th Cir. 2000) While "not everything that makes an employee unhappy is an actionable adverse action," *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996), <u>conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute an adverse action under Title VII.</u>  See *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1283 (11th Cir. 1999); *Robinson v. City of Pittsburgh*, 120 F. 3d 1286. 1300 (3d Cir. 1997).
> *Bass*, at 1118. emphasis added.

Here Watson has had diminished duties, loss of commission and loss of income related to the transfers. Even Stuart agrees Watson's income has suffered.  (Stuart Depo., pp. 46:21-47:17).

In order to be an adverse employment action, the employment action must be materially adverse as viewed by reasonable persons in the circumstances.  *Davis v. Town of Lake Park*, 245 F. 2d 1232, 1239 (11th Cir. 2001).  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indicia that might be unique to a particular situation. *Lawrence v. Wal-Mart Stores, Inc*., 236 F. Supp. 1314, 1330 (M.D. Fla. 2002). Watson's transfer is clearly an adverse action. However, the Supreme Court has recently relaxed the plaintiff's burden in a retaliation case, holding in *Burlington Northern & Santa Fe Railway Company v. Sheila White,* 126 S. Ct. 2405, (2006), the Supreme Court specifically stated that:

> 42 U.S.C. 2000e-3a "seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms. The White court noted that the proper test was whether a retaliation plaintiff could show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination". The court refers to material adversity to separate significance from trivial harms. The Court refers to a reasonable employee's reactions because of the provision standard for judging harm must be objective and thus judicially administrable. The standard is phrased in general terms because the significance of any given act of retaliation may depend on the particular circumstances.

In order to state a retaliation claim, Watson need only show that he had a "reasonable belief" that an unlawful employment practice was occurring, and is not required to show that the employer actually engaged in an unlawful employment practice. *Berman v. Orkin Exterminating Company, Inc.*, 160 F.3d 697, (11th Cir. 1998). Watson's belief was reasonable as he had increased sales by $50,000.00 and was replaced by a twenty-nine (29) year old.

A plaintiff in a retaliation case has the burden of proving that the persons responsible for plaintiff sustaining an adverse action actually have knowledge of his complaint. Here, Stuart is a decision maker regarding all transfers. Watson complained directly to Stuart in

November before his reassignments in February. (Plaintiff Depo., pp. 44:14-50:20). Plaintiff has evidence that Stuart knew of his protected activities (both his oral complaint and EEOC charge), prior to his reassigning him. (Stuart Depo., pp. 55:1-56:10; 57:2-10; 47). Stuart denies receiving Watson's letters of January 10th and February 2nd, even though Watson asked Gatlin to give them to him. Gatlin and Stuart both work on the same property in Union Springs.

The third prong of Watson's retaliation claim is the causal relationship between the protected activity and the adverse action. In addressing evidence of a casual relationship, the Courts look to the timing of the protected activity (Watson's oral complaints) and the adverse action (transfer). Only approximately one - two months passed from the date of Watson's complaint to Stuart until Watson's transfer in February 2006 to Donaldsonville, Louisiana. Watson filed his EEOC charge on June 6, 2006. (Pl's Ex. 8). Watson was transferred from Jasper to Beeville, Texas after filing his EEOC charge. Certainly the timing alone, even though Watson has demonstrated more, makes the causal connection in this case.

## IV.   CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Watson respectfully requests that the Defendant's Motion for Summary Judgment be denied and that he receive a jury trial on all issues. There are clearly genuine issues of material facts that compel this result. Watson has proved a prima facie case of age discrimination and retaliation, and has supplied compelling evidence of pretext. Bonnie has failed to offer any corroborating documents in support of

its articulated reasons, and has changed reasons in the course of this litigation.  Bonnie has

asked this Court to weigh the evidence, and to make credibility decisions which are reserved

for the jury.  For all those reasons, its summary judgment should be denied.

   Plaintiff respectfully requests oral argument in this matter and asks this Court to set

a hearing date.


                                      Respectfully submitted,


                                      s/Jerry Roberson
                                      Jerry Roberson (ROB010)
                                      Roberson & Roberson
                                      P.O. Box 380487
                                      Birmingham, Alabama 35238
                                      Telephone:   (205) 981-3906
                                      Fax:         (205) 981-3908
                                      E-mail**: jdratty@charter.net**


**OF COUNSEL:**
Albert H. Adams, Jr.
Law Office of Albert H. Adams, Jr., P.C.
Post Office Box 670
Eufaula, AL  36072-0670
Telephone: (334) 687-1326

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the using the Electronic Filing system which will send notification of such filing to the following:

Dent M. Morton
Bryance Metheny
BURR & FORMAN LLP
420 North 20th Street
Birmingham, Alabama 35203


_____                    s/Jerry Roberson
                                                      Jerry Roberson (ROB010)