## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **ARTHUR T. WATSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | |
| **v.** | ) | **2:07-cv-520-WHA** |
| | ) | |
| **ALABAMA FARMERS** | ) | |
| **COOPERATIVE, INC. d/b/a** | ) | |
| **BONNIE PLANT FARMS,** | ) | |
| | ) | |
| **Defendant.** | | |

### PLAINTIFF'S EVIDENTIARY MATERIALS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** Plaintiff Arthur T. Watson and submits the following evidentiary materials in Opposition to the Defendant's Motion for Summary Judgment:

Exhibit 1.    Deposition transcript of Arthur T. Watson

Exhibit 2.    Deposition transcript of Charlie Trussell

Exhibit 3.    Deposition transcript of Les Branham

Exhibit 4.    Deposition transcript of Adam Alley

Exhibit 5.    Deposition transcript of Tate Gatlin

Exhibit 6.    Deposition transcript of Joseph Padgett

Exhibit 7.    Deposition transcript of Joe Stuart

Exhibit 8.    EEOC Charge of Arthur T. Watson

Exhibit 9.    Defendant's Response to Watson's EEOC charge (Response to Exhibit A).

Exhibit 10.    Declaration of Arthur T. Watson

Exhibit 11.    Letter from Watson dated January 10th

Exhibit 12.    Letter from Watson dated February 2nd

Exhibit 13.    Declaration of Bobby Winders

Exhibit 14.    Declaration of David Boswell

Exhibit 15.    Fitness For Duty Report

Exhibit 16.    Release to full duty work

Exhibit 17.    2003 Commission Report - Stuart

Exhibit 18.    2004 Commission Report - Watson

Exhibit 19.    2005 Commission Report - Watson

Exhibit 20.    2006 Commission Report - Branham

Exhibit 21.    2007 Commission Report - Branham

Respectfully submitted,

s/Jerry Roberson
Jerry Roberson (ROB010)
Roberson & Roberson
P.O. Box 380487
Birmingham, Alabama 35238
Telephone:    (205) 981-3906
Fax:          (205) 981-3908
E-mail**:** **jdratty@charter.net**
              **tlbaker@charter.net**

**OF COUNSEL:**
Albert H. Adams, Jr. (ADA-058)
Law Office of Albert H. Adams, Jr., P.C.
520 South Eufaula Avenue, Suite E
Post Office Box 670

Eufaula, AL  36072-0670
Telephone: (334) 687-1326
Facsimile: (866) 910-9989
E-mail: albertadamslaw@aol.com


**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of July, 2008, I electronically filed the foregoing with the Clerk of the Court using the using the Electronic Filing system which will send notification of such filing to the following:

Dent M. Morton
Bryance Metheny
BURR & FORMAN LLP
420 North 20th Street
Birmingham, Alabama 35203
Telephone:   205-251-3000
Fax:   205-458-5100


s/Jerry Roberson
Jerry Roberson (ROB010)

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 1

# FREEDOM COURT REPORTING

**1**

1  IN THE UNITED STATES DISTRICT COURT FOR
2  THE NORTHERN DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4
5  CASE NUMBER: CV 2:07 520-WHA
6
7  ARTHUR T. WATSON,
8      Plaintiff,
9      vs.
10  ALABAMA FARMERS COOPERATIVE,
11  INC., d/b/a BONNIE PLANT FARMS,
12      Defendant.
13
14      S T I P U L A T I O N
15      IT IS STIPULATED AND AGREED, by
16  and between the parties through their
17  respective counsel, that the deposition of
18  ARTHUR T. WATSON may be taken before Michelle
19  L. Parvin, Commissioner, at the offices of
20  Burr & Forman, 3100 Wachovia Tower, 420 20th
21  Street North, Birmingham, Alabama, 35203, on
22  the 25th day of March, 2008.
23      IT IS FURTHER STIPULATED AND

**2**

1  AGREED that the signature to and the reading
2  of the deposition by the witness is waived,
3  the deposition to have the same force and
4  effect as if full compliance had been had
5  with all laws and rules of Court relating to
6  the taking of depositions.
7      IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for any
9  objections to be made by counsel to any
10  questions, except as to form or leading
11  questions, and that counsel for the parties
12  may make objections and assign grounds at the
13  time of trial, or at the time said deposition
14  is offered in evidence, or prior thereto.
15      IT IS FURTHER STIPULATED AND
16  AGREED that notice of filing of the
17  deposition by the Commissioner is waived.
18
19
20
21
22
23

**3**

1          I N D E X
2
3  EXAMINATION BY:        PAGE NUMBER:
4  Mr. Morton        7
5  Mr. Roberson (Voir Dire)  57
6  Mr. Morton        59
7  Mr. Roberson        199
8  Mr. Morton        225
9  Mr. Roberson        233
10  Mr. Morton        236
11
12  EXHIBITS
13  Defendant's 1        72
14      Commission for spring of 2006
15  Defendant's 2        75
16      Tax record 2006
17  Defendant's 3        104
18      Commission for spring of 2007
19  Defendant's 4        109
20      Letter dated January 10, 2006
21  Defendant's 5        121
22      Letter dated February 2, 2006
23  Defendant's 6        130

**4**

1      Driver's Helper-Employment Contract
2  Defendant's 7        137
3      Job description
4  Defendant's 8        141
5      Charge of Discrimination
6  Defendant's 9        143
7      Tax records for 2003, 2004, and 2005
8  Defendant's 10        164
9      Commission for spring of 2005
10  Defendant's 11        169
11      Handwritten notes
12  Plaintiff's 1        214
13      Commission for spring of 2006
14
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

5

```
 1      IN THE UNITED STATES DISTRICT COURT FOR
 2       THE NORTHERN DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
 5   CASE NUMBER: CV 2:07 520-WHA
 6
 7   ARTHUR T. WATSON,
 8          Plaintiff,
 9       vs.
10   ALABAMA FARMERS COOPERATIVE,
11   INC., d/b/a BONNIE PLANT FARMS,
12          Defendant.
13   BEFORE:
14          Michelle L. Parvin, Certified
15   Court Reporter
16   APPEARANCES:
17          JERRY D. ROBERSON, Attorney at
18   Law, 3765 Kinross Drive, P. O. Box 380487,
19   Birmingham, Alabama, 35238-0487, appearing on
20   behalf of the Plaintiff.
21          BURR & FORMAN by Mr. Dent M.
22   Morton, 420 20th Street North, Suite 3400,
23   Birmingham, Alabama, 35203, appearing on
```

6

```
 1   behalf of the Defendant.
 2
 3   Also Present:
 4   Joe Stewart
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

7

```
 1          I, Michelle L. Parvin, a Court
 2   Reporter of Birmingham, Alabama, acting as
 3   Commissioner, certify that on this date, as
 4   provided by the Federal Rules of Civil
 5   Procedure of the United States District
 6   Court, and the foregoing stipulation of
 7   counsel, there came before me at 3100
 8   Wachovia Tower, 420 20th Street North,
 9   Birmingham, Alabama, 35203, beginning at 1:05
10   p.m., ARTHUR T. WATSON, witness in the above
11   cause, for oral examination, whereupon the
12   following proceedings were had:
13
14          ARTHUR T. WATSON,
15   being first duly sworn, was examined and
16   testified as follows:
17
18   EXAMINATION BY MR. MORTON:
19
20       Q.   Mr. Watson, would you state your
21   full name for the record, please?
22       A.   Arthur Terell Watson.
23       Q.   Mr. Watson, have you ever been
```

8

```
 1   deposed before?  Have you ever given a
 2   deposition before?
 3       A.   Yes, sir.
 4       Q.   Okay.  What kind of case did you
 5   give a deposition in?
 6       A.   Automobile -- I had a wreck on a
 7   Bonnie truck.
 8       Q.   Okay.  Well, I just want to tell
 9   you a few rules for depositions so we try to
10   stay on the same sheet of music, okay?  First
11   of all, if I ask you a question and you don't
12   understand it, please let me know.  I'll try
13   to explain it, rephrase it, or whatever so
14   we're on the same sheet of music.  If you
15   don't tell me that you don't understand my
16   question, then, I'm going to assume you
17   understand it, and I'm going to assume that
18   your answer is responsive to the question,
19   okay?
20       A.   Yes, sir.
21       Q.   Let's try not to talk on top of
22   each other during the deposition.  Try to let
23   me finish my questions before you start your
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

9

1  answers. I'll try to let you finish your
2  answers before I start with another question,
3  okay?
4      A.  Yes, sir.
5      Q.  It is difficult for her to take
6  down a head nod or an uh-huh or an huh-uh.
7  So, please give your answers out loud
8  verbally, all right?
9      A.  Yes, sir.
10     Q.  Mr. Roberson was saying a second
11 ago, you may need some breaks, that's fine.
12 We'll probably need some breaks, too.  But if
13 at any time you need a break, please let me
14 know and we'll accommodate you, all right?
15         What's your address, Mr. Watson?
16     A.  28 -- my mailing address is 2801
17 Industrial Boulevard, Beeville, Texas, 78102.
18     Q.  All right.  And is that your
19 permanent residence?
20     A.  No, sir.
21     Q.  Where's your permanent residence?
22     A.  P.O. Box 106, Glenwood, Alabama,
23 36034.

10

1      Q.  P.O. Box?
2      A.  106, Glenwood, G-l-e-n-w-o-o-d,
3  one word.
4      Q.  Glenwood, Alabama.
5      A.  36034.
6      Q.  Where is Glenwood?
7      A.  It's about halfway between
8  Luverne and Troy.  It's eighteen miles west
9  of Troy.
10     Q.  How long have you lived there?
11     A.  Off and on since probably the mid
12 '70s.
13     Q.  How long have you been there this
14 time?  How long has that been your permanent
15 address this time around?
16     A.  Well, you know, I go work and be
17 gone six months, three months, four months at
18 a time.  But that's been my permanent --
19 that's been my address for probably forty
20 years.
21     Q.  All right.  What's your
22 educational background?
23     A.  I got a B.S. Degree from Troy

11

1  State University.
2      Q.  What'd you get your degree in?
3      A.  Got a Bachelor of Science in
4  general business.
5      Q.  And when was that?
6      A.  I probably got my degree in the
7  early '70s, just guessing.
8      Q.  All right.  Do you have any
9  other -- any other education, any other
10 degrees?
11     A.  No, sir.
12     Q.  Now, when did you go to work for
13 Alabama Farmers Cooperative first?
14     A.  When they bought Joe Stewart and
15 Company out.
16     Q.  And Joe Stewart would be the
17 gentleman sitting to my left here?
18     A.  Yes, sir.
19     Q.  All right.  How long did you work
20 for Mr. Stewart before Alabama Farmers bought
21 his company?
22     A.  I would guess seven years.
23     Q.  And what type of work did you do

12

1  for them?
2      A.  Route salesman.
3      Q.  Was your work about the same kind
4  of work that you have since done for --
5      A.  Yes.
6      Q.  -- Alabama Farmers?
7         MR. ROBERSON:  Dent, I guess
8  everybody knows but me, but when was that
9  purchase; do you know?
10        MR. MORTON:  Not off the top of
11 my head.
12        MR. STEWART:  1976.  I think
13 that's right.
14        MR. ROBERSON:  I'm sorry.  I'm
15 just trying to get a point of reference here.
16     Q.  (BY MR. MORTON)  What do you have
17 in front of you there, Mr. Watson?
18     A.  I've just got a notebook on some
19 things that I did on my route.  I just wrote
20 down a few notes that I thought I might need
21 today that I discussed with Jerry.  And that
22 is an example of the payment plan that Bonnie
23 offers to settle it.

3  (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

13

1    Q.   Well, I don't mind you referring
2  to notes if you want to during your
3  deposition.
4        MR. MORTON: But if he does that,
5  I'm entitled to a copy of them.
6        MR. ROBERSON: I was going to
7  make them an exhibit. So, I mean, if you
8  want to make a copy now, that would be fine.
9        MR. MORTON: Yeah, why don't I
10  get somebody in here to be copying them, and
11  we can --
12        MR. ROBERSON: Sure.
13        MR. MORTON: -- proceed with the
14  deposition.
15
16        (Whereupon, a discussion was held
17        off the record.)
18
19    Q.   (BY MR. MORTON) Where were you
20  working for Joe Stewart and Company, Mr.
21  Watson?
22    A.   New Summerfield, Texas.
23    Q.   And where is New Summerfield,

14

1  Texas?
2    A.   It's about ninety miles south of
3  Shreveport.
4    Q.   Is it in extreme east Texas?
5    A.   Yes, sir, extreme Texas, and it's
6  probably sixty miles south of Tyler, Texas.
7        THE COURT REPORTER: Can you
8  speak up just a little bit, please?
9        THE WITNESS: Yes, ma'am.
10    Q.   When you were working there,
11  where was your physical route? Was it in
12  Texas or was it in Louisiana or did it vary
13  from time to time?
14    A.   I started in Texas and worked
15  stores in Texas and Louisiana.
16    Q.   All right. At the time that you
17  went to work for Bonnie Plant Farm, Alabama
18  Farmers Cooperative, what was your first
19  route with Bonnie?
20    A.   It was the same route I had with
21  Joe Stewart.
22    Q.   And that was in both Texas and
23  Louisiana?

15

1    A.   Yes, sir.
2    Q.   And how long did you continue on
3  that route?
4    A.   I would guess I stayed on that
5  same route probably fourteen years, something
6  in that neighborhood.
7    Q.   Did the route change materially
8  during that time?
9    A.   Yes, sir, there were great
10  changes in the route. When I started, we
11  worked mostly independent stores. We had to
12  build our own route. We had to go to the
13  store and explain our program to them,
14  deliver the plants to them. And we worked no
15  chain stores at all.
16        MR. MORTON: Let's go off the
17  record a second.
18
19        (Whereupon, a discussion was held
20        off the record.)
21
22    Q.   (BY MR. MORTON) All right. And
23  the changes in your route, then, were that

16

1  you went to being heavily dependent on large
2  stores like Home Depot and Lowe's and places
3  like that?
4    A.   Well, that was one of the big
5  changes. We still worked the independents,
6  too.
7    Q.   Okay.
8    A.   One of the big changes was they
9  add on chain stores.
10    Q.   All right. Now, after your
11  fourteen or so years on the route out of
12  Summerfield, Texas, did your route change?
13    A.   Yes, sir. It changed many times
14  during the fourteen years that I was on that
15  route.
16    Q.   Okay. And you mean the actual
17  physical location that you stopped?
18    A.   The actual physical location that
19  I stopped changed many times.
20    Q.   Then, from the route out of
21  Summerfield, Texas, where did you go? Did
22  you go to Bells, Tennessee?
23    A.   Went to Bells, Tennessee.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

17

1    Q.   And did you go to Bells,
2  Tennessee -- did you agree to swap routes
3  with somebody --
4    A.   Yes, sir.
5    Q.   -- to go to Bells?
6    A.   Yes, sir, we discussed that it'd
7  probably be a lot easier on me to run a
8  shorter route with fewer miles and fewer
9  stops on it.
10   Q.   And who did you have that
11  conversation with?
12   A.   Butch Stewart.
13   Q.   And who is Butch Stewart?
14   A.   He's the routeman that I swapped
15  routes with that's been a good plant man for
16  a long time.
17   Q.   Okay.  And was it your idea to
18  change?
19   A.   Yes, sir, it was mine and his
20  consensually.  He thought that he'd be better
21  off working more.  Out in Texas, he worked in
22  the fall and worked a big fall route.  And he
23  thought it would be good for him to be able

18

1  to work rather than be off during those
2  times.
3    Q.   All right.  And was part of the
4  idea of your going to Bells that you would
5  not run -- not have to run a fall route?
6    A.   Yes, sir, I was planning on
7  having knee surgery.  I had a knee
8  replacement.  And I had both feet operated
9  on.
10   Q.   And did you intend for the change
11  to be permanent?
12   A.   Yes, sir.
13   Q.   Now, did anybody approve y'all's
14  route change as far as you know?
15   A.   Yes, sir.
16   Q.   Who approved it?
17   A.   Had to approve it.  Joe Stewart
18  had to approve it for it to take place.
19   Q.   Did you have any discussions with
20  Mr. Stewart about it?
21   A.   Yes, sir.
22   Q.   And what discussions did you have
23  with Mr. Stewart about it?

19

1    A.   He just agreed to it.  He never
2  had a big conversation about it.
3    Q.   Do you remember anything in
4  particular that he told you in connection
5  with the change in routes?
6    A.   No, sir, I don't.
7    Q.   All right.  Now, how old were you
8  at that time, Mr. Watson?
9    A.   I must have been fifty-nine or
10  fifty-eight.
11   Q.   By the way, how old are you now?
12   A.   I'm sixty-three.  I was born
13  January the 12th, 1945.
14   Q.   Now, why did you want a shorter
15  route with fewer miles and fewer stops?
16   A.   Well, my knee had wore out, and
17  that's the reason you replace them.  I had
18  bone spurs in my feet that I had removed.
19  And the hours and time in those trucks are
20  hard on your body.
21   Q.   You say the hours and time in the
22  trucks are hard on your body?
23   A.   Yes, sir.  You hurt in places you

20

1  didn't know you had.  And that's even younger
2  people.
3    Q.   Do you remember who approached
4  whom as between you and Butch about this swap
5  originally?
6    A.   I don't even remember how the
7  conversation came up.  We talked a lot and we
8  visit a lot.  And we just started talking
9  about it one day.  And he thought it would be
10  a good thing, and I thought it would be a
11  good thing.
12   Q.   Now, you told me that you talked
13  to Joe and that Joe approved it, but you
14  don't remember anything specific about that
15  conversation?
16   A.   No, sir.
17   Q.   Did you have any conversations
18  with anybody else at the management level
19  about that swap?
20   A.   Adam Alley and Bill Rainer.
21   Q.   All right.  Now, for the record,
22  who is Adam Alley?
23   A.   Adam Alley is the station manager

5  (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

21

1  in Bells, Tennessee.
2      Q.   And what conversations did you
3  have with Mr. Alley about your swapping
4  routes with Mr. Stewart?
5      A.   I told him that I'd like to come
6  up there and work with him and that I would
7  need a truck with an air ride seat to help
8  take some of the road bumps off of it.
9      Q.   Did you say an air ride seat?
10     A.   Yes, sir.
11
12         (Whereupon, a discussion was held
13         off the record.)
14
15     Q.   (BY MR. MORTON) All right.  Now,
16  had you had an air ride seat in --
17     A.   Yes, sir.
18     Q.   -- Texas?
19     A.   Yes, it's a common seat in a
20  truck.  Just some trucks didn't have them in
21  all models.  Some trucks have air ride
22  suspensions and some trucks have other type
23  of suspension.  And now, it's just a common

22

1  suspension to have air ride suspension.  But
2  you could have air ride suspension on your
3  truck and not have an air ride seat for some
4  reason.
5      Q.   All right.
6      A.   It was just the seat that they
7  happened to put in the truck when they
8  manufactured it.
9      Q.   All right.  And what did Mr.
10  Alley say when you told him you wanted to
11  come work there?
12     A.   He agreed.  He thought it might
13  be a good swap.
14     Q.   And did he give you a truck with
15  an air ride seat?
16     A.   Yes, sir.  But, then, he was --
17  the next year, I went up there, he decided he
18  wanted somebody else to have that truck with
19  the air ride seat and that he'd like for me
20  to have one of the older trucks that didn't
21  have an air ride seat in it.  So, a younger
22  person could have a nice truck with an air
23  ride seat.  They probably --

23

1      Q.   All right.  Well, the truck he
2  gave you the first year, you said it had an
3  air ride seat.  Did it have an air ride
4  suspension, too?
5      A.   Yes, sir.
6      Q.   All right.  You told me a minute
7  ago that you had a knee replaced, that you
8  had both your feet operated on; is that
9  correct?
10     A.   Yes, sir.
11     Q.   When did you have the knee
12  replaced?
13     A.   I think it was in the off season
14  of the '96 season, but that would be a guess.
15     Q.   All right.  So, that was long
16  before you negotiated to switch to Bells,
17  right?
18     A.   Oh, no, sir.  That was after I
19  was at -- that must have been 2006.
20         MR. ROBERSON:  2005, wasn't it?
21         THE WITNESS:  2005?
22         MR. ROBERSON:  The fall of 2005?
23     A.   But I'm sure that's in, you know,

24

1  the medical records everywhere.  And I'm sure
2  you probably have that.
3      Q.   (BY MR. MORTON) All right.  So,
4  you had the knee replaced in the off season.
5  Would that be after your first year at Bells
6  or before?
7      A.   After.
8      Q.   All right.  And did you also have
9  your feet operated on during that same off
10  season?
11     A.   That same off season.
12     Q.   Again, it'd be easier on her if
13  you'll let me finish before you start your
14  answer, okay?
15     A.   (Witness nods head.)
16     Q.   So, that was surgery on both feet
17  to remove bone spurs?
18     A.   Yes, sir.
19     Q.   And was your knee replacement and
20  your surgery on your feet covered by the
21  insurance that you have through Alabama
22  Farmers?
23     A.   Yes, sir.

6  (Pages 21 to 24)

## FREEDOM COURT REPORTING

25

1    Q.   Now, the season -- the spring
2  season for Alabama Farmers in this part of
3  the country, the south part of the country,
4  starts what, the week after New Year's?  Is
5  that typically when it starts?
6    A.   It depends on what part of the
7  United States you're working.  If you're
8  working out west, it starts in early January.
9  But the more east you come, the later it
10  starts.  And the more north you go, the later
11  it starts.
12    Q.   When did it start in Bells,
13  Tennessee, in 2006?
14    A.   I usually went up in February.
15    Q.   Did you report to work?  Were you
16  supposed to report to work prior to that?
17    A.   As a general rule, no.  Whenever
18  they said come, I always went.  When it
19  started getting time to go to work, I
20  prepared to go.  And I never said, well, I'll
21  wait and come next week or the week after
22  that.  I always tried to be there when they
23  said to be there.

26

1    Q.   Okay.  So, you worked in Bells,
2  Tennessee, starting the year after you had
3  your knee replacement and foot surgery; is
4  that right?
5    A.   No, sir.
6    Q.   Okay.
7    A.   I worked the first year before I
8  had it.
9    Q.   All right.
10    A.   And the next year, I had it.
11    Q.   You had it in the off season?
12    A.   Yes, sir.
13    Q.   All right.  By the time you were
14  supposed to report to work in 2006, had your
15  doctor released you for full duty without
16  restriction?
17    A.   Yes, sir.
18    Q.   And when had he released you?
19    A.   In January of that year.
20    Q.   Okay.  And did you go back to
21  work in Bells that year?
22    A.   No, sir.
23    Q.   So, you worked only one year in

27

1  Bells, Tennessee?
2    A.   I worked two years in Bells,
3  Tennessee.
4    Q.   You worked two years in Bells,
5  Tennessee.  Well, did you work one before and
6  one after --
7    A.   No, sir.
8    Q.   -- your surgery?
9    A.   After my surgery, I never went
10  back to Bells.
11    Q.   Okay.  So, you worked two years
12  in Bells before your surgery?
13    A.   Yes, sir.
14    Q.   All right.  Now, you started to
15  tell me about the truck that you got the
16  second year in Bells.  What truck did you get
17  the second year in Bells?
18    A.   I got the truck with that -- with
19  the -- that didn't have the air ride seat in
20  it where all the shock was taken in the seat.
21    Q.   Did that truck have an air ride
22  suspension?
23    A.   Yes, sir.

28

1    Q.   Your second year in Bells, were
2  you on a shorter route than you had been on
3  the previous year?
4    A.   No, sir.
5    Q.   Were you on a different route
6  than you had been on the previous year?
7    A.   Yes, sir.  I was on the same
8  route number, but some stores had been taken
9  off of it.  It had fewer stores.
10    Q.   All right.  Did you talk to Mr.
11  Alley about the fact that your truck didn't
12  have an air ride seat?
13    A.   Yes, sir.
14    Q.   Tell me about that conversation.
15  Tell me what you said, tell me what he said.
16    A.   He said, if you're going to work,
17  drive that truck.
18    Q.   Did he give you any explanation
19  for why he had --
20    A.   No explanation whatsoever --
21    Q.   -- swapped -- switched the
22  trucks?
23    A.   -- why he switched.

7  (Pages 25 to 28)

## FREEDOM COURT REPORTING

29

1    (Whereupon, a discussion was held
2    off the record.)
3
4    Q.   (BY MR. MORTON)  Now, some of the
5    stores were taken off your route that second
6    year, weren't they --
7    A.   Yes.
8    Q.   -- because you had not been able
9    to get around to them --
10    A.   No, sir.
11    Q.   -- the first year?
12    A.   No, sir.  I had never been
13    told -- I had never been told that.
14    Q.   Have you ever been told why
15    trucks were taken off your route --
16    A.   No, sir.
17    Q.   -- I mean, stops were taken off
18    your route?
19    A.   No, I had never been told that.
20    Q.   Did you ask?
21    A.   I'm sure that I mentioned it on
22    occasion, but it -- they always changed
23    routes.  And they said that they had changed

30

1    those routes, and they gave somebody thirteen
2    stores to work in that area that year and
3    that they needed those to make out his
4    thirteen stores or twelve stores or whatever
5    it was.
6    Q.   Okay.  So, it's not uncommon for
7    routes to be changed --
8    A.   No --
9    Q.   -- is that right?
10    A.   -- it's not uncommon for a route
11    to be changed.
12    Q.   And did you have thirteen stores
13    on your route?
14    A.   I had more than thirteen.
15    Q.   You had more than thirteen?
16    A.   (Witness nods head.)
17    Q.   So, you had more than the person
18    who got the stores that were taken off your
19    route?
20    A.   Yes, sir.
21    Q.   Had you previously, prior to your
22    second year at Bells, driven a truck without
23    an air ride seat?

31

1    A.   No, sir.
2    Q.   Never?
3    A.   Not that I remember for a season.
4    Q.   Was the same truck that you had
5    been driving at that station that second
6    year?
7    A.   The first year, I drove a truck
8    with an air ride seat, then, the second year,
9    I didn't.
10    Q.   I understand that.  What I'm
11    asking you is, the truck you drove the first
12    year, was somebody else at this particular
13    station, the Bells, Tennessee, station,
14    driving that truck?
15    A.   Yes, sir.
16    Q.   Who was that?
17    A.   I don't know who was driving the
18    truck.  It wasn't really -- I just needed one
19    with an air ride seat and had requested one
20    and didn't get one.
21    Q.   Were there other people at that
22    station who didn't have a truck with an air
23    ride seat, or do you know?

32

1    A.   I wouldn't think.  I think I was
2    the only one that didn't have an air ride
3    seat, because I was probably the oldest
4    person working at that station.  And that was
5    kind of the way to let them know.
6    Q.   Well, can you testify under oath
7    that nobody else at that station had an air
8    ride seat?
9    A.   No, sir, I couldn't.
10    Q.   Can you testify under oath that
11    everybody else at that station did have an
12    air ride seat, other than you?
13    A.   I couldn't testify to that, but
14    I --
15    Q.   Now, when you worked with Mr.
16    Stewart before you went to work for Bonnie,
17    you never had an air ride seat back then, did
18    you?
19    A.   I drove a Mack truck with Joe
20    Stewart about the whole time I worked with
21    him.  And that truck had good suspension on
22    it.  It wasn't as -- I wasn't really thinking
23    about it as much at that time until I was

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

33

1  younger and I was more able to work. And --
2  but I didn't have any problems at that time.
3      Q.   Okay. But the answer to the
4  question is, you didn't have an air ride seat
5  when you worked with Mr. Stewart at his
6  company; is that right?
7      A.   I don't know whether the seat was
8  air ride or not. I know I had a nice truck.
9      Q.   Now, you said that that was --
10     A.   And that --
11     Q.   I'm sorry.
12     A.   Go ahead. I --
13     Q.   You said that that was when you
14  were younger and more able to work. Are you
15  not as able to work as you were then?
16     A.   Oh, no, sir, I have aged. And
17  with age, you change and your abilities
18  change, your thoughts change.
19     Q.   And the answer is, you're not as
20  able to work anymore as you were then?
21     A.   No, sir.
22     Q.   So, you're saying you can work
23  just as well now as you could then?

34

1      A.   No, sir. My answer is, no, I'm
2  not as able to work as I was then.
3      Q.   Now, you said a few minutes ago
4  that you thought that maybe you had a truck
5  without an air ride seat your second year at
6  Bells because you were the oldest person
7  there?
8      A.   Yes, sir.
9      Q.   What makes you believe that?
10     A.   I don't remember anybody else
11  even looking to see if they had an air ride
12  or not.
13     Q.   Okay. You don't remember --
14     A.   I was the only person that worked
15  there that it was important to to have an air
16  ride seat.
17     Q.   When you say you don't remember
18  anybody else looking, you mean you don't
19  remember looking to see if anybody else had
20  an air ride seat?
21     A.   That's right. I didn't look to
22  see what anybody else had. I knew what I
23  needed, and I asked for what I needed. And

35

1  he didn't give it to me because of my age.
2      Q.   Okay. What I'm trying to get at
3  is, why do you believe it was because of your
4  age?
5      A.   Well, everybody else had what
6  they wanted.
7      Q.   Well, tell me who else you know
8  of had an air ride seat.
9      A.   Tony Brown, Johnny Roy Fendelson,
10  Les Branum, Brent Raider. I don't know
11  who -- Eric Rank.
12     Q.   You're certain under oath that
13  all these people had air ride seats?
14     A.   No, sir, you asked me a general
15  question, and that's just, in general, who
16  was there driving trucks.
17     Q.   Okay. But you can't say
18  specifically that any one of those people had
19  an air ride seat, correct?
20     A.   Oh, no, sir.
21     Q.   All right. Any other reason that
22  you believe, Mr. Watson, that the fact that
23  you didn't have an air ride seat was due to

36

1  your age?
2      A.   I'll just say that they had to
3  have picked me out because of my age to be
4  sure that I didn't get a truck with an air
5  ride seat for me not to have one.
6      Q.   All right. Well, you had had an
7  air ride seat the year before, correct?
8      A.   Yes, sir.
9      Q.   Why did you think one year made
10  that much difference, Mr. Watson?
11     A.   I don't know. I don't know how
12  people think. I can't think for somebody
13  else.
14     Q.   Okay. Have you told me all the
15  reasons you believe that the fact that you
16  didn't have an air ride seat your second year
17  at Bells was based on your age?
18     A.   Yes, sir.
19     Q.   And that would be that you
20  believe everybody else had what they wanted,
21  and you didn't get the air ride seat, and,
22  therefore, you think it must have been your
23  age because you were the oldest?

9  (Pages 33 to 36)

## FREEDOM COURT REPORTING

37

1    A.   Yes, sir, and I was the only one
2   that it was important to have one.
3    Q.   Do you know whether any of the
4   other folks requested an air ride seat?
5    A.   I have no idea.
6
7       (Whereupon, a discussion was held
8         off the record.)
9
10   Q.   (BY MR. MORTON)  Did you have any
11   discussions with anybody, other -- anybody in
12   a management position, other than Mr. Alley,
13   about the fact that you wanted, but did not
14   have, an air ride seat?
15   A.   Yes, sir.
16   Q.   Who did you talk to?
17   A.   I called Joe, and I couldn't get
18   him on the phone.  So, I discussed it with
19   Kyle.  And they didn't appear to be
20   interested in it.  So, I went to work just
21   like they said do.
22   Q.   All right.  What conversation did
23   you have with Kyle?

38

1    A.   I just told him that I had asked
2   Adam for an air ride seat when I went up
3   there.  And he said he'd let me have a truck
4   with an air ride seat, and he didn't.  And
5   I'd like to know if he could help me get one.
6   And he said he couldn't.
7    Q.   Did you tell Kyle anything else?
8    A.   That was all.
9    Q.   Okay.  Did you tell him
10   anything -- did you tell him that you thought
11   it was because of your age?
12   A.   No, sir.
13   Q.   Did you have any disputes with
14   Mr. Alley during your first year at Bells?
15   A.   Not that I know of.
16   Q.   During your second year at
17   Bells -- well, one of the reasons you had
18   gone up to Bells, as I understand it, is you
19   wanted to get a shorter route than what you
20   had in Texas, correct?
21   A.   Correct.
22   Q.   During your second year at Bells,
23   did you have the shortest route out of that

39

1   station?
2    A.   I don't know.  I had one of the
3   shorter ones.  I wouldn't -- I mean, compared
4   to what I was used to driving, it was --
5    Q.   It was what?
6    A.   Shorter.
7    Q.   Other than talking to Mr. Alley
8   on one occasion that you described to me
9   about not having an air ride seat the second
10   year, did you have any discussions with him
11   on that subject?
12   A.   Not that I remember.
13   Q.   Okay.  Other than talking to Kyle
14   when you tried to get in touch with Joe here
15   about the issue, did you talk to anybody else
16   in a management position about that issue,
17   the fact that you didn't have an air ride
18   seat --
19   A.   No, sir.
20   Q.   -- the second year at Bells?
21   A.   No, sir.
22   Q.   Did you have any disputes with
23   Mr. Alley during your second year at Bells?

40

1    A.   No, sir.
2    Q.   During your first year at Bells,
3   did Mr. Alley in any way criticize your
4   performance?
5    A.   No, sir.
6    Q.   At the end of your first year at
7   Bells, or during the off season between your
8   first and second years, did he in any way
9   criticize your performance?
10   A.   No, sir, he never said anything
11   to me.  If he did, he said it to somebody
12   else.
13   Q.   Did anybody else criticize your
14   performance during your first year at Bells
15   or during the off season afterwards?
16   A.   No, sir.
17   Q.   Did you talk with any of your co-
18   employees about the fact that you didn't have
19   an air ride seat your second year at Bells?
20   A.   I imagine I said something around
21   somebody about it.  But when you're in the
22   plant business, you don't have time to cry
23   long about anything.  You have to go on and

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

41

1  attend to the business. And I went on, and I
2  attended to the business.
3      Q.   Do you remember anybody or any of
4  your co-workers saying anything to you about
5  that fact, that you didn't have an air ride
6  seat?
7      A.   I don't recall anything today.
8      Q.   Now, did you have helpers your
9  first year at Bells?
10      A.   Sir?
11      Q.   Did you have helpers your first
12  year at Bells?
13      A.   Yes, I've had helpers everywhere
14  I've worked.
15      Q.   How many did you have?
16      A.   One to two.
17      Q.   At Bells, you had one to two?
18      A.   Yes, sir.
19      Q.   All right. When did you have
20  one?
21      A.   In the early part of the season
22  when things were slower and you had time to
23  get around and do. When I was putting up

42

1  racks or something, I would take two. When
2  it got in the heat of the season, we were
3  hauling the plants real fast, I'd try to take
4  two. And in the end of the season, I'd run
5  one. And in the end of the season when we
6  had to get up racks, I'd run with two.
7      Q.   All right. After your second
8  year at Bells, where -- okay. During your
9  second year at Bells, did Mr. Alley in any
10  way criticize your performance?
11      A.   No, sir. He saw increases, big.
12      Q.   And --
13      A.   He saw good sales.
14      Q.   And after the season, did he in
15  any way criticize your performance?
16      A.   Not to me.
17      Q.   Do you know if he criticized it
18  to anybody else?
19      A.   Hearsay, I've heard people say
20  things, but he didn't say anything to me.
21      Q.   What did you hear?
22      A.   I was -- I live with a guy that's
23  got two stiff knees. Went to get knee

43

1  replacement surgery and had an infection got
2  in there. And they put pins in his legs.
3  And he's in his seventies. And he asked me
4  to take him to visit his brothers in Mobile.
5  And Joe called me and told me that he wanted
6  a meeting with him on a Tuesday. I remember
7  it was in November, because it was election
8  time. I told him I'd be back and come over
9  there.
10      Well, that Tuesday morning,
11  voting, Sam asked me if I'd take him to vote
12  before I left. So, we got down there when
13  the polls opened to take him to vote. And
14  Joe called me and wanted to know why I wasn't
15  over there, and I told him. And then, I came
16  on to Union Springs. And that was when he
17  told me that I wouldn't be going back to
18  Bells.
19      Q.   All right. Let's back up just a
20  second. The guy with the two stiff knees,
21  did he work for Bonnie?
22      A.   No, sir, he worked for the bank.
23      I was coming home and -- but

44

1  lived in a trailer out in the woods, an old
2  trailer had burned up. I mean, a tree had
3  fell down on it. It hadn't burned up. And
4  he said, why don't you move in with me and
5  help me get started. And I just moved in
6  with him. His wife had died when his
7  children was young. And my children were
8  raised up there with them. So, I moved in
9  with him. Been living with him ever since.
10      Q.   What's his name?
11      A.   Sam Goodwin.
12      Q.   Goodwin?
13      A.   G double O d-w-i-n.
14      Q.   All right. So, you went to Union
15  Springs, and you met with Joe. And Joe told
16  you you weren't going back to Bells, or
17  wouldn't be going back to Bells?
18      A.   Yes, sir.
19      Q.   Did he tell you why?
20      A.   No, sir. He said it just didn't
21  work out.
22      Q.   Did you ask for any other
23  explanation?

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

<br/>

45

1    A.    No, sir.
2    Q.    What did you say to Joe?
3    A.    I told Joe that I needed to work.
4  That if I sat down, I wouldn't never get up.
5  And he said that he'd help me fill out my
6  disability papers.  And then, he said, no,
7  he'd get his secretary to do it.
8    Q.    And what did you say to that?
9    A.    I said, well, probably age is --
10  has a factor in this decision.  My age
11  probably has a factor in this decision.
12    Q.    You said that to Joe?
13    A.    Yes, sir.
14    Q.    What did Joe say?
15    A.    At the time, I don't remember the
16  response, but he called me back in later and
17  told me that he didn't want to hear anymore
18  about this age thing.  That they had people
19  working there that was older than me and that
20  they were hiring people that was older than
21  me.
22    Q.    Were those statements true?
23    A.    I don't know.  I hadn't seen

46

1  anybody older than me that they hired.
2    Q.    When he called you back in, when
3  was that?
4    A.    I don't know.  About a week or
5  two after he told me that I wasn't going back
6  to Bells.
7    Q.    When he called you back in, did
8  he tell you to find you someplace to work?
9    A.    He told me that he'd help me get
10  my disability.
11    Q.    Right.  Did you agree to that?
12    A.    No, sir.
13    Q.    What'd you tell him?
14    A.    I told him I didn't think I could
15  qualify.
16    Q.    What did he say?
17    A.    He said, well, he'd see what he
18  could do.  Something to that order.
19    Q.    And did he ultimately find you
20  someplace to go work?
21    A.    Yes, sir.  He sent me to
22  Donaldsonville, Louisiana.
23    Q.    And who was your station manager

47

1  at Donaldsonville?
2    A.    Charlie Trussell.
3    Q.    Is Charlie any kin to Tim
4  Trussell?
5    A.    I think they're brothers.
6    Q.    In fact, Charlie Trussell's
7  sixty-six years old, isn't he?
8    A.    I know he's a few years older
9  than I am.  I wouldn't know exactly how old
10  he is.
11    Q.    And, in fact, Joe is older than
12  you, is he not?
13    A.    Yes.
14    Q.    Now, when did you find out you
15  were going to Donaldsonville, Louisiana?
16    A.    I would guess it was out in
17  February.  I wouldn't -- I mean, I don't
18  remember.
19      MR. ROBERSON:  February of '06?
20    Q.    (BY MR. MORTON)  Is that right?
21    A.    February of '06.
22    Q.    Now, did you tell me everything
23  you can remember about the conversations that

48

1  you had with Joe here in which he calls you
2  to Union Springs and told you you wouldn't be
3  going back to Bells, and you said you thought
4  age had something to do with it, and he told
5  you he'd fill out your disability papers,
6  then, you told me he called you back and told
7  you he didn't want to hear anything else
8  about age?  Have you told me everything you
9  can remember about those two conversations?
10    A.    Yes, sir.  And Mr. Pete Trussell
11  was in there.  If you wanted to talk to him,
12  he may remember some things I don't remember.
13    Q.    Pete Trussell?
14    A.    (Witness nods head.)
15    Q.    Who is that?
16    A.    He's Tim's brother that Tim is
17  working where he was working with Bonnie.
18    Q.    And how old is Pete?
19    A.    I don't know.  I'd say he was a
20  good many years probably older than me.  I'd
21  say he was --
22    Q.    Older than you?
23    A.    -- in his seventies.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

49

1      Yes, sir.
2      Q.   And what was he doing so far as
3  work was concerned?  What position did he
4  have?
5      A.   He had the position that Tim
6  Trussell has now.
7      Q.   Do you know what he's doing
8  currently?
9      A.   No, sir.
10      Q.   Now, other than the one comment
11  that you made about thinking that age had
12  something to do with the decision, did you
13  tell -- did you say anything else to Mr.
14  Stewart about your age in either of those
15  conversations?
16      A.   No, sir.
17      Q.   And did you tell him why you
18  thought age had something to do with it?
19      A.   I insinuated -- I guess, more
20  than what I said, I insinuated that age was
21  the reason that he didn't send me back up
22  there on that route.
23      Q.   Now, when you say you insinuated

50

1  rather than actually said, how did you do
2  that?
3      A.   I told him that I felt like that
4  it was age discrimination, the reason he
5  didn't send me back up there.
6      Q.   All right.  And what did he say
7  to you?  Did he tell you that wasn't the
8  reason?
9      A.   He said that they had people
10  working there that was older than me.
11      Q.   Did he tell you age wasn't the
12  reason?
13      A.   No, sir.
14      Q.   Did you understand from what he
15  did tell you that that was his position, that
16  age wasn't the reason?
17      A.   No, sir.
18      Q.   What did you understand him to be
19  saying, then, when he told you that there
20  were --
21      A.   That age was the reason that he
22  didn't send me back up there.
23      Q.   I'm sorry.  That what?

51

1      A.   That age is the reason that he
2  didn't send me back to Bells.
3      Q.   You understood him to be telling
4  you that?
5      A.   Yes, sir.
6      Q.   When he told you that there were
7  older people than you working for the
8  company?
9      A.   Working for the company, yes,
10  sir.
11      Q.   Why did you understand that to
12  mean that age was the reason he wasn't
13  sending you back?
14      A.   Well, most of the older people
15  that I knew working for the company was in
16  different type jobs.  I don't know of anybody
17  my age that was in the same type job.
18      Q.   Well, Mr. Stewart didn't tell you
19  that age had anything to do with not sending
20  you back to Bells, did he?
21      A.   No, sir, he didn't.  He didn't
22  tell me that.
23      Q.   Did anybody else tell you that?

52

1      A.   No, sir, nobody -- I mean, nobody
2  ever -- they just told me that it didn't work
3  out up there.
4      Q.   And I believe you told me
5  earlier, he didn't give you an explanation of
6  what he -- of what he meant by it didn't work
7  out?
8      A.   No, sir.
9      Q.   Did you have an understanding of
10  what he meant?
11      A.   I understood that it was because
12  of my age.
13      Q.   Okay.  Well, why did you think
14  that the decision not to send you back to
15  Bells had something to do with your age?
16      A.   Well, as a general rule, when
17  somebody increased a route, had a good
18  increase in sales, and had a few problems on
19  their route, they just left them on the
20  route.  They left me on the one route for, I
21  don't know, fourteen, fifteen years.
22      Q.   Well, that wasn't an ironclad
23  rule of the company, though, was it?

13  (Pages 49 to 52)

## FREEDOM COURT REPORTING

53

1    A.   I don't know of any ironclad
2  rules that the company had.
3    Q.   Well, you also would agree with
4  me, would you not, that it was pretty common
5  for station managers to say that they didn't
6  want somebody back and the company not send
7  that person back, correct?
8    A.   I don't know.  I hadn't been
9  around enough to know how they operate on
10 that.
11   Q.   So, you don't know how the --
12   A.   I don't know --
13   Q.   -- decision making process works?
14   A.   Not -- no, sir.
15   Q.   You have known of people, though,
16 that have been --
17   A.   I don't know of anybody --
18   Q.   -- on a route one year and
19 somewhere else the next?
20   A.   I don't know of anybody that had
21 increased their route, and then, went on a
22 route that didn't have the opportunity to go
23 back on that route.

54

1    Q.   Now, at the time that you were
2  told that you were not going back to Bells,
3  weren't Earl Ledbetter and Donald McGrady
4  running routes with the company?
5    A.   I don't really know what Earl and
6  Donald were doing.  I thought Earl was going
7  around checking stations out.  Donald McGrady
8  probably was running a route in Atlanta, I
9  think.
10   Q.   And both -- and both --
11   A.   I'm not real sure.
12   Q.   Okay.  And both of those
13 gentlemen are older than you, are they not?
14   A.   Yes, sir.  And they left both of
15 them on the routes that they were on, as far
16 as I know.
17   Q.   Did Joe Stewart tell you when he
18 told you you weren't going back to Bells that
19 Adam Alley did not want you back?
20   A.   No, sir.
21   Q.   All right.  Other than what
22 you've told me so far, are there any other
23 reasons that you believe that the decision

55

1  not to send you back to Bells had anything to
2  do with your age?
3    A.   The only -- the only reason that
4  I know they didn't send me back is because of
5  my age.
6    Q.   All right.  Well, what I'm asking
7  you is, are there any other facts that you
8  think support the proposition that you
9  weren't sent back because of your age, other
10 than what you've told me so far?
11   A.   There are no facts to support a
12 reason they didn't send me back.
13   Q.   Okay.  I want to make sure we're
14 on the same sheet of music.  What I'm asking
15 you, have you told me all the facts that you
16 believe support the idea that they didn't
17 send you back because of your age?
18   A.   The only reason that they didn't
19 send me back is because of my age.
20   Q.   Okay.  But I'm asking you why you
21 believe that.  Is there any reason that you
22 believe that, other than what you've already
23 told me?

56

1        MR. MORTON:  Let's let him answer
2  the question.
3        MR. ROBERSON:  Sure.
4    A.   I could probably make a general
5  statement about that question, the direct
6  cause was, but I didn't have any problems
7  there on that route.
8    Q.   (BY MR. MORTON)  So, the only --
9  okay.  So, to clarify, you believe it was
10 your age, because you didn't have any
11 problems up there?
12   A.   Yes, sir.
13   Q.   And they're not -- you don't have
14 any other facts that support the proposition
15 that your age had anything to do with that
16 decision; is that right?
17   A.   The -- that's right, the only
18 reason --
19       MR. MORTON:  Okay.  Do you need
20 to talk to him?
21       MR. ROBERSON:  No, I don't need
22 to talk.  I was just going to -- Terry is a
23 plant salesman.  He's not a discrimination

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

57

1 lawyer. But if you want me to wait until you
2 complete your examination, I will. I was
3 just going to ask him a question. He may not
4 know that that suggests age discrimination.
5 I do know that it does. But if you want me
6 to wait --
7        MR. MORTON: Well, if you want
8 to -- if you want to -- if you want to go
9 ahead and ask him that question, go ahead,
10 because you're entitled to question him at
11 the end of the deposition anyway.
12        MR. ROBERSON: And I think we're
13 all trying to get --
14        MR. MORTON: I think I know
15 what -- go ahead.
16
17 VOIR DIRE EXAMINATION BY MR. ROBERSON:
18
19    Q.   Terry, do you know who replaced
20 you and took your route up in Bells,
21 Tennessee?
22    A.   Yes, sir.
23    Q.   Who was that?

58

1    A.   Les Branum.
2    Q.   All right. Do you know how old
3 he is, approximately? I know you don't
4 know --
5    A.   I would say approximately in his
6 thirties.
7    Q.   And he's substantially younger
8 than you --
9    A.   Yes, sir.
10    Q.   -- is that correct?
11    A.   Yes, sir.
12    Q.   I know you're not a
13 discrimination lawyer, but it is evidence
14 that can suggest discrimination if a person
15 who replaced you is substantially younger
16 than you. So, you do know that, correct?
17    A.   Yes, sir.
18    Q.   You know he -- the person that
19 replaced you was substantially younger than
20 you?
21    A.   Yes, sir.
22    Q.   He's asking you for facts. You
23 were trying to tell him. He didn't ask you

59

1 that question. I'm not suggesting he's a bad
2 lawyer. I'm just trying to help you give him
3 the information he's asking for, okay?
4    A.   Yes, sir.
5    Q.   So, that is one fact that does
6 suggest discrimination, right?
7    A.   Right.
8        MR. ROBERSON: Okay. I'm sorry.
9 I didn't mean to steal your thunder.
10        MR. MORTON: No, I understand
11 where you're coming from.
12
13 EXAMINATION BY MR. MORTON:
14
15    Q.   Do you know who made the decision
16 for -- what did you say the man's name was
17 that replaced you?
18    A.   Les Branum.
19    Q.   Les Branum?
20    A.   (Witness nods head.)
21    Q.   Do you know who made the decision
22 for him to replace you?
23    A.   I don't really know who makes

60

1 those decisions. You know, you just get up
2 one day, and that's what they've decided to
3 do.
4    Q.   Okay. And do you have any idea
5 of when that decision was made for him to
6 replace you?
7    A.   No, sir.
8    Q.   Did he go on the same route that
9 you went, or do you know?
10    A.   I heard that they changed those
11 routes up. I hadn't been up there to see.
12 But I heard that they made a lot of changes
13 in that route the next year.
14    Q.   What kind of changes?
15    A.   They made it shorter and put
16 bigger stores on them, bigger sale stores on
17 them.
18    Q.   Who told you that?
19    A.   Just looking. I mean, I don't
20 really know that. I just -- that's just
21 hearsay. They had closed a station down.
22 And they changed a lot of routes up there
23 around a lot.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

61

1    Q.    At that particular time?
2    A.    Yes, sir.
3    Q.    And when you say they closed a
4    station down, what do you mean?
5    A.    They had a station up there close
6    to that one, and the stations were close to
7    each other. And they just decided that they
8    would close one down and put them into two
9    other stations. I don't understand exactly
10   what I'm talking about. Joe does that and --
11   Q.    Did they close the -- did they
12   close the station that you worked out of?
13   A.    No, sir, they kept that one.
14   Q.    Closed the other one?
15       MR. ROBERSON:  Restructured it,
16   basically?
17       THE WITNESS:  Restructured it.
18       MR. MORTON:  Okay.
19   Q.    Do you know who made that
20   decision?
21   A.    I'm sure it was management of
22   Bonnie Plant Farm.
23   Q.    And do you know how many total

62

1    route salesmen there were out of the combined
2    stations?
3    A.    No, sir.
4    Q.    Do you know whether there were
5    more or less or the same number --
6    A.    I don't have --
7    Q.    -- as there had been?
8    A.    -- any idea.
9         They figured out how the company
10   simply can get a truck to all the stores and
11   try to get them there in time to sell the
12   plants.
13       THE WITNESS:  If it's okay, I'd
14   like to take a restroom break.
15       MR. MORTON:  Okay. Let's go off
16   the record.
17
18       (Whereupon, a brief recess was
19       taken.)
20
21       MR. MORTON:  All right. Back on
22   the record.
23   Q.    Now, when you were working at

63

1    Bells, did you work with a fellow named
2    Willie Hughes?
3    A.    Yes, sir.
4    Q.    Do you know him?
5         And he was a driver, was he not?
6    A.    Yes, sir.
7    Q.    He's about your age, isn't he?
8    A.    I think he's younger than I am.
9    Q.    Pardon?
10   A.    I think he's younger than I am.
11   Q.    By what, a couple of years?
12   A.    I wouldn't know what. I don't
13   know what it would be, his birthday is.
14   Q.    Do you know a fellow named James
15   A. Brown --
16   A.    Yes, sir.
17   Q.    -- up in Bells?
18        Is he close to your age?
19   A.    Well, he's what -- he's a few
20   years younger than I am.
21   Q.    You knew Johnny Fendelson, right?
22   A.    Yes, sir.
23   Q.    Are all three of those guys still

64

1    with the company as far as you know?
2    A.    As far as I know, they are, yes,
3    sir.
4    Q.    Johnny Fendelson is about your
5    age, isn't he?
6    A.    He's a few years younger than I
7    am.
8    Q.    Isn't he in his early sixties, or
9    do you know?
10   A.    He's probably -- he might be
11   sixty. I don't know. He might not be sixty.
12   Q.    Are you kin to him?
13   A.    Yes.
14   Q.    How?
15   A.    My daddy's his grandmother's
16   brother.
17   Q.    Do you know whether he's still
18   with Bonnie?
19   A.    Yes, sir, he's probably still
20   with Bonnie.
21   Q.    And he was a route salesman like
22   you?
23   A.    Yes, sir.

16 (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

65

1    Q.   And are you aware that he's been
2  promoted to where he's running a mini-station
3  now?  Did you know that?
4    A.   He had said something to me about
5  it.  He thought he was going to make a change
6  this year.
7    Q.   Is he happy about that?
8    A.   He's excited about the
9  opportunity to make more money.  It helps his
10  Social Security benefits.  It helps his
11  401(k) benefits.
12    Q.   I asked you about Mr. James A.
13  Brown.  He was a route salesman like you,
14  wasn't he?
15    A.   Yes, sir.
16    Q.   All right.  You said that you
17  ultimately ended up in Donaldsonville,
18  Louisiana, in the February after you didn't
19  go back to Bells.  So, that would have been
20  February of '06, right?
21    A.   Yes, sir.
22    Q.   Who told you to go to
23  Donaldsonville?

66

1    A.   Joe.
2    Q.   And what did you do in
3  Donaldsonville?
4    A.   Well, I spent a lot of time
5  opening the stores up and went on a route a
6  couple of times for Charlie when he needed to
7  be somewhere else.
8    Q.   Now, when you say you spent time
9  opening stores up, what do you mean?
10    A.   Going into a new business that
11  wasn't doing business with Bonnie Plant Farm
12  and talk to them about handling Bonnie
13  Product Farm's products.
14    Q.   Now, was the idea in
15  Donaldsonville to develop a route down there,
16  a new route?
17    A.   I think that -- I don't really
18  know, but I think that they had a lot of
19  chain stores working.  And they'd like to get
20  a few more independents in the area to work
21  if they -- but I don't really know.
22    Q.   Did you have a route down there?
23    A.   No, sir.

67

1    Q.   How were you paid?
2    A.   I was paid on a draw.
3    Q.   The same draw you've been making
4  everywhere else?
5    A.   Yes, sir.  And they -- it seemed
6  like they like give the younger people higher
7  draws.  And they gave me the lowest draw
8  available.
9    Q.   What younger people had higher
10  draws than you?  Well, before we go into
11  that, you said seems like.  Can you testify
12  under oath that anybody younger than you had
13  a higher draw?
14    A.   Oh, yes, sir.
15    Q.   All right.  Who had a higher
16  draw?
17    A.   I wouldn't want to just start
18  naming people, but if you would check
19  records, I think you would find that most of
20  the new people that they started, most of the
21  new people that were there did.
22    Q.   What was your draw when you were
23  in Donaldsonville?

68

1    A.   A thousand dollars biweekly.
2    Q.   And wasn't that the standard
3  draw, standard biweekly amount, to give to
4  the standard yearly draw?
5    A.   I don't know how they did them.
6  I just noticed that mine was usually lower
7  than whoever I was talking to said theirs
8  was.
9    Q.   Okay.  So, you're basing --
10    A.   Just basing it on hearsay of who
11  I talked to through the company.
12    Q.   And those would be other people
13  in your position --
14    A.   Yes, sir.
15    Q.   -- have told you that?
16      Nobody in management told you
17  that?
18    A.   No, sir.
19    Q.   And did you complain to anybody
20  about your draws?
21    A.   No, sir.
22    Q.   And how long were you in
23  Donaldsonville?

17  (Pages 65 to 68)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

69

1    A.    I imagine about a month, just a
2  guess.
3    Q.    Where did you go then?
4    A.    I had a guy that quit a route in
5  Jasper, Alabama. I went up to Jasper,
6  Alabama.
7    Q.    All right. Were you told to go
8  there or were you asked if you wanted to go
9  there?
10    A.    Well, you know, when your boss
11  man tells you something -- have you ever
12  worked for anybody? If your boss man tells
13  you something, usually, if you want to keep
14  your job, you go do it. I mean, Joe's been
15  telling me for a lot of years to go do this,
16  go do that. So, you know, I don't know how
17  you want to --
18    Q.    Well, did somebody ask you if you
19  wanted to go to Jasper or tell you to go to
20  Jasper?
21    A.    They said go to Jasper and run
22  this route.
23    Q.    Who told you that?

70

1    A.    You know, I don't even -- I don't
2  remember.
3    Q.    Now, by going to Jasper, you had
4  your own route rather than just going in and
5  working, opening up work in Donaldsonville,
6  correct?
7    A.    Joe told me that he couldn't pay
8  me commission, but I could go up there and,
9  you know, and work it.
10    Q.    So, you're telling me you didn't
11  get paid any commission for working in
12  Jasper?
13    A.    That's right. They hired a
14  younger man to run that route, and they're
15  paying him commission. They told me that it
16  didn't work out for me up there.
17    Q.    Okay. But I want to make sure I
18  understand. You're telling me that you
19  didn't get any commission for running the
20  route in Jasper?
21    A.    No, sir.
22    Q.    No, sir, you didn't?
23    A.    No, sir, I did not get any

71

1  commission.
2    Q.    How were you paid?
3    A.    They just kept sending me my
4  biweekly draw.
5    Q.    Which was a thousand dollars a
6  month?
7    A.    No, sir, a thousand dollars every
8  two weeks.
9    Q.    A thousand dollars every two
10  weeks.
11         And did that continue year round?
12    A.    Last year, they stopped sending
13  it. Started sending me a -- I don't know how
14  much it was, but it come out to me getting
15  sixty-five dollars a week. Sixty-five
16  thirty-five -- sixty-five dollars every two
17  weeks. And then, it started back February
18  the 22nd to getting a thousand dollars
19  biweekly.
20    Q.    February 22nd, 2008?
21    A.    Yes, sir.
22    Q.    Did your draws typically drop off
23  during the off season?

72

1    A.    My draws had never dropped
2  before. I had always gotten more money.
3  When you don't -- when you don't get paid
4  your normal commission, it costs you money on
5  what you're going to draw in Social Security,
6  it cost you money on your 401(k), it cost you
7  money on -- it's a big, big drawback to you.
8  It cuts your unemployment draw when you're --
9  through the work force commission when you're
10  off. It puts you where it's hard for you to
11  pay bills and --
12    Q.    Now, the year we're talking about
13  here is 2006; is that correct?
14    A.    Yes, sir, when I went to Jasper.
15  I never got any --
16         MR. MORTON: Let's mark that as
17  the first exhibit, please.
18
19         (Whereupon, Defendant's Exhibit 1
20         was marked and copy of same is
21         attached hereto.)
22
23    Q.    (BY MR. MORTON) Mr. Watson, let

18  (Pages 69 to 72)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

73

1  me show you what's been marked as Defendant's
2  Exhibit 1 to your deposition. Now, that's
3  what's called a settlement sheet, right?
4      A.   Yes, sir.
5      Q.   And this is a settlement sheet
6  for you for the spring of 2006, correct?
7      A.   That's what it's got on here,
8  yes, sir.
9      Q.   And that would have been for the
10 period that you were working in Jasper,
11 correct?
12     A.   The way they pay, it's hard to
13 keep up with what they're paying for.
14     Q.   Well, can you tell me one way or
15 the other whether or not this is your
16 settlement sheet for the spring of 2006?
17     A.   This is the first time I have
18 looked at this. And I don't see where
19 they -- they've got it dated 23rd of August
20 of '07. And this is the first time I have
21 seen this piece of paper.
22     Q.   And it's your testimony, you have
23 not seen Defendant's Exhibit 1 before, Mr.

74

1  Watson?
2      A.   No, sir, this is my first time to
3  see this. And I'm not sure -- I don't really
4  know. I see where we've got fines of
5  fourteen hundred and fifty dollars. I don't
6  know what that would be from.
7      Q.   You don't know what a chain store
8  skip fine is?
9      A.   I didn't skip them.
10     Q.   How many helpers did you have on
11 this route?
12     A.   I had two.
13     Q.   And you paid them eleven
14 thousand, two hundred and thirty-two dollars?
15     A.   See, I wouldn't know, because
16 that labor must include something other than
17 time. I mean, this -- this looks like some
18 kind of prorated something. But I don't know
19 how they prorate it.
20     Q.   Do you know whether it's accurate
21 or not?
22     A.   No, sir, I haven't -- I mean,
23 I -- it appears -- it doesn't appear to be a

75

1  proper --
2      Q.   Have you seen another settlement
3  sheet for the spring of 2006?
4      A.   No, sir, this is the only one
5  I've ever seen right here.
6          MR. MORTON:  Let's make that 2 if
7  we could.
8
9          (Whereupon, Defendant's Exhibit 2
10         was marked and copy of same is
11         attached hereto.)
12
13     Q.   (BY MR. MORTON)  Let me show you
14 Defendant's Exhibit 2, which is a document
15 which you and your lawyer gave me today. And
16 I believe those are your W-2 forms from
17 Alabama Farmers for 2006; is that correct?
18     A.   Yes, sir.
19     Q.   And, in fact, is it correct, it's
20 reflected on there that Alabama Farmers paid
21 you somewhere north of thirty-eight thousand
22 dollars during 2006?
23     A.   On that, that was the settlement

76

1  from Tennessee. And the settlement, we got a
2  copy of that from some fall business that I
3  had worked. That wasn't a settlement from
4  the year of 2006 on this -- on this return.
5          MR. ROBERSON:  In other words,
6  the income trails them a year, if that makes
7  any sense.
8      Q.   (BY MR. MORTON)  So, the wages on
9  there were paid to you when?
10     A.   I'm sure it was paid in 2006.
11     Q.   All right.
12     A.   But for what -- do you have the
13 settlement sheet for this year?
14         MR. ROBERSON:  But the work was
15 done in 2005?
16         THE WITNESS:  Yes, sir.
17         MR. MORTON:  Well, I'll tell you
18 what, let's let him answer the questions,
19 okay?
20     Q.   Are you saying that the work was
21 done in 2005?
22     A.   Yes, sir, the work was done in
23 the prior time.

19  (Pages 73 to 76)

## FREEDOM COURT REPORTING

77

1    Q.    Now --
2    A.    You should have a settlement
3  statement for that, just like this one
4  (indicating), that shows that.
5    Q.    Okay. Well, the first thing I
6  need to know is, is it your sworn testimony
7  that Defendant's Exhibit Number 1, that
8  settlement sheet, is not accurate?
9    A.    That settlement sheet is from
10  money earned the prior -- in prior years.
11    Q.    The settlement sheet that's
12  marked Defendant's Exhibit 1?
13    A.    Yes, sir.
14    Q.    And it is not an accurate
15  statement of what you earned in the spring of
16  2006?
17    A.    No, sir.
18    Q.    Now, at the end of 2006, were
19  you -- had you received more in draws than
20  you had earned in commission?
21    A.    I have no way of knowing, because
22  I've seen no paperwork.
23    Q.    You never saw a settlement

78

1  sheet --
2    A.    No, sir.
3    Q.    -- for 2006?
4    A.    No, sir.
5    Q.    Do you know what you made in the
6  spring of 2006? Do you know, rather -- let
7  me withdraw that.
8        Do you know what your total sales
9  were in the spring of 2006?
10    A.    No, sir. I tried to track them.
11  And I was gone before the -- got the final
12  rebates and the final -- and the final sales.
13    Q.    When you say you were gone, what
14  do you mean?
15    A.    I was -- I had -- I had gotten
16  off from work.
17    Q.    Why had you gotten off from work?
18    A.    The season had ended.
19    Q.    And what did you do then?
20    A.    See, when the season ends, you
21  don't necessarily have your complete sales
22  in. You don't have all --
23    Q.    All right. Did the company ever

79

1  allow your insurance coverage to lapse?
2    A.    No, sir.
3    Q.    And do you know -- and you're
4  responsible for paying for part of that
5  insurance --
6    A.    Yes, sir.
7    Q.    -- are you not?
8        And do you know whether or not
9  that's the reason your draw was reduced?
10    A.    No, sir, I never knew that was
11  the reason my draw was reduced.
12    Q.    Did you ever ask anybody why your
13  draw was reduced?
14    A.    Yes.
15    Q.    Who did you ask?
16    A.    I asked Joe Stewart, I asked Jeff
17  Seymour.
18    Q.    Anybody else?
19    A.    I can't think of anybody else
20  that I would have asked.
21    Q.    All right. What did Joe Stewart
22  tell you?
23    A.    He said that I didn't have enough

80

1  commission. Didn't have enough sales.
2    Q.    Didn't have enough sales to
3  support the draw?
4    A.    Yes, sir.
5    Q.    What did you say to that?
6    A.    I just took it as an answer. And
7  I can't remember who I -- I think I asked
8  Jeff Seymour for my paperwork and never got
9  it.
10    Q.    Did you ask Jeff why your draw
11  was reduced?
12    A.    Yes, sir.
13    Q.    What did he say?
14    A.    He said he'd get around to
15  settling up or something. But it's always --
16  it's always a problem, you know, getting
17  settlement sheets and ended up getting the
18  settlement sheets.
19    Q.    You mean, it's always been like
20  that since you've worked with the company?
21    A.    When I worked for Joe Stewart, it
22  wasn't no problem. Since I went to work for
23  Bonnie Plant Farm, it was.

20  (Pages 77 to 80)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

81

1    Q.   Do you have any reason to believe
2    that Joe Stewart was not telling you the
3    truth when he told you that you did not have
4    sufficient --
5    A.   No, sir.
6    Q.   -- sales to support the draw?
7    A.   I had no -- I had -- I had no
8    reason at all.
9    Q.   All right.  Do you have any
10   reason now to believe he wasn't telling the
11   truth?
12   A.   No, sir, I just haven't seen it.
13   And I don't really -- we're showing no
14   Wal-Mart increases.  I don't know about that.
15   I don't know about -- I just don't know about
16   some of the things that I see on here.
17   Q.   You just don't know whether
18   they're accurate or not?
19   A.   Yes, sir, I just don't know.
20   Q.   All right.  Is there any
21   particular thing on Exhibit 1 that you can
22   tell me that's not accurate?
23   A.   No, sir, but I can tell you that

82

1    you'd have to go in and check Wal-Mart sales,
2    Lowe's sales, Home Depot sales to see about
3    those one percents.  And those one percents,
4    they add up on your -- on your total when you
5    qualify for them.
6    Q.   But you don't know whether you
7    qualified for those or not?
8    A.   No, sir, I don't.
9    Q.   All right.  Your first year in
10   Bells, did you not have a lower total sales
11   amount than had been on that route the year
12   before?
13   A.   I had never been told.
14   Q.   Okay.  So, you don't know the
15   answer to that?
16   A.   So, I don't know the answer to
17   that.
18   Q.   Okay.  Now, when you went to
19   Jasper, when you were sent to Jasper, wasn't
20   that an opportunity to make more money than
21   you were making in Donaldsonville?
22   A.   Joe told me that he couldn't pay
23   me commission.  So, I went to Jasper to

83

1    complete -- to complete the route.
2    Q.   Well, the answer to the question
3    is what?
4    A.   Sir?
5    Q.   The answer to the question is
6    what?  Was it an opportunity for you to make
7    more money or not?
8    A.   No, sir, it wasn't an opportunity
9    to make more money.  It was a -- I was on a
10   set draw.
11   Q.   Had you ever been in that
12   situation before?
13   A.   No, sir.
14   Q.   Are you aware of other people in
15   the company who have done that?
16   A.   No, sir.
17   Q.   Now, after you worked your year
18   in Jasper -- by the way, who did you work for
19   up there?
20   A.   Joey Padgett.
21   Q.   How did you and Mr. Padgett get
22   along?
23   A.   As far as I know, we got along

84

1    all right.
2    Q.   Did he ever criticize your work
3    or any aspect of your work?
4    A.   No, sir.
5    Q.   Anybody else in Jasper
6    criticize --
7    A.   No, sir.
8    Q.   -- your work?
9    Now, how long was your route up
10   there in Jasper compared to the other routes
11   being run in that area?
12   A.   I had one of the longer routes.
13   Q.   And did you have an air ride seat
14   in Jasper?
15   A.   Yes, sir.
16   Q.   And an air ride suspension?
17   A.   Yes, sir.
18   Q.   And how many helpers did you have
19   in Jasper?
20   A.   I had two.
21   Q.   The whole time you were there?
22   A.   Yes, sir, the whole time I was
23   there.

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

85

1      Q.    And who paid for those since you
2  weren't getting commission?
3      A.    I don't know where they took the
4  pay out of.
5      Q.    Who were the helpers?
6      A.    Quinton something was one of them
7  and Michael something was the other one.
8      Q.    Did you pick them?
9      A.    No, sir.
10     Q.    Did you inherit them?
11     A.    Yes, sir.
12     Q.    Did they do a good job?
13     A.    Yes, sir.
14     Q.    Did you decide how much their
15  draw was going to be?
16     A.    No, sir.
17     Q.    Who did?
18     A.    Well, whoever they was working
19  for before I got there.  They were hourly
20  employees.
21     Q.    When you were in Bells, working
22  in Bells, did you ever tell anybody that you
23  were only working for your insurance

86

1  coverage?
2      A.    No, sir.
3      Q.    Have you ever told anybody that?
4      A.    Yes, sir.
5      Q.    Who'd you tell?
6      A.    I don't know.  I mentioned -- I
7  mean, I told Butch that one of the most
8  important things for me to do was to keep my
9  insurance coverage until I was sixty-five,
10  because it would be hard for me to get
11  insurance anywhere else because of my age.
12     Q.    You told Butch that?
13     A.    Yes, sir, and I probably told
14  some other people that, but I just don't
15  remember making an all-out statement saying
16  that.
17     Q.    Well, is it true that you have
18  continued to work since you started working
19  in Bells in order to ensure that you do have
20  insurance?
21     A.    That's one of the main reasons
22  that I have worked, is to maintain my
23  insurance, maintain my Social Security,

87

1  maintain my 401(k), and maintain my income.
2      Q.    Okay.
3      A.    That's the reason I work.
4      Q.    Did you ever tell anybody, other
5  than Butch, that you were working for
6  insurance coverage?
7      A.    Yes, sir, I probably have said
8  that.
9      Q.    Do you remember who else you told
10  that?
11     A.    No, sir.
12     Q.    Now, when you were working in
13  south Alabama, did you -- I'm sorry, in south
14  Louisiana, working out of what, Texas?
15        MR. MORTON:  What was it?
16        MR. ROBERSON:  New Summerfield,
17  Texas.
18     Q.    (BY MR. MORTON)  New Summerfield,
19  Texas, did you ever sell any plants for cash
20  and keep the money while you were running
21  that route for Bonnie?
22     A.    No, sir.
23     Q.    When you were working in Bells,

88

1  did you ever sleep in the truck while your
2  helper worked the store?
3      A.    I probably propped my feet up
4  because -- to keep the circulation in my
5  feet.
6      Q.    Okay.  Did you go to sleep?
7      A.    I don't remember ever going to
8  sleep.
9      Q.    How often did you sit in the
10  truck while the helper worked the store?
11     A.    It depended on the size of the
12  store we were at.  If we was somewhere where
13  we put a lot of plants, needed help, I was
14  out there putting plants.  If we were parked
15  in a parking lot out of town where you
16  couldn't -- needed to move to let people in
17  and out of parking places and things like
18  that, I stayed in.
19     Q.    Is that a common occurrence, for
20  you to stay in the truck while your helper
21  worked the store?
22     A.    No, sir.
23     Q.    Had it ever happened when you

22  (Pages 85 to 88)

## FREEDOM COURT REPORTING

89

1  were working in Jasper?
2      A.   No, sir.
3      Q.   Did it ever happen when you were
4  working in Donaldsonville?
5      A.   No, sir.
6      Q.   You're now working in Beeville,
7  Texas; is that right?
8      A.   Yes, sir.  But I have --
9      Q.   Anything happen out there?
10      A.   No, sir.
11      Q.   So, the only place where you ever
12  stayed in the car while your helper worked
13  the store was Bells; is that right?
14      A.   Yes, sir.
15      Q.   And your helper at that time was
16  a fellow named Michael Rhodes?
17      A.   Yes, sir.
18      Q.   Did Michael also do the driving
19  for you?
20      A.   No, sir.
21      Q.   Did he do some of it?
22      A.   No, sir.
23      Q.   Never drove the truck?

90

1      A.   No, sir.
2      Q.   Have you ever been told that
3  customers called in and complained that you
4  were sleeping in the truck?
5      A.   No, sir.
6      Q.   If that were the case, would it
7  be true?
8      A.   No, sir.
9      Q.   When did you leave Beeville to
10  come here for your deposition?
11      A.   Friday afternoon.
12      Q.   And who's your station manager
13  out there?
14      A.   Chris Hall.
15      Q.   And when did you tell Chris you
16  were coming here?
17      A.   Sunday afternoon.
18      Q.   After you were already here?
19      A.   Yes, sir.
20      Q.   Did you make any arrangements for
21  anybody to run your route on Saturday?
22      A.   I had the route in shape for the
23  weekend.  And the route probably needs

91

1  running now.
2      Q.   So, you didn't make any
3  arrangements to have anybody cover it on
4  Saturday, correct?
5      A.   No, sir.  I had --
6      Q.   And, in fact, you had not even
7  told -- did not even tell Chris until Sunday
8  that you weren't going to be there running
9  the route; is that right?
10      A.   Yes, sir.
11      Q.   And did you run the route Friday?
12      A.   Yes, sir.
13      Q.   All of it?
14      A.   No, sir.
15      Q.   How much of it?
16      A.   I don't know how you would count
17  it.  I think I worked about seven stores
18  Friday, just off the wall guess.
19      Q.   Just what?
20      A.   I think about seven stores
21  Friday, just off the wall guess.
22      Q.   Is that fewer stores than you
23  normally would run in a day?

92

1      A.   Depends on where you were and
2  what time you left and --
3      Q.   What time did you knock off on
4  Friday?
5      A.   Around lunchtime.
6      Q.   Normally, this time of year, what
7  time do you work to in the evening?
8      A.   It depends on what day it is,
9  whether I'm loaded or not.
10      Q.   You don't normally knock off
11  around lunchtime, do you?
12      A.   On a lot of Fridays, I do.  That
13  route down there has slowed down.  It's a
14  February, March route.  And on that route, it
15  would be normal to knock off right at lunch.
16      Q.   How many times have you done that
17  this year?
18      A.   I don't know.
19      Q.   And --
20      A.   A lot of times --
21      Q.   I guess, there would be time
22  records --
23      A.   -- you would load on Friday

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

93

1 afternoon and --
2     Q. There would be time records for
3 your helpers, wouldn't there?
4     A. Yes, sir.
5     Q. How many helpers are you using on
6 that route?
7     A. One now. I used two to help set
8 up the racks and get the route set up.
9     Q. Is that a short run?
10     A. No, sir, that's an unordinarily
11 long route. They --
12     Q. Who sent you to Beeville?
13     A. Joe Stewart.
14     Q. Did he tell you why?
15     A. He said that was the only place
16 he could find for me to work because of my
17 age.
18     Q. Did he tell you it was because of
19 your age?
20     A. That's what he kindly insinuated.
21     Q. How's that?
22     A. He thought, I think -- you know,
23 you hate -- you hate to say what you think

94

1 somebody's thinking --
2     Q. Right.
3     A. -- you know.
4     I don't really know what the man
5 was thinking. I told you what I thought.
6 He's sitting there. Ask him.
7     Q. Well, I'm asking you at this
8 point. And you're telling me that you're
9 believing that your going to Beeville had
10 something to do with your age is based purely
11 on what you thought Joe was thinking?
12     A. Yes, sir.
13     Q. Not on anything he said?
14     A. No, sir.
15     Q. What conversations did you and he
16 have about your going to Beeville?
17     A. He told me that was the only
18 place he had for me.
19     Q. Well, is that the entirety of
20 your conversation?
21     A. That's the basis of it.
22     Q. Was there anything else said by
23 you or anything else said by him in that

95

1 conversation?
2     A. I don't recall anything else.
3     Q. Did you have any conversations
4 about why you weren't going back to Jasper?
5     A. He told me it didn't work out up
6 there for me.
7     Q. Did he tell you why?
8     A. He kindly insinuated it was
9 because of my age.
10     Q. And how did he do that?
11     A. He had hired a younger man to run
12 that route up there.
13     Q. Who is that?
14     A. I don't know.
15     Q. Who told you that a younger man
16 had been hired to run that route?
17     A. Nobody. I've just never seen
18 them hire anybody in my age limits. I've
19 never seen them hire a routeman my age. So,
20 you would figure that it would have been a
21 younger person.
22     Q. Okay. So, that is speculation on
23 your part? You don't know one way or the

96

1 other?
2     A. Well, from what I've seen with
3 the company, I mean, I've never seen them
4 hire a routeman my age.
5     Q. Okay. But you don't know who was
6 running that route, do you?
7     A. I have no idea.
8     Q. Or how old that person is?
9     A. No, sir.
10     Q. Did Mr. Stewart do anything else
11 to insinuate that the reason you weren't sent
12 back up there was because of your age? Or,
13 rather, since you don't know who was running
14 that route, did he do anything to insinuate
15 that it was your age or your age had anything
16 to do with the decision not to send you back
17 up there?
18     A. That was the only thing that I
19 could figure.
20     Q. The only reason you could figure
21 was because of your age?
22     A. Yes, sir.
23     Q. Okay. Have you told me all of

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

97

1  the reasons that you believe that decision
2  was based on your age?
3      A.   For some reason, it's important
4  that I make less money, that I have less to
5  go into my 401(k), I have less money to pay
6  my bills with.  And I guess he figures
7  because I'm older, it don't cost as much for
8  me to live.
9      Q.   And all of that is speculation on
10 your part, correct?
11     A.   From what I've been told and see.
12     Q.   Well, what have you been told
13 that leads you to that belief?
14     A.   I've been told that they never
15 had heard of anybody -- moving somebody off
16 of a route that made a good increase on it
17 and was doing a good job on it.
18     Q.   Who told you that?
19     A.   Comer Lee Phillips.
20     Q.   C-o-m-e-r?
21     A.   Yes, sir.
22     Q.   And who is he?
23     A.   He's an employee with Bonnie.  I

98

1  don't know what --
2      Q.   Is he a route salesman?
3      A.   I don't really know what his -- I
4  don't really know what his position with the
5  company is at this time.
6      Q.   Do you know what his position was
7  at the time he made the statement to you?
8      A.   He went around checking on
9  growing stations and checking on stores to be
10 sure people had everything in the store they
11 needed.  I don't really know what all he did.
12     Q.   Did he say anything about your
13 age?
14     A.   I don't recall him saying
15 anything about it.
16     Q.   When did he make that statement
17 to you about he didn't know about anybody
18 else that had been pulled off a route after
19 they had made an increase and done a good
20 job?
21     A.   He just made it in general one
22 day up there at -- I can't remember if it was
23 in Bells or Beeville.

99

1      Q.   So, you're not sure when it was
2  made?
3      A.   No, sir.
4      Q.   Did you tell Mr. Stewart when he
5  sent you to Beeville that you were glad to
6  get the work?
7      A.   Yes, sir.
8      Q.   And did you tell --
9      A.   I'm thankful for the time that I
10 spent working for Joe.
11     Q.   Did you tell Mr. Stewart when he
12 sent you to Donaldsonville that you were glad
13 to get the work?
14     A.   Yes, sir.
15     Q.   Did you tell Tim Trussell that?
16     A.   Yes, sir.
17     Q.   On both occasions?
18     A.   Yes, sir.
19     Q.   Other than what you've told me,
20 are there any other facts on which you base
21 your belief that any decision Bonnie or
22 Alabama Farmers has made about you is based
23 on your age?

100

1      A.   Would you mind repeating that
2  question?
3      Q.   I'll be glad to.
4          Other than what you've told me,
5  are there any other facts that you believe
6  support the proposition that Bonnie or AFC
7  has discriminated against you on the basis of
8  your age?
9      A.   I don't see them hiring people my
10 age.  They hire a lot of people every year,
11 and I don't see people my age in the same job
12 that I'm in.  I see younger people but not my
13 age.  And that's basically what I have to say
14 about it, I guess.
15     Q.   You don't know of any other facts
16 that support the proposition that you've been
17 discriminated against on the basis of your
18 age, other than that and what you previously
19 told me in this deposition?
20     A.   It appears that when I made my
21 complaint, I made my complaint in the wide
22 open to them.  They did harm to me behind
23 closed doors, and then, took -- brought me in

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

101

1 later. And when I made my complaint, it
2 appears that the company would have had
3 somebody to have sat down and talked with me
4 about my problems and try to help me with
5 them.
6      Q.   Okay. Well, and you said you
7 don't see the company hiring people your age.
8 Do you know of anybody your age who's been
9 turned down for a job with the company in
10 your position?
11     A.   Not right offhand, I don't.
12     Q.   So, you don't know anything about
13 the pool of applicants that the company
14 has --
15     A.   I don't know.
16     Q.   -- to choose from, correct?
17     A.   No, sir.
18     Q.   Correct?
19     A.   That's correct. That's correct.
20 That's correct. I'm sorry.
21     Q.   That's all right.
22         Now, you said that the company
23 should have sat down with you and talked to

102

1 you about your problems and tried to help you
2 with them. What problems are those, Mr.
3 Watson?
4      A.   Nobody ever discussed with me the
5 problems that I had staying on my routes.
6 Nobody ever discussed with me why I had to go
7 down to Beeville, Texas. I just had very
8 little rapport to no rapport from them to
9 help me see how devastating this treatment
10 has been to me. I think that they should
11 double the damages that I have lost and --
12 and that's basically how I feel.
13     Q.   Well, going back to nobody ever
14 talked to you about the problems. Did you
15 ask anybody to talk to you about the
16 problems?
17     A.   I wrote a letter.
18     Q.   Well, you had several face-to-
19 face conversations, you've told me about,
20 with Mr. Stewart. In any of those
21 conversations, did you ask him to discuss any
22 problems with you?
23     A.   No, sir. We were sitting in

103

1 there discussing what he had decided to do
2 with me. And, you know, no reason was given
3 to why he had decided to do that.
4      Q.   Okay. But you didn't ask him,
5 did you?
6      A.   No, sir.
7      Q.   And, in fact, he's the general
8 sales manager for the company, isn't he?
9      A.   Yes, sir.
10     Q.   And it is his job to decide where
11 to send people, isn't it?
12     A.   Yes, sir. I've never doubted
13 what he's told me. I've always gone to work
14 when he said go to work, and I've always
15 tried to do a good job.
16     Q.   I mean, you really honestly don't
17 believe that Joe Stewart has discriminated
18 against you because of your age?
19     A.   Yes, sir.
20         MR. MORTON: Let's take a break
21 for a minute.
22
23         (Whereupon, a brief recess was

104

1         taken.)
2
3         (Whereupon, Defendant's Exhibit 3
4         was marked and copy of same is
5         attached hereto.)
6
7      Q.   (BY MR. MORTON) Mr. Watson, let
8 me ask you to look at --
9         MR. ROBERSON: I don't think
10 Terry's seen it. So, he might need to look
11 at it a minute.
12         (BY MR. MORTON) Let me ask you
13 to take a look at Exhibit 3 to your
14 deposition, Mr. Watson. Now, that is the
15 settlement sheet for the spring of 2007 for
16 you. Have you seen it before?
17     A.   No, sir.
18     Q.   Do you know whether or not it's
19 accurate?
20     A.   No, sir, but I would -- you know,
21 I wouldn't say that it was.
22     Q.   I'm sorry?
23     A.   No, sir, I don't know.

26  (Pages 101 to 104)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

105

1      MR. MORTON: Let's go off the
2  record for a second.
3
4      (Whereupon, a discussion was held
5      off the record.)
6
7      MR. MORTON: Okay. Are you ready
8  to go back on the record?
9      Q.  Mr. Watson, I believe I'd asked
10 you if you knew whether or not the settlement
11 sheet for the spring of 2007, what's in
12 Exhibit 3, was accurate. And I don't know
13 whether your answer was recorded or not.
14     A.  This appears to be a -- to be on
15 target to being correct.
16     Q.  All right. And at the end of the
17 year, in 2007, you ended up, shall we say,
18 upside down, correct?
19     A.  Yes, sir.
20     Q.  You had received more in draws --
21     A.  Yes, sir.
22     Q.  -- than you had earned in
23 commissions?

106

1      A.  Yes, sir.
2      Q.  And you continued to receive
3  draws after this document was issued; is that
4  right?
5      A.  Yes, sir. I hadn't seen this
6  document.
7      Q.  Okay. But you continued to
8  receive draws after February 29th, 2008,
9  right?
10     A.  I started receiving draws
11 February the 22nd, back --
12     Q.  All right.
13     A.  No. My draw was cut. It was
14 drastically cut prior to this.
15     Q.  Now, was your draw drastically
16 cut in 2006 and 2007, after the season?
17     A.  No, sir. Yes, sir, 2006.
18     Q.  And 2007?
19     A.  And part of 2000 -- wait. What
20 year are we in now?
21     Q.  2008.
22     A.  2007, it was drastically cut.
23     Q.  Okay.

107

1      A.  And part of 2008.
2      Q.  Beg your pardon?
3      A.  And part of 2008.
4      Q.  Okay. But it was not reduced in
5  2006?
6      A.  No, sir.
7      Q.  Okay.
8      A.  It was not reduced in 2006.
9      Q.  All right. And then, you
10 inquired about why your draw had been
11 reduced?
12     A.  Yes, sir.
13     Q.  And you've already described
14 those conversations for me, correct?
15     A.  Yes, sir.
16     Q.  Okay. All right. Now, if this
17 document is accurate, and you said you think
18 it looks like it probably is, it ends up with
19 you owing the company somewhere around ten
20 thousand dollars, correct?
21     A.  It shows me owing how much?
22     Q.  Owing seven thousand, seven
23 hundred and three seventy-five plus the

108

1  remaining advances of twenty-five hundred
2  dollars.
3      A.  I didn't understand exactly like
4  that, but that's the first time I've ever
5  gotten one of these that I was in the hole.
6  Nobody's ever explained to me really how it
7  works and what goes on. I've never been in
8  this situation before.
9      Q.  So, you're not sure how it
10 operates?
11     A.  So, I'm not sure how it operates.
12     Q.  All right. Well, you do know,
13 though, that the company is not -- the
14 company has not tried to recover any of the
15 money that's shown as a negative balance on
16 here from you? You do know that, don't you?
17     A.  Yes, sir.
18     Q.  And you do know that the company
19 has kept your health insurance in force?
20     A.  Yes, sir.
21     Q.  Despite the fact --
22     A.  Despite the fact --
23     Q.  -- that you ended up upside down?

27  (Pages 105 to 108)

## FREEDOM COURT REPORTING

109

1    A.   Yes, sir.
2    Q.   I'm sorry.  I think I may have
3  asked you this.  When did you find out that
4  you were not going back to Bells?
5    A.   Just a guess, November the 2nd.
6  I mean, on election day.  I don't remember if
7  it was November -- in November of --
8    Q.   Of 2005?
9    A.   Yes, sir.
10    MR. MORTON:  Okay.  Let's mark
11  this as the next exhibit if we could.
12
13    (Whereupon, Defendant's Exhibit 4
14    was marked and copy of same is
15    attached hereto.)
16
17    MR. ROBERSON:  Dent, I believe
18  you couldn't have produced this.  It wasn't
19  FAXed until the 24th.
20    MR. MORTON:  I think I already
21  had a copy of it.
22    MR. ROBERSON:  Oh, okay.
23    MR. MORTON:  I think it has been

110

1  produced.  If it hadn't, I apologize.
2    Q.   Mr. Watson, let me show you
3  Exhibit Number 4 to your deposition.  Now, is
4  that a letter that you wrote to Tate Gatlin?
5    A.   Well, yes, sir.
6    Q.   At the time you wrote that letter
7  to Tate Gatlin, you already knew that you
8  were not going back to Bells, correct?
9    A.   Correct.
10    Q.   And prior to the date on this
11  letter, January 10th, 2006, you had not
12  complained to anybody about age
13  discrimination; is that right?
14    A.   No, sir.
15    Q.   Who had you complained to?
16    A.   I had not.
17    Q.   You had not.  Okay.
18    Now, at the time that you wrote
19  this letter, Watson 4, did you already have
20  counsel?  Did you already have a lawyer to
21  represent you?
22    A.   At this time, you could say yes
23  or no.  I probably did.  We were just waiting

111

1  to see what the reaction was going to be,
2  because I was -- had confidence and was
3  hoping the whole time that my route situation
4  would be straightened out.
5    Q.   All right.  And what lawyer did
6  you have at that time?
7    A.   Albert Adams, who is my cousin.
8  And we were --
9    Q.   Now, let me caution you.  I'm not
10  entitled to know what you and Mr. Adams
11  talked about, okay?  So, you don't want to
12  tell me that, and I'm not going to ask you
13  that, okay?
14    MR. ROBERSON:  He's not going to
15  solicit that information.  So, don't tell
16  him.
17    Q.   (BY MR. MORTON)  Okay.  Who
18  actually composed this letter?
19    A.   His secretary typed it up.
20    Q.   And did she compose it?  Was she
21  responsible for what it said?
22    A.   I was responsible for some of it,
23  and I'm sure Albert was responsible for some

112

1  things that was said.
2    Q.   All right.  And then, you signed
3  it?
4    A.   Yes, sir.
5    Q.   Now, did you mail it to Mr.
6  Gatlin or did you hand it to him?
7    A.   I physically handed it to him and
8  asked him to hand a copy to Joe.  I wanted to
9  be sure that Joe got it.  Joe wasn't in the
10  office at the time that I went in.
11    Q.   Now, Mr. Gatlin was not your
12  supervisor, correct?
13    A.   Mr. Gatlin is the safety
14  director.
15    Q.   Right.  And he was -- he was not
16  your supervisor, correct?
17    A.   No, sir, he was not my
18  supervisor.
19    Q.   Did you have any conversation
20  with him about your situation when you handed
21  this letter to him?
22    A.   I just told him that I was being
23  put on another route and that I was trying to

28 (Pages 109 to 112)

## FREEDOM COURT REPORTING

113

1  keep my job with the company.
2      Q.   Now, why did you address the
3  letter to Mr. Gatlin rather than Mr. Stewart
4  if you wanted Mr. Stewart to get it?
5      A.   To start this thing off -- do you
6  want to go back to the first where it
7  started?
8      Q.   Well, no, sir.  I just want you
9  to answer my question, which is why you
10  addressed it to Mr. Gatlin?
11      A.   Mr. Gatlin had performed an
12  industrial rehab program at the meeting.
13      Q.   He had performed an industrial
14  rehab program what?
15      A.   At the meeting.
16      Q.   What meeting?
17      A.   At the 2005 meeting.
18      Q.   Okay.  And what sort of
19  industrial rehab program did he perform?
20      A.   Step -- stepping up and down off
21  of boxes, moving around and doing things that
22  I wasn't able to do at the time, because I
23  had had operations on my feet.

114

1      Q.   All right.  And Mr. Gatlin
2  performed a rehab program --
3      A.   For Bonnie Plant Farm.
4      Q.   -- for Bonnie Plant Farm?
5      All right.
6      A.   At the 2005 sales meeting in
7  Auburn, Alabama.
8      Q.   All right.  And did he perform it
9  just on you or --
10      A.   He performed it on everybody at
11  the meeting.
12      Q.   All right.  Did you voluntarily
13  participate in it?
14      A.   Yes, sir.
15      Q.   Now, at that time, was Mr. Gatlin
16  employed by Alabama Farmers?
17      A.   Yes, sir.
18      Q.   And did you get some sort of
19  report in connection with what he performed
20  on you?
21      A.   I wasn't able to do any of it at
22  the time.  So --
23      Q.   You were not able --

115

1      A.   -- that was when he -- yes, sir,
2  I was not able -- I was not physically able
3  to participate.
4      So, I didn't participate.  They
5  just passed by me.
6      Q.   All right.  Did you tell them you
7  were not able to participate?
8      A.   Yes, sir.
9      Q.   All right.  What, if anything,
10  was said to you at that time about the fact
11  that you were not participating?
12      A.   Nothing.  They said that I was to
13  help employees and to help employees see what
14  they needed to do to stay fit and able to do
15  the job.
16      Q.   All right.  And since you weren't
17  able to do it at that time, did you do it at
18  some other time?
19      A.   They made an appointment with me
20  to an industrial rehab center in Troy,
21  Alabama.  I can't remember the name of it.
22  But -- and I asked them if they were calling
23  me in there to do that industrial rehab to

116

1  fire me.  And he assured me that I was over
2  there for him to help me.
3      Q.   Okay.
4      A.   And he talked to me a few minutes
5  and told me that I just needed to go on about
6  my business.
7      Q.   Meaning what?
8      A.   That I was not able to do the
9  rehab program at that time.
10      Q.   Did you agree with that
11  assessment?
12      A.   Yes, sir.
13      Q.   All right.  Did you ever do the
14  rehab program?
15      A.   No, sir.  The guy told me that it
16  really didn't have anything to do with your
17  job, that it was just to help you have a
18  healthier lifestyle and a --
19      Q.   So, you never did it?
20      A.   No, sir.
21      Q.   All right.  Now, with that
22  background, why did you address the letter to
23  Mr. Gatlin?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

117

1    A.   Because he was the one that
2  started to give me the industrial rehab
3  first.  And the next week after I went to
4  Troy, Joe called me in the office to fire me.
5    Q.   Now, when you say after you went
6  to Troy, is that where you went to the
7  appointment?
8    A.   Yes, sir, that's where I went to
9  the appointment.
10    Q.   And you say Joe called you in the
11  office to fire you?
12    A.   The next week.
13    Q.   All right.  And tell me about
14  that conversation.
15    A.   He said that he would help me
16  fill out my disability papers and that -- and
17  I told him that the day I quit work and sat
18  down, that'd be where I'd be.  I'd be sitting
19  in that chair.  And I pleaded to get a job
20  back.
21    Q.   And I'm sorry.  The last thing
22  you said, I didn't understand it.
23    A.   I pleaded to get a job back.

118

1    Q.   Did Joe tell you -- ever tell you
2  you were fired?
3    A.   No, sir.
4    Q.   Did he ever tell you you were
5  terminated or words to that effect?
6    A.   No, sir.
7    Q.   And, in fact, he ultimately did
8  find a place for you to work in --
9    A.   He ultimately worked with me.
10    Q.   Pardon?
11    A.   He ultimately worked with me.
12  But he put me in positions where I couldn't
13  make the money that I needed -- that I needed
14  to make to keep up a good standard of living,
15  my 401(k), my --
16    Q.   Well, did you tell Tate Gatlin in
17  the meeting in Auburn, Alabama, that you
18  couldn't do the rehab program?
19    A.   Yes, sir.
20    Q.   And did you tell the gentleman
21  that you went to see in Troy that you
22  couldn't do the rehab program?
23    A.   Yes, sir, the gentleman in Troy

119

1  just realized that he couldn't ask me to
2  stand on one foot, because I didn't have a
3  foot that was ready to stand on right then.
4    Q.   Okay.  Did you ever have any form
5  of assessment of the type that Mr. Gatlin and
6  the fellow in Troy wanted to perform?  Did
7  you ever have any type of assessment like
8  that?
9    A.   What do you mean?  What do you
10  mean by that question?
11    Q.   Did you ever go somewhere where
12  they saw how long you could stand on one leg
13  or --
14    A.   Oh, no, sir, I was never -- I
15  never -- I never had it done.
16    Q.   All right.  And the conversation
17  in which you said a minute ago that Mr.
18  Stewart told you that he would help you fill
19  out disability papers, that was before you
20  made your complaint of age discrimination,
21  correct?
22    A.   Yes, sir.
23    Q.   All right.  Now, at the time that

120

1  you addressed this letter on January 10th,
2  2006, to Mr. Gatlin, did you have any
3  information that Mr. Gatlin had anything to
4  do with where you were going to work?
5    A.   No, sir.
6    Q.   All right.  Now, you didn't put
7  anything in the letter to Mr. Gatlin about
8  his forwarding the letter to Mr. Stewart,
9  correct?
10    A.   No, sir.
11    Q.   And the letter doesn't show a
12  carbon copy to Mr. Stewart, correct?
13    A.   No, sir.
14    Q.   And, in fact, it was just
15  addressed to Mr. Gatlin, right?
16    A.   Right.
17    Q.   Did Mr. Gatlin read the letter in
18  front of you?  Did he read it at the time you
19  gave it to him?
20    A.   Yes, sir.
21    Q.   What did he say?
22    A.   He didn't comment on it.  He just
23  said --

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

121

1    Q.    And did you ever, in fact, have
2    any conversation with anybody, other than
3    Mr. Gatlin, regarding this letter --
4        A.    No, sir.
5        Q.    -- which is Watson Exhibit 4?
6        MR. MORTON:  All right.  Let's
7    mark this as 5, please.
8
9        (Whereupon, Defendant's Exhibit 5
10        was marked and copy of same is
11        attached hereto.)
12
13    Q.    (BY MR. MORTON)  Let me show you
14    what's been marked as Exhibit 5 to your
15    deposition, Mr. Watson.  Is that a letter
16    that you wrote to Mr. Gatlin?
17        A.    My lawyer, Albert, wrote the
18    letter, and I signed it.
19        Q.    All right.  Now, the second line
20    on --
21        A.    The secretary typed the letter.
22        Q.    Okay.  This one does show a
23    carbon copy to Joe Stewart, correct?

122

1        A.    Correct.
2        Q.    Did you mail this letter?
3        A.    No, sir, I hand delivered this
4    letter.  I would have delivered it to Joe,
5    but Joe wasn't in there.
6        Q.    All right.
7        A.    I wanted to take it --
8        Q.    But you hand delivered a copy of
9    the letter to Mr. Gatlin?
10        A.    Yes, sir.
11        Q.    Did you bring him a copy for Mr.
12    Stewart?
13        A.    You know, I think I had one
14    copied.  That's all.  I don't think I had two
15    copies.
16        Q.    Did Mr. Gatlin read this letter
17    in front of you?
18        A.    I don't remember whether he read
19    this one or not.  This was in a time of the
20    year when he was getting ready to leave.  And
21    I don't remember.
22        Q.    Did you have any discussion with
23    him about the letter?

123

1        A.    No, sir.
2        Q.    Did you have any discussion with
3    him at all when you brought him this letter?
4        A.    No, sir.
5        Q.    The second line of the letter
6    says, and I am bringing you a letter today
7    from my doctor saying I'm able to work
8    without restrictions.  Was that a letter you
9    had just received from your doctor?
10        A.    Yes, sir.
11        Q.    And what had your restrictions
12    been prior to your receiving that letter?
13        A.    I had had both feet operated on,
14    I'd had my right knee replaced, and I have a
15    problem with bone spurs.
16        Q.    Okay.  But evidently your doctor
17    had had you on some sort of restrictions as
18    to what you could and couldn't do.  And I'm
19    asking you what those were.
20        Well, let me back up and let me
21    ask it this way:  Prior to getting the letter
22    that's referenced here, had you been unable
23    to work at all?

124

1        A.    I had been in a -- in a truck
2    wreck.  And the doctor that was tending me
3    had put some restrictions on me due to the
4    wreck, due to the bone spurs in my neck.  And
5    I had gone through a rehabilitation program.
6        Q.    All right.  When were you in the
7    truck wreck?  I mean, was this something that
8    happened in late '05, early '06?
9        A.    I can't remember when it was, but
10    we have it on record somewhere over there.
11        Q.    Was it --
12        A.    I think --
13        Q.    Were you on company business when
14    that happened?
15        A.    Yes, sir.
16        Q.    Was that a wreck that occurred
17    back in December of 2002 that's referenced --
18        A.    Yes.
19        Q.    -- in this January 10th letter?
20        A.    Yes.
21        Q.    Well, what I'm asking you is, you
22    had just gotten a letter from your doctor
23    that said -- releasing you to work without

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

125

1  restrictions on or about February 2nd of
2  2006. What were those restrictions? What
3  could you or couldn't you do prior to the
4  time the doctor released you?
5      A.   Well, from bending over and
6  picking things up. When you go to a doctor,
7  they put it -- the restrictions that I
8  remember, walking and bending over and
9  picking things up.
10     Q.   And when were you put under those
11 restrictions; do you recall?
12     A.   Back in 2002 and during the
13 process of getting my knees operated on when
14 I had that truck wreck. And when I was going
15 up to Houston Clinic to get my yearly -- my
16 operations.
17     Q.   Well, were the restrictions that
18 you had at the time or up to the time that
19 you wrote this letter, February 2nd, 2006,
20 were those a result of the surgery that you
21 had had on your knees and on your feet?
22     A.   Partially, yes, sir.
23     Q.   Did you ever have any

126

1  conversation with Mr. Stewart about this
2  letter that's labeled Exhibit 5?
3      A.   No, sir.
4      Q.   Did you ever have any
5  conversation with anybody else at Bonnie
6  regarding that letter?
7      A.   No, sir. Nobody ever called me
8  to talk to me about these or anything.
9      Q.   Now, shortly after you received
10 this letter is when you got sent to
11 Donaldsonville, correct?
12     A.   Yes, sir.
13     Q.   Now, other than what you have
14 told me in this deposition here today, have
15 you ever had any conversations with anybody
16 at Bonnie about age discrimination?
17     A.   No at-length conversations. Some
18 people have asked me about it.
19     Q.   About your lawsuit?
20     A.   Yes, sir.
21     Q.   Who asked about your lawsuit, to
22 speak with you?
23     A.   Johnny Roy asked me about it.

127

1      Q.   Pardon me?
2      A.   My cousin, Johnny Roy Fendelson,
3  asked me about it. Tony Brown. I talked to
4  Butch Stewart about it. That's about -- it
5  has not been a big topic of conversation for
6  me, because it wasn't something that I wanted
7  to do or intended to do. I'd like to recover
8  the damages that it has done -- that has been
9  done to me.
10     Q.   If there are, in fact, people
11 older than you running routes with the
12 company -- I mean, filling your position,
13 would that convince you that you haven't been
14 discriminated against because of your age?
15     A.   No, sir.
16     Q.   Why not?
17     A.   Everybody at Bonnie gets a little
18 different treatment. And Bonnie doesn't
19 appear to be hiring people my age. So,
20 people -- somebody -- just because somebody's
21 older than me has a route, he probably has a
22 route that he -- you know, that he always
23 had. He probably hadn't had to go down and

128

1  find a store in Harleton, Texas, or Westaco,
2  Texas, or Brownsville, Texas, down on the
3  border where you're having a border war,
4  where you have to be, you know, very careful
5  about where you leave your truck.
6      Q.   Well, if somebody else who's
7  older than you is running a route and hasn't
8  had to do that, would that tend to indicate
9  to you that the company doesn't base its
10 decisions on age?
11     A.   No, sir, if somebody older than
12 me had a route, they probably had the same
13 route they had last year.
14     Q.   Well, the fact that they had the
15 same route they had last year, wouldn't that
16 tend to indicate to you that the company
17 doesn't discriminate on the basis of age?
18     A.   No, sir.
19     Q.   Well, why do you think -- if, in
20 fact, the company has discriminated against
21 you, Terry Watson, on the basis of your age,
22 why do you think you've been singled out for
23 that treatment?

32  (Pages 125 to 128)

## FREEDOM COURT REPORTING

129

1     A.  I have no way to know.  And I --
2 it's probably a good thing I don't know the
3 answer to that question.
4     Q.  You don't have any opinion as to
5 why the company would single you out to
6 discriminate against you on the basis of your
7 age?
8     A.  If I formed an opinion, it
9 wouldn't be good for the person I formed
10 it -- I formed it against.  So, I choose to
11 just sit and listen and see what to do.
12     Q.  Well, would it be fair to say,
13 then, that you don't have an opinion as to
14 why the company would single you out for age
15 discrimination?
16     A.  I sure would.  I have no idea why
17 they picked me out to discriminate against
18 me.
19     Q.  Do you know anybody else they've
20 discriminated against on the basis of their
21 age?
22     A.  No, sir.  I hadn't been going
23 around asking them.

130

1        MR. MORTON:  Let's mark this one
2 as the next exhibit.
3
4        (Whereupon, Defendant's Exhibit 6
5        was marked and copy of same is
6        attached hereto.)
7
8     Q.  (BY MR. MORTON)  Let me show you
9 what's been marked Defendant's Exhibit 6.
10 That is Driver's Helper-Employment Contract
11 for Kenny Smith, right?
12     A.  Yes, sir.
13     Q.  And Kenny Smith is your helper,
14 correct?
15     A.  Yes, sir.
16     Q.  Did you fill this document out?
17     A.  Yes, sir.
18     Q.  And is it your signature over
19 here in the blank that says salesman?
20     A.  Yes, sir.
21     Q.  And down here at the bottom, it
22 says, Kenny B. Smith requests year round
23 driver pay.  And then, there's something

131

1 written below that line.  What is that
2 written below that line?  Can you read it?
3     A.  I just said that I would like for
4 him to have it.
5     Q.  And then, you wrote Arthur Terell
6 wants it?
7     A.  Yes, sir.
8     Q.  And then, what does year round
9 driver pay mean?
10     A.  They have people that can get on
11 year round pay where they, you know, work
12 year round with the company.  And this guy's
13 been working for Bonnie Plant Farm ever since
14 he was a young child.  And he asked me if I'd
15 see if he could get it.  And the company
16 said, no, that he couldn't get it.
17     Q.  If he were to get it, would it
18 come out of your pocket?
19     A.  Yes, sir.
20     Q.  And who said he couldn't get it?
21     A.  Tim Trussell called me and told
22 me that he could not.  I don't know who
23 the --

132

1     Q.  What did you say to Tim?
2     A.  I told him that was fine.  He
3 just, you know, wondered if he could get it.
4     Q.  And --
5     A.  And I told him --
6     Q.  -- how old is Kenny Smith?
7     A.  I imagine he's around forty, just
8 guessing.  I don't really know.
9     Q.  If he received year round driver
10 pay, wouldn't that increase the chance that
11 your labor cost would exceed your commission?
12     A.  Well, it would -- it would put
13 him in a position to -- it may -- it may --
14 it may would figure less on that long route.
15 It's two hundred fifteen miles from Beeville
16 to the big stores in Brownsville.  And I
17 don't know if you've ever been down to
18 Brownsville, Westaco, Harleton, Rio Grande
19 City.  I don't know if you've ever been down
20 to the border or not --
21     Q.  I haven't.
22     A.  -- but it looks like Miami.
23        They're building Lowe's, Home

33  (Pages 129 to 132)

# FREEDOM COURT REPORTING

133

1  Depots, Wal-Marts down there like they're
2  going out of style.
3      Q.   And my question simply is, if
4  Mr. Smith received year round driver pay --
5      A.   If he went on year round driver
6  pay, it would probably be less money.
7      Q.   And why do you believe that?
8      A.   Because they would -- that would
9  be a set amount of dollars that he made
10  and --
11      Q.   Doesn't he get paid by the hour?
12      A.   Yes, sir, but he wouldn't be paid
13  by the hour if he was on the year round pay.
14  If he was on the year round pay, he would be
15  paid a certain amount of money per year.
16      Q.   Do you know whether or not he's
17  required in his position to be paid by the
18  hour?
19      A.   Do I know what?
20      Q.   Do you know whether the law
21  requires, given his position, he be paid by
22  the hour?
23      A.   No, sir, I had no idea what the

134

1  law was.  I just made the request for him
2  because he asked me to.
3      Q.   All right.  But if it turned
4  out --
5      A.   And the request was denied, and
6  nobody -- nobody -- nobody got upset.  Nobody
7  said anything.  It was just over.  We got --
8  we stayed at work, got up the next day and
9  went to work.  And find out, it wasn't --
10      Q.   Does he have a Commercial
11  Driver's License?
12      A.   No, sir, but he has a health
13  card.  To drive these trucks, you only have
14  to have a health card and a regular driver's
15  license.  And he has a health card and a
16  driver's license.
17      Q.   And, in fact, you don't know for
18  sure whether or not his receiving year round
19  driver's pay would have increased or
20  decreased his compensation, do you?
21      A.   That's true.
22      Q.   And, in fact, don't you think it
23  would be strange for him to request something

135

1  that would reduce his pay?
2      A.   No, sir, because if he could get
3  on the year round program, it would qualify
4  him for health insurance.  And he was
5  interested in getting some benefits.
6      Q.   As part of your job, are you
7  required to get in and out of the back of
8  your truck?
9      A.   Yes, sir.
10      Q.   Can you do that?
11      A.   Yes, sir.
12      Q.   When's the last time you did it?
13      A.   Probably Friday.  I got in and
14  pulled the plants out for the Wal-Mart in
15  Alice, Texas.
16      Q.   How many times a day do you get
17  in and out of the back of your truck?
18      A.   Some days, I don't even get in
19  the back of the truck.  But when I need to, I
20  do.
21      Q.   Isn't it your responsibility to
22  make sure that the load's safely loaded and
23  secured?

136

1      A.   Yes, sir.
2      Q.   How can you do that without
3  getting in the back of the truck?
4      A.   I can look up in the truck and
5  see.
6      Q.   But you don't get up in --
7      A.   I can see all through the truck.
8  I get up in there if I need to.
9      Q.   Is it physically difficult for
10  you to get up in there?
11      A.   I can get in and out of the truck
12  with a -- with difficulty.  And if I -- I
13  couldn't get in and out of the truck all day
14  long like most people could.  If I could, I
15  always worked the back of my truck myself
16  when I was able to get in and out of the back
17  of it.  But, now, I've gotten to where I
18  can't, and I try to have somebody working
19  with me that I can depend on to get up in the
20  back of that truck and do what needs to be
21  done up there.
22      Q.   But you can't get in and out like
23  most people can, correct?

34  (Pages 133 to 136)

## FREEDOM COURT REPORTING

137

1    A.    Correct.
2    Q.    Did you sign a contract with
3  Bonnie this year?
4    A.    I always sign them. I don't
5  remember if I signed one this year or not.
6  I'm sure I did. I'm sure I signed one at the
7  sales meeting in August.
8        MR. MORTON:  Mark that.
9
10        (Whereupon, Defendant's Exhibit 7
11        was marked and copy of same is
12        attached hereto.)
13
14    Q.    (BY MR. MORTON) Let me show you
15  what's been marked Exhibit 7 to your
16  deposition and ask if that is not a job
17  description for your position as driver/
18  salesman at Bonnie?
19    A.    Yes, sir.
20    Q.    You've seen it before, correct?
21    A.    Yes, sir.
22    Q.    And you understand that it does,
23  in fact, accurately describe your duties and

138

1  responsibilities --
2    A.    Yes, sir.
3    Q.    -- in that position, correct?
4        And would you agree with me that
5  in order to fully discharge your duties and
6  responsibilities, you need to be able to get
7  back and get in and out of the back of your
8  truck on a regular basis?
9    A.    Well, I know what's in the back
10  of my truck. I get in and out of my truck
11  when I need to. And I've had no problem, and
12  nobody's ever told me I had a problem. Now,
13  you're telling me that I've got a problem
14  getting in and out of the back of my truck.
15  Where does that come from?
16    Q.    I'm just asking you questions,
17  Mr. Watson. And you're telling me you do
18  have a difficult time getting in and out of
19  the back of the truck.
20    A.    But I don't have a difficult time
21  running my route and doing what needs to be
22  done on that route.
23    Q.    Are you happy with your current

139

1  route?
2    A.    No, sir.
3    Q.    Why not?
4    A.    It's a long route with a pile of
5  chain stores on it that's just too cumbersome
6  and too long and hard to work. It's a type
7  of route that is -- that is -- it's just
8  overloaded with chain stores.
9    Q.    Don't chain stores -- when you
10  say chain stores, do you mean stores like
11  Wal-Marts, Lowe's?
12    A.    Wal-Mart, Home Depot, Lowe's --
13    Q.    And --
14    A.    -- Kmart.
15    Q.    And doesn't the presence of a lot
16  of chain stores on your route give you an
17  opportunity to make more money?
18    A.    Excuse me. It depends on where
19  you are. The reason that I have -- I'll give
20  you an example. Adam Alley, he worked a
21  route out of Bells, Tennessee. And he had
22  about four stores on it, but one of them
23  could sell a hundred thousand dollars worth

140

1  of plants.
2        I have stores down there, and we
3  don't really know what they'll sell. We
4  don't really have the product that they ask
5  for to put in the stores when they -- when
6  they want it. And it's -- that's just a
7  loaded question to say about this business.
8    Q.    Well, you've got the same product
9  to sell to those stores that everybody else
10  that works out of Beeville, Texas, has, don't
11  you?
12    A.    Those stores start selling in
13  February and March. And as a general rule,
14  it's hard to have a lot of product ready, you
15  know, in February and March.
16    Q.    Did you understand my question?
17  My question is, don't you have the same
18  products to sell to those stores that
19  everybody else that works out of your station
20  has?
21    A.    I have the product a month late
22  after that season down there has slowed down.
23    Q.    At the same time that everybody

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

141

1  else in Beeville, Texas --
2      A.   At the same time they have
3  access to it --
4      Q.   -- gets it, correct?
5      A.   -- I have access to it, but it's
6  late for the people down on the border.
7          MR. MORTON: Let's mark this one
8  as the next exhibit.
9
10         (Whereupon, Defendant's Exhibit 8
11         was marked and copy of same is
12         attached hereto.)
13
14     Q.   (BY MR. MORTON) What's Exhibit
15  8? Is that your charge of discrimination,
16  Mr. Watson?
17     A.   What was your question?
18     Q.   Is that your charge of
19  discrimination that you filed with the EEOC?
20     A.   Yes, sir.
21     Q.   And you understand that you
22  signed it under oath, right?
23     A.   Yes, sir.

142

1      Q.   You say that you developed the
2  route in Bells, Tennessee, into a very
3  lucrative route. That route had actually
4  been around since the early '70s, hadn't it,
5  sir?
6      A.   Yes, sir.
7      Q.   You state in here that on your
8  route in Bells, Tennessee, you made forty-
9  five thousand dollars.
10     A.   Yes, sir.
11     Q.   Do you see that?
12     A.   Yes, sir.
13     Q.   Now, your W-2 for Bonnie for
14  2006, right?
15         MR. ROBERSON: He didn't work
16  that route in 2006.
17     Q.   (BY MR. MORTON) You didn't work
18  that route in 2006?
19     A.   No, sir.
20     Q.   Well, does your 2006 W-2 reflect
21  your compensation from that route?
22     A.   Let me see. I was paid that
23  on -- when I was in Donaldsonville,

143

1  Louisiana. Where is that? It is hard -- it
2  is hard to keep up with when you're paid for
3  what, sir.
4      Q.   Well, in 2006, you made thirty-
5  eight thousand dollars from Bonnie, right?
6      A.   Right. But that was from 2005
7  payments, I'm sure.
8      Q.   All right.
9      A.   I'm not really sure what the
10  settlement sheet is. I'd have to look at
11  them, go through them, and go back and figure
12  it up what was what.
13         MR. MORTON: Let's mark these as
14  9.
15
16         (Whereupon, Defendant's Exhibit 9
17         was marked and copy of same is
18         attached hereto.)
19
20     Q.   (BY MR. MORTON) Let me show you
21  what I've marked as Exhibit 9 to your
22  deposition. Ask you if those are not your
23  W-2s for 2003, 2004, and 2005?

144

1      A.   Yes, sir, these are my W-2s for
2  these years. But for what year I was paid on
3  them, my compensation was paid on what year I
4  made it, would be hard to tell looking at
5  this W-2.
6      Q.   Okay. But in none of those
7  years, 2003, 2004, and 2005, were you paid
8  forty-five thousand dollars by Bonnie; isn't
9  that correct?
10     A.   That is correct. But my pay for
11  2005 is not represented on the W-2 form.
12     Q.   Well, is your pay for 2005 --
13  it's not represented on any of the W-2 forms?
14     A.   I'm sure that part of it would be
15  over on the 2006. In 2006, I had to file
16  state income taxes to the State of Alabama
17  and to the State of Louisiana. And part of
18  that compensation was for money that I made
19  in Tennessee that I shouldn't have had to pay
20  any state income tax on.
21     Q.   Why not?
22     A.   Tennessee doesn't have a state
23  income tax.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

145

1    Q.   Well, certainly, it's not
2  Bonnie's fault what the tax laws in other
3  states are, is it?
4    A.   It's Bonnie's fault that they
5  paid me for money earned in Tennessee as if
6  it was earned in Louisiana.
7    Q.   Did you take that up with Bonnie?
8    A.   I just realized that I had to
9  fill the forms out and filled them out,
10  because I had been down there working. And
11  then, when I had time to look at it -- see, I
12  don't even have my forms yet for this year.
13  I'm going to have to get my taxes filled out
14  before April the 15th now. And I travel so
15  much until we're going to have to get the IRS
16  to send us the tax forms from 2006.
17    Q.   Anybody running your route -- did
18  anybody run your route yesterday?
19    A.   No, sir.
20    Q.   Anybody running your route today?
21    A.   No, sir.
22    Q.   Why didn't you tell Chris Hall
23  until Sunday that you were going to be here

146

1  instead of out there?
2    A.   I really wasn't planning on
3  leaving Friday. I was planning on waiting
4  and leaving Saturday morning. And I just
5  changed my mind. And I've got a six-year-old
6  son that I've never spent Easter with. He
7  has lost his grandfather and grandmother on
8  his mother's side. And I said, if I'm going
9  to spend Easter with him, I've got to go now,
10  because it's a sixteen-hour drive.
11        And I didn't really think about
12  calling Chris Hall. And the route is in good
13  shape. And I feel sure he wouldn't send
14  anybody down there on it anyway.
15    Q.   Don't you think, as your boss, he
16  had the right to know whether you were going
17  to be there or not?
18    A.   He sure did.
19    Q.   He's got a cell phone, doesn't
20  he?
21    A.   He sure does.
22    Q.   And you've got a cell phone,
23  don't you?

147

1    A.   Yes, sir.
2    Q.   And you know his number, don't
3  you?
4    A.   Yes, sir.
5    Q.   You just didn't tell him?
6    A.   I just didn't do it. There's no
7  other way around.
8    Q.   Did you not get out to Beeville,
9  Texas, late this year?
10    A.   No, sir. I got out there -- I
11  carried a new man out to Beeville. And I had
12  some problems at home that I had to come back
13  to see about. And nobody was put on my route
14  to see about anything then. So, I didn't
15  figure he would be concerned about putting
16  anybody on my route today.
17    Q.   Didn't you get out to Beeville,
18  Texas, later than you were supposed to
19  report --
20    A.   No, sir.
21    Q.   -- initially?
22    A.   No, sir.
23    Q.   You went home and you stayed

148

1  longer than you had told Chris Hall you were
2  going to stay, did you not?
3    A.   Yes, sir.
4    Q.   And, in fact, he called you
5  several times trying to find out when you
6  were coming back, didn't he?
7    A.   I think he might have called me
8  one time, maybe twice. I told him what I was
9  doing. I take Coumadin.
10    Q.   I beg your pardon?
11    A.   I take Coumadin, which is rat
12  poison. It's what you feed a rat, and it
13  will cause them to bleed to death internally.
14  And I was having some problems with that
15  Coumadin. And I had to put Sam in the
16  hospital. He had pneumonia. And I had to go
17  leave him in the hospital and get him.
18        But I wasn't -- that's the
19  only -- that's the only time out of my tenure
20  with the company I've ever been late getting
21  started. And I went out there to start and
22  got -- showed the new man my route. And I
23  took the man around and showed him the stores

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

149

1 on the route, because I was going to give
2 that route to him. And when it came time for
3 me to go back on mine, I had major problems
4 that I needed to see about.
5　Q. And there were, as you're aware,
6 a number of complaints from customers on your
7 routes about lack of service, correct?
8　A. No, sir, there are no complaints
9 that I know of on my route.
10　Q. You're not aware of any
11 complaints on your route at all?
12　A. No, sir.
13　Q. And you're not aware -- Tim
14 Trussell never told you that there were
15 complaints that you had not been to stores on
16 your route in a timely fashion?
17　A. He told me that I needed to get
18 down there and get that route straightened
19 out, that some of the stores had looked for
20 plants a little earlier than they got them.
21　Q. And had called him and wanted to
22 know where the plants were, correct?
23　A. I don't know who they called. I

150

1 don't know who they talked to about it.
2　Q. You don't know whether they made
3 complaints or not?
4　A. Huh-uh.
5　Q. Right?
6　A. Right. When you start off, they
7 usually call you and tell you -- it's not
8 unusual for them to call and tell you we're
9 ready to get plants now. It's not an unusual
10 call at all.
11　Q. How late were you getting started
12 on your route?
13　A. I wouldn't know how to define
14 that. I know the Home Depots didn't even
15 come out to see us, we started so early. The
16 Lowe's people wanted their racks in place.
17 We had a problem getting them --
18　Q. Well, let me ask it this way --
19　A. -- in place and set up.
20　Q. -- when were you supposed to
21 start running that route?
22　A. I normally started running that
23 route the week that I carried Chris Salter

151

1 down there and showed him my route. That's
2 the week I should have started running that
3 route.
4　Q. And how much time did you miss by
5 coming back to Birmingham, or coming back to
6 Alabama?
7　A. I don't really know. You know,
8 you're just in the heat of working and trying
9 to get things straightened out and do the
10 best you can do.
11　Q. Well, you don't know when you
12 left out there and when you got back?
13　A. I don't.
14　Q. Why'd you come back here?
15　A. I needed to see about my Coumadin
16 levels, and I had to take Sam and put him in
17 the hospital, because he had pneumonia. I
18 had a death in the family, and I also lost a
19 neighbor while I was here.
20　Q. Okay. I'm asking you why you
21 came back here.
22　A. I came --
23　　MR. ROBERSON: I think he told

152

1 you.
2　A. I came back here to tend to --
3　　MR. MORTON: He's telling me that
4 he lost a neighbor while he was here. That
5 doesn't explain -- that doesn't answer my
6 question as to why he came back here.
7　A. I came back here to see my
8 doctor.
9　Q. (BY MR. MORTON) To see your
10 daughter?
11　A. Doctor.
12　　MR. ROBERSON: Doctor.
13　Q. (BY MR. MORTON) To see your
14 doctor. What doctor is that?
15　A. Dr. Pat Walker.
16　Q. And where is Dr. Pat Walker?
17　A. He's in Vernon, Alabama.
18　Q. And how long was that supposed to
19 take?
20　A. You don't know when you're having
21 problems getting your blood level right.
22　Q. Did you try to find a doctor in
23 Texas?

38 (Pages 149 to 152)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

153

1    A.    I have a doctor in Texas.
2    Q.    Why didn't you go to that doctor?
3    A.    He suggested -- he suggested that
4  I come.  I had to come home twice.  The
5  second time was a time that really hurt.  I
6  overdosed out there.  And he said that I
7  could have an allergic reaction, and it could
8  be bad.
9    Q.    When was the second time you came
10 back?
11   A.    I don't remember.
12   Q.    Was it this year?
13   A.    This year, yes, sir.  I told you,
14 this is the only year that I have ever been
15 late on a route.  And one time out of as many
16 years as I've been out there, and I had no
17 help offered me at all.
18   Q.    What do you mean no help offered
19 you?
20   A.    Exactly what I said.  Nobody
21 offered to do anything on that route.  And
22 when I go back this time, if anybody's done
23 anything on that route, it would be shocking.

154

1    Q.    Did you ask anybody -- did you
2  ask anybody to run your route?
3    A.    No, sir, there wasn't nobody out
4  there to ask.  I didn't even know where the
5  route was.  The way they showed me that
6  route, they just put some dots on a map.
7    Q.    So, you've been back to Alabama
8  since you started in Beeville three times?
9  Twice were for, you said --
10   A.    That's right, and this is --
11   Q.    -- medical reasons --
12   A.    -- third time.
13   Q.    -- and then, this time?
14   A.    That's right.
15   Q.    The other two times, did you
16 tell --
17   A.    This is the first time --
18   Q.    -- Chris when you left?
19   MR. ROBERSON:  Let him ask the
20 question.
21   A.    Yes, sir.  Yes, sir.
22   Q.    (BY MR. MORTON)  When will you be
23 back out there?

155

1    A.    Well, I was planning on driving
2  back tonight.
3    Q.    When you were given your route,
4  weren't you given a list of customers and
5  addresses?
6    A.    Yes, sir.
7    Q.    Do you have access to a map?
8    A.    Have you ever looked at a map in
9  south Texas?
10   Q.    My question is, did you have
11 access to a map?
12   A.    I went by the visitor's station
13 and picked a map up.
14   Q.    And did you have phone numbers
15 for these places?
16   A.    Yes, sir.
17   Q.    Did you call them and find out
18 how to get there?
19   A.    No, sir.
20   Q.    Why not?
21   A.    You usually just find them.
22   Q.    Pardon me?
23   A.    You usually just find them.

156

1    Q.    But that was an option you had
2  that you didn't exercise, right?
3    A.    Yes.  And those people speak a
4  different language, and it's hard to ask
5  somebody where something is out there.  They
6  can tell me somebody's name out there, and I
7  might have no idea what they said.
8    Q.    How old is Bill Rainer, by the
9  way?
10   A.    I imagine he's a few years
11 younger than I am.  I don't know for sure.
12   Q.    You told me one medicine that you
13 were on.  What are you on that medicine for?
14   A.    To thin my blood.
15   Q.    All right.  What condition causes
16 you to need to have your blood thinned?
17   A.    My heart.
18   Q.    All right.
19   A.    I need to be sure that I don't
20 have clots should I have a problem.
21   Q.    And when did you develop problems
22 with your heart?
23   A.    I had them all my life, and I

39  (Pages 153 to 156)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

157

1  found out about them in 2000.
2      Q.   Did you miss time in 2007 as a
3  result of heart problems?
4      A.   In when?
5      Q.   2007?
6      A.   No, sir.
7      Q.   Did you miss some time in 2007
8  for any reason?
9      A.   No, sir.
10      Q.   What other medications do you
11  take?
12      A.   I take Actos.
13      Q.   What is that for?
14      A.   Sugar lowering drug.
15      Q.   Are you diabetic?
16      A.   Yes, sir.
17      Q.   When did you find out you were
18  diabetic?
19      A.   Joe sent me to get a physical
20  when I was working with him over in Union
21  Springs.  And the doctor knew my family
22  history.  It must have been mid '80s,
23  somewhere in there, just guessing.

159

1      Q.   What for?
2      A.   Pain.  I take Skelaxin for pain.
3  I take Florocid.  And I take --
4      Q.   What's that for?
5      A.   Water pill.
6      Q.   What do you mean by water pill?
7      A.   It makes you go to the bathroom.
8  It's a diuretic.
9      Q.   What else?
10      A.   Let's see.  Metropol.  It's a
11  heart medicine.
12          What else have you got?  How many
13  have you got on there?
14      Q.   One, two, three, four, five, six,
15  seven, eight, nine, ten.
16      A.   Did you put -- yeah, you put
17  Coumadin on there.  I take some more, but I
18  can't just right offhand recall them, and I
19  know what they are.
20      Q.   All right.  The ones that you've
21  told me about, do you take those daily?
22      A.   Yes, sir.
23      Q.   And there are other medications

158

1      Q.   What else do you take?
2      A.   Clonidine.
3      Q.   What is that?
4      A.   That's a blood pressure lowering
5  medicine.
6      Q.   What's it for?
7      A.   Heart.
8      Q.   What else?
9      A.   Diovan.
10      Q.   What's that for?
11      A.   I don't know.  It's a heart
12  medicine is all I know.
13      Q.   What other medications do you
14  take?
15      A.   I take Glucophage.
16      Q.   Is that for the diabetes?
17      A.   Diabetes.
18      Q.   What else do you take?
19      A.   I take Lyrica.
20      Q.   For what?
21      A.   For nerves.
22      Q.   What else?
23      A.   I take Hydrocodeine.

160

1  you take daily as well?
2      A.   Yes, sir.
3      Q.   Do any of the medicines that you
4  take make it unsafe for you to operate
5  machinery?
6      A.   No, sir.
7      Q.   You specifically checked into
8  that?
9      A.   Yes, sir.  I have a --
10      Q.   That's your health card so you
11  can drive?
12      A.   Yes, sir.
13      Q.   It was issued in October of '07?
14      A.   Yes, sir.
15      Q.   Have you added any medication
16  since that time?
17      A.   No, sir.
18      Q.   You told me about your
19  difficulties getting in and out of the truck.
20  Do you have difficulties bending, stooping,
21  or lifting?
22      A.   I don't have any problem moving
23  plants, but I have a problem with weights.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

161

1   Q.   What kind of problem with weights
2   do you have?
3   A.   As long as I stay a certain
4   height, none.  If I go up too high with them.
5   Q.   In other words, you have problems
6   lifting things above the level of your chest?
7   A.   Yes, sir, that would be up
8   overhead, somewhere up there.  I don't know
9   exactly where the line is.
10  Q.   Do you have any other problems
11  with weights?
12  A.   Well, not to mention that I can
13  think of.
14  Q.   Do you have any problems with
15  bending or stooping?
16  A.   No, sir.  They said they was
17  going to get a man to help me load my truck.
18  Sometimes we have help and sometimes we
19  don't.
20  Q.   All right.  And this would be
21  somebody in addition to Mr. Smith?
22  A.   Yes, sir.
23  Q.   And where would this person come

163

1   Bonnie, do you not, to do business with a
2   certain number of schools and a certain
3   number of churches?
4   A.   Yes, sir.
5   Q.   And that would be twenty schools
6   and twenty churches?
7   A.   Yes, sir.
8   Q.   And how many schools and churches
9   have you signed up at this point?
10  A.   I've probably got one church and
11  probably six schools, just guessing offhand.
12  That'll be one of the things that I'll start
13  doing hard when I go back.
14  Q.   Are you behind on that with
15  respect to the other people out there in
16  Beeville?
17  A.   I don't know what -- I don't
18  know.  I have no idea what --
19  Q.   Now, your performance, your
20  sales, your achievement of levels for bonuses
21  and so on affects the compensation of the
22  station manager, does it not?
23  A.   Yes, sir.

162

1   from?
2   A.   There on the yard.
3   Q.   All right.  And what's his normal
4   job?  Does he normally work in the
5   greenhouse?
6   A.   Well, sometimes he would be
7   working on another truck or -- the
8   greenhouse, you don't get any help from them
9   down there.
10  Q.   Do you and Mr. Smith need help
11  loading the truck?
12  A.   Sometimes we do and sometimes --
13  when we can get it, if we need it.  When we
14  can't, we do it ourselves.
15  Q.   Who pays for the labor to help
16  you load your truck?
17  A.   It's charged to my account.
18  Q.   Charged to your account?
19  A.   Yes, sir.
20  Q.   At what rate?
21  A.   At whatever rate that person is
22  being paid.
23  Q.   Now, you have some obligations to

164

1   Q.   If you don't do a good job, it
2   takes money out of his pocket, right?
3   A.   That's right.
4   Q.   What's the name of the church you
5   signed up?
6   A.   It was a Presbyterian church over
7   there in Beeville.  I don't remember what the
8   name of it was.
9   THE WITNESS:  When you get where
10  we can, I'd like to take a restroom break.
11  MR. MORTON:  All right.  Why
12  don't we take a break?
13
14  (Whereupon, a brief recess was
15  taken.)
16
17  (Whereupon, Defendant's Exhibit
18  10 was marked and copy of same is
19  attached hereto.)
20
21  Q.   (BY MR. MORTON)  How tall are
22  you, Mr. Watson?
23  A.   Around six one.

41  (Pages 161 to 164)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

165

1    Q.    All right.  And how much do you
2    weigh?
3    A.    I weigh around three twenty-five,
4    three twenty-six now.
5    Q.    All right.  And what's the most
6    that you've weighed in the last two years?
7    A.    Probably three thirty.
8    Q.    Would you agree with me that your
9    physical condition makes it difficult for you
10   to do your job as a driver/salesman at
11   Bonnie?
12   A.    I would agree with that theory,
13   but I have always been able to do the job and
14   get the job done regardless of it.  Somehow,
15   I've been blessed to do it.
16   Q.    Would you agree with me that you
17   are not capable of working as quickly as you
18   could when you were younger?
19   A.    Yes, sir.  I definitely can't
20   work as fast as I used to.  Riding in them
21   trucks is rough on you.
22   Q.    Let me show you Defendant's
23   Exhibit 10.

166

1    MR. MORTON:  And, Jerry, I just
2    shot you a copy over there.
3    Q.    Is that your settlement sheet,
4    your commission settlement sheet, for the
5    spring of 2005?
6    A.    Fall, '04 and spring, '05.  They
7    added -- yeah, they started adding the fall
8    sales then.  I don't know where fall, '04
9    came from, and I don't know where spring, '05
10   came from.
11   Q.    Pardon me, sir?
12   A.    Where did fall, '04 come from?
13   Q.    Did you ever work a fall route?
14   A.    Yes, sir.
15   Q.    When?
16   A.    I worked fall routes up until '05
17   when I went to work in Bells.
18   Q.    All right.  Well --
19   A.    So, it must have been the fall
20   route that I worked down in Texas.
21   Q.    Have you seen this settlement
22   sheet before?
23   A.    Yes, sir.

167

1    Q.    And is it, in fact, accurate?
2    A.    The best I can tell, it probably
3    is.
4    Q.    Now, when you wanted -- when you
5    decided to go to Bells to swap with Butch
6    Stewart, part of your reason for doing so was
7    that you would not have to run a fall route,
8    correct?
9    A.    Would not have to run a fall
10   route and wouldn't have to run a long spring
11   route.
12   Q.    And, generally, the longer your
13   spring route, the more opportunity you have
14   to make money?
15   A.    No, sir.
16   Q.    So far as not running a fall
17   route is concerned, if you don't run a fall
18   route, that cuts into your income, does it
19   not?
20   A.    Yes, sir.
21   Q.    And did you --
22   A.    The reason that I had to make
23   that change is, I was making plans to have my

168

1    knees and feet repaired.
2    Q.    Have you sought to work a fall
3    route since then?
4    A.    No, sir.
5    Q.    Never asked anybody for the
6    opportunity to do that, correct?
7    A.    No, sir.
8    Q.    And you had an opportunity to run
9    a fall route in Beeville, did you not, this
10   past fall?
11   A.    No, sir.  Fall routes were filled
12   over there this fall.
13   Q.    And nobody asked you to run a
14   fall route in Beeville --
15   A.    No, sir.
16   Q.    -- is that your testimony?
17   A.    Yes, sir.
18   Q.    Have you made any attempts to
19   calculate your damages in this case?
20   A.    No, sir, I have no idea what my
21   damages would be or what to -- nobody's told
22   me anything about damages if you mean dollar
23   value --

42  (Pages 165 to 168)

## FREEDOM COURT REPORTING

169

1    Q.    That's right.
2    A.    -- values.
3    Q.    Have you made any --
4    A.    I mean, I -- and I can't
5    calculate the physical and the working
6    damages.  No way to calculate that.
7    Q.    What do you mean by that?
8    A.    When you've been mistreated, you
9    can't calculate in dollars and cents what
10    that has cost you --
11    Q.    Well, have you made any --
12    A.    -- that you can calculate in
13    dollars and cents what you would have made
14    against what you're making.
15    Q.    Have you made any attempt to do
16    that?
17    A.    No, sir, I've had no reason to.
18    MR. MORTON:  Let's mark that.
19
20    (Whereupon, Defendant's Exhibit
21    11 was marked and copy of same is
22    attached hereto.)
23

170

1    Q.    (BY MR. MORTON)  I'll show you
2    Defendant's Exhibit Number 11, which is a
3    copy of some documents that you produced
4    today in this spiral notebook.
5    A.    All right, sir.  This is just
6    where I was getting information on stores
7    that I've got to get into the computer.  And
8    the way the stores -- the way I fixed up my
9    route to run it, with the store numbers on it
10    where I could write them down without, you
11    know, having to pull the computer sheet up to
12    find them.
13    Q.    Do any of the documents in
14    here -- do you contend that any of the
15    documents in here support your claim of age
16    discrimination, any of the documents
17    contained in this exhibit?
18    A.    The fact that I'm down there on
19    that route does.  The fact that there is the
20    opportunity for less money to be made on that
21    route does.
22    One thing I see in these
23    documents is Bonnie said that I didn't attend

171

1    a 2005 sales meeting.  I was at the sales
2    meeting.
3    Q.    And that was the 2005 sales
4    meeting in Auburn?
5    A.    In Auburn, Alabama.
6    Q.    All right.
7    A.    You know, they even stopped
8    giving me my base pay.  Why did they do that?
9    Q.    When did they stop giving you
10    base pay?
11    A.    In June or July of this year -- I
12    can't remember exactly when -- of '07.
13    Q.    Is that when your --
14    A.    Here it is.
15    Q.    And they stopped giving you your
16    base pay, you say, in 2007?
17    A.    Yes, sir.
18    Q.    Or, rather, reduced your base
19    pay, right?
20    A.    Reduced my base, yes, sir.
21    Q.    And, in fact, the explanation
22    that you received from Mr. Stewart for that
23    was that you were -- that they were -- they

172

1    were taking money out to pay for your
2    insurance, correct?
3    A.    Yes, sir.
4    Q.    And, in fact, if we -- as we've
5    seen, in 2007, you were upside down so far as
6    the company is concerned?  Your draws
7    exceeded your commissions earned, right?
8    A.    Yes, sir.
9    Q.    All right.  There's a statement
10    in this exhibit --
11    MR. MORTON:  What exhibit is
12    this, 10?  What's the last --
13    MR. ROBERSON:  The first page
14    right there.
15    MR. MORTON:  11?
16    THE WITNESS:  11.
17    Q.    (BY MR. MORTON)  All right.
18    There's a page in here that's several pages
19    in that says, on February or around February
20    15th, Tim Trussell called about helper hours
21    of 101.  He said he --
22    A.    He justified that because I'd
23    been driving the truck seventy-nine hours.

43  (Pages 169 to 172)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

173

1    Q.    What was the point of his call?
2    A.    I didn't know, unless he thought
3  I was just trying to give a helper pay time
4  for no reason. And it just made me wonder if
5  I had made a mistake or something.
6    Q.    Did Mr. Smith drive any of those
7  seventy-nine hours or did you drive them all?
8    A.    I drove them all.
9    Q.    And your testimony under oath is
10  Mr. Smith never drove your truck?
11    A.    No, sir.
12    Q.    No, sir, he did not?
13    A.    My testimony is not -- that Mr.
14  Smith never drove my truck. He didn't drive
15  my truck during this period of time
16  (indicating).
17    Q.    When did he drive your truck?
18    A.    He drove my truck when I took my
19  morning pills instead of my night pills. And
20  he drove it on the log, and the log was
21  turned in.
22    Q.    All right. What do you mean when
23  you took your morning pills instead of your

174

1  night pills?
2    A.    I accidently took the wrong pills
3  one day.
4    Q.    Is that the only time he ever
5  drove your truck?
6    A.    And he has driven around the
7  yard, and he's driven from the plant farm to
8  the house. But that's the only time he's
9  ever driven it on the route.
10    Q.    Did you have permission for him
11  to drive it on the route that day?
12    A.    Yes, sir.
13    Q.    From who?
14    A.    We had a form that we filled out
15  on him. And he is a legal driver.
16    Q.    Was it correct that, as reflected
17  on this page of Exhibit 11 that we were
18  looking at a minute ago that references
19  February the 15th, was it true that, in fact,
20  you had a hundred and one helper hours and
21  only seventy-nine hours on the GPS?
22    A.    Yes, sir.
23    Q.    Why?

175

1    A.    Well, it takes time to load the
2  truck, unload the truck, and it takes time to
3  put racks up.
4    Q.    What was the resolution of Mr.
5  Trussell's call to you? How did y'all leave
6  it?
7    A.    He left it with it was possible
8  for him to have the hundred and one hours.
9    Q.    Okay. So, after you explained,
10  he agreed with you?
11    A.    Well, he -- I mean, he had it
12  right there in front of him. It wasn't --
13  when something comes up out of whack, they're
14  going to check it. And that came up out of
15  whack, and they checked it and it checked out
16  all right, which was -- you know, I'm
17  thankful for.
18    Q.    So, his call to you, then, was
19  not anything out of the ordinary?
20    A.    Well, yes, sir, it was out of the
21  ordinary for him to call me about what he
22  called me about. It concerned me. I
23  wouldn't have written it down.

176

1    Q.    Well, I thought --
2    A.    But it was nothing to be -- it
3  was straightened out and resolved on the
4  phone.
5    Q.    All right. And when something
6  unusual like that pops up, it's not unusual
7  for the driver to be called, correct?
8    A.    Correct.
9    Q.    Now, the seventy-nine hours here
10  that's reflected that you drove, was that all
11  reflected in your logbook?
12    A.    No, sir.
13    Q.    Why not?
14    A.    It's illegal to put down that
15  number of hours in your logbook. If you put
16  your hours in your logbook, nine times out of
17  ten, you're going to be illegal. It's
18  just -- it's an illegal act that I performed
19  doing my duties for Bonnie Plant Farm.
20    Q.    So, you falsified the logbook?
21    A.    Yes, sir.
22    Q.    Did you discuss that with anybody
23  at Bonnie?

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

177

1    A.    They pretty well understand about
2  it.
3    Q.    No, the question was:  Did you
4  discuss it with anybody?
5    A.    Nobody ever said anything to me
6  about it.  I didn't say it to any of them.
7  I've never heard them say, drive legal.
8    Q.    Have you ever heard of them say
9  drive illegal?
10   A.    I've heard them insinuate it.
11 I've heard them say it was good to go out and
12 unload a load and come back in and get
13 another load and go back out with it.
14   Q.    But nobody ever told you to drive
15 illegal?
16   A.    No, sir, nobody's ever told me to
17 drive illegal.
18   Q.    And you've never told anybody
19 that you were driving illegal, nobody at
20 Bonnie; is that right?
21   A.    No, sir.  I'm sure that Bonnie
22 wouldn't stand behind you in the event that
23 you had a problem driving illegal like that,

178

1  but I'm sure that it'd be hard to stay on the
2  payroll if you didn't do it.  You have a
3  certain number of hours that you can drive a
4  certain number of hours a day.  And our work
5  time and our drive time doesn't coincide a
6  lot.  And it's -- to me, it's not something
7  to be -- deny, be upset about, or --
8    Q.    How many times did you falsify
9  the logbook?
10   A.    Probably every time I turned one
11 in.
12        Can you write down your hours
13 what you do all day?
14   Q.    I do.  I have to.
15   A.    Well, you're a good man.  Do you
16 ever falsify yours?  I didn't mean that.  I
17 didn't mean that.
18   Q.    No, sir, I don't.
19   A.    I didn't mean that.  But, I mean,
20 ours is a little different.
21        MR. ROBERSON:  According to his
22 time sheets, it's a hundred and four.
23        MR. MORTON:  Now, that's not

179

1  true.  I'm only ninety-six.
2    Q.    No.  We don't do that.  I don't
3  do it.  He doesn't do it.  We've seen people
4  in our profession come to serious grief over
5  that.
6        MR. MORTON:  Hadn't we?
7        MR. ROBERSON:  I'm certain that's
8  true.
9    A.    Well, it -- you know, it happens
10 with us.  But I'm not -- I'm not trying to
11 shove it off.  But I'm trying to be honest
12 with you, sir.
13   Q.    (BY MR. MORTON)  Good.  Well, I
14 appreciate your being honest.
15        There's reference in here about
16 the 2005 sales meeting.  It says, my name and
17 an example of my bad work was put in the
18 meeting by Butch Stewart.  He will admit that
19 the example he gave was charged by his
20 brother, Joe, to make him look better than
21 me.  But according to dollars in sales, that
22 would be debatable.  What's that a reference
23 to?

180

1    A.    They made a statement that Butch
2  was just going into a town and saw a store
3  sitting up on a hill and went up and opened
4  it up and got sixteen thousand dollars out of
5  it.  That store that was sitting up on that
6  hill, I was working a store that belonged to
7  the same company in a different location in
8  the town.  And I had been trying to get into
9  that store and couldn't.  And I told Butch
10 that he'd probably have no problem getting
11 into that store.  That the garden center
12 manager from the store that I was working at
13 was going to be the garden center manager in
14 that store the next year.  And it was a real
15 good plant store.
16   Q.    Well, what was said about you in
17 this 2005 sales meeting?
18   A.    That I was just riding by the
19 store and never went by there and never saw
20 it, just never paid any attention to it.
21   Q.    And you say Butch Stewart said
22 that?
23   A.    No, sir, that was kindly

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

181

1  insinuated in there.
2      Q.   Well, my point is, was your --
3  did your name actually even come up in that
4  sales meeting?  Did anybody mention your name
5  in that sales meeting?
6      A.   No, sir.
7      Q.   There's also a statement, in
8  2006, showed --
9      A.   Deliveries and not sales.
10     Q.   What does that mean?
11     A.   Do you have a copy of the
12 exhibit?
13          MR. ROBERSON:  It's the EEOC
14 response.
15     A.   EEOC response.
16          MR. ROBERSON:  Bonnie Plant's
17 EEOC response.
18     A.   These are just notes that I wrote
19 down today when I read that response.  I
20 don't keep notes.  I don't keep a log.  I
21 don't --
22     Q.   (BY MR. MORTON)  Now, when you're
23 talking about in response in putting down for

182

1  2006 deliveries rather than sales, do you
2  mean that the number that was shown was not
3  the number you actually collected?
4      A.   Yes, sir.
5      Q.   And, in fact, in the chain
6  stores, the payment's automatic, right?
7      A.   Yes, sir.
8      Q.   And with respect to other stores,
9  it's your responsibility to collect the
10 money, correct?
11     A.   Yes, sir.
12     Q.   And the difference between
13 deliveries and sales would be the difference
14 between -- would be money that you didn't
15 collect; is that right?
16     A.   We put plants in -- we're only
17 paid for what sells.  Our gross deliveries
18 are higher than our sales figures.
19     Q.   Okay.  But, again --
20     A.   These people -- I've worked for
21 some smart people.  They learn if you keep
22 those plants out there, somebody's going to
23 buy them.  And if you've got them out there

183

1  at the right time, they're really going to
2  buy them.
3      Q.   The question, though, is, the
4  difference between deliveries and sales, is
5  that the difference between -- I mean, is
6  that money that you are responsible for
7  collecting and didn't?
8      A.   No, sir.
9      Q.   Okay.
10     A.   It's the difference in the amount
11 of plants that you put out and what actually
12 sells.
13          MR. ROBERSON:  They can return
14 the plants they don't sell.
15          MR. STEWART:  Consignment.
16     Q.   (BY MR. MORTON)  Okay.  You're
17 saying that the figure that appears on the
18 EEOC response was deliveries, not sales?
19     A.   They gave sales in all but one.
20 And one, they put deliveries.
21     Q.   Okay.  Then, you say, around
22 2000, my route was divided into three routes.
23 Bill Rainer told me there would be no more

184

1  big routes, it looks like.
2      A.   Yes, sir.
3      Q.   What's that a reference to?
4      A.   Well, it's just something that
5  came to my mind when I was sitting down and
6  thinking about, you know, how I had been
7  mistreated through the years.  And it -- when
8  it -- when he did that, he sent me all the
9  way to the edge of Mississippi to Ferriday,
10 Louisiana.  And when I'd get over there and
11 get out the plants, I'd have to drive back
12 all the way across the State of Louisiana
13 into east Texas to get another load.  And I
14 just felt like that, you know, he could have
15 figured out another way to have done things.
16 But he didn't.  And, you know, I'm satisfied.
17 I'm happy with everything except for being --
18 you know, getting to the age that I am now
19 and them feeling like, well, we'll just kick
20 him out the door.
21     Q.   You're not contending that what
22 Mr. Rainer did in 2000 was age
23 discrimination, are you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

185

1    A.    No, sir.
2    Q.    Now, there's indication in this
3 exhibit that less money makes it harder to
4 pay your bills.
5    A.    Yes, sir.
6    Q.    Have you lost a car or a house or
7 a boat or anything like that as a result of
8 them reducing your pay?
9    A.    I went into my 401(k) and got
10 moneys out of it to offset the difference.
11    Q.    All right.  The question is, did
12 you lose any property?
13    A.    I lost money, actual dollars, out
14 of my 401(k) to pay my bills with.
15    Q.    But that's not the question I'm
16 asking you.  Did you lose a car, a house, a
17 trailer, a piece of property, anything that
18 you were paying for on time?
19    A.    No, sir.
20    Q.    How much money did you borrow
21 from your 401(k)?
22    A.    I got ten thousand dollars.
23    Q.    When?

186

1    A.    I'd have to see the paperwork on
2 it to remember.  Probably November of '07.
3    Q.    November of 2007?
4    A.    Yes, sir.
5    Q.    Is that the only loan you've
6 taken out from your 401(k)?
7    A.    Yes, sir.
8    Q.    Have you borrowed any other money
9 from any other source?
10    A.    No, sir.  I use regular credit
11 cards to pay my drug bill with, and I try to
12 get that money to turn around and pay.  And
13 it's hard -- it's hard to do, because I take
14 a lot of drugs, as you can see.
15    Q.    Your health insurance doesn't pay
16 for your drugs?
17    A.    Yes, sir.
18    Q.    It does?
19    A.    Yes, sir, on the -- on the turn
20 around.  See, I've got big deductibles the
21 first of the year coming up.  And I got
22 behind on them.  But I have to pay for the
23 drugs, and then, they -- then, the company

187

1 reimburses me for the drugs.
2    Q.    And they've been reimbursing you,
3 correct?
4    A.    Yes, sir, I've had no problem.
5        MR. MORTON:  Let's go off the
6 record for a few minutes.
7
8        (Whereupon, a brief recess was
9        taken.)
10
11    Q.    (BY MR. MORTON)  We were talking
12 about the schools and churches earlier.
13 Weren't you supposed to do those things first
14 thing, early in the year?
15    A.    Well, as a normal -- normally,
16 that's the first thing you start doing.
17    Q.    Well, why didn't you do it first
18 thing this year?
19    A.    Well, when I got down there, they
20 suggested I put the racks up and start
21 putting the plants in the stores.
22    Q.    And that was after you'd come
23 back to Alabama --

188

1    A.    Yes, sir.
2    Q.    -- and drove back out there?
3    A.    And this is the first year I've
4 ever been late.  And --
5    Q.    Can you name any of the schools
6 that you have a contract with?
7    A.    Orange Grove, Skidmore, Saretha.
8 I can't think of anymore of them that I have.
9 I think I've got --
10    Q.    Has Mr. Hall talked to you about
11 slow sales in your territory?
12    A.    No, sir.
13    Q.    Hadn't said a word to you about
14 that?
15    A.    No, sir.
16    Q.    Has he criticized any aspect of
17 your performance?
18    A.    Yes, sir.
19    Q.    And what aspect is that?
20    A.    Being late getting out there,
21 having to leave to come up here for this.  I
22 needed to get the information they wanted in
23 on these stores.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

189

1    Q.   Did he criticize you about the
2  school and church programs?
3    A.   Yes, sir, he wants to get those
4  done.
5    Q.   Anything else?
6    A.   I can't think of anything else
7  right off the bat.
8    Q.   Any of those criticisms
9  unjustified as far as you're concerned?
10   A.   Not one that I can think of.
11  Like I say, I've always tried to do what they
12  told me to do when they told me to do it.
13
14        (Whereupon, a discussion was held
15        off the record.)
16
17   Q.   (BY MR. MORTON) All right. I'm
18  looking at a document called Plaintiff's
19  Initial Disclosures. And one of the things
20  that this document does, is it lists the name
21  of people who may have knowledge about facts
22  related to the case. One of the people
23  you've listed on here is Johnny Roy

190

1  Fendelson. What do you think he knows --
2    A.   He knows --
3    Q.   -- or may have knowledge about
4  this case?
5    A.   -- that I've filed it.
6        That's all.
7    Q.   He doesn't know anything else?
8    A.   I don't -- I don't know what else
9  he knows.
10   Q.   Have you talked to him about the
11  case?
12   A.   No, sir.
13   Q.   Have you put him in touch with
14  your counsel?
15   A.   No, sir.
16   Q.   It says, Tony, last name unknown,
17  Bells, Tennessee. Is that Tony Brown?
18   A.   It must be Tony Brown.
19   Q.   What do you think Mr. Brown knows
20  about the case?
21   A.   Just that I filed it probably.
22   Q.   He doesn't know anything about
23  any facts that support your claims or

191

1  anything of that nature?
2    A.   No, sir.
3    Q.   The same question for Mr.
4  Fendelson.
5    A.   The same. The same.
6    Q.   Same answer?
7    A.   I hadn't really known what to
8  discuss with anybody.
9    Q.   You've listed Adam Alley. What
10  do you think he knows about your claims?
11   A.   I don't remember listing Adam.
12  But I think that it would be hearsay what I'd
13  have to say what he knows. And if you want
14  to hear what somebody told me, I'll tell you.
15   Q.   That's what I want to hear.
16   A.   Somebody told me that they heard
17  him and Eric Rankin in the office laughing
18  one morning. And he was laughing about the
19  letter I had written asking for my job back.
20  And I don't know that he ever even saw that
21  letter or not.
22   Q.   Who told you that?
23   A.   Michael Rhodes.

192

1    Q.   Alley and Michael Rankin?
2    A.   Eric.
3    Q.   Eric Rankin. Laughing in the
4  office about the letter you wrote. And that
5  letter would be this January 10th letter?
6    A.   Yes, sir, the one asking for my
7  job back. I don't even know whether he even
8  got a copy of the letter or not.
9    Q.   And what was the fellow's name
10  who told you this?
11   A.   Michael Rhodes.
12   Q.   And who is he?
13   A.   He's my helper from that year.
14  And he just -- he called me, asking me about
15  it.
16   Q.   When?
17   A.   It's been a long time ago.
18   Q.   Michael Rhodes called you and
19  asked about it?
20   A.   Uh-huh.
21   Q.   What did he say to you?
22   A.   He just said he heard Adam and
23  them in there laughing about some kind of

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

193

1  letter I had wrote asking for my job back.
2      Q.   Where's Michael now?
3      A.   I don't really know.  He lives up
4  there near Bells.
5      Q.   What did you tell him?
6      A.   I told him, yeah, I was trying to
7  get back up there.  And he said, I sure hope
8  you do.
9      Q.   So, this would have been sometime
10 in early 2006?
11     A.   Yes, sir, this would have been in
12 that time.
13     Q.   And Michael Rhodes was your
14 helper, meaning, somebody hired -- that you
15 hired to work on the truck?
16     A.   Yes, sir.
17     Q.   Did he ever drive a truck for
18 you?
19     A.   No, sir.
20     Q.   Not one time?
21     A.   No, sir.
22     Q.   Anything else Michael Rhodes said
23 to you or you said to him in that

194

1  conversation?
2      A.   I'm sure we talked about other
3  things, but that was all that I know of that
4  was said about that.
5      Q.   All right.  What else do you
6  think Adam Alley knows that relates to your
7  claim?
8      A.   I don't know of anything that --
9  I don't really know.
10     Q.   You don't know of anything else
11 he knows?
12     A.   No, sir.
13     Q.   Nobody's told you anything else?
14     A.   No, sir.
15     Q.   What about Joseph Padgett?  He
16 was your boss in Jasper?
17     A.   Uh-huh.
18     Q.   Is that correct?
19     A.   That's correct.
20     Q.   What do you believe he knows that
21 relates to your complaints?
22     A.   Probably that it's been filed
23 would be the only thing I know that he knows.

195

1  He never discussed it with me.
2      Q.   And you've never discussed it
3  with him?
4      A.   No, sir.
5      Q.   And you never discussed age
6  discrimination with him?
7      A.   No, sir.
8      Q.   Was he ever critical of your job
9  performance?
10     A.   Yes, sir.  He said I needed to
11 leave more six packs in some places that --
12 that they were big six pack sellers.
13     Q.   Was that criticism justified?
14     A.   Yes, sir.
15     Q.   Did you leave more six packs?
16     A.   Yes, sir.  Yes, sir, it was very
17 much so justified.
18     Q.   And was he ever critical of your
19 job performance in any other way?
20     A.   Not face to face in any way, no.
21     Q.   Do you know of any criticisms he
22 made to anybody else?
23     A.   No, sir.

196

1      Q.   Did Adam Alley ever criticize you
2  for not keeping your truck clean --
3      A.   No, sir.
4      Q.   -- or not keeping your racks
5  organized?
6      A.   No, sir.
7      Q.   Did he ever criticize you for not
8  picking up old product in a timely manner?
9      A.   No, sir.  He -- that's all right.
10     Q.   I'm sorry?
11     A.   No, sir, he never criticized me
12 for any of that.
13     Q.   You list Donald Christopher Hall.
14 That would be Chris Hall, right?
15     A.   Yes, sir.
16     Q.   He's the station manager in
17 Beeville?
18     A.   Yes, sir.
19     Q.   What do you believe he knows that
20 might be relevant to your case?
21     A.   Nothing but it's filed.
22     Q.   Was he ever critical of your job
23 performance in any way beyond what we've

49 (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

197

1  talked about today?
2      A.   No, sir.  He told me that I
3  didn't cost him any money last year.
4      Q.   Did you make him any?
5      A.   No, sir, but I don't believe any
6  money's ever been made on that route that I
7  was on.  If they can show a profitable
8  year -- everybody that has worked that
9  route -- well, I can't say everybody.  I know
10 Alberto had that route, and he went into the
11 hole.  And he was trying to work his way out
12 of it.
13     Q.   But you don't know whether
14 anybody's made a profit on that route or not,
15 right?
16     A.   No, sir.
17     Q.   Charlie Trussell he was station
18 manager at Donaldsonville?
19     A.   Yes, sir.
20     Q.   What do you believe he knows that
21 might be relevant to your case?
22     A.   Nothing.
23     Q.   Nothing at all?

198

1      A.   Nothing at all.
2      Q.   Did he ever do anything that you
3  thought was discriminatory, Mr. Trussell?
4      A.   No, sir.
5      Q.   How about Bill Rainer, you've
6  listed him.  What do you think he knows that
7  might be relevant to your claims?
8      A.   Nothing but that it's filed.  I
9  think he would know that a claim had been
10 filed.
11     Q.   Anything else?
12     A.   That's all.
13     Q.   How high up is the bed of your
14 truck from the ground; do you know?
15     A.   The bed of the truck?
16     Q.   Right.
17     A.   When you walk up to it, it hits
18 you about there (indicating), if you're my
19 size, my height.
20     Q.   So, it would be what,
21 somewhere --
22     A.   Three and a half, four feet.
23     Q.   Let's see.  You're six one.  That

199

1  hits you --
2      A.   I want to say somewhere around
3  here (indicating).
4      Q.   -- the middle of your chest?
5           Have you ever measured it?
6      A.   No, sir.
7           MR. MORTON:  I don't believe I've
8  got anything else.
9           MR. ROBERSON:  I've got a few
10 questions.
11
12 EXAMINATION BY MR. ROBERSON:
13
14     Q.   Mr. Watson, you go by Terry,
15 don't you?
16     A.   That's right.
17     Q.   I want to talk about two periods
18 of time.  I want to talk about up until you
19 had your knee surgery.  That'd be knee
20 surgery in the fall of 2005.  You worked for
21 this -- for Joe Stewart and for AFC for over
22 twenty years --
23     A.   Yes, sir.

200

1      Q.   -- right?
2           And never had a problem that
3  you --
4      A.   No, sir.
5      Q.   -- of any significance?
6           MR. MORTON:  I'll object to your
7  leading him.
8           MR. ROBERSON:  Please do.
9           MR. MORTON:  No, I mean, do you
10 want to give me a standing objection or do
11 you want me to object to every question?
12          MR. ROBERSON:  Whatever you want.
13 Whatever is easier for you.
14     Q.   And in those twenty something
15 years, how many routes did you have?
16     A.   I had two routes until I went to
17 Bells, Tennessee.
18     Q.   Okay.  Now, when you got
19 transferred to Bells, Tennessee, at whose
20 request was that?
21     A.   That was my request.
22     Q.   You wanted a shorter route?
23     A.   I wanted a shorter route, and

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

201

1 Butch wanted a --
2    Q.    Longer route?
3    A.    -- longer route.
4    Q.    Okay. And so, you initiated --
5 you and Butch initiated that transaction?
6    A.    We initiated it together.
7    Q.    Before the fall of 2005, had
8 AFC -- I call them Bonnie Plant. But had
9 the -- had the company you worked for ever
10 transferred you involuntarily?
11    A.    No, sir.
12    Q.    Had they ever written you up or
13 disciplined you?
14    A.    No, sir.
15    Q.    Did y'all have any kind of a
16 formal written evaluation as to your job
17 performance, your supervisor come and sit
18 down with you and go over some annual job
19 performance?
20    A.    I never saw one.
21    Q.    Okay. But they had incentives,
22 sales incentives, right?
23    A.    Right.

202

1    Q.    The whole time you worked there,
2 you had been on a commission, right?
3    A.    Right.
4    Q.    And you get a draw that offsets
5 the commission --
6        MR. MORTON: Object to the form.
7    A.    That's right.
8    Q.    (BY MR. ROBERSON) -- correct?
9 I mean, a draw against the
10 commission?
11    A.    A draw against commission, right.
12    Q.    So, your income, Terry, what
13 shows up on your W-2, is not -- is not ever
14 what you actually earned that year; is that
15 correct?
16    A.    That's correct.
17        MR. MORTON: Object to the form.
18    Q.    (BY MR. ROBERSON) In other
19 words, you get on your W-2, let's say for
20 2005, are the draws you received during 2005,
21 correct?
22    A.    Correct.
23    Q.    And then, you get the commission,

203

1 the settlement statement, if you earned any
2 commission, you get that from 2004 in 2005 --
3        MR. MORTON: Object to the --
4    Q.    (BY MR. ROBERSON) -- right?
5        MR. MORTON: Object to the form.
6    Q.    (BY MR. ROBERSON) Is that right?
7    A.    That's right.
8    Q.    And so, that means that your
9 earnings were at least always partially
10 trailing the next year?
11    A.    Yes, sir.
12    Q.    Correct?
13    A.    Yes, sir.
14    Q.    So, when you told the EEOC you
15 earned forty-five thousand, you would have
16 gotten part of that in 2006, that income?
17    A.    That's correct.
18        MR. MORTON: Object to the form.
19    Q.    (BY MR. ROBERSON) You would have
20 received that in the next year, your
21 commission income?
22    A.    That's correct.
23    Q.    Okay. And they've got a -- the

204

1 compensation at Bonnie Plant, does it change
2 from time to time?
3    A.    It changes every year.
4    Q.    And so, the percentage of
5 commission, everything else may change from
6 year to year?
7    A.    Yes, sir.
8    Q.    And the goals -- there's a
9 breakdown on the commission, isn't there?
10 Don't you have to exceed a sales goal --
11    A.    Yes, sir.
12    Q.    -- to get a higher commission
13 rate?
14    A.    To get a higher percentage.
15    Q.    So, that's going to change every
16 year?
17    A.    It's going to change every year.
18    Q.    And I'm guessing, now, but I'm
19 guessing it don't get lower, your sales goal,
20 it gets higher?
21    A.    It gets higher.
22        MR. MORTON: Object to the form.
23    Q.    (BY MR. ROBERSON) All right.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

205

1  Well, I'm going to -- and is this --
2      MR. ROBERSON: Dent, did you make
3  this an exhibit (indicating)? That's 2000 --
4  you gave it to me.
5      MR. MORTON: Yes.
6      MR. ROBERSON: Can you find that
7  for me? I want to keep the number and ask
8  him about it.
9      Q.  Oh, here we go. It's Exhibit 10,
10 Terry. Let me show you what Mr. --
11     MR. MORTON: Morton.
12     Q.  (BY MR. ROBERSON) -- Morton,
13 excuse me, marked as Exhibit 10.
14     And this shows commission for the
15 spring of 2005. And you are Arthur T.
16 Watson, right?
17     A.  That's me.
18     Q.  Okay. And where were you working
19 in the spring of 2005?
20     A.  I was working in Bells,
21 Tennessee.
22     Q.  Okay. And --
23     A.  In the fall, I was working in --

206

1      Q.  All right. Well, look here
2  for what it says the collected sales were in
3  the spring of 2005. Can you read what that
4  figure is on Exhibit 10?
5      A.  Three thirty-six.
6      Q.  Oh, that's the fall and -- I'm
7  just -- I'm just -- I'm asking you the
8  spring, just that figure. I may be asking
9  you something you can't see.
10     A.  The collected figure for the
11 spring --
12     Q.  Yeah.
13     A.  -- was 302,703.95.
14     Q.  So, does that means you sold
15 three hundred -- over three hundred thousand
16 dollars worth of plants, collected the money
17 for them?
18     A.  Yes, sir.
19     Q.  All right. And it shows that you
20 got twelve percent of sales. That's the
21 first part of your commission --
22     A.  Yes.
23     Q.  -- right?

207

1      And it shows -- you've got some
2  additional compensation. I'm assuming that's
3  because you were over the sales goal. That's
4  the way that worked, right?
5      A.  Yes, sir. If you go over the
6  sales goal, you get paid more money.
7      Q.  So, you get a base commission up
8  to the sales goal, correct?
9      A.  You get a base pay.
10     Q.  Okay.
11     A.  And you get a base commission up
12 to dollar collected, and then, the commission
13 goes higher for more dollars.
14     Q.  Okay. Now, in the spring of
15 2004, you also -- that was the first year you
16 worked in Bells, right?
17     A.  Right.
18     Q.  And it shows how much you
19 collected that year on the second page of
20 this document, Exhibit 10. And that's two
21 hundred and fifty-three thousand, right?
22     A.  Yes, sir. They took two stores
23 off of my route that year to go into '5.

208

1  They took a nice big, good selling Wal-Mart
2  and a Kmart off of it.
3      Q.  Okay. But in 2004, the spring,
4  you sold two hundred fifty -- over two
5  hundred and fifty thousand dollars worth of
6  plants?
7      A.  Yes, sir.
8      Q.  And here, you actually got
9  sixteen percent of collected sales. So,
10 that's what we're talking about. Over here,
11 it was twelve percent, see, in 2005; is that
12 right?
13     A.  That's right.
14     Q.  Okay. Now, so, if you had the
15 same route -- same route number, even though
16 I understand it changed a little bit, you
17 grew the route from 2004 to 2005 by over
18 fifty thousand dollars, correct?
19     A.  Correct.
20     Q.  And that'd be over twenty
21 percent?
22     A.  That would be over twenty
23 percent.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

209

1    Q.    Okay.  So, those were the numbers
2    you were making on the short route.  And you
3    asked for the short route --
4        A.    Yes, sir.
5        Q.    -- to make it easier with your --
6    as you got older and had health problems, it
7    would be less demanding, less hours for you
8    to work?
9        A.    Yes, sir.
10       Q.    All right.  Now, after your knee
11   surgery -- Tate is the safety --
12       A.    Safety director.
13       Q.    Safety director.  And so, any
14   medical condition you have, you have to get
15   his approval to go back driving a truck?
16       A.    Right.
17       Q.    Is that right?
18       A.    That's right.
19       Q.    Does he work with you about your
20   health -- your cards and everything?
21       A.    He does the drug test, and he
22   checks your health cards and --
23       Q.    And I know you didn't directly

210

1    report to Tate -- I mean, he wasn't over
2    sales, but if you wanted to work, you had to
3    have that card --
4        A.    Yes.
5        Q.    -- right?
6            MR. MORTON:  Object to the form.
7        A.    If you don't pass the physical
8    examination and the drug test, you can't go
9    to work.
10       Q.    (BY MR. ROBERSON)  You ain't
11   working, are you?
12       All right.  So, because of your
13   surgeries in the fall, you had to go back
14   through Tate; is that right?
15       A.    That's right.
16           MR. MORTON:  Object to form.
17       Q.    (BY MR. ROBERSON)  Did he have
18   any say-so?
19       A.    Yes, sir, he --
20       Q.    He had to clear you?
21       A.    He had to clear it.  He had to
22   clear it --
23           MR. MORTON:  Object to the form.

211

1        A.    -- whether you passed or failed.
2        Q.    (BY MR. ROBERSON)  All right.
3    And so, while that process is ongoing, you
4    went to the sales meeting in Auburn, right,
5    in 2005?
6        A.    Right.
7        Q.    The one that Bonnie Plant told
8    the EEOC you didn't go to --
9        A.    Yes, sir.
10       Q.    -- right?
11       That's a lie, isn't it?
12           MR. MORTON:  Object to the form.
13       A.    Yes, sir.
14       Q.    (BY MR. ROBERSON)  And then, in
15   November, you had a discussion with Joe
16   Stewart, right?
17       A.    Right.
18       Q.    And that's when you found out you
19   weren't going back to --
20       A.    Going back to Bells, Tennessee.
21       Q.    -- Bells?
22       Okay.  And that's the first time
23   you mentioned the words "age discrimination",

212

1    correct?
2            MR. MORTON:  Object to the form.
3        A.    Correct.
4        Q.    (BY MR. ROBERSON)  Didn't you
5    have a conversation with Joe?
6        A.    Yes, sir.
7        Q.    Did you tell him any -- did you
8    make any complaint about what you perceived
9    to be what could be age discrimination?
10       A.    I sure did.
11           MR. MORTON:  Object to the form.
12       Q.    (BY MR. ROBERSON)  Okay.  So,
13   that's your first protected activity.  Do you
14   know what a protected activity is?
15       A.    No, sir.
16       Q.    Okay.  Well, then, you gave these
17   two letters -- January and February, you gave
18   those two letters to Tate, right?
19       A.    Right.
20       Q.    And you were doing that because
21   he had to approve you going back to driving a
22   truck, right?
23       A.    Right.

53  (Pages 209 to 212)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

213

1  Q. He's not your up-line supervisor,
2 but if he told you to do something, you had
3 to do it?
4  A. You had to do it.
5  Q. In the spring season in Bells,
6 Tennessee, you don't start work until
7 sometime in late February, do you, or --
8  MR. MORTON: Object to the form.
9  Q. (BY MR. ROBERSON) What time do
10 you start work?
11  A. Mid February to late February.
12 It depends on the weather that year.
13  Q. Okay. Well, you got cleared from
14 your doctor to go to full duty before the
15 season started; is that correct?
16  MR. MORTON: Object to the form.
17  A. That's correct.
18  Q. (BY MR. ROBERSON) And Joe -- I'm
19 sorry. Leslie Branum took your route; is
20 that correct?
21  A. That's correct.
22  MR. MORTON: Object to the form.
23  Q. (BY MR. ROBERSON) I'm going to

214

1 show you --
2  MR. ROBERSON: I don't think
3 you've marked this one. Have you got a
4 plaintiff's sticker?
5  This is AFC Document 00626. It's
6 something y'all produced this week, marked
7 confidential.
8  Q. So, don't tell anybody about it,
9 Terry.
10  MR. ROBERSON: Mark that
11 Plaintiff's 1, please, ma'am.
12
13  (Whereupon, Plaintiff's Exhibit 1
14  was marked and copy of same is
15  attached hereto.)
16
17  Q. (BY MR. ROBERSON) All right.
18 I'm going to show you a document that Bonnie
19 Plant Farms made available to me shortly
20 before your deposition and show you what
21 Leslie Branum, his commissions for the spring
22 of 2006. Do you see what number he collected
23 working your route?

215

1  A. Working my route.
2  MR. MORTON: Object to the form.
3  Q. (BY MR. ROBERSON) Do you see
4 that? What is that number?
5  A. 378,622.05.
6  Q. And what were his gross
7 commissions for that year, right there, that
8 number (indicating)?
9  A. Eighty-two thousand, a hundred
10 and seventy-eight dollars and thirty-four
11 cents.
12  Q. Now, you don't know that he had
13 the same route you had, correct? You don't
14 know --
15  A. I don't know that.
16  Q. You don't know what stores he had
17 on his route?
18  A. No, sir.
19  Q. Let me show you what's been
20 marked as Defendant's Exhibit 1, which is
21 your sales for the spring of 2006. And,
22 first of all, Terry, you got sent to
23 Louisiana, right?

216

1  A. Right.
2  MR. MORTON: Object to the form.
3  Q. (BY MR. ROBERSON) Was that
4 voluntary? Did you want to go there?
5  A. No, sir.
6  Q. They told you to go?
7  A. Yes, sir.
8  Q. Were you on a commission?
9  A. No, sir.
10  Q. Had you always been on a
11 commission?
12  A. Yes, sir.
13  Q. That's a difference, isn't it,
14 after your complaint of discrimination,
15 right?
16  A. Right.
17  Q. Well, do you know what -- have
18 you -- what this -- these figures are in
19 Exhibit 1, do you know how they calculated
20 that for the route you ultimately took over
21 in Jasper in 2006?
22  A. No, sir.
23  Q. Did you work the route from its

54 (Pages 213 to 216)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

217

1 beginning, when the season opened, till the
2 end of the season?
3      A.   No, sir.
4      Q.   So, you didn't have an
5 opportunity to run the whole route, did you?
6      A.   No, sir.
7      Q.   Do you know how they figured what
8 you did on that route?
9      A.   No, sir, I have no idea.
10      Q.   Okay.  Well, we know what they
11 paid a commission on on that route, or what
12 they claim the commission was, was a hundred
13 and seventy-three thousand dollars, right?
14      A.   Right.
15      Q.   Now, before these transfers two
16 times after your complaint, had you ever not
17 made -- gone in the hole on your commission?
18      A.   I had never gone in the hole on
19 my commission.
20      Q.   In other words, your commission
21 was always more than your draw?
22      A.   I always got a check.
23      Q.   And these draws they're claiming

218

1 that they paid you too much, did they take
2 out when you were working just on a draw; do
3 you know?
4      A.   I don't know.
5      Q.   Well, that don't hardly seem
6 right if they didn't, does it?
7           MR. MORTON:  Object to the form.
8      Q.   (BY MR. ROBERSON)  I mean, how
9 can you --
10      A.   It's sure not right.
11      Q.   Now, let me show you Exhibit 3,
12 which is your -- you ain't ever seen this
13 document till you got over here, had you?
14      A.   No, sir.
15      Q.   Have you got your W-2 yet for
16 2007?
17      A.   No, sir.
18      Q.   What's today's date?  March 25th?
19      A.   March 25th.
20      Q.   Huh.  Got your settlement
21 statement for 2007?
22      A.   No, sir.
23      Q.   Okay.  Mr. Morton's got it,

219

1 apparently.
2           MR. MORTON:  Object to the side
3 bar, Counsel.  Ask questions.  Don't make
4 comments.
5      Q.   (BY MR. ROBERSON)  Well, do you
6 see what net collected sales for 2007 are,
7 one thirty-three --
8      A.   One thirty-three thousand, eight
9 hundred and eighty-five dollars and fifty
10 cents.
11      Q.   Okay.  Now, the route you're
12 working in Texas, or you worked in 2007, is
13 that a long route or a short route?
14      A.   That's a long route.
15      Q.   The kind of route you asked to
16 get off of?
17      A.   The kind of route I would like to
18 get off of.
19      Q.   Okay.  And, in fact, they know --
20 Bonnie Plant knows every hour that that truck
21 is being operated, don't they?
22      A.   Yes, sir.
23      Q.   They've got a GPS in that truck,

220

1 don't they?
2      A.   Yes, sir.
3      Q.   And that sends a signal when
4 you're moving and when you're not, right?
5      A.   Yes, sir.
6      Q.   They know your location.  They
7 know how many hours you work and drive the
8 truck, don't they?
9      A.   Yes, sir.
10      Q.   And they can compare how many
11 hours your truck's moving to your logbook if
12 they were really interested in that, couldn't
13 they?
14      A.   Yes, sir.
15      Q.   In your twenty something years at
16 Bonnie Plant Farms, has anybody ever
17 disciplined you for working too many hours?
18      A.   No, sir.
19      Q.   You work on a commission, don't
20 you?
21      A.   Yes, sir.
22      Q.   If you don't sell, you don't eat,
23 right?

55  (Pages 217 to 220)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

221

1     A.   Right.

2     Q.   In fact, do you have any idea how

3   many million dollars of plants you've sold

4   for Joe Stewart and Bonnie Plant Farms?

5     A.   No idea at all.

6     Q.   Well, you'd think that working

7   for a guy for twenty something years and

8   making him a bunch of money, that he'd be

9   loyal to you; wouldn't you think that?

10       MR. MORTON:  Object to the form.

11    A.   I would have thought that.

12    Q.   (BY MR. ROBERSON)  Well, he ain't

13   done you any favors since you complained of

14   age discrimination, has he?

15       MR. MORTON:  Object to the form.

16    A.   No, sir, he has not.

17    Q.   (BY MR. ROBERSON)  He's put you

18   on four routes --

19       MR. STEWART:  This is bullshit.

20       MR. MORTON:  Well, just calm

21   down.

22       MR. STEWART:  I was trying to

23   give this boy a job to where he could draw a

222

1   check, and I'll be goddamned if I'm going to

2   sit here and listen to this.

3

4       (Whereupon, Mr. Stewart leaves

5       the room.)

6

7     Q.   (BY MR. ROBERSON)  Has he put you

8   on routes that earned less money than the

9   Bells, Tennessee, route?

10    A.   Yes, sir.

11       MR. MORTON:  Object to the form.

12    Q.   (BY MR. ROBERSON)  Has your

13   compensation been lowered?

14    A.   Yes, sir.

15       MR. MORTON:  Object to the form.

16    Q.   (BY MR. ROBERSON)  Mr. Watson,

17   was there any salesman up there in Tennessee

18   that were over -- in the year that you sold

19   three hundred thousand dollars worth of

20   product in 2005, how old were you?

21    A.   I was sixty-one years old.  I was

22   sixty years old in 2005, turned sixty-one.

23    Q.   Okay.  Now, Mr. Morton has asked

223

1   you a bunch of questions about facts that you

2   have, that you know about.  Do you know of

3   any reason why they would have to change your

4   truck the second year you were in Bells?

5     A.   None whatsoever.

6     Q.   Do you know any reason that

7   prevented them from giving you a truck with

8   an air ride seat?

9     A.   None whatsoever.

10    Q.   Were you the oldest salesman up

11   there at Bells?

12       MR. MORTON:  Object to the form.

13    A.   I was the oldest salesman up

14   there.

15    Q.   (BY MR. ROBERSON)  Did you have

16   the most seniority?

17    A.   I had --

18       MR. MORTON:  Object to the form.

19    A.   -- the most seniority up there.

20    Q.   (BY MR. ROBERSON)  Was, in fact,

21   2005 one of your best years for production?

22       MR. MORTON:  Object to the form.

23    A.   It was one of the best years on

224

1   that route, that that route had ever had.

2     Q.   (BY MR. ROBERSON)  Did they give

3   you any explanation for why you couldn't work

4   that route in 2006.

5     A.   None.

6     Q.   Other than you just weren't

7   working out?

8     A.   I just wasn't working out.

9     Q.   And how many places have you been

10   since then?  How many places have you worked?

11   Donaldsonville?

12    A.   Donaldsonville, Louisiana;

13   Jasper, Alabama; and two routes in Beeville,

14   Texas.

15    Q.   And every time, does it seem like

16   you're going backwards?

17    A.   Every time --

18       MR. MORTON:  Object to the form.

19    A.   -- since I've filed that, it has

20   gone backwards.

21       MR. ROBERSON:  Thank you, sir.  I

22   don't have anything else.

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

225

1   FURTHER EXAMINATION BY MR. MORTON.
2
3       Q.   Your lawyer asked you if you had
4   ever been written up prior to your knee
5   surgery, or your surgery in the off season in
6   2005.  Have you ever been written up since
7   then?
8       A.   I've never been written up that I
9   know of.
10      Q.   Now, your lawyer asked you some
11  questions about your --
12      A.   I need to go to the restroom.
13  Can I come right back and answer?
14      Q.   Sure.
15
16          (Whereupon, a brief recess was
17          taken.)
18
19      Q.   (BY MR. MORTON)  All right.  Your
20  lawyer asked you some questions about what
21  your W-2 shows so far as your earnings are
22  concerned.  You're not saying that you got
23  income from Bonnie that's not reported on the

226

1   W-2 somewhere, are you?
2       A.   No, sir.
3       Q.   Now, at the time that you found
4   out you weren't going back to Bells, you had
5   not been cleared by your doctor to come back
6   to work, had you?
7       A.   I had not been stopped from going
8   back to work, and nobody told me anything
9   about not going back to work.
10      Q.   I'm talking about your doctor.
11  In fact, you didn't get released to go back
12  to work, as you told me earlier, until early
13  February, '06 without restrictions; isn't
14  that right?
15      A.   That may be.  That's probably --
16  that may be right, but I don't ever remember
17  being told that I couldn't go back to work.
18      Q.   Well, if you had been told you
19  couldn't --
20      A.   I remember -- I remember them --
21  I remember having a problem -- you know,
22  you've got to get over your operations.  And
23  in February, he wrote me a letter saying that

227

1   I was over my operations.
2       Q.   And --
3       A.   Through the whole time, I had
4   anticipated going back to work.  But that was
5   when I got the record from my doctor, in
6   February.
7       Q.   That was when you got something
8   from your doctor telling you you could go
9   back --
10      A.   Yes, sir.
11      Q.   -- to work, correct?
12          And, in fact, prior to that time,
13  in November and December, you had not only
14  been unable to pass the physical
15  rehabilitation exercises, you hadn't even
16  been able to participate in them, correct?
17      A.   Correct.
18      Q.   And, in fact, you don't know when
19  Leslie Branum was assigned that route in
20  Bells, do you?
21      A.   No, sir.
22      Q.   Don't know when that decision was
23  made --

228

1       A.   No, sir.
2       Q.   -- at all?
3          And, in fact, in January of '06
4   and up to the point that your doctor finally
5   did release you, the company didn't have any
6   way of knowing when you'd be able to drive,
7   did it?
8       A.   They had no reason to believe
9   that I wouldn't be back to work.
10      Q.   Well, they certainly knew that
11  you hadn't been able to even --
12      A.   They knew that I hadn't --
13      Q.   -- participate?
14      A.   That's right.
15      Q.   You hadn't even been able to
16  participate in the physical rehabilitation
17  exercises on two different occasions,
18  correct?
19      A.   Correct.
20      Q.   And they had nothing from your
21  doctor releasing you to go back to work,
22  correct?
23      A.   Correct.

57 (Pages 225 to 228)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

229

1    Q.    And they didn't get anything from
2  your doctor releasing you to go back to work
3  until February, correct?
4    A.    Correct.
5    Q.    And prior to that time, back to
6  my original question, they didn't have any
7  way of knowing when you'd be able to go back
8  to work, did they, sir?
9    A.    Correct.
10    Q.    Now, so far as Tate Gatlin is
11  concerned, Tate Gatlin reviews the documents
12  to take sure that you have the appropriate
13  medical and other permissions to allow you to
14  drive the truck --
15    A.    Yes, sir.
16    Q.    -- correct?
17      That is his function, right?
18    A.    Yes, sir.
19    Q.    You were saying with respect to
20  the sales in Jasper on Defendant's Exhibit 1,
21  you don't know how those were calculated,
22  right?
23    A.    No, sir.

230

1    Q.    So, you don't know whether you
2  got credit for what had been sold on that
3  route before you got there or not?
4    A.    No, sir.
5    Q.    Now, you're talking about having
6  a long route in Texas.
7    A.    Yes, sir.
8    Q.    And the reason you don't want a
9  long route anymore is that it's hard on you
10  physically, correct?
11    A.    Correct.
12    Q.    And it's hard on you physically
13  because of your physical condition, correct?
14    A.    Correct.
15    Q.    And do you think it's hard on you
16  physically because of your age in addition to
17  your physical condition?
18    A.    No, sir.
19    Q.    Okay.  So, it's your physical
20  condition that makes it hard on you to run a
21  long route, right?
22    A.    I've been riding in those trucks
23  for a lot of years.

231

1    Q.    Well, the answer to the question
2  is, yes, correct?
3    A.    It is, yes.
4    Q.    And, in fact, initially, when you
5  asked to get off a long route, the company
6  honored your request, correct?
7    A.    Yes.
8    Q.    And you were what, sixty years
9  old at that time?
10    A.    Yes, sir.
11    Q.    And at the age of sixty, they
12  moved you to Bells, Tennessee, at your
13  request, correct?
14    A.    Yes, sir.
15    Q.    And they gave you a truck with an
16  air ride suspension and an air ride seat,
17  correct?
18    A.    Yes, sir.
19    Q.    And you said you didn't know of
20  any reason why they couldn't give you an air
21  ride seat the second time around.  But did
22  you ever ask why?
23    A.    Yes, sir.

232

1    Q.    And what were you told?
2    A.    I was never given an answer.
3  Just somebody else had the trucks this year.
4    Q.    And do you even know how trucks
5  were assigned that year at Bells?
6    A.    No, sir.
7    Q.    Do you know whether other people
8  had already asked for the air ride trucks?
9    A.    No, sir.
10    Q.    And for all you know, the trucks
11  with the air ride seats had been given out to
12  people who asked before you did, correct?
13    A.    Well, I've never -- that's true.
14    Q.    Okay.
15    A.    I've never known anybody to
16  request a truck like that but --
17    Q.    Well, it's a lot more
18  comfortable --
19    A.    And I'm the only person that
20  knows that -- that I know that requested an
21  air ride seat.
22    Q.    And the air ride seats are more
23  comfortable?

58  (Pages 229 to 232)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

233

1    A.  No, sir, it takes more shock out
2  of you when you're -- when you're hitting
3  bumps on the road.
4    Q.  Smooths out the ride?
5    A.  Smooths out the ride.
6    Q.  You wouldn't agree that that's
7  more comfortable?
8    A.  Well, some of the other seats may
9  be more where you just fall in them, you
10  know, and sit back on the cushion and be more
11  comfortable, depending on the condition of
12  the person that's sitting in the -- in the
13  seat.
14      MR. MORTON:  All right.  I don't
15  think I've got anything else.
16
17  FURTHER EXAMINATION BY MR. ROBERSON:
18
19    Q.  Hey, Terry, did they know who
20  your doctors were at Bonnie Plant?
21    A.  Yes.
22    Q.  It's their insurance, right?
23  They knew every time you went to the doctor?

234

1    A.  They knew every time I went.
2    Q.  To your knowledge, did they seek
3  any information about when you could return
4  to work or with what restrictions?
5    A.  None whatsoever.
6    Q.  Okay.  Well, when he says there
7  wasn't any way for them to know, there was a
8  way, wasn't there?
9      MR. MORTON:  Object to the form.
10    A.  There was a way.  They never
11  asked for any information about it.
12    Q.  (BY MR. ROBERSON)  They could
13  call your doctor, right?
14    A.  Right.
15    Q.  To your knowledge, they never
16  did, did they?
17    A.  They never called --
18      MR. MORTON:  Object to the form.
19    A.  -- anybody.
20    Q.  (BY MR. ROBERSON)  And this thing
21  about your deposition and leaving work
22  without telling them and all that stuff -- by
23  the way, the defendant in this case is Bonnie

235

1  Plant, right?
2    A.  Right.
3    Q.  Who scheduled your deposition?
4    A.  Bonnie Plant.
5    Q.  You saw Joe Stewart.  He knew you
6  were being deposed, didn't he?
7    A.  (Witness nods head.)
8    Q.  Did he make arrangements to cover
9  your route while you traveled here?
10    A.  No.
11    Q.  Did anybody?
12    A.  No.
13    Q.  Is it a secret that you're being
14  deposed?
15    A.  No, it's not a secret.
16    Q.  Well, why in the world wouldn't
17  they know?  Can you think of any reason?
18    A.  None at all.
19    Q.  Okay.  I can't either.  I mean,
20  if it's so important --
21      MR. MORTON:  Object to the side
22  bar.
23    Q.  (BY MR. ROBERSON)  If it's so

236

1  important, you'd think they would let
2  somebody know, wouldn't you?
3    A.  I think Bonnie Plant Farm knew
4  where I was going to be today.
5    Q.  Yeah.  I think so, too.
6      MR. MORTON:  Object to the side
7  bar.  You don't get to make comments.  Ask
8  questions.
9      MR. ROBERSON:  I'm through.
10
11  FURTHER EXAMINATION BY MR. MORTON:
12
13    Q.  You don't think, sir, that you,
14  as an employee of Bonnie Plant Farm, have a
15  responsibility to keep your direct supervisor
16  informed of where you are when you're
17  supposed to be working?
18    A.  Yes, sir, he knows where I am, as
19  a general rule.
20    Q.  But you didn't tell him this time
21  until two days after you'd left, correct?
22    A.  Correct.
23    Q.  And you don't know what he knows

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING



237

1  about this litigation, do you?
2      A.  No, sir.
3          MR. MORTON:  All right.  Thank
4  you.
5          MR. ROBERSON:  Let's go.
6      FURTHER DEPONENT SAITH NOT.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

238

1          C E R T I F I C a T E
2
3  STATE OF ALABAMA    )
4  JEFFERSON COUNTY    )
5          I hereby certify that the above
6  and foregoing deposition was taken down by me
7  in stenotype, and the questions and answers
8  thereto were transcribed by means of
9  computer-aided transcription, and that the
10 foregoing represents a true and correct
11 transcript of the testimony given by said
12 witness upon said hearing.
13         I further certify that I am
14 neither of counsel, nor of kin to the parties
15 to the action, nor am I an anywise interested
16 in the result of said cause.
17
18
19         MICHELLE L. PARVIN
20         Certified Court Reporter
21         Licence Number 126
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

239

| A | | | | |
|---|---|---|---|---|
| **abilities** 33:17 | **add** 16:9 82:4 | 129:7,14,21 | 69:5,6 75:17 | 20:18 34:10,18 |
| **able** 17:23 29:8 | **added** 160:15 | 170:15 184:18 | 75:20 87:13 | 34:19,22 37:11 |
| 33:1,14,15,20 | 166:7 | 184:22 195:5 | 99:22 114:7,16 | 37:11 39:15 |
| 34:2 113:22 | **adding** 166:7 | 211:23 212:9 | 115:21 118:17 | 40:13 41:3 |
| 114:21,23 | **addition** 161:21 | 221:14 230:16 | 144:16 151:6 | 42:18 46:1 |
| 115:2,2,7,14 | 230:16 | 231:11 | 152:17 154:7 | 51:16,23 53:17 |
| 115:17 116:8 | **additional** 207:2 | **aged** 33:16 | 171:5 187:23 | 53:20 67:12 |
| 123:7 136:16 | **address** 9:15,16 | **ago** 9:11 23:7 | 224:13 238:3 | 68:19 69:12 |
| 138:6 165:13 | 10:15,19 113:2 | 34:3 119:17 | **Albert** 111:7,23 | 79:12,18,19 |
| 227:16 228:6 | 116:22 | 174:18 192:17 | 121:17 | 84:5 85:22 |
| 228:11,15 | **addressed** | **agree** 17:2 46:11 | **Alberto** 197:10 | 86:3 87:4 |
| 229:7 | 113:10 120:1 | 53:3 116:10 | **Alice** 135:15 | 90:21 91:3 |
| **access** 141:3,5 | 120:15 | 138:4 165:8,12 | **allergic** 153:7 | 95:18 97:15 |
| 155:7,11 | **addresses** 155:5 | 165:16 233:6 | **Alley** 20:20,22 | 98:17 101:8 |
| **accidently** 174:2 | **admit** 179:18 | **agreed** 1:15 2:1 | 20:23 21:3 | 102:15 110:12 |
| **accommodate** | **advances** 108:1 | 2:8,16 19:1 | 22:10 28:11 | 121:2 126:5,15 |
| 9:14 | **AFC** 100:6 | 22:12 175:10 | 37:12 38:14 | 129:19 145:17 |
| **account** 162:17 | 199:21 201:8 | **ahead** 33:12 | 39:7,23 40:3 | 145:18,20 |
| 162:18 | 214:5 | 57:9,9,15 | 42:9 54:19 | 146:14 147:16 |
| **accurate** 74:20 | **afternoon** 90:11 | **ain't** 210:10 | 139:20 191:9 | 154:1,2 168:5 |
| 77:8,14 81:18 | 90:17 93:1 | 218:12 221:12 | 192:1 194:6 | 176:22 177:4 |
| 81:22 104:19 | **age** 33:17 35:1,4 | **air** 21:7,9,16,21 | 196:1 | 177:18 181:4 |
| 105:12 107:17 | 36:1,3,17,23 | 22:1,2,3,15,19 | **allow** 79:1 | 191:8 195:22 |
| 167:1 | 38:11 45:9,10 | 22:21,22 23:3 | 229:13 | 214:8 220:16 |
| **accurately** | 45:18 48:4,8 | 23:3 27:19,21 | **all-out** 86:15 | 232:15 234:19 |
| 137:23 | 49:11,14,18,20 | 28:12 30:23 | **amount** 68:3 | 235:11 |
| **achievement** | 50:4,11,16,21 | 31:8,19,22 | 82:11 133:9,15 | **anybody's** |
| 163:20 | 51:1,12,17,19 | 32:2,7,12,17 | 183:10 | 153:22 197:14 |
| **act** 176:18 | 52:12,15 55:2 | 33:4,8 34:5,11 | **annual** 201:18 | **anymore** 33:20 |
| **acting** 7:2 | 55:5,9,17,19 | 34:15,20 35:8 | **answer** 8:18 | 45:17 188:8 |
| **action** 238:15 | 56:10,15 57:4 | 35:13,19,23 | 24:14 33:3,19 | 230:9 |
| **activity** 212:13 | 63:7,18 64:5 | 36:4,7,16,21 | 34:1 56:1 | **anyway** 57:11 |
| 212:14 | 86:11 93:17,19 | 37:4,14 38:2,4 | 76:18 80:6 | 146:14 |
| **Actos** 157:12 | 94:10 95:9,18 | 39:9,17 40:19 | 82:15,16 83:2 | **anywise** 238:15 |
| **actual** 16:16,18 | 95:19 96:4,12 | 41:5 84:13,16 | 83:5 105:13 | **apologize** 110:1 |
| 185:13 | 96:15,15,21 | 223:8 231:16 | 113:9 129:3 | **apparently** |
| **Adam** 20:20,22 | 97:2 98:13 | 231:16,20 | 152:5 191:6 | 219:1 |
| 20:23 38:2 | 99:23 100:8,10 | 232:8,11,21,22 | 225:13 231:1 | **appear** 37:19 |
| 54:19 139:20 | 100:11,13,18 | **Alabama** 1:15 | 232:2 | 74:23 127:19 |
| 191:9,11 | 101:7,8 103:18 | 1:21 5:2,10,19 | **answers** 9:1,2,7 | **APPEARAN...** |
| 192:22 194:6 | 110:12 119:20 | 5:23 7:2,9 9:22 | 238:7 | 5:16 |
| 196:1 | 126:16 127:14 | 10:4 11:13,20 | **anticipated** | **appearing** 5:19 |
| **Adams** 111:7,10 | 127:19 128:10 | 12:6 14:17 | 227:4 | 5:23 |
| | 128:17,21 | 24:21 25:2 | **anybody** 18:13 | **appears** 74:23 |

# FREEDOM COURT REPORTING

240

100:20 101:2
105:14 183:17
applicants
101:13
appointment
115:19 117:7,9
appreciate
179:14
approached
20:3
appropriate
229:12
approval 209:15
approve 18:13
18:17,18
212:21
approved 18:16
20:13
approximately
58:3,5
April 145:14
area 30:2 66:20
84:11
arrangements
90:20 91:3
235:8
Arthur 1:7,18
5:7 7:10,14,22
131:5 205:15
asked 34:23
35:14 38:1
43:3,11 65:12
69:8 79:16,16
79:20 80:7
105:9 109:3
112:8 115:22
126:18,21,23
127:3 131:14
134:2 168:5,13
192:19 209:3
219:15 222:23
225:3,10,20
231:5 232:8,12
234:11

asking 31:11
55:6,14,20
58:22 59:3
94:7 123:19
124:21 129:23
138:16 151:20
185:16 191:19
192:6,14 193:1
206:7,8
aspect 84:3
188:16,19
assessment
116:11 119:5,7
assign 2:12
assigned 227:19
232:5
assume 8:16,17
assuming 207:2
assured 116:1
Atlanta 54:8
attached 72:21
75:11 104:5
109:15 121:11
130:6 137:12
141:12 143:18
164:19 169:22
214:15
attempt 169:15
attempts 168:18
attend 41:1
170:23
attended 41:2
attention 180:20
Attorney 5:17
at-length 126:17
Auburn 114:7
118:17 171:4,5
211:4
August 73:19
137:7
automatic 182:6
Automobile 8:6
available 67:8
214:19

aware 65:1
83:14 149:5,10
149:13

---

## B

B 130:22
Bachelor 11:3
back 26:20
27:10 32:17
43:8,17,19
44:16,17 45:16
46:2,5,7 48:3,6
49:21 50:5,22
51:2,13,20
52:14 53:6,7
53:23 54:2,18
54:19 55:1,4,9
55:12,17,19
62:21 65:19
71:17 95:4
96:12,16
102:13 105:8
106:11 109:4
110:8 113:6
117:20,23
123:20 124:17
125:12 135:7
135:17,19
136:3,15,16,20
138:7,7,9,14
138:19 143:11
147:12 148:6
149:3 151:5,5
151:12,14,21
152:2,6,7
153:10,22
154:7,23 155:2
163:13 177:12
177:13 184:11
187:23 188:2
191:19 192:7
193:1,7 209:15
210:13 211:19
211:20 212:21

225:13 226:4,5
226:8,9,11,17
227:4,9 228:9
228:21 229:2,5
229:7 233:10
background
10:22 116:22
backwards
224:16,20
bad 59:1 153:8
179:17
balance 108:15
bank 43:22
bar 219:3
235:22 236:7
base 99:20 128:9
171:8,10,16,18
171:20 207:7,9
207:11
based 36:17
94:10 97:2
99:22
basically 61:16
100:13 102:12
basing 68:9,10
basis 94:21
100:7,17
128:17,21
129:6,20 138:8
bat 189:7
bathroom 159:7
bed 198:13,15
Beeville 9:17
89:6 90:9
93:12 94:9,16
98:23 99:5
102:7 132:15
140:10 141:1
147:8,11,17
154:8 163:16
164:7 168:9,14
196:17 224:13
beg 107:2
148:10

beginning 7:9
217:1
behalf 5:20 6:1
belief 97:13
99:21
believe 34:9
35:3,22 36:15
36:20 52:4
54:23 55:16,21
55:22 56:9
75:16 81:1,10
97:1 100:5
103:17 105:9
109:17 133:7
194:20 196:19
197:5,20 199:7
228:8
believing 94:9
Bells 16:22,23
17:1,5 18:4
21:1 23:16
24:5 25:12
26:1,21 27:1,2
27:4,10,12,16
27:17 28:1
30:22 31:13
34:6 36:17
38:14,17,18,22
39:20,23 40:2
40:7,14,19
41:9,12,17
42:8,9 43:18
44:16,17 46:6
48:3 51:2,20
52:15 54:2,18
55:1 57:20
63:1,17 65:19
82:10 85:21,22
86:19 87:23
89:13 98:23
109:4 110:8
139:21 142:2,8
166:17 167:5
190:17 193:4

# FREEDOM COURT REPORTING

241

200:17,19
205:20 207:16
211:20,21
213:5 222:9
223:4,11 226:4
227:20 231:12
232:5
**belonged** 180:6
**bending** 125:5,8
160:20 161:15
**benefits** 65:10
65:11 135:5
**best** 151:10
167:2 223:21
223:23
**better** 17:20
179:20
**beyond** 196:23
**big** 16:4,8 17:22
19:2 42:11
72:7,7 127:5
132:16 184:1
186:20 195:12
208:1
**bigger** 60:16,16
**bill** 20:20 156:8
183:23 186:11
198:5
**bills** 72:11 97:6
185:4,14
**Birmingham**
1:21 5:19,23
7:2,9 151:5
**birthday** 63:13
**bit** 14:8 208:16
**biweekly** 68:1,3
71:4,19
**blank** 130:19
**bleed** 148:13
**blessed** 165:15
**blood** 152:21
156:14,16
158:4
**boat** 185:7

**body** 19:20,22
**bone** 19:18
24:17 123:15
124:4
**Bonnie** 1:11
5:11 8:7 12:22
14:17,19 32:16
43:21 48:17
61:22 64:18,20
66:11,12 80:23
87:21 97:23
99:21 100:6
114:3,4 126:5
126:16 127:17
127:18 131:13
137:3,18
142:13 143:5
144:8 145:7
163:1 165:11
170:23 176:19
176:23 177:20
177:21 181:16
201:8 204:1
211:7 214:18
219:20 220:16
221:4 225:23
233:20 234:23
235:4 236:3,14
**Bonnie's** 145:2,4
**bonuses** 163:20
**border** 128:3,3
132:20 141:6
**born** 19:12
**borrow** 185:20
**borrowed** 186:8
**boss** 69:10,12
146:15 194:16
**bottom** 130:21
**bought** 11:14,20
**Boulevard** 9:17
**Box** 5:18 9:22
10:1
**boxes** 113:21
**boy** 221:23

**Branum** 35:10
58:1 59:18,19
213:19 214:21
227:19
**break** 9:13
62:14 103:20
164:10,12
**breakdown**
204:9
**breaks** 9:11,12
**Brent** 35:10
**brief** 62:18
103:23 164:14
187:8 225:16
**bring** 122:11
**bringing** 123:6
**brother** 48:16
64:16 179:20
**brothers** 43:4
47:5
**brought** 100:23
123:3
**Brown** 35:9
63:15 65:13
127:3 190:17
190:18,19
**Brownsville**
128:2 132:16
132:18
**build** 15:12
**building** 132:23
**bullshit** 221:19
**bumps** 21:8
233:3
**bunch** 221:8
223:1
**burned** 44:2,3
**Burr** 1:20 5:21
**business** 11:4
40:22 41:1,2
66:10,11 76:2
116:6 124:13
140:7 163:1
**Butch** 17:12,13

20:4 86:7,12
87:5 127:4
167:5 179:18
180:1,9,21
201:1,5
**buy** 182:23
183:2
**B.S** 10:23

---
## C

**C** 238:1,1
**calculate** 168:19
169:5,6,9,12
**calculated**
216:19 229:21
**call** 150:7,8,10
155:17 173:1
175:5,18,21
201:8 234:13
**called** 37:17
43:5,14 45:16
46:2,7 48:6
73:3 90:3
117:4,10 126:7
131:21 148:4,7
149:21,23
172:20 175:22
176:7 189:18
192:14,18
234:17
**calling** 115:22
146:12
**calls** 48:1
**calm** 221:20
**capable** 165:17
**car** 89:12 185:6
185:16
**carbon** 120:12
121:23
**card** 134:13,14
134:15 160:10
210:3
**cards** 186:11
209:20,22

**careful** 128:4
**carried** 147:11
150:23
**case** 1:5 5:5 8:4
90:6 168:19
189:22 190:4
190:11,20
196:20 197:21
234:23
**cash** 87:19
**cause** 7:11 56:6
148:13 238:16
**causes** 156:15
**caution** 111:9
**cell** 146:19,22
**center** 115:20
180:11,13
**cents** 169:9,13
215:11 219:10
**certain** 35:12
133:15 161:3
163:2,2 178:3
178:4 179:7
**certainly** 145:1
228:10
**Certified** 5:14
238:20
**certify** 7:3 238:5
238:13
**chain** 15:15 16:9
66:19 74:7
139:5,8,9,10
139:16 182:5
**chair** 117:19
**chance** 132:10
**change** 15:7
16:12 17:18
18:10,14 19:5
33:17,18,18
65:5 167:23
204:1,5,15,17
223:3
**changed** 16:13
16:19 29:22,23

# FREEDOM COURT REPORTING

30:7,11 60:10
60:22 146:5
208:16
**changes** 15:10
15:23 16:5,8
60:12,14 204:3
**charge** 4:5
141:15,18
**charged** 162:17
162:18 179:19
**Charlie** 47:2,3,6
66:6 197:17
**check** 67:18
82:1 175:14
217:22 222:1
**checked** 160:7
175:15,15
**checking** 54:7
98:8,9
**checks** 209:22
**chest** 161:6
199:4
**child** 131:14
**children** 44:7,7
**choose** 101:16
129:10
**Chris** 90:14,15
91:7 145:22
146:12 148:1
150:23 154:18
196:14
**Christopher**
196:13
**church** 163:10
164:4,6 189:2
**churches** 163:3
163:6,8 187:12
**circulation** 88:4
**City** 132:19
**Civil** 7:4
**claim** 170:15
194:7 198:9
217:12
**claiming** 217:23

**claims** 190:23
191:10 198:7
**clarify** 56:9
**clean** 196:2
**clear** 210:20,21
210:22
**cleared** 213:13
226:5
**Clinic** 125:15
**Clonidine** 158:2
**close** 61:5,6,8,11
61:12 63:18
**closed** 60:21
61:3,14 100:23
**clots** 156:20
**coincide** 178:5
**collect** 182:9,15
**collected** 182:3
206:2,10,16
207:12,19
208:9 214:22
219:6
**collecting** 183:7
**combined** 62:1
**come** 21:5 22:11
25:9,18,21
43:8 71:14
90:10 131:18
138:15 147:12
150:15 151:14
153:4,4 161:23
166:12 177:12
179:4 181:3
187:22 188:21
201:17 225:13
226:5
**Comer** 97:19
**comes** 175:13
**comfortable**
232:18,23
233:7,11
**coming** 43:23
59:11 90:16
148:6 151:5,5

186:21
**comment** 49:10
120:22
**comments** 219:4
236:7
**Commercial**
134:10
**commission**
3:14,18 4:9,13
70:8,11,15,19
71:1 72:4,9
77:20 80:1
82:23 85:2
132:11 166:4
202:2,5,10,11
202:23 203:2
203:21 204:5,9
204:12 205:14
206:21 207:7
207:11,12
216:8,11
217:11,12,17
217:19,20
220:19
**Commissioner**
1:19 2:17 7:3
**commissions**
105:23 172:7
214:21 215:7
**common** 21:19
21:23 53:4
88:19
**company** 11:15
11:21 13:20
33:6 51:8,9,15
52:23 53:2,6
54:4 62:9 64:1
68:11 78:23
80:20 83:15
96:3 98:5
101:2,7,9,13
101:22 103:8
107:19 108:13
108:14,18

113:1 124:13
127:12 128:9
128:16,20
129:5,14
131:12,15
148:20 172:6
180:7 186:23
201:9 228:5
231:5
**compare** 220:10
**compared** 39:3
84:10
**compensation**
134:20 142:21
144:3,18
163:21 204:1
207:2 222:13
**complain** 68:19
**complained** 90:3
110:12,15
221:13
**complaint**
100:21,21
101:1 119:20
212:8 216:14
217:16
**complaints**
149:6,8,11,15
150:3 194:21
**complete** 57:2
78:21 83:1,1
**compliance** 2:4
**compose** 111:20
**composed**
111:18
**computer** 170:7
170:11
**computer-aided**
238:9
**concerned** 49:3
147:15 167:17
172:6 175:22
189:9 225:22
229:11

**condition**
156:15 165:9
209:14 230:13
230:17,20
233:11
**confidence**
111:2
**confidential**
214:7
**connection** 19:4
114:19
**consensually**
17:20
**Consignment**
183:15
**contained**
170:17
**contend** 170:14
**contending**
184:21
**continue** 15:2
71:11
**continued** 86:18
106:2,7
**contract** 4:1
130:10 137:2
188:6
**conversation**
17:11 19:2
20:7,15 28:14
37:22 94:20
95:1 112:19
117:14 119:16
121:2 126:1,5
127:5 194:1
212:5
**conversations**
20:17 21:2
47:23 48:9
49:15 94:15
95:3 102:19,21
107:14 126:15
126:17
**convince** 127:13

# FREEDOM COURT REPORTING

243

**Cooperative**
1:10 5:10
11:13 14:18
**copied** 122:14
**copies** 122:15
**copy** 13:5,8
72:20 75:10
76:2 104:4
109:14,21
112:8 120:12
121:10,23
122:8,11 130:5
137:11 141:11
143:17 164:18
166:2 169:21
170:3 181:11
192:8 214:14
**copying** 13:10
**correct** 23:9
35:19 36:7
38:20,21 53:7
58:10,16 70:6
72:13 73:6,11
75:17,19 91:4
97:10 101:16
101:18,19,19
101:20 105:15
105:18 107:14
107:20 110:8,9
112:12 119:21
120:9,12
121:23 122:1
126:11 130:14
136:23 137:1
137:20 138:3
141:4 144:9,10
149:7,22 167:8
168:6 172:2
174:16 176:7,8
182:10 187:3
194:18,19
202:8,15,16,21
202:22 203:12
203:17,22

207:8 208:18
208:19 212:1,3
213:15,17,20
213:21 215:13
227:11,16,17
228:18,19,22
228:23 229:3,4
229:9,16
230:10,11,13
230:14 231:2,6
231:13,17
232:12 236:21
236:22 238:10
**cost** 72:6,6 97:7
132:11 169:10
197:3
**costs** 72:4
**Coumadin**
148:9,11,15
151:15 159:17
**counsel** 1:17 2:9
2:11 7:7
110:20 190:14
219:3 238:14
**count** 91:16
**country** 25:3,3
**COUNTY** 238:4
**couple** 63:11
66:6
**Court** 1:1 2:5
5:1,15 7:1,6
14:7 238:20
**cousin** 111:7
127:2
**cover** 91:3 235:8
**coverage** 79:1
86:1,9 87:6
**covered** 24:20
**co-workers** 41:4
**credit** 186:10
230:2
**critical** 195:8,18
196:22
**criticism** 195:13

**criticisms** 189:8
195:21
**criticize** 40:3,9
40:13 42:10,15
84:2,6 189:1
196:1,7
**criticized** 42:17
188:16 196:11
**cry** 40:22
**cumbersome**
139:5
**current** 138:23
**currently** 49:8
**cushion** 233:10
**customers** 90:3
149:6 155:4
**cut** 106:13,14,16
106:22
**cuts** 72:8 167:18
**CV** 1:5 5:5
**C-o-m-e-r** 97:20

---

## D

**D** 3:1 5:17
**daddy's** 64:15
**daily** 159:21
160:1
**damages** 102:11
127:8 168:19
168:21,22
169:6
**date** 7:3 110:10
218:18
**dated** 3:20,22
73:19
**daughter** 152:10
**day** 1:22 20:9
60:2 91:23
92:8 98:22
109:6 117:17
134:8 135:16
136:13 174:3
174:11 178:4
178:13

**days** 135:18
236:21
**death** 148:13
151:18
**debatable**
179:22
**December**
124:17 227:13
**decide** 85:14
103:10
**decided** 22:17
60:2 61:7
103:1,3 167:5
**decision** 45:10
45:11 49:12
52:14 53:13
54:23 56:16
59:15,21 60:5
61:20 96:16
97:1 99:21
227:22
**decisions** 60:1
128:10
**decreased**
134:20
**deductibles**
186:20
**defendant** 1:12
5:12 6:1
234:23
**Defendant's**
3:13,15,17,19
3:21,23 4:2,4,6
4:8,10 72:19
73:1,23 75:9
75:14 77:7,12
104:3 109:13
121:9 130:4,9
137:10 141:10
143:16 164:17
165:22 169:20
170:2 215:20
229:20
**define** 150:13

**definitely**
165:19
**degree** 10:23
11:2,6
**degrees** 11:10
**deliver** 15:14
**delivered** 122:3
122:4,8
**deliveries** 181:9
182:1,13,17
183:4,18,20
**demanding**
209:7
**denied** 134:5
**Dent** 5:21 12:7
109:17 205:2
**deny** 178:7
**depend** 136:19
**depended** 88:11
**dependent** 16:1
**depending**
233:11
**depends** 25:6
92:1,8 139:18
213:12
**DEPONENT**
237:6
**deposed** 8:1
235:6,14
**deposition** 1:17
2:2,3,13,17 8:2
8:5,22 13:3,14
57:11 73:2
90:10 100:19
104:14 110:3
121:15 126:14
137:16 143:22
214:20 234:21
235:3 238:6
**depositions** 2:6
8:9
**Depot** 16:2 82:2
139:12
**Depots** 133:1

# FREEDOM COURT REPORTING

150:14
describe 137:23
described 39:8
  107:13
description 4:3
  137:17
Despite 108:21
  108:22
devastating
  102:9
develop 66:15
  156:21
developed 142:1
diabetes 158:16
  158:17
diabetic 157:15
  157:18
died 44:6
difference 36:10
  182:12,13
  183:4,5,10
  185:10 216:13
different 28:5
  51:16 127:18
  156:4 178:20
  180:7 228:17
difficult 9:5
  136:9 138:18
  138:20 165:9
difficulties
  160:19,20
difficulty 136:12
Diovan 158:9
Dire 3:5 57:17
direct 56:5
  236:15
directly 209:23
director 112:14
  209:12,13
disability 45:6
  46:10 48:5
  117:16 119:19
discharge 138:5
disciplined

201:13 220:17
Disclosures
  189:19
discriminate
  128:17 129:6
  129:17
discriminated
  100:7,17
  103:17 127:14
  128:20 129:20
discrimination
  4:5 50:4 56:23
  57:4 58:13,14
  59:6 110:13
  119:20 126:16
  129:15 141:15
  141:19 170:16
  184:23 195:6
  211:23 212:9
  216:14 221:14
discriminatory
  198:3
discuss 102:21
  176:22 177:4
  191:8
discussed 12:21
  17:6 37:18
  102:4,6 195:1
  195:2,5
discussing 103:1
discussion 13:16
  15:19 21:12
  29:1 37:7
  105:4 122:22
  123:2 189:14
  211:15
discussions
  18:19,22 37:11
  39:10
disputes 38:13
  39:22
District 1:1,2
  5:1,2 7:5
diuretic 159:8

divided 183:22
DIVISION 1:3
  5:3
doctor 26:15
  123:7,9,16
  124:2,22 125:4
  125:6 152:8,11
  152:12,14,14
  152:22 153:1,2
  157:21 213:14
  226:5,10 227:5
  227:8 228:4,21
  229:2 233:23
  234:13
doctors 233:20
document 75:14
  106:3,6 107:17
  130:16 189:18
  189:20 207:20
  214:5,18
  218:13
documents
  170:3,13,15,16
  170:23 229:11
doing 49:2,7
  54:6 66:11
  97:17 113:21
  138:21 148:9
  163:13 167:6
  176:19 187:16
  212:20
dollar 168:22
  207:12
dollars 68:1
  71:5,7,9,15,16
  71:18 74:5,14
  75:22 107:20
  108:2 133:9
  139:23 142:9
  143:5 144:8
  169:9,13
  179:21 180:4
  185:13,22
  206:16 207:13

208:5,18
  215:10 217:13
  219:9 221:3
  222:19
Donald 54:3,6,7
  196:13
Donaldsonville
  46:22 47:1,15
  65:17,23 66:3
  66:15 67:23
  68:23 70:5
  82:21 89:4
  99:12 126:11
  142:23 197:18
  224:11,12
door 184:20
doors 100:23
dots 154:6
double 44:13
  102:11
doubted 103:12
Dr 152:15,16
drastically
  106:14,15,22
draw 67:2,3,7
  67:13,16,22
  68:3,4 71:4
  72:5,8 79:9,11
  79:13 80:3,10
  81:6 83:10
  85:15 106:13
  106:15 107:10
  202:4,9,11
  217:21 218:2
  221:23
drawback 72:7
draws 67:7,10
  68:20 71:22
  72:1 77:19
  105:20 106:3,8
  106:10 172:6
  202:20 217:23
drive 5:18 28:17
  134:13 146:10

160:11 173:6,7
  173:14,17
  174:11 177:7,9
  177:14,17
  178:3,5 184:11
  193:17 220:7
  228:6 229:14
driven 30:22
  174:6,7,9
driver 63:5
  130:23 131:9
  132:9 133:4,5
  137:17 174:15
  176:7
driver's 4:1
  130:10 134:11
  134:14,16,19
driver/salesman
  165:10
driving 31:5,14
  31:17 35:16
  39:4 89:18
  155:1 172:23
  177:19,23
  209:15 212:21
drop 71:22
dropped 72:1
drove 31:7,11
  32:19 89:23
  173:8,10,14,18
  173:20 174:5
  176:10 188:2
drug 157:14
  186:11 209:21
  210:8
drugs 186:14,16
  186:23 187:1
due 35:23 124:3
  124:4
duly 7:15
duties 137:23
  138:5 176:19
duty 26:15
  213:14

# FREEDOM COURT REPORTING

245

| | | | | |
|---|---|---|---|---|
| **d-w-i-n** 44:13 | **either** 49:14 | 225:1 233:17 | 28:18,20 44:23 | 168:2,9,10,11 |
| **d/b/a** 1:11 5:11 | 235:19 | 236:11 | 52:5 171:21 | 168:12,14 |
| | **election** 43:7 | **examined** 7:15 | 224:3 | 199:20 201:7 |
| **E** | 109:6 | **example** 12:22 | **extreme** 14:4,5 | 205:23 206:6 |
| **E** 3:1 238:1,1 | **eleven** 74:13 | 139:20 179:17 | | 210:13 233:9 |
| **Earl** 54:3,5,6 | **employed** | 179:19 | **F** | **falsified** 176:20 |
| **earlier** 52:5 | 114:16 | **exceed** 132:11 | **F** 238:1 | **falsify** 178:8,16 |
| 149:20 187:12 | **employee** 97:23 | 204:10 | **face** 102:19 | **family** 151:18 |
| 226:12 | 236:14 | **exceeded** 172:7 | 195:20,20 | 157:21 |
| **early** 11:7 25:8 | **employees** 40:18 | **excited** 65:8 | **face-to** 102:18 | **far** 18:14 49:2 |
| 41:21 64:8 | 85:20 115:13 | **excuse** 139:18 | **fact** 28:11 35:22 | 54:15,22 55:10 |
| 124:8 142:4 | 115:13 | 205:13 | 36:15 37:13 | 64:1,2 83:23 |
| 150:15 187:14 | **ended** 65:17 | **exercise** 156:2 | 39:17 40:18 | 167:16 172:5 |
| 193:10 226:12 | 78:18 80:17 | **exercises** 227:15 | 41:5 47:6,11 | 189:9 225:21 |
| **earned** 77:10,15 | 105:17 108:23 | 228:17 | 59:5 75:19 | 229:10 |
| 77:20 105:22 | **ends** 78:20 | **exhibit** 13:7 | 91:6 103:7 | **farm** 14:17 |
| 145:5,6 172:7 | 107:18 | 72:17,19 73:2 | 108:21,22 | 61:22 66:11 |
| 202:14 203:1 | **ensure** 86:19 | 73:23 75:9,14 | 115:10 118:7 | 80:23 114:3,4 |
| 203:15 222:8 | **entirety** 94:19 | 77:7,12 81:21 | 120:14 121:1 | 131:13 174:7 |
| **earnings** 203:9 | **entitled** 13:5 | 104:3,13 | 127:10 128:14 | 176:19 236:3 |
| 225:21 | 57:10 111:10 | 105:12 109:11 | 128:20 134:17 | 236:14 |
| **easier** 17:7 | **Eric** 35:11 | 109:13 110:3 | 134:22 137:23 | **Farmers** 1:10 |
| 24:12 200:13 | 191:17 192:2,3 | 121:5,9,14 | 148:4 167:1 | 5:10 11:13,20 |
| 209:5 | **evaluation** | 126:2 130:2,4 | 170:18,19 | 12:6 14:18 |
| **east** 14:4 25:9 | 201:16 | 130:9 137:10 | 171:21 172:4 | 24:22 25:2 |
| 184:13 | **evening** 92:7 | 137:15 141:8 | 174:18 182:5 | 75:17,20 99:22 |
| **Easter** 146:6,9 | **event** 177:22 | 141:10,14 | 219:19 221:2 | 114:16 |
| **eat** 220:22 | **everybody** 12:8 | 143:16,21 | 223:20 226:11 | **Farms** 1:11 5:11 |
| **edge** 184:9 | 32:11 35:5 | 164:17 165:23 | 227:12,18 | 214:19 220:16 |
| **education** 11:9 | 36:20 114:10 | 169:20 170:2 | 228:3 231:4 | 221:4 |
| **educational** | 127:17 140:9 | 170:17 172:10 | **factor** 45:10,11 | **Farm's** 66:13 |
| 10:22 | 140:19,23 | 172:11 174:17 | **facts** 55:7,11,15 | **fashion** 149:16 |
| **EEOC** 141:19 | 197:8,9 | 181:12 185:3 | 56:14 58:22 | **fast** 42:3 165:20 |
| 181:13,15,17 | **evidence** 2:14 | 205:3,9,13 | 99:20 100:5,15 | **fault** 145:2,4 |
| 183:18 203:14 | 58:13 | 206:4 207:20 | 189:21 190:23 | **favors** 221:13 |
| 211:8 | **evidently** 123:16 | 214:13 215:20 | 223:1 | **FAXed** 109:19 |
| **effect** 2:4 118:5 | **exactly** 47:9 | 216:19 218:11 | **failed** 211:1 | **February** 3:22 |
| **eight** 143:5 | 61:9 108:3 | 229:20 | **fair** 129:12 | 25:14 47:17,19 |
| 159:15 219:8 | 153:20 161:9 | **EXHIBITS** 3:12 | **fall** 17:22,22 | 47:21 65:18,20 |
| **eighteen** 10:8 | 171:12 | **explain** 8:13 | 18:5 23:22 | 71:17,20 92:14 |
| **eighty-five** | **examination** 3:3 | 15:13 152:5 | 76:2 166:6,7,8 | 106:8,11 125:1 |
| 219:9 | 7:11,18 57:2 | **explained** 108:6 | 166:12,13,16 | 125:19 140:13 |
| **Eighty-two** | 57:17 59:13 | 175:9 | 166:19 167:7,9 | 140:15 172:19 |
| 215:9 | 199:12 210:8 | **explanation** | 167:16,17 | 172:19 174:19 |

# FREEDOM COURT REPORTING

246

212:17 213:7
213:11,11
226:13,23
227:6 229:3
**Federal** 7:4
**feed** 148:12
**feel** 102:12
146:13
**feeling** 184:19
**feet** 18:8 19:18
23:8 24:9,16
24:20 88:3,5
113:23 123:13
125:21 168:1
198:22
**fell** 44:3
**fellow** 63:1,14
89:16 119:6
**fellow's** 192:9
**felt** 50:3 184:14
**Fendelson** 35:9
63:21 64:4
127:2 190:1
191:4
**Ferriday** 184:9
**fewer** 17:8,8
19:15,15 28:9
91:22
**fifteen** 52:21
132:15
**fifty** 74:5 208:4
208:5,18 219:9
**fifty-eight** 19:10
**fifty-nine** 19:9
**fifty-three**
207:21
**figure** 95:20
96:19,20
132:14 143:11
147:15 183:17
206:4,8,10
**figured** 62:9
184:15 217:7
**figures** 97:6

182:18 216:18
**file** 144:15
**filed** 141:19
190:5,21
194:22 196:21
198:8,10
224:19
**filing** 2:16
**fill** 45:5 48:5
117:16 119:18
130:16 145:9
**filled** 145:9,13
168:11 174:14
**filling** 127:12
**final** 78:11,12
78:12
**finally** 228:4
**find** 46:8,19
47:14 67:19
93:16 109:3
118:8 128:1
134:9 148:5
152:22 155:17
155:21,23
157:17 170:12
205:6
**fine** 9:11 13:8
74:8 132:2
**fines** 74:4
**finish** 8:23 9:1
24:13
**fire** 116:1 117:4
117:11
**fired** 118:2
**first** 7:15 8:10
11:13 14:18
23:2 24:5 26:7
29:11 31:7,11
38:14 40:2,6,8
40:14 41:9,11
72:17 73:17,20
74:2 77:5 82:9
108:4 113:6
117:3 154:17

172:13 186:21
187:13,16,17
188:3 206:21
207:15 211:22
212:13 215:22
**fit** 115:14
**five** 142:9
159:14
**fixed** 170:8
**Florocid** 159:3
**folks** 37:4
**following** 7:12
**follows** 7:16
**foot** 26:3 119:2,3
**force** 2:3 72:9
108:19
**foregoing** 7:6
238:6,10
**form** 2:10 119:4
144:11 174:14
202:6,17 203:5
203:18 204:22
210:6,16,23
211:12 212:2
212:11 213:8
213:16,22
215:2 216:2
218:7 221:10
221:15 222:11
222:15 223:12
223:18,22
224:18 234:9
234:18
**formal** 201:16
**Forman** 1:20
5:21
**formed** 129:8,9
129:10
**forms** 75:16
144:13 145:9
145:12,16
**forty** 10:19
132:7 142:8
**forty-five** 144:8

203:15
**forwarding**
120:8
**found** 157:1
211:18 226:3
**four** 10:17
139:22 159:14
178:22 198:22
221:18
**fourteen** 15:5
16:11,14 52:21
74:5
**Friday** 90:11
91:11,18,21
92:4,23 135:13
146:3
**Fridays** 92:12
**front** 12:17
120:18 122:17
175:12
**full** 2:4 7:21
26:15 213:14
**fully** 138:5
**function** 229:17
**further** 1:23 2:7
2:15 225:1
233:17 236:11
237:6 238:13

---
### G
---

**G** 44:13
**garden** 180:11
180:13
**Gatlin** 110:4,7
112:6,11,13
113:3,10,11
114:1,15
116:23 118:16
119:5 120:2,3
120:7,15,17
121:3,16 122:9
122:16 229:10
229:11
**general** 11:4

25:17 35:14,15
52:16 56:4
98:21 103:7
140:13 236:19
**generally** 167:12
**gentleman** 11:17
118:20,23
**gentlemen** 54:13
**getting** 25:19
71:14,18 80:16
80:17 85:2
122:20 123:21
125:13 135:5
136:3 138:14
138:18 148:20
150:11,17
152:21 160:19
170:6 180:10
184:18 188:20
**give** 8:5 9:7
22:14 28:18
35:1 52:5 59:2
67:6 68:3
117:2 139:16
139:19 149:1
173:3 200:10
221:23 224:2
231:20
**given** 8:1 103:2
133:21 155:3,4
232:2,11
238:11
**giving** 171:8,9
171:15 223:7
**glad** 99:5,12
100:3
**Glenwood** 9:22
10:2,4,6
**Glucophage**
158:15
**go** 10:16 11:12
15:12,16 16:21
16:22 17:1,5
25:10,19,20

| | | | | |
|---|---|---|---|---|
| 26:20 33:12 | 70:3,4 72:5 | 146:7 | 4:11 | 159:11 |
| 40:23 46:20 | 85:15 88:7 | **grandmother's** | **happen** 89:3,9 | **heat** 42:2 151:8 |
| 53:22 57:8,9 | 91:8 94:9,16 | 64:15 | **happened** 22:7 | **heavily** 16:1 |
| 57:15 60:8 | 95:4 102:13 | **great** 15:9 | 88:23 124:8,14 | **height** 161:4 |
| 62:15 65:19,22 | 109:4 110:8 | **greenhouse** | **happens** 179:9 | 198:19 |
| 67:10 69:3,7,8 | 111:1,12,14 | 162:5,8 | **happy** 65:7 | **held** 13:16 15:19 |
| 69:14,15,16,19 | 120:4 125:14 | **grew** 208:17 | 138:23 184:17 | 21:12 29:1 |
| 69:19,21 70:8 | 129:22 133:2 | **grief** 179:4 | **hard** 19:20,22 | 37:7 105:4 |
| 82:1 88:6 97:5 | 145:13,15,23 | **gross** 182:17 | 72:10 73:12 | 189:14 |
| 102:6 103:14 | 146:8,16 148:2 | 215:6 | 86:10 139:6 | **help** 21:7 38:5 |
| 105:1,8 113:6 | 149:1 161:17 | **ground** 198:14 | 140:14 143:1,2 | 44:5 45:5 46:9 |
| 116:5 119:11 | 175:14 176:17 | **grounds** 2:12 | 144:4 156:4 | 59:2 88:13 |
| 125:6 127:23 | 180:2,13 | **Grove** 188:7 | 163:13 178:1 | 93:7 101:4 |
| 143:11,11 | 182:22 183:1 | **growing** 98:9 | 186:13,13 | 102:1,9 115:13 |
| 146:9 148:16 | 204:15,17 | **guess** 11:22 12:7 | 230:9,12,15,20 | 115:13 116:2 |
| 149:3 153:2,22 | 205:1 211:19 | 15:4 23:14 | **harder** 185:3 | 116:17 117:15 |
| 159:7 161:4 | 211:20 212:21 | 47:16 49:19 | **Harleton** 128:1 | 119:18 153:17 |
| 163:13 167:5 | 213:23 214:18 | 69:2 91:18,21 | 132:18 | 153:18 161:17 |
| 177:11,13 | 222:1 224:16 | 92:21 97:6 | **harm** 100:22 | 161:18 162:8 |
| 187:5 199:14 | 226:4,7,9 | 100:14 109:5 | **hate** 93:23,23 | 162:10,15 |
| 201:18 205:9 | 227:4 236:4 | **guessing** 11:7 | **hauling** 42:3 | **helper** 88:2,10 |
| 207:5,23 | **good** 17:15,23 | 132:8 157:23 | **head** 9:6 12:11 | 88:20 89:12,15 |
| 209:15 210:8 | 20:10,11 22:13 | 163:11 204:18 | 24:15 30:16 | 130:13 172:20 |
| 210:13 211:8 | 32:21 42:13 | 204:19 | 48:14 59:20 | 173:3 174:20 |
| 213:14 216:4,6 | 48:20 52:17 | **guy** 42:22 43:20 | 235:7 | 192:13 193:14 |
| 225:12 226:11 | 85:12 97:16,17 | 69:4 116:15 | **health** 108:19 | **helpers** 41:8,11 |
| 226:17 227:8 | 98:19 103:15 | 221:7 | 134:12,14,15 | 41:13 74:10 |
| 228:21 229:2,7 | 118:14 129:2,9 | **guys** 63:23 | 135:4 160:10 | 84:18 85:5 |
| 237:5 | 146:12 164:1 | **guy's** 131:12 | 186:15 209:6 | 93:3,5 |
| **goal** 204:10,19 | 177:11 178:15 | **G-l-e-n-w-o-o-d** | 209:20,22 | **Helper-Emplo...** |
| 207:3,6,8 | 179:13 180:15 | 10:2 | **healthier** 116:18 | 4:1 130:10 |
| **goals** 204:8 | 208:1 | | **hear** 42:21 | **helps** 65:9,10 |
| **goddamned** | **Goodwin** 44:11 | **H** | 45:17 48:7 | **hereto** 72:21 |
| 222:1 | 44:12 | **half** 198:22 | 191:14,15 | 75:11 104:5 |
| **goes** 108:7 | **gotten** 72:2 | **halfway** 10:7 | **heard** 42:19 | 109:15 121:11 |
| 207:13 | 78:15,17 108:5 | **Hall** 90:14 | 60:10,12 97:15 | 130:6 137:12 |
| **going** 8:16,17 | 124:22 136:17 | 145:22 146:12 | 177:7,8,10,11 | 141:12 143:18 |
| 13:6 18:4 | 203:16 | 148:1 188:10 | 191:16 192:22 | 164:19 169:22 |
| 28:16 43:17 | **GPS** 174:21 | 196:13,14 | **hearing** 238:12 | 214:15 |
| 44:16,17 46:5 | 219:23 | **hand** 112:6,8 | **hearsay** 42:19 | **Hey** 233:19 |
| 47:15 48:3 | **Grande** 132:18 | 122:3,8 | 60:21 68:10 | **high** 161:4 |
| 54:2,6,18 | **grandfather** | **handed** 112:7,20 | 191:12 | 198:13 |
| 56:22 57:3 | 146:7 | **handling** 66:12 | **heart** 156:17,22 | **higher** 67:6,9,13 |
| 65:5 66:10 | **grandmother** | **Handwritten** | 157:3 158:7,11 | 67:15 182:18 |

# FREEDOM COURT REPORTING

204:12,14,20
204:21 207:13
**hill** 180:3,6
**hire** 95:18,19
96:4 100:10
**hired** 46:1 70:13
95:11,16
193:14,15
**hiring** 45:20
100:9 101:7
127:19
**history** 157:22
**hits** 198:17
199:1
**hitting** 233:2
**hole** 108:5
197:11 217:17
217:18
**home** 16:2 43:23
82:2 132:23
139:12 147:12
147:23 150:14
153:4
**honest** 179:11
179:14
**honestly** 103:16
**honored** 231:6
**hope** 193:7
**hoping** 111:3
**hospital** 148:16
148:17 151:17
**hour** 133:11,13
133:18,22
219:20
**hourly** 85:19
**hours** 19:19,21
172:20,23
173:7 174:20
174:21 175:8
176:9,15,16
178:3,4,12
209:7 220:7,11
220:17
**house** 174:8

185:6,16
**Houston** 125:15
**How's** 93:21
**Hughes** 63:2
**Huh** 218:20
**huh-uh** 9:6
150:4
**hundred** 74:5,14
107:23 108:1
132:15 139:23
174:20 175:8
178:22 206:15
206:15 207:21
208:4,5 215:9
217:12 219:9
222:19
**hurt** 19:23 153:5
**Hydrocodeine**
158:23

———————
**I**
**idea** 17:17 18:4
37:5 55:16
60:4 62:8
66:14 96:7
129:16 133:23
156:7 163:18
168:20 217:9
221:2,5
**illegal** 176:14,17
176:18 177:9
177:15,17,19
177:23
**imagine** 40:20
69:1 132:7
156:10
**important** 34:15
37:2 86:8 97:3
235:20 236:1
**incentives**
201:21,22
**include** 74:16
**income** 76:6
87:1 144:16,20

144:23 167:18
202:12 203:16
203:21 225:23
**increase** 52:18
97:16 98:19
132:10
**increased** 52:17
53:21 134:19
**increases** 42:11
81:14
**independent**
15:11
**independents**
16:5 66:20
**indicate** 128:8
128:16
**indicating** 77:4
173:16 198:18
199:3 205:3
215:8
**indication** 185:2
**industrial** 9:17
113:12,13,19
115:20,23
117:2
**infection** 43:1
**information**
59:3 111:15
120:3 170:6
188:22 234:3
234:11
**informed** 236:16
**inherit** 85:10
**Initial** 189:19
**initially** 147:21
231:4
**initiated** 201:4,5
201:6
**inquired** 107:10
**insinuate** 96:11
96:14 177:10
**insinuated**
49:19,20,23
93:20 95:8

181:1
**insurance** 24:21
79:1,5 85:23
86:9,11,20,23
87:6 108:19
135:4 172:2
186:15 233:22
**intend** 18:10
**intended** 127:7
**interested** 37:20
135:5 220:12
238:15
**internally**
148:13
**involuntarily**
201:10
**ironclad** 52:22
53:1
**IRS** 145:15
**issue** 39:15,16
**issued** 106:3
160:13
**it'd** 17:6 24:12
178:1

———————
**J**
**James** 63:14
65:12
**January** 3:20
19:13 25:8
26:19 110:11
120:1 124:19
192:5 212:17
228:3
**Jasper** 69:5,5,19
69:20,21 70:3
70:12,20 72:14
73:10 82:19,19
82:23 83:18
84:5,10,14,19
89:1 95:4
194:16 216:21
224:13 229:20
**Jeff** 79:16 80:8

80:10
**JEFFERSON**
238:4
**Jerry** 5:17 12:21
166:1
**job** 4:3 51:17
69:14 85:12
97:17 98:20
100:11 101:9
103:10,15
113:1 115:15
116:17 117:19
117:23 135:6
137:16 162:4
164:1 165:10
165:13,14
191:19 192:7
193:1 195:8,19
196:22 201:16
201:18 221:23
**jobs** 51:16
**Joe** 6:4 11:14,16
13:20 14:21
18:17 20:13,13
32:19 37:17
39:14 43:5,14
44:15,15 45:2
45:3,12,14
47:11 48:1
54:17 61:10
66:1 70:7
79:16,21 80:21
81:2 82:22
93:13 94:11
99:10 103:17
112:8,9,9
117:4,10 118:1
121:23 122:4,5
157:19 179:20
199:21 211:15
212:5 213:18
221:4 235:5
**Joey** 83:20
**Joe's** 69:14

# FREEDOM COURT REPORTING

249

Johnny 35:9
63:21 64:4
126:23 127:2
189:23
Joseph 194:15
July 171:11
June 171:11
justified 172:22
195:13,17

## K

keep 69:13
73:13 86:8
87:20 88:4
113:1 118:14
143:2 181:20
181:20 182:21
205:7 236:15
keeping 196:2,4
Kenny 130:11
130:13,22
132:6
kept 61:13 71:3
108:19
kick 184:19
kin 47:3 64:12
238:14
kind 8:4 12:3
32:5 60:14
74:18 161:1
192:23 201:15
219:15,17
kindly 93:20
95:8 180:23
Kinross 5:18
Kmart 139:14
208:2
knee 18:7,7
19:16 23:7,11
24:4,19 26:3
42:23 123:14
199:19,19
209:10 225:4
knees 42:23

43:20 125:13
125:21 168:1
knew 34:22
51:15 63:21
79:10 105:10
110:7 157:21
228:10,12
233:23 234:1
235:5 236:3
knock 92:3,10
92:15
know 8:12 9:14
10:16 12:9
18:14 20:1
23:23 31:17,23
32:5 33:7,8
35:7,10 36:11
36:11 37:3
38:5,15 39:2
42:17 43:14
45:23 46:4
47:8,9 48:19
49:7 51:16
52:21 53:1,8,9
53:11,12,17,20
54:5,16 55:4
57:4,5,14,19
58:2,3,4,12,16
58:18 59:15,21
59:23 60:1,9
60:20 61:19,23
62:4 63:4,12
63:13,14 64:1
64:2,9,11,17
65:3 66:18,21
68:5 69:10,16
69:16 70:1,9
71:13 74:4,6,7
74:15,18,20
77:6 78:5,6,8
79:3,8 80:16
81:14,15,15,17
81:19 82:6,14
82:16 83:23

85:3 86:6
91:16 92:18
93:22 94:3,4
95:14,23 96:5
96:13 98:1,3,4
98:6,11,17
100:15 101:8
101:12,15
103:2 104:18
104:20,23
105:12 108:12
108:16,18
111:10 122:13
127:22 128:4
129:1,2,19
131:11,22
132:3,8,17,19
133:16,19,20
134:17 138:9
140:3,15
146:16 147:2
149:9,22,23
150:1,2,13,14
151:7,7,11
152:20 154:4
156:11 158:11
158:12 159:19
161:8 163:17
163:18 166:8,9
170:11 171:7
173:2 175:16
179:9 184:6,14
184:16,18
190:7,8,22
191:20 192:7
193:3 194:3,8
194:9,10,23
195:21 197:9
197:13 198:9
198:14 209:23
212:14 215:12
215:14,15,16
216:17,19
217:7,10 218:3

218:4 219:19
220:6,7 223:2
223:2,6 225:9
226:21 227:18
227:22 229:21
230:1 231:19
232:4,7,10,20
233:10,19
234:7 235:17
236:2,23
knowing 77:21
228:6 229:7
knowledge
189:21 190:3
234:2,15
known 53:15
191:7 232:15
knows 12:8
190:1,2,9,19
191:10,13
194:6,11,20,23
196:19 197:20
198:6 219:20
232:20 236:18
236:23
Kyle 37:19,23
38:7 39:13

## L

L 1:14,19 5:14
7:1 238:19
labeled 126:2
labor 74:16
132:11 162:15
lack 149:7
language 156:4
lapse 79:1
large 16:1
late 124:8
140:21 141:6
147:9 148:20
150:11 153:15
188:4,20 213:7
213:11

laughing 191:17
191:18 192:3
192:23
law 5:18 133:20
134:1
laws 2:5 145:2
lawsuit 126:19
126:21
lawyer 57:1
58:13 59:2
75:15 110:20
111:5 121:17
225:3,10,20
leading 2:10
200:7
leads 97:13
learn 182:21
leave 90:9
122:20 128:5
148:17 175:5
188:21 195:11
195:15
leaves 222:4
leaving 146:3,4
234:21
Ledbetter 54:3
Lee 97:19
left 11:17 43:12
52:19,20 54:14
92:2 151:12
154:18 175:7
236:21
leg 119:12
legal 174:15
177:7
legs 43:2
Les 35:10 58:1
59:18,19
Leslie 213:19
214:21 227:19
letter 3:20,22
102:17 110:4,6
110:11,19
111:18 112:21

# FREEDOM COURT REPORTING

113:3 116:22
120:1,7,8,11
120:17 121:3
121:15,18,21
122:2,4,9,16
122:23 123:3,5
123:6,8,12,21
124:19,22
125:19 126:2,6
126:10 191:19
191:21 192:4,5
192:5,8 193:1
226:23
**letters** 212:17,18
**let's** 8:21 15:16
43:19 56:1
62:15 72:16
75:6 76:18
103:20 105:1
109:10 121:6
130:1 141:7
143:13 159:10
169:18 187:5
198:23 202:19
237:5
**level** 20:18
152:21 161:6
**levels** 151:16
163:20
**Licence** 238:21
**license** 134:11
134:15,16
**lie** 211:11
**life** 156:23
**lifestyle** 116:18
**lifting** 160:21
161:6
**limits** 95:18
**line** 121:19
123:5 131:1,2
161:9
**list** 155:4 196:13
**listed** 189:23
191:9 198:6

**listen** 129:11
222:2
**listing** 191:11
**lists** 189:20
**litigation** 237:1
**little** 14:8 102:8
127:17 149:20
178:20 208:16
**live** 42:22 97:8
**lived** 10:10 44:1
**lives** 193:3
**living** 44:9
118:14
**load** 92:23
161:17 162:16
175:1 177:12
177:13 184:13
**loaded** 92:9
135:22 140:7
**loading** 162:11
**load's** 135:22
**loan** 186:5
**location** 16:17
16:18 180:7
220:6
**log** 173:20,20
181:20
**logbook** 176:11
176:15,16,20
178:9 220:11
**long** 10:10,13,14
11:19 15:2
17:16 23:15
40:23 68:22
84:9 93:11
119:12 132:14
136:14 139:4,6
152:18 161:3
167:10 192:17
219:13,14
230:6,9,21
231:5
**longer** 84:12
148:1 167:12

201:2,3
**look** 34:21 104:8
104:10,13
136:4 143:10
145:11 179:20
206:1
**looked** 73:18
149:19 155:8
**looking** 34:11,18
34:19 60:19
144:4 174:18
189:18
**looks** 74:17
107:18 132:22
184:1
**lose** 185:12,16
**lost** 102:11
146:7 151:18
152:4 185:6,13
**lot** 17:7 20:7,8
60:12,22,23
66:4,18 69:15
88:13,15 92:12
92:20 100:10
139:15 140:14
178:6 186:14
230:23 232:17
**loud** 9:7
**Louisiana** 14:12
14:15,23 46:22
47:15 65:18
87:14 143:1
144:17 145:6
184:10,12
215:23 224:12
**lower** 68:6 82:10
204:19
**lowered** 222:13
**lowering** 157:14
158:4
**lowest** 67:7
**Lowe's** 16:2
82:2 132:23
139:11,12

150:16
**loyal** 221:9
**lucrative** 142:3
**lunch** 92:15
**lunchtime** 92:5
92:11
**Luverne** 10:8
**Lyrica** 158:19

--------

**M**

**M** 5:21
**machinery**
160:5
**Mack** 32:19
**mail** 112:5 122:2
**mailing** 9:16
**main** 86:21
**maintain** 86:22
86:23 87:1,1
**major** 149:3
**making** 53:13
67:3 82:21
86:15 167:23
169:14 209:2
221:8
**man** 17:15 69:11
69:12 70:14
94:4 95:11,15
147:11 148:22
148:23 161:17
178:15
**management**
20:18 37:12
39:16 61:21
68:16
**manager** 20:23
46:23 90:12
103:8 163:22
180:12,13
196:16 197:18
**managers** 53:5
**manner** 196:8
**manufactured**
22:8

**man's** 59:16
**map** 154:6 155:7
155:8,11,13
**March** 1:22
92:14 140:13
140:15 218:18
218:19
**mark** 72:16
109:10 121:7
130:1 137:8
141:7 143:13
169:18 214:10
**marked** 72:20
73:1 75:10
77:12 104:4
109:14 121:10
121:14 130:5,9
137:11,15
141:11 143:17
143:21 164:18
169:21 205:13
214:3,6,14
215:20
**materially** 15:7
**ma'am** 14:9
214:11
**McGrady** 54:3,7
**mean** 13:7 16:16
29:17 34:18
39:3 44:2
47:17 51:12
52:1 59:9
60:19 61:4
66:9 69:14
74:17,22 78:14
80:19 86:7
96:3 103:16
109:6 119:9,10
124:7 127:12
131:9 139:10
153:18 159:6
168:22 169:4,7
173:22 175:11
178:16,17,19

# FREEDOM COURT REPORTING

178:19 181:10
182:2 183:5
200:9 202:9
210:1 218:8
235:19
meaning 116:7
193:14
means 203:8
206:14 238:8
meant 52:6,10
measured 199:5
medical 24:1
154:11 209:14
229:13
medication
160:15
medications
157:10 158:13
159:23
medicine 156:12
156:13 158:5
158:12 159:11
medicines 160:3
meeting 43:6
113:12,15,16
113:17 114:6
114:11 118:17
137:7 171:1,2
171:4 179:16
179:18 180:17
181:4,5 211:4
mention 161:12
181:4
mentioned
29:21 86:6
211:23
met 44:15
Metropol
159:10
Miami 132:22
Michael 85:7
89:16,18
191:23 192:1
192:11,18

193:2,13,22
Michelle 1:18
5:14 7:1
238:19
mid 10:11
157:22 213:11
middle 199:4
miles 10:8 14:2
14:6 17:8
19:15 132:15
million 221:3
mind 13:1 100:1
146:5 184:5
mine 17:19 68:6
149:3
mini-station
65:2
minute 23:6
103:21 104:11
119:17 174:18
minutes 34:3
116:4 187:6
Mississippi
184:9
mistake 173:5
mistreated
169:8 184:7
Mobile 43:4
models 21:21
money 65:9 72:2
72:4,6,7 77:10
82:20 83:7,9
87:20 97:4,5
108:15 118:13
133:6,15
139:17 144:18
145:5 164:2
167:14 170:20
172:1 182:10
182:14 183:6
185:3,13,20
186:8,12 197:3
206:16 207:6
221:8 222:8

moneys 185:10
money's 197:6
month 69:1 71:6
140:21
months 10:17,17
10:17
morning 43:10
146:4 173:19
173:23 191:18
Morton 3:4,6,8
3:10 5:22 7:18
12:10,16 13:4
13:9,13,19
15:16,22 21:15
24:3 29:4
37:10 47:20
56:1,8,19 57:7
57:14 59:10,13
61:18 62:15,21
72:16,23 75:6
75:13 76:8,17
87:15,18
103:20 104:7
104:12 105:1,7
109:10,20,23
111:17 121:6
121:13 130:1,8
137:8,14 141:7
141:14 142:17
143:13,20
152:3,9,13
154:22 164:11
164:21 166:1
169:18 170:1
172:11,15,17
178:23 179:6
179:13 181:22
183:16 187:5
187:11 189:17
199:7 200:6,9
202:6,17 203:3
203:5,18
204:22 205:5
205:11,11,12

210:6,16,23
211:12 212:2
212:11 212:8
213:16,22
215:2 216:2
218:7 219:2
221:10,15,20
222:11,15,23
223:12,18,22
224:18 225:1
225:19 233:14
234:9,18
235:21 236:6
236:11 237:3
Morton's 218:23
mother's 146:8
move 44:4 88:16
moved 44:5,8
231:12
moving 97:15
113:21 160:22
220:4,11
music 8:10,14
55:14

**N**

N 1:14 3:1
name 7:21 44:10
59:16 115:21
156:6 164:4,8
179:16 181:3,4
188:5 189:20
190:16 192:9
named 63:1,14
89:16
naming 67:18
nature 191:1
near 193:4
necessarily
78:21
necessary 2:8
neck 124:4
need 9:11,12,13
12:20 21:7

56:19,21 77:6
104:10 135:19
136:8 138:6,11
156:16,19
162:10,13
225:12
needed 30:3
31:18 34:23,23
45:3 66:6
88:13,16 98:11
115:14 116:5
118:13,13
149:4,17
151:15 188:22
195:10
needs 90:23
136:20 138:21
negative 108:15
negotiated 23:16
neighbor 151:19
152:4
neighborhood
15:6
neither 238:14
nerves 158:21
net 219:6
never 19:1 25:20
27:9 29:12,13
29:19 31:2
32:17 40:10
45:4 72:1,15
77:23 79:10
80:8 82:13
89:23 95:17,19
96:3 97:14
103:12 108:7
116:19 119:14
119:15,15
146:6 149:14
168:5 173:10
173:14 177:7
177:18 180:19
180:19,20
195:1,2,5

# FREEDOM COURT REPORTING

196:11 200:2 201:20 217:18 225:8 232:2,13 232:15 234:10 234:15,17
**new** 13:22,23 25:4 66:10,16 67:20,21 87:16 87:18 147:11 148:22
**nice** 22:22 33:8 208:1
**night** 173:19 174:1
**nine** 159:15 176:16
**ninety** 14:2
**ninety-six** 179:1
**nobody's** 108:6 138:12 168:21 177:16 194:13
**nod** 9:6
**nods** 24:15 30:16 48:14 59:20 235:7
**normal** 72:4 92:15 162:3 187:15
**normally** 91:23 92:6,10 150:22 162:4 187:15
**north** 1:21 5:22 7:8 25:10 75:21
**NORTHERN** 1:2,3 5:2,3
**notebook** 12:18 170:4
**notes** 4:11 12:20 13:2 181:18,20
**notice** 2:16
**noticed** 68:6
**November** 43:7 109:5,7,7

186:2,3 211:15 227:13
**number** 1:5 3:3 5:5 28:8 62:5 77:7 110:3 147:2 149:6 163:2,3 170:2 176:15 178:3,4 182:2,3 205:7 208:15 214:22 215:4,8 238:21
**numbers** 155:14 170:9 209:1

---
**O**

**O** 1:14 5:18 44:13
**oath** 32:6,10 35:12 67:12 141:22 173:9
**object** 200:6,11 202:6,17 203:3 203:5,18 204:22 210:6 210:16,23 211:12 212:2 212:11 213:8 213:16,22 215:2 216:2 218:7 219:2 221:10,15 222:11,15 223:12,18,22 224:18 234:9 234:18 235:21 236:6
**objection** 200:10
**objections** 2:9 2:12
**obligations** 162:23
**occasion** 29:22 39:8
**occasions** 99:17

228:17
**occurred** 124:16
**occurrence** 88:19
**October** 160:13
**offered** 2:14 153:17,18,21
**offers** 12:23
**offhand** 101:11 159:18 163:11
**office** 112:10 117:4,11 191:17 192:4
**offices** 1:19
**offset** 185:10
**offsets** 202:4
**Oh** 23:18 33:16 35:20 67:14 109:22 119:14 205:9 206:6
**okay** 8:4,8,10,19 9:3 16:7,16 17:17 24:14 26:1,6,20 27:11 30:6 33:3 34:13 35:2,17 36:14 38:9 39:13 42:8 52:13 54:12 55:13,20 56:9,19 59:3,8 60:4 61:18 62:13,15 68:9 70:17 76:19 77:5 82:14,18 87:2 88:6 95:22 96:5,23 101:6 103:4 105:7 106:7,23 107:4,7,16 109:10,22 110:17 111:11 111:13,17 113:18 116:3

119:4 121:22 123:16 144:6 151:20 175:9 182:19 183:9 183:16,21 200:18 201:4 201:21 203:23 205:18,22 207:10,14 208:3,14 209:1 211:22 212:12 212:16 213:13 217:10 218:23 219:11,19 222:23 230:19 232:14 234:6 235:19
**old** 19:7,11 44:1 47:7,9 48:18 58:2 96:8 132:6 156:8 196:8 222:20 222:21,22 231:9
**older** 22:20 45:19,20 46:1 47:8,11 48:20 48:22 50:10 51:7,14 54:13 97:7 127:11,21 128:7,11 209:6
**oldest** 32:3 34:6 36:23 223:10 223:13
**ones** 39:3 159:20
**ongoing** 211:3
**open** 100:22
**opened** 43:13 180:3 217:1
**opening** 66:5,9 70:5
**operate** 53:9 160:4
**operated** 18:8

23:8 24:9 123:13 125:13 219:21
**operates** 108:10 108:11
**operations** 113:23 125:16 226:22 227:1
**opinion** 129:4,8 129:13
**opportunity** 53:22 65:9 82:20 83:6,8 139:17 167:13 168:6,8 170:2 217:5
**option** 156:1
**oral** 7:11
**Orange** 188:7
**order** 46:18 86:19 138:5
**ordinary** 175:19 175:21
**organized** 196:5
**original** 229:6
**originally** 20:5
**overdosed** 153:6
**overhead** 161:8
**overloaded** 139:8
**owing** 107:19,21 107:22

---
**P**

**P** 1:14 5:18
**pack** 195:12
**packs** 195:11,15
**Padgett** 83:20 83:21 194:15
**page** 3:3 172:13 172:18 174:17 207:19
**pages** 172:18
**paid** 67:1,2

# FREEDOM COURT REPORTING

253

70:11 71:2
72:3 74:13
75:20 76:9,10
85:1 133:11,12
133:15,17,21
142:22 143:2
144:2,3,7
145:5 162:22
180:20 182:17
207:6 217:11
218:1
**pain** 159:2,2
**paper** 73:21
**papers** 45:6 48:5
117:16 119:19
**paperwork**
77:22 80:8
186:1
**pardon** 63:9
107:2 118:10
127:1 148:10
155:22 166:11
**parked** 88:14
**parking** 88:15
88:17
**part** 18:3 25:2,3
25:6 41:21
79:4 95:23
97:10 106:19
107:1,3 135:6
144:14,17
167:6 203:16
206:21
**partially** 125:22
203:9
**participate**
114:13 115:3,4
115:7 227:16
228:13,16
**participating**
115:11
**particular** 19:4
31:12 61:1
81:21

**parties** 1:16
2:11 238:14
**Parvin** 1:19 5:14
7:1 238:19
**pass** 210:7
227:14
**passed** 115:5
211:1
**Pat** 152:15,16
**pay** 70:7 72:11
73:12 82:22
85:4 97:5
130:23 131:9
131:11 132:10
133:4,6,13,14
134:19 135:1
144:10,12,19
171:8,10,16,19
172:1 173:3
185:4,8,14
186:11,12,15
186:22 207:9
**paying** 70:15
73:13 79:4
185:18
**payment** 12:22
**payments** 143:7
**payment's** 182:6
**payroll** 178:2
**pays** 162:15
**people** 20:2
31:21 35:13,18
36:12 42:19
45:18,20 50:9
51:7,14 53:15
67:6,9,18,20
67:21 68:12
83:14 86:14
88:16 98:10
100:9,10,11,12
101:7 103:11
126:18 127:10
127:19,20
131:10 136:14

136:23 141:6
150:16 156:3
163:15 179:3
182:20,21
189:21,22
232:7,12
**perceived** 212:8
**percent** 206:20
208:9,11,21,23
**percentage**
204:4,14
**percents** 82:3,3
**perform** 113:19
114:8 119:6
**performance**
40:4,9,14
42:10,15
163:19 188:17
195:9,19
196:23 201:17
201:19
**performed**
113:11,13
114:2,10,19
176:18
**period** 73:10
173:15
**periods** 199:17
**permanent** 9:19
9:21 10:14,18
18:11
**permission**
174:10
**permissions**
229:13
**person** 22:22
30:17 32:4
34:6,14 53:7
58:14,18 95:21
96:8 129:9
161:23 162:21
232:19 233:12
**Pete** 48:10,13,18
**Phillips** 97:19

**phone** 37:18
146:19,22
155:14 176:4
**physical** 14:11
16:17,18
157:19 165:9
169:5 210:7
227:14 228:16
230:13,17,19
**physically** 112:7
115:2 136:9
230:10,12,16
**pick** 85:8
**picked** 36:3
129:17 155:13
**picking** 125:6,9
196:8
**piece** 73:21
185:17
**pile** 139:4
**pill** 159:5,6
**pills** 173:19,19
173:23 174:1,2
**pins** 43:2
**place** 18:18
89:11 93:15
94:18 118:8
150:16,19
**places** 16:2
19:23 88:17
155:15 195:11
224:9,10
**Plaintiff** 1:8 5:8
5:20
**plaintiff's** 4:12
189:18 214:4
214:11,13
**plan** 12:22
**planning** 18:6
146:2,3 155:1
**plans** 167:23
**plant** 1:11 5:11
14:17 17:15
40:22 56:23

61:22 66:11
80:23 114:3,4
131:13 174:7
176:19 180:15
201:8 204:1
211:7 214:19
219:20 220:16
221:4 233:20
235:1,4 236:3
236:14
**plants** 15:14
42:3 62:12
87:19 88:13,14
135:14 140:1
149:20,22
150:9 160:23
182:16,22
183:11,14
184:11 187:21
206:16 208:6
221:3
**Plant's** 181:16
**pleaded** 117:19
117:23
**please** 7:21 8:12
9:7,13 14:8
72:17 121:7
200:8 214:11
**plus** 107:23
**pneumonia**
148:16 151:17
**pocket** 131:18
164:2
**point** 12:15 94:8
163:9 173:1
181:2 228:4
**poison** 148:12
**polls** 43:13
**pool** 101:13
**pops** 176:6
**position** 37:12
39:16 49:3,5
50:15 68:13
98:4,6 101:10

# FREEDOM COURT REPORTING

254

127:12 132:13
133:17,21
137:17 138:3
**positions** 118:12
**possible** 175:7
**prepared** 25:20
**Presbyterian**
164:6
**presence** 139:15
**Present** 6:3
**pressure** 158:4
**pretty** 53:4
177:1
**prevented** 223:7
**previous** 28:3,6
**previously** 30:21
100:18
**prior** 2:14 25:16
30:21 76:23
77:10,10
106:14 110:10
123:12,21
125:3 225:4
227:12 229:5
**probably** 9:12
10:11,19 11:6
14:6 15:5 17:7
22:23 24:2
32:3 45:9,11
48:20 54:8
56:4 64:10,19
86:13 87:7
88:3 90:23
107:18 110:23
127:21,23
128:12 129:2
133:6 135:13
163:10,11
165:7 167:2
178:10 180:10
186:2 190:21
194:22 226:15
**problem** 80:16
80:22 123:15

138:11,12,13
150:17 156:20
160:22,23
161:1 177:23
180:10 187:4
200:2 226:21
**problems** 33:2
52:18 56:6,11
101:4 102:1,2
102:5,14,16,22
147:12 148:14
149:3 152:21
156:21 157:3
161:5,10,14
209:6
**Procedure** 7:5
**proceed** 13:13
**proceedings**
7:12
**process** 53:13
125:13 211:3
**produced**
109:18 110:1
170:3 214:6
**product** 66:13
140:4,8,14,21
196:8 222:20
**production**
223:21
**products** 66:13
140:18
**profession** 179:4
**profit** 197:14
**profitable** 197:7
**program** 15:13
113:12,14,19
114:2 116:9,14
118:18,22
124:5 135:3
**programs** 189:2
**promoted** 65:2
**proper** 75:1
**property** 185:12
185:17

**proposition** 55:8
56:14 100:6,16
**propped** 88:3
**prorate** 74:19
**prorated** 74:18
**protected**
212:13,14
**provided** 7:4
**pull** 170:11
**pulled** 98:18
135:14
**purchase** 12:9
**purely** 94:10
**put** 22:7 43:2
60:15 61:8
88:13 112:23
118:12 120:6
124:3 125:7,10
132:12 140:5
147:13 148:15
151:16 154:6
159:16,16
175:3 176:14
176:15 179:17
182:16 183:11
183:20 187:20
190:13 221:17
222:7
**puts** 72:10
**putting** 41:23
88:14 147:15
181:23 187:21
**p.m** 7:10
**P.O** 9:22 10:1

---
**Q**
**qualified** 82:7
**qualify** 46:15
82:5 135:3
**question** 8:11,16
8:18 9:2 33:4
35:15 56:2,5
57:3,9,10 59:1
83:2,5 100:2

113:9 119:10
129:3 133:3
140:7,16,17
141:17 152:6
154:20 155:10
177:3 183:3
185:11,15
191:3 200:11
229:6 231:1
**questions** 2:10
2:11 8:23
76:18 138:16
199:10 219:3
223:1 225:11
225:20 236:8
238:7
**quickly** 165:17
**Quinton** 85:6
**quit** 69:4 117:17

---
**R**
**R** 238:1
**racks** 42:1,6
93:8 150:16
175:3 187:20
196:4
**Raider** 35:10
**Rainer** 20:20
156:8 183:23
184:22 198:5
**raised** 44:8
**Rank** 35:11
**Rankin** 191:17
192:1,3
**rapport** 102:8,8
**rat** 148:11,12
**rate** 162:20,21
204:13
**reaction** 111:1
153:7
**read** 120:17,18
122:16,18
131:2 181:19
206:3

**reading** 2:1
**ready** 105:7
119:3 122:20
140:14 150:9
**real** 42:3 54:11
180:14
**realized** 119:1
145:8
**really** 31:18
32:22 54:5
59:23 60:20
66:17,21 74:3
81:13 94:4
98:3,4,11
103:16 108:6
116:16 132:8
140:3,4 143:9
146:2,11 151:7
153:5 183:1
191:7 193:3
194:9 220:12
**reason** 19:17
22:4 35:21
49:21 50:4,8
50:12,16,21
51:1,12 55:3
55:12,18,21
56:18 79:9,11
81:1,8,10 87:3
96:11,20 97:3
103:2 139:19
157:8 167:6,22
169:17 173:4
223:3,6 228:8
230:8 231:20
235:17
**reasons** 36:15
38:17 54:23
86:21 97:1
154:11
**rebates** 78:12
**recall** 41:7 95:2
98:14 125:11
159:18

# FREEDOM COURT REPORTING

receive 106:2,8
received 77:19
  105:20 123:9
  126:9 132:9
  133:4 171:22
  202:20 203:20
receiving 106:10
  123:12 134:18
recess 62:18
  103:23 164:14
  187:8 225:16
record 3:16 7:21
  13:17 15:17,20
  20:21 21:13
  29:2 37:8
  62:16,22 105:2
  105:5,8 124:10
  187:6 189:15
  227:5
recorded 105:13
records 4:7 24:1
  67:19 92:22
  93:2
recover 108:14
  127:7
reduce 135:1
reduced 79:9,11
  79:13 80:11
  107:4,8,11
  171:18,20
reducing 185:8
reference 12:15
  179:15,22
  184:3
referenced
  123:22 124:17
references
  174:18
referring 13:1
reflect 142:20
reflected 75:20
  174:16 176:10
  176:11
regarding 121:3

126:6
regardless
  165:14
regular 134:14
  138:8 186:10
rehab 113:12,14
  113:19 114:2
  115:20,23
  116:9,14 117:2
  118:18,22
rehabilitation
  124:5 227:15
  228:16
reimburses
  187:1
reimbursing
  187:2
related 189:22
relates 194:6,21
relating 2:5
release 228:5
released 26:15
  26:18 125:4
  226:11
releasing 124:23
  228:21 229:2
relevant 196:20
  197:21 198:7
remaining 108:1
remember 19:3
  20:3,6,14 31:3
  34:10,13,17,19
  39:12 41:3
  43:6 45:15
  47:18,23 48:9
  48:12,12 70:2
  80:7 86:15
  87:9 88:7
  98:22 109:6
  115:21 122:18
  122:21 124:9
  125:8 137:5
  153:11 164:7
  171:12 186:2

191:11 226:16
  226:20,20,21
remove 24:17
removed 19:18
repaired 168:1
repeating 100:1
rephrase 8:13
replace 19:17
  59:22 60:6
replaced 23:7,12
  24:4 57:19
  58:15,19 59:17
  123:14
replacement
  18:8 24:19
  26:3 43:1
report 25:15,16
  26:14 114:19
  147:19 210:1
reported 225:23
Reporter 5:15
  7:2 14:7
  238:20
represent
  110:21
represented
  144:11,13
represents
  238:10
request 134:1,5
  134:23 200:20
  200:21 231:6
  231:13 232:16
requested 31:19
  37:4 232:20
requests 130:22
required 133:17
  135:7
requires 133:21
residence 9:19
  9:21
resolution 175:4
resolved 176:3
respect 163:15

182:8 229:19
respective 1:17
response 45:16
  181:14,15,17
  181:19,23
  183:18
responsibilities
  138:1,6
responsibility
  135:21 182:9
  236:15
responsible 79:4
  111:21,22,23
  183:6
responsive 8:18
restriction 26:16
restrictions
  123:8,11,17
  124:3 125:1,2
  125:7,11,17
  226:13 234:4
restroom 62:14
  164:10 225:12
Restructured
  61:15,17
result 125:20
  157:3 185:7
  238:16
return 76:4
  183:13 234:3
reviews 229:11
Rhodes 89:16
  191:23 192:11
  192:18 193:13
  193:22
ride 21:7,9,16
  21:21 22:1,2,3
  22:15,19,21,23
  23:3,3 27:19
  27:21 28:12
  30:23 31:8,19
  31:23 32:2,8
  32:12,17 33:4
  33:8 34:5,11

34:16,20 35:8
  35:13,19,23
  36:5,7,16,21
  37:4,14 38:2,4
  39:9,17 40:19
  41:5 84:13,16
  223:8 231:16
  231:16,21
  232:8,11,21,22
  233:4,5
riding 165:20
  180:18 230:22
right 9:8,14,18
  10:21 11:8,19
  12:13 14:16
  15:22 16:10
  18:3 19:7
  20:21 21:15
  22:5,9 23:1,6
  23:15,17 24:3
  24:8 26:4,9,13
  27:14 28:10
  30:9 33:6
  34:21 35:21
  36:6 37:22
  41:19 42:7
  43:19 44:14
  46:11 47:20
  50:6 54:21
  55:6 56:16,17
  58:2 59:6,7
  62:21 63:21
  65:16,20 67:15
  69:7 70:13
  73:3 75:5
  76:11 78:23
  79:21 81:9,20
  82:9 84:1 89:7
  89:13 91:9
  92:15 94:2
  101:11,21
  105:16 106:4,9
  106:12 107:9
  107:16 108:12

# FREEDOM COURT REPORTING

110:13 111:5
112:2,15,16
114:1,5,8,12
115:6,9,16
116:13,21
117:13 119:3
119:16,23
120:6,15,16
121:6,19 122:6
123:14 124:6
130:11 134:3
141:22 142:14
143:5,6,8
146:16 150:5,6
152:21 154:10
154:14 156:2
156:15,18
159:18,20
161:20 162:3
164:2,3,11
165:1,5 166:18
169:1 170:5
171:6,19 172:7
172:9,14,17
173:22 175:12
175:16 176:5
177:20 182:6
182:15 183:1
185:11 189:7
189:17 194:5
196:9,14
197:15 198:16
199:16 200:1
201:22,23
202:2,3,7,11
203:4,6,7
204:23 205:16
206:1,19,23
207:4,16,17,21
208:12,13
209:10,16,17
209:18 210:5
210:12,14,15
211:2,4,6,10

211:16,17
212:18,19,22
212:23 214:17
215:7,23 216:1
216:15,16
217:13,14
218:6,10 220:4
220:23 221:1
225:13,19
226:14,16
228:14 229:17
229:22 230:21
233:14,22
234:13,14
235:1,2 237:3
**Rio** 132:18
**road** 21:8 233:3
**Roberson** 3:5,7
3:9 5:17 9:10
12:7,14 13:6
13:12 23:20,22
47:19 56:3,21
57:12,17 59:8
61:15 76:5,14
87:16 104:9
109:17,22
111:14 142:15
151:23 152:12
154:19 172:13
178:21 179:7
181:13,16
183:13 199:9
199:12 200:8
200:12 202:8
202:18 203:4,6
203:19 204:23
205:2,6,12
210:10,17
211:2,14 212:4
212:12 213:9
213:18,23
214:2,10,17
215:3 216:3
218:8 219:5

221:12,17
222:7,12,16
223:15,20
224:2,21
233:17 234:12
234:20 235:23
236:9 237:5
**room** 222:5
**rough** 165:21
**round** 71:11
130:22 131:8
131:11,12
132:9 133:4,5
133:13,14
134:18 135:3
**route** 12:2,19
14:11,19,20
15:3,5,7,10,12
15:23 16:11,12
16:15,20 17:8
17:22 18:5,14
19:15 28:2,5,8
29:5,15,18
30:10,13,19
38:19,23 49:22
52:17,19,20,20
53:18,21,22,23
54:8 56:7
57:20 60:8,13
62:1 64:21
65:13 66:5,15
66:16,22 69:4
69:22 70:4,14
70:20 74:11
82:11 83:1
84:9 87:21
90:21,22,23
91:9,11 92:13
92:14,14 93:6
93:8,11 95:12
95:16 96:6,14
97:16 98:2,18
111:3 112:23
127:21,22

128:7,12,13,15
132:14 138:21
138:22 139:1,4
139:7,16,21
142:2,3,3,8,16
142:18,21
145:17,18,20
146:12 147:13
147:16 148:22
149:1,2,9,11
149:16,18
150:12,21,23
151:1,3 153:15
153:21,23
154:2,5,6
155:3 166:13
166:20 167:7
167:10,11,13
167:17,18
168:3,9,14
170:9,19,21
174:9,11
183:22 197:6,9
197:10,14
200:22,23
201:2,3 207:23
208:15,15,17
209:2,3 213:19
214:23 215:1
215:13,17
216:20,23
217:5,8,11
219:11,13,13
219:14,15,17
222:9 224:1,1
224:4 227:19
230:3,6,9,21
231:5 235:9
**routeman** 17:14
95:19 96:4
**routes** 17:2,15
19:5 21:4
29:23 30:1,7
54:4,15 60:11

60:22 84:10,12
102:5 127:11
149:7 166:16
168:11 183:22
184:1 200:15
200:16 221:18
222:8 224:13
**Roy** 35:9 126:23
127:2 189:23
**rule** 25:17 52:16
52:23 140:13
236:19
**rules** 2:5 7:4 8:9
53:2
**run** 17:7 18:5,5
42:4,6 69:21
70:14 84:11
90:21 91:11,23
93:9 95:11,16
145:18 154:2
167:7,9,10,17
168:8,13 170:9
217:5 230:20
**running** 54:4,8
65:2 70:19
87:20 91:1,8
96:6,13 127:11
128:7 138:21
145:17,20
150:21,22
151:2 167:16

---

**S**

**S** 1:14
**safely** 135:22
**safety** 112:13
209:11,12,13
**SAITH** 237:6
**sale** 60:16
**sales** 42:13
52:18 78:8,12
78:21 80:1,2
81:6 82:1,2,2
82:10 103:8

# FREEDOM COURT REPORTING

257

114:6 137:7
163:20 166:8
171:1,1,3
179:16,21
180:17 181:4,5
181:9 182:1,13
182:18 183:4
183:18,19
188:11 201:22
204:10,19
206:2,20 207:3
207:6,8 208:9
210:2 211:4
215:21 219:6
229:20
**salesman** 12:2
56:23 64:21
65:13 98:2
130:19 137:18
222:17 223:10
223:13
**salesmen** 62:1
**Salter** 150:23
**Sam** 43:11 44:11
148:15 151:16
**Saretha** 188:7
**sat** 45:4 101:3
101:23 117:17
**satisfied** 184:16
**Saturday** 90:21
91:4 146:4
**saw** 42:11,13
77:23 119:12
180:2,19
191:20 201:20
235:5
**saying** 9:10
33:22 41:4
50:19 76:20
86:15 98:14
123:7 183:17
225:22 226:23
229:19
**says** 123:6

130:19,22
172:19 179:16
190:16 206:2
234:6
**say-so** 210:18
**scheduled** 235:3
**school** 189:2
**schools** 163:2,5
163:8,11
187:12 188:5
**Science** 11:3
**season** 23:13,14
24:4,10,11
25:1,2 26:11
31:3 40:7,15
41:21 42:2,4,5
42:14 71:23
78:18,20
106:16 140:22
213:5,15 217:1
217:2 225:5
**seat** 21:7,9,16,19
22:3,6,15,19
22:21,23 23:3
27:19,20 28:12
30:23 31:8,19
31:23 32:3,8
32:12,17 33:4
33:7 34:5,16
34:20 35:8,19
35:23 36:5,7
36:16,21 37:4
37:14 38:2,4
39:9,18 40:19
41:6 84:13
223:8 231:16
231:21 232:21
233:13
**seats** 35:13
232:11,22
233:8
**second** 9:10
15:17 27:16,17
28:1 29:5

30:22 31:5,8
34:5 36:16
38:16,22 39:9
39:20,23 40:8
40:19 42:7,9
43:20 105:2
121:19 123:5
153:5,9 207:19
223:4 231:21
**secret** 235:13,15
**secretary** 45:7
111:19 121:21
**secured** 135:23
**Security** 65:10
72:5 86:23
**see** 34:11,19,22
46:17 60:11
73:18 74:3,4
74:15 78:20
81:16 82:2
97:11 100:9,11
100:12 101:7
102:9 111:1
115:13 118:21
129:11 131:15
136:5,7 142:11
142:22 145:11
147:13,14
149:4 150:15
151:15 152:7,9
152:13 159:10
170:22 186:1
186:14,20
198:23 206:9
208:11 214:22
215:3 219:6
**seek** 234:2
**seen** 45:23 73:21
73:23 75:2,5
77:22 81:12
95:17,19 96:2
96:3 104:10,16
106:5 137:20
166:21 172:5

179:3 218:12
**sell** 62:11 87:19
139:23 140:3,9
140:18 183:14
220:22
**sellers** 195:12
**selling** 140:12
208:1
**sells** 182:17
183:12
**send** 49:21 50:5
50:22 51:2
52:14 53:6
55:1,4,12,17
55:19 96:16
103:11 145:16
146:13
**sending** 51:13
51:19 71:3,12
71:13
**sends** 220:3
**seniority** 223:16
223:19
**sense** 76:7
**sent** 46:21 55:9
82:19 93:12
96:11 99:5,12
126:10 157:19
184:8 215:22
**serious** 179:4
**service** 149:7
**set** 83:10 93:7,8
133:9 150:19
**settle** 12:23
**settlement** 73:3
73:5,16 75:2
75:23 76:1,3
76:13 77:2,8,9
77:11,23 80:17
80:18 104:15
105:10 143:10
166:3,4,21
203:1 218:20
**settling** 80:15

**seven** 11:22
91:17,20
107:22,22
159:15
**seventies** 43:3
48:23
**seventy-eight**
215:10
**seventy-five**
107:23
**seventy-nine**
172:23 173:7
174:21 176:9
**seventy-three**
217:13
**Seymour** 79:17
80:8
**shape** 90:22
146:13
**sheet** 8:10,14
55:14 73:3,5
73:16 75:3
76:13 77:8,9
77:11 78:1
104:15 105:11
143:10 166:3,4
166:22 170:11
**sheets** 80:17,18
178:22
**shock** 27:20
233:1
**shocking** 153:23
**short** 93:9 209:2
209:3 219:13
**shorter** 17:8
19:14 28:2
38:19 39:3,6
60:15 200:22
200:23
**shortest** 38:23
**shortly** 126:9
214:19
**shot** 166:2
**shove** 179:11

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| **show** 73:1 75:13 | 21:10,17 22:16 | 86:4,13 87:7 | 145:19,21 | 201:14 203:11 |
| 110:2 120:11 | 23:5,10,18 | 87:11,22 88:22 | 147:1,4,10,20 | 203:13 204:7 |
| 121:13,22 | 24:18,23 26:5 | 89:2,5,8,10,14 | 147:22 148:3 | 204:11 206:18 |
| 130:8 137:14 | 26:12,17,22 | 89:17,20,22 | 149:8,12 | 207:5,22 208:7 |
| 143:20 165:22 | 27:7,13,23 | 90:1,5,8,19 | 153:13 154:3 | 209:4,9 210:19 |
| 170:1 197:7 | 28:4,7,13 | 91:5,10,12,14 | 154:21,21 | 211:9,13 212:6 |
| 205:10 214:1 | 29:10,12,16 | 93:4,10 94:12 | 155:6,16,19 | 212:15 215:18 |
| 214:18,20 | 30:20 31:1,15 | 94:14 96:9,22 | 157:6,9,16 | 216:5,7,9,12 |
| 215:19 218:11 | 32:9 33:16,21 | 97:21 99:3,7 | 159:22 160:2,6 | 216:22 217:3,6 |
| **showed** 148:22 | 34:1,8 35:14 | 99:14,16,18 | 160:9,12,14,17 | 217:9 218:14 |
| 148:23 151:1 | 35:20 36:8,18 | 101:17 102:23 | 161:7,16,22 | 218:17,22 |
| 154:5 181:8 | 37:1,15 38:12 | 103:6,9,12,19 | 162:19 163:4,7 | 219:22 220:2,5 |
| **showing** 81:13 | 39:19,21 40:1 | 104:17,20,23 | 163:23 165:19 | 220:9,14,18,21 |
| **shown** 108:15 | 40:5,10,16 | 105:19,21 | 166:11,14,23 | 221:16 222:10 |
| 182:2 | 41:10,18 42:11 | 106:1,5,17,17 | 167:15,20 | 222:14 224:21 |
| **shows** 77:4 | 43:22 44:18,20 | 107:6,12,15 | 168:4,7,11,15 | 226:2 227:10 |
| 107:21 202:13 | 45:1,13 46:12 | 108:17,20 | 168:17,20 | 227:21 228:1 |
| 205:14 206:19 | 46:21 48:10 | 109:1,9 110:5 | 169:17 170:5 | 229:8,15,18,23 |
| 207:1,18 | 49:1,9,16 | 110:14 112:4 | 171:17,20 | 230:4,7,18 |
| 225:21 | 50:13,17 51:5 | 112:17 113:8 | 172:3,8 173:11 | 231:10,14,18 |
| **Shreveport** 14:3 | 51:10,21 52:1 | 114:14,17 | 173:12 174:12 | 231:23 232:6,9 |
| **side** 146:8 219:2 | 52:8 53:14 | 115:1,8 116:12 | 174:22 175:20 | 233:1 236:13 |
| 235:21 236:6 | 54:14,20 56:12 | 116:15,20 | 176:12,21 | 236:18 237:2 |
| **sign** 137:2,4 | 57:22 58:9,11 | 117:8 118:3,6 | 177:16,21 | **sit** 88:9 129:11 |
| **signal** 220:3 | 58:17,21 59:4 | 118:19,23 | 178:18 179:12 | 201:17 222:2 |
| **signature** 2:1 | 60:7 61:2,13 | 119:14,22 | 180:23 181:6 | 233:10 |
| 130:18 | 62:3 63:3,6,16 | 120:5,10,13,20 | 182:4,7,11 | **sitting** 11:17 |
| **signed** 112:2 | 63:22 64:3,19 | 121:4 122:3,10 | 183:8 184:2 | 94:6 102:23 |
| 121:18 137:5,6 | 64:23 65:15,21 | 123:1,4,10 | 185:1,5,19 | 117:18 180:3,5 |
| 141:22 163:9 | 66:23 67:5,14 | 124:15 125:22 | 186:4,7,10,17 | 184:5 233:12 |
| 164:5 | 68:14,18,21 | 126:3,7,12,20 | 186:19 187:4 | **situation** 83:12 |
| **significance** | 70:21,22,23 | 127:15 128:11 | 188:1,12,15,18 | 108:8 111:3 |
| 200:5 | 71:7,21 72:14 | 128:18 129:22 | 189:3 190:12 | 112:20 |
| **simply** 62:10 | 73:4,8 74:2,22 | 130:12,15,17 | 190:15 191:2 | **six** 10:17 159:14 |
| 133:3 | 75:4,18 76:16 | 130:20 131:7 | 192:6 193:11 | 163:11 164:23 |
| **single** 129:5,14 | 76:22 77:13,17 | 131:19 133:12 | 193:16,19,21 | 195:11,12,15 |
| **singled** 128:22 | 78:2,4,10 79:2 | 133:23 134:12 | 194:12,14 | 198:23 |
| **sir** 8:3,20 9:4,9 | 79:6,10 80:4 | 135:2,9,11 | 195:4,7,10,14 | **sixteen** 180:4 |
| 9:20 11:11,18 | 80:12 81:5,12 | 136:1 137:19 | 195:16,16,23 | 208:9 |
| 14:5 15:1,9 | 81:19,23 82:8 | 137:21 138:2 | 196:3,6,9,11 | **sixteen-hour** |
| 16:13 17:4,6 | 83:4,8,13,16 | 139:2 141:20 | 196:15,18 | 146:10 |
| 17:19 18:6,12 | 84:4,7,15,17 | 141:23 142:5,6 | 197:2,5,16,19 | **sixties** 64:8 |
| 18:15,21 19:6 | 84:22 85:9,11 | 142:10,12,19 | 198:4 199:6,23 | **sixty** 14:6 64:11 |
| 19:23 20:16 | 85:13,16 86:2 | 143:3 144:1 | 200:4 201:11 | 64:11 222:22 |

231:8,11
sixty-five 71:15
71:15,16 86:9
sixty-one 222:21
222:22
sixty-six 47:7
sixty-three
19:12
six-year-old
146:5
size 88:11
198:19
Skelaxin 159:2
Skidmore 188:7
skip 74:8,9
sleep 88:1,6,8
sleeping 90:4
slow 188:11
slowed 92:13
140:22
slower 41:22
smart 182:21
Smith 130:11,13
130:22 132:6
133:4 161:21
162:10 173:6
173:10,14
Smooths 233:4,5
Social 65:10
72:5 86:23
sold 206:14
208:4 221:3
222:18 230:2
solicit 111:15
somebody 13:10
17:3 22:18
30:1 31:12
36:12 40:11,21
52:17 53:6
69:18 97:15
101:3 127:20
128:6,11
136:18 156:5
161:21 191:14

191:16 193:14
232:3 236:2
somebody's 94:1
127:20 156:6
182:22
someplace 46:8
46:20
son 146:6
sorry 12:14
33:11 50:23
59:8 87:13
101:20 104:22
109:2 117:21
196:10 213:19
sort 113:18
114:18 123:17
sought 168:2
source 186:9
south 14:2,6
25:3 87:13,13
155:9
speak 14:8
126:22 156:3
specific 20:14
specifically
35:18 160:7
speculation
95:22 97:9
spend 146:9
spent 66:4,8
99:10 146:6
spiral 170:4
spring 3:14,18
4:9,13 25:1
73:6,16 75:3
77:15 78:6,9
104:15 105:11
166:5,6,9
167:10,13
205:15,19
206:3,8,11
207:14 208:3
213:5 214:21
215:21

Springs 43:16
44:15 48:2
157:21
spurs 19:18
24:17 123:15
124:4
stand 119:2,3,12
177:22
standard 68:2,3
68:4 118:14
standing 200:10
start 8:23 9:2
24:13 25:12
67:17 113:5
140:12 148:21
150:6,21
163:12 187:16
187:20 213:6
213:10
started 14:14
15:10 20:8
25:19 27:14
44:5 67:20
71:13,17 86:18
106:10 113:7
117:2 148:21
150:11,15,22
151:2 154:8
166:7 213:15
starting 26:2
starts 25:4,5,8
25:10,11
state 7:20 11:1
142:7 144:16
144:16,17,20
144:22 184:12
238:3
statement 56:5
77:3,15 86:15
98:7,16 172:9
180:1 181:7
203:1 218:21
statements
45:22

states 1:1 5:1 7:5
25:7 145:3
station 20:23
31:5,13,13,22
32:4,7,11 39:1
46:23 53:5
60:21 61:4,5
61:12 90:12
140:19 155:12
163:22 196:16
197:17
stations 54:7
61:6,9 62:2
98:9
stay 8:10 88:20
115:14 148:2
161:3 178:1
stayed 15:4
88:18 89:12
134:8 147:23
staying 102:5
steal 59:9
stenotype 238:7
Step 113:20
stepping 113:20
Stewart 6:4
11:14,16,20
12:12 13:20
14:21 17:12,13
18:17,20,23
21:4 32:16,20
33:5 49:14
51:18 54:17
79:16,21 80:21
81:2 93:13
96:10 99:4,11
102:20 103:17
113:3,4 119:18
120:8,12
121:23 122:12
126:1 127:4
167:6 171:22
179:18 180:21
183:15 199:21

211:16 221:4
221:19,22
222:4 235:5
sticker 214:4
stiff 42:23 43:20
STIPULATED
1:15,23 2:7,15
stipulation 7:6
stooping 160:20
161:15
stop 171:9
stopped 16:17
16:19 71:12
171:7,15 226:7
stops 17:9 19:15
29:17
store 15:13 74:7
88:2,10,12,21
89:13 98:10
128:1 170:9
180:2,5,6,9,11
180:12,14,15
180:19
stores 14:15
15:11,15 16:2
16:9 28:8,9
29:5 30:2,4,4
30:12,18 60:16
60:16 62:10
66:5,9,19
91:17,20,22
98:9 132:16
139:5,8,9,10
139:10,16,22
140:2,5,9,12
140:18 148:23
149:15,19
170:6,8 182:6
182:8 187:21
188:23 207:22
215:16
straightened
111:4 149:18
151:9 176:3

| | | | | |
|---|---|---|---|---|
| **strange** 134:23 | 129:16 134:18 | 151:16 152:19 | **tax** 3:16 4:7 | 16:23 17:2 |
| **Street** 1:21 5:22 | 135:22 137:6,6 | 157:11,12 | 144:20,23 | 21:1 25:13 |
| 7:8 | 143:7,9 144:14 | 158:1,14,15,18 | 145:2,16 | 26:2 27:1,3,5 |
| **stuff** 234:22 | 146:13,18,21 | 158:19,23 | **taxes** 144:16 | 31:13 57:21 |
| **style** 133:2 | 156:11,19 | 159:2,3,3,17 | 145:13 | 76:1 139:21 |
| **subject** 39:11 | 177:21 178:1 | 159:21 160:1,4 | **tell** 8:8,15 27:15 | 142:2,8 144:19 |
| **substantially** | 193:7 194:2 | 164:10,12 | 28:14,15,15 | 144:22 145:5 |
| 58:7,15,19 | 212:10 218:10 | 186:13 218:1 | 35:7 38:7,9,10 | 190:17 200:17 |
| **sufficient** 81:4 | 225:14 229:12 | 229:12 | 44:19 46:8,13 | 200:19 205:21 |
| **Sugar** 157:14 | **surgeries** 210:13 | **taken** 1:18 27:20 | 47:22 49:13,17 | 211:20 213:6 |
| **suggest** 58:14 | **surgery** 18:7 | 28:8 29:5,15 | 50:7,11,15 | 222:9,17 |
| 59:6 | 24:16,20 26:3 | 29:17 30:18 | 51:18,22,23 | 231:12 |
| **suggested** 153:3 | 27:8,9,12 43:1 | 62:19 104:1 | 54:17 58:23 | **tenure** 148:19 |
| 153:3 187:20 | 125:20 199:19 | 164:15 186:6 | 69:19 73:14 | **Terell** 7:22 |
| **suggesting** 59:1 | 199:20 209:11 | 187:9 225:17 | 76:17 79:22 | 131:5 |
| **suggests** 57:4 | 225:5,5 | 238:6 | 81:22,23 85:22 | **terminated** |
| **Suite** 5:22 | **suspension** | **takes** 164:2 | 86:5 87:4 | 118:5 |
| **Summerfield** | 21:23 22:1,1,2 | 175:1,2 233:1 | 90:15 91:7 | **territory** 188:11 |
| 13:22,23 16:12 | 23:4 27:22 | **talk** 8:21 28:10 | 93:14,18 95:7 | **Terry** 56:22 |
| 16:21 87:16,18 | 32:21 84:16 | 37:16 39:15 | 99:4,8,11,15 | 57:19 128:21 |
| **Sunday** 90:17 | 231:16 | 40:17 48:11 | 111:12,15 | 199:14 202:12 |
| 91:7 145:23 | **suspensions** | 56:20,22 66:12 | 115:6 117:13 | 205:10 214:9 |
| **supervisor** | 21:22 | 102:15 126:8 | 118:1,1,4,16 | 215:22 233:19 |
| 112:12,16,18 | **swap** 17:2 20:4 | 199:17,18 | 118:20 144:4 | **Terry's** 104:10 |
| 201:17 213:1 | 20:19 22:13 | **talked** 20:7,12 | 145:22 147:5 | **test** 209:21 |
| 236:15 | 167:5 | 68:11 101:3,23 | 150:7,8 154:16 | 210:8 |
| **support** 55:8,11 | **swapped** 17:14 | 102:14 111:11 | 156:6 167:2 | **testified** 7:16 |
| 55:16 56:14 | 28:21 | 116:4 127:3 | 191:14 193:5 | **testify** 32:6,10 |
| 80:3 81:6 | **swapping** 21:3 | 150:1 188:10 | 212:7 214:8 | 32:13 67:11 |
| 100:6,16 | **switch** 23:16 | 190:10 194:2 | 236:20 | **testimony** 73:22 |
| 170:15 190:23 | **switched** 28:21 | 197:1 | **telling** 51:3 | 77:6 168:16 |
| **supposed** 25:16 | 28:23 | **talking** 20:8 | 69:15 70:10,18 | 173:9,13 |
| 26:14 147:18 | **sworn** 7:15 77:6 | 39:7,13 61:10 | 81:2,10 94:8 | 238:11 |
| 150:20 152:18 | | 68:7 72:12 | 138:13,17 | **Texas** 9:17 |
| 187:13 236:17 | **T** | 181:23 187:11 | 152:3 227:8 | 13:22 14:1,4,5 |
| **sure** 13:12 23:23 | **T** 1:7,14,14,18 | 208:10 226:10 | 234:22 | 14:6,12,14,15 |
| 24:1 29:21 | 5:7 7:10,14 | 230:5 | **tells** 69:11,12 | 14:22 16:12,21 |
| 36:4 54:11 | 205:15 238:1,1 | **tall** 164:21 | **ten** 107:19 | 17:21 21:18 |
| 55:13 56:3 | **take** 9:5 18:18 | **target** 105:15 | 159:15 176:17 | 38:20 87:14,17 |
| 61:21 70:17 | 21:8 42:1,3 | **Tate** 110:4,7 | 185:22 | 87:19 89:7 |
| 74:3 76:10 | 43:4,11,13 | 118:16 209:11 | **tend** 128:8,16 | 102:7 128:1,2 |
| 98:10 99:1 | 62:14 103:20 | 210:1,14 | 152:2 | 128:2 135:15 |
| 108:9,11 | 104:13 122:7 | 212:18 229:10 | **tending** 124:2 | 140:10 141:1 |
| 111:23 112:9 | 145:7 148:9,11 | 229:11 | **Tennessee** 16:22 | 147:9,18 |

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 152:23 153:1 | 109:2,20,23 | 71:5,7,9,18 | 114:15,22 | 21:5 22:10 |
| 155:9 166:20 | 122:13,14 | 74:14 75:21 | 115:10,17,18 | 23:6 29:13,13 |
| 184:13 219:12 | 124:12 128:19 | 107:20,22 | 116:9 119:23 | 29:14,19 36:14 |
| 224:14 230:6 | 128:22 134:22 | 139:23 142:9 | 120:18 122:19 | 38:1 43:5,8,15 |
| **Thank** 224:21 | 146:11,15 | 143:5 144:8 | 125:4,18,18 | 43:17 44:15 |
| 237:3 | 148:7 151:23 | 180:4 185:22 | 135:12 138:18 | 45:3,17 46:5,9 |
| **thankful** 99:9 | 161:13 188:8,9 | 203:15 206:15 | 138:20 140:23 | 46:14 48:2,4,6 |
| 175:17 | 189:6,10 190:1 | 207:21 208:5 | 141:2 145:11 | 48:6,8 50:3,19 |
| **that'd** 117:18 | 190:19 191:10 | 208:18 215:9 | 148:8,19 149:2 | 51:6 52:2,4 |
| 199:19 208:20 | 191:12 194:6 | 217:13 219:8 | 151:4 153:5,5 | 54:2,18,22 |
| **theirs** 68:7 | 198:6,9 214:2 | 222:19 | 153:9,15,22 | 55:10,15,23 |
| **theory** 165:12 | 221:6,9 230:15 | **three** 10:17 | 154:12,13,17 | 60:18 65:22 |
| **thereto** 2:14 | 233:15 235:17 | 63:23 107:23 | 157:2,7 160:16 | 68:15,16 69:7 |
| 238:8 | 236:1,3,5,13 | 154:8 159:14 | 173:3,15 174:4 | 69:23 70:7,15 |
| **they'd** 66:19 | **thinking** 32:22 | 165:3,4,7 | 174:8 175:1,2 | 81:3 82:13,22 |
| **thin** 156:14 | 49:11 94:1,5 | 183:22 198:22 | 178:5,5,10,22 | 86:3,7,12,13 |
| **thing** 20:10,11 | 94:11 184:6 | 206:5,15,15 | 183:1 185:18 | 87:9 90:2 91:7 |
| 45:18 77:5 | **thinned** 156:16 | 222:19 | 192:17 193:12 | 94:5,17 95:5 |
| 81:21 96:18 | **third** 154:12 | **thunder** 59:9 | 193:20 199:18 | 95:15 96:23 |
| 113:5 117:21 | **thirteen** 30:1,4 | **till** 217:1 218:13 | 202:1 204:2,2 | 97:11,12,14,18 |
| 129:2 170:22 | 30:12,14,15 | **Tim** 47:3 48:16 | 211:22 213:9 | 99:19 100:4,19 |
| 187:14,16,18 | **thirties** 58:6 | 49:5 99:15 | 224:15,17 | 102:19 103:13 |
| 194:23 234:20 | **thirty** 143:4 | 131:21 132:1 | 226:3 227:3,12 | 112:22 116:5 |
| **things** 12:19 | 165:7 | 149:13 172:20 | 229:5 231:9,21 | 116:15 117:17 |
| 41:22 42:20 | **thirty-eight** | **time** 2:13,13 | 233:23 234:1 | 119:18 126:14 |
| 48:12 81:16 | 75:21 | 9:13 10:14,15 | 236:20 | 131:21 132:2,5 |
| 86:8 88:17 | **thirty-five** 71:16 | 10:18 14:13,13 | **timely** 149:16 | 138:12 148:1,8 |
| 112:1 113:21 | **thirty-four** | 14:16 15:8 | 196:8 | 149:14,17 |
| 125:6,9 151:9 | 215:10 | 17:16 19:8,19 | **times** 16:13,19 | 151:23 153:13 |
| 161:6 163:12 | **thirty-six** 206:5 | 19:21 25:19 | 18:2 66:6 | 156:12 159:21 |
| 184:15 187:13 | **thirty-three** | 26:13 32:20,23 | 92:16,20 | 160:18 168:21 |
| 189:19 194:3 | 219:7,8 | 33:2 40:22 | 135:16 148:5 | 177:14,16,18 |
| **think** 12:12 | **thirty-two** 74:14 | 41:22 43:8 | 154:8,15 | 180:9 183:23 |
| 23:13 32:1,1 | **thought** 12:20 | 45:15 54:1 | 176:16 178:8 | 189:12,12 |
| 36:9,12,12,22 | 17:20,23 20:9 | 61:1 62:11 | 217:16 | 191:14,16,22 |
| 46:14 47:5 | 20:10 22:12 | 66:4,8 73:17 | **Tim's** 48:16 | 192:10 193:6 |
| 52:13 54:9 | 34:4 38:10 | 73:20 74:2,17 | **today** 12:21 41:7 | 194:13 197:2 |
| 55:8 57:12,14 | 48:3 49:18 | 76:23 84:21,22 | 75:15 123:6 | 203:14 211:7 |
| 63:8,10 66:17 | 54:6 65:5 | 89:15 92:2,3,6 | 126:14 145:20 | 213:2 216:6 |
| 66:18 67:19 | 93:22 94:5,11 | 92:7,21 93:2 | 147:16 170:4 | 226:8,12,17,18 |
| 79:19 80:7 | 173:2 176:1 | 98:5,7 99:9 | 181:19 197:1 | 232:1 |
| 91:17,20 93:22 | 198:3 221:11 | 108:4 110:6,18 | 236:4 | **tonight** 155:2 |
| 93:23 102:10 | **thoughts** 33:18 | 110:22 111:3,6 | **today's** 218:18 | **Tony** 35:9 127:3 |
| 104:9 107:17 | **thousand** 68:1 | 112:10 113:22 | **told** 19:4 20:12 | 190:16,17,18 |

# FREEDOM COURT REPORTING

**top** 8:21 12:10
**topic** 127:5
**total** 61:23 78:8
  82:4,10
**touch** 39:14
  190:13
**Tower** 1:20 7:8
**town** 88:15
  180:2,8
**track** 78:10
**trailer** 44:1,2
  185:17
**trailing** 203:10
**trails** 76:6
**transaction**
  201:5
**transcribed**
  238:8
**transcript**
  238:11
**transcription**
  238:9
**transferred**
  200:19 201:10
**transfers** 217:15
**travel** 145:14
**traveled** 235:9
**treatment** 102:9
  127:18 128:23
**tree** 44:2
**trial** 2:13
**tried** 25:22
  39:14 78:10
  102:1 103:15
  108:14 189:11
**Troy** 10:8,9,23
  115:20 117:4,6
  118:21,23
  119:6
**truck** 8:7 21:7
  21:20 22:3,7
  22:14,18,22
  23:1 27:15,16
  27:18,21 28:11

28:17 30:22
31:4,7,11,14
31:18,22 32:19
32:21 33:8
34:4 36:4 38:3
62:10 88:1,10
88:20 89:23
90:4 124:1,7
125:14 128:5
135:8,17,19
136:3,4,7,11
136:13,15,20
138:8,10,10,14
138:19 160:19
161:17 162:7
162:11,16
172:23 173:10
173:14,15,17
173:18 174:5
175:2,2 193:15
193:17 196:2
198:14,15
209:15 212:22
219:20,23
220:8 223:4,7
229:14 231:15
232:16
**trucks** 19:19,22
  21:20,21,23
  22:20 28:22
  29:15 35:16
  134:13 165:21
  230:22 232:3,4
  232:8,10
**truck's** 220:11
**true** 45:22 86:17
  90:7 134:21
  174:19 179:1,8
  232:13 238:10
**Trussell** 47:2,4
  48:10,13 49:6
  99:15 131:21
  149:14 172:20
  197:17 198:3

**Trussell's** 47:6
  175:5
**truth** 81:3,11
**try** 8:9,12,21,22
  9:1 42:3 62:11
  101:4 136:18
  152:22 186:11
**trying** 12:15
  35:2 57:13
  58:23 59:2
  112:23 148:5
  151:8 173:3
  179:10,11
  180:8 193:6
  197:11 221:22
**Tuesday** 43:6,10
**turn** 186:12,19
**turned** 101:9
  134:3 173:21
  178:10 222:22
**twelve** 30:4
  206:20 208:11
**twenty** 163:5,6
  199:22 200:14
  208:20,22
  220:15 221:7
**twenty-five**
  108:1 165:3
**twenty-six** 165:4
**twice** 148:8
  153:4 154:9
**two** 27:2,4,11
  41:16,17 42:1
  42:4,6,23
  43:20 46:5
  48:9 61:8 71:8
  71:9,16 74:12
  74:14 84:20
  93:7 122:14
  132:15 154:15
  159:14 165:6
  199:17 200:16
  207:20,22
  208:4,4 212:17

212:18 217:15
224:13 228:17
236:21
**Tyler** 14:6
**type** 11:23 21:22
  51:16,17 119:5
  119:7 139:6
**typed** 111:19
  121:21
**typically** 25:5
  71:22

---

## U

**U** 1:14
**uh-huh** 9:6
  192:20 194:17
**ultimately** 46:19
  65:17 118:7,9
  118:11 216:20
**unable** 123:22
  227:14
**uncommon** 30:6
  30:10
**understand** 8:12
  8:15,17 31:10
  38:18 50:14,18
  51:11 59:10
  61:9 70:18
  108:3 117:22
  137:22 140:16
  141:21 177:1
  208:16
**understanding**
  52:9
**understood** 51:3
  52:11
**unemployment**
  72:8
**Union** 43:16
  44:14 48:2
  157:20
**United** 1:1 5:1
  7:5 25:7
**University** 11:1

**unjustified**
  189:9
**unknown**
  190:16
**unload** 175:2
  177:12
**unordinarily**
  93:10
**unsafe** 160:4
**unusual** 150:8,9
  176:6,6
**upset** 134:6
  178:7
**upside** 105:18
  108:23 172:5
**up-line** 213:1
**use** 186:10
**usually** 25:14
  68:6 69:13
  150:7 155:21
  155:23

---

## V

**value** 168:23
**values** 169:2
**vary** 14:12
**verbally** 9:8
**Vernon** 152:17
**visit** 20:8 43:4
**visitor's** 155:12
**Voir** 3:5 57:17
**voluntarily**
  114:12
**voluntary** 216:4
**vote** 43:11,13
**voting** 43:11
**vs** 1:9 5:9

---

## W

**Wachovia** 1:20
  7:8
**wages** 76:8
**wait** 25:21 57:1
  57:6 106:19
**waiting** 110:23

# FREEDOM COURT REPORTING

263

146:3
waived 2:2,17
walk 198:17
Walker 152:15
152:16
walking 125:8
wall 91:18,21
Wal-Mart 81:14
82:1 135:14
139:12 208:1
Wal-Marts
133:1 139:11
want 8:8 13:2,8
19:14 45:17
48:7 53:6
54:19 55:13
57:1,5,7,8,8
67:17 69:13,17
70:17 111:11
113:6,8 140:6
191:13,15
199:2,17,18
200:10,11,12
205:7 216:4
230:8
wanted 22:10,18
35:6 36:20
37:13 38:19
43:5,14 48:11
69:8,19 112:8
113:4 119:6
122:7 127:6
149:21 150:16
167:4 188:22
200:22,23
201:1 210:2
wants 131:6
189:3
war 128:3
wasn't 23:20
31:18 32:22,22
43:14 46:5
50:7,11,16
51:12 52:22

65:14 66:11
68:2 76:3
80:22 81:10
82:19 83:8
109:18 112:9
113:22 114:21
122:5 127:6
134:9 146:2
148:18 154:3
175:12 210:1
224:8 234:7,8
water 159:5,6
Watson 1:7,18
5:7 7:10,14,20
7:22,23 9:15
12:17 13:21
19:8 35:22
36:10 72:23
74:1 102:3
104:7,14 105:9
110:2,19 121:5
121:15 128:21
138:17 141:16
164:22 199:14
205:16 222:16
way 19:11 32:5
40:3,8 42:10
42:15 73:12,14
77:21 83:18
95:23 123:21
129:1 147:7
150:18 154:5
156:9 169:6
170:8,8 184:9
184:12,15
195:19,20
196:23 197:11
207:4 228:6
229:7 234:7,8
234:10,23
weather 213:12
week 25:4,21,21
46:4 71:15
117:3,12

150:23 151:2
214:6
weekend 90:23
weeks 71:8,10
71:17
weigh 165:2,3
weighed 165:6
weights 160:23
161:1,11
went 14:17 16:1
16:23 22:17
25:14,18 27:9
32:16 37:20
38:2 41:1
42:23 44:14
53:21 60:9
66:5 69:5
72:14 80:22
82:18,23 98:8
112:10 117:3,5
117:6,8 118:21
133:5 134:9
147:23 148:21
155:12 166:17
180:3,19 185:9
197:10 200:16
211:4 233:23
234:1
weren't 29:6
44:16 54:3,18
55:9 85:2 91:8
95:4 96:11
115:16 155:4
187:13 211:19
224:6 226:4
west 10:8 25:8
Westaco 128:1
132:18
we'll 9:12,14
184:19
we're 8:14 55:13
57:12 72:12
81:13 145:15
150:8 182:16

208:10
we've 74:4 172:4
179:3 196:23
whack 175:13
175:15
whatsoever
28:20 223:5,9
234:5
What'd 11:2
46:13
When's 135:12
Why'd 151:14
wide 100:21
wife 44:6
Willie 63:2
withdraw 78:7
witness 2:2 7:10
14:9 23:21
24:15 30:16
48:14 59:20
61:17 62:13
76:16 164:9
172:16 235:7
238:12
wonder 173:4
wondered 132:3
woods 44:1
word 10:3
188:13
words 76:5
118:5 161:5
202:19 211:23
217:20
wore 19:16
work 10:16
11:12,19,23
12:3,4 14:17
18:1 21:6
22:11 25:15,16
25:19 26:14,21
27:5 28:16
30:2 32:16
33:1,14,15,20
33:22 34:2

37:20 43:21
44:21 45:3
46:8,20 49:3
52:2,6 63:1
66:20 70:5,9
70:16 72:9
76:14,20,22
78:16,17 80:22
83:18 84:2,3,8
86:18 87:3
92:7 93:16
95:5 99:6,13
103:13,14
117:17 118:8
120:4 123:7,23
124:23 131:11
134:8,9 139:6
142:15,17
162:4 165:20
166:13,17
168:2 178:4
179:17 193:15
197:11 209:8
209:19 210:2,9
213:6,10
216:23 220:7
220:19 224:3
226:6,8,9,12
226:17 227:4
227:11 228:9
228:21 229:2,8
234:4,21
worked 14:14
15:11,14 16:5
17:21,22 26:1
26:7,23 27:2,4
27:11 32:15,20
33:5 34:14
41:14 43:22
61:12 69:12
76:3 80:20,21
83:17 86:22
88:2,10,21
89:12 91:17

# FREEDOM COURT REPORTING

264

| | | | | |
|---|---|---|---|---|
| 118:9,11 | 133:12 146:13 | 27:16,17 28:1 | 52:21 63:11,20 | **1:05** 7:9 |
| 136:15 139:20 | 150:13 167:10 | 28:3,6 29:6,11 | 64:6 69:15 | **10** 3:20 4:8 |
| 166:16,20 | 175:23 177:22 | 30:2,22 31:6,7 | 77:10 144:2,7 | 164:18 165:23 |
| 182:20 197:8 | 221:9 228:9 | 31:8,12 34:5 | 153:16 156:10 | 172:12 205:9 |
| 199:20 201:9 | 233:6 235:16 | 36:7,9,16 | 165:6 184:7 | 205:13 206:4 |
| 202:1 207:4,16 | 236:2 | 38:14,16,22 | 199:22 200:15 | 207:20 |
| 219:12 224:10 | **wreck** 8:6 124:2 | 39:10,20,23 | 220:15 221:7 | **10th** 110:11 |
| **working** 13:20 | 124:4,7,16 | 40:2,6,14,19 | 222:21,22 | 120:1 124:19 |
| 14:10 17:21 | 125:14 | 41:9,12 42:8,9 | 223:21,23 | 192:5 |
| 25:7,8 32:4 | **write** 170:10 | 53:18 60:13 | 230:23 231:8 | **101** 172:21 |
| 45:19 48:17,17 | 178:12 | 65:6 71:11,12 | **Year's** 25:4 | **104** 3:17 |
| 50:10 51:7,9 | **written** 131:1,2 | 72:12 76:4,6 | **yesterday** | **106** 9:22 10:2 |
| 51:15 62:23 | 175:23 191:19 | 76:13 82:9,11 | 145:18 | **109** 3:19 |
| 66:19 70:5,11 | 201:12,16 | 83:17 92:6,17 | **young** 44:7 | **11** 4:10 169:21 |
| 73:10 85:18,21 | 225:4,6,8 | 100:10 105:17 | 131:14 | 170:2 172:15 |
| 85:23 86:18 | **wrong** 174:2 | 106:20 122:20 | **younger** 20:1 | 172:16 174:17 |
| 87:5,12,14,23 | **wrote** 12:19 | 128:13,15 | 22:21 33:1,14 | **12th** 19:13 |
| 89:1,4,6 99:10 | 102:17 110:4,6 | 130:22 131:8 | 58:7,15,19 | **121** 3:21 |
| 131:13 136:18 | 110:18 121:16 | 131:11,12 | 63:8,10,20 | **126** 238:21 |
| 145:10 151:8 | 121:17 125:19 | 132:9 133:4,5 | 64:6 67:6,9,12 | **130** 3:23 |
| 157:20 162:7 | 131:5 181:18 | 133:13,14,15 | 70:14 95:11,15 | **137** 4:2 |
| 165:17 169:5 | 192:4 193:1 | 134:18 135:3 | 95:21 100:12 | **141** 4:4 |
| 180:6,12 | 226:23 | 137:3,5 144:2 | 156:11 165:18 | **143** 4:6 |
| 205:18,20,23 | **W-2** 75:16 | 144:3 145:12 | **y'all** 175:5 | **15th** 145:14 |
| 210:11 214:23 | 142:13,20 | 147:9 153:12 | 201:15 214:6 | 172:20 174:19 |
| 215:1 218:2 | 144:5,11,13 | 153:13,14 | **y'all's** 18:13 | **164** 4:8 |
| 219:12 220:17 | 202:13,19 | 171:11 180:14 | _____ | **169** 4:10 |
| 221:6 224:7,8 | 218:15 225:21 | 186:21 187:14 | **0** | **1945** 19:13 |
| 236:17 | 226:1 | 187:18 188:3 | 00626 214:5 | **1976** 12:12 |
| **works** 53:13 | **W-2s** 143:23 | 192:13 197:3,8 | **04** 166:6,8,12 | **199** 3:7 |
| 108:7 140:10 | 144:1 | 202:14 203:10 | **05** 124:8 166:6,9 | |
| 140:19 | _____ | 203:20 204:3,6 | 166:16 | _____ |
| **world** 235:16 | **X** | 204:6,16,17 | **06** 47:19,21 | **2** |
| **worth** 139:23 | **X** 3:1 | 207:15,19,23 | 65:20 124:8 | **2** 3:15,22 75:6,9 |
| 206:16 208:5 | _____ | 213:12 215:7 | 226:13 228:3 | 75:14 |
| 222:19 | **Y** | 222:18 223:4 | **07** 73:20 160:13 | **2nd** 109:5 125:1 |
| **wouldn't** 32:1 | **yard** 162:2 | 232:3,5 | 171:12 186:2 | 125:19 |
| 39:3 43:17 | 174:7 | | _____ | **2:07** 1:5 5:5 |
| 44:17 45:4 | **yeah** 13:9 | **yearly** 68:4 | **1** | **20th** 1:20 5:22 |
| 47:9,17 48:2 | 159:16 166:7 | 125:15 | **1** 3:13 4:12 | 7:8 |
| 63:12 67:17 | 193:6 206:12 | **years** 10:20 | 72:19 73:2,23 | **2000** 106:19 |
| 74:15 93:3 | 236:5 | 11:22 15:5 | 77:7,12 81:21 | 157:1 183:22 |
| 104:21 128:15 | **year** 22:17 23:2 | 16:11,14 27:2 | 214:11,13 | 184:22 205:3 |
| 129:9 132:10 | 24:5 26:2,7,10 | 27:4,11 40:8 | 215:20 216:19 | **2002** 124:17 |
| | 26:19,21,23 | 47:7,8 48:20 | 229:20 | 125:12 |

# FREEDOM COURT REPORTING

**2003** 4:7 143:23 144:7
**2004** 4:7 143:23 144:7 203:2 207:15 208:3 208:17
**2005** 4:7,9 23:20 23:21,22 76:15 76:21 109:8 113:17 114:6 143:6,23 144:7 144:11,12 166:5 171:1,3 179:16 180:17 199:20 201:7 202:20,20 203:2 205:15 205:19 206:3 208:11,17 211:5 222:20 222:22 223:21 225:6
**2006** 3:14,16,20 3:22 4:13 23:19 25:13 26:14 72:13 73:6,16 75:3 75:17,22 76:4 76:10 77:16,18 78:3,6,9 106:16,17 107:5,8 110:11 120:2 125:2,19 142:14,16,18 142:20 143:4 144:15,15 145:16 181:8 182:1 193:10 203:16 214:22 215:21 216:21 224:4
**2007** 3:18 104:15 105:11 105:17 106:16

106:18,22 157:2,5,7 171:16 172:5 186:3 218:16 218:21 219:6 219:12
**2008** 1:22 71:20 106:8,21 107:1 107:3
**214** 4:12
**22nd** 71:18,20 106:11
**225** 3:8
**23rd** 73:19
**233** 3:9
**236** 3:10
**24th** 109:19
**25th** 1:22 218:18 218:19
**28** 9:16
**2801** 9:16
**29th** 106:8

---
### 3
---

**3** 3:17 104:3,13 105:12 218:11
**302,703.95** 206:13
**3100** 1:20 7:7
**3400** 5:22
**35203** 1:21 5:23 7:9
**35238-0487** 5:19
**36034** 9:23 10:5
**3765** 5:18
**378,622.05** 215:5
**380487** 5:18

---
### 4
---

**4** 3:19 109:13 110:3,19 121:5
**401(k)** 65:11 72:6 87:1 97:5 118:15 185:9

185:14,21 186:6
**420** 1:20 5:22 7:8

---
### 5
---

**5** 3:21 121:7,9 121:14 126:2 207:23
**520-WHA** 1:5 5:5
**57** 3:5
**59** 3:6

---
### 6
---

**6** 3:23 130:4,9

---
### 7
---

**7** 3:4 4:2 137:10 137:15
**70s** 10:12 11:7 142:4
**72** 3:13
**75** 3:15
**78102** 9:17

---
### 8
---

**8** 4:4 141:10,15
**80s** 157:22

---
### 9
---

**9** 4:6 143:14,16 143:21
**96** 23:14

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

## EXHIBIT 2

In The Matter Of:

## ARTHUR T. WATSON
v.
## ALABAMA FARMERS COOPERATIVE, INC., ET AL.

## NO. 2:07-CV-520-WHA

---

## CHARLIE TRUSSELL
### April 1, 2008

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
—————— www.TylerEaton.com ——————

ARTHUR T. WATSON                                            CHARLIE TRUSSELL
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                     April 1, 2008

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-520-WHA

ARTHUR T. WATSON,
        Plaintiff,
vs.
ALABAMA FARMERS COOPERATIVE, INC.,
D/B/A BONNIE PLANT FARMS,
        Defendants.


VIDEO DEPOSITION
OF
CHARLIE TRUSSELL
April 1, 2008

REPORTED BY:  Eleanor S. Pickett
        Certified Shorthand Reporter
        and Notary Public

---

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jerry D. Roberson
    Attorney at Law
    Roberson & Roberson
    P.O. Box 380487
    Birmingham, Alabama 35238

FOR THE DEFENDANT:
    Mr. Graham Gerhardt
    Attorney at Law
    Burr & Forman LLP
    3400 Wachovia Tower
    Birmingham, Alabama 35203



INDEX OF EXAMINATION
    PAGE:
EXAMINATION BY MR. ROBERSON        6
EXAMINATION BY MR. GERHARDT       70

---

**Page 2**

S T I P U L A T I O N

1       IT IS STIPULATED AND AGREED,
2   by and between the parties, through their
3   respective counsel, that the video
4   deposition of CHARLIE TRUSSELL may be
5   taken before Eleanor S. Pickett,
6   Commissioner, Certified Shorthand Reporter
7   and Notary Public;
8       That the signature to and
9   reading of the deposition by the witness
10  is waived, the deposition to have the same
11  force and effect as if full compliance had
12  been had with all laws and rules of Court
13  relating to the taking of depositions;
14      That it shall not be necessary
15  for any objections to be made by counsel
16  to any questions, except as to form or
17  leading questions, and that counsel for
18  the parties may make objections and assign
19  grounds at the time of trial, or at the
20  time said deposition is offered in
21  evidence, or prior thereto.

---

**Page 4**

1       I, Eleanor S. Pickett, a
2   Certified Shorthand Reporter of
3   Birmingham, Alabama, and a Notary Public
4   for the State of Alabama at Large, acting
5   as Commissioner, certify that on this
6   date, as provided by the Federal Rules of
7   Civil Procedure of the United States
8   District Court, and the foregoing
9   stipulation of counsel, there came before
10  me at the law offices of Burr & Forman
11  LLP, 3400 Wachovia Tower, Birmingham,
12  Alabama, on April 1, 2007, commencing at
13  1:16 p.m. 1:15 p.m., CHARLIE TRUSSELL,
14  witness in the above cause, for oral
15  examination, whereupon the following
16  proceedings were had:

18      MR. ROBERSON:  This is the
19  videotape deposition of Charlie Trussell.
20  Today is April 1st, 2008.  We are at the
21  law offices of Burr & Forman at 420 North
22  20th Street, Birmingham, Alabama.  My name
23  is Jerry Roberson.  I'm the attorney for

---

1 (Pages 1 to 4)

Page 5

the plaintiff, Arthur T. Watson.  This
case is pending in the United States
District Court for the Middle District of
Alabama, Northern Division, styled Arthur
Watson, plaintiff, versus Alabama Farmers
Cooperative, Inc., doing business as
Bonnie Plant Farms, defendant, CV2-07-520.
I would ask all counsel of record to state
their name and the party they represent.
        MR. GERHARDT:  Graham Gerhardt
with Burr & Forman representing the
defendant.
        MR. TRUSSELL:  Charlie
Trussell.
        MR. ROBERSON:  All right.  Our
deponent.  And if you would swear our
witness, please, ma'am.

        CHARLIE TRUSSELL,
having been first duly sworn, was examined
and testified as follows:

        THE REPORTER:  Usual

Page 6

stipulations?
        MR. ROBERSON:  Yes.
        MR. GERHARDT:  That will be
fine.

EXAMINATION BY MR. ROBERSON:
        Q.    Mr. Trussell, my name is Jerry
Roberson.  I represent -- it's Terry
Watson, what he goes by.  He's the
plaintiff in this case.  Do you know
Terry?
        A.    Yes.
        Q.    How long have you been knowing
him?
        A.    Off and on, probably twenty
years.
        Q.    And have you ever given a
deposition before?
        A.    No, sir.
        Q.    Let me tell you today, I know
you have counsel here, but today I'm going
to be asking you some questions.  And I
need you to answer out audibly, that is,

Page 7

don't nod your head and don't say uh-huh
or huh-uh, which we do all the time in
normal conversation.  Is that fair?
        A.    That's fair.
        Q.    And then I'm going to ask you
questions.  If you don't understand what
I'm asking, please tell me and I'll try to
rephrase it.  Okay?
        A.    Okay.
        Q.    If you answer it, I'm going to
have to assume that you understood what I
was asking.  Okay?
        A.    Okay.
        Q.    All right.  You understand
that you're under oath today, correct?
        A.    That's right.
        Q.    Just like you were in the
courtroom?
        A.    That's correct.
        Q.    Okay.  Now, Charlie, how old
are you?
        A.    Sixty-six.
        Q.    Where do you work?

Page 8

        A.    Bonnie Farms.
        Q.    And that's the company that
sells plants, correct?
        A.    That's correct.
        Q.    Do they sell anything besides
plants?
        A.    That's it.
        Q.    I mean, and by plants, I mean
they sell vegetables, correct?
        A.    That's correct.
        Q.    And they also sell shrubs or
flowering plants, correct?
        A.    That's correct.
        Q.    So if I go to Lowe's or Home
Depot and I pick out some plants, those
are probably from Bonnie Plant, correct?
        A.    More than likely.
        Q.    Okay.  And those are just some
of your customers, correct?
        A.    That's correct.
        Q.    Now, how long have you been
working for Bonnie Plant?
        A.    Oh, about fifty years, all my

2 (Pages 5 to 8)

Page 9

life.

Q.   Okay.  Well, did you work for
somebody else before and they were
acquired by Bonnie Plant?

A.   That's correct.

Q.   Okay.  Who did you work for
before?

A.   I worked with Bonnie and then
I worked for Four Way Plant Farm which was
owned by my family, and we merged with
Bonnie about '90, '89, '90, something, I
can't remember -- '97, excuse me.

Q.   So you grew up in a family
business?

A.   Business, plant business all
my life.

Q.   Four Way Plant Farms?

A.   Bonnie Plant Farm.  I was
originally with Bonnie.

Q.   Okay.

A.   And we withdrew from Bonnie
and started our own business, and we
merged back together and been there ever

Page 10

since.

Q.   Where was Four Way located?

A.   Union Springs, Alabama.

Q.   All right.  Down in Bullock
County?

A.   That's correct.

Q.   And who started that business
besides yourself?  Did you have any
partners or anybody in with you?

A.   In?

Q.   Four Way.

A.   My brothers -- my brothers and
my uncles.

Q.   Tell me who those people, what
their names, are if you would, your
brothers.

A.   Pete Trussell.

Q.   Okay.

A.   John Waters.

Q.   Now, there is a John Waters
who's a lawyer down there in Union
Springs.

A.   That's my first cousin.

Page 11

Q.   Okay.  He's not the one --

A.   That's his daddy.

Q.   Okay.

A.   Sam Waters, Glenn Paulk.

Q.   I'm sorry, Glenn?

A.   Glenn Paulk.

Q.   Now, are all those people that
you named, are they still -- are they with
Bonnie?

A.   No, they are all retired.

Q.   Okay.  Pete's retired?

A.   Retired.

Q.   And John Waters is retired?

A.   Retired.

Q.   And Sam and Glenn retired?

A.   Retired.

Q.   So you are the only one left?

A.   I'm the only one left.

Q.   Okay.  Now --

A.   Tim's left.

Q.   Tim?

A.   Yeah.

Q.   Is that your brother?

Page 12

A.   Yeah, younger brother.  He was
with Four Way too.

Q.   Okay.  Where does Tim work?

A.   Bonnie.

Q.   I mean what city is he located
in?

A.   Union Springs.

Q.   Okay.  So he works in an
office down there?

A.   Uh-huh.

Q.   Is that yes?

A.   Yes, yes.

Q.   I'll try to remind you.

A.   Yes.

Q.   And where do you work, sir,
now, where are you located?

A.   Donaldsonville, Louisiana.

Q.   Sir, I don't know much about
Louisiana.  Can you tell me where that
city is located?

A.   It's on the West Bank halfway
between Baton Rouge and New Orleans.  West
side of the river.  They call it the West

3 (Pages 9 to 12)

Page 13

Bank down there.
Q.    Okay.  And how long have you
been working for Bonnie down in
Donaldsonville?
A.    This is the third season.
Q.    And this business, the plant
business, is a seasonal business, correct?
A.    That's correct.
Q.    Now, the people that work,
that sell for Bonnie over -- sometimes
they work a spring season and sometimes
they work a fall season, correct?
A.    That's correct.
Q.    Do you have year-round
employment with Bonnie, or do you work
seasonally too?
A.    I work year-round.
Q.    Okay.  And what is your
position with Bonnie?
A.    Station manager for
Donaldsonville.
Q.    Mr. Trussell, can you explain
what a station manager does?

Page 14

A.    I oversee growing and seeding
plants and manage the salesmen and the
helpers of the routes.
Q.    Okay.  Now, is there a station
in Donaldsonville?
A.    That's correct.
Q.    So does that mean you grow
plants there?
A.    That's correct.
Q.    All right.  And do you have
some office staff that is at
Donaldsonville or near there?
A.    Yeah, my wife is the office
manager there.  We stay there.
Q.    Okay.  And when you say -- the
plants have to be grown or put in
containers to be sold, to grow and be
sold, correct?
A.    That's correct.
Q.    And you -- you are in charge
of the actual physical growing of the
plants?
A.    That's correct.

Page 15

Q.    Do y'all have a greenhouse
down there?
A.    That's correct.
Q.    Okay.  And you just have -- it
may be several greenhouses?
A.    It is.
Q.    Okay.  And so what do you call
the people who work in that greenhouse in
the seeding and growing stage?
A.    Greenhouse labor.
Q.    Okay.  And how many folks do
y'all have that work down there, just
average, a range of people?
A.    Five.
Q.    And do they just work a season
too, that is, a growing season?
A.    They just work during the
growing season.
Q.    And for Donaldsonville, the
growing season I assume is like the -- is
like the sales season in that it varies by
your location?
A.    That is correct.

Page 16

Q.    So what is your growing season
down in Donaldsonville normally?
A.    From December to July.
Q.    Okay.
A.    And from August to November.
Q.    And the August to November,
would that be for the fall season?
A.    That's correct.
Q.    And the December to July would
be the spring season?
A.    Right on.
Q.    Okay.  Now, other than your
greenhouse labor and your wife, are there
any other employees for Bonnie that work
out of Donaldsonville?
A.    Four salesmen, four route
helpers.
Q.    So does that mean that you
have four routes in Donaldsonville.
A.    Four routes we run out of
there.
Q.    In terms of the geography,
where do your routes run?

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 17

1    A.    The Baton Rouge area, the New
2  Orleans area and the Lafayette area,
3  southwest Louisiana.
4    Q.    Okay.  Then are you part of
5  a -- if we go up, are you part of a
6  certain district or region for Bonnie
7  Plant?
8    A.    Just --
9    Q.    In other words, who do you
10  report to, Mr. Trussell?
11    A.    I report to Dennis Thomas,
12  Bonnie Plant --
13    Q.    Who is he?
14    A.    He's the manager for Bonnie
15  Plant.
16    Q.    Where is he?  Is he in Union
17  Springs?
18    A.    Union Springs.
19    Q.    All right.  But, in other
20  words, are there -- a lot of times
21  companies divide up geographically into
22  say the southern region or -- anything
23  like that?

Page 18

1    A.    Huh-uh.
2    Q.    Do y'all have anything like
3  that?
4    A.    No, sir, not that I know of.
5    Q.    Okay.  So you just manage your
6  four salesmen, four route helpers and your
7  five growers and your wife?
8    A.    That's correct.
9    Q.    That's all the folks that work
10  out of Donaldsonville?
11    A.    That's correct.
12    Q.    Okay.  And then you take
13  instructions from Dennis Thomas or that's
14  who you report your sales results and
15  things to?
16    A.    That's correct.
17    Q.    And if you need something,
18  labor or -- you report to him?
19    A.    I report to him, and he might
20  -- just report to him, and that's it.
21    Q.    All right.  And, Mr. Trussell,
22  I don't want to know specifically your
23  salary or anything like that.  I just want

Page 19

1  to know the arrangement of how you work.
2  Are you paid a salary?
3    A.    No.  I'm paid by the number of
4  flats that I grow at that station.
5    Q.    Okay.  You're paid on how many
6  you grow?
7    A.    How many we -- no, how many we
8  scan sell.
9    Q.    Scan sell?
10    A.    Sell, right.
11    Q.    So these plants are sold on a
12  consignment basis?
13    A.    That is correct.
14    Q.    So you physically have to --
15  not you, but your sales staff has to stock
16  them into stores, correct?
17    A.    That's correct.
18    Q.    And when they stock them, do
19  they scan them, that is, they have some
20  kind of a label or a bar code and they're
21  scanned into the computer?
22    A.    They have a bar code, and the
23  stores scan them.

Page 20

1    Q.    Okay.  And then if the plant
2  is not sold by the Lowe's or the Home
3  Depot or whatever, do they -- can they
4  turn it back in and get credit from you?
5    A.    We just pick it up, being it's
6  on pay by scan.  We only get paid for what
7  is scanned.
8    Q.    What they sell out the door?
9    A.    Right.  That's correct.
10    Q.    Okay.  So it takes a period of
11  time after your season for y'all to, in
12  effect, settle up?
13    A.    That is correct.
14    Q.    Okay.  Because, like we say,
15  it's a consignment basis, correct?
16    A.    That's correct.
17    Q.    Okay.  Now, how much do you
18  get a flat?  Is it so many cents a flat,
19  or how does that work?
20    A.    So much a flat.  We get paid
21  by the flat.
22    Q.    And a flat is like those tray
23  of eight?

5 (Pages 17 to 20)

Page 21

```
 1       A.   Right, tray of eight, tray of
 2  eight or a tray of seventeen or a tray of
 3  nineteen.
 4       Q.   Depending on the plant?
 5       A.   Depending on the number of
 6  plants in the tray.
 7       Q.   Okay.  So like I bought some
 8  marigolds, do y'all sell those?
 9       A.   That's correct.
10       Q.   And they come in a flat with
11  eight plants?
12       A.   With eight packs, nine --
13  eight oh nines, you have eight packs to
14  the flat.
15       Q.   Okay.
16       A.   Eight packs to the flat.  Or
17  either it could be if they're individual
18  plants, there can be seventeen, nineteen,
19  ten or either eight individual plants.
20       Q.   Okay.  All right.  Now, do you
21  have four salesmen that work out of
22  Donaldsonville?
23       A.   That's correct.
```

Page 22

```
 1       Q.   Who are those four salesmen
 2  right now?
 3       A.   Joey Vaughn.
 4       Q.   All right.
 5       A.   Jeff Parker.
 6       Q.   All right.  Is that
 7  V-a-u-g-h-n?
 8       A.   V-a-u-g-h-n.
 9       Q.   Okay.
10       A.   Jeff Parker.
11       Q.   Okay.
12       A.   Ian Mills, I-a-n, and Mike
13  Jones.
14       Q.   All right.  Now, have those
15  gentlemen all been working there the whole
16  time you've been there?
17       A.   No, sir.
18       Q.   Okay.
19       A.   Jeff Parker and Joey Vaughn
20  are the only two.
21       Q.   Okay.  They have been there
22  for three years?
23       A.   They have been there for three
```

Page 23

```
 1  years.
 2       Q.   All right.  How about Ian
 3  Mills?
 4       A.   This is Ian's second year,
 5  Mike's first year.
 6       Q.   Now, when you say Ian Mills'
 7  second year, is that with the company --
 8       A.   No.
 9       Q.   -- or as a salesman there?
10       A.   Second year in Louisiana.
11       Q.   Okay.  Where did he work
12  before?
13       A.   He worked out of Missouri, but
14  his territory was in the Dakotas.
15       Q.   All right.  And what about
16  Mike Jones?
17       A.   He's new.
18       Q.   He's new?
19       A.   He's new.
20       Q.   New hire?
21       A.   New hire.
22       Q.   How old is Mike Jones?
23       A.   Forty-four, forty-five.
```

Page 24

```
 1       Q.   Approximately his --
 2       A.   Between his middle forties,
 3  early fifties.
 4       Q.   Okay.  Now, you've been with
 5  the company for over twenty years?
 6       A.   Right.
 7       Q.   Okay.  Have you hired salesmen
 8  or do people come to you?  Or how do you
 9  get salesmen?
10            MR. GERHARDT:  Object to the
11  form.
12       Q.   You can answer.  He's just
13  objecting for the record.  How do y'all
14  hire salesmen?
15       A.   Different ways.  I can hire
16  them or either they come from the home
17  office.  It varies.
18       Q.   Okay.  But, I mean, from time
19  to time have people come to you and
20  applied for a job and you've hired them?
21       A.   I can hire them if I choose to
22  do so.
23       Q.   Okay.
```

6 (Pages 21 to 24)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 25

A. But I have to go through the office once I hire.

Q. You have to get approval?

A. Approval, right.

Q. Sure.

A. Right.

Q. But, I mean -- and can you fire a salesmen?

A. Yes, I can.

Q. Okay. You don't have to -- do you have to get approval for that too?

A. No, sir, I don't have to get approval for that.

Q. All right. Well, how many salesmen would you say you've hired during your career at Bonnie Plant? Would it be a dozen or more?

A. Oh, about six or seven.

Q. Okay. Were any of them over age sixty when you hired them?

A. No, sir.

Q. Okay. Now, and how many salesmen -- where did you work before

Page 26

Donaldsonville?

A. Tupelo, Mississippi.

Q. Were you a station manager there?

A. I was a station manager there.

Q. How long have you been a station manager?

A. Seven -- it's eight years, eight years.

Q. Okay. At one time did you used to sell for them, I mean as a route salesman?

A. Yes, I was a route salesmen.

Q. That's what Terry Watson does, correct?

A. Right. Right.

Q. So you've done that job, correct?

A. Correct.

Q. And is it a hard job in the sense that there is a lot -- you got to pay attention to your customer, correct?

MR. GERHARDT: Object to the

Page 27

form.

Q. You can answer.

A. It's the most physical work a person can do. It's long hours and hard work.

Q. Okay. I mean, salesmen for Bonnie Plant, they earn their money. Is that a fair statement?

A. That is good -- right, that's correct.

Q. Okay. I mean, if you want something easy, that ain't going to be for you?

A. Right.

MR. GERHARDT: Object to the form.

Q. Correct?

A. Correct.

Q. Now, I understood -- and the reason I'm taking your deposition, Mr. Trussell, is I was told by the attorneys for Bonnie Plant that for a short period of time, you supervised Terry Watson, that

Page 28

is, he reported to you.

A. That is correct.

Q. And do you know when that period of time was?

A. He was there about two and a half, maybe three weeks, February of 2006, I think that's correct.

Q. February. I know it was in the spring season of 2006?

A. February 2006, right.

Q. And do you know when he left Donaldsonville?

A. He wasn't there but about two and a half weeks, maybe three, I just don't remember. He left before the first of March, I'm pretty sure of that.

Q. Okay. Sir -- and I'm asking because I'm not familiar with y'all's documents or anything.

A. Okay.

Q. But are there any documents that might help us with the dates, that is, when they transfer from one location

7 (Pages 25 to 28)

ARTHUR T. WATSON                                           CHARLIE TRUSSELL
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                      April 1, 2008

---

Page 29

to another, does there have to be some
kind of document for that?
3    A.    I didn't have any, but the
4 office in Union Springs probably would
5 have something.
6    Q.    What would you call that?  I
7 mean, how would I ask for that?
8    A.    I don't know.
9    Q.    Okay.  Well, how was Terry
10 assigned to you, that is, who did it?
11    A.    Joe Stewart called and asked
12 me and I told him send him down there,
13 we'd try to give him something to do.
14    Q.    Okay.  Do you remember your
15 conversation with Joe?
16    A.    Yeah.  Joe said we needed to
17 try to keep the boy on the payroll so he
18 would be able to have some insurance.  And
19 I -- I thought it was mighty nice of Joe
20 to do that.
21    Q.    Did he tell you where Terry
22 had been working?
23    A.    No, did not know.

---

Page 30

1    Q.    Okay.  Do you know anybody in
2 Bells, Tennessee?
3    A.    Yes.
4    Q.    Do you know where that is?
5    A.    I know where that is.
6    Q.    Near Nashville.
7    A.    It's north of Tupelo, about
8 sixty miles.
9    Q.    Okay.  Did you know that Terry
10 Watson had worked for the company for
11 twenty years?
12    A.    Yeah, I knew Terry had worked
13 for the company.  But how long, I didn't
14 know.
15    Q.    In fact, would -- do y'all
16 have an annual sales meeting?
17    A.    Yes.
18    Q.    Where all the salesmen go and
19 station managers go, I assume?
20    A.    That is correct.
21    Q.    And so had you seen him from
22 time to time --
23    A.    Yeah --

---

Page 31

1    Q.    -- at that sales --
2    A.    -- at the meetings.
3    Q.    Sure.  And just -- Bonnie
4 Plant sells in all forty-eight states in
5 the continental U.S., correct?
6    A.    That's correct.
7    Q.    So they have salesmen in all
8 those states?
9    A.    That's correct.
10    Q.    And would y'all get together
11 all at once once a year?
12    A.    Most of them do.  Some are not
13 invited.
14    Q.    Okay.
15    A.    We can't room -- we can't put
16 them all in the hotel.
17    Q.    Where do y'all meet?  Do y'all
18 meet in Alabama?
19    A.    Conference Center at Auburn.
20    Q.    Is it always the meeting is
21 always at Auburn?
22    A.    Used to be in Eufaula at Lake
23 Point.

---

Page 32

1    Q.    At the golf course out there?
2    A.    Yeah.
3    Q.    Now --
4    A.    We got so big, we had to move
5 to Auburn.
6    Q.    And what kind of things do
7 y'all do at the sales meeting?  Y'all put
8 on programs and training things?
9    A.    No.
10    Q.    What do y'all do?
11    A.    Mostly nothing.  Party.
12    Q.    Just get liquored up?
13    A.    Get liquored up.
14    Q.    Well, did you know that in the
15 year 2005, in the spring season of 2005,
16 Terry Watson had sold three hundred
17 thousand dollars worth of plants?
18    A.    I didn't know that.
19    Q.    At age sixty-one, he'd sold
20 three hundred thousand.  You didn't know
21 that?
22    A.    I did not know that.
23    MR. GERHARDT:  Object to the

8 (Pages 29 to 32)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 33

form.
3  Q.   Do you have to hustle to do that?
4  MR. GERHARDT:  Object to the
5  form.
6  Q.   You can answer.
7  A.   He had to have some good
8  labor.
9  Q.   I agree with that.  Did he
10  have to work to do it?
11  MR. GERHARDT:  Object to the
12  form.
13  Q.   You can answer.  He just
14  objects for the record.  There is not
15  anybody here to rule on it.
16  A.   He would have had to have a
17  lot of good help.
18  Q.   Okay.  Mr. Trussell, do you
19  know what I mean when I say retaliation?
20  Do you know what that means?
21  A.   I think I do.
22  Q.   What does that mean, sir?
23  A.   I'm trying to think of a

Page 34

1  definition.  I can't think of one right at
2  the present time.
3  Q.   Okay.  Well, I tell you what,
4  I'll help you a little.  Do you agree with
5  me that it's illegal to discriminate
6  against somebody because of their age?
7  MR. GERHARDT:  Object to the
8  form.
9  Q.   You can answer.
10  A.   Well, I'm older than him and
11  hadn't discriminated against me.
12  Q.   Do you agree that age
13  discrimination is illegal?
14  MR. GERHARDT:  Object to the
15  form.
16  Q.   You can answer.
17  A.   I'm just older than Terry, and
18  I'm still there.
19  Q.   Well, sir, have you had any
20  training about age discrimination?
21  MR. GERHARDT:  Object to the
22  form.
23  Q.   Sir?

Page 35

1  A.   Do what?
2  Q.   Have you ever been trained
3  about age discrimination?
4  A.   No.
5  Q.   Do y'all have written
6  materials that are passed out at your
7  annual meetings about Bonnie Plant
8  policies regarding age discrimination?
9  A.   We have some literature passed
10  out, but I probably don't read it.
11  Q.   Okay.  Well, did you know
12  that if somebody complains of age
13  discrimination, that that is what the law
14  considers to be a protected activity?
15  MR. GERHARDT:  Object to the
16  form.
17  Q.   You can answer.  Did you know
18  that, sir?
19  A.   I didn't know that.
20  Q.   And did you know that the law
21  prohibits an employer from taking an
22  adverse action against a person because of
23  their complaint of age discrimination?

Page 36

1  Did you know that?
2  MR. GERHARDT:  Object to the
3  form.
4  Q.   You can answer.
5  A.   Didn't know that.
6  Q.   Did you know that before Terry
7  Watson was transferred to Donaldsonville,
8  that he made a written complaint of age
9  discrimination?  Did you know that?
10  MR. GERHARDT:  Object to the
11  form.
12  Q.   You can answer.
13  A.   No, sir.
14  Q.   Has anybody ever told you
15  that Terry Watson complained of age
16  discrimination?
17  A.   No, sir.
18  Q.   Well, do you know why you're
19  giving a deposition today?
20  A.   Why?
21  Q.   Do you know?  Has anybody told
22  you why you're giving a deposition?
23  MR. GERHARDT:  Object to the

9 (Pages 33 to 36)

Toll Free 800.458.6031

http://www.TylerEaton.com

ARTHUR T. WATSON                                              CHARLIE TRUSSELL
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                     April 1, 2008

---

Page 37

form.
   A.   He's got a lawsuit, I assume.
   Q.   Well, what job was Mr. Watson
assigned when he was in Donaldsonville?
   A.   A route helper.
   Q.   A route helper?
   A.   That is correct.
   Q.   Do those people work on a
commission?
   A.   Those people work on a
commission.
   Q.   As a route helper they get a
commission?
   A.   No, no, I thought you said did
the route men work on.  No.  He --
   Q.   Well, did Terry Watson receive
any commissions for the time that he
worked in Donaldsonville?
   A.   Not that I know of.  He didn't
receive anything.
   Q.   Well, he got paid, didn't he,
a draw?
   A.   I assume he did.  I never saw

---

Page 38

a check.
   Q.   Okay.  You weren't aware of
his compensation arrangement?
   A.   I wasn't aware.  He had a -- I
wasn't aware, you know.  They had an
agreement with him.
   Q.   Well, did they charge him
against you?
   A.   No, they did not.
   Q.   Do you know who they charged
him to?
   A.   I have no idea.
   Q.   Did he call on customers near
Donaldsonville and try to open new stores?
   A.   He rode with the guys on the
truck for about two or three trips.  And
as far as my knowledge, he didn't do
anything to help anybody.  Just rode with
them there for about seven, eight, ten
days.  It was early in the season, and
Terry didn't do much while he was there.
   Q.   Do you know Pitt Lowman?
   A.   Yes.

---

Page 39

   Q.   Who is that?
   A.   He's my stepson.
   Q.   So he married your daughter?
   A.   I married his momma.
   Q.   Oh, you married his momma?
   A.   Years ago.
   Q.   Okay.  Was Pitt Lowman ever
assigned to work with Terry Watson?
   A.   They rode around down there,
and they didn't -- they didn't receive any
pay out of my station.  They were just
down there.  And he went with Pitts out
there and found a couple of stores.  To my
knowledge, we're not working but two
accounts that Pitts opened up while he was
there, and they both left after about two
or three weeks.
   Q.   Sir, is Pitts still working
with Bonnie Plant?
   A.   I think Pitts is in New York.
   Q.   Is he with Bonnie Plant?
   A.   Yeah.
   Q.   What does he do?

---

Page 40

   A.   He's a salesman.
   Q.   And had Pitt ever worked as a
salesman before being assigned to
Donaldsonville?
   A.   No, he has not.
   Q.   Does he have a college degree?
   A.   No, he does not.
   Q.   How old is Pitt?
   A.   Oh, about thirty, thirty-one.
   Q.   Has he ever worked in sales
before?
   A.   He worked for himself.  He had
a little trucking company.
   Q.   Well, do you know if Terry and
Pitt called on businesses and tried to
sell them plants while he was working at
Donaldsonville?
      MR. GERHARDT:  Object to the
form.
   Q.   You can answer.
   A.   I think they went out, and,
like I said, I think we have two accounts
that they opened up during the two weeks

---

10 (Pages 37 to 40)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 41

they was down there. They -- the business
was already there. They were just out
3 there riding around.
4    Q.    Well, did they have to provide
5 any kind of report or anything to you
6 about where they went?
7    A.    Nothing. Nothing.
8    Q.    You didn't check on them?
9    A.    I didn't check on them. They
10 were just out there playing around.
11    Q.    They were just riding around?
12    A.    Riding around, burning up gas.
13    Q.    Are you a good manager, Mr.
14 Trussell?
15         MR. GERHARDT:  Object to the
16 form.
17    Q.    You can answer. Do you
18 consider yourself a pretty good manager?
19    A.    I would think so.
20    Q.    Well, did you not check on
21 them because he was your stepson, or what
22 reason?
23    A.    They didn't have anything to

Page 42

1 do. They were riding around trying to
2 open up a few new accounts, and it really
3 wasn't anything -- I knew they both wasn't
4 going to be there long because there
5 wasn't anything down there for them to do.
6    Q.    So basically this position was
7 just a make work position?
8    A.    Right, that's correct.
9    Q.    That's really what it was?
10    A.    Right, that's correct.
11    Q.    It wasn't any future in that.
12 It was just something for him to do for a
13 short time, correct --
14         MR. GERHARDT:  Object to the
15 form.
16    Q.    -- Terry Watson?
17    A.    I assume -- I'm assuming that
18 he was on the payroll, so they just
19 found -- you know, wanted to send him
20 somewhere because I didn't pay him
21 anything.
22    Q.    All right. And then what
23 happened after two or three weeks,

Page 43

1 according to you, what happened to Terry?
2    A.    They called and --
3    Q.    "They" being who?
4    A.    I think Joe Stewart called and
5 said that they was going to send him to
6 Jasper, Alabama. They had had some man to
7 quit there, to the best of my
8 recollection. I don't remember too --
9    Q.    A route salesman in Jasper
10 quit?
11    A.    Jasper, right, and he was
12 going up there to replace him.
13    Q.    And Terry was going to take
14 over that route?
15    A.    Right, that's correct.
16    Q.    Okay. And so did you tell
17 Terry that he needed to get in touch with
18 Joe and get on up to Jasper?
19    A.    I don't remember if Joe called
20 Terry or how it really worked. All I
21 know, he left and went to Jasper. The
22 details, I don't remember.
23    Q.    During the short time that you

Page 44

1 managed Terry or he reported to you, did
2 you have any criticism of his job
3 performance?
4    A.    No. He didn't have nothing to
5 do and wasn't no really job performance
6 that he was performing for me during the
7 time he was there.
8    Q.    You certainly didn't have any
9 occasion to write him up in some kind of a
10 disciplinary way?
11    A.    No, I didn't.
12    Q.    And you never orally reported
13 to him that there was something that he
14 wasn't doing that he should be doing; is
15 that correct?
16         MR. GERHARDT:  Object to the
17 form.
18    A.    That's correct.
19    Q.    Okay. So basically he just
20 called on some accounts while he worked
21 there for you, and you don't feel like he
22 garnered y'all a lot of business in the
23 short time he was there?

11 (Pages 41 to 44)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 45

A.   That's correct.
Q.   And there wasn't anybody that
3  replaced him in what he was doing?
4     A.   No.
5     Q.   Because this was a make work
6  position?
7          MR. GERHARDT:  Object to the
8  form.
9     A.   There you go.
10    Q.   And your son-in-law, what did
11  he do after Terry left?
12    A.   He left about the same time,
13  if I remember it, and he went on to New
14  York.
15    Q.   Okay.  So --
16    A.   And Terry went to Joe
17  Watson's -- I mean not Joe Watson.  Joey
18  Pageant.
19    Q.   And Mr. Pageant is a station
20  manager over Jasper; is that correct?
21    A.   At that time.
22    Q.   Oh, he was at that time?
23    A.   At the time.

Page 46

Q.   Is he not with the company
2  anymore?
3     A.   He is a station manager in
4  Senora, Kentucky now.
5     Q.   Okay.  Now, did you have
6  anything else to do with Terry Watson?
7     A.   No.
8     Q.   I mean, have you seen him at
9  the meetings since then?
10    A.   I saw him one time at the
11  meeting and just walked by and spoke to
12  him like I would you.
13    Q.   Sure.  I hope he said
14  something back.  Did he?
15    A.   He did.  He did.
16    Q.   Okay.  And, Mr. Trussell, can
17  you explain to me what you see to be the
18  differences between working a route as a
19  route salesman and the job of a station
20  manager?
21    A.   A route salesman has got to be
22  able to do physical work, get in and out
23  of a vehicle several times a day.  A

Page 47

1  station manager, all he is doing basically
2  is growing and managing labor.  My
3  physical work is nothing like it was at
4  one time.  And a route salesman for Bonnie
5  Plant Farm must be in excellent physical
6  condition to be able to do the work.
7     Q.   So if you had a -- I apologize
8  for asking you this, but do you have any
9  health problems, like high blood pressure
10  or anything like that?
11    A.   Nothing -- I have high blood
12  pressure, but it doesn't affect my working
13  ability.
14    Q.   Okay.  And do you take
15  medication for it?
16    A.   I take medication for it.
17    Q.   Have you ever had any heart
18  problem or anything like that?
19    A.   No, sir.
20    Q.   Good for you.
21    A.   That's the reason I'm staying.
22  As long as I'm healthy, I'm going to
23  continue doing it.

Page 48

1     Q.   Okay.  If a person -- let's
2  say a person had heart problems, they
3  could -- they could -- what you're
4  describing is they could do the job of --
5  it would be easier for them to do the job
6  of a station manager than it would be to
7  do the more physical labor of a route
8  salesman; is that correct?
9     A.   Yes, if they have the ability
10  to grow and fertilize and spray plants.  A
11  lot about running a station everybody
12  can't do it.
13    Q.   Obviously they have to be able
14  to grow plants, correct?
15    A.   Right.
16    Q.   And they have to be able to
17  manage employees, correct?
18    A.   Right.
19    Q.   Now, do you get paid more or
20  less if your salesmen -- the salesmen have
21  a commission, correct?
22    A.   That's correct.
23    Q.   And their commission, if they

12 (Pages 45 to 48)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 49

reach a certain goal or sales level, they
get more commission, correct?
3    A.   That's correct.
4    Q.   And I think, from what I've
5 seen, that at like three hundred and
6 seventy-five thousand dollars, the
7 commission changes?
8    A.   That's correct.
9    Q.   Do you know what it is, what
10 percentage it is?
11    A.   No.  Because I'm not running a
12 route now and, you know, I hadn't -- I get
13 paid by the flat.
14    Q.   Okay.  Well, what I'm trying
15 to ask you is -- see if I'm understanding
16 this right, and I'm just going to throw
17 out these figures.
18    A.   Okay.
19    Q.   Up to three hundred and
20 seventy-five thousand dollars, if you
21 don't get there, let's say you get ten
22 percent commission, okay?
23    A.   Okay.

Page 50

1    Q.   But if you get -- if you meet
2 your goal of three hundred seventy-five
3 thousand, let's say you get fourteen
4 percent commission.  Does that make sense
5 you have?
6    A.   You have an increase according
7 to where you are at.  I don't know what it
8 is.  But the more you sell, the more --
9 certain stations.
10    Q.   Okay.  So a salesmen that
11 meets his commission is going to get paid
12 more for all the sales.  It's not fourteen
13 percent over three seventy-five, it's
14 fourteen percent of the three
15 seventy-five?
16    A.   That's correct.
17    Q.   But if you don't meet your
18 goal, you're going to get less commission,
19 right?
20    A.   That's correct.  That's
21 correct.
22    Q.   So it's important in terms of
23 compensation to the salesmen that they

Page 51

1 meet that sales goal?
2    A.   That's correct.
3    Q.   Is that a fair statement?
4    A.   That's fair.
5    Q.   And the commissions that you
6 pay them, they have certain expenses that
7 have to come out of those commissions,
8 correct?
9    A.   That's correct.
10    Q.   So that Bonnie Plant can
11 manage their cost, correct?
12    A.   Correct.
13    MR. GERHARDT:  Object to the
14 form.
15    Q.   They're making a percentage on
16 every flat they sell, right?  That's the
17 hope anyway?
18    A.   Yeah.
19    Q.   Correct?
20    A.   That's correct.
21    Q.   So the salesman is bearing the
22 risk of his route for sales?  He has to
23 pay his helper out of his commissions,

Page 52

1 correct?
2    MR. GERHARDT:  Object to the
3 form.
4    Q.   Correct?
5    A.   Correct.
6    Q.   And he has certain costs that
7 are deducted from his route?  For example,
8 y'all have some kind of charge-back for
9 fines.  Do you know what I'm talking
10 about?
11    A.   Yes, there is certain fines.
12    Q.   What is a fine for a salesman?
13 What does that mean?
14    A.   If he doesn't do his logbook
15 properly, doesn't turn his tickets in.
16 It's different things.
17    Q.   They got a financial incentive
18 to do what you ask?
19    A.   Right.
20    Q.   In fact, if they don't go to
21 their -- y'all have chain stores like
22 Lowe's and Home Depot, correct, on your
23 routes?

13 (Pages 49 to 52)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

---

Page 53

A.   That's correct.

Q.   If they don't go to those every so often, they can be fined, correct?

A.   Right.

Q.   How often do they have to show up at the chain stores?

A.   We have changed that this year.  Doesn't have a skip program.  That's what they call a skip program.  We doesn't have it anymore.  It was in effect until this year.

Q.   Do you know in previous years how often they had to show up?

A.   Twice a week.  Every four days.

Q.   And, sir, at Bonnie Plant, y'all have got GPS devices in the trucks, correct?

A.   That's correct.

Q.   You know when the truck is running and when it's moving, correct?

A.   That's correct.

---

Page 54

Q.   You know how many hours a day the salesmen is working, correct?

A.   That's correct.

Q.   Now, you don't have to have a CDL to drive this truck, right?

A.   Nope.

Q.   But do you have certain legal requirements about when -- what hours you can operate it?

A.   Yes, you do.

Q.   What do y'all call that?

A.   Well, you got a logbook.  You can only work so many hours a week.

Q.   A log law or something that you --

A.   Yeah.

Q.   Now, can the helper drive the truck?

A.   If he's legal.  If he has the --

Q.   If he has the --

A.   -- paperwork that's necessary.

Q.   If he has a health card and --

---

Page 55

A.   Right.

Q.   -- driver's license?

A.   Legal driver's license and a medical card.

Q.   Okay.  So --

A.   And pass the drug test.

Q.   So between the helper and the salesmen, they can -- can they work around the clock then?

A.   About twenty, twenty-one hours.

Q.   Okay.

A.   But they will have enough time off, the other three or four doesn't matter.  They will work -- in other words, the other three or four, they will be off enough that that doesn't matter.

Q.   Have you ever fired anybody for a logbook violation?

A.   No, sir.

Q.   Have you ever disciplined anybody for working too many hours?

A.   No, sir, because I hadn't had

---

Page 56

to.

Q.   Do you get reports that are printed out about the trucks and how many hours they are operating?

A.   I know how many hours they are operating.  I have the logbook that I look at before I send it to Union Springs.

Q.   You have what the driver reports?

A.   Right.

Q.   I'm asking you about information that may be different from what the driver reports, that is, the actual GPS log.

A.   I don't have that.

Q.   Who has it?

A.   It's in Union Springs.

Q.   Oh, okay.  Well, why don't they make that available to you?

A.   I don't guess they feel it's necessary.

Q.   Okay.  Now, is commission important, an important element of your

---

14 (Pages 53 to 56)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

Page 57

compensation to a route salesmen?

MR. GERHARDT:  Object to the form.

Q.   You can answer.

A.   It's the only way he gets paid is on commission.

Q.   He gets a draw against his commission, correct?

A.   That's correct.

Q.   Because there's -- it takes some time to settle up.  Y'all pay him a draw during the season, right?

A.   That's correct.

Q.   And if his commission doesn't exceed his draw, he can owe y'all money, can't he?

A.   That is correct, yeah.

Q.   That ain't a good thing, is it?

A.   Nope.

Q.   That's like working for the company store there, isn't it?

A.   Yeah.

Page 58

MR. GERHARDT:  Object to the form.

Q.   You work all season and you owe money at the end of the season, right?

MR. GERHARDT:  Object to the form.

Q.   You can answer.

A.   That's correct.

Q.   Now, do you know what I'm talking about when I say a long route versus a short route?

A.   Yes, I do.

Q.   Okay.  What does that mean for the people on the jury?  What is the difference between a long route and a short route?

A.   Some of them consist of more mileage than others.

Q.   There is a longer distance between the stores?

A.   Right.  In the North and Midwest, you have go longer routes because Montana and Iowa and Ohio and places like

Page 59

that, more distance between towns.

Q.   Okay.  It's basically a matter of the concentration of the stores; is that right?

A.   That's correct.

Q.   I mean, in New Orleans, for example, you might have ten or twelve stores within twenty miles?

A.   That's correct.

Q.   But in Louisiana, other parts of Louisiana, you might have to drive fifty miles between stores, right, or Texas or somewhere like that?

A.   Louisiana about twenty, twenty-five.

Q.   Okay.  Well, and part of your job as a station manager is to try to even up the routes, correct?

A.   That's right.

Q.   I mean, you want -- you know, Home Depot and Lowe's and people are opening stores all the time, you want each salesman to have an opportunity to sell,

Page 60

correct?

A.   That's correct.

Q.   And you want them to have -- well, you wouldn't want to have a salesman with twenty-five stores and another salesman with ten, right?

A.   That's correct.

Q.   You try to get that number closer together, correct?

A.   Try to get the money balancing.

Q.   That's right.  That's right.  And so every year, do y'all -- is that one of the things y'all do at the sales meeting or some other location is y'all try to balance up the routes, even up the routes?

A.   That's up to each station manager.

Q.   Okay.  That's just something you do on your own?

A.   Right.

Q.   Okay.  Charlie, do y'all

15 (Pages 57 to 60)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

---

Page 61

1   have -- some sales organizations, they
2   have promotions or contests or things like
3   that. Do y'all have anything like that?
4      A.   No, sir.
5      Q.   Okay. I mean, you know what
6   I'm talking about, though, right, where
7   somebody can win a trip if they sell so
8   much or something like that?
9      A.   No.
10      Q.   Y'all don't have any awards or
11   anything for salesmen?
12      A.   Nothing. Work. It's a unique
13   business.
14      Q.   Charlie, you live in
15   Louisiana, I'm in Birmingham. I'm not
16   going to have a chance to talk to you
17   again. Is there anything good or bad that
18   you can say about Terry Watson, my
19   client --
20      MR. GERHARDT:  Object to the
21   form.
22      Q.   -- as an employee?
23      A.   Nothing good or bad. Nothing.

---

Page 62

1   I don't have nothing to say --
2      Q.   Okay.
3      A.   -- one way or the other.
4      Q.   Now, I will tell you this,
5   that I've asked for your deposition, and
6   they produced you. And the same law that
7   protects Terry Watson protects you, that
8   is, they can't punish you or take any
9   action against you because you
10   participated in this proceeding, in this
11   hearing. That is, they can't take action
12   against you because you give testimony
13   that they don't like. Do you understand
14   that?
15      A.   I understand.
16      MR. GERHARDT:  Jerry, I
17   object. I can't believe you are even
18   insinuating that either.
19      MR. ROBERSON:  I didn't
20   insinuate anything. Since y'all hadn't
21   bothered to train him, I thought I might
22   ought to.
23      Q.   But do you understand that you

---

Page 63

1   can't be punished for any testimony you
2   give today?
3      MR. GERHARDT:  Object to the
4   form, Jerry. And, again, I can't believe
5   you are asking these questions.
6      A.   (No response.)
7      Q.   Sir?
8      A.   That's correct.
9      Q.   Okay. Mr. Trussell, have you
10   ever got a speeding ticket?
11      A.   Several times.
12      Q.   You know what happens when you
13   break the law, you can be punished, right?
14   You can be fined or have some punishment,
15   correct?
16      A.   That's correct.
17      Q.   Do you think that people,
18   employers that discriminate based on age,
19   which is an illegal activity, do you think
20   they should be punished?
21      MR. GERHARDT:  Object to the
22   form.
23      Q.   You can answer.

---

Page 64

1      A.   They're not discriminating
2   because I'm older than Terry.
3      Q.   You are older than Terry.
4      A.   I'm still working.
5      Q.   You are still working. He's
6   still working. He's still working. For a
7   lot less than he was working for.
8      MR. GERHARDT:  Object to the
9   form, if that's a question.
10      Q.   Do you understand that?
11      MR. GERHARDT:  Object to the
12   form.
13      Q.   Do you understand Terry's
14   compensation has changed since he made his
15   complaint of age discrimination?
16      MR. GERHARDT:  Object to the
17   form.
18      Q.   Are you aware of that? Sir?
19      A.   No.
20      MR. GERHARDT:  He's testified
21   he's not aware of his compensation since
22   he left, I believe.
23      Q.   Can I get an answer to my

16 (Pages 61 to 64)

Toll Free 800.458.6031                    http://www.TylerEaton.com

Page 65

question?  Do you know about his
compensation?
3    A.   I have no -- don't know
4  anything about it.
5    Q.   Okay.  Well, do you know any
6  reason why a route salesmen is transferred
7  when he's doing a satisfactory job?
8        MR. GERHARDT:  Objection.
9    Q.   Do you know why his route is
10 reassigned when he's doing a satisfactory
11 job?
12       MR. GERHARDT:  Object to the
13 form.
14   Q.   You can answer.
15   A.   It happens all the time.
16   Q.   Why does it happen?
17   A.   Just they might need somebody
18 in some other area.  You know, it's no
19 reason.  It's just happens.
20   Q.   Well, you have got to take him
21 off that route to put him somewhere else,
22 don't you?
23   A.   That's correct.

Page 66

1    Q.   Why would you do that?
2        MR. GERHARDT:  Object to the
3  form.
4    A.   I don't know.
5    Q.   I don't either.  Have you ever
6  done that, taken a route salesman that was
7  doing a satisfactory job and send him
8  somewhere else?
9    A.   Yes.
10   Q.   Why?  Why did you do it?
11   A.   For expansion purposes.  I
12 divided my routes up this year, went from
13 three to four.  Took money away from all
14 three of them to make a fourth route.  And
15 it will continue to expand.  It does every
16 year.  Didn't really take anything.  They
17 will have more time to do a better job.
18   Q.   But, I understand what you're
19 saying.
20   A.   Uh-huh.
21   Q.   You had three routes, now you
22 have four?
23   A.   There are four.

Page 67

1    Q.   But you didn't take a salesman
2  that was doing a good job and send him to
3  another territory?
4    A.   I took money away from some
5  that was doing a good job.
6    Q.   You did take money away.  But
7  you didn't transfer him involuntarily, did
8  you?
9        MR. GERHARDT:  Object to the
10 form.
11   Q.   You can answer.
12       MR. GERHARDT:  I don't even
13 know who we are talking about getting --
14 who is this person we're talking about?
15 Who is the "him"?
16       MR. ROBERSON:  Terry Watson.
17       MR. GERHARDT:  I didn't know
18 if you were asking about Mr. Watson
19 because you have been going back and forth
20 about generalities, and sometimes I guess
21 trying to imply that this may have to do
22 with Mr. Watson.
23       MR. ROBERSON:  No, I'm asking

Page 68

1  him if he has ever transferred a route
2  salesman who was meeting his sales goals
3  to another route.
4    Q.   And his answer is?
5    A.   It has -- it has been done.
6    Q.   Have you ever done it, Mr.
7  Trussell?
8    A.   No, I haven't.  Haven't had to
9  yet.
10   Q.   Thank you.  And you don't know
11 any reason why it would be done, correct?
12       MR. GERHARDT:  Object to the
13 form.
14   Q.   Sir?  You don't know any
15 reason why you would transfer somebody
16 that was doing a satisfactory job to
17 another territory, do you?
18       MR. GERHARDT:  That's been
19 asked and answered.  And one of the
20 reasons -- I know one reason he gave was
21 for expansion purposes.  That's one of the
22 reasons.
23       MR. ROBERSON:  He tried to give

17 (Pages 65 to 68)

Page 69

1 it, but we have eliminated that because he
2 said that's what he did on his route, but
3 he didn't transfer anybody.  He created an
4 additional route, but he didn't transfer
5 anybody, correct?
6     A.   That's correct.
7     Q.   And you hadn't and you don't
8 know why anyone would be transferred under
9 those circumstances, correct?
10     MR. GERHARDT:  Object to the
11 form.
12     Q.   You can answer.
13     A.   I don't really know.
14     MR. ROBERSON:  Okay.  Thank
15 you, Mr. Trussell.  I don't have any
16 further questions.  Do you have any?  I'm
17 at fifty-three minutes.  I need to change
18 tapes if you are going to have some
19 questions.
20     MR. GERHARDT:  I might have a
21 few if you want to stop now and take a
22 quick break.
23     MR. ROBERSON:  Okay.  Let's

Page 70

1 just go off the record and let me change
2 tapes.  We'll go off the record at 2:10.
3     (Whereupon, a break was had
4     from 2:10 p.m. until 2:15 p.m.)
5     MR. ROBERSON:  All right.
6 We'll start tape two of the videotape
7 deposition of Charlie Trussell at 2:15.
8
9 EXAMINATION BY MR. GERHARDT:
10     Q.   This will be very short.  Mr.
11 Trussell, I know you testified a little
12 bit earlier, and I think you were joking,
13 but just to make sure, just to clear that
14 up, will you tell me what it is that you
15 all do at the annual sales meeting?
16     A.   We go over the projected sales
17 for the upcoming year to see what our
18 increases can be.  We'll go over
19 different -- I'm trying to think of --
20 like trucks and logbooks and all this, we
21 have changes in that, and we'll meet and
22 have a little meeting on it.  And the
23 biggest, biggest thing about it, though,

Page 71

1 is we'll have the projected sales.  That's
2 the number one thing.  What each man
3 thinks he can do, we'll have him put it
4 down on a piece of paper.  And as a
5 station manager, I go over it and look at
6 it and we try to have an increase every
7 year.  In my fifty years of business, I've
8 never had a decrease.
9     MR. GERHARDT:  Thank you.
10 Jerry, that's all I've got.
11     MR. ROBERSON:  I didn't have
12 to change tapes for that.  I don't have
13 anything else.  Thank you, Mr. Trussell.
14 I appreciate your help today.
15
16     FURTHER THE DEPONENT SAITH NOT

Page 72

1              C E R T I F I C A T E
2
3 STATE OF ALABAMA)
4 JEFFERSON COUNTY)
5
6     I hereby certify that the
7 above and foregoing deposition was taken
8 down by me in stenotypy, and the questions
9 and answers thereto were reduced to
10 typewriting under my supervision, and that
11 the foregoing represents a true and
12 correct transcript of the deposition given
13 by said witness upon said hearing.
14     I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action, nor am I in anywise
17 interested in the result of said cause.
18
19
20
21
22
23     COMMISSIONER - NOTARY PUBLIC
     ACCR LICENSE NO. 278

18 (Pages 69 to 72)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

## A

ability
47:13 48:9
able
29:18 46:22 47:6 48:13
48:16
accounts
39:15 40:22 42:2 44:20
ACCR
72:23
acquired
9:4
acting
4:4
action
1:5 35:22 62:9,11 72:11
activity
35:14 63:19
actual
14:21 56:14
additional
69:4
adverse
35:22
affect
47:12
age
25:20 32:19 34:6,12,20
35:3,8,12,23 36:8,15
63:18 64:15
ago
39:6
agree
33:9 34:4,12
AGREED
2:3
agreement
38:6
ain't
27:12 57:18
Alabama
1:2,10 3:8,15 4:3,4,12,22
5:4,5 10:3 31:18 43:6
72:4
annual
30:16 35:7 70:15
answer
6:23 7:10 24:12 27:2
33:6,13 34:9,16 35:17
36:4,12 40:20 41:17
57:4 58:7 63:23 64:23
65:14 67:11 68:4 69:12
answered
68:19
answers
72:10
anybody
10:9 30:1 33:15 36:14,21
38:18 45:2 55:18,22
69:3,5

anymore
46:2 53:11
anyway
51:17
anywise
72:17
apologize
47:7
applied
24:20
appreciate
71:14
approval
25:3,4,11,13
Approximately
24:1
April
1:19 4:12,20
area
17:1,2,2 65:18
arrangement
19:1 38:3
Arthur
1:7 5:1,4
asked
29:11 62:5 68:19
asking
6:22 7:7,12 28:17 47:8
56:11 63:5 67:18,23
assign
2:20
assigned
29:10 37:4 39:8 40:3
assume
7:11 15:20 30:19 37:2,23
42:17
assuming
42:17
attention
26:22
attorney
3:5,12 4:23
attorneys
27:21
Auburn
31:19,21 32:5
audibly
6:23
August
16:5,6
available
56:19
average
15:13
awards
61:10
aware
38:2,4,5 64:18,21

## B

back
9:23 20:4 46:14 67:19
bad
61:17,23
balance
60:16
balancing
60:11
Bank
12:21 13:1
bar
19:20,22
based
63:18
basically
42:6 44:19 47:1 59:2
basis
19:12 20:15
Baton
12:22 17:1
bearing
51:21
believe
62:17 63:4 64:22
Bells
30:2
best
43:7
better
66:17
big
32:4
biggest
70:23,23
Birmingham
3:8,15 4:3,11,22 61:15
bit
70:12
blood
47:9,11
Bonnie
1:11 5:7 8:1,16,22 9:4,8
9:11,18,19,21 11:9 12:4
13:3,10,15,19 16:14 17:6
17:12,14 25:16 27:7,22
31:3 35:7 39:19,21
47:4 51:10 53:17
bothered
62:21
bought
21:7
Box
3:7
boy
29:17
break
63:13 69:22 70:3
brother
11:23 12:1
brothers
10:12,12,16

Bullock
10:4
burning
41:12
Burr
3:13 4:10,21 5:11
business
5:6 9:14,15,15,22 10:7
13:6,7,7 41:1 44:22
61:13 71:7
businesses
40:15

## C

C
3:1 72:1,1
call
12:23 15:7 29:6 38:13
53:10 54:11
called
29:11 40:15 43:2,4,19
44:20
card
54:23 55:4
career
25:16
case
5:2 6:10
cause
4:14 72:18
CDL
54:5
Center
31:19
cents
20:18
certain
17:6 49:1 50:9 51:6 52:6
52:11 54:7
certainly
44:8
Certified
1:22 2:8 4:2
certify
4:5 72:7,15
chain
52:21 53:7
chance
61:16
change
69:17 70:1 71:12
changed
53:8 64:14
changes
49:7 70:21
charge
14:20 38:7
charged
38:10
charge-back

52:8
Charlie
1:18 2:6 4:13,19 5:13,19
7:20 60:23 61:14 70:7
check
38:1 41:8,9,20
choose
24:21
circumstances
69:9
city
12:5,20
Civil
1:5 4:7
clear
70:13
client
61:19
clock
55:9
closer
60:9
code
19:20,22
college
40:6
come
21:10 24:8,16,19 51:7
commencing
4:12
commission
37:9,11,13 48:21,23 49:2
49:7,22 50:4,11,18
56:22 57:6,8,14
Commissioner
2:8 4:5 72:22
commissions
37:17 51:5,7,23
companies
17:21
company
8:2 23:7 24:5 30:10,13
40:13 46:1 57:22
compensation
38:3 50:23 57:1 64:14,21
65:2
complained
36:15
complains
35:12
complaint
35:23 36:8 64:15
compliance
2:13
computer
19:21
concentration
59:3
condition
47:6
Conference

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

31:19
consider
41:18
considers
35:14
consignment
19:12 20:15
consist
58:17
containers
14:17
contests
61:2
continental
31:5
continue
47:23 66:15
conversation
7:3 29:15
Cooperative
1:10 5:6
correct
7:15,19 8:3,4,9,10,12,13
 8:16,19,20 9:5 10:6
 13:7,8,12,13 14:6,9,18
 14:19,23 15:3,23 16:8
 18:8,11,16 19:13,16,17
 20:9,13,15,16 21:9,23
 26:15,18,19,22 27:10,17
 27:18 28:2,7 30:20
 31:5,6,9 37:7 42:8,10
 42:13 43:15 44:15,18
 45:1,20 48:8,14,17,21
 48:22 49:2,3,8 50:16
 50:20,21 51:2,8,9,11,12
 51:19,20 52:1,4,5,22
 53:1,4,19,20,22,23 54:2
 54:3 57:8,9,13,17 58:8
 59:5,9,18 60:1,2,7,9
 63:8,15,16 65:23 68:11
 69:5,6,9 72:13
cost
51:11
costs
52:6
counsel
2:5,17,19 4:9 5:8 6:21
 72:16
County
10:5 72:5
couple
39:13
course
32:1
Court
1:1 2:14 4:8 5:3
courtroom
7:18
cousin
10:23
created

69:3
credit
20:4
criticism
44:2
customer
26:22
customers
8:19 38:13
CV2-07-520
5:7

D

D
3:4
daddy
11:2
Dakotas
23:14
date
4:6
dates
28:22
daughter
39:3
day
46:23 54:1
days
38:20 53:16
December
16:3,9
decrease
71:8
deducted
52:7
defendant
3:10 5:7,12
Defendants
1:12
definition
34:1
degree
40:6
Dennis
17:11 18:13
Depending
21:4,5
deponent
5:16 71:16
deposition
1:16 2:6,11,12,22 4:19
 6:18 27:20 36:19,22
 62:5 70:7 72:8,13
depositions
2:15
Depot
8:15 20:3 52:22 59:21
describing
48:4
details

43:22
devices
53:18
difference
58:15
differences
46:18
different
24:15 52:16 56:12 70:19
disciplinary
44:10
disciplined
55:21
discriminate
34:5 63:18
discriminated
34:11
discriminating
64:1
discrimination
34:13,20 35:3,8,13,23
 36:9,16 64:15
distance
58:19 59:1
district
1:1,2 4:8 5:3,3 17:6
divide
17:21
divided
66:12
Division
1:3 5:4
document
29:2
documents
28:19,21
doing
5:6 44:14,14 45:3 47:1
 47:23 65:7,10 66:7
 67:2,5 68:16
dollars
32:17 49:6,20
Donaldsonville
12:17 13:4,21 14:5,12
 15:19 16:2,15,19 18:10
 21:22 26:1 28:12 36:7
 37:4,18 38:14 40:4,17
door
20:8
dozen
25:17
draw
37:22 57:7,12,15
drive
54:5,17 59:11
driver
56:8,13
driver's
55:2,3
drug
55:6

duly
5:20
D/B/A
1:11

E

E
3:1,1 72:1,1
earlier
70:12
early
24:3 38:20
earn
27:7
easier
48:5
easy
27:12
effect
2:13 20:12 53:11
eight
20:23 21:1,2,11,12,13,13,16
 21:19 26:8,9 38:19
either
21:17,19 24:16 62:18 66:5
Eleanor
1:21 2:7 4:1
element
56:23
eliminated
69:1
employee
61:22
employees
16:14 48:17
employer
35:21
employers
63:18
employment
13:15
Eufaula
31:22
everybody
48:11
evidence
2:23
examination
3:20,22,23 4:15 6:6 70:9
examined
5:20
example
52:7 59:7
exceed
57:15
excellent
47:5
excuse
9:12
expand

66:15
expansion
66:11 68:21
expenses
51:6
explain
13:22 46:17

F

F
72:1
fact
30:15 52:20
fair
7:3,4 27:8 51:3,4
fall
13:12 16:7
familiar
28:18
family
9:10,13
far
38:17
Farm
9:9,18 47:5
Farmers
1:10 5:5
Farms
1:11 5:7 8:1 9:17
February
28:6,8,10
Federal
4:6
feel
44:21 56:20
fertilize
48:10
fifties
24:3
fifty
8:23 59:12 71:7
fifty-three
69:17
figures
49:17
financial
52:17
fine
6:4 52:12
fined
53:3 63:14
fines
52:9,11
fire
25:8
fired
55:18
first
5:20 10:23 23:5 28:15
five

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

15:14 18:7
flat
20:18,18,20,21,22 21:10,14
  21:16 49:13 51:16
flats
19:4
flowering
8:12
folks
15:11 18:9
following
4:15
follows
5:21
force
2:13
foregoing
4:8 72:8,12
form
2:18 24:11 27:1,16 33:1,5
  33:12 34:8,15,22 35:16
  36:3,11 37:1 40:19
  41:16 42:15 44:17 45:8
  51:14 52:3 57:3 58:2,6
  61:21 63:4,22 64:9,12
  64:17 65:13 66:3 67:10
  68:13 69:11
Forman
3:13 4:10,21 5:11
forth
67:19
forties
24:2
forty-eight
31:4
forty-five
23:23
Forty-four
23:23
found
39:13 42:19
four
9:9,17 10:2,11 12:2 16:16
  16:16,19,20 18:6,6 21:21
  22:1 53:15 55:14,16
  66:13,22,23
fourteen
50:3,12,14
fourth
66:14
full
2:13
further
69:16 71:16 72:15
future
42:11

_____ G _____

garnered
44:22

gas
41:12
generalities
67:20
gentlemen
22:15
geographically
17:21
geography
16:22
Gerhardt
3:11,23 5:10,10 6:3 24:10
  26:23 27:15 32:23
  33:4,11 34:7,14,21
  35:15 36:2,10,23 40:18
  41:15 42:14 44:16 45:7
  51:13 52:2 57:2 58:1,5
  61:20 62:16 63:3,21
  64:8,11,16,20 65:8,12
  66:2 67:9,12,17 68:12
  68:18 69:10,20 70:9
  71:9
getting
67:13
give
29:13 62:12 63:2 68:23
given
6:17 72:13
giving
36:19,22
Glenn
11:4,5,6,15
go
8:14 17:5 25:1 30:18,19
  45:9 52:20 53:2 58:22
  70:1,2,16,18 71:5
goal
49:1 50:2,18 51:1
goals
68:2
goes
6:9
going
6:21 7:5,10 27:12 42:4
  43:5,12,13 47:22 49:16
  50:11,18 61:16 67:19
  69:18
golf
32:1
good
27:9 33:7,17 41:13,18
  47:20 57:18 61:17,23
  67:2,5
GPS
53:18 56:14
Graham
3:11 5:10
greenhouse
15:1,8,10 16:13
greenhouses
15:5

grew
9:13
grounds
2:21
grow
14:7,17 19:4,6 48:10,14
growers
18:7
growing
14:1,21 15:9,16,18,20 16:1
  47:2
grown
14:16
guess
56:20 67:20
guys
38:15

_____ H _____

half
28:6,14
halfway
12:21
happen
65:16
happened
42:23 43:1
happens
63:12 65:15,19
hard
26:20 27:4
head
7:1
health
47:9 54:23
healthy
47:22
hearing
62:11 72:14
heart
47:17 48:2
help
28:22 33:17 34:4 38:18
  71:14
helper
37:5,6,12 51:23 54:17
  55:7
helpers
14:3 16:17 18:6
high
47:9,11
hire
23:20,21 24:14,15,21 25:2
hired
24:7,20 25:15,20
home
8:14 20:2 24:16 52:22
  59:21
hope
46:13 51:17

hotel
31:16
hours
27:4 54:1,8,13 55:11,22
  56:4,5
huh-uh
7:2 18:1
hundred
32:16,20 49:5,19 50:2
hustle
33:2

_____ I _____

Ian
22:12 23:2,6
Ian's
23:4
idea
38:12
illegal
34:5,13 63:19
imply
67:21
important
50:22 56:23,23
incentive
52:17
increase
50:6 71:6
increases
70:18
INDEX
3:20
individual
21:17,19
information
56:12
insinuate
62:20
insinuating
62:18
instructions
18:13
insurance
29:18
interested
72:18
invited
31:13
involuntarily
67:7
Iowa
58:23
I-a-n
22:12

_____ J _____

Jasper
43:6,9,11,18,21 45:20
Jeff

22:5,10,19
JEFFERSON
72:5
Jerry
3:4 4:23 6:7 62:16 63:4
  71:10
job
24:20 26:17,20 37:3
  44:2,5 46:19 48:4,5
  59:17 65:7,11 66:7,17
  67:2,5 68:16
Joe
29:11,15,16,19 43:4,18,19
  45:16,17
Joey
22:3,19 45:17
John
10:19,20 11:13
joking
70:12
Jones
22:13 23:16,22
July
16:3,9
jury
58:14

_____ K _____

keep
29:17
Kentucky
46:4
kin
72:16
kind
19:20 29:2 32:6 41:5
  44:9 52:8
knew
30:12 42:3
know
6:10,20 12:18 18:4,22
  19:1 28:3,8,11 29:8,23
  30:1,4,5,9,14 32:14,18
  32:20,22 33:19,20
  35:11,17,19,20 36:1,5,6
  36:9,18,21 37:19 38:5
  38:10,22 40:14 42:19
  43:21 49:9,12 50:7
  52:9 53:13,21 54:1
  56:5 58:9 59:20 61:5
  63:12 65:1,3,5,9,18
  66:4 67:13,17 68:10,14
  68:20 69:8,13 70:11
knowing
6:13
knowledge
38:17 39:14

_____ L _____

L

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

CHARLIE TRUSSELL
April 1, 2008

2:1
label
19:20
labor
15:10 16:13 18:18 33:8
47:2 48:7
Lafayette
17:2
Lake
31:22
Large
4:4
law
3:5,12 4:10,21 35:13,20
54:14 62:6 63:13
laws
2:14
lawsuit
37:2
lawyer
10:21
leading
2:19
left
11:17,18,20 28:11,15 39:16
43:21 45:11,12 64:22
legal
54:7,19 55:3
let's
48:1 49:21 50:3 69:23
level
49:1
license
55:2,3 72:23
life
9:1,16
liquored
32:12,13
literature
35:9
little
34:4 40:13 70:11,22
live
61:14
LLP
3:13 4:11
located
10:2 12:5,16,20
location
15:22 28:23 60:15
log
54:14 56:14
logbook
52:14 54:12 55:19 56:6
logbooks
70:20
long
6:13 8:21 13:2 26:6 27:4
30:13 42:4 47:22 58:10
58:15
longer

58:19,22
look
56:6 71:5
lot
17:20 26:21 33:17 44:22
48:11 64:7
Louisiana
12:17,19 17:3 23:10 59:10
59:11,14 61:15
Lowe's
8:14 20:2 52:22 59:21
Lowman
38:22 39:7

_____

**M**

making
51:15
man
43:6 71:2
manage
14:2 18:5 48:17 51:11
managed
44:1
manager
13:20,23 14:14 17:14 26:3
26:5,7 41:13,18 45:20
46:3,20 47:1 48:6
59:17 60:19 71:5
managers
30:19
managing
47:2
March
28:16
marigolds
21:8
married
39:3,4,5
materials
35:6
matter
55:15,17 59:2
ma'am
5:17
mean
8:8,8 12:5 14:7 16:18
24:18 25:7 26:11 27:6
27:11 29:7 33:19,22
45:17 46:8 52:13 58:13
59:6,20 61:5
means
33:20
medical
55:4
medication
47:15,16
meet
31:17,18 50:1,17 51:1
70:21
meeting

30:16 31:20 32:7 46:11
60:15 68:2 70:15,22
meetings
31:2 35:7 46:9
meets
50:11
men
37:15
merged
9:10,23
middle
1:2 5:3 24:2
Midwest
58:22
mighty
29:19
Mike
22:12 23:16,22
Mike's
23:5
mileage
58:18
miles
30:8 59:8,12
Mills
22:12 23:3,6
minutes
69:17
Mississippi
26:2
Missouri
23:13
momma
39:4,5
money
27:7 57:15 58:4 60:10
66:13 67:4,6
Montana
58:23
move
32:4
moving
53:22

_____

**N**

N
2:1 3:1
name
4:22 5:9 6:7
named
11:8
names
10:15
Nashville
30:6
near
14:12 30:6 38:13
necessary
2:16 54:22 56:21
need

6:23 18:17 65:17 69:17
needed
29:16 43:17
neither
72:16
never
37:23 44:12 71:8
new
12:22 17:1 23:17,18,19,20
23:21 38:14 39:20 42:2
45:13 59:6
nice
29:19
nine
21:12
nines
21:13
nineteen
21:3,18
nod
7:1
Nope
54:6 57:20
normal
7:3
normally
16:2
north
4:21 30:7 58:21
Northern
1:3 5:4
Notary
1:23 2:9 4:3 72:22
November
16:5,6
number
19:3 21:5 60:8 71:2

_____

**O**

O
2:1
oath
7:15
object
24:10 26:23 27:15 32:23
33:4,11 34:7,14,21
35:15 36:2,10,23 40:18
41:15 42:14 44:16 45:7
51:13 52:2 57:2 58:1,5
61:20 62:17 63:3,21
64:8,11,16 65:12 66:2
67:9 68:12 69:10
objecting
24:13
Objection
65:8
objections
2:17,20
objects
33:14

Obviously
48:13
occasion
44:9
offered
2:22
office
12:9 14:11,13 24:17 25:2
29:4
offices
4:10,21
oh
8:23 21:13 25:18 39:5
40:9 45:22 56:18
Ohio
58:23
okay
7:8,9,12,13,20 8:18 9:2,6
9:20 10:18 11:1,3,11,19
12:3,8 13:2,18 14:4,15
15:4,7,11 16:4,12 17:4
18:5,12 19:5 20:1,10,14
20:17 21:7,15,20 22:9
22:11,18,21 23:11 24:4,7
24:18,23 25:10,19,22
26:10 27:6,11 28:17,20
29:9,14 30:1,9 31:14
33:18 34:3 35:11 38:2
39:7 43:16 44:19 45:15
46:5,16 47:14 48:1
49:14,18,22,23 50:10
55:5,12 56:18,22 58:13
59:2,16 60:20,23 61:5
62:2 63:9 65:5 69:14
69:23
old
7:20 23:22 40:8
older
34:10,17 64:2,3
once
25:2 31:11,11
open
38:14 42:2
opened
39:15 40:23
opening
59:22
operate
54:9
operating
56:4,6
opportunity
59:23
oral
4:14
orally
44:12
organizations
61:1
originally
9:19

Page 76

Orleans
12:22 17:2 59:6

ought
62:22

oversee
14:1

owe
57:15 58:4

owned
9:10

**P**

P
2:1 3:1,1

packs
21:12,13,16

PAGE
3:21

Pageant
45:18,19

paid
19:2,3,5 20:6,20 37:21
48:19 49:13 50:11 57:5

paper
71:4

paperwork
54:22

Parker
22:5,10,19

part
17:4,5 59:16

participated
62:10

parties
2:4,20 72:17

partners
10:9

parts
59:10

party
5:9 32:11

pass
55:6

passed
35:6,9

Paulk
11:4,6

pay
20:6 26:22 39:11 42:20
51:6,23 57:11

payroll
29:17 42:18

pending
5:2

people
10:14 11:7 13:9 15:8,13
24:8,19 37:8,10 58:14
59:21 63:17

percent
49:22 50:4,13,14

percentage
49:10 51:15

performance
44:3,5

performing
44:6

period
20:10 27:22 28:4

person
27:4 35:22 48:1,2 67:14

Pete
10:17

Pete's
11:11

physical
14:21 27:3 46:22 47:3,5
48:7

physically
19:14

pick
8:15 20:5

Pickett
1:21 2:7 4:1

piece
71:4

Pitt
38:22 39:7 40:2,8,15

Pitts
39:12,15,18,20

places
58:23

plaintiff
1:8 3:3 5:1,5 6:10

plant
1:11 5:7 8:16,22 9:4,9,15
9:17,18 13:6 17:7,12,15
20:1 21:4 25:16 27:7
27:22 31:4 35:7 39:19
39:21 47:5 51:10 53:17

plants
8:3,6,8,12,15 14:2,8,16,22
19:11 21:6,11,18,19
32:17 40:16 48:10,14

playing
41:10

please
5:17 7:7

Point
31:23

policies
35:8

position
13:19 42:6,7 45:6

present
34:2

pressure
47:9,12

pretty
28:16 41:18

previous
53:13

printed
56:3

prior
2:23

probably
6:15 8:16 29:4 35:10

problem
47:18

problems
47:9 48:2

Procedure
4:7

proceeding
62:10

proceedings
4:16

produced
62:6

program
53:9,10

programs
32:8

prohibits
35:21

projected
70:16 71:1

promotions
61:2

properly
52:15

protected
35:14

protects
62:7,7

provide
41:4

provided
4:6

Public
1:23 2:19 4:3 72:22

punish
62:8

punished
63:1,13,20

punishment
63:14

purposes
66:11 68:21

put
14:16 31:15 32:7 65:21
71:3

p.m
4:13,13 70:4,4

P.O
3:7

**Q**

question
64:9 65:1

questions
44:5

2:18,19 6:22 7:6 63:5
69:16,19 72:9

quick
69:22

quit
43:7,10

**R**

R
3:1 72:1

range
15:13

reach
49:1

read
35:10

reading
2:11

really
42:2,9 43:20 44:5 66:16
69:13

reason
27:20 41:22 47:21 65:6
65:19 68:11,15,20

reasons
68:20,22

reassigned
65:10

receive
37:16,20 39:10

recollection
43:8

record
5:8 24:13 33:14 70:1,2

reduced
72:10

regarding
35:8

region
17:6,22

relating
2:15

remember
9:12 28:15 29:14 43:8,19
43:22 45:13

remind
12:13

rephrase
7:8

replace
43:12

replaced
45:3

report
17:10,11 18:14,18,19,20
41:5

reported
1:21 28:1 44:1,12

Reporter
1:22 2:8 4:2 5:23

reports
56:2,9,13

represent
5:9 6:8

representing
5:11

represents
72:12

requirements
54:8

respective
2:5

response
63:6

result
72:18

results
18:14

retaliation
33:19

retired
11:10,11,12,13,14,15,16

riding
41:3,11,12 42:1

right
5:15 7:14,16 10:4 14:10
16:11 17:19 18:21 19:10
20:9 21:1,20 22:2,4,6
22:14 23:2,15 24:6
25:4,6,14 26:16,16 27:9
27:14 28:10 34:1 42:8
42:10,22 43:11,15 48:15
48:18 49:16 50:19
51:16 52:19 53:5 54:5
55:1 56:10 57:12 58:4
58:21 59:4,12,19 60:6
60:12,12,22 61:6 63:13
70:5

risk
51:22

river
12:23

Roberson
3:4,6,6,22 4:18,23 5:15
6:2,6,8 62:19 67:16,23
68:23 69:14,23 70:5
71:11

rode
38:15,18 39:9

room
31:15

Rouge
12:22 17:1

route
16:16 18:6 26:11,13 37:5
37:6,12,15 43:9,14
46:18,19,21 47:4 48:7
49:12 51:22 52:7 57:1
58:10,11,15,16 65:6,9,21
66:6,14 68:1,3 69:2,4

routes

14:3  16:19,20,23  52:23
58:22  59:18  60:16,17
66:12,21
rule
33:15
rules
2:14  4:6
run
16:20,23
running
48:11  49:11  53:22

_____ S _____

S
1:21  2:1,7  3:1  4:1
SAITH
71:16
salary
18:23  19:2
sales
15:21  18:14  19:15  30:16
31:1  32:7  40:10  49:1
50:12  51:1,22  60:14
61:1  68:2  70:15,16  71:1
salesman
23:9  26:12  40:1,3  43:9
46:19,21  47:4  48:8
51:21  52:12  59:23  60:4
60:6  66:6  67:1  68:2
salesmen
14:2  16:16  18:6  21:21
22:1  24:7,9,14  25:8,15
25:23  26:13  27:6  30:18
31:7  48:20,20  50:10,23
54:2  55:8  57:1  61:11
65:6
Sam
11:4,15
satisfactory
65:7,10  66:7  68:16
saw
37:23  46:10
saying
66:19
scan
19:8,9,19,23  20:6
scanned
19:21  20:7
season
13:5,11,12  15:15,16,18,20
15:21  16:1,7,10  20:11
28:9  32:15  38:20  57:12
58:3,4
seasonal
13:7
seasonally
13:16
second
23:4,7,10
see

46:17  49:15  70:17
seeding
14:1  15:9
seen
30:21  46:8  49:5
sell
8:5,9,11  13:10  19:8,9,10
20:8  21:8  26:11  40:16
50:8  51:16  59:23  61:7
sells
8:3  31:4
send
29:12  42:19  43:5  56:7
66:7  67:2
Senora
46:4
sense
26:21  50:4
settle
20:12  57:11
seven
25:18  26:8  38:19
seventeen
21:2,18
seventy-five
49:6,20  50:2,13,15
short
27:22  42:13  43:23  44:23
58:11,16  70:10
Shorthand
1:22  2:8  4:2
show
53:6,14
shrubs
8:11
side
12:23
signature
2:10
sir
6:19  12:15,18  18:4  22:17
25:12,21  28:17  33:22
34:19,23  35:18  36:13,17
39:18  47:19  53:17
55:20,23  61:4  63:7
64:18  68:14
six
25:18
sixty
25:20  30:8
sixty-one
32:19
Sixty-six
7:22
skip
53:9,10
sold
14:17,18  19:11  20:2  32:16
32:19
somebody
9:3  34:6  35:12  61:7

65:17  68:15
son-in-law
45:10
sorry
11:5
southern
17:22
southwest
17:3
specifically
18:22
speeding
63:10
spoke
46:11
spray
48:10
spring
13:11  16:10  28:9  32:15
Springs
10:3,22  12:7  17:17,18
29:4  56:7,17
staff
14:11  19:15
stage
15:9
start
70:6
started
9:22  10:7
state
4:4  5:8  72:4
statement
27:8  51:3
states
1:1  4:7  5:2  31:4,8
station
13:20,23  14:4  19:4  26:3
26:5,7  30:19  39:11
45:19  46:3,19  47:1
48:6,11  59:17  60:18
71:5
stations
50:9
stay
14:14
staying
47:21
stenotypy
72:9
stepson
39:2  41:21
Stewart
29:11  43:4
STIPULATED
2:3
stipulation
4:9
stipulations
6:1
stock

19:15,18
stop
69:21
store
57:22
stores
19:16,23  38:14  39:13
52:21  53:7  58:20  59:3
59:8,12,22  60:5
Street
4:22
styled
5:4
supervised
27:23
supervision
72:11
sure
25:5  28:16  31:3  46:13
70:13
swear
5:16
swom
5:20

_____ T _____

T
1:7  2:1,1  5:1  72:1,1
take
18:12  43:13  47:14,16  62:8
62:11  65:20  66:16  67:1
67:6  69:21
taken
2:7  66:6  72:8
takes
20:10  57:10
talk
61:16
talking
52:9  58:10  61:6  67:13,14
tape
70:6
tapes
69:18  70:2  71:12
tell
6:20  7:7  10:14  12:19
29:21  34:3  43:16  62:4
70:14
ten
21:19  38:19  49:21  59:7
60:6
Tennessee
30:2
terms
16:22  50:22
territory
23:14  67:3  68:17
Terry
6:8,11  26:14  27:23  29:9
29:21  30:9,12  32:16

34:17  36:6,15  37:16
38:21  39:8  40:14  42:16
43:1,13,17,20  44:1  45:11
45:16  46:6  61:18  62:7
64:2,3  67:16
Terry's
64:13
test
55:6
testified
5:21  64:20  70:11
testimony
62:12  63:1
Texas
59:13
Thank
68:10  69:14  71:9,13
thereto
2:23  72:10
thing
57:18  70:23  71:2
things
18:15  32:6,8  52:16  60:14
61:2
think
28:7  33:21,23  34:1  39:20
40:21,22  41:19  43:4
49:4  63:17,19  70:12,19
thinks
71:3
third
13:5
thirty
40:9
thirty-one
40:9
Thomas
17:11  18:13
thought
29:19  37:14  62:21
thousand
32:17,20  49:6,20  50:3
three
22:22,23  28:6,14  32:16
32:20  38:16  39:17
42:23  49:5,19  50:2,13
50:14  55:14,16  66:13,14
66:21
throw
49:16
ticket
63:10
tickets
52:15
Tim
11:21  12:3
time
2:21,22  7:2  20:11  22:16
24:18,19  26:10  27:23
24:30:22,22  34:2
37:17  42:13  43:23  44:7

Page 78

44:23  45:12,21,22,23
46:10  47:4  55:13  57:11
59:22  65:15  66:17

**times**
17:20  46:23  63:11

**Tim's**
11:20

**today**
4:20  6:20,21  7:15  36:19
63:2  71:14

**told**
27:21  29:12  36:14,21

**touch**
43:17

**Tower**
3:14  4:11

**towns**
59:1

**train**
62:21

**trained**
35:2

**training**
32:8  34:20

**transcript**
72:13

**transfer**
28:23  67:7  68:15  69:3,4

**transferred**
36:7  65:6  68:1  69:8

**tray**
20:22  21:1,1,2,2,6

**trial**
2:21

**tried**
40:15  68:23

**trip**
61:7

**trips**
38:16

**truck**
38:16  53:21  54:5,18

**trucking**
40:13

**trucks**
53:18  56:3  70:20

**true**
72:12

**Trussell**
1:18  2:6  4:13,19  5:13,14
5:19  6:7  10:17  13:22
17:10  18:21  27:21  33:18
41:14  46:16  63:9  68:7
69:15  70:7,11  71:13

**try**
7:7  12:13  29:13,17  38:14
59:17  60:8,10,16  71:6

**trying**
33:23  42:1  49:14  67:21
70:19

**Tupelo**

26:2  30:7

**turn**
20:4  52:15

**twelve**
59:7

**twenty**
6:15  24:5  30:11  55:10
59:8,14

**twenty-five**
59:15  60:5

**twenty-one**
55:10

**Twice**
53:15

**two**
22:20  28:5,13  38:16
39:14,16  40:22,23
42:23  70:6

**typewriting**
72:11

---

**U**

**U**
2:1

**uh-huh**
7:1  12:10  66:20

**uncles**
10:13

**understand**
7:6,14  62:13,15,23  64:10
64:13  66:18

**understanding**
49:15

**understood**
7:11  27:19

**Union**
10:3,21  12:7  17:16,18
29:4  56:7,17

**unique**
61:12

**United**
1:1  4:7  5:2

**upcoming**
70:17

**Usual**
5:23

**U.S**
31:5

---

**V**

**varies**
15:21  24:17

**Vaughn**
22:3,19

**vegetables**
8:9

**vehicle**
46:23

**versus**
5:5  58:11

**video**
1:16  2:5

**videotape**
4:19  70:6

**violation**
55:19

**vs**
1:9

**V-a-u-g-h-n**
22:7,8

---

**W**

**Wachovia**
3:14  4:11

**waived**
2:12

**walked**
46:11

**want**
18:22,23  27:11  59:20,22
60:3,4  69:21

**wanted**
42:19

**wasn't**
28:13  38:4,5  42:3,3,5,11
44:5,14  45:2

**Waters**
10:19,20  11:4,13

**Watson**
1:7  5:1,5  6:9  26:14
27:23  30:10  32:16  36:7
36:15  37:3,16  39:8
42:16  45:17  46:6  61:18
62:7  67:16,18,22

**Watson's**
45:17

**way**
9:9,17  10:2,11  12:2  44:10
57:5  62:3

**ways**
24:15

**week**
53:15  54:13

**weeks**
28:6,14  39:17  40:23
42:23

**went**
39:12  40:21  41:6  43:21
45:13,16  66:12

**weren't**
38:2

**West**
12:21,22,23

**we'll**
70:2,6,18,21  71:1,3

**we're**
39:14  67:14

**wife**
14:13  16:13  18:7

**win**

61:7

**withdrew**
9:21

**witness**
2:11  4:14  5:17  72:14

**words**
17:9,20  55:15

**work**
7:23  9:2,6  12:3,15  13:9
13:10,11,12,15,17  15:8,12
15:15,17  16:14  18:9  19:1
20:19  21:21  23:11
25:23  27:3,5  33:10
37:8,10,15  39:8  42:7
45:5  46:22  47:3,6
54:13  55:8,15  58:3
61:12

**worked**
9:8,9  23:13  30:10,12
37:18  40:2,10,12  43:20
44:20

**working**
8:22  13:3  22:15  29:22
39:14,18  40:16  46:18
47:12  54:2  55:22  57:21
64:4,5,6,6,7

**works**
12:8

**worth**
32:17

**wouldn't**
60:4

**write**
44:9

**written**
35:5  36:8

---

**Y**

**yeah**
11:22  12:1  14:13  29:16
30:12,23  32:2  39:22
51:18  54:16  57:17,23

**year**
23:4,5,7,10  31:11  32:15
53:9,12  60:13  66:12,16
70:17  71:7

**years**
6:16  8:23  22:22  23:1
24:5  26:8,9  30:11  39:6
53:13  71:7

**year-round**
13:14,17

**York**
39:20  45:14

**younger**
12:1

**y'all**
15:1,12  18:2  20:11  21:8
24:13  30:15  31:10,17,17
32:7,7,10  35:5  44:22

61:7
57:11,15  60:13,14,15,23
61:3,10  62:20

**y'all's**
28:18

---

**1**

**1**
1:19  4:12

**1st**
4:20

**1:15**
4:13

**1:16**
4:13

---

**2**

2:07-CV-520-WHA
1:5

**2:10**
70:2,4

**2:15**
70:4,7

**20th**
4:22

**2005**
32:15,15

**2006**
28:6,9,10

**2007**
4:12

**2008**
1:19  4:20

**278**
72:23

---

**3**

**3400**
3:14  4:11

**35203**
3:15

**35238**
3:8

**380487**
3:7

---

**4**

**420**
4:21

---

**6**

**6**
3:22

---

**7**

**70**
3:23

---

**8**

**89**

52:8,21  53:18  54:11

---

9:11

9

90
9:11,11
97
9:12

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

Toll Free 800.458.6031                                    http://www.TylerEaton.com

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 3

In The Matter Of:

# ARTHUR T. WATSON
v.
# ALABAMA FARMERS COOPERATIVE, INC., ET AL.

## NO. 2:07-CV-520-WHA

---

## LES BRANHAM
### April 9, 2008

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

ARTHUR T. WATSON                                              LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                    April 9, 2008

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2         MIDDLE DISTRICT OF ALABAMA
3              NORTHERN DIVISION
4
5  CIVIL ACTION NO. 2:07-CV-520-WHA
6
7  ARTHUR T. WATSON,
        Plaintiff,
8  vs.
9  ALABAMA FARMERS COOPERATIVE, INC.,
   D/B/A BONNIE PLANT FARMS,
10       Defendants.
11
12
13
14         VIDEO DEPOSITION
15               OF
16           LES BRANHAM
             April 9, 2008
17
18
19  REPORTED BY:  Eleanor S. Pickett
20       Certified Shorthand Reporter
21       and Notary Public
22
23

Page 2

1              S T I P U L A T I O N
2
3       IT IS STIPULATED AND AGREED,
4  by and between the parties, through their
5  respective counsel, that the video
6  deposition of LES BRANHAM may be taken
7  before Eleanor S. Pickett, Commissioner,
8  Certified Shorthand Reporter and Notary
9  Public;
10      That the signature to and
11  reading of the deposition by the witness
12  is waived, the deposition to have the same
13  force and effect as if full compliance had
14  been had with all laws and rules of Court
15  relating to the taking of depositions;
16      That it shall not be necessary
17  for any objections to be made by counsel
18  to any questions, except as to form or
19  leading questions, and that counsel for
20  the parties may make objections and assign
21  grounds at the time of trial, or at the
22  time said deposition is offered in
23  evidence, or prior thereto.

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jerry D. Roberson
    Attorney at Law
    Roberson & Roberson
    P.O. Box 380487
    Birmingham, Alabama 35238

FOR THE DEFENDANT:
    Mr. Graham Gerhardt
    Attorney at Law
    Burr & Forman LLP
    3400 Wachovia Tower
    Birmingham, Alabama 35203


              I N D E X
                    PAGE:
EXAMINATION BY MR. ROBERSON        6

Page 4

1       I, Eleanor S. Pickett, a
2  Certified Shorthand Reporter of
3  Birmingham, Alabama, and a Notary Public
4  for the State of Alabama at Large, acting
5  as Commissioner, certify that on this
6  date, as provided by the Federal Rules of
7  Civil Procedure of the United States
8  District Court, and the foregoing
9  stipulation of counsel, there came before
10  me at the law offices of Burr & Forman
11  LLP, 3400 Wachovia Tower, Birmingham,
12  Alabama, on April 9, 2007, commencing at
13  11:36 a.m., LES BRANHAM, witness in the
14  above cause, for oral examination,
15  whereupon the following proceedings were
16  had:
17
18      MR. ROBERSON:  All right.
19  This is the videotape deposition of Les
20  Branham.  It's being taken at the offices
21  of Burr & Forman on April 9th, 2008.  It
22  is presently 1:15 p.m.  It's being taken
23  in the case of Arthur T. Watson, Terry

1 (Pages 1 to 4)

Page 5

1   Watson, versus Alabama Farmers
2   Cooperative, Inc., doing business as
3   Bonnie Plant Farms, defendant, CV 07-520.
4   My name is Jerry Roberson.  I'm the
5   attorney for the plaintiff.  I'm also
6   running the video camera.  And I would ask
7   all counsel of record to state their name
8   and the party they represent.
9           MR. GERHARDT:  My name is
10  Graham Gerhardt, I'm with Burr & Forman,
11  here on behalf of the defendant.
12          MR. ROBERSON:  Would you swear
13  our witness, please, ma'am.
14
15          LES BRANHAM,
16  having been first duly sworn, was examined
17  and testified as follows:
18
19          THE REPORTER:  Usual
20  stipulations?
21          MR. GERHARDT:  Yes, ma'am.
22          MR. ROBERSON:  Yes.
23

Page 6

1   EXAMINATION BY MR. ROBERSON:
2       Q.   Mr. Branham, my name is Jerry
3   Roberson.  I introduced myself before the
4   deposition.  Have you ever given a
5   deposition before?
6       A.   No, I have not.
7       Q.   Let me tell you a couple rules
8   that we have today.  I'm going to be
9   asking you questions.  I need you to
10  answer my questions truthfully, but also
11  audibly, that is, don't shake or nod your
12  head or don't say uh-huh or huh-uh, okay?
13      A.   Okay.
14      Q.   And if I ask you a question
15  that you don't understand, please tell me
16  that.
17      A.   Okay.
18      Q.   And I'll try to rephrase it or
19  ask it a way that you do understand it.
20  Fair enough?
21      A.   Yes.
22      Q.   Because if you answer it, I
23  have to assume that you knew what I was

Page 7

1   asking you, okay?
2       A.   Yeah.
3       Q.   Les, what is your date of
4   birth?
5       A.   7/28/76.
6       Q.   So does that make you how old?
7       A.   Thirty-one.
8       Q.   Thirty-one.  And how long have
9   you worked at Bonnie Plant Farms?
10      A.   This will be my fifth year.
11      Q.   All that time have you been a
12  salesman?
13      A.   Yes, sir.
14      Q.   Okay.  You're working now in
15  Bells, Tennessee?
16      A.   Yes, sir.
17      Q.   Did you start, begin your
18  career there with Bonnie Plant?
19      A.   Yes, sir.
20      Q.   Had you worked at any other
21  location than Bells, Tennessee?
22      A.   I went to Arizona for three
23  weeks prior to being sent to Bells,

Page 8

1   Tennessee.
2       Q.   Okay.  What year was that,
3   sir?
4       A.   2004.
5       Q.   Now, did you know the
6   gentleman I just talked to, LES BRANHAM,
7   before you went to work for him?
8       A.   No.
9       Q.   Never met him?
10      A.   No.
11      Q.   How did you get hired with
12  Bonnie Plant?  I mean, did you apply for a
13  job?
14      A.   Yes.
15      Q.   Respond to an ad or something?
16      A.   I have an uncle that worked
17  for Bonnie Plant Farms, and he referred me
18  to the company.
19      Q.   Who is your uncle?
20      A.   Michael Caddell.
21      Q.   Where does he work?
22      A.   In Alabama.
23      Q.   Do you know where?

Page 9

```
 2      A.   Out of Union Springs.
 2      Q.   Okay.. Is he in part of the
 3  management team?
 4      A.   No.
 5      Q.   Is he a salesman?
 6      A.   Salesman, yes.
 7      Q.   Okay.  He just reports to work
 8  down in Union Springs?
 9      A.   Yes.
10      Q.   Okay.  How long has he worked
11  for the company?
12      A.   Roughly thirty years.
13      Q.   Just can't keep a job; is that
14  right?
15      A.   That's right.
16      Q.   All right.  So he thought it
17  would be a good opportunity for you?
18      A.   Yes.
19      Q.   That's correct?
20           MR. GERHARDT:  Objection.
21      Q.   Tell me about the extent of
22  your education.  How far did you go in
23  school?
```

Page 10

```
 1      A.   High school diploma.
 2      Q.   Okay.  Have you had any
 3  college?
 4      A.   No, sir.
 5      Q.   Have you had any prior sales
 6  experience, that is, before you went to
 7  work with Bonnie?
 8      A.   No.
 9      Q.   Did you have any previous
10  employment before you went to work?  Did
11  you hold a full-time job?
12      A.   Yes, sir.
13      Q.   Where did you work?
14      A.   I worked for a lawn care
15  company.
16      Q.   What were you doing,
17  landscaping?
18      A.   Yes.
19      Q.   That's hard work, isn't it?
20      A.   Yeah, can be.
21      Q.   Okay.  So cutting grass and
22  trimming and that kind of stuff?
23      A.   Uh-huh.
```

Page 11

```
 1      Q.   Is that right?
 2      A.   Uh-huh.
 3      Q.   Is that yes?
 4      A.   Yes.
 5      Q.   I'll try to remind you.
 6      A.   Sorry about that.
 7      Q.   That's right.  I'm not doing
 8  it to annoy you.  I'm just trying to make
 9  a record.
10      A.   I understand.
11           MR. GERHARDT:  And crunching
12  the ice might not be the best idea either.
13      Q.   Okay.
14      Q.   All right.  Where did you work
15  for a landscape company?
16      A.   In Augusta, Georgia.
17      Q.   Are you married?
18      A.   No.
19      Q.   Now, you presently work in
20  Bells, Tennessee, correct?
21      A.   Yes.
22      Q.   Began working there in 2004?
23      A.   Yes.
```

Page 12

```
 1      Q.   Was that the spring of 2004?
 2      A.   Yes, spring 2004.
 3      Q.   How do you know -- this is a
 4  seasonal business, correct?
 5      A.   Uh-huh, yeah.
 6      Q.   How do you know when to come
 7  to work?  Do they send you a letter or do
 8  they call you, what -- how do you know?
 9      A.   Usually have a date to be in
10  Bells.
11      Q.   Report date?
12      A.   Yes.
13      Q.   How do they get that word to
14  you?
15      A.   By telephone.
16      Q.   They just call and say this is
17  your report date?
18      A.   Yes.
19      Q.   Okay.  Is that normally Adam
20  that calls?
21      A.   Yes.
22      Q.   Okay.  And then do you know
23  when the season ends, the spring season in
```

3 (Pages 9 to 12)

Page 13

Bells?
2    A.    Yes.
3    Q.    When is that?
4    A.    Usually around the end of
5  June. This year it will be around July
6  10th, 11th, somewhere around there.
7    Q.    Okay. And it varies by where
8  you're located in the country, that is,
9  your season, planting season varies?
10    A.    Usually most of us end on the
11  same date. Now beginning, we all begin on
12  a different date.
13    Q.    Yeah. The further south the
14  earlier you begin?
15    A.    Yes.
16    Q.    And the further north the
17  later you begin?
18    A.    Yes.
19    Q.    Okay. Do you work in the fall
20  season?
21    A.    No.
22    Q.    Does Bells have a fall season?
23    A.    No.

Page 14

1    Q.    Okay. And that varies too by
2  location?
3    A.    Right.
4    Q.    Correct?
5    A.    Yes.
6    Q.    So people that -- anyone that
7  doesn't want to work the fall season,
8  Bells would be a good place to work,
9  correct? I mean, they just have a spring
10  season, right?
11    A.    Yes.
12    Q.    You've worked for Adam for
13  four years?
14    A.    Yes.
15    Q.    This will be your fourth year?
16    A.    That will be my fifth year.
17    Q.    Fifth year. You're wearing a
18  Bonnie shirt. Is that required, or is
19  that just something that's available to
20  you if you want it?
21    A.    It's available. We are -- we
22  are asked to wear Bonnie logos in the
23  stores to represent our company, yes.

Page 15

1    Q.    So the staff will know you're
2  a Bonnie salesman, that type thing?
3    A.    Yes, yes.
4    Q.    And you're on route eighteen
5  oh three?
6    A.    Yes.
7    Q.    Before you were assigned that
8  route, what route did you work?
9    A.    Route in Illinois, eighteen oh
10  five.
11    Q.    And do you -- you get a
12  settlement sheet each year for commission
13  purposes, correct?
14    A.    Yes.
15    Q.    As a salesman for Bonnie
16  Plant, you're paid a draw against your
17  commission, correct?
18    A.    Yes.
19    Q.    They don't settle up with you
20  for the year until actually the next
21  calendar year, correct?
22    A.    They will settle up with us at
23  the end of the season.

Page 16

1    Q.    Oh, they will?
2    A.    Yes.
3    Q.    Okay. So let's say for 2008,
4  sometime after July but before December
5  31st, you'll know what your commissions
6  are?
7    A.    Yes.
8    Q.    And then that will be offset
9  by what you've drawn to date?
10    A.    Yes.
11    Q.    Now, a lot of folks -- if we
12  have a jury trial, probably nobody is
13  going to be a former Bonnie Plant
14  salesman, so I'm just trying to explain
15  how y'all get paid, okay?
16    A.    Okay.
17    Q.    Y'all get a draw. Is it
18  biweekly or weekly?
19    A.    Biweekly.
20    Q.    Okay. And that's a certain
21  amount?
22    A.    Yes.
23    Q.    How much is your draw?

ARTHUR T. WATSON                                                                            LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                                                   April 9, 2008

Page 17

1    A.    It is fifteen hundred dollars.
2    Q.    Every two weeks?
3    A.    Yes.
4    Q.    Okay.  And then you get paid a
5    commission which actually can vary year to
6    year, right?
7    A.    Well, all of our pay is
8    commission.
9    Q.    Okay.
10   A.    It just varies year to year
11   whether your commission is over your draw
12   or under your draw.
13   Q.    Okay.  I'm doing a poor job of
14   explaining this.  But your compensation is
15   based on the sales volume for your route;
16   is that fair?
17   A.    Your sales collected, yes,
18   sir.
19   Q.    Collected sales for the year.
20   A.    Yes, sir.
21   Q.    Okay.  And the percentage of
22   your sales that are collected, you receive
23   as a commission, right, a percentage of

Page 18

1    that amount?
2    A.    It can be, yes.
3    Q.    Okay.
4    A.    You have an option to defer.
5    If you make over your -- if your
6    commission winds up being over what your
7    draw is, you have the choice of getting a
8    one-time settlement check or you can defer
9    it to the rest of your draw checks.
10   Q.    Okay.  So do you get a draw
11   for the entire year?
12   A.    Yes.
13   Q.    They don't lay you off and let
14   you draw unemployment any part of the
15   year?
16   A.    They do lay us off of work,
17   yes.
18   Q.    Okay.  Like in August, do you
19   get a draw check or an unemployment check?
20   A.    I get a draw check.
21   Q.    Until when?
22   A.    I get it year-round,
     twenty-six weeks a year.

Page 19

1    Q.    Twenty-six biweekly checks?
2    A.    Yes, sir, yes, sir.
3    Q.    Okay.  So they never -- do
4    they lay you off?
5    A.    Yes.
6    Q.    So you get that on top of your
7    draw check?
8    A.    Get what on top of my draw
9    check?
10   Q.    Your unemployment check.
11   A.    Yes.
12   Q.    Okay.  Okay.  I'm with you
13   now.  So when you're not working, when the
14   season is over, in addition to your draw
15   check, you can get unemployment?
16   A.    Yes.
17   Q.    Okay.  Now, and when the --
18   when does your unemployment start?  Does
19   it normally start in August or July?
20   A.    No.  About a month after I
21   have my date of release.
22   Q.    Okay.  So they actually say
23   that you're released on a certain day?

Page 20

1    They report that to unemployment?
2    A.    Yes, sir.
3    Q.    And then after your time runs,
4    you can draw unemployment after that date?
5    A.    Yes.
6    Q.    Okay.  I'm with you now.  Now,
7    when you worked the other route in
8    Illinois, before you got to eighteen oh
9    three, when you worked eighteen oh five,
10   did you have a year-round draw?
11   A.    Yes.
12   Q.    Was it also fifteen hundred
13   dollars?
14   A.    First two years it was a
15   thousand dollars.  Then the third year I
16   moved it to fifteen hundred.
17   Q.    Okay.  So when you worked in
18   Illinois, your draw check was a thousand
19   dollars biweekly or five hundred dollars a
20   week, correct?
21   A.    Yes.
22   Q.    When you changed in 2006 to
23   eighteen oh three, you increased your draw

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON                                                    LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          April 9, 2008

---

Page 21

to fifteen hundred dollars biweekly?
    A.   No matter if I would have
changed routes, I would have increased my
draw.
    Q.   Okay.  But that's how it
occurred, correct?
    A.   Yes.
    Q.   Okay.  And then that's
currently what you're receiving, correct?
    A.   Yes.
    Q.   Now, can you tell me how many
stores you had on your route in 2006 on
eighteen oh three?
    A.   Roughly thirty-five.
    Q.   Thirty-five.  Do you know if
they made any changes from -- on that
route from the previous year?
    A.   Yes.
    Q.   Did they add any stores?
    A.   Well, they added some and they
took some away.
    Q.   Okay.  What stores did they
add, if you know?

---

Page 22

    A.   They added a Home Depot.
    Q.   Where is that?
    A.   In Memphis, in Cordova,
Tennessee.
    Q.   Okay.  What else did they add?
    A.   Wal-Mart.
    Q.   Where is that one?
    A.   In Memphis, Germantown
Parkway.
    Q.   Okay.  Anything else they
added?
    A.   Nope.
    Q.   Do you know what they took
away?
    A.   There was a -- there was I
believe it was three or four stores in
Selmer, Tennessee.
    Q.   Selmer?
    A.   Selmer.
    Q.   And do you know what kind of
stores they were?  Were they independents
or chains?
    A.   Chains and independents.

---

Page 23

    Q.   Okay.  Can you name any of
them?
    A.   Wal-Mart, Tennessee Farmers
Co-op.  And I don't know the name -- I
think it was some other stores,
independent stores that I'm not familiar
with the name.
    Q.   Where is Selmer in reference
to Germantown, I mean how far is that?
    A.   Maybe -- I really don't know,
forty-five minutes, an hour.
    Q.   Is it like about forty miles
or so or -- I don't know anything about
Tennessee.
    A.   I'm not sure how, I've never
driven from Germantown Parkway to Selmer
or Germantown to Selmer, so I really don't
know.
    Q.   Well, did this change have the
effect of making the route be shorter
geographically?
    A.   Yes.
    Q.   Okay.  And did it also have

---

Page 24

the effect of being higher volume?
    A.   No.
    Q.   No.  Roughly offset?
    A.   Yes.
    Q.   That's your understanding?
    A.   Uh-huh.
    Q.   Is that yes?
    A.   Yes.
    Q.   Okay.  Now, were there any
changes in 2007?
    A.   No.
    Q.   All right.
    A.   Actually there was.  I did
lose a couple stores in 2007.
    Q.   What did you lose in 2007?
    A.   I lost two stores in
Henderson, Tennessee and one in Middleton,
Tennessee, so it was actually three
stores.
    Q.   Okay.  Did somebody else get
them?
    A.   Yes.
    Q.   Who got them, what route, do

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON                                          LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                  April 9, 2008

Page 25

you know?
2    A.    It was what we called a
3  Mississippi route.  He runs a little bit
4  of Tennessee and a little bit of
5  Mississippi.
6    Q.    He just inches into Tennessee
7  there and catches something?
8    A.    Right.  That territory was
9  added to Bells, Tennessee.  Mississippi
10  territory was added to Bells, Tennessee in
11  2006.
12    Q.    Okay.
13    A.    And that's why the routes were
14  redone the way they were.
15    Q.    Now, what about this year,
16  2008, have you added any stores?
17    A.    Yes, we've changed them.
18  We've taken some away and added some more.
19    Q.    What did you add?
20    A.    Another Home Depot in Memphis
21  area and another Wal-Mart.
22    Q.    Now, when y'all add a store,
23  is that because Home Depot has opened a

Page 26

1  new location, or is that because you've
2  just rearranged your route?
3    A.    A lot of times as far as I
4  know, it's because I guess the territory.
5  I mean, it will be easier to run one way
6  than the other.  The territory I'd lose
7  most of the time is on somebody's else's
8  way to their stores or vice versa.  Or the
9  ones I gain are really close to me.
10    Q.    It seems like they're making
11  your route more efficient, is that -- when
12  they add stores, it's to make your route
13  more efficient; is that correct?
14    A.    Yes.
15    Q.    And when you lose stores, it's
16  because you're not losing a customer,
17  they're reassigning them to another route?
18    A.    Yes.
19    Q.    Is that a fair statement?
20    A.    Yes.
21    Q.    Now, are you supposed to try
22  to develop business, that is, call on
23  stores that you don't currently service?

Page 27

1    A.    Yes.
2    Q.    Have you since you've been
3  assigned to this route opened any stores?
4    A.    Yes, sir.
5    Q.    You know what I'm talking
6  about --
7    A.    Yes.
8    Q.    -- when I say that?
9    A.    Yes, I have.
10    Q.    What stores have you opened,
11  that is, obtained their business?
12    A.    I've opened a store by the
13  name of Naturescapes in Whiteville,
14  Tennessee.
15    Q.    Okay.  Is that an independent?
16    A.    Yes.
17    Q.    Is that a nursery or what do
18  they --
19    A.    Yeah, I would basically call
20  it a nursery, yes.
21    Q.    Okay.  Anything else?
22    A.    No.
23    Q.    Okay.  Now --

Page 28

1    A.    Well, and I have reopened one
2  store in Germantown, Germantown Hardware,
3  which was worked in past years which I
4  guess had not been worked three or four
5  years prior to me being on that route
6  again.
7    Q.    Okay.  Now, you were working
8  for Adam and -- in 2000 -- you worked in
9  2005 in Illinois, correct?
10    A.    Yes.
11    Q.    When did he approach you about
12  changing routes, when in time did he
13  approach you of that?
14    A.    I was offered a Tennessee
15  route in December of 2005.
16    Q.    Did he have any conversation
17  with you when he offered you that route?
18    A.    He just said that he had an
19  opening and was just -- was curious if I
20  was interested.
21    Q.    Okay.  Did he tell you
22  anything else about who had the route or
23  why they weren't coming back?

7 (Pages 25 to 28)

ARTHUR T. WATSON                                                      LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          April 9, 2008

Page 29

1      A.    No.
2      Q.    Did you know?  I mean you
3   worked with Terry?
4      A.    Yes.  I knew Terry had just
5   worked that route.
6      Q.    Okay.  What was your
7   understanding about why Terry wasn't
8   coming back?
9      A.    I had no clue.
10     Q.    That was not something he had
11  ever discussed with you?
12     A.    No, sir.
13     Q.    Okay.  And a lot of places
14  have an annual evaluation, a job
15  evaluation.  You know what I'm talking
16  about when I say a job evaluation?
17     A.    Yes, sir.
18     Q.    Okay.  Have you ever seen a
19  job evaluation for the job you're doing?
20     A.    I think we're evaluated every
21  year.
22     Q.    Okay.  Well, is it in writing?
23     A.    No, sir.

Page 30

1      Q.    How do you know what kind of
2   job you're doing?  I mean, I know you can
3   read a sales report, but, I mean --
4      A.    Pretty much that, to me that
5   is the evaluation.
6      Q.    Well, do you sit down with
7   Adam or anybody at Bonnie Plant?
8      A.    Me and Adam have sat down
9   almost every year at the end of the season
10  and talked.
11     Q.    Okay.  What did he tell you
12  about what kind of job you're doing and
13  what strengths and weaknesses you have or
14  whatever?
15     A.    Yes.
16     Q.    What does he tell you?  I
17  don't know.
18     A.    Well, I mean, just that.  Just
19  talks about what was done right.  I talk
20  about things that -- problems I had,
21  things we can do next year to increase
22  sales in certain areas, you know, any
23  problems with any stores, any help that I

Page 31

1   can get from him maybe talking to, you
2   know, regional managers and stuff like
3   that of different companies and just, you
4   know --
5      Q.    Like if a certain item was
6   selling well but y'all couldn't keep it --
7   grow it fast enough or whatever, that is,
8   stocking inventory, discuss things like
9   that?
10     A.    Yes.
11     Q.    Okay.  And who is your helper?
12  Do you have a helper?
13     A.    Yes.
14     Q.    Who is that?
15     A.    His name is Conrado Antunez
16  C-o-n-r-a-d-o A-n-t-u-n-e-z.
17     Q.    I apologize, but is he Mexican
18  or is he a foreigner?
19     A.    He is Mexican.
20     Q.    Okay.  And has he been your
21  helper for how long?
22     A.    Two years.
23     Q.    So since 2006, 2007?

Page 32

1      A.    No.  He started with me last
2   year.  This will be his second year.
3      Q.    Okay.  Who was your helper in
4   2006?
5      A.    I had -- started with a man
6   named Michael Rhodes.  He worked with me
7   for a month, and it moved to Keith Hunter
8   and also --
9      Q.    He what --
10     A.    Keith Hunter.
11     Q.    You changed helpers.  Why
12  wasn't Michael still working with you?
13     A.    He failed to come to work a
14  few days when I needed him, and I had to
15  use somebody else.
16     Q.    Okay.  Did you have any
17  conversation with him or --
18     A.    Very little.
19     Q.    Where does he live, do you
20  know?
21     A.    He lives in Brownsville,
22  Tennessee.  He did then.  I don't know if
23  he still does or not.

8 (Pages 29 to 32)

ARTHUR T. WATSON                                                    LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          April 9, 2008

Page 33

Q. Did he ever come back to work for Bonnie Plant that you know of?

A. He worked that same season for other salesmen, and then worked last year for a salesman.

Q. Is he still working with them, or do you know who he worked for?

A. Not in Bells, Tennessee, no.

Q. Do you know who he worked for other than you in Bonnie Plant?

A. I know he worked -- I know years before he's worked for Terry Watson.

Q. But after he left you, do you know anybody he worked for?

A. Stanley Johnson.

Q. Is he in Bells?

A. Yes.

Q. Okay. Anybody else?

A. Not that I know of.

Q. So who finished that year with you, Keith Hunter?

A. Keith Hunter.

Q. Is he still working for Bonnie

Page 34

Plant?

A. Yes, he is.

Q. Who's he working for?

A. He works -- he kind of works for all of us. He works at the farm and helps us load trucks.

Q. Okay. He's just kind of everybody's helper?

A. Yes.

Q. Where does he live, what city?

A. Bells, Tennessee.

Q. Okay. Now, may -- your first name is Leslie?

A. Yes.

Q. May I call you Les? Is that what you go by is Les?

A. Les, yes.

Q. Okay. Les, I'm going to show you what I've marked as Exhibit 3 to Adam Alley's deposition, and this is your commission statement for the spring of 2006. And there is a protective order, by the way, so I'm not going to be showing

Page 35

this to everybody.

A. Okay.

Q. But is that your commission statement?

A. Yes.

Q. Do you know what the collected sales were for your spring season in 2003? What were they?

A. I cannot recall.

Q. Doesn't it list it there?

A. For 2003?

Q. I'm sorry, 2006. I apologize.

A. That's okay. Yes, collected sales, I see it. Do you want me to say it?

Q. Yes.

A. Three thousand seven -- three hundred seventy-eight thousand.

Q. Is what you collected?

A. Yes.

Q. Okay. Now, do you know what you did in -- for the spring of 2007, what your collected sales were?

Page 36

A. Roughly it was four hundred thousand.

Q. Approximately? Is it over four?

A. Yes, it was over four.

Q. Okay. And do y'all have a -- your commission varies by how much you sell, not just -- there is a flat rate commission for all sales, correct?

A. For a certain percent, yes.

Q. And then it goes up depending on how much you sell? That is, there are increases if you sell above the goal, correct?

A. There are incentives. If you have an increase on your route, yes, there are usually incentives to get more money, yes.

Q. There are sales incentives where you can make more money if you can exceed the sales goal or the sales of the previous year, correct?

A. Yes.

9 (Pages 33 to 36)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

---

Page 37

    Q.   And there are incentives if
you exceed the company's stated sales
goal, right? I think it was three
seventy-five, three hundred seventy-five
thousand was one goal.
    A.   That was what -- you get paid
a certain amount up to three seventy-five
and then you can get another amount
over -- anything over three seventy-five.
That doesn't mean that if you make four
hundred thousand you are going to get the
increase. It's just on that twenty-five
thousand you would get that extra
percentage on that twenty-five thousand,
not the whole amount.
    Q.   Okay. Then as a commission
salesman, you have to pay certain expenses
out of your commissions, correct?
    A.   Yes, yes.
    Q.   And tell us what those --
kinds of things those are. For your
helper?
    A.   We have to pay labor for our

---

Page 38

helper. We have to pay for racks and
signs. Any motel rooms we stay in while
we're on the road we have to pay for
those. Any tools or lumber that we use on
our routes to make racks or signs or
anything, we have to pay for all that.
    Q.   And they have fines, Bonnie
Plant has fines or in previous years they
have had fines for skipping stores. Do
you know what I'm talking about?
    A.   Yes, sir.
    Q.   Tell me how that works.
    A.   We have stores, what we call
chain stores, which is Home Depot, Lowe's,
Wal-Marts. We're required to work those
stores every four weeks during a six-week
period. And if we did not work them every
four days within a six-week period, then
we would be fined.
    Q.   So you have to go to the chain
stores twice a week, is that fair?
    A.   Yes.
    Q.   Approximately?

---

Page 39

    A.   Approximately, yes.
    Q.   And if you failed to do that,
they can fine you? They can take money
out of your commissions?
    A.   Yes.
    Q.   Now, how do they know what
stores you've worked? How do they know
you skipped a store?
    A.   We have a log that we keep
when we are at stores, tickets, delivery
reports that we fill out every week and
turn in.
    Q.   Okay. Now, I don't know how
much you know about Terry. Have you ever
worked with Terry?
    A.   I mean, I worked in Bells,
Tennessee with him, so I mean --
    Q.   The same physical location but
y'all never rode in the truck together?
    A.   No.
    Q.   And you never went with him on
his route, correct?
    A.   No.

---

Page 40

    Q.   And he never went with you on
your route?
    A.   No.
    Q.   So you don't know anything
about his work ethic or habits or anything
like that?
    A.   No.
    Q.   Or job performance or
anything?
    A.   No.
    Q.   All right. And Adam never
told -- shared anything with you about
Terry, did he?
    A.   No.
    Q.   Okay. And you've worked for
four -- this is your fifth year?
    A.   Yes.
    Q.   Every move that you've made --
you've only worked two different routes,
correct?
    A.   Yes.
    Q.   The second route that you
worked, you were asked if you wanted to

---

10 (Pages 37 to 40)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

Page 41

work?
A.   Yes.
Q.   Okay.  It was your decision to
take that route?
A.   Yes.
Q.   Okay.  They never reassigned
you to work another route involuntarily?
A.   No.
Q.   Okay.  And I know this sounds
crazy, but I need to ask you anyway, you
certainly at age thirty-one --
A.   Yes.
Q.   -- you've never made a
complaint of age discrimination because
you're not even old enough to make one,
right?  You're not over age forty?
A.   No.
Q.   Now, every year that you've
worked as a salesman, have you -- and when
you are in sales, it's important -- one of
the ways they measure, evaluate your
performance is based on how the route did
the previous year as compared to this

Page 42

year, correct?
A.   Yes.
Q.   In every year, have you
increased the route, the sales on the
route?
A.   Every year I've been with
Bonnie, I've increased sales on every
route I've worked on.
Q.   Okay.  And then in terms of
this stated sales goal which changes from
year to year, have you always met that on
your route?
A.   I'm sorry, ask that again.
Q.   You know like I told you
before, the three hundred seventy-five
thousand was a goal for one year?
A.   Uh-huh.
Q.   And the commission broke, you
got a higher --
A.   I wouldn't necessarily say it
was a goal.  It was just a number they
came up with.  I don't know why.  There
are several people under that goal and

Page 43

there are several people over that goal.
I mean, I can't even say it was a goal.  I
mean, it was just that line.
Q.   Well, you know what I'm
talking about when I say -- we can call it
anything you want, a commission break or
whatever.
A.   Okay.
Q.   Every year that you've worked
there, have you always made -- your sales
always been over that stated amount so
that you got additional commissions?
A.   Additional over my draw?
Q.   No.  Over your -- the higher
percentage for the incentive, have you
always received an incentive?
A.   Have I always made more money
is what you are asking?  I don't
understand what you are asking.
Q.   Okay.  Well, I will try to
make it clear.  You know how -- what we
described earlier over three hundred
seventy-five thousand dollars in sales,

Page 44

you got a higher commission over any
amount over that?
A.   Okay.
Q.   We call that a sales
incentive, correct?
A.   Uh-huh.
Q.   Correct?
A.   Uh-huh.
Q.   Is that yes?
A.   Yes.
Q.   And they tell you before the
season starts what figure you need to
reach in order to obtain an incentive
above that?
A.   Yes.
Q.   Have you always since you've
been a salesman sold enough so that you
received the additional incentive?
A.   I've reached incentives every
year.  We usually have three or four
incentives that you need to reach every
year to get an extra percent or more
money.  So not every year, I have not

11 (Pages 41 to 44)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

Page 45

1  reached all of them, no.
2      Q.   Okay.  You've answered my
3  question.
4      A.   Okay.
5      Q.   Sorry it's hard to ask, I
6  guess.
7      A.   I understand.
8      MR. GERHARDT:  Jerry, can I
9  get this straight for a second?
10     MR. ROBERSON:  Sure.
11     MR. GERHARDT:  So I
12  understand, there is no one -- is there
13  one incentive number?
14     A.   No.
15     MR. GERHARDT:  Or are there
16  multiple?
17     A.   There is multiple.  Every year
18  there is multiple.
19     Q.   And every year do they put in
20  a document in writing what the incentives
21  are?
22     A.   Yes, a pay plan, yes.
23     Q.   A pay plan?  Thank you.

Page 46

1      A.   Uh-huh.
2      Q.   So that would be available
3  from Bonnie Plant for every year?
4      A.   Yes.
5      Q.   Okay.  And that's what y'all
6  call it, the pay plan?
7      A.   Pay plan, yes, sir.
8      MR. ROBERSON:  All right.
9  Thank you.  I don't have anything else for
10  Mr. Branham.  Thank you, sir.
11     Do you have any questions?
12     MR. GERHARDT:  I don't.
13     MR. ROBERSON:  This -- we'll
14  stop the deposition at looks like it's
15  1:51.  Let's go off the record.
16
17     (Off-the-record discussion.)
18
19  FURTHER THE DEPONENT SAITH NOT
20
21
22

Page 47

1  C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6
7      I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the questions
10  and answers thereto were reduced to
11  typewriting under my supervision, and that
12  the foregoing represents a true and
13  correct transcript of the deposition given
14  by said witness upon said hearing.
15     I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action, nor am I in anywise
18  interested in the result of said cause.
19
20
21
22
23     COMMISSIONER - NOTARY PUBLIC
       ACCR LICENSE NO. 278

12 (Pages 45 to 47)

ARTHUR T. WATSON                                                          LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                                April 9, 2008

---

### A

ACCR
47:23
acting
4:4
action
1:5  47:17
ad
8:15
Adam
12:19  14:12  28:8  30:7,8
34:19  40:11
add
21:19,23  22:5  25:19,22
26:12
added
21:20  22:1,11  25:9,10,16
25:18
addition
19:14
additional
43:12,13  44:18
age
41:11,14,16
AGREED
2:3
Alabama
1:2,10  3:8,15  4:3,4,12  5:1
8:22  47:4
Alley's
34:20
amount
16:21  18:1  37:7,8,15
43:11  44:2
annoy
11:8
annual
29:14
answer
6:10,22
answered
45:2
answers
47:10
Antunez
31:15
anybody
30:7  33:14,18
anyway
41:10
anywise
47:17
apologize
31:17  35:12
apply
8:12
approach
28:11,13
Approximately
36:3  38:23  39:1

April
1:19  4:12,21
area
25:21
areas
30:22
Arizona
7:22
Arthur
1:7  4:23
asked
14:22  40:23
asking
6:9  7:1  43:18,19
assign
2:20
assigned
15:7  27:3
assume
6:23
attorney
3:5,12  5:5
audibly
6:11
August
18:18  19:19
Augusta
11:16
available
14:19,21  46:2
A-n-t-u-n-e-z
31:16
a.m
4:13

### B

back
28:23  29:8  33:1
based
17:15  41:22
basically
27:19
Began
11:22
beginning
13:11
behalf
5:11
believe
22:16
Bells
7:15,21,23  11:20  12:10
13:1,22  14:8  25:9,10
33:8,16  34:11  39:16
best
11:12
Birmingham
3:8,15  4:3,11
birth
7:4

bit
25:3,4
biweekly
16:18,19  19:1  20:19  21:1
Bonnie
1:11  5:3  7:9,18  8:12,17
10:7  14:18,22  15:2,15
16:13  30:7  33:2,10,23
38:7  42:7  46:3
Box
3:7
Branham
1:18  2:6  4:13,20  5:15  6:2
8:6  46:10
break
43:6
broke
42:18
Brownsville
32:21
Burr
3:13  4:10,21  5:10
business
5:2  12:4  26:22  27:11

### C

C
3:1  47:1,1
Caddell
8:20
calendar
15:21
call
12:8,16  26:22  27:19
34:15  38:13  43:5  44:4
46:6
called
25:2
calls
12:20
camera
5:6
care
10:14
career
7:18
case
4:23
catches
25:7
cause
4:14  47:18
certain
16:20  19:23  30:22  31:5
36:10  37:7,17
certainly
41:11
Certified
1:22  2:8  4:2
certify

4:5  47:7,15
chain
38:14,20
chains
22:22,23
change
23:19
changed
20:22  21:3  25:17  32:11
changes
21:16  24:10  42:10
changing
28:12
check
18:8,19,19,20  19:7,9,10,15
20:18
checks
18:9  19:1
choice
18:7
city
34:10
Civil
1:5  4:7
clear
43:21
close
26:9
clue
29:9
collected
17:17,19,22  35:6,13,19,23
college
10:3
come
12:6  32:13  33:1
coming
28:23  29:8
commencing
4:12
commission
15:12,17  17:5,8,11,23  18:6
34:21  35:3  36:7,9
37:16  42:18  43:6  44:1
Commissioner
2:7  4:5  47:22
commissions
16:5  37:18  39:4  43:12
companies
31:3
company
8:18  9:11  10:15  11:15
14:23
company's
37:2
compared
41:23
compensation
17:14
complaint
41:14

compliance
2:13
Conrado
31:15
conversation
28:16  32:17
Cooperative
1:10  5:2
Cordova
22:3
correct
9:19  11:20  12:4  14:4,9
15:13,17,21  20:20  21:6
21:9  26:13  28:9  36:9
36:14,22  37:18  39:22
40:20  42:1  44:5,7
47:13
counsel
2:5,17,19  4:9  5:7  47:16
country
13:8
COUNTY
47:5
couple
6:7  24:14
Court
1:1  2:14  4:8
Co-op
23:4
crazy
41:10
crunching
11:11
curious
28:19
currently
21:9  26:23
customer
26:16
cutting
10:21
CV
5:3
C-o-n-r-a-d-o
31:16

### D

D
3:4,20
date
4:6  7:3  12:9,11,17  13:11
13:12  16:9  19:21  20:4
day
19:23
days
32:14  38:18
December
16:4  28:15
decision
41:3

---

Page 48

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

defendant
3:10  5:3,11
Defendants
1:12
defer
18:4,8
delivery
39:10
depending
36:11
DEPONENT
46:19
deposition
1:16  2:6,11,12,22  4:19  6:4
6:5  34:20  46:14  47:8
47:13
depositions
2:15
Depot
22:1  25:20,23  38:14
described
43:22
develop
26:22
different
13:12  31:3  40:19
diploma
10:1
discrimination
41:14
discuss
31:8
discussed
29:11
discussion
46:17
District
1:1,2  4:8
DIVISION
1:3
document
45:20
doing
5:2  10:16  11:7  17:13
29:19  30:2,12
dollars
17:1  20:13,15,19,19  21:1
43:23
draw
15:16  16:17,23  17:11,12
18:7,9,10,14,19,20  19:7
19:8,14  20:4,10,18,23
21:4  43:13
drawn
16:9
driven
23:16
duly
5:16
D/B/A
1:11

**E**

E
3:1,1,20  47:1,1
earlier
13:14  43:22
easier
26:5
education
9:22
effect
2:13  23:20  24:1
efficient
26:11,13
eighteen
15:4,9  20:8,9,23  21:13
either
11:12
Eleanor
1:21  2:7  4:1
else's
26:7
employment
10:10
ends
12:23
entire
18:11
ethic
40:5
evaluate
41:21
evaluated
29:20
evaluation
29:14,15,16,19  30:5
everybody
35:1
everybody's
34:8
evidence
2:23
examination
3:22  4:14  6:1
examined
5:16
exceed
36:21  37:2
Exhibit
34:19
expenses
37:17
experience
10:6
explain
16:14
explaining
17:14
extent
9:21
extra

37:13  44:22

**F**

F
47:1
failed
32:13  39:2
fair
6:20  17:16  26:19  38:21
fall
13:19,22  14:7
familiar
23:6
far
9:22  23:9  26:3
farm
34:5
Farmers
1:10  5:1  23:3
Farms
1:11  5:3  7:9  8:17
fast
31:7
Federal
4:6
fifteen
17:1  20:12,16  21:1
fifth
7:10  14:16,17  40:16
figure
44:12
fill
39:11
fine
39:3
fined
38:19
fines
38:7,8,9
finished
33:20
first
5:16  20:14  34:12
five
15:10  20:9,19
flat
36:8
folks
16:11
following
4:15
follows
5:17
force
2:13
foregoing
4:8  47:8,12
foreigner
31:18
form

2:18
Forman
3:13  4:10,21  5:10
former
16:13
forty
23:12  41:16
forty-five
23:11
four
14:13  22:16  28:4  36:1,4,5
37:10  38:16,18  40:16
44:20
fourth
14:15
full
2:13
full-time
10:11
further
13:13,16  46:19  47:15

**G**

gain
26:9
gentleman
8:6
geographically
23:21
Georgia
11:16
Gerhardt
3:11  5:9,10,21  9:20  11:11
45:8,11,15  46:12
Germantown
22:8  23:9,16,17  28:2,2
getting
18:7
given
6:4  47:13
go
9:22  34:16  38:20  46:15
goal
36:13,21  37:3,5  42:10,16
42:21,23  43:1,2
goes
36:11
going
6:8  16:13  34:18,23  37:11
good
9:17  14:8
Graham
3:11  5:10
grass
10:21
grounds
2:21
grow
31:7
guess

2:18
26:4  28:4  45:6

**H**

habits
40:5
hard
10:19  45:5
Hardware
28:2
head
6:12
hearing
47:14
help
30:23
helper
31:11,12,21  32:3  34:8
37:22  38:1
helpers
32:11
helps
34:6
Henderson
24:17
High
10:1
higher
24:1  42:19  43:14  44:1
hired
8:11
hold
10:11
Home
22:1  25:20,23  38:14
hour
23:11
huh-uh
6:12
hundred
17:1  20:12,16,19  21:1
35:18  36:1  37:4,11
42:15  43:22
Hunter
32:7,10  33:21,22

**I**

ice
11:12
idea
11:12
Illinois
15:9  20:8,18  28:9
important
41:20
incentive
43:15,16  44:5,13,18  45:13
incentives
36:15,17,19  37:1  44:19,21
45:20
inches

Tyler Eaton Morgan Nichols & Pritchett, Inc.
Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

25:6
increase
30:21 36:16 37:12
increased
20:23 21:3 42:4,7
increases
36:13
independent
23:6 27:15
independents
22:21,23
interested
28:20 47:18
introduced
6:3
inventory
31:8
involuntarily
41:7
item
31:5

**J**

JEFFERSON
47:5
Jerry
3:4 5:4 6:2 45:8
job
8:13 9:13 10:11 17:13
29:14,16,19,19 30:2,12
40:8
Johnson
33:15
July
13:5 16:4 19:19
June
13:5
jury
16:12

**K**

keep
9:13 31:6 39:9
Keith
32:7,10 33:21,22
kin
47:16
kind
10:22 22:20 30:1,12 34:4
34:7
kinds
37:21
knew
6:23 29:4
know
8:5,23 12:3,6,8,22 15:1
16:5 21:15,23 22:13,20
23:4,10,13,18 25:1 26:4
27:5 29:2,15 30:1,2,17
30:22 31:2,4 32:20,22

33:2,7,9,11,11,14,19
35:6,21 38:10 39:6,7,13
39:14 40:4 41:9 42:14
42:22 43:4,21

**L**

L
2:1
labor
37:23
landscape
11:15
landscaping
10:17
Large
4:4
law
3:5,12 4:10
lawn
10:14
laws
2:14
lay
18:13,16 19:4
leading
2:19
left
33:13
Les
1:18 2:6 4:13,19 5:15 7:3
8:6 34:15,16,17,18
Leslie
34:13
letter
12:7
let's
16:3 46:15
LICENSE
47:23
line
43:3
list
35:10
little
25:3,4 32:18
live
32:19 34:10
lives
32:21
LLP
3:13 4:11
load
34:6
located
13:8
location
7:21 14:2 26:1 39:18
log
39:9
logos

14:22
long
7:8 9:10 31:21
looks
46:14
lose
24:14,15 26:6,15
losing
26:16
lost
24:16
lot
16:11 26:3 29:13
Lowe's
38:14
lumber
38:4

**M**

making
23:20 26:10
man
32:5
management
9:3
managers
31:2
marked
34:19
married
11:17
matter
21:2
ma'am
5:13,21
mean
8:12 14:9 23:9 26:5 29:2
30:2,3,18 37:10 39:16
39:17 43:2,3
measure
41:21
Memphis
22:3,8 25:20
met
8:9 42:11
Mexican
31:17,19
Michael
8:20 32:6,12
MIDDLE
1:2
Middleton
24:17
miles
23:12
minutes
23:11
Mississippi
25:3,5,9
money

36:17,20 39:3 43:17
44:23
month
19:20 32:7
motel
38:2
move
40:18
moved
20:16 32:7
multiple
45:16,17,18

**N**

N
2:1 3:1,20
name
5:4,7,9 6:2 23:1,4,7
27:13 31:15 34:13
named
32:6
Naturescapes
27:13
necessarily
42:20
necessary
2:16
need
6:9 41:10 44:12,21
needed
32:14
neither
47:16
never
8:9 19:3 23:15 39:19,21
40:1,11 41:6,13
new
26:1
nod
6:11
Nope
22:12
normally
12:19 19:19
north
13:16
NORTHERN
1:3
Notary
1:23 2:8 4:3 47:22
number
42:21 45:13
nursery
27:17,20

**O**

O
2:1
Objection
9:20

objections
2:17,20
obtain
44:13
obtained
27:11
occurred
21:6
offered
2:22 28:14,17
offices
4:10,20
offset
16:8 24:3
Off-the-record
46:17
oh
15:5,9 16:1 20:8,9,23
21:13
okay
6:12,13,17 7:1,14 8:2 9:2
9:7,10 10:2,21 11:13
12:19,22 13:7,9 14:1
16:3,15,16,20 17:4,9,13
17:21 18:3,10,18 19:3,12
19:12,17,22 20:6,17
21:5,8,22 22:5,10 23:1
23:23 24:9,20 25:12
27:15,21,23 28:7,21
29:6,13,18,22 30:11
31:11,20 32:3,16 33:18
34:7,12,18 35:2,13,21
36:6 37:16 39:13 40:15
41:3,6,9 42:9 43:8,20
44:3 45:2,4 46:5
old
7:6 41:15
ones
26:9
one-time
18:8
opened
25:23 27:3,10,12
opening
28:19
opportunity
9:17
option
18:4
oral
4:14
order
34:22 44:13

**P**

P
2:1 3:1,1
PAGE
3:21
paid

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

15:16  16:15  17:4  37:6
Parkway
22:9  23:16
part
9:2  18:14
parties
2:4,20  47:17
party
5:8
pay
17:7  37:17,23  38:1,3,6
45:22,23  46:6,7
people
14:6  42:23  43:1
percent
36:10  44:22
percentage
17:21,23  37:14  43:15
performance
40:8  41:22
period
38:17,18
physical
39:18
Pickett
1:21  2:7  4:1
place
14:8
places
29:13
plaintiff
1:8  3:3  5:5
plan
45:22,23  46:6,7
Plant
1:11  5:3  7:9,18  8:12,17
15:16  16:13  30:7  33:2
33:10  34:1  38:8  46:3
planting
13:9
please
5:13  6:15
poor
17:13
presently
4:22  11:19
Pretty
30:4
previous
10:9  21:17  36:22  38:8
41:23
prior
2:23  7:23  10:5  28:5
probably
16:12
problems
30:20,23
Procedure
4:7
proceedings
4:15

protective
34:22
provided
4:6
Public
1:23  2:9  4:3  47:22
purposes
15:13
put
45:19
p.m
4:22
P.O
3:7

### Q

question
6:14  45:3
questions
2:18,19  6:9,10  46:11  47:9

### R

R
3:1  47:1
racks
38:1,5
rate
36:8
reach
44:13,21
reached
44:19  45:1
read
30:3
reading
2:11
really
23:10,17  26:9
rearranged
26:2
reassigned
41:6
reassigning
26:17
recall
35:9
receive
17:22
received
43:16  44:18
receiving
21:9
record
5:7  11:9  46:15
redone
25:14
reduced
47:10
reference
23:8

referred
8:17
regional
31:2
relating
2:15
release
19:21
released
19:23
remind
11:5
reopened
28:1
rephrase
6:18
report
12:11,17  20:1  30:3
REPORTED
1:21
Reporter
1:22  2:8  4:2  5:19
reports
9:7  39:11
represent
5:8  14:23
represents
47:12
required
14:18  38:15
respective
2:5
Respond
8:15
rest
18:9
result
47:18
Rhodes
32:6
right
4:18  9:14,15,16  11:1,7,14
14:3,10  17:6,23  24:12
25:8  30:19  37:3  40:11
41:16  46:8
road
38:3
Roberson
3:4,6,6,22  4:18  5:4,12,22
6:1,3  45:10  46:8,13
rode
39:19
rooms
38:2
Roughly
9:12  21:14  24:3  36:1
route
15:4,8,8,9  17:15  20:7
21:12,17  23:20  24:23
25:3  26:2,11,12,17  27:3
28:5,15,17,22  29:5

36:16  39:22  40:2,22
41:4,7,22  42:4,5,8,12
routes
21:3  25:13  28:12  38:5
40:19
rules
2:14  4:6  6:7
run
26:5
running
5:6
runs
20:3  25:3

### S

S
1:21  2:1,7  3:1  4:1
SAITH
46:19
sales
10:5  17:15,17,19,22  30:3
30:22  35:7,14,23  36:9
36:19,21,21  37:2  41:20
42:4,7,10  43:10,23
44:4
salesman
7:12  9:5,6  15:2,15  16:14
33:5  37:17  41:19  44:17
salesmen
33:4
sat
30:8
school
9:23  10:1
season
12:23,23  13:9,9,20,22
14:7,10  15:23  19:14
30:9  33:3  35:7  44:12
seasonal
12:4
second
32:2  40:22  45:9
see
35:14
seen
29:18
sell
36:8,12,13
selling
31:6
Selmer
22:17,18,19  23:8,16,17
send
12:7
sent
7:23
service
26:23
settle
15:19,22

settlement
15:12  18:8
seven
35:17
seventy-eight
35:18
seventy-five
37:4,4,7,9  42:15  43:23
shake
6:11
shared
40:12
sheet
15:12
shirt
14:18
shorter
23:20
Shorthand
1:22  2:8  4:2
show
34:18
showing
34:23
signature
2:10
signs
38:2,5
sir
7:13,16,19  8:3  10:4,12
17:18,20  19:2,2  20:2
27:4  29:12,17,23  38:11
46:7,10
sit
30:6
six-week
38:16,18
skipped
39:8
skipping
38:9
sold
44:17
somebody
24:20  32:15
somebody's
26:7
sorry
11:6  35:12  42:13  45:5
sounds
41:9
south
13:13
spring
12:1,2,23  14:9  34:21  35:7
35:22
Springs
9:1,8
staff
15:1
Stanley

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                      http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

LES BRANHAM
April 9, 2008

33:15
start
7:17 19:18,19
started
32:1,5
starts
44:12
state
4:4 5:7 47:4
stated
37:2 42:10 43:11
statement
26:19 34:21 35:4
States
1:1 4:7
stay
38:2
stenotypy
47:9
STIPULATED
2:3
stipulation
4:9
stipulations
5:20
stocking
31:8
stop
46:14
store
25:22 27:12 28:2 39:8
stores
14:23 21:12,19,22 22:16
22:21 23:5,6 24:14,16
24:19 25:16 26:8,12,15
26:23 27:3,10 30:23
38:9,13,14,16,21 39:7,10
straight
45:9
strengths
30:13
stuff
10:22 31:2
supervision
47:11
supposed
26:21
sure
23:15 45:10
swear
5:12
sworn
5:16

**T**

T
1:7 2:1,1 4:23 47:1,1
take
39:3 41:4
taken

2:6 4:20,22 25:18 47:8
talk
30:19
talked
8:6 30:10
talking
27:5 29:15 31:1 38:10
43:5
talks
30:19
team
9:3
telephone
12:15
tell
6:7,15 9:21 21:11 28:21
30:11,16 37:20 38:12
44:11
Tennessee
7:15,21 8:1 11:20 22:4,17
23:3,14 24:17,18 25:4,6
25:9,10 27:14 28:14
32:22 33:8 34:11 39:17
terms
42:9
territory
25:8,10 26:4,6
Terry
4:23 29:3,4,7 33:12
39:14,15 40:13
testified
5:17
Thank
45:23 46:9,10
thereto
2:23 47:10
thing
15:2
things
30:20,21 31:8 37:21
think
23:5 29:20 37:3
third
20:15
thirty
9:12
thirty-five
21:14,15
thirty-one
7:7,8 41:11
thought
9:16
thousand
20:15,18 35:17,18 36:2
37:5,11,13,14 42:16
43:23
three
7:22 15:5 20:9,23 21:13
22:16 24:18 34:8 35:17
35:17 37:3,4,7,9 42:15
43:22 44:20

tickets
39:10
time
2:21,22 7:11 20:3 26:7
28:12
times
26:3
today
6:8
told
40:12 42:14
tools
38:4
top
19:6,8
Tower
3:14 4:11
transcript
47:13
trial
2:21 16:12
trimming
10:22
truck
39:19
trucks
34:6
true
47:12
truthfully
6:10
try
6:18 11:5 26:21 43:20
trying
11:8 16:14
turn
39:12
twenty-five
37:12,14
twenty-six
18:23 19:1
twice
38:21
two
17:2 20:14 24:16 31:22
40:19
type
15:2
typewriting
47:11

**U**

U
2:1
uh-huh
6:12 10:23 11:2 12:5
24:6 42:17 44:6,8 46:1
uncle
8:16,19
understand

6:15,19 11:10 43:19 45:7
45:12
understanding
24:5 29:7
unemployment
18:14,19 19:10,15,18 20:1
20:4
Union
9:1,8
United
1:1 4:7
use
32:15 38:4
Usual
5:19
usually
12:9 13:4,10 36:17 44:20

**V**

varies
13:7,9 14:1 17:10 36:7
vary
17:5
versa
26:8
versus
5:1
vice
26:8
video
1:16 2:5 5:6
videotape
4:19
volume
17:15 24:1
vs
1:9

**W**

Wachovia
3:14 4:11
waived
2:12
Wal-Mart
22:6 23:3 25:21
Wal-Marts
38:15
want
14:7,20 35:14 43:6
wanted
40:23
wasn't
29:7 32:12
Watson
1:7 4:23 5:1 33:12
way
6:19 25:14 26:5,8 34:23
ways
41:21
weaknesses

30:13
wear
14:22
wearing
14:17
week
20:20 38:21 39:11
weekly
16:18
weeks
7:23 17:2 18:23 38:16
went
7:22 8:7 10:6,10 39:21
40:1
weren't
28:23
we'll
46:13
we're
29:20 38:3,15
we've
25:17,18
Whiteville
27:13
winds
18:6
witness
2:11 4:13 5:13 47:14
word
12:13
work
8:7,21 9:7 10:7,10,13,19
11:14,19 12:7 13:19 14:7
14:8 15:8 18:16 32:13
33:1 38:15,17 40:5 41:1
41:7
worked
7:9,20 8:16 9:10 10:14
14:12 20:7,9,17 28:3,4
28:8 29:3,5 32:6 33:3
33:4,7,9,11,12,14 39:7
39:15,16 40:15,19,23
41:19 42:8 43:9
working
7:14 11:22 19:13 28:7
32:12 33:6,23 34:3
works
34:4,4,5 38:12
wouldn't
42:20
writing
29:22 45:20

**X**

X
3:20

**Y**

yeah
7:2 10:20 12:5 13:13

Page 52

ARTHUR T. WATSON                                          LES BRANHAM
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                  April 9, 2008

27:19
year
  7:10  8:2  13:5  14:15,16,17
  15:12,20,21  17:5,6,10,10
  17:19  18:11,15,23  20:15
  21:17  25:15  29:21  30:9
  30:21  32:2,2  33:4,20
  36:22  40:16  41:18,23
  42:1,3,6,11,11,16  43:9
  44:20,22,23  45:17,19
  46:3
years
  9:12  14:13  20:14  28:3,5
  31:22  33:12  38:8
year-round
  18:22  20:10
y'all
  16:15,17  25:22  31:6  36:6
  39:19  46:5

_____
            0
07-520
  5:3

_____
            1
1:15
  4:22
1:51
  46:15
10th
  13:6
11th
  13:6
11:36
  4:13

_____
            2
2:07-CV-520-WHA
  1:5
2000
  28:8
2003
  35:7,11
2004
  8:4  11:22  12:1,2
2005
  28:9,15
2006
  20:22  21:12  25:11  31:23
  32:4  34:22  35:12
2007
  4:12  24:10,14,15  31:23
  35:22
2008
  1:19  4:21  16:3  25:16
278
  47:23

_____
            3
3

34:19
31st
  16:5
3400
  3:14  4:11
35203
  3:15
35238
  3:8
380487
  3:7

_____
            6
6
  3:22

_____
            7
7/28/76
  7:5

_____
            9
9
  1:19  4:12
9th
  4:21

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 4**

In The Matter Of:

# ARTHUR T. WATSON
v.
# ALABAMA FARMERS COOPERATIVE, INC., ET AL.

## NO. 2:07-CV-520-WHA

---

## ADAM ALLEY
### April 9, 2008

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-520-WHA

ARTHUR T. WATSON,
        Plaintiff,
vs.
ALABAMA FARMERS COOPERATIVE, INC.,
D/B/A BONNIE PLANT FARMS,
        Defendants.


VIDEO DEPOSITION
OF
ADAM ALLEY
April 9, 2008

REPORTED BY:  Eleanor S. Pickett
        Certified Shorthand Reporter
        and Notary Public

---

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jerry D. Roberson
    Attorney at Law
    Roberson & Roberson
    P.O. Box 380487
    Birmingham, Alabama 35238

FOR THE DEFENDANT:
    Mr. Graham Gerhardt
    Attorney at Law
    Burr & Forman LLP
    3400 Wachovia Tower
    Birmingham, Alabama 35203

---

**Page 2**

S T I P U L A T I O N

        IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the video
deposition of ADAM ALLEY may be taken
before Eleanor S. Pickett, Commissioner,
Certified Shorthand Reporter and Notary
Public;
        That the signature to and
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions;
        That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign
grounds at the time of trial, or at the
time said deposition is offered in
evidence, or prior thereto.

---

**Page 4**

I N D E X
                    PAGE:
EXAMINATION BY MR. ROBERSON        7

E X H I B I T S
Plaintiff's Exhibit 1        48
Plaintiff's Exhibit 2        59
Plaintiff's Exhibits 3 - 7        65

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 5

1    I, Eleanor S. Pickett, a
2    Certified Shorthand Reporter of
3    Birmingham, Alabama, and a Notary Public
4    for the State of Alabama at Large, acting
5    as Commissioner, certify that on this
6    date, as provided by the Federal Rules of
7    Civil Procedure of the United States
8    District Court, and the foregoing
9    stipulation of counsel, there came before
10    me at the law offices of Burr & Forman
11    LLP, 3400 Wachovia Tower, Birmingham,
12    Alabama, on April 9, 2007, commencing at
13    11:36 a.m., ADAM ALLEY, witness in the
14    above cause, for oral examination,
15    whereupon the following proceedings were
16    had:
17
18    MR. ROBERSON:  This is the
19    videotape deposition of Adam Alley.  It's
20    being taken in the case of Arthur Watson,
21    plaintiff, versus Alabama Farmers
22    Cooperative, Inc., doing business as
23    Bonnie Plant Farms, defendant.  This case

Page 6

1    is pending in the United States District
2    Court For the Middle District of Alabama,
3    Northern Division.  It's CV number 07-520.
4    We are here today at the offices of BURR,
5    Forman in Birmingham.  It's now 11:40 on
6    April 9th, 2008.  My name is Jerry
7    Roberson.  I'm the attorney for the
8    plaintiff, Terry Watson.  And I would ask
9    all counsel of record to state their name
10    and who they represent.
11    MR. GERHARDT:  I'm Graham
12    Gerhardt with Burr & Forman representing
13    the defendant.
14    MR. ROBERSON:  Would you swear
15    our witness, please, ma'am.
16
17    ADAM ALLEY,
18    having been first duly sworn, was examined
19    and testified as follows:
20
21    THE REPORTER:  Usual
22    stipulations?
23    MR. ROBERSON:  Yes.

Page 7

1    MR. GERHARDT:  Yes, ma'am.
2
3    EXAMINATION BY MR. ROBERSON:
4    Q.    Mr. Alley, I introduced myself
5    before the deposition.  But have you ever
6    given a deposition before today?
7    A.    Yes.
8    Q.    Okay.  So you know today
9    you're under oath just like in a court of
10    law, correct?
11    A.    Yes, yes.
12    Q.    And, if you would, there is
13    only one microphone, if I could get you to
14    articulate your answers out loud and speak
15    up a little bit, okay --
16    A.    Sure.
17    Q.    And today if I ask you a
18    question that you don't understand, please
19    let me know that you don't understand it,
20    okay?
21    A.    Okay.
22    Q.    If you answer it, I'm going to
23    have to assume that you understood it.

Page 8

1    Fair enough?
2    A.    Okay.
3    Q.    Now, do you know Terry Watson?
4    A.    Yes.
5    Q.    And was he assigned to work
6    under your supervision for a period of
7    time?
8    A.    Yes.
9    Q.    Where do you work, sir?
10    A.    Bells, Tennessee.
11    Q.    And where is that city in
12    Tennessee?
13    A.    West Tennessee, near Jackson,
14    about an hour east of Memphis.
15    Q.    And who do you work for?
16    A.    Bonnie Plants.
17    Q.    How long have you worked for
18    Bonnie Plant?
19    A.    Since '95.
20    Q.    And have you always worked in
21    Bells, Tennessee?
22    A.    Yes.
23    Q.    Did you start as a salesman?

2 (Pages 5 to 8)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

---

Page 9

1    A.    Yes.
2    Q.    Okay.  And you are now working
3  as a station manager?
4    A.    Yes.
5    Q.    Who is your supervisor?
6    A.    Joe Stewart.
7    Q.    What is his position?
8    A.    National sales manager.
9    Q.    And does he have an office in
10  Union Springs?
11    A.    Yes.
12    Q.    So if you have a question or
13  you need to get in touch with Joe, you
14  call him at his office?
15    A.    Yes.
16    Q.    Do you have access to fax
17  machines and e-mail as well?
18    A.    Yes.
19    Q.    Okay.  And have you used all
20  those ways to contact Joe?
21    A.    Probably everything short of
22  fax.  Normally it's almost always phone.
23    Q.    Okay.  And I'm sorry, you have

Page 10

1  been a station manager since what date?
2    A.    1999.
3    Q.    Okay.  So for four years you
4  worked a route in Bells?
5    A.    Yes.
6    Q.    How do y'all identify the
7  routes?  Are they by number or are they by
8  name?
9    A.    They are by number.
10    Q.    Okay.  What route did you work
11  in Bells?
12    A.    Eighteen two.
13    Q.    Okay.  And what does that
14  consist of, sir?
15    A.    At the time it was Western
16  Kentucky, Southern Illinois and a little
17  bit of Eastern Missouri.
18    Q.    Would that be considered a
19  long route?
20    A.    At the time it was, yes.
21    Q.    Okay.  And do you know what I
22  mean when I say a long route?
23    A.    Why don't --

Page 11

1    Q.    Span a large geographical
2  area?
3    A.    Pretty much, yeah.
4    Q.    You would have to drive for a
5  long time on that route?
6    A.    Yes.
7    Q.    Is that correct?
8    A.    Right.
9    Q.    Do you know what I mean when I
10  say a short route, that is, the stores are
11  close together?
12    A.    Right.
13    Q.    Not that much driving?
14    A.    Right.
15    Q.    Okay.  And what y'all try to
16  do at Bonnie Plant is to make your routes
17  somewhat even, correct?
18    A.    Right.
19    Q.    Have about the same number of
20  stores --
21    A.    Right.
22    Q.    -- on each route?
23    A.    Right.

Page 12

1    Q.    Correct?
2    A.    Right.
3    Q.    Just to be efficient, right?
4    A.    Right.
5    Q.    Now, when you worked as a
6  route salesman, who was the station
7  manager?
8    A.    Joe Stewart.
9    Q.    Oh, Joe worked in Bells?
10    A.    Yes.
11    Q.    The same Joe Stewart?
12    A.    Yes.
13    Q.    He was a station manager from
14  '95 to '99?
15    A.    Uh-huh.
16    Q.    Is that correct?
17    A.    That's correct, through '98.
18  I guess that would be '94 to '98 because I
19  started the spring -- beginning of '99.
20    Q.    Okay.  All right.  So you're
21  telling me it's a seasonal business?
22    A.    Right.
23    Q.    And y'all consider the spring

---

3 (Pages 9 to 12)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

---

Page 13

1   season to be your best season?
2     A.   Right.
3     Q.   Correct?
4     A.   Right.
5     Q.   And going back to this, Joe
6   hadn't been the nationwide sales manager
7   the whole time.  He was formerly a station
8   manager in Bells --
9     A.   Right.
10     Q.   -- is that correct?
11     A.   Correct.
12     Q.   Okay.  And then did he leave
13   and become the national sales manager?
14     A.   Yes.
15     Q.   And you moved up to his job?
16     A.   Right.
17     Q.   Now, when you worked as a
18   route salesman in Bells, how many other
19   salesmen were there?
20     A.   There was six or more every
21   year.
22     Q.   And what you do as a route
23   salesmen is you drive a truck, correct?

---

Page 14

1     A.   Right.
2     Q.   And you get plants and
3   vegetables to different stores, correct?
4     A.   Correct.
5     Q.   You sell them but you also
6   stock the stores, correct?
7     A.   Right.
8     Q.   So there is some labor
9   involved as well as sales activity --
10     A.   Right.
11     Q.   -- correct?  And when you do
12   this work, you don't have to have a CDL --
13     A.   No.
14     Q.   -- correct?  You just have to
15   be able to drive -- is it a six-wheel
16   truck; is that correct?
17     A.   Uh-huh, correct.
18     Q.   And, sir, today -- I know when
19   we normally talk, we say uh-huh and
20   huh-uh, but today I'm going to ask you to
21   answer out audibly yes or no, okay?  Just
22   so we have a clean record.  Fair enough?
23     A.   Fair enough.

---

Page 15

1     Q.   I will try to remind you.  I'm
2   not doing that to annoy you, okay?
3         Then when you took over as the
4   station manager in Bells, did you still
5   have six or more salesmen?
6     A.   Yes.
7     Q.   Okay.  And how many do you
8   have now?
9     A.   Nine.
10     Q.   All right.  And Terry Watson
11   worked under your supervision in 2004 and
12   '5 --
13     A.   Yes.
14     Q.   -- is that correct, those
15   seasons, correct?
16     A.   Correct.
17     Q.   Okay.  And at the time that he
18   worked under your supervision, he actually
19   was previously working down in Louisiana,
20   correct, or Texas and swapped?
21     A.   Working out of Texas.
22     Q.   Yeah, and swapped, exchanged
23   routes.  He had a long route in Louisiana

---

Page 16

1   or Texas, and he exchanged it -- who was
2   the guy he swapped with?
3     A.   Butch Stewart.
4     Q.   Okay.  Now, is Butch related
5   to Joe?
6     A.   Brother.
7     Q.   Okay.  And Butch went to his
8   route and he went to Butch's route,
9   correct?
10     A.   Correct.  I have no idea -- I
11   don't know anything about the route in
12   Texas, but they did want to swap routes.
13     Q.   Okay.  And in order to make
14   that exchange, did they have to get your
15   permission?
16     A.   Yes.
17     Q.   Did they?
18     A.   Yes.
19     Q.   Okay.  And so was Charlie
20   Trussell over Texas?
21     A.   No.
22     Q.   Who was over there?
23     A.   Bill Rainer was over Texas.

---

4 (Pages 13 to 16)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 17

1    Q.    They had to get his permission
2    too I assume?
3    A.    I would gather.
4    Q.    Yeah.  And did they also have
5    to get Joe Stewart, the national sales
6    manager, get his permission?
7    A.    Yes.
8    Q.    Okay.  Now, is there any
9    paperwork about that permission or is that
10   just an oral permission?
11   A.    Just oral.
12   Q.    Okay.  And the route that
13   Butch had been working in Tennessee, was
14   that considered a short route?
15   A.    A shorter route.
16   Q.    Okay.  Did that one have a
17   number?
18   A.    Eighteen three.
19   Q.    Do you know where that route
20   -- what was on that route, that is, what
21   was its geographic location?
22   A.    Basically.  Basically Jackson,
23   Tennessee south to the Mississippi line

Page 18

1    and it crossed the eastern side of
2    Memphis.
3    Q.    So it was Tennessee and
4    Mississippi?
5    A.    Just Tennessee.  He didn't go
6    into Mississippi.
7    Q.    Oh, it didn't go into
8    Mississippi?
9    A.    It seems like one year it was
10   one store right across the line, but
11   basically Tennessee.
12   Q.    Okay.  So all the stores were
13   either in or near Tennessee?
14   A.    Right.
15   Q.    Okay.  And how many -- about
16   how many stores would there be?
17   A.    Thirty, just a ballpark.
18   Q.    Sure.  That's fine.  So Terry
19   worked there in 2004, correct?
20   A.    Correct.
21   Q.    And he's testified in this
22   case and he said that when he came, he
23   asked for a truck with some kind of

Page 19

1    special seat.  Do you know what I'm
2    talking about?
3    A.    No.
4    Q.    Some kind of suspension or
5    seat?
6    A.    Not particularly, no.
7    Q.    Are there different types of
8    vehicles?
9    A.    There are all -- at that time,
10   they were all Hino trucks that as far as I
11   could see they're basically the same
12   trucks.
13   Q.    Okay.  Well, he claims that
14   there is some kind of seat that absorbs
15   some of the shock when you drive it.  It's
16   got a name, but I can't remember it.
17   A.    Okay.
18   Q.    Do you know what I'm talking
19   about?
20   A.    No.  It could be -- I just --
21   I mean, I don't --
22   Q.    Air ride, does that make --
23   have you heard of that name?

Page 20

1    A.    It could be, yeah.
2    Q.    Okay.  And he says that in
3    2004, he was in a truck that had that type
4    of seat, that suspension in that seat.
5    Does that make sense?
6    A.    Makes sense.
7    Q.    Okay.  But he said in 2005,
8    y'all changed his vehicle so that he
9    didn't have that.  Now, do you know why
10   they would change vehicles in 2005?
11        MR. GERHARDT:  Object to the
12   form.
13   Q.    You can answer.  He just does
14   that to -- for the record and to annoy me.
15        MR. GERHARDT:  For the record.
16   A.    As far as whatever we do with
17   the trucks or what I do with the trucks,
18   they are assigned according to need on the
19   routes.  The longer routes get newer
20   trucks, and I did have probably -- could
21   have had that year where a longer route
22   needed a truck, that particular route.
23   Eighteen three didn't go that many miles

5 (Pages 17 to 20)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 21

1   from home. So if you had a problem with
2   the truck, I don't remember any problem
3   with it, but if I made the change, that's
4   probably why it was.
5       Q. Okay. So what you are saying
6   is you had nine or more routes?
7       A. Right.
8       Q. And so you would make the
9   truck assignments based on the length of
10   the route, that is, you would assign the
11   newer trucks to the longer routes?
12       A. Right.
13       Q. Is that correct?
14       A. Right.
15       Q. So if Terry's vehicle changed,
16   it was for that reason?
17       A. Sure.
18       Q. Okay. Now, did Terry ever
19   mention anything to you about -- in 2005
20   about an air ride seat or make a request
21   for one?
22       A. Not that I remember, but that
23   was a long time ago.

Page 22

1       Q. That's exactly right. That
2   was a long time ago. If he had made that
3   request, is there any reason why he
4   couldn't, that you know of, that he could
5   not have received that type of vehicle?
6       MR. GERHARDT: Object to the
7   form.
8       Q. You can answer. I mean, I'm
9   not in the plant business.
10       A. What I answered before was the
11   trucks were assigned according to the need
12   and how far they went from home. So if I
13   changed them around, that was the reason.
14   But, like I say, that would be -- that
15   would be the reason, putting the trucks
16   where they were needed the most.
17       Q. Tell me, if you can, do you
18   have the -- approximately the same
19   salesmen that you had in 2004 and 2005, or
20   do they change over a lot?
21       A. They change over quite a bit.
22   Well, let me think. I've got one, two,
23   three -- no, I have got -- majority of the

Page 23

1   them were the same.
2       Q. Let's do it this way, if we
3   can. Can you tell me who's working for
4   you now and then, if you would, just
5   identify anybody who wasn't working in
6   2004 or '5. Can you do that? I know Les
7   is working?
8       A. Les is still working for me.
9       Q. Okay. And he took Terry's
10   route, right?
11       A. He took route eighteen three.
12       Q. That was the one Terry was
13   working?
14       A. Correct.
15       Q. I don't mean it like he owned
16   it.
17       A. Right.
18       Q. I just mean he succeeded
19   Terry --
20       A. Right.
21       Q. -- in taking over that route.
22   Okay.
23       A. Stanley Johnson still works

Page 24

1   for me. He worked for me now and then.
2       Q. What route is he? Is he --
3       A. Eighteen one.
4       Q. Okay.
5       A. Willie Hughes, eighteen oh
6   now. He was on a different route before,
7   but he worked for me both times.
8       Q. Eighteen hundred?
9       A. Uh-huh.
10       Q. How old is Les, about, if you
11   know?
12       A. Thirty-five.
13       Q. How about Stanley?
14       A. About fifty.
15       Q. Willie?
16       A. Fifty-six or -seven probably.
17       Q. Okay. I'm sorry, keep going.
18       A. Johnny Roy Finlinson worked
19   for me then, but he does not work for me
20   now. He was promoted to a mini station
21   manager this year. He's --
22       Q. What route did he run?
23       A. He ran eighteen two. And he's

6 (Pages 21 to 24)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 25

sixty, sixty plus, a little over sixty,
sixty-one or -two.
    Q.   Now he's a station manager?
    A.   Right, a mini station manager.
    Q.   Mini, what does that mean?
    A.   Something we're doing new with
one or two -- one or two or three trucks
just trying to better service, breaking
down some longer routes, trying to better
service. One, two or three trucks I have
in town and a big station ships them to
their plants. They don't grow anything
there. It's shipped to them.
    Q.   Okay. See if you have got --
this is the way I understand it. If
you've got a long route, then you can get
a long way from your plants so that if you
run out of plants, you have to come back,
all the way back to get some more?
    A.   Right.
    Q.   And this is a way to have a
station further out so that you wouldn't
have to drive as much just to get plants,

Page 26

is that a fair way of saying it?
    A.   Pretty much, yeah.
    Q.   Okay. All right. Keep going.
After Johnny, who else?
    A.   Let's see. Four.
    Q.   Where is he a mini station
manager, by the way?
    A.   Salem, Illinois.
    Q.   Is that off of your territory?
    A.   About half of it was.
    Q.   Okay.
    A.   Eighteen five, Tony Brown is
on it now, and he worked for me then and
now.
    Q.   How old is he?
    A.   You are going to get me in
trouble there. Sixty plus.
    Q.   Okay.
    A.   Eighteen six is James Decouto.
    Q.   Can you help me with that
spelling?
    A.   D-e-c-o-u-t-o.
    Q.   Thank you.

Page 27

    A.   He -- I'm not positive. He
was there in 2005. I don't remember about
'4. And eighteen seven --
    Q.   How old is he?
    A.   Forties.
    Q.   Okay.
    A.   Eighteen seven is James --
James has changed. James was on eighteen
six at that time. Now he's on eighteen
seven.
    Q.   Okay. Who's on eighteen six?
    A.   Eighteen six now is Michael
Phillips. And he's new this year.
    Q.   Okay. He was just hired?
    A.   Just hired.
    Q.   How old is he?
    A.   Twenty-seven or -eight.
    Q.   Okay.
    A.   Eighteen eight is Pat Gaines.
He was not with me at the time, and I did
not have that territory at the time.
    Q.   Okay. How old is he?
    A.   He's forty -- no, he's fifty.

Page 28

And then eighteen nine I no longer have.
I'm trying to think. I don't even
remember who was on it at the time when
Terry was there, and I don't have that
route. That territory I gave up, that's
all.
    Q.   You don't have that territory,
what did you say?
    A.   No, I gave -- I don't have
that territory anymore.
    Q.   Okay. Does somebody else?
Has it been reassigned to another manager?
    A.   Been assigned to another
manager.
    Q.   Okay. But at the time in
2004, you had it?
    A.   Had it.
    Q.   Do you know who worked there?
    A.   I don't remember who worked
it. A lot of them have changed around, so
I don't remember.
    Q.   All right. Now, Johnny
Finlinson, you said he was sixty or more,

7 (Pages 25 to 28)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON                                                          ADAM ALLEY
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                                 April 9, 2008

Page 29

1 and he's been assigned as a mini station
2 manager?
3    A.    Correct.
4    Q.    How long has he been with the
5 company that you know of?
6    A.    That I know of, he's been
7 there -- seems like he came to me in 2000,
8 2001, or one of the two, and he worked
9 years in the '70s and '80s.
10    Q.    He's been a long time in the
11 plant business?
12    A.    Long time employee, right.
13    Q.    Is that right?
14    A.    Right.
15    Q.    And then Tony Brown, does he
16 have a lot of experience in the plant
17 business?
18    A.    Right.
19    Q.    Okay. Have Stanley, Willie,
20 Tony, James all been there the whole time
21 you've been the station manager?
22    A.    James has not. The rest of
23 them have.

Page 30

1    Q.    And have they kept the same
2 routes?
3    A.    No. Some have, some have
4 changed and some have kept the same ones.
5    Q.    Well, I'm not in the plant
6 business, so I need your help. What --
7 why would you change the route of a
8 salesman who was -- they have a quota, a
9 sales quota, correct?
10    A.    You have a goal, but that's
11 about all.
12    Q.    Well, a sales goal in terms of
13 their commission, they get a certain
14 percentage of their sales, right?
15    A.    Right.
16    Q.    And that changes year to year,
17 what their goal is?
18    A.    Right. They have a goal, but,
19 I mean, it's nothing more than a number on
20 paper. It could be -- yes.
21    Q.    Do y'all evaluate them in
22 writing?
23    A.    Not in writing, no.

Page 31

1    Q.    Do you evaluate them in any
2 way?
3    A.    We do at the end of season,
4 you are evaluating -- I go through each
5 salesman and see what I like or don't
6 like.
7    Q.    Identify strengths and
8 weakness?
9    A.    Identify, right, right.
10    Q.    Do you sit down with them and,
11 you know, tell them what they need to do
12 to improve and stuff?
13    A.    Usually, not always, but
14 usually.
15    Q.    Did you ever do that with
16 Terry?
17    A.    What I did with Terry was
18 throughout the season.
19    Q.    Well, see, I guess I'm
20 trying to understand why y'all would
21 change a salesperson and reassign him to
22 another route maybe even out of that --
23 out from under that station manager. Can

Page 32

1 you help me with that, why would you do
2 that?
3    A.    Well, we have -- everything --
4 anything you can imagine. We have
5 salesmen that ask for -- to change. They
6 want to be closer to home, they want to be
7 further from home, they want to be --
8 different things.
9    Q.    That's when the salesmen
10 initiates a change, though, correct?
11 That's one set of circumstances. But why
12 do y'all do it on an involuntary basis?
13 That's my question.
14    A.    I'm not real sure. I guess
15 there would be times when another route
16 may better suit the salesmen, whether it's
17 long or short or starts earlier in the
18 year, later. I mean, just --
19    Q.    Who makes that decision?
20    A.    Usually I guess it would be
21 the station manager and sales manager.
22    Q.    Well, Terry worked for you in
23 2004 and 2005, correct?

8 (Pages 29 to 32)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 33

    A.  Correct.
    Q.  How would you rate his job
performance on route -- was it eighteen oh
three?
    A.  Right.
    Q.  How would you rate that?
    A.  Had -- we had numerous
conversations about him not having --
things being in disarray, his stores not
being kept neat and clean, and, you know.
In all these stores we're given an area,
and we bring in fresh product, take out
everything that's bad, and we're -- that's
strictly, you know, the salesmen decides
that, but it's pretty much left up to us.
And we had had numerous conversations
about him not picking up trash, not
picking up the bad stuff, stuff -- plants,
you know, this tall (indicating) that
looked terrible left on the route.  And we
also bring back all of our trays and reuse
them and crates and reuse them and --
crates that onions come in, and had to

Page 34

stay on him about getting those back in,
and we just had talked about -- time and
time again about getting that done, and
you know, just no improvement was made.
    Q.  Tell me about your process
there for salesmen.  Do you know what I
mean when I say a progressive disciplinary
process?  Do you know what that means?
    A.  Not really.
    Q.  Well, Adam, do you have a
college degree?
    A.  Yes.
    Q.  Where did you go to college?
    A.  Auburn.
    Q.  And what did you get your
degree in?
    A.  Agri business, ag economics.
    Q.  Did you -- have you worked for
anybody other than Bonnie Plant?
    A.  I have.
    Q.  Have you ever worked for an
employer who uses some written
communication devices to rate and evaluate

Page 35

and advise their employees of their
expectations?
    A.  No.
    Q.  Okay.  Well, there are --
imagine this, there are employers who do
use writings to evaluate and discipline
their employees and they -- even if it's
an oral, for example, the first step of
any process might just be a warning.  And
although it's a warning, they may write it
out and get the employee to acknowledge
that they were counseled or given a verbal
warning.  Have you ever seen anything like
that?
    MR. GERHARDT:  Object to the
form.
    Q.  You can answer.
    A.  No.
    Q.  Do y'all have any kind of
forms at Bonnie Plant Farms that would
assist you in that process?
    A.  Today we do.
    Q.  When did those -- when did you

Page 36

begin using those?
    A.  I don't remember what year we
started.
    Q.  Okay.  So y'all have personnel
forms?
    A.  Right.
    Q.  Have access to them off the
computer?
    A.  They're mostly sent to us in
a -- we have them.  I guess we could get
them on the computer.
    Q.  Do y'all have an HR, human
relations, department?
    A.  Yes.
    Q.  If you have a question about
somebody's vacation or leave or if they
are out sick or something, is there
someone you can call?
    A.  Yes.
    Q.  Who is that, sir?
    A.  It's through our home office,
Alabama Farmers Co-Op.  I'm not sure who
the person's name is.

9 (Pages 33 to 36)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

---

Page 37

Q.   So you haven't had any
occasion to speak to them?
A.   No.
Q.   Is that correct?
A.   That's correct.
Q.   Okay.  And can you -- as a
station manager, do you have the authority
to write someone up, that is, put a
written warning or written disciplinary
notice in their personnel file?
A.   Yes.
Q.   Does each employee have a
personnel file, each salesmen have a
personnel file?
A.   Yes.
Q.   And have you ever had an
occasion to write someone up, get them to
sign it and acknowledge that this is
unsatisfactory behavior and it must be
improved upon?
A.   No.
Q.   Okay.  Can you suspend a
salesman?

---

Page 38

A.   I have the authority.  But the
way our business works, you don't -- I
mean, you are working twelve, fourteen,
sixteen weeks out of the year is your main
time.  You know, you really can't suspend
-- the job really has to be done by
somebody.  But, yeah, I guess I would have
the authority.
Q.   Can you make a decision to
fire --
A.   Yes.
Q.   -- and terminate an employee?
A.   Yes.
Q.   Do you have to have anybody
else's approval, Joe Stewart or anybody
else?
A.   I do have to talk to them
about it first.
Q.   To Joe?
A.   Right.  Joe or Mr. Kyle or
Dennis, somebody in management.
Q.   Okay.  And do you have what I
call hiring authority, that is, can you

---

Page 39

offer a job to someone?
A.   I have to go through them
first.
Q.   You have to get approval for a
slot or a budgetary --
A.   Right.
Q.   -- position, maybe to add a
route or something; is that correct?
A.   Yes.
Q.   So you've been a station
manager since approximately 1999, and to
date, you've never had a written
discipline of any salesperson; is that a
fair statement?
A.   Right.
Q.   Okay.  And so you never had
any occasion or Mr. Watson's job
performance was never so bad that you were
required to write him up or make anyone
else aware of it, correct?
      MR. GERHARDT:  Object to the
form.
Q.   Correct?

---

Page 40

A.   I didn't write anybody up.
Q.   Okay.  So you didn't write
Terry up?
A.   It was handled verbally.  We
didn't write things up.  And it was
verbally given to him numerous times.
Q.   Okay.  And the things you've
told me about that you verbally
communicated with Terry were that he --
his stores were not appropriately neat and
he didn't satisfactorily return the trays,
the containers, that held the plants.
Anything else?
A.   Didn't keep his truck clean.
It was like a dumpster, dirty inside and
out.  I say that in the cab as well as the
bed, not the outside of the truck.
Q.   Now, did you ever have any
occasion to go to any of his stores?
A.   Yes.
Q.   Do you have a camera?
A.   Do what?
Q.   Do you have a camera?

---

10 (Pages 37 to 40)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 41

1    A.   Yes.
2    Q.   Did you take any photographs
3 of his stores?
4    A.   No.  That was before -- I do
5 now.  Digital changed the whole works
6 there.  Before it was film developed -- I
7 would say they probably had digital
8 cameras then, but I didn't have one, so --
9    Q.   Any customer that Terry Watson
10 had on his route, did you ever get a
11 written complaint from any of them?
12    A.   No, we don't get written
13 complaints from anybody.
14    Q.   Okay.  Well, did you get
15 verbal complaints from any of them?
16    A.   Yes.
17    Q.   Who?
18    A.   Lowe's.
19    Q.   Lowe's where?
20    A.   Germantown Parkway, Memphis,
21 Tennessee.
22    Q.   Do you remember the nature of
23 the complaint?

Page 42

1    A.   Just bad plants, plants
2 overgrown and stuff that needed to be
3 picked up that wasn't salable left.
4    Q.   Returns that weren't
5 collected?
6    A.   Returns that weren't
7 collected.
8    Q.   Okay.  And the way it works at
9 Bonnie Plant, they sell on consignment.
10 So when they return a plant, that comes
11 off their -- the salesmen's --
12    A.   At the independents, smaller
13 stores, it does.  Today all the big boxes
14 is pay by scan.  So we get paid by what
15 goes through their computer.  So we still
16 pick them up, but it's not paper.  You
17 don't write pick tickets.  In all the big
18 boxes we deliver whatever they need, pick
19 up whatever is bad and there is no
20 paperwork whatsoever.
21    Q.   Okay.  Well, do you recall if
22 Terry met his sales goals for 2004 and
23 2005?

Page 43

1    A.   Best of my knowledge, on the
2 spring sales of '04, he had a decrease
3 from the year before and an increase in
4 spring sales of '05.
5    Q.   An increase from '04 or an
6 increase from 2003?
7    A.   Both.
8    Q.   Okay.  He sold three hundred
9 -- over three hundred thousand dollars
10 worth of plants in 2005, correct?
11    A.   I don't remember the exact
12 number.  I was thinking it was around
13 three hundred thousand.  I don't remember
14 the number.
15    Q.   Do you know a gentleman named
16 Tate?
17    A.   Yes.
18    Q.   What's his last name?
19    A.   Gatlin, I think.
20    Q.   What is his job?
21    A.   Safety director.
22    Q.   Is he over your trucks?
23    A.   He's over the safety of Bonnie

Page 44

1 Plant Farm.
2    Q.   Over the whole country?
3    A.   Uh-huh.
4    Q.   Is that yes?
5    A.   Yes.
6    Q.   Okay.  And so he handles the
7 paperwork for -- your drivers have to have
8 an annual card that shows they're -- from
9 a health standpoint they're able to
10 operate a motor vehicle?
11    A.   It's biannual.
12    Q.   It's twice every two years?
13    A.   Once every two years.
14    Q.   Okay.  I'm sorry.  But they
15 have to have a card and be examined by a
16 physician, correct?
17    A.   Correct.
18    Q.   Be certified as being in the
19 state of health that they can operate a
20 vehicle?
21    A.   It's a DOT physical.
22    Q.   Okay.  So he handles, he deals
23 with the salesmen from that aspect,

11 (Pages 41 to 44)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

| Page 45 |

correct?
2      A.    Correct.
3      Q.    Okay.
4      A.    His office does.
5      Q.    Where is his office?
6      A.    Union Springs.
7      Q.    Oh, okay. Well, did you know
8   that Terry underwent some surgery in 2005,
9   in the fall of 2005?
10     A.    I knew he was going to have
11  it, but I don't particularly remember that
12  he did or didn't.
13     Q.    And he had a knee replacement
14  and had some surgery done on his feet.
15  Were you aware of that?
16     A.    I was aware he was going to
17  have them, but I didn't know that --
18     Q.    Yeah. Okay. All right. Now,
19  when does y'all's season start in Bells,
20  Tennessee?
21     A.    End of January, first of
22  February. When do your drivers, when are

| Page 46 |

1   they required to report for work?
2      A.    Within that same time frame,
3   just according to where the routes are,
4   end of January to during February
5   sometime.
6      Q.    What, do y'all send out a
7   letter telling them to report? What do
8   y'all do?
9      A.    Usually verbal contact on the
10  phone because each route is different. I
11  mean, I have got routes that go to
12  Arkansas. Generally plants sell from west
13  to east or whatever -- north -- I mean
14  south to north. So according to each
15  route, you sort of talk to them. In
16  January the weather fluctuates. So you
17  may tell them, you know, we'll -- we stay
18  in constant contact, may let you know to
19  come next week or if the weather is
20  terrible, you come next week and that kind
21  of thing.
22     Q.    Well, Mr. Alley, I normally
23  tend to deal in documents, so that's

| Page 47 |

1   really what I'm asking you from that
2   perspective. Are there any documents that
3   would show when the season began and when
4   the salesmen were to report in 2006 for
5   the spring season in Bells, Tennessee?
6   Are there any documents that you're aware
7   of?
8      A.    No. Some salesmen would be --
9   I mean, like new routes that, you know,
10  they wouldn't start getting -- wouldn't
11  start being paid a draw or whatever until
12  their route actually started. But I don't
13  really know --
14     Q.    Well, then, there would
15  certainly be payroll records that would
16  reflect when the route started, correct?
17     A.    Well, no. Some salesmen would
18  receive -- draws could start -- see,
19  our -- the last money is not paid -- on
20  the draw checks, they go through January
21  from the previous year. So, no, it
22  wouldn't be.
23     Q.    Well, so you're telling me

| Page 48 |

1   that, to your knowledge, there are no
2   written documents that -- from Bonnie
3   Plant Farms that would indicate when the
4   season began and when the salesmen were to
5   report to work in -- for Bells, Tennessee
6   in the calendar year 2006?
7          MR. GERHARDT: Object to the
8   form. Asked and answered.
9      Q.    You can answer. You don't
10  know of any?
11     A.    Not that I'm aware of, no.
12     Q.    Okay. Well, just make it
13  Exhibit 1.
14          (Whereupon, Plaintiff's
15          Exhibit 1 was marked for
16          identification.)
17     Q.    Did you have any contact with
18  Terry Watson in the fall, in the winter of
19  2005 or before the season started in 2006?
20     A.    I don't -- I don't remember if
21  I did or not. I mean, that's --
22     Q.    You got a phone number for
23  him, don't you?

12 (Pages 45 to 48)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

---

Page 49

1    A.    I don't today, no.
2    Q.    Well, you did in 2005, didn't
3  you, you have a cell phone for him?
4    A.    Seems like I had a home phone
5  for him.  I don't remember cell phone.
6    Q.    You can't contact -- how do
7  you contact your salesmen if you need to
8  talk to him during the week?  Does he have
9  a radio or something?
10    A.    Oh, are you talking about
11  during the season?
12    Q.    Yeah.
13    A.    During when he's working,
14  sure, we had cell phones.
15    Q.    Well, that wouldn't change,
16  would it, when he went home?
17    A.    Sure, we have a lot of them
18  have cell phones and -- several that use
19  one service in Tennessee and that number
20  doesn't work, doesn't work when they're
21  home.
22    Q.    Okay.  You have an address for
23  him, don't you?  You know where to contact

---

Page 50

1  him, correct?  You can write him a letter,
2  correct?
3    A.    Yes, I could, yes.
4    Q.    Did you have any
5  correspondence with Terry Watson about his
6  health prior to the 2006 season?
7    A.    Not that I remember, no.
8    Q.    Did you make any decision or
9  make any recommendation as to Terry
10  Watson's employment with Bonnie Plant
11  Farms for the year 2006?
12    A.    Yes, I had made Joe Stewart
13  aware that I didn't want to bring Terry
14  back for that season.
15    Q.    When did you do that, sir?
16    A.    I don't remember exact dates.
17  I would definitely say it was early fall
18  of that year.
19    Q.    And is there any writing,
20  e-mail or letter about that decision and
21  recommendation?
22    A.    No.
23    Q.    Why didn't you want to bring

---

Page 51

1  him back?
2    A.    Prior performance.
3    Q.    And what about his prior
4  performance led you to that conclusion?
5    A.    Just continually not doing
6  things that I asked him to do, which were
7  straighten up the stores, clean up the
8  stores, clean up his truck, oversee his
9  helper loading the truck.  Like I said,
10  keeping the trunk clean, keeping the
11  stores -- keeping the junk out of the
12  stores, the crates and trays picked up.
13    Q.    Did you ever have any
14  conversation with Terry Watson where you
15  told him that you were going to recommend
16  that he not be returned to your
17  supervision?
18    A.    I -- I did in the spring of
19  '05 when -- after numerous times of having
20  that same conversation, had that -- you
21  know, that that's what I intend to do.  If
22  you don't do better, I'm not going to
23  bring you back.  But outside that, no, I

---

Page 52

1  didn't have any conversation with him in
2  the fall of '05.
3    Q.    So this gentleman was an
4  underperformer for you for two years, and
5  there is no writing that reflects any
6  aspect of his underperformance, correct?
7    A.    Correct.
8    Q.    We just have to take your word
9  for it, correct?
10        MR. GERHARDT:  Object to the
11  form.
12    Q.    You can answer.
13    A.    I guess, sure.
14    Q.    I mean, there was nobody else
15  in the room when you were talking to
16  Terry, was there?
17        MR. GERHARDT:  Object to the
18  form.
19    A.    I don't remember.  I would say
20  it was -- that conversation took place
21  enough I'm sure there was probably
22  somebody around, I don't remember who,
23  but --

13 (Pages 49 to 52)

---

Page 53

Q.   Can you presently name any witness to any of these conversations?

A.   No, not that I remember, no.

Q.   Okay.  So you spoke with Joe Stewart and told him you didn't want to bring Terry back in 2000 -- for the 2006 season, correct?

A.   Correct.

Q.   Did you speak with anyone other than Joe Stewart?

A.   Not that I recall, no.

Q.   Do you recall when it was you made the recommendation other than the fall of 2005?

A.   That's all I remember.

Q.   Okay.  Do you know why Terry wasn't told that he wasn't returning, do you know?

A.   I don't know when he was told.

Q.   Let me show you what I've marked as Exhibit 1 to your deposition.  Have you ever seen that letter that's dated January 10th?

Page 54

A.   (Reviewing document.)  Okay.  What was your question now?

Q.   Have you ever seen that letter before today?

A.   No.

Q.   Well, it appears from your reading of that letter that Mr. Watson hadn't been told as of January 10th that he wasn't returning, correct?

MR. GERHARDT:  Object to the form.

A.   Looks like this letter was written on January 10th.  I have no idea when he was told.

Q.   When was Les assigned to Terry's route in Tennessee?

A.   I don't remember dates, but starting of the spring, starting of the 2006 season, which I don't -- I mean, I --

Q.   Well, was he already working for Bonnie Plant?

A.   Yes.

Q.   What route had he worked in

Page 55

2005?

A.   It was an Illinois route.  The numbers have changed around so much.  I believe it was eighteen five at the time.

Q.   Was that under your supervision?

A.   Yes.

Q.   So did you have to hire someone to take Les' route then in Illinois?

A.   I did.  I hired the guy named Jerry Brogland.  I think it was Jerry Brogland.  That route has changed over a few times, but seems like he was a sixty or so gentleman and he worked for Tennessee Farmers Farmers Co-Op and I hired him.

Q.   You hired Jerry Brogland to replace Les, correct?

A.   Correct.

Q.   All right.  And Les replaced Terry Watson, correct?

A.   Correct.

Q.   And Les is approximately

Page 56

thirty-five years old?

A.   Approximately.

Q.   How long had Les worked for Bonnie Plant Farms before he replaced Terry?

A.   Three or four years.  Three years, I think.

Q.   Under your supervision?

A.   Most of it.

Q.   Does he have a college degree?

A.   I don't -- I don't think so.

Q.   Who hired -- did you hire Les?

A.   No.  I did hire him to come to -- for that route.  But, no, he was hired by -- he was a helper in I think Arizona at the time, and he came to me as a route man.

Q.   I mean, did you know him?

A.   No.

Q.   Before he went to work for you?

A.   No.

Q.   Who assigned him to work under

14 (Pages 53 to 56)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 57

1 your supervision?
2     A.    There was a previous salesman,
3 had to fire someone, let someone go, and I
4 don't really remember.  I gather it would
5 have been -- was Joe Stewart.  It was --
6 after the season started, someone couldn't
7 handle a job and I had to replace him
8 pretty quickly, you know, pretty quickly.
9 And so he was a helper in I believe it was
10 Arizona.
11     Q.    Okay.  Have you had occasions
12 to fire route salesmen?
13     A.    Yes.
14     Q.    That worked under your
15 supervision?
16     A.    Yes.
17     Q.    Can you name any of the people
18 that you have fired?
19     A.    Let me think about it a
20 minute.  No, not really, I mean, it's been
21 several, but it's been that long ago.
22 That was probably the last one, so I don't
23 remember the names.

Page 58

1     Q.    Well, are there records that
2 would reflect that they worked for you and
3 were fired?
4     A.    Records?
5          MR. GERHARDT:  Object to the
6 form.
7     Q.    Yeah.
8     A.    They worked for me.
9     Q.    Personnel files that would
10 show they were terminated?
11          MR. GERHARDT:  Object to the
12 form.
13     A.    Probably not.  I know there
14 would be records that show they worked for
15 me.
16     Q.    Could we get their names?
17     A.    Yeah, we could get names.
18     Q.    Okay.  I mean, can you provide
19 those to Mr. Gerhardt?
20     A.    I would think our personnel
21 department could get that.
22     Q.    Okay.  That's all I'm asking.
23 I don't know who they were, so --

Page 59

1     A.    Right.
2     Q.    So if we could identify them,
3 that would be a help to me.
4          And any of those people, did
5 you sit them down before you fired them
6 and tell them look, you're not getting the
7 job done, this is what I need you to do
8 and if you don't do it, you're going to be
9 fired?  Did you do that?
10     A.    Yes.
11     Q.    Okay.  Did you make any
12 writing?
13     A.    No.
14     Q.    Okay.
15          (Whereupon, Plaintiff's
16          Exhibit 2 was marked for
17          identification.)
18     Q.    Let me show you what I've
19 marked as Exhibit 2.  Have you ever seen
20 that letter before today?
21     A.    No.
22     Q.    Do you agree with me that
23 Terry Watson makes a written complaint of

Page 60

1 age discrimination in this letter?  Do you
2 agree with that?
3     A.    It states he believes --
4 that's his belief, yes.
5     Q.    Okay.  Now, have you had any
6 training about employment practices?
7          MR. GERHARDT:  Object to the
8 form.
9     Q.    You can answer.
10     A.    What are you --
11     Q.    Well, do you know that age
12 discrimination is illegal?
13     A.    Sure.
14     Q.    Have you been trained on age
15 discrimination?
16     A.    I don't know that I've been
17 trained on it, no.
18     Q.    Do you know what retaliation
19 is?
20     A.    How would you define that
21 retaliation?
22     Q.    Well, it's when you punish
23 someone for making a complaint of age

15 (Pages 57 to 60)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 61

1 discrimination, that's one type of
2 retaliation. Are you aware that that is
3 illegal?
4      A.    Sure.
5      Q.    The law protects you from
6 discrimination based on your age. It also
7 protects you when you make a complaint of
8 age discrimination. You're aware of that?
9      A.    I don't know that I'm -- I
10 realize it's -- no, I don't know that I'm
11 aware of that, but I realize it's common
12 sense, but, I mean --
13      Q.    And, in fact, today you're
14 here at my request in an age
15 discrimination case. And if you give
16 testimony that Bonnie Plant does not like,
17 they cannot punish you for your testimony.
18 Are you aware of that?
19      A.    I am now.
20      Q.    Were you before?
21      A.    Just never really thought
22 about it really. I knew I was going to do
23 the right thing and everything else will

Page 62

1 take care of itself.
2      Q.    How old are you, Adam?
3      A.    Forty-one.
4      Q.    If Terry is sixty-two, would
5 you agree with me that you're
6 substantially younger than him, I mean
7 twenty-one years?
8          MR. GERHARDT:  Object to the
9 form.
10      Q.    Would that be a fair
11 statement?
12      A.    I'm younger.
13      Q.    Yeah. And in 2005, you were,
14 what, thirty-eight?
15      A.    If that's -- you do the math.
16 If that's right, that's right.
17      Q.    Okay. Now, Terry Watson
18 received a commission when he worked under
19 your supervision, correct?
20      A.    I would assume so.
21      Q.    All route salesmen can earn a
22 commission, correct, that's how they get
23 paid?

Page 63

1      A.    Right.
2      Q.    They get paid a draw against
3 their commission --
4      A.    Right.
5      Q.    -- correct? And if you don't
6 sell enough plants, you can wind up the
7 year upside-down, right?
8      A.    Sure.
9      Q.    Okay. But if you meet your
10 sales goal, then you get a higher
11 commission than salesmen who do not meet
12 their sales goal, do you agree with that?
13      A.    Yeah, strictly percentages. I
14 mean, it's still a numbers thing.
15      Q.    Yeah. But actually the
16 commission changes, you get a higher
17 commission rate if you meet your sales
18 goal, correct?
19      A.    Our pay plan is different.
20 Some -- most of the time. But most of the
21 time it would just be -- if you're in X
22 percent, the higher the sales were,
23 obviously the higher the salary would be

Page 64

1 just based on the numbers.
2      Q.    And y'all change the routes
3 sometimes annually, correct?
4      A.    Sometimes, you're correct.
5      Q.    And you compare how the route
6 performed to the year prior, correct?
7      A.    Correct.
8      Q.    Now, sometimes you may make
9 changes that may affect the route,
10 correct, either negatively or positively?
11      A.    Correct.
12      Q.    I mean, you may add stores or
13 delete stores?
14      A.    Right.
15      Q.    But you still make that
16 comparison in order to try to evaluate a
17 salesman's performance, correct?
18      A.    Right. And when we make that
19 comparison, if it's changes, it would be
20 made considering any changes. I mean, it
21 would be -- if a territory was taken off,
22 we took it off of the year before. I
23 mean, there were equal comparisons.

16 (Pages 61 to 64)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 65

Q.    Okay.  So you try to compare apples to apples?

A.    Apples to apples.

Q.    Sure.  Okay.  I tell you what, Mr. Alley, I have one-hour tapes and we're at about fifty-five minutes.  So with your permission, I'm going to take a break and change tapes.  I'm not going to keep you much longer, but I do need to get some more information.

A.    We'll take a break and run to the restroom.

MR. ROBERSON:  Let me just do this.  We're going to take a break here. It's 12:35.  Off the record.

(Whereupon, a break was had from 12:35 p.m. until 12:43 p.m.)

(Whereupon, Plaintiff's Exhibits 3 - 7 were marked for identification.)

MR. ROBERSON:  All right. This is tape two of the video deposition

Page 66

of Adam Alley.  It's 12:43 p.m.

Q.    Mr. Alley, we took a break. But, now, is it Luther Stuart, Luther L. Stuart, is that Butch?

A.    Who I refer to as Butch, yes.

Q.    Okay.  And he had this route in 2003?

A.    Right.

Q.    In Bells, Tennessee?

A.    Right.

Q.    I'm going to show you what I've marked as Exhibit 4 and ask you if this is his commission statement for his route, Luther L. Stuart, in 2003.  I hope it is.

A.    (Reviewing document.)

Q.    Do you recognize that document?

A.    That's what it says.  It says August of '03, Luther Stuart.

Q.    Okay.  What were his sales figures for this route in 2003?

A.    Basically two hundred

Page 67

sixty-three thousand.

Q.    Okay.  And was he doing a good job for you up there on that route?

A.    He was doing a pretty good job.

Q.    Okay.  Then I'm going to show you what I've marked as Exhibit 7 to your deposition.  And this is Terry Watson's commission from Bonnie Plant statement for the year 2004 when he took over Mr. Stuart's route; is that correct?

A.    Commission for spring of 2004, correct.

Q.    All right.  What was his sales figure for 2004 on that same route?

A.    Two hundred fifty-five thousand.

Q.    Okay.  So he was just under Mr. Stuart; is that correct?

A.    According to that, right.

Q.    Okay.  Then I'll show you Exhibit -- what I've marked as Exhibit 6, which is Terry Watson's 2005 commission

Page 68

statement.

A.    Okay.

Q.    And what is his sales -- is that correct?  Is that his 2006?

A.    Yeah, looks to be just like the rest of them.  It's three hundred six thousand.

Q.    Okay.  So that's an increase, correct?

A.    Right.  The second one is an increase.  First one was a decrease.

Q.    The first one was a five thousand dollar decrease?

A.    If that's what the math was, yeah.

Q.    And the second one is about a fifty-six thousand or forty-six thousand dollar increase?

A.    Okay.

Q.    Is that correct?

A.    If that's --

Q.    Yes?

A.    If the math is done right,

17 (Pages 65 to 68)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 69

1    that's right.
2    Q.   All right.  Then Terry, you
3  said you didn't want him, told Joe Stewart
4  you didn't want him, and he was
5  reassigned, that is, he left your
6  territory, correct?
7    A.   He left.
8    Q.   In 2006?
9    A.   He left route eighteen three,
10  right.
11    Q.   Okay.  And I'll show you
12  what's been marked as Exhibit 5.  And this
13  is the commission for Terry Watson for the
14  spring of 2006, and I believe that he was
15  reassigned to take over a route in
16  Montgomery or near Montgomery.  But is
17  that Mr. Watson's commission statement for
18  2006?
19    A.   Same as the rest of them,
20  that's what it says, yes.
21    Q.   Okay.  And what was his sales
22  figures for 2006?
23    A.   Two fifty-two.

Page 70

1    Q.   Well, don't they get paid on
2  collected?
3    A.   Well, every number I read off
4  was off the sales number.  So all of them
5  would be adjusted down, that's correct.
6  But every one of them would be -- would go
7  down.
8    Q.   Okay.  Just for record
9  purposes, will you identify the document
10  number and then the collected sales
11  figures?
12    A.   Okay.  Make it by year,
13  Document 7 was three fifty-three -- sorry,
14  Document 7 was two hundred fifty-three.
15    Q.   Is that Luther Stuart?
16    A.   No, that was Terry Watson.
17    Q.   Terry Watson for what?
18    A.   That was for 2004.
19    Q.   Okay.  Can you go to Luther
20  Stuart's sales, collected sales, in 2003?
21    A.   At that time -- I think at
22  that time we paid on deliveries, so his
23  was actually deliveries.  It changed some

Page 71

1  point in there.  His would be deliveries
2  in 2003.
3    Q.   So Terry may have actually
4  collected more than -- or more than Luther
5  in 2003, but there is a change in the
6  reporting from that -- from those two
7  years; is that correct?
8    MR. GERHARDT:  Object to the
9  form.
10    Q.   We don't know what Luther's
11  collecteds are in 2003, do we?
12    A.   Well, this just says sales, it
13  doesn't have that line, so they could have
14  taken it out.  I don't -- I'm not sure on
15  how we were paid.  This says -- just says
16  sales were in 2004, it says sales and
17  collected.  It's making a difference.
18    Q.   Okay.  In 2005, what were
19  Terry Watson's collected?
20    A.   2005, three hundred and two
21  thousand.
22    Q.   Okay.  And in 2006 what was
23  his collected sales?

Page 72

1    A.   A hundred and seventy-three
2  thousand five hundred.
3    Q.   That's a substantial decrease
4  from 2005, correct?
5    A.   Right.  Now, on collections,
6  just so you know, on collections of
7  independents, that's the salesmen does the
8  collecting.  So it looks like the sales
9  wasn't -- you know, what the final -- and
10  this is a -- they are paid on ninety
11  percent.  So the difference there is
12  probably outstanding independent money
13  that it is the salesman's responsibility
14  to collect.
15    Q.   Now, I'm going to show you
16  what has been marked as Exhibit 3, which
17  is Leslie Branham's commissions for this
18  eighteen oh three route for 2006.  And
19  what did he collect on that route in 2006?
20    A.   Three hundred and
21  seventy-eight thousand.
22    Q.   Okay.  And what did he receive
23  in commissions?  What are his commissions

Page 73

on that, eighty-seven?
2      A.    His gross commission?
3      Q.    Yes.
4      A.    Eighty-two.
5      Q.    Eighty-two. Okay. What are
6   Terry Watson's commissions, gross
7   commissions, in 2006?
8      A.    Gross commission, twenty
9   thousand eight hundred sixteen dollars.
10     Q.    And is he actually upside-down
11  for the year, that is, his draws exceeded
12  his commissions?
13     A.    At the time of this, it did.
14     Q.    So based on these changes, Mr.
15  Watson has been impacted negatively,
16  correct?
17        MR. GERHARDT: Object to the
18  form.
19     A.    Well, you are not comparing
20  apples to apples.
21     Q.    Well, he made less money in
22  2006 than he did in 2005, correct?
23     A.    So did any salesman that sold

Page 74

1   less in one year than he did the other.
2      Q.    Yes, sir. But this change
3   wasn't voluntary, was it?
4      A.    I have -- I don't know.
5      Q.    You made the decision to send
6   him to another territory, correct?
7      A.    I think most of the change
8   was -- let me see here.
9        MR. GERHARDT: His question
10  was just whether you made the decision to
11  change him to another territory.
12     A.    Okay. Yes, I made that
13  decision.
14     Q.    You would agree with me that
15  that decision cost Terry money, correct?
16        MR. GERHARDT: Object to the
17  form.
18     A.    I can't say that it did or
19  didn't. That wasn't the only thing that
20  cost him money, but it could have.
21     Q.    Well, I know you didn't
22  transfer him to Texas and assign him that
23  route. I understand that. You just

Page 75

1   recommended that he not be reassigned to
2   your territory, correct?
3      A.    Correct.
4      Q.    Do you know how much or how
5   the two routes compared, that is, Bells,
6   Tennessee and the route he's on for the
7   year 2005? Do you know how they compared,
8   how much was sold on each route?
9      A.    2005, I know what was --
10     Q.    Sold in Bells?
11     A.    Bells. But, no, the other
12  one, I don't.
13     Q.    What was sold in Bells?
14     A.    In 2005?
15     Q.    Yes, collected. How much did
16  he collect?
17     A.    The year that Terry was there?
18     Q.    Yeah.
19     A.    2005, three hundred two
20  thousand.
21     Q.    Okay. Do you know what was
22  sold on the route he's on now for 2005 in
23  2005?

Page 76

1      A.    No.
2      Q.    Okay. Tell me, the route that
3   Mr. Branham is working now, were there any
4   changes to it from 2005 to 2006? Were any
5   stores added or deleted?
6      A.    Best of my knowledge -- let me
7   think. Yeah, there was probably -- best
8   of my knowledge, there was some -- some of
9   both. Some taken away and some added to
10  it. I don't remember --
11     Q.    Well, is there some way that
12  we can determine what stores were on the
13  route in 2005 and what stores were on the
14  route in 2006, sir?
15     A.    I think so. I don't know how
16  long they keep that information.
17     Q.    Well, if you're a lawyer like
18  me and you wanted that information, what
19  would you ask for?
20     A.    2005. Home office may still
21  have that. The store -- the customer list
22  for that year, I don't know how long they
23  keep them.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 77

Q.   Would you ask for the customer
list for route eighteen oh three for 2005,
2006, is that what you would ask for?
A.   Right.
Q.   Okay.  Who would have that,
who at Union Springs?
A.   If it was available, Patty
Walker would have it.
Q.   Well, why wouldn't it be
available?  Don't y'all have computers
down there?
MR. GERHARDT:  Object to the
form.
A.   Sure.  But information becomes
irrelevant at some point in time.
Q.   Do you know what your policy
is about how long you retain information,
sir?
A.   No, no.
Q.   Okay.  Other than Joe Stewart,
have you had any conversation with anybody
at Bonnie Plant about the job performance
of Terry Watson?

Page 78

A.   Not that I remember, no.
Q.   Do you have to grow the plants
at your station?
A.   Yes.
Q.   How many folks do you have
that help you?
A.   It varies, but anywhere from
six or seven at the beginning of the
season to fifteen or so as we get busier.
Q.   And your route salesmen, do
they have a helper or someone to assist
them on their route?
A.   Yes.
Q.   Do you recall who Terry
Watson's helper was on his route?
A.   I do.  It was Michael Roades.
Q.   R-h-o-d-e-s?
A.   A-d-e-s, I think.
Q.   R-o-a-d-e-s?
A.   E-s, I think that's how it's
spelled.
Q.   Okay.  Is he still employed
with the company?

Page 79

A.   No.
Q.   When did he leave, if you
know?
A.   He worked -- best of my
knowledge, he worked with Terry part of
both years.  I know maybe part of the
first year and the second year.  Seems
like he worked with Les.  The first trip,
Les kept him out a long time or whatever,
he didn't work that year.  And then I
don't think he worked -- then he worked
again last year a little bit, helped me
out some last year, and I haven't seen
him.  He just -- haven't seen him this
year at all.
Q.   But is it fair to say that the
decision to sever the relationship was his
decision, that is, he wasn't fired?
A.   Sure, no.
Q.   It was a voluntary --
A.   Right.
Q.   -- quit or whatever?
A.   Right.

Page 80

Q.   Okay.  And were there any
other people that worked with Terry other
than Michael at your --
A.   I'm sure that -- I'm pretty
sure that first year, there probably was.
Seems like he had two helpers maybe at one
time.  But, you know, that's -- really I
do the paperwork and stuff for them.  But
that's -- they keep up with them as far as
if they're satisfied, they keep them.  And
people come -- I mean, there is a lot of
turnover there.  People come for a job,
but they don't really want to work
sometimes.
Q.   And y'all's trucks, the Bonnie
Plant trucks, they have a GPS device in
them, correct?
A.   Some -- at the time I don't
think -- I don't think they did during
this time, but they do now.
Q.   Okay.  Well, today you know
where the truck is and you know how many
hours a day it is moving, correct?

20 (Pages 77 to 80)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 81

1    A.    On the ones -- right.
2    Q.    That have that system?
3    A.    That have that system.
4    Q.    Do you get any kind of report
5    about the trucks, like --
6    A.    No.
7    Q.    Where does that information
8    go, to the home office?
9    A.    If they have one, yeah, as far
10   as I know.  I don't know where it goes.  I
11   have the capability I can pull up and look
12   at them and see where they are on a map.
13   Q.    On your computer?
14   A.    On the computer.
15   Q.    Okay.  So if you need them,
16   you know where they are?
17   A.    Most of the time.  There is
18   places like self-service and everything
19   else, places where they do work and places
20   where they don't work.
21   Q.    Like a phone?
22   A.    Just like a cell phone.  I
23   mean, but --

Page 82

1    Q.    Have to have a satellite?
2    A.    I don't understand that how
3    you cannot have a satellite, but there is
4    places that they don't.
5    Q.    Okay.  And when somebody is
6    working under your supervision, how do you
7    communicate with them, that is, do you
8    have an office at a location?
9    A.    Yes.
10   Q.    Where is that office, sir?
11   A.    It's at the plant farm in
12   Bells, Tennessee.
13   Q.    It's in Bells, your office?
14   A.    Right.
15   Q.    And that's where you normally
16   report to work?
17   A.    That's where I am, right.
18   Q.    And how -- if they're out on
19   the road, how do you communicate with
20   them?  Can you e-mail them?
21   A.    I can now if they have e-mail,
22   but they have to have access.
23   Q.    They have to have a Blackberry

Page 83

1    or something so they can see it?
2    A.    Right.  Most of the time now
3    it's cell phone.  It used to be, I mean,
4    primitively we used to have to call around
5    the stores and leave messages for them.
6    Q.    They don't have a laptop in
7    their truck or anything?
8    A.    They have a laptop now, but
9    it's something new this year.  They don't
10   have Internet access all the time.
11   Q.    Okay.  Again, like a cell
12   phone?
13   A.    Yeah, that and it's -- I mean,
14   it's something new, and they're figuring
15   out.
16   Q.    Okay.  And then, I mean, I
17   assume that there is times when you may
18   need to contact them, correct?
19   A.    Yes.
20   Q.    And so you normally reach them
21   by cell phone?
22   A.    Cell phone.
23   Q.    Okay.  And can you -- what do

Page 84

1    you do if somebody -- let's say they
2    become ill and their wife becomes ill, are
3    there occasions when you have to
4    physically run a route for somebody?
5    A.    Yes.
6    Q.    I mean, that's part of your
7    job too?
8    A.    Right.
9    Q.    I guess that's happened from
10   time to time?
11   A.    I has.
12   Q.    I mean, a family emergency or
13   something?
14   A.    Right.
15   Q.    Did you ever have to do that
16   with Terry?
17   A.    Not that I remember, no.
18   Q.    Now, how long is the season,
19   the spring season up in Tennessee, when do
20   they stop?
21   A.    Basically February to now we
22   run to about the 4th of July.
23   Q.    Okay.  And during that period

21 (Pages 81 to 84)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 85

1  of time, would a salesman work seven days
2  a week, or how would they work?
3      A.    It varied according to sales
4  whether it was seven days a week or two
5  days a week, according to -- according to
6  his sales volume.
7      Q.    They make their own schedule?
8      A.    Pretty much, right.
9      Q.    I mean, they don't have normal
10 hour they're required to work or anything?
11     A.    They're required to take care
12 of the stores, so that's their schedule.
13 I mean, if it takes two days a week or if
14 it takes seven days a week, whatever it
15 takes.
16     Q.    I wouldn't imagine you have
17 any routes that work two days a week, do
18 you?
19     A.    Well, only -- early on and
20 maybe late, you know.
21     Q.    When you are winding up or
22 gearing up?
23     A.    Right.

Page 86

1      Q.    Okay.  But these like -- for
2  example, your customers include Home Depot
3  and Lowe's, correct, Wal-Mart?
4      A.    Yes.
5      Q.    So chain stores, correct?
6      A.    Yes.
7      Q.    And I'm going to say
8  high-volume stores for plants?
9      A.    Right.
10     Q.    Do you serve -- sell to
11 nurseries too?
12     A.    Some.
13     Q.    Would that be your
14 independents?
15     A.    Independents would be anybody
16 from farm supply stores, cooperative
17 stores.  I mean, we have some florists, we
18 have some -- anything you can imagine,
19 service station.  I mean, most anybody
20 that wants to sell plants, we sell to a
21 wide variety of people.
22     Q.    Okay.  Now, when they go to an
23 independent, what you've described, you

Page 87

1  say they have to collect?
2      A.    Right.
3      Q.    Do they -- is there some
4  paperwork they have to do there and
5  physically get a check?
6      A.    Right.
7      Q.    How does that work?
8      A.    The billing is handled from
9  the home office.  It's the salesman's
10 responsibility to keep up with it and make
11 sure that they're paid on a timely manner.
12 And if they are not paying, you cut them
13 off from deliveries.
14     Q.    You only extend credit for so
15 long?
16     A.    So long.
17     Q.    So how many days do you
18 normally extend credit?
19     A.    Well, it's -- we don't have a
20 strict policy on that because it's sort of
21 according to the customer.  We've had
22 customers for years that, you know, you
23 try to work with them.  And then, of

Page 88

1  course, you have some, the newer they are,
2  probably thirty days.
3      Q.    Now, and physically, these
4  salesmen have to get these racks out of
5  their truck and set them up in the stores,
6  correct?
7      A.    Right.
8      Q.    I mean, they stock the stores,
9  they don't just drop -- pull their truck
10 up and the people in Home Depot --
11     A.    Right, that's the difference
12 between if I come in, I guess we have
13 salesmen as opposed to delivery boys or
14 delivery people.  They are actually seeing
15 what they need.  It's not put on their
16 truck this store gets this sixty and you
17 roll it off the rack and leave.  You get
18 out and look to see what is on the rack
19 and pick up what is there and see what
20 they have sold and what they haven't sold
21 and more popular things which vary from
22 one store to the other in the same town
23 and leave what they -- leave what they

22 (Pages 85 to 88)

Page 89

1 reason and come up with what they need and
2 leave that.
3     Q.   Do the salesmen get reports
4 sent to them about what has sold?
5     A.   They do now.
6     Q.   Okay.  That's not something
7 they were doing in 2004 or '5?
8     A.   No, it wasn't available to us
9 then at that time.
10     Q.   Okay.  So when the store scans
11 it, there is no information provided to
12 y'all?
13     A.   It is now.
14     Q.   Okay.
15     A.   In the beginning, we came up
16 with pay by scan, and it was -- it's so
17 much like everything else when compared to
18 electronics to 2004.  It's so much more
19 refined now than it was then.  At that
20 time we got a report I think it was
21 weekly.  And now you have daily reports,
22 and you have a lot more information
23 available today.

Page 90

1     Q.   And so that's one of the
2 reasons for the computers in the trucks,
3 is to provide that information to the
4 salesmen?
5     A.   Yes.
6     Q.   That is they're linked in some
7 way to your network so that they can get
8 this information, help them stock the
9 stores and keep the inventory?
10     A.   To some extent.  It still only
11 tells you volume.  It doesn't tell you
12 specific items.  Specific -- it tells you
13 containers.  It doesn't tell you specific
14 varieties and that type thing.
15     Q.   It doesn't break it down into
16 like we need more marigolds or anything
17 like that?
18     A.   No.  Because the containers
19 are -- the bar codes, they scan -- the SKU
20 numbers and bar codes are a container
21 because the stores won't give you -- I
22 mean, we would have to have just for
23 vegetables a hundred, hundred and fifty,

Page 91

1 two hundred different numbers and that
2 overloads their system.  So they give you
3 six or seven numbers, ten numbers that you
4 can use.  So each container size has a
5 number.  So you look up there and see they
6 sold -- you have volume.
7     Q.   You know they sold how many
8 vegetables maybe and then how many plants?
9     A.   How many five-inch cups,
10 four-inch cups, whatever.
11     Q.   Okay.  So they really have to
12 go to the stores and see what they need?
13     A.   Right.
14     Q.   And that makes it I assume
15 harder to know what to take --
16     A.   Right.
17     Q.   -- to the stores, right?
18     A.   Right.
19     Q.   So they may have to go twice a
20 week, whatever?
21     A.   High volume stores, you're
22 going every other day.  Every day on the
23 weekend.  Every -- or whatever.  But you

Page 92

1 are going -- the volume of the store, it
2 would be anywhere from one time to five
3 times a week probably.
4     Q.   And that's something that's
5 important, these high-volume stores, I
6 assume y'all sell most of your plants on
7 the weekend; is that correct?
8     A.   Most of the time, yes.
9     Q.   That is, people like me who
10 work during the week, they are going to go
11 to the store on the weekend and get
12 something to work in their yard?
13     A.   Right.
14     Q.   And then so you may have to go
15 a couple times on Friday and on Sunday or
16 on Saturday and Sunday, right?
17     A.   Right, sure.
18     Q.   And so it's important that
19 your salesmen work on the weekend and they
20 can slow down during the week, would that
21 be a fair statement?
22     MR. GERHARDT:  Object to the
23 form.

23 (Pages 89 to 92)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Page 93

A.    No.  When you are -- I mean,
you sell -- you know, there is times that
stores sell through the week just as well
as they do on the weekend.
Q.    Now, so y'all are constantly
refining your system, information systems,
correct?
A.    That's what they say.
Q.    Okay.  Well, do you feel like
it's gotten more helpful as the years --
over the years?
A.    It has.
Q.    Okay.  And you got Tony Brown
who is over age sixty and he's working
under your supervision, right?
A.    Correct.
Q.    Is he doing a good job?
A.    He does.
Q.    You can do this job even at an
advanced relatively speaking age, correct?
A.    Correct.
Q.    Now, you're telling me, as I
understand it, that you made the decision

Page 94

you didn't want Terry back as a salesman
was based strictly on his job performance
for you, correct?
A.    Correct.
Q.    It had nothing to do with his
health problems?  I mean, you didn't know
the status of his health, correct?
A.    Correct.
Q.    Okay.  I just want to --
because, I mean, he had surgery that fall.
But that wasn't the reason that you said
you didn't want him back, correct?
A.    That was not the reason,
right.
MR. ROBERSON:  Okay.  Well, I
think I'm through, Graham.  Have you got
any questions?
MR. GERHARDT:  I don't have
any.
MR. ROBERSON:  We'll go off
the record.  It's 1:12, and we'll go off
the record at this time.
FURTHER THE DEPONENT SAITH NOT

Page 95

C E R T I F I C A T E

STATE OF ALABAMA)
JEFFERSON COUNTY)

I hereby certify that the
above and foregoing deposition was taken
down by me in stenotypy, and the questions
and answers thereto were reduced to
typewriting under my supervision, and that
the foregoing represents a true and
correct transcript of the deposition given
by said witness upon said hearing.
I further certify that I am
neither of counsel nor of kin to the
parties to the action, nor am I in anywise
interested in the result of said cause.

COMMISSIONER - NOTARY PUBLIC
ACCR LICENSE NO. 278

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031

http://www.TylerEaton.com

## A

**able**
14:15 44:9
**absorbs**
19:14
**access**
9:16 36:7 82:22 83:10
**ACCR**
95:23
**acknowledge**
35:11 37:18
**acting**
5:4
**action**
1:5 95:17
**activity**
14:9
**Adam**
1:18 2:6 5:13,19 6:17
34:10 62:2 66:1
**add**
39:7 64:12
**added**
76:5,9
**address**
49:22
**adjusted**
70:5
**advanced**
93:20
**advise**
35:1
**affect**
64:9
**ag**
34:17
**age**
60:1,11,14,23 61:6,8,14
93:14,20
**ago**
21:23 22:2 57:21
**agree**
59:22 60:2 62:5 63:12
74:14
**AGREED**
2:3
**Agri**
34:17
**air**
19:22 21:20
**Alabama**
1:2,10 3:8,15 5:3,4,12,21
6:2 36:22 95:4
**Alley**
1:18 2:6 5:13,19 6:17 7:4
46:22 65:5 66:1,2
**annoy**
15:2 20:14
**annual**
44:8

**annually**
64:3
**answer**
7:22 14:21 20:13 22:8
35:17 48:9 52:12 60:9
**answered**
22:10 48:8
**answers**
7:14 95:10
**anybody**
23:5 34:19 38:14,15 40:1
41:13 77:21 86:15,19
**anymore**
28:10
**anywise**
95:17
**appears**
54:6
**apples**
65:2,2,3,3 73:20,20
**appropriately**
40:10
**approval**
38:15 39:4
**approximately**
22:18 39:11 55:23 56:2
**April**
1:19 5:12 6:6
**area**
11:2 33:11
**Arizona**
56:16 57:10
**Arkansas**
46:12
**Arthur**
1:7 5:20
**articulate**
7:14
**asked**
18:23 48:8 51:6
**asking**
47:1 58:22
**aspect**
44:23 52:6
**assign**
2:20 21:10 74:22
**assigned**
8:5 20:18 22:11 28:13
29:1 54:15 56:23
**assignments**
21:9
**assist**
35:21 78:11
**assume**
7:23 17:2 62:20 83:17
91:14 92:6
**attorney**
3:5,12 6:7
**Auburn**
34:14
**audibly**

**14:21**
**August**
66:20
**authority**
37:7 38:1,8,23
**available**
77:7,10 89:8,23
**aware**
39:20 45:15,16 47:6
48:11 50:13 61:2,8,11,18
**A–d–e–s**
78:18
**a.m**
5:13

## B

**B**
4:5
**back**
13:5 25:18,19 33:21 34:1
50:14 51:1,23 53:6 94:1
94:12
**bad**
33:13,18 39:18 42:1,19
**ballpark**
18:17
**bar**
90:19,20
**based**
21:9 61:6 64:1 73:14
94:2
**basically**
17:22,22 18:11 19:11
66:23 84:21
**basis**
32:12
**bed**
40:17
**began**
47:3 48:4
**beginning**
12:19 78:8 89:15
**behavior**
37:19
**belief**
60:4
**believe**
55:4 57:9 69:14
**believes**
60:3
**Bells**
8:10,21 10:4,11 12:9 13:8
13:18 15:4 45:19 47:5
48:5 66:9 75:5,10,11,13
82:12,13
**best**
13:1 43:1 76:6,7 79:4
**better**
25:8,9 32:16 51:22
**biannual**

**44:11**
**big**
25:11 42:13,17
**Bill**
16:23
**billing**
87:8
**Birmingham**
3:8,15 5:3,11 6:5
**bit**
7:15 10:17 22:21 79:12
**Blackberry**
82:23
**Bonnie**
1:11 5:23 8:16,18 11:16
34:19 35:20 42:9
43:23 48:2 50:10 54:21
56:4 61:16 67:9 77:22
80:15
**Box**
3:7
**boxes**
42:13,18
**boys**
88:13
**Branham**
76:3
**Branham's**
72:17
**break**
65:7,11,14,16 66:2 90:15
**breaking**
25:8
**bring**
33:12,21 50:13,23 51:23
53:6
**Brogland**
55:12,13,17
**Brother**
16:6
**Brown**
26:12 29:15 93:13
**budgetary**
39:5
**Burr**
3:13 5:10 6:4,12
**busier**
78:9
**business**
5:22 12:21 22:9 29:11,17
30:6 34:17 38:2
**Butch**
16:3,4,7 17:13 66:4,5
**Butch's**
16:8

## C

**C**
3:1 95:1,1
**cab**

**40:16**
**calendar**
48:6
**call**
9:14 36:18 38:23 83:4
**camera**
40:21,23
**cameras**
41:8
**capability**
81:11
**card**
44:8,15
**care**
62:1 85:11
**case**
5:20,23 18:22 61:15
**cause**
5:14 95:18
**CDL**
14:12
**cell**
49:3,5,14,18 81:22 83:3
83:11,21,22
**certain**
30:13
**certainly**
47:15
**certified**
1:22 2:8 5:2 44:18
**certify**
5:5 95:7,15
**chain**
86:5
**change**
20:10 21:3 22:20,21 30:7
31:21 32:5,10 49:15
64:2 65:8 71:5 74:2,7
74:11
**changed**
20:8 21:15 22:13 27:8
28:20 30:4 41:5 55:3
55:13 70:23
**changes**
30:16 63:16 64:9,19,20
73:14 76:4
**Charlie**
16:19
**check**
87:5
**checks**
47:20
**circumstances**
32:11
**city**
8:11
**Civil**
1:5 5:7
**claims**
19:13
**clean**

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

14:22 33:10 40:14 51:7
51:8,10
close
11:11
closer
32:6
codes
90:19,20
collect
72:14,19 75:16 87:1
collected
42:5,7 70:2,10,20 71:4,17
71:19,23 75:15
collecteds
71:11
collecting
72:8
collections
72:5,6
college
34:11,13 56:10
come
25:18 33:23 46:19,20
56:13 80:11,12 88:12
89:1
comes
42:10
commencing
5:12
commission
30:13 62:18,22 63:3,11,16
63:17 66:13 67:9,12,23
69:13,17 73:2,8
Commissioner
2:7 5:5 95:22
commissions
72:17,23,23 73:6,7,12
common
61:11
communicate
82:7,19
communicated
40:9
communication
34:23
company
29:5 78:23
compare
64:5 65:1
compared
75:5,7 89:17
comparing
73:19
comparison
64:16,19
comparisons
64:23
complaint
41:11,23 59:23 60:23
61:7
complaints

41:13,15
compliance
2:13
computer
36:8,11 42:15 81:13,14
computers
77:10 90:2
conclusion
51:4
consider
12:23
considered
10:18 17:14
considering
64:20
consignment
42:9
consist
10:14
constant
46:18
constantly
93:5
contact
9:20 46:9,18 48:17 49:6
49:7,23 83:18
container
90:20 91:4
containers
40:12 90:13,18
continually
51:5
conversation
51:14,20 52:1,20 77:21
conversations
33:8,16 53:2
cooperative
1:10 5:22 86:16
correct
7:10 11:7,17 12:1,16,17
13:3,10,11,23 14:3,4,6,11
14:14,16,17 15:14,15,16
15:20 16:9,10 18:19,20
21:13 23:14 29:3 30:9
32:10,23 33:1 37:4,5
39:8,20,23 43:10 44:16
44:17 45:1,2 47:16 50:1
50:2 52:6,7,9 53:7,8
54:9 55:18,19,21,22
62:19,22 63:5,18 64:3,4
64:6,7,10,11,17 67:11,13
67:19 68:4,9,20 69:6
70:5 71:7 72:4 73:16
73:22 74:6,15 75:2,3
80:17,23 83:18 86:3,5
88:6 92:7 93:7,16,20,21
94:3,4,7,8,12 95:13
correspondence
50:5
cost
74:15,20

counsel
2:5,17,19 5:9 6:9 95:16
counseled
35:12
country
44:2
COUNTY
95:5
couple
92:15
course
88:1
court
1:1 2:14 5:8 6:2 7:9
Co-Op
36:22 55:16
crates
33:22,23 51:12
credit
87:14,18
crossed
18:1
cups
91:9,10
customer
41:9 76:21 77:1 87:21
customers
86:2 87:22
cut
87:12
CV
6:3

_____
D

D
3:4 4:1
daily
89:21
date
5:6 10:1 39:12
dated
53:23
dates
50:16 54:17
day
80:23 91:22,22
days
85:1,4,5,13,14,17 87:17
88:2
deal
46:23
deals
44:22
decides
33:14
decision
32:19 38:9 50:8,20 74:5
74:10,13,15 79:17,18
93:23
Decouto

26:19
decrease
43:2 68:11,13 72:3
defendant
3:10 5:23 6:13
Defendants
1:12
define
60:20
definitely
50:17
degree
34:11,16 56:10
delete
64:13
deleted
76:5
deliver
42:18
deliveries
70:22,23 71:1 87:13
delivery
88:13,14
Dennis
38:21
department
36:13 58:21
DEPONENT
94:23
deposition
1:16 2:6,11,12,22 5:19 7:5
7:6 53:21 65:23 67:8
95:8,13
depositions
2:15
Depot
86:2 88:10
described
86:23
determine
76:12
developed
41:6
device
80:16
devices
34:23
difference
71:17 72:11 88:11
different
14:3 19:7 24:6 32:8
46:10 63:19 91:1
digital
41:5,7
director
43:21
dirty
40:15
disarray
33:9
disciplinary

34:7 37:9
discipline
35:6 39:13
discrimination
60:1,12,15 61:1,6,8,15
District
1:1,2 5:8 6:1,2
Division
1:3 6:3
document
54:1 66:16,18 70:9,13,14
documents
46:23 47:2,6 48:2
doing
5:22 15:2 25:6 51:5 67:2
67:4 89:7 93:17
dollar
68:13,18
dollars
43:9 73:9
DOT
44:21
draw
47:11,20 63:2
draws
47:18 73:11
drive
11:4 13:23 14:15 19:15
25:23
drivers
44:7 45:23
driving
11:13
drop
88:9
duly
6:18
dumpster
40:15
D-e-c-o-u-t-o
26:22
D/B/A
1:11

_____
E

E
3:1,1 4:1,5 95:1,1
earlier
32:17
early
50:17 85:19
earn
62:21
east
8:14 46:13
eastern
10:17 18:1
economics
34:17
effect

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

2:13
efficient
12:3
eight
27:17,19 73:9
eighteen
10:12 17:18 20:23 23:11
    24:3,5,8,23 26:12,19
    27:3,7,8,9,11,12,19 28:1
    33:3 55:4 69:9 72:18
    77:2
eighty–seven
73:1
Eighty–two
73:4,5
either
18:13 64:10
Eleanor
1:21 2:7 5:1
electronics
89:18
else's
38:15
emergency
84:12
employed
78:22
employee
29:12 35:11 37:12 38:12
employees
35:1,7
employer
34:22
employers
35:5
employment
50:10 60:6
equal
64:23
evaluate
30:21 31:1 34:23 35:6
    64:16
evaluating
31:4
evidence
2:23
exact
43:11 50:16
exactly
22:1
examination
4:3 5:14 7:3
examined
6:18 44:15
example
35:8 86:2
exceeded
73:11
exchange
16:14
exchanged

15:22 16:1
Exhibit
4:6,7 48:13,15 53:21
    59:16,19 66:12 67:7,22
    67:22 69:12 72:16
Exhibits
4:8 65:20
expectations
35:2
experience
29:16
extend
87:14,18
extent
90:10
e–mail
9:17 50:20 82:20,21
E–s
78:20

_____
          F
_____

F
95:1
fact
61:13
fair
8:1 14:22,23 26:1 39:14
    62:10 79:16 92:21
fall
45:9 48:18 50:17 52:2
    53:14 94:10
family
84:12
far
19:10 20:16 22:12 80:9
    81:9
farm
44:1 82:11 86:16
Farmers
1:10 5:21 36:22 55:16
Farms
1:11 5:23 35:20 48:3
    50:11 56:4
fax
9:16,22
February
45:22 46:4 84:21
Federal
5:6
feel
93:9
feet
45:14
fifteen
78:9
fifty
24:14 27:23 90:23
fifty–five
65:6 67:16
fifty–six

24:16 68:17
fifty–three
70:13,14
fifty–two
69:23
figure
67:15
figures
66:22 69:22 70:11
figuring
83:14
file
37:10,13,14
files
58:9
film
41:6
final
72:9
fine
18:18
Finlinson
24:18 28:23
fire
38:10 57:3,12
fired
57:18 58:3 58:9 59:5,9 79:18
first
6:18 35:8 38:18 39:3
    45:21 68:11,12 79:7,8
    80:5
five
26:12 55:4 68:12 72:2
    92:2
five–inch
91:9
florists
86:17
fluctuates
46:16
folks
78:5
following
5:15
follows
6:19
force
2:13
foregoing
5:8 95:8,12
form
2:18 20:12 22:7 35:16
    39:22 48:8 52:11,18
    54:11 58:6,12 60:8
    62:9 71:9 73:18 74:17
    77:13 92:23
Forman
3:13 5:10 6:5,12
formerly
13:7
forms

35:20 36:5
Forties
27:5
forty
27:23
Forty–one
62:3
forty–six
68:17
four
10:3 26:5 56:6
fourteen
38:3
four–inch
91:10
frame
46:2
fresh
33:12
Friday
92:15
full
2:13
further
25:22 32:7 94:23 95:15

_____
          G
_____

Gaines
27:19
gather
17:3 57:4
Gatlin
43:19
gearing
85:22
Generally
46:12
gentleman
43:15 52:3 55:15
geographic
17:21
geographical
11:1
Gerhardt
3:11 6:11,12 7:1 20:11,15
    22:6 35:15 39:21 48:7
    52:10,17 54:10 58:5,11
    58:19 60:7 62:8 71:8
    73:17 74:9,16 77:12
    92:22 94:18
Germantown
41:20
getting
34:1,3 47:10 59:6
give
61:15 90:21 91:2
given
7:6 33:11 35:12 40:6
    95:13
go

18:5,7 20:23 31:4 34:13
    39:2 40:19 46:11 47:20
    57:3 70:6,19 81:8
    86:22 91:12,19 92:10,14
    94:20,21
goal
30:10,12,17,18 63:10,12,18
goals
42:22
goes
42:15 81:10
going
7:22 13:5 14:20 24:17
    26:3,16 45:10,16 51:15
    51:22 59:8 61:22 65:7
    65:8,14 66:11 67:6
    72:15 86:7 91:22 92:1
    92:10
good
67:2,4 93:17
gotten
93:10
GPS
80:16
Graham
3:11 6:11 94:16
gross
73:2,6,8
grounds
2:21
grow
25:12 78:2
guess
12:18 31:19 32:14,20
    36:10 38:7 52:13 84:9
    88:12
guy
16:2 55:11

_____
          H
_____

H
4:5
half
26:10
handle
57:7
handled
40:4 87:8
handles
44:6,22
happened
84:9
harder
91:15
health
44:9,19 50:6 94:6,7
heard
19:23
hearing
95:14

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

held
40:12
help
26:20 30:6 32:1 59:3
78:6 90:8
helped
79:12
helper
51:9 56:15 57:9 78:11,15
helpers
80:6
helpful
93:10
High
91:21
higher
63:10,16,22,23
high–volume
86:8 92:5
Hino
19:10
hire
55:8 56:12,13
hired
27:14,15 55:11,16,17 56:12
56:15
hiring
38:23
home
21:1 22:12 32:6,7 36:21
49:4,16,21 76:20 81:8
86:2 87:9 88:10
hope
66:14
hour
8:14 85:10
hours
80:23
HR
36:12
Hughes
24:5
huh–uh
14:20
human
36:12
hundred
24:8 43:8,9,13 66:23
67:16 68:6 70:14 71:20
72:1,2,20 73:9 75:19
90:23,23 91:1

**I**

idea
16:10 54:13
identification
48:16 59:17 65:21
identify
10:6 23:5 31:7,9 59:2
70:9

ill
84:2,2
illegal
60:12 61:3
Illinois
10:16 26:8 55:2,10
imagine
32:4 35:5 85:16 86:18
impacted
73:15
important
92:5,18
improve
31:12
improved
37:20
improvement
34:4
include
86:2
increase
43:3,5,6 68:8,11,18
independent
72:12 86:23
independents
42:12 72:7 86:14,15
indicate
48:3
indicating
33:19
information
65:10 76:16,18 77:14,17
81:7 89:11,22 90:3,8
93:6
initiates
32:10
inside
40:15
intend
51:21
interested
95:18
Internet
83:10
introduced
7:4
inventory
90:9
involuntary
32:12
involved
14:9
irrelevant
77:15
items
90:12

**J**

Jackson
8:13 17:22

James
26:19 27:7,8,8 29:20,22
January
45:21 46:4,16 47:20
53:23 54:8,13
JEFFERSON
95:5
Jerry
3:4 6:6 55:12,12,17
job
13:15 33:2 38:6 39:1,17
43:20 57:7 59:7 67:3,5
77:22 80:12 84:7 93:17
93:19 94:2
Joe
9:6,13,20 12:8,9,11 13:5
16:5 17:5 38:15,19,20
50:12 53:4,10 57:5
69:3 77:20
Johnny
24:18 26:4 28:22
Johnson
23:23
July
84:22
junk
51:11

**K**

keep
24:17 26:3 40:14 65:8
76:16,23 80:9,10 87:10
90:9
keeping
51:10,10,11
Kentucky
10:16
kept
30:1,4 33:10 79:9
kin
95:16
kind
18:23 19:4,14 35:19
46:20 81:4
knee
45:13
knew
45:10 61:22
know
7:8,19 8:3 10:21 11:9
14:18 16:11 17:19 19:1
19:18 20:9 22:4 23:6
24:11 28:18 29:5,6
31:11 33:10,14,19 34:4,6
34:8 38:5 43:15 45:7
45:17 46:17,18 47:9,13
48:10 49:23 51:21
53:16,18,19 56:18 57:8
58:13,23 60:11,16,18
61:9,10 71:10 72:6,9

74:4,21 75:4,7,9,21
76:15,22 77:16 79:3,6
80:7,21,22 81:10,10,16
85:20 87:22 91:7,15
93:2 94:6
knowledge
43:1 48:1 76:6,8 79:5
Kyle
38:20

**L**

L
2:1 66:3,14
labor
14:8
laptop
83:6,8
large
5:4 11:1
late
85:20
law
3:5,12 5:10 7:10 61:5
laws
2:14
lawyer
76:17
leading
2:19
leave
13:12 36:16 79:2 83:5
88:17,23,23 89:2
led
51:4
left
33:15,20 42:3 69:5,7,9
length
21:9
Les
23:6,8 24:10 54:15 55:9
55:18,20,23 56:3,12
79:8,9
Leslie
72:17
letter
46:7 50:1,20 53:22 54:3
54:7,12 59:20 60:1
let's
23:2 26:5 84:1
LICENSE
95:23
line
17:23 18:10 71:13
linked
90:6
list
76:21 77:2
little
7:15 10:16 25:1 79:12
LLP

3:13 5:11
loading
51:9
location
17:21 82:8
long
8:17 10:19,22 11:5 15:23
21:23 22:2 25:16,17
29:4,10,12 32:17 56:3
57:21 76:16,22 77:17
79:9 84:18 87:15,16
longer
20:19,21 21:11 25:9 28:1
65:9
look
59:6 81:11 88:18 91:5
looked
33:20
looks
54:12 68:5 72:8
lot
22:20 28:20 29:16 49:17
80:11 89:22
loud
7:14
Louisiana
15:19,23
Lowe's
41:8,19 86:3
Luther
66:3,3,14,20 70:15,19
71:4
Luther's
71:10

**M**

machines
9:17
main
38:4
majority
22:23
making
60:23 71:17
man
56:17
management
38:21
manager
9:3,8 10:1 12:7,13 13:6,8
13:13 15:4 17:6 24:21
25:3,4 26:7 28:12,14
29:2,21 31:23 32:21,21
37:7 39:11
manner
87:11
map
81:12
marigolds
90:16

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

marked
48:15  53:21  59:16,19
65:20  66:12  67:7,22
69:12  72:16
math
62:15  68:14,23
ma'am
6:15  7:1
mean
10:22  11:9  19:21  22:8
23:15,18  25:5  30:19
32:18  34:7  38:3  46:11
46:13  47:9  48:21  52:14
54:19  56:18  57:20
58:18  61:12  62:6  63:14
64:12,20,23  80:11  81:23
83:3,13,16  84:6,12  85:9
85:13  86:17,19  88:8
90:22  93:1  94:6,10
means
34:8
meet
63:9,11,17
Memphis
8:14  18:2  41:20
mention
21:19
messages
83:5
met
42:22
Michael
27:12  78:16  80:3
microphone
7:13
Middle
1:2  6:2
miles
20:23
mini
24:20  25:4,5  26:6  29:1
minute
57:20
minutes
65:6
Mississippi
17:23  18:4,6,8
Missouri
10:17
money
47:19  72:12  73:21  74:15
74:20
Montgomery
69:16,16
motor
44:10
moved
13:15
moving
80:23

**N**

N
2:1  3:1  4:1
name
6:6,9  10:8  19:16,23
36:23  43:18  53:1  57:17
named
43:15  55:11
names
57:23  58:16,17
national
9:8  13:13  17:5
nationwide
13:6
nature
41:22
near
8:13  18:13  69:16
neat
33:10  40:10
necessary
2:16
need
9:13  20:18  22:11  30:6
31:11  42:18  49:7  54:7
65:9  81:15  83:18  88:15
89:1  90:16  91:12
needed
20:22  22:16  42:2
negatively
64:10  73:15
neither
95:16
network
90:7
never
39:12,16,18  61:21
new
25:6  27:13  47:9  83:9,14
newer
20:19  21:11  88:1
nine
15:9  21:6  28:1
ninety
72:10
normal
85:9
normally
9:22  14:19  46:22  82:15
83:20  87:18
north
46:13,14
Northern
1:3  6:3
Notary
1:23  2:8  5:3  95:22
notice
37:10
number
6:3  10:7,9  11:19  17:17

30:19  43:12,14  48:22
49:19  70:3,4,10  91:5
numbers
55:3  63:14  64:1  90:20
91:1,3,3
numerous
33:7,16  40:6  51:19
nurseries
86:11

**O**

O
2:1
oath
7:9
Object
20:11  22:6  35:15  39:21
48:7  52:10,17  54:10
58:5,11  60:7  62:8  71:8
73:17  74:16  77:12
92:22
objections
2:17,20
obviously
63:23
occasion
37:2,17  39:17  40:19
occasions
57:11  84:3
offer
39:1
offered
2:22
office
9:9,14  36:21  45:4,5
76:20  81:8  82:8,10,13
87:9
offices
5:10  6:4
oh
12:9  18:7  24:5  33:3  45:7
49:10  72:18  77:2
okay
7:8,15,20,21  8:2  9:2,19
9:23  10:3,10,13,21  11:15
12:20  13:12  14:21  15:2
15:7,17  16:4,7,13,19
17:8,12,16  18:12,15
19:13,17  20:2,7  21:5,18
23:9,22  24:4,17  25:14
26:3,11,18  27:6,11,14,18
27:22  28:11,15  29:19
31:19  35:4  36:4  37:6
37:22  38:22  39:16
40:2,7  41:14  42:8,21
43:8  44:6,14,22  45:3,7
45:18  48:12  49:22  53:4
53:16  54:1  57:11  58:18
58:22  59:11,14  60:5
62:17  63:9  65:1,4  66:6

66:21  67:2,6,18,21  68:2
68:8,19  69:11,21  70:8
70:12,19  71:18,22  72:22
73:5  74:12  75:21  76:2
77:5,20  78:22  80:1,21
81:15  82:5  83:11,16,23
84:23  86:1,22  89:6,10
89:14  91:11  93:9,13
94:9,15
old
24:10  26:15  27:4,16,22
56:1  62:2
Once
44:13
ones
30:4  81:1
one-hour
65:5
onions
33:23
operate
44:10,19
opposed
88:13
oral
5:14  17:10,11  35:8
order
16:13  64:16
outside
40:17  51:23
outstanding
72:12
overgrown
42:2
overloads
91:2
oversee
51:8
owned
23:15

**P**

P
2:1  3:1,1
PAGE
4:2
paid
42:14  47:11,19  62:23
63:2  70:1,22  71:15
72:10  87:11
paper
30:20  42:16
paperwork
17:9  42:20  44:7  80:8
87:4
Parkway
41:20
part
79:5,6  84:6
particular

20:22
particularly
19:6  45:11
parties
2:4,20  95:17
Pat
27:19
Patty
77:7
pay
42:14  63:19  89:16
paying
87:12
payroll
47:15
pending
6:1
people
57:17  59:4  80:2,11,12
86:21  88:10,14  92:9
percent
63:22  72:11
percentage
30:14
percentages
63:13
performance
33:3  39:18  51:2,4  64:17
77:22  94:2
performed
64:6
period
8:6  84:23
permission
16:15  17:1,6,9,10  65:7
personnel
36:4  37:10,13,14  58:9,20
person's
36:23
perspective
47:2
Phillips
27:13
phone
9:22  46:10  48:22  49:3,4
49:5  81:21,22  83:3,12
83:21,22
phones
49:14,18
photographs
41:2
physical
44:21
physically
84:4  87:5  88:3
physician
44:16
pick
42:16,17,18  88:19
picked
42:3  51:12

Page 100

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Pickett
1:21  2:7  5:1
picking
33:17,18
place
52:20
places
81:18,19,19  82:4
plaintiff
1:8  3:3  5:21  6:8
Plaintiff's
4:6,7,8  48:14  59:15
65:19
plan
63:19
plant
1:11  5:23  8:18  11:16  22:9
29:11,16  30:5  34:19
35:20  42:9,10  44:1
48:3  50:10  54:21  56:4
61:16  67:9  77:22  80:16
82:11
plants
8:16  14:2  25:12,17,18,23
33:18  40:12  42:1,1
43:10  46:12  63:6  78:2
86:8,20  91:8  92:6
please
6:15  7:18
plus
25:1  26:17
point
71:1  77:15
policy
77:16  87:20
popular
88:21
position
9:7  39:7
positive
27:1
positively
64:10
practices
60:6
presently
53:1
pretty
11:3  26:2  33:15  57:8,8
67:4  80:4  85:8
previous
47:21  57:2
previously
15:19
primitively
83:4
prior
2:23  50:6  51:2,3  64:6
probably
9:21  20:20  21:4  24:16
41:7  52:21  57:22  58:13

72:12  76:7  80:5  88:2
92:3
problem
21:1,2
problems
94:6
Procedure
5:7
proceedings
5:15
process
34:5,8  35:9,21
product
33:12
progressive
34:7
promoted
24:20
protects
61:5,7
provide
58:18  90:3
provided
5:6  89:11
Public
1:23  2:9  5:3  95:22
pull
81:11  88:9
punish
60:22  61:17
purposes
70:9
put
37:8  88:15
putting
22:15
p.m
65:17,18  66:1
P.O
3:7

---

**Q**

question
7:18  9:12  32:13  36:15
54:2  74:9
questions
2:18,19  94:17  95:9
quickly
57:8,8
quit
79:22
quite
22:21
quota
30:8,9

---

**R**

R
3:1  95:1
rack

88:17,18
racks
88:4
radio
49:9
Rainer
16:23
ran
24:23
rate
33:2,6  34:23  63:17
reach
83:20
read
70:3
reading
2:11  54:7
real
32:14
realize
61:10,11
really
34:9  38:5,6  47:1,13  57:4
57:20  61:21,22  80:7,13
91:11
reason
21:16  22:3,13,15  89:1
94:11,13
reasons
90:2
reassign
31:21
reassigned
28:12  69:5,15  75:1
recall
42:21  53:11,12  78:14
receive
47:18  72:22
received
22:5  62:18
recognize
66:17
recommend
51:15
recommendation
50:9,21  53:13
recommended
75:1
record
6:9  14:22  20:14,15  65:15
70:8  94:21,22
records
47:15  58:1,4,14
reduced
95:10
refer
66:5
refined
89:19
refining
93:6

reflect
47:16  58:2
reflects
52:5
related
16:4
relating
2:15
relations
36:13
relationship
79:17
relatively
93:20
remember
19:16  21:2,22  27:2  28:3
28:19,21  36:2  41:22
43:11,13  45:11  48:20
49:5  50:7,16  52:19,22
53:3,15  54:17  57:4,23
76:10  78:1  84:17
remind
15:1
replace
55:18  57:7
replaced
55:20  56:4
replacement
45:13
report
46:1,7  47:4  48:5  81:4
82:16  89:20
REPORTED
1:21
Reporter
1:22  2:8  5:2  6:21
reporting
71:6
reports
89:3,21
represent
6:10
representing
6:12
represents
95:12
request
21:20  22:3  61:14
required
39:19  46:1  85:10,11
respective
2:5
responsibility
72:13  87:10
rest
29:22  68:6  69:19
restroom
65:12
result
95:18
retain

77:17
retaliation
60:18,21  61:2
return
40:11  42:10
returned
51:16
returning
53:17  54:9
Returns
42:4,6
reuse
33:21,22
Reviewing
54:1  66:16
ride
19:22  21:20
right
11:8,12,14,18,21,23  12:2,3
12:4,20,22  13:2,4,9,16
14:1,7,10  15:10  18:10,14
21:7,12,14  22:1  23:10,17
23:20  25:4,20  26:3
28:22  29:12,13,14,18
30:14,15,18  31:9,9  33:5
36:6  38:20  39:6,15
45:18  55:20  58:1  59:23
62:16,16  63:1,4,7  64:14
64:18  65:22  66:8,10
67:14,20  68:10,23  69:1
69:2,10  72:5  77:4
79:21,23  81:1  82:14,17
83:2  84:8,14  85:8,23
86:9  87:2,6  88:7,11
91:13,16,17,18  92:13,16
92:17  93:15  94:14
road
82:19
Roades
78:16
Roberson
3:4,6,6  4:3  5:18  6:7,14
6:23  7:3  65:13,22
94:15,20
roll
88:17
room
52:15
route
10:4,10,19,22  11:5,10,22
12:6  13:18,22  15:23
16:8,8,11  17:12,14,15,19
17:20  20:21,22  21:10
23:10,11,21  24:2,6,22
25:16  28:5  30:7  31:22
32:15  33:3,20  39:8
41:10  46:10,15  47:12,16
54:16,23  55:2,9,13
56:14,17  57:12  62:21
64:5,9  66:6,14,22  67:3
67:11,15  69:9,15  72:18

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031

http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

72:19 74:23 75:6,8,22
76:2,13,14 77:2 78:10
78:12,15 84:4
**routes**
10:7 11:16 15:23 16:12
20:19,19 21:6,11 25:9
30:2 46:3,11 47:9 64:2
75:5 85:17
**Roy**
24:18
**rules**
2:14 5:6
**run**
24:22 25:18 65:11 84:4
84:22
**R-h-o-d-e-s**
78:17
**R-o-a-d-e-s**
78:19

---

S

**S**
1:21 2:1,7 3:1 4:5 5:1
**safety**
43:21,23
**SAITH**
94:23
**salable**
42:3
**salary**
63:23
**Salem**
26:8
**sales**
9:8 13:6,13 14:9 17:5
30:9,12,14 32:21 42:22
43:2,4 63:10,12,17,22
66:21 67:14 68:3 69:21
70:4,10,20,20 71:12,16
71:16,23 72:8 85:3,6
**salesman**
8:23 12:6 13:18 30:8
31:5 37:23 57:2 73:23
85:1 94:1
**salesman's**
64:17 72:13 87:9
**salesmen**
13:19,23 15:5 22:19 32:5
32:9,16 33:14 34:6
37:13 44:23 47:4,8,17
48:4 49:7 57:12 62:21
63:11 72:7 78:10 88:4
88:13 89:3 90:4 92:19
**salesmen's**
42:11
**salesperson**
31:21 39:13
**satellite**
82:1,3
**satisfactorily**

**40:11**
**satisfied**
80:10
**Saturday**
92:16
**saying**
21:5 26:1
**says**
20:2 66:19,19 69:20
71:12,15,15,16
**scan**
42:14 89:16 90:19
**scans**
89:10
**schedule**
85:7,12
**season**
13:1,1 31:3,18 45:19 47:3
47:5 48:4,19 49:11
50:6,14 53:7 54:19
57:6 78:9 84:18,19
**seasonal**
12:21
**seasons**
15:15
**seat**
19:1,5,14 20:4,4 21:20
**second**
68:10,16 79:7
**see**
19:11 25:14 26:5 31:5,19
47:18 74:8 81:12 83:1
88:18,19 91:5,12
**seeing**
88:14
**seen**
35:13 53:22 54:3 59:19
79:13,14
**self-service**
81:18
**sell**
14:5 42:9 46:12 63:6
86:10,20,20 92:6 93:2
93:3
**send**
46:6 74:5
**sense**
20:5,6 61:12
**sent**
30:6 89:4
**serve**
86:10
**service**
25:8,10 49:19 86:19
**set**
32:11 88:5
**seven**
24:16 27:3,7,10 78:8
85:1,4,14 91:3
**seventy-eight**
72:21

**seventy-three**
72:1
**sever**
79:17
**shipped**
25:13
**ships**
25:11
**shock**
19:15
**short**
9:21 11:10 17:14 32:17
**shorter**
17:15
**Shorthand**
1:22 2:8 5:2
**show**
47:3 53:20 58:10,14
59:18 66:11 67:6,21
69:11 72:15
**shows**
44:8
**sick**
36:17
**side**
18:1
**sign**
37:18
**signature**
2:10
**sir**
8:9 10:14 14:18 36:20
50:15 74:2 76:14 77:18
82:10
**sit**
31:10 59:5
**six**
13:20 15:5 26:19 27:9,11
27:12 68:6 78:8 91:3
**sixteen**
38:4 73:9
**sixty**
25:1,1,1 26:17 28:23
55:14 88:16 93:14
**sixty-one**
25:2
**sixty-three**
67:1
**sixty-two**
62:4
**six-wheel**
14:15
**size**
91:4
**SKU**
90:19
**slot**
39:5
**slow**
92:20
**smaller**

**42:12**
**sold**
43:8 73:23 75:8,10,13,22
88:20,20 89:4 91:6,7
**somebody**
28:11 38:7,21 52:22 82:5
84:1,4
**somebody's**
36:16
**somewhat**
11:17
**sorry**
9:23 24:17 44:14 70:13
**sort**
46:15 87:20
**south**
17:23 46:14
**Southern**
10:16
**Span**
11:1
**speak**
7:14 37:2 53:9
**speaking**
93:20
**special**
19:1
**specific**
90:12,12,13
**spelled**
78:21
**spelling**
26:21
**spoke**
53:4
**spring**
12:19,23 42:3,4 47:5
51:18 54:18 67:12 69:14
**Springs**
9:10 45:6 77:6
**standpoint**
44:9
**Stanley**
23:23 24:13 29:19
**start**
8:23 45:19 47:10,11,18
**started**
12:19 36:3 47:12,16 48:19
57:6
**starting**
54:18,18
**starts**
32:17
**state**
5:4 6:9 44:19 95:4
**statement**
39:14 62:11 66:13 67:9
68:1 69:17 92:21
**states**
1:1 5:7 6:1 60:3

**station**
9:3 10:1 12:6,13 13:7
15:4 24:20 25:3,4,11,22
26:6 29:1,21 31:23
32:21 37:7 39:10 78:3
86:19
**status**
94:7
**stay**
34:1 46:17
**stenotypy**
95:9
**step**
35:8
**Stewart**
9:6 12:8,11 16:3 17:5
38:15 50:12 53:5,10
57:5 69:3 77:20
**STIPULATED**
2:3
**stipulation**
5:9
**stipulations**
6:22
**stock**
14:6 88:8 90:8
**stop**
84:20
**store**
18:10 76:21 88:16,22
89:10 92:1,11
**stores**
11:10,20 14:3,6 18:12,16
33:9,11 40:10,19 41:3
42:13 51:7,8,11,12 64:12
64:13 76:5,12,13 83:5
85:12 86:5,8,16,17 88:5
88:8 90:9,21 91:12,17
91:21 92:5 93:3
**straighten**
51:7
**strengths**
31:7
**strict**
87:20
**strictly**
33:14 63:13 94:2
**Stuart**
66:3,4,14,20 67:19 70:15
**Stuart's**
67:11 70:20
**stuff**
31:12 33:18,18 42:2 80:8
**substantial**
72:3
**substantially**
62:6
**succeeded**
23:18
**suit**
32:16

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

Sunday
92:15,16
supervision
8:6 15:11,18 51:17 55:6
56:8 57:1,15 62:19
82:6 93:15 95:11
supervisor
9:5
supply
86:16
sure
7:16 18:18 21:17 32:14
36:22 49:14,17 52:13,21
60:13 61:4 63:8 65:4
71:14 77:14 79:19 80:4
80:5 87:11 92:17
surgery
45:8,14 94:10
suspend
37:22 38:5
suspension
19:4 20:4
swap
16:12
swapped
15:20,22 16:2
swear
6:14
sworn
6:18
system
81:2,3 91:2 93:6
systems
93:6

T
T
1:7 2:1,1 4:5 95:1,1
take
33:12 41:2 52:8 55:9
62:1 65:7,11,14 69:15
85:11 91:15
taken
2:6 5:20 64:21 71:14
76:9 95:8
takes
85:13,14,15
talk
14:19 38:17 46:15 49:8
talked
34:2
talking
19:2,18 49:10 52:15
tall
33:19
tape
65:23
tapes
65:5,8
Tate

43:16
tell
22:17 23:3 31:11 34:5
46:17 59:6 65:4 76:2
90:11,13
telling
12:21 46:7 47:23 93:22
tells
90:11,12
ten
91:3
tend
46:23
Tennessee
8:10,12,13,21 17:13,23
18:3,5,11,13 41:21 45:20
47:5 48:5 49:19 54:16
55:16 66:9 75:6 82:12
84:19
terminate
38:12
terminated
58:10
terms
30:12
terrible
33:20 46:20
territory
26:9 27:21 28:5,7,10
64:21 69:6 74:6,11
75:2
Terry
6:8 8:3 15:10 18:18 21:18
23:12,19 28:4 31:16,17
32:22 40:3,9 41:9
42:22 45:8 48:18 50:5
50:9,13 51:14 52:16
53:6,16 55:21 56:5
59:23 62:4,17 67:8,23
69:2,13 70:16,17 71:3
71:19 73:6 74:15 75:17
77:23 78:14 79:5 80:2
84:16 94:1
Terry's
21:15 23:9 54:16
testified
6:19 18:21
testimony
61:16,17
Texas
15:20,21 16:1,12,20,23
74:22
Thank
26:23
thereto
2:23 95:10
thing
46:21 61:23 63:14 74:19
90:14
things
32:8 33:9 40:5,7 51:6

88:21
think
22:22 28:2 43:19 55:12
56:7,11,15 57:19 58:20
70:21 74:7 76:7,15
78:18,20 79:11 80:19,19
89:20 94:16
thinking
43:12
thirty
18:17 88:2
thirty-eight
62:14
thirty-five
24:12 56:1
thought
61:21
thousand
43:9,13 67:1,17 68:7,13
68:17,17 71:21 72:2,21
73:9 75:20
three
17:18 20:23 22:23 23:11
25:7,10 33:4 43:8,9,13
56:6,6 68:6 69:9 70:13
71:20 72:18,20 75:19
77:2
tickets
42:17
time
2:21,22 8:7 10:15,20 11:5
13:7 15:17 19:9 21:23
22:2 27:9,20,21 28:3,15
29:10,12,20 34:2,3
38:5 46:2 55:4 56:16
63:20,21 70:21,22
73:13 77:15 79:9 80:7
80:18,20 81:17 83:2,10
84:10,10 85:1 89:9,20
92:2,8 94:22
timely
87:11
times
24:7 32:15 40:6 51:19
55:14 83:17 92:3,15
93:2
today
6:4 7:6,8,17 14:18,20
35:22 42:13 49:1 54:4
59:20 61:13 80:21
89:23
told
40:8 51:15 53:5,17,19
54:8,14 69:3
Tony
26:12 29:15,20 93:13
touch
9:13
Tower
3:14 5:11
town

25:11 88:22
trained
60:14,17
training
60:6
transcript
95:13
transfer
74:22
trash
33:17
trays
33:21 40:11 51:12
trial
2:21
trip
79:8
trouble
26:17
truck
13:23 14:16 18:23 20:3
20:22 21:2,9 40:14,17
51:8,9 80:22 83:7 88:5
88:9,16
trucks
19:10,12 20:17,17,20 21:11
22:11,15 25:7,10 43:22
80:15,16 81:5 90:2
true
95:12
trunk
51:10
Trussell
16:20
try
11:15 15:1 64:16 65:1
87:23
trying
25:8,9 28:2 31:20
turnover
80:12
twelve
38:3
twenty
73:8
twenty-one
62:7
Twenty-seven
27:17
twice
44:12 91:19
two
10:12 22:22 24:23 25:2,7
25:7,10 29:8 44:12,13
52:4 65:23 66:23
67:16 69:23 70:14 71:6
71:20 75:5,19 80:6
85:4,13,17 91:1
type
20:3 22:5 61:1 90:14
types

19:7
typewriting
95:11

U
U
2:1
uh-huh
12:15 14:17,19 24:9 44:3
underperformance
52:6
underperformer
52:4
understand
7:18,19 25:15 31:20
74:23 82:2 93:23
understood
7:23
underwent
45:8
Union
9:10 45:6 77:6
United
1:1 5:7 6:1
unsatisfactory
37:19
upside-down
63:7 73:10
use
35:6 49:18 91:4
uses
34:22
Usual
6:21
usually
31:13,14 32:20 46:9

V
vacation
36:16
varied
85:3
varies
78:7
varieties
90:14
variety
86:21
vary
88:21
vegetables
14:3 90:23 91:8
vehicle
20:8 21:15 22:5 44:10,20
vehicles
19:8 20:10
verbal
35:12 41:15 46:9
verbally
40:4,6,8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

ADAM ALLEY
April 9, 2008

| | | | | |
|---|---|---|---|---|
| versus | weekly | 25:22 47:10,10,22 49:15 | **1** | 3:14 5:11 |
| 5:21 | 89:21 | 77:9 85:16 | 1 | 35203 |
| video | weeks | write | 4:6 48:13,15 53:21 | 3:15 |
| 1:16 2:5 65:23 | 38:4 | 35:10 37:8,17 39:19 40:1 | 1:12 | 35238 |
| videotape | went | 40:2,5 42:17 50:1 | 94:21 | 3:8 |
| 5:19 | 16:7,8 22:12 49:16 56:20 | writing | 10th | 380487 |
| volume | weren't | 30:22,23 50:19 52:5 | 53:23 54:8,13 | 3:7 |
| 85:6 90:11 91:6,21 92:1 | 42:4,6 | 59:12 | 11:36 | |
| voluntary | west | writings | 5:13 | **4** |
| 74:3 79:20 | 8:13 46:12 | 35:6 | 11:40 | 4 |
| vs | Western | written | 6:5 | 27:3 66:12 |
| 1:9 | 10:15 | 34:22 37:9,9 39:12 41:11 | 12:35 | 4th |
| | we'll | 41:12 48:2 54:13 59:23 | 65:15,17 | 84:22 |
| **W** | 46:17 65:11 94:20,21 | | 12:43 | 48 |
| Wachovia | we're | **X** | 65:17 66:1 | 4:6 |
| 3:14 5:11 | 25:6 33:11,13 65:5,14 | X | 1999 | |
| waived | We've | 4:1,5 63:21 | 10:2 39:11 | **5** |
| 2:12 | 87:21 | | | 5 |
| Walker | whatsoever | **Y** | **2** | 15:12 23:6 69:12 89:7 |
| 77:8 | 42:20 | yard | 2 | 59 |
| Wal-Mart | wide | 92:12 | 4:7 59:16,19 | 4:7 |
| 86:3 | 86:21 | yeah | 2:07-CV-520-WHA | |
| want | wife | 11:3 15:22 17:4 20:1 | 1:5 | **6** |
| 16:12 32:6,6,7 50:13,23 | 84:2 | 26:2 38:7 45:18 49:12 | 2000 | 6 |
| 53:5 69:3,4 80:13 94:1 | Willie | 58:7,17 62:13 63:13,15 | 29:7 53:6 | 67:22 |
| 94:9,12 | 24:5,15 29:19 | 68:5,15 75:18 76:7 | 2001 | 65 |
| wanted | wind | 81:9 83:13 | 29:8 | 4:8 |
| 76:18 | 63:6 | year | 2003 | |
| wants | winding | 13:21 18:9 20:21 24:21 | 43:6 66:7,14,22 70:20 | **7** |
| 86:20 | 85:21 | 27:13 30:16,16 32:18 | 71:2,5,11 | 7 |
| warning | winter | 36:2 38:4 43:3 47:21 | 2004 | 4:3,8 65:20 67:7 70:13 |
| 35:9,10,13 37:9 | 48:18 | 48:6 50:11,18 63:7 | 15:11 18:19 20:3 22:19 | 70:14 |
| wasn't | witness | 64:6,22 67:10 70:12 | 23:6 28:16 32:23 | 70s |
| 23:5 42:3 53:17,17 54:9 | 2:11 5:13 6:15 53:2 95:14 | 73:11 74:1 75:7,17 | 42:22 67:10,12,15 70:18 | 29:9 |
| 72:9 74:3,19 79:18 | word | 76:22 79:7,7,10,12,13 | 71:16 89:7,18 | |
| 89:8 94:11 | 52:8 | 79:15 80:5 83:9 | 2005 | **8** |
| Watson | work | years | 20:7,10 21:19 22:19 27:2 | 80s |
| 1:7 5:20 6:8 8:3 15:10 | 8:5,9,15 10:10 14:12 | 10:3 29:9 44:12,13 52:4 | 32:23 42:23 43:10 | 29:9 |
| 41:9 48:18 50:5 51:14 | 24:19 46:1 48:5 49:20 | 56:1,6,7 62:7 71:7 | 45:8,9 48:19 49:2 | |
| 54:7 55:21 59:23 62:17 | 49:20 56:20,23 79:10 | 79:6 87:22 93:10,11 | 53:14 55:1 62:13 67:23 | **9** |
| 69:13 70:16,17 73:15 | 80:13 81:19,20 82:16 | younger | 71:18,20 72:4 73:22 | 9 |
| 77:23 | 85:1,2,10,17 87:7,23 | 62:6,12 | 75:7,9,14,19,22,23 76:4 | 1:19 5:11 |
| Watson's | 92:10,12,19 | y'all | 76:13,20 77:2 | 9th |
| 39:17 50:10 67:8,23 | worked | 10:6 11:15 12:23 20:8 | 2006 | 6:6 |
| 69:17 71:19 73:6 78:15 | 8:17,20 10:4 12:5,9 13:17 | 30:21 31:20 32:12 | 47:4 48:6,19 50:6,11 | 94 |
| way | 15:11,18 18:19 24:1,7,18 | 35:19 36:4,12 46:6,8 | 53:6 54:19 68:4 69:8 | 12:18 |
| 23:2 25:15,17,19,21 26:1 | 26:13 28:18,19 29:8 | 64:2 77:10 89:12 92:6 | 69:14,18,22 71:22 72:18 | 95 |
| 26:7 31:2 38:2 42:8 | 32:22 34:18,21 54:23 | 93:5 | 72:19 73:7,22 76:4,14 | 8:19 12:14 |
| 76:11 90:7 | 55:15 56:3 57:14 58:2 | y'all's | 77:3 | 98 |
| ways | 58:8,14 62:18 79:4,5,8 | 45:19 80:15 | 2007 | 12:17,18 |
| 9:20 | 79:11,11 80:2 | | 5:12 | 99 |
| weakness | working | **O** | 2008 | 12:14,19 |
| 31:8 | 9:2 15:19,21 17:13 23:3,5 | 03 | 1:19 6:6 | |
| weather | 23:7,8,13 38:3 49:13 | 66:20 | 278 | |
| 46:16,19 | 54:20 76:3 82:6 93:14 | 04 | 95:23 | |
| week | works | 43:2,5 | | |
| 46:19,20 49:8 85:2,4,5,13 | 23:23 38:2 41:5 42:8 | 05 | **3** | |
| 85:14,17 91:20 92:3,10 | worth | 43:4 51:19 52:2 | 3 | |
| 92:20 93:3 | 43:10 | 07-520 | 4:8 65:20 72:16 | |
| weekend | wouldn't | 6:3 | 3400 | |

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

Toll Free 800.458.6031                    http://www.TylerEaton.com

PLAINTIFF ARTHUR WATSON'S

EVIDENTIARY SUBMISSIONS

EXHIBIT 5

In The Matter Of:

ARTHUR T. WATSON
v.
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

NO. 2:07-CV-520-WHA

---

TATE GATLIN
April 22, 2008

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
———————— www.TylerEaton.com ————————

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-520-WHA

ARTHUR T. WATSON,
        Plaintiff,
vs.
ALABAMA FARMERS COOPERATIVE, INC.,
D/B/A BONNIE PLANT FARMS,
        Defendants.

VIDEO DEPOSITION
OF
TATE GATLIN
April 22, 2008

REPORTED BY:  Eleanor S. Pickett
        Certified Shorthand Reporter
        and Notary Public

**Page 2**

1        S T I P U L A T I O N
2
3        IT IS STIPULATED AND AGREED,
4   by and between the parties, through their
5   respective counsel, that the video
6   deposition of TATE GATLIN may be taken
7   before Eleanor S. Pickett, Commissioner,
8   Certified Shorthand Reporter and Notary
9   Public;
10        That the signature to and
11   reading of the deposition by the witness
12   is waived, the deposition to have the same
13   force and effect as if full compliance had
14   been had with all laws and rules of Court
15   relating to the taking of depositions;
16        That it shall not be necessary
17   for any objections to be made by counsel
18   to any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and assign
21   grounds at the time of trial, or at the
22   time said deposition is offered in
23   evidence, or prior thereto.

**Page 3**

1        A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4        Mr. Jerry D. Roberson
5        Attorney at Law
6        Roberson & Roberson
7        P.O. Box 380487
8        Birmingham, Alabama 35238
9
10   FOR THE DEFENDANT:
11        Mr. Graham Gerhardt
12        Attorney at Law
13        Burr & Forman LLP
14        3400 Wachovia Tower
15        Birmingham, Alabama 35203
16
17
18        I N D E X
19                PAGE:
20   EXAMINATION BY MR. ROBERSON        6
21
22        E X H I B I T S
23   Plaintiff's Exhibits 1 - 3        4

**Page 4**

1        I, Eleanor S. Pickett, a
2   Certified Shorthand Reporter of
3   Birmingham, Alabama, and a Notary Public
4   for the State of Alabama at Large, acting
5   as Commissioner, certify that on this
6   date, as provided by the Federal Rules of
7   Civil Procedure of the United States
8   District Court, and the foregoing
9   stipulation of counsel, there came before
10   me at the law offices of Burr & Forman
11   LLP, 3400 Wachovia Tower, Birmingham,
12   Alabama, on April 22, 2007, commencing at
13   11:35 a.m., TATE GATLIN, witness in the
14   above cause, for oral examination,
15   whereupon the following proceedings were
16   had:
17
18        (Whereupon, Plaintiff's
19        Exhibits 1 - 3 were marked for
20        identification.)
21        MR. ROBERSON:  All right.
22   This is the videotape deposition of Tate
23   Gatlin.  It's being taken on April 22nd,

1 (Pages 1 to 4)

Page 5

1  2008 at the law offices of Burr & Forman
2  in Birmingham, Alabama. This case is
3  pending in the United States District
4  Court for the Middle District of Alabama,
5  Northern Division. It's styled Arthur T.
6  Watson, Terry Watson, versus Alabama
7  Farmers Cooperative, Inc., doing business
8  as Bonnie Plant Farms, defendant. It's CV
9  07-520. I'm Jerry Roberson. I represent
10 the plaintiff, Terry Watson. And I'm also
11 running the video camera. I would ask all
12 counsel of record to state their name and
13 the party that they represent.
14        MR. GERHARDT: I'm Graham
15 Gerhardt with Burr & Forman here on behalf
16 of the defendant. Okay.
17
18        TATE GATLIN,
19 having been first duly sworn, was examined
20 and testified as follows:
21
22        THE REPORTER: Usual
23 stipulations?

Page 6

1        MR. GERHARDT: Yes, ma'am.
2        MR. ROBERSON: Yes.
3
4  EXAMINATION BY MR. ROBERSON:
5        Q.   Mr. Gatlin, my name is Jerry
6  Roberson. I represent Terry Watson in
7  this case. Have you ever given a
8  deposition before?
9        A.   Yes, sir.
10       Q.   How many times?
11       A.   Numerous. I don't know
12 particular numbers.
13       Q.   Okay. So you know the rules
14 today in that you have to answer out loud
15 audibly to my questions.
16       A.   Yes, sir.
17       Q.   Don't nod your head or say
18 uh-huh or huh-uh like we would do in
19 normal conversation. Fair enough?
20       A.   Fair enough.
21       Q.   And if I ask you a question
22 that you don't understand, please let me
23 know you don't understand, okay?

Page 7

1        A.   Okay.
2        Q.   So if you answer it, I'm going
3  to assume you understood it. Fair enough?
4        A.   Fair enough.
5        Q.   And I apologize, I have a cold
6  today. So if you can't understand me or
7  if I'm not communicating with you, if you
8  will let me know, I'll try to talk louder,
9  all right?
10       A.   Okay.
11       Q.   Now, would you tell me where
12 you reside, what your -- the street
13 address is of your home?
14       A.   It's 681 County Road 205,
15 Jack, Alabama.
16       Q.   Jack, Alabama?
17       A.   That's correct.
18       Q.   Can you tell me where that's
19 located?
20       A.   It's about twenty miles
21 southeast of Troy, Alabama.
22       Q.   Okay. So is your office where
23 you report to work, is that in Union

Page 8

1  Springs, Alabama?
2        A.   Yes, sir, that is correct.
3        Q.   How far is your home from
4  Union Springs?
5        A.   It's fifty-four miles.
6        Q.   Okay. Do you commute each
7  day?
8        A.   Yes, sir.
9        Q.   Okay. And are you married?
10       A.   No, sir.
11       Q.   How old are you, Tate?
12       A.   I'm thirty-six.
13       Q.   How long have you worked for
14 Bonnie Plant Farms?
15       A.   For -- since 2003.
16       Q.   Okay. So --
17       A.   Going on five years.
18       Q.   Coming up on five years?
19       A.   Yes, sir.
20       Q.   Would you tell me what your
21 job title is or job classification?
22       A.   I'm the safety director.
23       Q.   For Bonnie Plant, the

2 (Pages 5 to 8)

ARTHUR T. WATSON                                          TATE GATLIN
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                  April 22, 2008

Page 9

entire --
    A.   For Bonnie Plant Farm.
    Q.   And just for those of us who
are not in the plant business, what does
that mean, you're the safety director?
All the drivers report to you?
    A.   I am responsible for dealing
with compliance with OSHA, EPA, DOT and
also handle insurance claims and stuff of
that nature for our company, reduce risk.
    Q.   Okay. Well, Terry Watson is a
salesperson, a plant salesman. You
understand that?
    A.   Yes, sir.
    Q.   Okay. And all the people --
how many -- do you know about how many
plant salesmen they have? Several
hundred?
    A.   Several hundred, yes.
    Q.   Okay. And all of them, I
understand, drive a truck to deliver the
plants; is that correct?
    A.   Yes, sir.

Page 10

    Q.   So they have to have a motor
vehicle license, correct?
    A.   Yes, sir.
    Q.   And part of your job as the
safety director is to make sure that -- I
may have just unplugged my video camera.
    Part of your job is to make
sure that they all are qualified to
operate this truck, correct?
    A.   That's correct.
    Q.   They don't have to have a CDL.
It's only a six-wheel truck, right?
    A.   That's correct, but it's
judged by the GVW, gross vehicle weight,
yes.
    Q.   Okay. Well, how much do these
trucks weigh?
    A.   They're GVW'd at twenty-five
thousand nine hundred ninety-five pounds.
    Q.   Okay. Now, if you were an
over-the-road truck driver, then you would
have to have a CDL, correct?
    A.   If you're operating a vehicle

Page 11

over twenty-six thousand one pound or
above or greater, you would have to have a
CDL, yes, sir.
    Q.   Okay. And so in order -- in
order to operate these vehicles for Bonnie
Plant, do the people have to have, the
truck drivers or the plant salesmen, do
they have to have some medical
certification?
    A.   Yes, sir, they do.
    Q.   What is that called? What is
that known as?
    A.   DOT physical.
    Q.   Okay. They have to have a DOT
physical every two years?
    A.   Depending on the physician's
request. Other conditions require fewer
or less years.
    Q.   Okay. All right. And Terry
Watson is a truck driver, so he has to
have a DOT physical, correct?
    A.   That is correct.
    Q.   Now, the helpers, the people

Page 12

that assist the plant salesmen, if they
want to operate the vehicle or if the
salesman wants them to be able to operate
the vehicle, do they have to comply with
these same rules?
    A.   Yes, sir, they do.
    Q.   So they have to be certified
and have a motor vehicle license, correct?
    A.   That's correct.
    Q.   All right. And then all that
has to be reported on your insurance,
correct? In order to have insurance
coverage when they're operating it, they
have to be a listed driver, correct?
    A.   The insurance -- vehicles are
insured, yes, which covers our people.
Our people are insured.
    Q.   Okay. But don't you have to
submit some kind of list to them?
    A.   No, sir, we do not submit a
particular list of all our drivers with
them.
    Q.   Oh, you don't?

3 (Pages 9 to 12)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

Page 13

    A.   No, sir.
2    Q.   Do you just list your
3 vehicles?
4    A.   Yes, sir.
5    Q.   You have a list of vehicles?
6    A.   It's a fleet policy, that's
7 correct.
8    Q.   Okay.  And you identify the
9 vehicles by their VIN number, correct?
10    A.   Yes, sir, that's correct.
11    Q.   And if you add or remove
12 vehicles, you delete them or add them to
13 your list, correct?
14    A.   That is correct, sir.
15    Q.   But you're telling me, as I
16 understand -- who is your insurance
17 carrier for your vehicles?
18    A.   Nationwide Agri Business.
19    Q.   You're telling me that you
20 don't have to report who your operators of
21 those vehicles are and they don't have to
22 have their license information and their
23 DOT certification?

Page 14

1    A.   No, sir, we do not submit that
2 to them.
3    Q.   Okay.  Who is y'all's agent?
4    A.   Arthur J. Gallagher.
5    Q.   Is he in Union Springs?
6    A.   Arthur J. Gallagher, no, sir.
7 They are out of Nashville, Tennessee.
8    Q.   Okay.  Now, Terry, do you know
9 how long Terry Watson has been employed as
10 a plant salesman for Bonnie Plant?
11    A.   I have no idea.
12    Q.   Do you know how old he is?
13    A.   I don't have any idea, no,
14 sir.
15    Q.   Well, let me show you what
16 I've marked as Plaintiff's Exhibit 1, and
17 this is the deposition notice I sent to
18 the attorney for Bonnie Plant, Mr.
19 Gerhardt.  Have you seen that document
20 before today?
21    A.   Have I seen it, yes, sir.
22    Q.   Okay.  And I asked at this
deposition that Bonnie Plant produce some

Page 15

1 documents regarding Terry Watson.  You're
2 aware of that?
3    A.   Uh-huh.
4    Q.   Is that a yes?
5    A.   Yes, sir, I'm sorry.
6    Q.   That's all right.  I'll try to
7 remind you.  I'm not doing that to annoy
8 you, just to make the record clear.
9    A.   That's fine.
10    Q.   All right.  Exhibit 1 is the
11 deposition notice.  And y'all have in
12 response, Bonnie Plant has, in response to
13 that notice produced two documents which
14 I've marked as Exhibits 2 and 3; is that
15 correct?
16    A.   Yes, sir, that is correct.
17    Q.   Okay.  Now, would you hand me
18 back Exhibit 1?
19    A.   Surely.
20    Q.   I asked for all documents
21 which relate to the decision not to
22 reassign Terry Watson to the Bells,
23 Tennessee route beginning in the spring

Page 16

1 season of 2006.  This request includes
2 correspondence, medical records, or
3 correspondence from any physician about
4 the state of Mr. Watson's health or any
5 inquiry into his health by this defendant.
6 So as the medical -- as the safety
7 director, are you allowed to communicate
8 with physicians about the employees that
9 you supervise?
10    A.   Sure.
11    Q.   You have to, don't you?
12    A.   To some extent, yes.
13    Q.   Yeah.  If you get some -- if
14 somebody is having some type of procedure
15 done and they may have some restrictions
16 for a while, you have to know whether they
17 can drive a truck, correct?
18    A.   Sure, if we're notified of it.
19    Q.   You have to know about their
20 state of health and any restrictions that
21 they have, correct?
22    A.   Yes.
23    Q.   Okay.  All right.  And you

4 (Pages 13 to 16)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

Page 17

1 have produced or Bonnie Plant has produced
2 two documents. Now, would you tell me
3 what Exhibit 2 is? It's a one-page
4 document, and it says from Wellness Group,
5 Inc., to Tate something on-line. Watson's
6 screening results today. It's dated
7 January 4th, 2006. Can you tell me what
8 that is?
9     A.   That is an e-mail from Mark
10 Mashburn which is a physical therapist.
11     Q.   Where is he?
12     A.   Where is he?
13     Q.   Where is he located?
14     A.   Out of Dothan, Alabama.
15     Q.   Okay. And did he examine
16 Terry Watson?
17     A.   He performed a fitness for
18 duty testing on all of our employees.
19     Q.   Okay. And is that done in
20 Dothan, or where is that done?
21     A.   That is actually done at our
22 sales meeting.
23     Q.   Your annual sales meeting?

Page 18

1     A.   Yes, sir.
2     Q.   Okay. Do you know where that
3 was in January of '06?
4     A.   I believe it was probably in
5 Auburn, Alabama, if I'm -- if I recall
6 correctly.
7     Q.   Okay. And what was the
8 results of his testing in January of '06?
9     A.   It says his screening was
10 limited to his report and the restrictions
11 do not -- do I need to read this whole
12 thing, sir?
13     Q.   No, hand it to me.
14     A.   (Witness complies.)
15     Q.   All right. This examination
16 was conducted in January of '06, correct?
17 That's when your annual meeting was?
18     A.   If it was in January.
19 Sometimes it's in usually November or
20 December.
21     Q.   Okay.
22     A.   And then I get the report back
23 in January.

Page 19

1     Q.   Okay. Well, the e-mail is
2 dated January 4th, '06.
3     A.   Yes, sir.
4     Q.   I don't know when the
5 examination took place.
6     A.   Yes, sir, it took place at our
7 sales meeting.
8     Q.   Okay. So the meeting would
9 have been back earlier is what you're
10 saying?
11     A.   Yes, sir, end of November,
12 first of December.
13     Q.   Okay. And Terry had had a
14 total knee replacement in July of '05,
15 correct?
16     A.   According to that, yes, sir.
17     Q.   All right. And this says he
18 is fine to drive, get in and out of truck,
19 maybe help carry items, plants, at waist
20 to knuckle level and to shoulder level but
21 not overhead. Okay. Do you see that in
22 that document about the middle of the
23 page?

Page 20

1     A.   Yes, I do.
2     Q.   Okay. Then we have
3 Plaintiff's Exhibit 3 which is an
4 attending physician statement from Mr.
5 Watson's neck doctor, Dr. Burkus, at the
6 Hughston Clinic in Columbus, Georgia,
7 which indicates that he has no
8 restrictions as of January of '06,
9 correct?
10     A.   Yes, sir.
11     Q.   Okay. So based on those two
12 documents, did you believe that Terry
13 Watson was fit for duty as a plant
14 salesman truck driver for Bonnie Plant
15 Farms?
16     MR. GERHARDT:  Object to the
17 form.
18     Q.   You can answer.
19     A.   With some additional help,
20 yes.
21     Q.   Okay. As long as he had
22 somebody to help him, assist him, with
23 loading and unloading the plants, correct?

5 (Pages 17 to 20)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

Page 21

1    A.   I felt, yes.
2    Q.   Okay.  And did you advise Joe
3  Stewart of that?
4    A.   Of?
5    Q.   Terry's fitness for duty.
6    A.   Yes.
7    Q.   Is there a writing where you
8  said he was fit for duty?
9    A.   No.
10    Q.   Okay.  Do you -- where is Mr.
11  Stewart's office in relation to yours at
12  the Union Springs headquarters?
13    A.   It's in a separate building
14  across the way.
15    Q.   Okay.  So how did you contact
16  him?  Was it by phone, or did you go stop
17  by and see him?
18    A.   Don't recall particulars, but
19  probably talked to Joe at some point in
20  time when he was in the office.
21    Q.   Do you maintain a file on each
22  employee, truck driver employee?
23    A.   We have a driver files on

Page 22

1  those individuals, yes, sir, we have to.
2    Q.   Okay.  Is that on OSHA
3  requirement?
4    A.   No, sir, it's DOT.
5    Q.   DOT?
6    A.   Yes, sir.
7    Q.   And what kind of information
8  do you keep in a DOT file for each
9  employee, their card, their physical card?
10    A.   Medical card has to be kept
11  there, a copy of the driver's license we
12  keep, a copy of the person's application,
13  the previous three-years prior history of
14  employment history, drug screen results.
15    Q.   Are these drivers subject to
16  random drug tests?
17    A.   Yes, sir.
18    Q.   Okay.  Are they also
19  subject -- do you have to periodically run
20  an MVR on each of them?
21    A.   Yes, sir.
22    Q.   How often do you have to do
23  that?

Page 23

1    A.   Annually.
2    Q.   And does that become part of
3  the file?
4    A.   Yes, sir.
5    Q.   And just for our jury, what is
6  an MVR?
7    A.   Motor vehicle record which is
8  a review of a person's driving history for
9  -- we look at the past three years is what
10  we look at.
11    Q.   So if they have had a moving
12  violation, a ticket, it will be on the MVR
13  if they paid it, correct?
14    A.   It should appear on the MVR.
15    Q.   Okay.  And do you have to
16  periodically review the MVRs with the
17  employees and let them know if they're
18  doing something wrong?
19    A.   Yes, sir.  We do if they're in
20  danger of not being able to drive due to
21  our policy, then we notify them of where
22  they're at.
23    Q.   Okay.  Now, would there be

Page 24

1  anything in Terry Watson's file that would
2  tell us when you spoke with Joe Stewart or
3  what you said with respect to Terry
4  Watson's clearance to drive and fitness
5  for duty in January of '06?
6    A.   No, sir.
7    Q.   So all that's just oral; is
8  that correct?
9    A.   Yes, sir.
10    Q.   Okay.  Do you know when the
11  spring season began in Bells, Tennessee?
12    A.   No, sir.
13    Q.   And as I understand it, you
14  clear somebody to drive, but you don't
15  have anything to do with the decision of
16  where they're assigned to work; is that a
17  fair statement?
18    A.   That's a fair statement, yes,
19  sir.
20    Q.   Okay.  In other words, you
21  clear them and they can work any route
22  that they're designated for, correct?
23    A.   That is correct, sir.

6 (Pages 21 to 24)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

---

Page 25

1     Q.  Okay. And have you ever had
2 any restrictions other than this period
3 after Terry's surgeries in -- after the
4 '05 season, have you ever had any
5 restrictions on Terry Watson's ability to
6 work as a plant salesman?
7     MR. GERHARDT: Object to the
8 form.
9     Q.  You can answer. Have you ever
10 placed him on any kind of he can't work as
11 a salesman for a period of time?
12     A.  No, sir. I don't have
13 anything to do with that, no.
14     Q.  Okay. Well, you issue the
15 medical clearance. So he's always been
16 cleared to drive for y'all; is that
17 correct?
18     MR. GERHARDT: Object to the
19 form.
20     Q.  Up until 2005 until he had his
21 surgery, he's always been approved to
22 operate a motor vehicle, correct?
23     A.  For my period of time as being

Page 26

1 safety director that I have knowledge of,
2 sir.
3     Q.  Okay. That's -- I apologize,
4 yeah. Since 2003 since you've been the
5 safety director, he's always been approved
6 to drive, correct?
7     A.  Yes, sir, that I'm aware of.
8     Q.  He has appropriate medical
9 clearances to drive and operate a motor
10 vehicle?
11     A.  Yes, sir, that I'm aware of.
12     Q.  Is this examination that's
13 done by -- and you told me his name, Mark,
14 what is Mark's last name?
15     A.  Mashburn.
16     Q.  That's done for all employees
17 every year?
18     A.  We try and get new employees
19 as they come in. We had to go back and do
20 people that were currently employed at the
21 time.
22     Q.  Okay. All right. So this
23 isn't done every year on an annual basis,

Page 27

1 it's only for the new hires?
2     A.  That's correct. Now it's
3 presently done for new hires. After we
4 got the employees that were employed with
5 us after we started the program, we had to
6 get them in first at a point in time and
7 then now it's done for all the new people.
8     Q.  And Mr. Mashburn isn't a
9 doctor a physician, he's a physical
10 therapist, correct?
11     A.  That is correct.
12     Q.  All right. And so he -- have
13 you ever sat in on this evaluation for any
14 person? Do you know what it consists of?
15     A.  I am aware of what it consists
16 of.
17     Q.  I mean, are they required to
18 move objects, lift and bend, pull and
19 stoop, those kind of things, the functions
20 of what you do as a driver?
21     A.  Yes, sir, basically.
22     Q.  Okay. And that's --
23     A.  The gist of the job

Page 28

1 assignments, job duties, is performed in
2 that short period of time.
3     Q.  Okay. Now, did Terry ever
4 have any additional examination by Mr.
5 Mashburn after the one that's reported
6 here in Exhibit 2?
7     A.  Not that I'm aware of.
8     Q.  Okay. All right. And
9 other -- other than this one record from
10 the Hughston Clinic that y'all have
11 marked -- that I've marked as Exhibit 3,
12 do you have any other additional
13 information from his physicians about his
14 restrictions?
15     A.  No, sir.
16     Q.  And did you seek any, that is,
17 did you try to obtain any information from
18 any of his physicians?
19     A.  No, sir.
20     Q.  Mr. Watson actually brought
21 you Exhibit 3, isn't that correct?
22     A.  Yes, sir.
23     MR. ROBERSON: Okay. All

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                                                 http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008



Page 29

right. I hate to say it but I think I'm
2   through.
3         MR. GERHARDT: Good enough.
4         MR. ROBERSON: Have you got
5   any questions?
6         MR. GERHARDT: I don't.
7         MR. ROBERSON: Okay. That
8   will conclude the deposition of Tate
9   Gatlin at 11:55. We are off the record.
10
11       FURTHER THE DEPONENT SAITH NOT
12
13
14
15
16
17
18
19
20
21
22
23

Page 30

1   C E R T I F I C A T E
2
3
4   STATE OF ALABAMA)
5   JEFFERSON COUNTY)
6
7         I hereby certify that the
8   above and foregoing deposition was taken
9   down by me in stenotypy, and the questions
10  and answers thereto were reduced to
11  typewriting under my supervision, and that
12  the foregoing represents a true and
13  correct transcript of the deposition given
14  by said witness upon said hearing.
15        I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action, nor am I in anywise
18  interested in the result of said cause.
19
20
21
22
         COMMISSIONER - NOTARY PUBLIC
         ACCR LICENSE NO. 278

8 (Pages 29 to 30)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

| A | | | | |
|---|---|---|---|---|
| **ability** 25:5 | 2:20 | 3:13 4:10 5:1,15 | 7:7 | **date** 4:6 |
| **able** 12:3 23:20 | **assigned** 24:16 | **business** 5:7 9:4 13:18 | **commute** 8:6 | **dated** 17:6 19:2 |
| **ACCR** 30:23 | **assignments** 28:1 | **C** | **company** 9:10 | **day** 8:7 |
| **acting** 4:4 | **assist** 12:1 20:22 | **C** 3:1 30:1,1 | **compliance** 2:13 9:8 | **dealing** 9:7 |
| **action** 1:5 30:17 | **assume** 7:3 | **called** 11:14 | **complies** 18:14 | **December** 18:20 19:12 |
| **add** 13:11,12 | **attending** 20:4 | **camera** 5:11 10:6 | **comply** 12:4 | **decision** 15:21 24:15 |
| **additional** 20:19 28:4,12 | **attorney** 3:5,12 14:18 | **card** 22:9,9,10 | **conclude** 29:8 | **defendant** 3:10 5:8,16 16:5 |
| **address** 7:13 | **Auburn** 18:5 | **carrier** 13:17 | **conditions** 11:17 | **Defendants** 1:12 |
| **advise** 21:2 | **audibly** 6:15 | **carry** 19:19 | **conducted** 18:16 | **delete** 13:12 |
| **agent** 14:3 | **aware** 15:2 26:7,11 27:15 28:7 | **case** 5:2 6:7 | **consists** 27:14,15 | **deliver** 9:21 |
| **AGREED** 2:3 | **a.m** 4:13 | **cause** 4:14 30:18 | **contact** 21:15 | **Depending** 11:16 |
| **Agri** 13:18 | | **CDL** 10:11,22 11:3 | **conversation** 6:19 | **DEPONENT** 29:11 |
| **Alabama** 1:2,10 3:8,15 4:3,4,12 5:2,4,6 7:15,16,21 8:1 17:14 18:5 30:4 | **B** | **certification** 11:9 13:23 | **Cooperative** 1:10 5:7 | **deposition** 1:16 2:6,11,12,22 4:22 6:8 14:17,23 15:11 29:8 30:8,13 |
| **allowed** 16:7 | **B** 3:22 | **certified** 1:22 2:8 4:2 12:7 | **copy** 22:11,12 | **depositions** 2:15 |
| **annoy** 15:7 | **back** 15:18 18:22 19:9 26:19 | **certify** 4:5 30:7,15 | **correct** 7:17 8:2 9:22 10:2,9,10 10:13,22 11:21,22 12:8,9 12:12,14 13:7,9,10,13,14 15:15,16 16:17,21 18:16 19:15 20:9,23 23:13 24:8,22,23 25:17,22 26:6 27:2,10,11 28:21 30:13 | **designated** 24:22 |
| **annual** 17:23 18:17 26:23 | **based** 20:11 | **Civil** 1:5 4:7 | | **director** 8:22 9:5 10:5 16:7 26:1 26:5 |
| **Annually** 23:1 | **basically** 27:21 | **claims** 9:9 | | **District** 1:1,2 4:8 5:3,4 |
| **answer** 6:14 7:2 20:18 25:9 | **basis** 26:23 | **classification** 8:21 | | **Division** 1:3 5:5 |
| **answers** 30:10 | **began** 24:11 | **clear** 15:8 24:14,21 | | **doctor** 20:5 27:9 |
| **anywise** 30:17 | **beginning** 15:23 | **clearance** 24:4 25:15 | **correctly** 18:6 | **document** 14:19 17:4 19:22 |
| **apologize** 7:5 26:3 | **behalf** 5:15 | **clearances** 26:9 | **correspondence** 16:2,3 | **documents** 15:1,13,20 17:2 20:12 |
| **appear** 23:14 | **believe** 18:4 20:12 | **cleared** 25:16 | **counsel** 2:5,17,19 4:9 5:12 30:16 | **doing** 5:7 15:7 23:18 |
| **application** 22:12 | **Bells** 15:22 24:11 | **Clinic** 20:6 28:10 | **County** 7:14 30:5 | **DOT** 9:8 11:13,14,21 13:23 22:4,5,8 |
| **appropriate** 26:8 | **bend** 27:18 | **cold** 7:5 | **Court** 1:1 2:14 4:8 5:4 | **Dothan** 17:14,20 |
| **approved** 25:21 26:5 | **Birmingham** 3:8,15 4:3,11 5:2 | **Columbus** 20:6 | **coverage** 12:13 | **Dr** 20:5 |
| **April** 1:19 4:12,23 | **Bonnie** 1:11 5:8 8:14,23 9:2 11:5 14:10,18,23 15:12 17:1 20:14 | **come** 26:19 | **covers** 12:16 | **drive** 9:21 16:17 19:18 23:20 24:4,14 25:16 26:6,9 |
| **Arthur** 1:7 5:5 14:4,6 | **Box** 3:7 | **Coming** 8:18 | **currently** 26:20 | **driver** 10:21 11:20 12:14 20:14 21:22,23 27:20 |
| **asked** 14:22 15:20 | **brought** 28:20 | **commencing** 4:12 | **CV** 5:8 | **drivers** |
| **assign** | **building** 21:13 | **Commissioner** 2:7 4:5 30:22 | | |
| | **Burkus** 20:5 | **communicate** 16:7 | **D** | |
| | **Burr** | **communicating** 16:7 | **D** 3:4,18 | |
| | | | **danger** 23:20 | |

Page 31

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

9:6 11:7 12:21 22:15

**driver's**
22:11
**driving**
23:8
**drug**
22:14,16
**due**
23:20
**duly**
5:19
**duties**
28:1
**duty**
17:18 20:13 21:5,8 24:5
**D/B/A**
1:11

**E**

E
3:1,1,18,22 30:1,1
**earlier**
19:9
**effect**
2:13
**Eleanor**
1:21 2:7 4:1
**employed**
14:9 26:20 27:4
**employee**
21:22,22 22:9
**employees**
16:8 17:18 23:17 26:16,18
27:4
**employment**
22:14
**entire**
9:1
**EPA**
9:8
**evaluation**
27:13
**evidence**
2:23
**examination**
3:20 4:14 6:4 18:15 19:5
26:12 28:4
**examine**
17:15
**examined**
5:19
**Exhibit**
14:16 15:10,18 17:3 20:3
28:6,11,21
**Exhibits**
3:23 4:19 15:14
**extent**
16:12
**e-mail**
17:9 19:1

**F**

F
30:1
**fair**
6:19,20 7:3,4 24:17,18
**far**
8:3
**Farm**
9:2
**Farmers**
1:10 5:7
**Farms**
1:11 5:8 8:14 20:15
**Federal**
4:6
**felt**
21:1
**fewer**
11:17
**fifty–four**
8:5
**file**
21:21 22:8 23:3 24:1
**files**
21:23
**fine**
15:9 19:18
**first**
5:19 19:12 27:6
**fit**
20:13 21:8
**fitness**
17:17 21:5 24:4
**five**
8:17,18
**fleet**
13:6
**following**
4:15
**follows**
5:20
**force**
2:13
**foregoing**
4:8 30:8,12
**form**
2:18 20:17 25:8,19
**Forman**
3:13 4:10 5:1,15
**full**
2:13
**functions**
27:19
**further**
29:11 30:15

**G**

**Gallagher**
14:4,6
**Gatlin**

1:18 2:6 4:13,23 5:18 6:5
29:9
**Georgia**
20:6
**Gerhardt**
3:11 5:14,15 6:1 14:19
20:16 25:7,18 29:3,6
**gist**
27:23
**given**
6:7 30:13
**go**
21:16 26:19
**going**
7:2 8:17
**Good**
29:3
**Graham**
3:11 5:14
**greater**
11:2
**gross**
10:14
**grounds**
2:21
**Group**
17:4
**GVW**
10:14
**GVW'd**
10:18

**H**

H
3:22
**hand**
15:17 18:13
**handle**
9:9
**hate**
29:1
**head**
6:17
**headquarters**
21:12
**health**
16:4,5,20
**hearing**
30:14
**help**
19:19 20:19,22
**helpers**
11:23
**hires**
27:1,3
**history**
22:13,14 23:8
**home**
7:13 8:3
**Hughston**

20:6 28:10
**huh–uh**
6:18
**hundred**
9:18,19 10:19

**I**

**idea**
14:11,13
**identification**
4:20
**identify**
13:8
**includes**
16:1
**indicates**
20:7
**individuals**
22:1
**information**
13:22 22:7 28:13,17
**inquiry**
16:5
**insurance**
9:9 12:11,12,15 13:16
**insured**
12:16,17
**interested**
30:18
**issue**
25:14
**items**
19:19

**J**

J
14:4,6
**Jack**
7:15,16
**January**
17:7 18:3,8,16,18,23 19:2
20:8 24:5
**JEFFERSON**
30:5
**Jerry**
3:4 5:9 6:5
**job**
8:21,21 10:4,7 27:23 28:1
**Joe**
21:2,19 24:2
**judged**
10:14
**July**
19:14
**jury**
23:5

**K**

**keep**
22:8,12

**kept**
22:10
**kin**
30:16
**kind**
12:19 22:7 25:10 27:19
**knee**
19:14
**know**
6:11,13,23 7:8 9:16 14:8
14:12 16:16,19 18:2
19:4 23:17 24:10 27:14
**knowledge**
26:1
**known**
11:12
**knuckle**
19:20

**L**

L
2:1
**Large**
4:4
**law**
3:5,12 4:10 5:1
**laws**
2:14
**leading**
2:19
**level**
19:20,20
**license**
10:2 12:18 13:22 22:11
30:23
**lift**
27:18
**limited**
18:10
**list**
12:19,21 13:2,5,13
**listed**
12:14
**LLP**
3:13 4:11
**loading**
20:23
**located**
7:19 17:13
**long**
8:13 14:9 20:21
**look**
23:9,10
**loud**
6:14
**louder**
7:8

**M**

**maintain**

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031    http://www.TylerEaton.com

**21:21**
Mark
17:9 26:13
marked
4:19 14:16 15:14 28:11,11
Mark's
26:14
married
8:9
Mashburn
17:10 26:15 27:8 28:5
ma'am
6:1
mean
9:5 27:17
medical
11:8 16:2,6 22:10 25:15
26:8
meeting
17:22,23 18:17 19:7,8
middle
1:2 5:4 19:22
miles
7:20 8:5
motor
10:1 12:8 23:7 25:22
26:9
move
27:18
moving
23:11
MVR
22:20 23:6,12,14
MVRs
23:16

___ N ___
N
2:1 3:1,18
name
5:12 6:5 26:13,14
Nashville
14:7
Nationwide
13:18
nature
9:10
necessary
2:16
neck
20:5
need
18:11
neither
30:16
new
26:18 27:1,3,7
nine
10:19
ninety-five

10:19
nod
6:17
normal
6:19
Northern
1:3 5:5
Notary
1:23 2:8 4:3 30:22
notice
14:17 15:11,13
notified
16:18
notify
23:21
November
18:19 19:11
number
13:9
numbers
6:12
Numerous
6:11

___ O ___
O
2:1
Object
20:16 25:7,18
objections
2:17,20
objects
27:18
obtain
28:17
offered
2:22
office
7:22 21:11,20
offices
4:10 5:1
Oh
12:23
okay
5:16 6:13,23 7:1,10,22
8:6,9,16 9:11,15,20
10:16,20 11:4,14,19
12:18 13:8 14:3,8,22
15:17 16:23 17:15,19
18:2,7,21 19:1,8,15,21
20:2,11,21 21:2,10,15
22:2,18 23:15,23 24:10
24:20 25:1,14 26:3,22
27:22 28:3,8,23 29:7
old
8:11 14:12
one-page
17:3
on-line
17:5

operate
10:9 11:5 12:2,3 25:22
26:9
operating
10:23 12:13
operators
13:20
oral
4:14 24:7
order
11:4,5 12:12
OSHA
9:8 22:2
overhead
19:21
over-the-road
10:21

___ P ___
P
2:1 3:1,1
page
3:19 19:23
paid
23:13
part
10:4,7 23:2
particular
6:12 12:21
particulars
21:18
parties
2:4,20 30:17
party
5:13
pending
5:3
people
9:15 11:6,23 12:16,17
26:20 27:7
performed
17:17 28:1
period
25:2,11,23 28:2
periodically
22:19 23:16
person
27:14
person's
22:12 23:8
phone
21:16
physical
11:13,15,21 17:10 22:9
27:9
physician
16:3 20:4 27:9
physicians
16:8 28:13,18
physician's

11:16
Pickett
1:21 2:7 4:1
place
19:5,6
placed
25:10
plaintiff
1:8 3:3 5:10
Plaintiff's
3:23 4:18 14:16 20:3
plant
1:11 5:8 8:14,23 9:2,4,12
9:17 11:6,7 12:1 14:10
14:10,18,23 15:12 17:1
20:13,14 25:6
plants
9:22 19:19 20:23
please
6:22
point
21:19 27:6
policy
13:6 23:21
pound
11:1
pounds
10:19
presently
27:3
previous
22:13
prior
2:23 22:13
probably
18:4 21:19
procedure
4:7 16:14
proceedings
4:15
produce
14:23
produced
15:13 17:1,1
program
27:5
provided
4:6
Public
1:23 2:9 4:3 30:22
pull
27:18
P.O
3:7

___ Q ___
qualified
10:8
question
6:21

questions
2:18,19 6:15 29:5 30:9

___ R ___
R
3:1 30:1
random
22:16
read
18:11
reading
2:11
reassign
15:22
recall
18:5 21:18
record
5:12 15:6 23:7 28:9 29:9
records
16:2
reduce
9:10
reduced
30:10
regarding
15:1
relate
15:21
relating
2:15
relation
21:11
remind
15:7
remove
13:11
replacement
19:14
report
7:23 9:6 13:20 18:10,22
reported
1:21 12:11 28:5
Reporter
1:22 2:8 4:2 5:22
represent
5:9,13 6:6
represents
30:12
request
11:17 16:1
require
11:17
required
27:17
requirement
22:3
reside
7:12
respect
24:3

respective
2:5
response
15:12,12
responsible
9:7
restrictions
16:15,20 18:10 20:8 25:2
25:5 28:14
result
30:18
results
17:6 18:8 22:14
review
23:8,16
right
4:21 7:9 10:12 11:19
12:10 15:6,10 16:23
18:15 19:17 26:22 27:12
28:8 29:1
risk
9:10
Road
7:14
Roberson
3:4,6,6,20 4:21 5:9 6:2,4
6:6 28:23 29:4,7
route
15:23 24:21
rules
2:14 4:6 6:13 12:5
run
22:19
running
5:11

**S**

S
1:21 2:1,7 3:1,22 4:1
safety
8:22 9:5 10:5 16:6 26:1
26:5
SAITH
29:11
sales
17:22,23 19:7
salesman
9:12 13:23 14:10 20:14
25:6,11
salesmen
9:17 11:7 12:1
salesperson
9:12
sat
27:13
saying
19:10
says
17:4 18:9 19:17
screen

22:14
screening
17:6 18:9
season
16:1 24:11 25:4
see
19:21 21:17
seek
28:16
seen
14:19,21
sent
14:17
separate
21:13
short
28:2
Shorthand
1:22 2:8 4:2
shoulder
19:20
show
14:15
signature
2:10
sir
6:9,16 8:2,8,10,19 9:14
9:23 10:3 11:3,10 12:6
12:20 13:1,4,10,14 14:1
14:6,14,21 15:5,16 18:1
18:12 19:3,6,11,16 20:10
22:1,4,6,17,21 23:4,19
24:6,9,12,19,23 25:12
26:2,7,11 27:21 28:15
28:19,22
six-wheel
10:12
somebody
16:14 20:22 24:14
sorry
15:5
southeast
7:21
spoke
24:2
spring
15:23 24:11
Springs
8:1,4 14:5 21:12
started
27:5
state
4:4 5:12 16:4,20 30:4
statement
20:4 24:17,18
States
1:1 4:7 5:3
stenotypy
30:9
Stewart
21:3 24:2

Stewart's
21:11
STIPULATED
2:3
stipulation
4:9
stipulations
5:23
stoop
27:19
stop
21:16
street
7:12
stuff
9:9
styled
5:5
subject
22:15,19
submit
12:19,20 14:1
supervise
16:9
supervision
30:11
sure
10:5,8 16:10,18
Surely
15:19
surgeries
25:3
surgery
25:21
sworn
5:19

**T**

T
1:7 2:1,1 3:22 5:5 30:1,1
taken
2:6 4:23 30:8
talk
7:8
talked
21:19
Tate
1:18 2:6 4:13,22 5:18
8:11 17:5 29:8
tell
7:11,18 8:20 17:2,7 24:2
telling
13:15,19
Tennessee
14:7 15:23 24:11
Terry
5:6,10 6:6 9:11 11:19
14:8,9 15:1,22 17:16
19:13 20:12 24:1,3 25:5
28:3

Terry's
21:5 25:3
testified
5:20
testing
17:18 18:8
tests
22:16
therapist
17:10 27:10
thereto
2:23 30:10
thing
18:12
things
27:19
think
29:1
thirty-six
8:12
thousand
10:19 11:1
three
23:9
three-years
22:13
ticket
23:12
time
2:21,22 21:20 25:11,23
26:21 27:6 28:2
times
6:10
title
8:21
today
6:14 7:6 14:20 17:6
told
26:13
total
19:14
Tower
3:14 4:11
transcript
30:13
trial
2:21
Troy
7:21
truck
10:9,12,21 11:7,20
16:17 19:18 20:14 21:22
trucks
10:17
true
30:12
try
7:8 15:6 26:18 28:17
twenty
7:20
twenty-five

10:18
twenty-six
11:1
two
11:15 15:13 17:2 20:11
type
16:14
typewriting
30:11

**U**

U
2:1
uh-huh
6:18 15:3
understand
6:22,23 7:6 9:13,21 13:16
24:13
understood
7:3
Union
7:23 8:4 14:5 21:12
United
1:1 4:7 5:3
unloading
20:23
unplugged
10:6
Usual
5:22
usually
18:19

**V**

vehicle
10:2,14,23 12:2,4,8 23:7
25:22 26:10
vehicles
11:5 12:15 13:3,5,9,12,17
13:21
versus
5:6
video
1:16 2:5 5:11 10:6
videotape
4:22
VIN
13:9
violation
23:12
vs
1:9

**W**

Wachovia
3:14 4:11
waist
19:19
waived
2:12

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

TATE GATLIN
April 22, 2008

want
12:2
wants
12:3
Watson
1:7  5:6,6,10  6:6  9:11
    11:20  14:9  15:1,22
    17:16  20:13  28:20
Watson's
16:4  17:5  20:5  24:1,4
    25:5
way
21:14
weigh
10:17
weight
10:14
Wellness
17:4
we're
16:18
witness
2:11  4:13  18:14  30:14
words
24:20
work
7:23  24:16,21  25:6,10
worked
8:13
writing
21:7
wrong
23:18

---
X
---
X
3:18,22

---
Y
---
yeah
16:13  26:4
year
26:17,23
years
8:17,18  11:15,18  23:9
y'all
15:11  25:16  28:10
y'all's
14:3

---
0
---
05
19:14  25:4
06
18:3,8,16  19:2  20:8  24:5
07-520
5:9

---
1
---
1

3:23  4:19  14:16  15:10,18
11:35
4:13
11:55
29:9

---
2
---
2
15:14  17:3  28:6
2:07-CV-520-WHA
1:5
2003
8:15  26:4
2005
25:20
2006
16:1  17:7
2007
4:12
2008
1:19  5:1
205
7:14
22
1:19  4:12
22nd
4:23
278
30:23

---
3
---
3
3:23  4:19  15:14  20:3
    28:11,21
3400
3:14  4:11
35203
3:15
35238
3:8
380487
3:7

---
4
---
4
3:23
4th
17:7  19:2

---
6
---
6
3:20
681
7:14

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 6

In The Matter Of:

### ARTHUR T. WATSON
v.
### ALABAMA FARMERS COOPERATIVE, INC., ET AL.

### NO. 2:07-CV-520-WHA

---

### JOSEPH PADGETT
May 8, 2008

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-520-WHA

ARTHUR T. WATSON,
        Plaintiff,
vs.
ALABAMA FARMERS COOPERATIVE, INC.,
D/B/A BONNIE PLANT FARMS,
        Defendants.


VIDEO DEPOSITION
OF
JOSEPH PADGETT
May 8, 2008

REPORTED BY:  Eleanor S. Pickett
        Certified Shorthand Reporter
        and Notary Public

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. Jerry D. Roberson
    Attorney at Law
    Roberson & Roberson
    P.O. Box 380487
    Birmingham, Alabama 35238

FOR THE DEFENDANT:
    Mr. Graham Gerhardt
    Attorney at Law
    Burr & Forman LLP
    3400 Wachovia Tower
    Birmingham, Alabama 35203

Page 2

S T I P U L A T I O N

        IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the video
deposition of JOSEPH PADGETT may be taken
before Eleanor S. Pickett, Commissioner,
Certified Shorthand Reporter and Notary
Public;
        That the signature to and
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions;
        That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign
grounds at the time of trial, or at the
time said deposition is offered in
evidence, or prior thereto.

Page 4

        I, Eleanor S. Pickett, a
Certified Shorthand Reporter of
Birmingham, Alabama, and a Notary Public
for the State of Alabama at Large, acting
as Commissioner, certify that on this
date, as provided by the Federal Rules of
Civil Procedure of the United States
District Court, and the foregoing
stipulation of counsel, there came before
me at the law offices of Burr & Forman
LLP, 3400 Wachovia Tower, Birmingham,
Alabama, on May 8, 2008, commencing at
12:35 p.m., JOSEPH PADGETT, witness in the
above cause, for oral examination,
whereupon the following proceedings were
had:

        MR. ROBERSON:  This is the
videotape deposition of Joey Padgett.
It's May 8th, 2008 and 12:35 p.m.  My name
is Jerry Roberson.  I'm the attorney for
the plaintiff, Arthur Watson.  This case
is pending in the United States District

1 (Pages 1 to 4)

ARTHUR T. WATSON                                    JOSEPH PADGETT
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                    May 8, 2008

| Page 5 | Page 7 |
|---|---|

**Page 5**

1  Court For the Northern District of
2  Alabama, Northern Division; and it's
3  styled Arthur T. Watson, plaintiff, versus
4  Alabama Farmers Cooperative, Inc., doing
5  business as Bonnie Plant Farms, defendant.
6       I would ask all counsel of
7  record to state their name and the party
8  they represent.
9       MR. GERHARDT:  My name is
10  Graham Gerhardt.  I'm with Burr & Forman,
11  appearing on behalf of the defendant.
12       MR. ROBERSON:  Would you swear
13  our witness, please, ma'am?
14
15       JOSEPH PADGETT,
16  having been first duly sworn, was examined
17  and testified as follows:
18
19       THE REPORTER:  Usual
20  stipulations?
21       MR. GERHARDT:  Yes, ma'am.
22       MR. ROBERSON:  Yes.
23

**Page 6**

1  EXAMINATION BY MR. ROBERSON:
2       Q.   Mr. Padgett, my name is Jerry
3  Roberson.  I represent Terry Watson in
4  this case.
5            Have you ever given a
6  deposition before?
7       A.   Yes.
8       Q.   All right.  So how many times?
9       A.   Twice.
10       Q.   And were those cases involving
11  personal matters as opposed to some
12  business of Bonnie Plant Farms?
13       A.   Yes.
14       Q.   Okay.  So today just, so you
15  know, I'm going to be asking you
16  questions.  I need you to answer out loud
17  audibly; that is, if you respond, don't
18  nod your head or say uh-huh or huh-uh,
19  okay?
20       A.   Yes.
21       Q.   And if you don't understand my
22  question, tell me you don't understand and
23  I'll try to rephrase it.  Fair enough?

**Page 7**

1       A.   Fair enough.
2       Q.   And if you answer, I'm going
3  to have to assume that you understood what
4  I was asking.  So that's why I give you
5  that warning.  Fair enough?
6       A.   Fair enough.
7       Q.   Okay.  Now, what is your age,
8  sir?
9       A.   Forty-six.
10       Q.   And you are Joey Padgett,
11  correct?
12       A.   That's correct.
13       Q.   Where do you live now, Mr.
14  Padgett?
15       A.   In Sonora, Kentucky.
16       Q.   Okay.  And where is that, sir?
17       A.   In the middle of nowhere.
18  Twenty miles south or fifteen miles south
19  of Elizabethtown.
20       Q.   Have you recently moved up
21  there?
22       A.   Yes.  Yes, I have.
23       Q.   When did you move?

**Page 8**

1       A.   In January.
2       Q.   Of 2008?
3       A.   Correct.
4       Q.   Where did you live before you
5  lived in Kentucky, sir?
6       A.   In Jasper, Alabama.
7       Q.   All right.  And how long did
8  you live in Jasper?
9       A.   Moved there in '95.
10       Q.   So you lived there for about
11  twelve or thirteen years?
12       A.   Yes.
13       Q.   And the whole time that you
14  lived there, sir, did you work for Bonnie
15  Plant Farms?
16       A.   Yes.
17       Q.   All right.  When did you begin
18  --
19       A.   No, I'm sorry, did not.
20       Q.   Okay.  When did you begin your
21  employment with Bonnie Plant?
22       A.   In '96.
23       Q.   In Jasper?

2 (Pages 5 to 8)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

Page 9

1     A.   Yes.
2     Q.   What -- in what capacity were
3 you first employed with Bonnie Plant?
4     A.   A salesman.
5     Q.   A route salesman?
6     A.   That's correct.
7     Q.   Okay.  And did you have a
8 geographical territory?
9     A.   Yes.
10    Q.   Where was that located?
11    A.   North Alabama and North
12 Mississippi.
13    Q.   And did you report to a
14 district manager or some sales supervisor?
15    A.   Yes.
16    Q.   What do y'all call that
17 position?
18    A.   My manager --
19    Q.   Station manager?
20    A.   No, I didn't report to a
21 station manager.  I just reported to the
22 office out of Union Springs.
23    Q.   Okay.  How many routes are

Page 10

1 there -- if you know, how many routes are
2 there in Alabama?
3     A.   Don't know.
4     Q.   Okay.  How long did you work
5 as a salesman for Bonnie Plant?
6     A.   Through 2007.
7     Q.   Okay.  And then -- as a
8 salesperson?
9     A.   That's correct.
10    Q.   And then in 2007 you got
11 promoted to what?
12    A.   Well, I've been a salesman the
13 whole time until this year, and I've been
14 a station manager since '99.
15    Q.   Okay.  So you do both jobs,
16 that is --
17    A.   Yes.
18    Q.   -- you have your own route,
19 correct?
20    A.   That's correct.
21    Q.   But you also supervise other
22 salesmen as a station manager?
23    A.   That's correct.

Page 11

1     Q.   Okay.  How many days a week do
2 you -- does it take you to run your route?
3     A.   That varies.
4     Q.   Okay.  Well, give me a range,
5 if you can.
6     A.   Well, it could take two days
7 during parts of the year, and it could
8 take three to four days during other parts
9 of the year.
10    Q.   So there are some days even
11 during your busiest times when you are in
12 an office or a station; is that correct?
13    A.   Yeah.  I was never there every
14 day in a station.  I was on my truck
15 somewhere every day.
16    Q.   Okay.  All right.  Well --
17    A.   Maybe I misunderstood your
18 question.  I thought maybe you were
19 meaning just a route in general with
20 Bonnie Plant Farm.
21    Q.   Well, I apologize.  My
22 question may not have been clear.
23        But it sounds to me like you do

Page 12

1 two functions; that is, you run your own
2 route as a salesman, correct?
3     A.   That's correct.
4     Q.   But you also supervise other
5 salesmen who report to you --
6     A.   That's correct.
7     Q.   -- correct?  Is there a
8 station for North Alabama?
9     A.   There are two.
10    Q.   Okay.  Where is the one that
11 you supervise?
12    A.   Jasper, Alabama.
13    Q.   Okay.  Where is the other one
14 in North Alabama?
15    A.   Athens.  Athens.
16    Q.   Okay.  Now, how many other
17 salesmen for Bonnie Plant report to you in
18 Jasper?
19    A.   Two.
20       MR. GERHARDT:  Jerry, let me
21 interrupt you for a second.  I just want
22 to make it clear that that's not -- he's
23 not currently in Alabama.

3 (Pages 9 to 12)

Page 13

MR. ROBERSON: I do understand that.

MR. GERHARDT: Okay.

Q. I apologize.

A. That's all right.

Q. Up until you just moved to Kentucky, two other salesmen reported to you?

A. Correct.

Q. Okay. And for 2006 that is when Terry Watson worked under your supervision; is that correct?

A. In spring of 2006.

Q. Okay. That's why I'm taking your deposition is because he did work for you, okay?

A. (Witness nods head affirmatively.)

Q. Is that a yes?

A. Correct.

Q. Okay. But I understood that he only worked for you for part of a season, the spring season in 2006,

Page 14

correct?

A. Yes. Yes.

Q. Okay. Now, he replaced a salesman, correct?

A. Yes.

Q. Who was that?

A. Thomas Heath, H-e-a-t-h.

Q. Did Mr. Heath change locations, or did he sever his relationship with Bonnie Plant?

A. Relationship was severed with Bonnie Plants.

Q. Okay. Involuntarily on his part?

A. Voluntarily on his part.

Q. Okay. So he resigned; is that correct?

A. That's correct.

Q. Okay. Do you know where he is or what he's doing now?

A. No, sir.

Q. Okay. Did that route have a number, or how did you refer to it?

Page 15

A. It was seven five zero two.

Q. Okay. And how many stores were on that route, approximately?

A. Approximately, forty.

Q. And can you tell me some of the cities that that route served?

A. Columbus, Mississippi; Amory, Mississippi; Winfield, Alabama. I can tell you a bunch of them if you want. Fayette, Alabama; Haleyville, Alabama.

Q. That's where I'm from, sir.

A. Is that right?

Q. Uh-huh.

A. Sulligent, Vernon, Millport, Iuka, Mississippi; Golden, Mississippi; and numerous others.

Q. Okay. Well, it sounds to me like, and I'm -- don't let me put words in your mouth, but it sounds to me like there would be numerous smaller stores on that route because this isn't -- you hadn't identified any what I would call major metropolitan area, correct?

Page 16

MR. GERHARDT: Object to the form.

A. I had several real good accounts over there.

Q. Okay. You can have a good account in a small town?

A. Yeah.

Q. Sure. But what I'm saying is, you didn't -- you didn't have any large cities that were served on that route. Is that fair?

A. I would say the Columbus area was more populated than any of the rest of it, yeah.

Q. Okay. Well, I'm from Haleyville, and there ain't five thousand people in Haleyville.

A. A lot of big gardeners.

Q. Well, what store did you have, Wal-Mart?

A. We had the Wal-Mart and Winston County Co-op.

Q. Okay. And would that pretty

4 (Pages 13 to 16)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

---

Page 17

1  much be you would -- if this -- if these
2  cities had a Wal-Mart, then that would be
3  on the route?  And then if they had a
4  farmers co-op, that would be on the route?
5      A.    (Witness nods head
6  affirmatively.)
7      Q.    And possibly if they had some
8  other independent smaller store, they
9  could be serviced too?
10     A.    That's correct.
11     Q.    Okay.  I mean, I'm just trying
12  to get the lay of the land.
13         Okay.  Now, how long did Mr.
14  Heath work there as a route salesman for
15  you?
16     A.    (No response.)
17     Q.    Did he work in the spring of
18  2005?
19     A.    Yes.
20     Q.    So he worked that same route?
21     A.    That's correct.
22     Q.    The whole year?
23     A.    The whole year.  I would say

Page 18

1  he worked two to three years --
2      Q.    All right.
3      A.    -- prior to -- prior to that
4  year.
5      Q.    Do you or does Bonnie Plant
6  keep a file, a personnel file, on every
7  salesman?
8      A.    I don't personally, no.
9      Q.    Okay.  But there are records
10  that show how long he worked there?
11     A.    Sure.
12     Q.    And would also show his
13  commissions, his sales?
14     A.    That would be correct.
15     Q.    Okay.  Do you know where those
16  are located or how I could obtain those?
17     A.    In Union Springs, Alabama.
18     Q.    Okay.  Under whose control are
19  they?
20     A.    That, I wouldn't know.
21  It's -- I mean, we could just call the
22  office and ask for whatever, you know.
23  What exact person, I wouldn't know.

Page 19

1      Q.    I still got to take the
2  deposition of Joe Stewart.
3      A.    Uh-huh.
4      Q.    Would he have access to those
5  records?
6      A.    I'm sure he would.
7      Q.    Okay.  In fact, is he your
8  boss or somebody that you reported to?
9      A.    In a roundabout way, but not
10  directly, no.
11     Q.    Who was your direct
12  supervisor?
13     A.    Dennis Thomas.
14     Q.    And what's his position?
15     A.    President of Bonnie Plant
16  Farm, general manager.
17     Q.    Is he in Union Springs?
18     A.    Yes, sir.
19     Q.    Now, has any of that changed
20  since you've gone to Kentucky this year?
21     A.    Not really, no.
22     Q.    Okay.  You still report to
23  him?

Page 20

1      A.    That's correct.
2      Q.    Okay.  And how many folks are
3  you supervising now?
4      A.    In the neighborhood of
5  forty-eight.
6      Q.    Okay.  How many of them are
7  route salesmen?
8      A.    Nine.
9      Q.    I hope they gave you a raise.
10     A.    I hope to earn one.
11     Q.    Okay.  Do you still run a
12  route --
13     A.    No.
14     Q.    -- in Kentucky?  It's just a
15  supervisory position now?
16     A.    That's correct.
17     Q.    Okay.  But a station manager
18  has to supervise people who actually grow
19  the plants too, correct?
20     A.    He's also a grower.
21     Q.    That's right.
22     A.    He is the grower.
23     Q.    Okay.  So he has to provide

5 (Pages 17 to 20)

---

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Page 21

1 the plants to be sold, is that a fair
2 statement?
3        A.    Correct.
4        Q.    All right.  And -- well, I
5 want to talk to you about the time that
6 you supervised Terry Watson, okay?  Did
7 you know him before he came to your
8 supervision?
9        A.    No.
10       Q.    Okay.  Had -- who made the
11 decision to send Terry to Jasper?
12            MR. GERHARDT:  Object to the
13 form.
14       Q.    You can answer.
15       A.    I called Union Springs and
16 told them that my route man had quit, that
17 I needed somebody.
18       Q.    Okay.  Who did you talk to?
19       A.    Kyle Currington.  A couple
20 three days later Kyle called and said he
21 could send Terry Watson.
22       Q.    Okay.  Did you ever talk to
23 Joe Stewart about Terry?

Page 22

1        A.    No, don't think I did, not
2 that I recall.
3        Q.    Then Terry arrived at your
4 location?
5        A.    No, sir.
6        Q.    Okay.  What happened?
7        A.    I had to go and get him.
8        Q.    Where did you go?
9        A.    Hattiesburg, Mississippi.
10       Q.    Okay.  When you say "you had
11 to go get him," sounds like he wasn't
12 coming.
13       A.    No, he was in a motel room
14 there for about a week and couldn't seem
15 to get any further.  So I went --
16       Q.    He didn't have transportation?
17 I don't know what you are telling me.
18       A.    He was in a truck, and he said
19 his truck broke down.
20       Q.    Oh.
21       A.    And instead of getting a bus
22 or something to get on up there to go to
23 work, he just stayed there.

Page 23

1        Q.    Okay.  Was that true that his
2 truck had broken down?
3        A.    Yeah.
4        Q.    Okay.
5        A.    Yeah.
6        Q.    So you went physically and got
7 him, to Hattiesburg, Mississippi?
8        A.    Yes, sir.
9        Q.    Okay.  And he worked for you
10 from what date; starting what date, if you
11 know?
12       A.    Sometime the week after Good
13 Friday of '06 until we finished out the
14 year.
15       Q.    Okay.  When is Good Friday?
16       A.    Changes every year.
17       Q.    I know.  What month does it
18 occur in?
19       A.    Either March or April.
20       Q.    Okay.  The end of March or the
21 beginning of April; is that correct?
22       A.    It would fall somewhere in
23 that range.

Page 24

1        Q.    Okay.  We'll I'm just
2 trying --
3        A.    That particular year, I really
4 can't say without a calendar in front of
5 me when it was.
6        Q.    Okay.  Well, I'm just trying
7 to ascertain when he was physically in
8 Jasper.
9        A.    Okay.
10       Q.    So sometime at the end of
11 March of '06?
12       A.    Right.  Or the first of April.
13       Q.    And he worked -- what do y'all
14 consider the spring season, until what
15 date, July or sometime?
16       A.    Sometime around the 4th of
17 July.
18       Q.    Okay.  And when does your
19 spring season start in Jasper; that is,
20 when do the route salesmen begin their
21 routes?
22       A.    I have started as early as
23 December.

6 (Pages 21 to 24)

Page 25

1  Q.  When did you start in 2006?
2  A.  It would be safe to say the
3  first week or so of January.
4  Q.  Okay.  So is it fair to say
5  that he missed a substantial portion of
6  that season, that is, he wasn't assigned
7  to that route?
8  A.  That would be correct.
9  Q.  Okay.  During that period of
10  time until Terry got there, was Mr. Heath
11  working the route?
12  A.  Yes, sir.
13  Q.  Okay.  And do you know when he
14  resigned; that is, the date of his
15  resignation?
16  A.  Somewhere around Good Friday
17  of '06.
18  Q.  Okay.  So you weren't without
19  a salesman for long?
20  A.  About a week.
21  Q.  Okay.  Now, I'm going to show
22  you -- this was marked as Defendant's
23  Exhibit 1 to Terry Watson's deposition.

Page 26

1  It's a commission statement for him for
2  the spring of 2006.  And this is Bonnie's
3  document, so I would ask for your help in
4  interpreting it, okay?
5  Now, does that document
6  indicate the sales on the route for both
7  Mr. Heath and for Mr. Watson?
8  A.  It could possibly.
9  Q.  What were the sales on this
10  route for 2006, the spring season?
11  A.  I wouldn't know off the top of
12  my head.  I wouldn't recall.
13  Q.  Well, doesn't it show there?
14  A.  Well, I don't know whether
15  this is just for that period --
16  Q.  That he worked?
17  A.  -- that he was there or
18  whether this is for -- see, this could
19  be -- I put out plants for over a week on
20  that route myself after Heath had quit.
21  This could include sales from that week.
22  It could include sales from the week that
23  Heath worked where plants were delivered

Page 27

1  but not yet sold until Watson got there.
2  Q.  Okay.  Who would know what
3  that -- what those figures represent, sir?
4  A.  Someone in the sales office in
5  Union Springs.
6  Q.  Can you give me a name?
7  A.  Dennis Thomas, Kyle
8  Currington.
9  Q.  What is Kyle's job?
10  A.  He's the -- he's vice
11  president or -- under the general manager,
12  whatever is next.
13  Q.  Okay.  All right.  Well, do
14  you know what the sales on that -- I'm
15  sure I'm taxing your memory, but do you
16  know what the sales were on that route for
17  2005 when Mr. Heath had it?
18  A.  No, sir.
19  Q.  Do you know if they were more
20  or less than what is listed on that
21  document?
22  A.  I wouldn't remember.
23  Q.  Okay.  What about now?  Terry

Page 28

1  Watson worked that route only in 2006,
2  right?
3  A.  For partial of 2006.
4  Q.  Right.  Correct.  Who's on the
5  route now?
6  A.  I wouldn't know.
7  Q.  So after Terry left, that's
8  when you got reassigned to Kentucky?
9  A.  No, I didn't get reassigned
10  until this year.  But there is a new
11  manager there, and he has new people.
12  Q.  Okay.  For 2007, you didn't
13  hold the job as a route salesmen and
14  station manager in Jasper?
15  A.  Yes, I did.
16  Q.  But that route was assigned to
17  somebody else?
18  A.  In 2007, I assigned Chris
19  Sparks to this route.
20  Q.  Okay.  Is he still there?
21  A.  He's still there, but I don't
22  think he's on this same route.
23  Q.  Okay.  Did he work the route

7 (Pages 25 to 28)

ARTHUR T. WATSON                                                JOSEPH PADGETT
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                       May 8, 2008

---

Page 29

in 2007?
2    A.    Yes.
3    Q.    Is it under your supervision?
4    A.    Yes.
5    Q.    Do you know what his sales
6    were?
7    A.    I think they were twenty to
8    thirty thousand dollars more than the '06
9    total.
10   Q.    Okay.  All right.  And is
11   Chris -- I'm sorry, I may have asked you
12   this, but is Chris still working on that
13   route?
14   A.    He still works out of Jasper
15   station.  I don't know which route.
16   Q.    Which number he's on, you
17   don't know?
18   A.    Right.  Right.
19   Q.    Who is the station manager in
20   Jasper now?
21   A.    Heath Davis.  No relation to
22   the last name of the prior Heath.
23   Q.    Hey, have you ever eaten at

---

Page 30

1    the Green Top Barbecue?
2    A.    A few times.
3    Q.    Have you ever eaten any better
4    barbecue?
5    A.    Uh-huh.
6    Q.    Okay.
7    A.    It's good.
8    Q.    After this deposition, though,
9    you can tell me where you ate that was
10   better.
11   A.    All right.
12   Q.    Now, during the time that
13   Terry worked under your supervision from
14   late March or early April until July, did
15   you have any criticism of his job
16   performance?
17   A.    I had a lot of customer
18   complaints on him not getting around the
19   route.
20   Q.    Okay.  Were any of those
21   complaints in writing?
22   A.    I'm sure some of them at the
23   time were, yeah.

---

Page 31

1    Q.    Do you know where I could
2    obtain any written complaint about Terry
3    Watson's job performance?
4    A.    Not from me, no, huh-uh.
5    Q.    Well, you didn't keep them?
6    A.    I gave them to him.
7    Q.    You gave them to him?
8    A.    Uh-huh.
9    Q.    Is that correct?
10   A.    That would be correct.
11   Q.    Can you remember any customer
12   who made a written complaint, Mr. Padgett?
13   A.    They were telephone
14   complaints.  They call our office.  We
15   write it down on a telephone pad, tear it
16   off and put it on their file.
17   Q.    Okay.  Well, they would say
18   things like "we're out of something"?
19   A.    Right.
20   Q.    Or --
21   A.    "Need plants, hadn't seen my
22   salesman in a week, out of tomato plants."
23   Q.    Have you ever -- other than

---

Page 32

1    Terry Watson, has that ever occurred in --
2    since 1999 since you've been a station
3    manager, have you ever had a customer
4    complaint on any other salesman?
5    A.    Not to that volume, no.
6    Q.    Oh, I see.  Has it ever
7    occurred before that somebody has called
8    and said they're out of something; "I
9    don't know where my salesman is, but I'm
10   out of a product"?
11   A.    Sure.  We hope they're selling
12   them.  We don't want them to stay there on
13   the shelf.
14   Q.    That's the point, isn't it?
15   A.    Uh-huh.  But we need to get
16   back there with some more so we can
17   continue selling them.
18   Q.    Okay.  Well, any other
19   criticism of Mr. Watson's job performance
20   while he worked under your supervision
21   those few months?
22   A.    It all boils down to what
23   you're selling.  You know, you got to get

8 (Pages 29 to 32)

ARTHUR T. WATSON                                          JOSEPH PADGETT
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                      May 8, 2008

---

Page 33

1  them there to sell them. That's it in a
2  nutshell.
3      Q.   I understand. In the time
4  that he worked for you, did you ever have
5  an occasion to write him up, reprimand him
6  in writing for any area of his job
7  performance?
8      A.   Didn't have the opportunity in
9  writing, no, sir.
10     Q.   Well, you certainly had the
11 opportunity, but you never availed
12 yourself of that opportunity, correct?
13          MR. GERHARDT:  Object to the
14 form.
15     Q.   Correct?
16     A.   Incorrect.
17     Q.   Okay. Why didn't you have the
18 opportunity to write him up?
19     A.   They were written and already
20 put in his file every time a customer
21 calls. You know, that's kind of a
22 personal -- you know, I take it personal
23 if a store of mine doesn't have product to

Page 34

1  sell because I'm paid on what he sells, so
2  I get back there with more product.
3      Q.   Mr. Padgett, do y'all have
4  forms where you can discipline an employee
5  at Bonnie Plant?
6      A.   I'm sure there are.
7      Q.   Do you have access to them?
8      A.   Yes, sir.
9      Q.   Do you have a -- what is the
10 extent of your education, sir?
11     A.   In what form --
12     Q.   Have you completed high
13 school?
14     A.   -- formally?
15     Q.   Yes, sir.
16     A.   Yes, sir, I completed high
17 school.
18     Q.   Did you attend college?
19     A.   I did.
20     Q.   Did you graduate?
21     A.   No, sir, I didn't.
22     Q.   How many years of college have
   you got?

Page 35

1      A.   Two years.
2      Q.   You are able to read and write
3  the English language is my point.
4      A.   I would hope so.
5      Q.   Okay. You know how to write
6  someone up if their job performance is
7  unsatisfactory, correct?
8          MR. GERHARDT:  Object to the
9  form.
10     Q.   You can answer.
11     A.   (No response.)
12     Q.   Sir?
13     A.   I -- I pass the notes on to
14 him.
15     Q.   Have you ever written up Terry
16 Watson?
17     A.   Oh, no, sir. I answered that
18 question.
19     Q.   Have you ever written up any
20 other employee?
21     A.   Yes, sir.
22     Q.   For what?
23     A.   Loading product that they

Page 36

1  shouldn't have loaded.
2      Q.   So you have disciplined
3  employees in writing; you know how to do
4  that, right?
5      A.   On one occasion I have.
6      Q.   Did you get them to sign and
7  acknowledge their job performance was
8  deficient?
9      A.   That, I did.
10     Q.   Why did you do that?
11     A.   Situation mandated it.
12     Q.   In fact, it's important to
13 manage an employee that they be made aware
14 and made to acknowledge that their
15 performance, prior performance has been
16 unsatisfactory, correct?
17          MR. GERHARDT:  Object to the
18 form.
19     A.   Mr. Watson was notified that
20 his stores were out of plants in writing
21 numerous occasions, daily.
22     Q.   Sir, employees have to know
23 what the expectations are of management,

9 (Pages 33 to 36)

Page 37

1  correct?
2      MR. GERHARDT:  Object to the
3  form.
4      Q.    Correct?
5      A.    Don't really understand your
6  question.
7      Q.    You can't do your job until
8  you know what your job is, correct?
9      A.    Oh, Mr. Watson was not a new
10 employee. He knew what his job was. I
11 think he had been working -- I didn't know
12 his past, but I think he had been there
13 for several years.
14     Q.    He had been working over
15 twenty-five years, and he was sixty-two
16 years of age, correct?
17     A.    Don't really know how old he
18 is.
19     Q.    How old are you?
20     A.    Forty-six.
21     Q.    Did he appear to be
22 substantially older than you?
23     MR. GERHARDT:  Object to the

Page 38

1  form.
2      A.    I can't tell how old anybody
3  is these days.
4      Q.    I see. Well, have you ever
5  worked anywhere besides Bonnie Plant?
6      A.    Smith Plant Farm.
7      Q.    Where are they?
8      A.    Union Springs.
9      Q.    Have they been bought by
10 Bonnie?
11     A.    They kind of merged.
12     Q.    What did you do for them?
13     A.    Sold plants.
14     Q.    Did you ever do any management
15 for them?
16     A.    Yes, I did.
17     Q.    Did you ever write up anybody
18 while you were at Smith Plant Farms?
19     A.    No, sir, I didn't.
20     Q.    So you've been -- how long
21 have you been in the plant business?
22     A.    Twenty-eight years.
23     Q.    And in those twenty-eight

Page 39

1  years, you've only written up one person?
2      A.    That's correct.
3      Q.    All right. Is he still with
4  the company?
5      A.    Left voluntarily. I think we
6  covered that.
7      Q.    Okay. Did you put the
8  write-up in his personnel file?
9      A.    I sent it to who is supposed
10 to do that.
11     Q.    Why did you do that?
12     A.    That's what it says to do.
13     Q.    That's right. Because
14 sometimes you may have -- he may not be
15 working for you, may be working for
16 somebody else, correct?
17     A.    I don't know if he's working
18 or not.
19     Q.    So whatever problem you
20 contend Terry Watson created by failing to
21 service your accounts, it wasn't so
22 serious that you had to write him up,
23 correct?

Page 40

1      MR. GERHARDT:  Object to the
2  form.
3      A.    I sell plants. My plants are
4  going to be sold. If he doesn't sell
5  them, it costs him money. I'm going to
6  sell them. So he cost himself money by
7  not servicing his customers.
8      Q.    Sir, I'm not going to be very
9  long with you, but I would appreciate it
10 if you would listen to my question and
11 answer my question. And my question was:
12 Whatever problem Terry Watson had, you
13 didn't think it was so serious as to
14 require you to initiate formal written
15 discipline, correct?
16     MR. GERHARDT:  Object to the
17 form.
18     A.    I think I've stated I have not
19 written up Terry Watson.
20     Q.    And you know how?
21     A.    I passed along customer
22 complaints. I can write up somebody if
23 they need it.

10 (Pages 37 to 40)

ARTHUR T. WATSON                                                    JOSEPH PADGETT
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                               May 8, 2008

Page 41

1    Q.   Okay.  And that's the point.
2    A.   Sure.
3    Q.   You didn't think he needed it,
4  correct?
5         MR. GERHARDT:  Object to the
6  form.
7    A.   Passed along -- he missed his
8  commissions on his own, not on anything I
9  did.
10   Q.   If you had thought he had
11 needed it, you would have written him up,
12 though, correct?
13   A.   My point is, I'm going to sell
14 the plants to somebody.  If he doesn't get
15 his share, that's his problem.  That's his
16 issue.
17   Q.   Now, did anybody ever tell you
18 that Terry Watson had complained of age
19 discrimination before he was sent to work
20 for you?
21   A.   No, sir.
22   Q.   You were unaware of his prior
23 complaint, correct?

Page 42

1    A.   That's correct.
2    Q.   Do you know where he had
3  worked before?
4    A.   With Bonnie Plant Farm.
5    Q.   Do you know what locations?
6    A.   No, sir.
7    Q.   Let me show you what were
8  marked as Exhibits 4 and 5 to his
9  deposition and ask you if you've ever seen
10 either of those documents?
11   A.   I've never seen these two
12 documents.
13   Q.   Has anybody ever informed you
14 about those two documents before?
15   A.   Not before today, no, sir.
16   Q.   Why did Terry Watson transfer
17 from under your supervision?  Did you
18 request that he be transferred?
19   A.   Oh, no, sir.
20   Q.   Do you know why he was
21 transferred?
22   A.   He was never hired by me.
23   Q.   What was he doing?

Page 43

1    A.   He was just filling in that
2  position because the salesman had quit.
3    Q.   Well, who made the decision
4  for him to fill in?
5    A.   I guess someone out of Union
6  Springs.
7    Q.   Well, did you hire someone?
8    A.   No.  The year ended.  He
9  finished out the year.
10   Q.   Right.  And then did you hire
11 someone, a permanent replacement?
12   A.   Oh, yes, sir.
13   Q.   Who did you hire?
14   A.   Chris Sparks.
15   Q.   Why did you hire him when you
16 already had Terry Watson?
17        MR. GERHARDT:  Object to the
18 form.
19   Q.   You can answer.
20   A.   I didn't hire Terry Watson.
21   Q.   How old is Chris Sparks?
22   A.   Probably forty-eight.  My age
23 or a little bit older.

Page 44

1    Q.   Well, since Mr. Watson
2  finished out the season with you, have you
3  had any occasion to see him?
4    A.   I have.
5    Q.   Where?
6    A.   At different sales meetings
7  that we've had with Bonnie.
8    Q.   Okay.  You mean the annual
9  meeting where all the salesmen get
10 together?
11   A.   Well, we have two.  And the
12 annual meeting I guess you'd consider
13 would be the Florida trip, and I don't
14 think I've seen him there.
15   Q.   Okay.  What other meetings do
16 y'all have?
17   A.   We have some sales meetings
18 down in Auburn.
19   Q.   What do you call those?
20   A.   Sales meetings.
21   Q.   And so you saw him at that
22 meeting?
23   A.   Uh-huh, yes, sir.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

Page 45

1     Q.   Did you speak to him?
2     A.   Yeah. Sure.
3     Q.   What did you tell him, do you
4 recall?
5     A.   How you doing.
6     Q.   Just small talk?
7     A.   Just small talk, yeah.
8     Q.   Sure. All right. Did Terry
9 Watson work under any kind of restriction
10 while he worked under your supervision,
11 that is, health restriction? Did he have
12 any limitations?
13     MR. GERHARDT: Object to the
14 form.
15     Q.   You can answer.
16     A.   In what form? I don't really
17 understand your question.
18     Q.   Is there anything he couldn't
19 do?
20     A.   I don't know what he couldn't
21 do, but he didn't load his truck, and he
22 didn't unload his truck.
23     Q.   Did he have a helper?

Page 46

1     A.   He had three of my people.
2 One helper off another truck and two of my
3 greenhouse workers.
4     Q.   Did he have a helper that went
5 with him on his route?
6     A.   He didn't come with a helper.
7 He said he had one, but the guy never
8 showed. His last name was Coon, C-o-o-n.
9     Q.   When he worked under your
10 supervision, was there someone who rode
11 with him on his truck?
12     A.   Sure, yeah, those three
13 helpers.
14     Q.   Three people rode with him on
15 his truck?
16     A.   At times there were three
17 people in there with him.
18     Q.   And who would those three
19 people have been?
20     A.   I don't recall their names.
21     Q.   Why would you need three
22 people on a truck to help you load and
23 unload?

Page 47

1     A.   I don't -- I don't know.
2     Q.   Can you think of any reason
3 why --
4     A.   You just don't do it yourself.
5 You would rather pay other people to do
6 it, I guess. Doesn't make sense.
7     Q.   I see. Do you know what the
8 sales goal was for that route in 2006?
9     A.   There wasn't one with Terry.
10     Q.   Did he receive any commissions
11 in 2006?
12     A.   I'm sure he did. According to
13 this sheet, if this was his pay sheet for
14 that year, yes, he did. Was overpaid.
15     Q.   That means his draw exceeded
16 his commissions, doesn't it?
17     A.   That's correct.
18     Q.   And why did Mr. Heath resign?
19     A.   You'd have to ask Mr. Heath
20 that.
21     Q.   He didn't have a conversation
22 with you?
23     A.   He said "I quit."

Page 48

1     Q.   He didn't tell you why?
2     A.   No, he didn't.
3     Q.   Did you ask him?
4     A.   No, I didn't.
5     Q.   Did you want him to quit?
6     A.   I didn't try to beg him to
7 stay.
8     Q.   He really wasn't getting the
9 job done, was he?
10     A.   Not to my satisfaction, no.
11     Q.   Okay.
12     A.   No.
13     MR. ROBERSON: We'll go off
14 the record for just a minute. The court
15 reporter has a problem. We are going off
16 the record at 1:10.
17     (Whereupon, a break was had
18     from 1:10 p.m. until 1:12 p.m.)
19     MR. ROBERSON: All right. We
20 are back on the record at 1:12.
21     Q.   Mr. Padgett, this is the only
22 time I get to talk to you before our trial
23 if we have a trial in this case. I just

12 (Pages 45 to 48)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

Page 49

1  ask you to tell me anything you know about
2  Terry Watson, my client.  If you know
3  anything negative about him, I'm just
4  asking you to tell me today so I don't
5  hear it for the first time at the trial,
6  okay?  Do you understand my question?
7      A.    Yes.
8      Q.    You tell me -- you've already
9  told me that you had customer complaints
10 that he wasn't visiting their stores
11 frequently enough and he -- and they were
12 out of product at times, correct?
13     A.    Correct.
14     Q.    All right.  Is there anything
15 else negative -- you also told me that he
16 had three people that worked on his truck?
17     A.    Up to three.
18     Q.    Okay.  Is there anything else,
19 any other criticism or anything bad that
20 you want to say about Terry Watson?  I'm
21 just asking you to tell me now and not
22 later, okay?
23     A.    No, it's all about the sales.

Page 50

1  I mean, if he -- if his sales would have
2  been up, no customers complaining -- you
3  know, it's a difference when you get a
4  call and they say "I'm out of plants.
5  I've sold them all this morning.  My guy
6  left me some yesterday."  I don't have an
7  issue with that.
8      Q.    Sure.
9      A.    But when you've got a customer
10 that calls like Winston County Co-Op in
11 Haleyville and says, "We haven't seen our
12 salesman in six days," I have an issue
13 with that.
14     Q.    Okay.  Well, during the few
15 months that he worked for you, can you say
16 anything positive about him?
17     A.    Terry is a real likable guy.
18 I mean, I called him last year even
19 though, you know, he wasn't working for
20 me.  I knew he was on another truck.  "How
21 are you doing, Terry," scrolling through
22 my numbers and saw it, you know.  We had
23 about a quick three minute chat.

Page 51

1      MR. ROBERSON:  All right.  I
2  don't think I've got anything else.  Mr.
3  Gerhardt, do you have any questions?
4      MR. GERHARDT:  I don't have
5  any questions either.
6      MR. ROBERSON:  Well, then,
7  that will conclude the deposition of Mr.
8  Padgett at 1:15.  Thank you, sir.
9
10     FURTHER THE DEPONENT SAITH NOT
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 52

1      C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6
7      I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the questions
10 and answers thereto were reduced to
11 typewriting under my supervision, and that
12 the foregoing represents a true and
13 correct transcript of the deposition given
14 by said witness upon said hearing.
15     I further certify that I am
16 neither of counsel nor of kin to the
17 parties to the action, nor am I in anywise
18 interested in the result of said cause.
19
20
21
22
       COMMISSIONER - NOTARY PUBLIC
23     ACCR LICENSE NO. 278

13 (Pages 49 to 52)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

| A |
|---|

able
35:2
access
19:4 34:7
account
16:6
accounts
16:4 39:21
ACCR
52:23
acknowledge
36:7,14
acting
4:4
action
1:5 52:17
affirmatively
13:18 17:6
age
7:7 37:16 41:18 43:22
AGREED
2:3
ain't
16:16
Alabama
1:2,10 3:8,15 4:3,4,12
5:2,4 8:6 9:11 10:2
12:8,12,14,23 15:8,10,10
18:17 52:4
Amory
15:7
annual
44:8,12
answer
6:16 7:2 21:14 35:10
40:11 43:19 45:15
answered
35:17
answers
52:10
anybody
38:2,17 41:17 42:13
anywise
52:17
apologize
11:21 13:4
appear
37:21
appearing
5:11
appreciate
40:9
approximately
15:3,4
April
23:19,21 24:12 30:14
area
15:23 16:12 33:6
arrived

22:3
Arthur
1:7 4:22 5:3
ascertain
24:7
asked
29:11
asking
6:15 7:4 49:4,21
assign
2:20
assigned
25:6 28:16,18
assume
7:3
ate
30:9
Athens
12:15,15
attend
34:18
attorney
3:5,12 4:21
Auburn
44:18
audibly
6:17
availed
33:11
aware
36:13

| B |
|---|

back
32:16 34:2 48:20
bad
49:19
barbecue
30:1,4
beg
48:6
beginning
23:21
behalf
5:11
better
30:3,10
big
16:18
Birmingham
3:8,15 4:3,11
bit
43:23
boils
32:22
Bonnie
1:11 5:5 6:12 8:14,21 9:3
10:5 11:20 12:17 14:10
14:12 18:5 19:15 34:5
38:5,10 42:4 44:7

Bonnie's
26:2
boss
19:8
bought
38:9
Box
3:7
break
48:17
broke
22:19
broken
23:2
bunch
15:9
Burr
3:13 4:10 5:10
bus
22:21
busiest
11:11
business
5:5 6:12 38:21

| C |
|---|

C
3:1 52:1,1
calendar
24:4
call
9:16 15:22 18:21 31:14
44:19 50:4
called
21:15,20 32:7 50:18
calls
33:21 50:10
capacity
9:2
case
4:22 6:4 48:23
cases
6:10
cause
4:14 52:18
certainly
33:10
Certified
1:22 2:8 4:2
certify
4:5 52:7,15
change
14:8
changed
19:19
Changes
23:16
chat
50:23
Chris

28:18 29:11,12 43:14,21
cities
15:6 16:10 17:2
Civil
1:5 4:7
clear
11:22 12:22
client
49:2
college
34:18,22
Columbus
15:7 16:12
come
46:6
coming
22:12
commencing
4:12
commission
26:1
Commissioner
2:7 4:5 52:22
commissions
18:13 41:8 47:10,16
company
39:4
complained
41:18
complaining
50:2
complaint
31:2,12 32:4 41:23
complaints
30:18,21 31:14 40:22
49:9
completed
34:12,16
compliance
2:13
conclude
51:7
consider
24:14 44:12
contend
39:20
continue
32:17
control
18:18
conversation
47:21
Coon
46:8
Cooperative
1:10 5:4
correct
7:11,12 8:3 9:6 10:9,19
10:20,23 11:12 12:2,3,6
12:7 13:9,12,20 14:1,4
14:17,18 15:23 17:10,21

18:14 20:1,16,19 21:3
23:21 25:8 28:4 31:9
31:10 33:12,15 35:7
36:16 37:1,4,8,16 39:2
39:16,23 40:15 41:4,12
41:23 42:1 47:17 49:12
49:13 52:13
cost
40:6
costs
40:5
counsel
2:5,17,19 4:9 5:6 52:16
County
16:22 50:10 52:5
couple
21:19
court
1:1 2:14 4:8 5:1 48:14
covered
39:6
co-op
16:22 17:4 50:10
created
39:20
criticism
30:15 32:19 49:19
currently
12:23
Currington
21:19 27:8
customer
30:17 31:11 32:3 33:20
40:21 49:9 50:9
customers
40:7 50:2
C-o-o-n
46:8

| D |
|---|

D
3:4
daily
36:21
date
4:6 23:10,10 24:15 25:14
Davis
29:21
day
11:14,15
days
11:1,6,8,10 21:20 38:3
50:12
December
24:23
decision
21:11 43:3
defendant
3:10 5:5,11
Defendants

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

1:12
Defendant's
25:22
deficient
36:8
delivered
26:23
Dennis
19:13  27:7
DEPONENT
51:10
deposition
1:16  2:6,11,12,22  4:19  6:6
  13:15  19:2  25:23  30:8
  42:9  51:7  52:8,13
depositions
2:15
difference
50:3
different
44:6
direct
19:11
directly
19:10
discipline
34:4  40:15
disciplined
36:2
discrimination
41:19
district
1:1,2  4:8,23  5:1  9:14
Division
1:3  5:2
document
26:3,5  27:21
documents
42:10,12,14
doing
5:4  14:20  42:23  45:5
  50:21
dollars
29:8
draw
47:15
duly
5:16
D/B/A
1:11

### E

E
3:1,1  52:1,1
early
24:22  30:14
earn
20:10
eaten
29:23  30:3

education
34:10
effect
2:13
either
23:19  42:10  51:5
Eleanor
1:21  2:7  4:1
Elizabethtown
7:19
employed
9:3
employee
34:4  35:20  36:13  37:10
employees
36:3,22
employment
8:21
ended
43:8
English
35:3
evidence
2:23
exact
18:23
examination
4:14  6:1
examined
5:16
exceeded
47:15
Exhibit
25:23
Exhibits
42:8
expectations
36:23
extent
34:10

### F

F
52:1
fact
19:7  36:12
failing
39:20
fair
6:23  7:1,5,6  16:11  21:1
  25:4
fall
23:22
Farm
11:20  19:16  38:6  42:4
farmers
1:10  5:14  17:4
Farms
1:11  5:5  6:12  8:15  38:18
Fayette

15:10
Federal
4:6
fifteen
7:18
figures
27:3
file
18:6,6  31:16  33:20  39:8
fill
43:4
filling
43:1
finished
23:13  43:9  44:2
first
5:16  9:3  24:12  25:3  49:5
five
15:1  16:16
Florida
44:13
folks
20:2
following
4:15
follows
5:17
force
2:13
foregoing
4:8  52:8,12
form
2:18  16:2  21:13  33:14
  34:11  35:9  36:18  37:3
  38:1  40:2,17  41:6  43:18
  45:14,16
formal
40:14
formally
34:14
Forman
3:13  4:10  5:10
forms
34:4
forty
15:4
forty-eight
20:5  43:22
Forty-six
7:9  37:20
four
11:8
frequently
49:11
Friday
23:13,15  25:16
front
24:4
full
2:13
functions

12:1
further
22:15  51:10  52:15

### G

gardeners
16:18
general
11:19  19:16  27:11
geographical
9:8
Gerhardt
3:11  5:9,10,21  12:20  13:3
  16:1  21:12  33:13  35:8
  36:17  37:2,23  40:1,16
  41:5  43:17  45:13  51:3,4
getting
22:21  30:18  48:8
give
7:4  11:4  27:6
given
6:5  52:13
go
22:7,8,11,22  48:13
goal
47:8
going
6:15  7:2  25:21  40:4,5,8
  41:13  48:15
Golden
15:15
good
16:3,5  23:12,15  25:16
  30:7
graduate
34:20
Graham
3:11  5:10
Green
30:1
greenhouse
46:3
grounds
2:21
grow
20:18
grower
20:20,22
guess
43:5  44:12  47:6
guy
46:7  50:5,17

### H

Haleyville
15:10  16:16,17  50:11
happened
22:6
Hattiesburg
22:9  23:7

head
6:18  13:17  17:5  26:12
health
45:11
hear
49:5
hearing
52:14
Heath
14:7,8  17:14  25:10  26:7
  26:20,23  27:17  29:21
  29:22  47:18,19
help
26:3  46:22
helper
43:23  46:2,4,6
helpers
46:13
Hey
29:23
high
34:12,16
hire
43:7,10,13,15,20
hired
42:22
hold
28:13
hope
20:9,10  32:11  35:4
huh-uh
6:18  31:4
H-e-a-t-h
14:7

### I

identified
15:22
important
36:12
include
26:21,22
Incorrect
33:16
independent
17:8
indicate
26:6
informed
42:13
initiate
40:14
interested
52:18
interpreting
26:4
interrupt
12:21
Involuntarily
14:13

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

involving
6:10
issue
41:16 50:7,12
luka
15:15

**J**

January
8:1 25:3
Jasper
8:6,8,23 12:12,18 21:11
24:8,19 28:14 29:14,20
JEFFERSON
52:5
Jerry
3:4 4:21 6:2 12:20
job
27:9 28:13 30:15 31:3
32:19 33:6 35:6 36:7
37:7,8,10 48:9
jobs
10:15
Joe
19:2 21:23
Joey
4:19 7:10
JOSEPH
1:18 2:6 4:13 5:15
July
24:15,17 30:14

**K**

keep
18:6 31:5
Kentucky
7:15 8:5 13:7 19:20
20:14 28:8
kin
52:16
kind
33:21 38:11 45:9
knew
37:10 50:20
know
6:15 10:1,3 14:19 18:15
18:20,22,23 21:7 22:17
23:11,17 25:13 26:11,14
27:2,14,16,19 28:6 29:5
29:15,17 31:1 32:9,23
33:21,22 35:5 36:3,22
37:8,11,17 39:17 40:20
42:2,5,20 45:20 47:1,7
49:1,2 50:3,19,22
Kyle
21:19,20 27:7
Kyle's
27:9

**L**

L
2:1
land
17:12
language
35:3
large
4:4 16:9
late
30:14
law
3:5,12 4:10
laws
2:14
lay
17:12
leading
2:19
left
28:7 39:5 50:6
LICENSE
52:23
likable
50:17
limitations
45:12
listed
27:20
listen
40:10
little
43:23
live
7:13 8:4,8
lived
8:5,10,14
LLP
3:13 4:11
load
45:21 46:22
loaded
36:1
Loading
35:23
located
9:10 18:16
location
22:4
locations
14:9 42:5
long
8:7 10:4 17:13 18:10
25:19 38:20 40:9
lot
16:18 30:17
loud
6:16

**M**

major

15:22
man
21:16
manage
36:13
management
36:23 38:14
manager
9:14,18,19,21 10:14,22
19:16 20:17 27:11 28:11
28:14 29:19 32:3
mandated
36:11
March
23:19,20 24:11 30:14
marked
25:22 42:8
matters
6:11
ma'am
5:13,21
mean
17:11 18:21 44:8 50:1,18
meaning
11:19
means
47:15
meeting
44:9,12,22
meetings
44:6,15,17,20
memory
27:15
merged
38:11
metropolitan
15:23
middle
1:2 7:17
miles
7:18,18
Millport
15:14
mine
33:23
minute
48:14 50:23
missed
25:5 41:7
Mississippi
9:12 15:7,8,15,15 22:9
23:7
misunderstood
11:17
money
40:5,6
month
23:17
months
32:21 50:15
morning

50:5
motel
22:13
mouth
15:19
move
7:23
moved
7:20 8:9 13:6

**N**

N
2:1 3:1
name
4:20 5:7,9 6:2 27:6
29:22 46:8
names
46:20
necessary
2:16
need
6:16 31:21 32:15 40:23
46:21
needed
21:17 41:3,11
negative
49:3,15
neighborhood
20:4
neither
52:16
never
11:13 33:11 42:11,22 46:7
new
28:10,11 37:9
Nine
20:8
nod
6:18
nods
13:17 17:5
North
9:11,11 12:8,14
Northern
1:3 5:1,2
Notary
1:23 2:8 4:3 52:22
notes
35:13
notified
36:19
number
14:23 29:16
numbers
50:22
numerous
15:16,20 36:21
nutshell
33:2

**O**

O
2:1
Object
16:1 21:12 33:13 35:8
36:17 37:2,23 40:1,16
41:5 43:17 45:13
objections
2:17,20
obtain
18:16 31:2
occasion
33:5 36:5 44:3
occasions
36:21
occur
23:18
occurred
32:1,7
offered
2:22
office
9:22 11:12 18:22 27:4
31:14
offices
4:10
Oh
22:20 32:6 35:17 37:9
42:19 43:12
okay
6:14,19 7:7,16 8:20 9:7
9:23 10:4,7,15 11:1,4,16
12:10,13,16 13:3,10,14,16
13:21 14:3,13,16,19,22
15:2,17 16:5,15,23 17:11
17:13 18:9,15,18 19:7,22
20:2,6,11,17,23 21:6,10
21:18,22 22:6,10 23:1,4
23:9,15,20 24:1,6,9,18
25:4,9,13,18,21 26:4
27:2,13,23 28:12,20,23
29:10 30:6,20 31:17
32:18 33:17 35:5 39:7
41:1 44:8,15 48:11 49:6
49:18,22 50:14
old
37:17,19 38:2 43:21
older
37:22 43:23
opportunity
33:8,11,12,18
opposed
6:11
oral
4:14
overpaid
47:14

**P**

P

ARTHUR T. WATSON                                                                    JOSEPH PADGETT
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                                          May 8, 2008

2:1 3:1,1
pad
31:15
Padgett
1:18 2:6 4:13,19 5:15 6:2
  7:10,14 31:12 34:3
  48:21 51:8
paid
34:1
part
13:22 14:14,15
partial
28:3
particular
24:3
parties
2:4,20 52:17
parts
11:7,8
party
5:7
pass
35:13
passed
40:21 41:7
pay
47:5,13
pending
4:23
people
16:17 20:18 28:11 46:1,14
  46:17,19,22 47:5 49:16
performance
30:16 31:3 32:19 33:7
  35:6 36:7,15,15
period
25:9 26:15
permanent
43:11
person
18:23 39:1
personal
6:11 33:22,22
personally
18:8
personnel
18:6 39:8
physically
23:6 24:7
Pickett
1:21 2:7 4:1
plaintiff
1:8 3:3 4:22 5:3
plant
1:11 5:5 6:12 8:15,21 9:3
  10:5 11:20 12:17 14:10
  18:5 19:15 34:5 38:5,6
  38:18,21 42:4
plants
14:12 20:19 21:1 26:19,23
  31:21,22 36:20 38:13

40:3,3 41:14 50:4
please
5:13
point
32:14 35:3 41:1,13
populated
16:13
portion
25:5
position
9:17 19:14 20:15 43:2
positive
50:16
possibly
17:7 26:8
president
19:15 27:11
pretty
16:23
prior
2:23 18:3,3 29:22 36:15
  41:22
Probably
43:22
problem
39:19 40:12 41:15 48:15
Procedure
4:7
proceedings
4:15
product
32:10 33:23 34:2 35:23
  49:12
promoted
10:11
provide
20:23
provided
4:6
Public
1:23 2:9 4:3 52:22
put
15:18 26:19 31:16 33:20
  39:7
p.m
4:13,20 48:18,18
P.O
3:7

| Q |
| --- |

question
6:22 11:18,22 35:18 37:6
  40:10,11,11 45:17 49:6
questions
2:18,19 6:16 51:3,5 52:9
quick
50:23
quit
21:16 26:20 43:2 47:23
  48:5

| R |
| --- |

R
3:1 52:1
raise
20:9
range
11:4 23:23
read
35:2
reading
2:11
real
16:3 50:17
really
19:21 24:3 37:5,17 45:16
  48:8
reason
47:2
reassigned
28:8,9
recall
22:2 26:12 45:4 46:20
receive
47:10
record
5:7 48:14,16,20
records
18:9 19:5
reduced
52:10
refer
14:23
relating
2:15
relation
29:21
relationship
14:10,11
remember
27:22 31:11
rephrase
6:23
replaced
14:3
replacement
43:11
report
9:13,20 12:5,17 19:22
reported
1:21 9:21 13:7 19:8
reporter
1:22 2:8 4:2 5:19 48:15
represent
5:8 6:3 27:3
represents
52:12
reprimand
33:5
request
42:18

require
40:14
resign
47:18
resignation
25:15
resigned
14:16 25:14
respective
2:5
respond
6:17
response
17:16 35:11
rest
16:13
restriction
45:9,11
result
52:18
right
6:8 8:7,17 11:16 13:5
  15:12 18:2 20:21 21:4
  24:12 27:13 28:2,4
  29:10,18,18 30:11 31:19
  36:4 39:3,13 43:10
  45:8 48:19 49:14 51:1
Roberson
3:4,6,6 4:18,21 5:12,22
  6:1,3 13:1 48:13,19 51:1
  51:6
rode
46:10,14
room
22:13
roundabout
19:9
route
9:5 10:18 11:2,19 12:2
  14:22 15:3,6,21 16:10
  17:3,4,14,20 20:7,12
  21:16 24:20 25:7,11
  26:6,10,20 27:16 28:1,5
  28:13,16,19,22,23 29:13
  29:15 30:19 46:5 47:8
routes
9:23 10:1 24:21
rules
2:14 4:6
run
11:2 12:1 20:11

| S |
| --- |

S
1:21 2:1,7 3:1 4:1
safe
25:2
SAITH
51:10
sales

9:14 18:13 26:6,9,21,22
  27:4,14,16 29:5 44:6,17
  44:20 47:8 49:23 50:1
salesman
9:4,5 10:5,12 12:2 14:4
  17:14 18:7 25:19 31:22
  32:4,9 43:2 50:12
salesmen
10:22 12:5,17 13:7 20:7
  24:20 28:13 44:9
salesperson
10:8
satisfaction
48:10
saw
44:21 50:22
saying
16:8
says
39:12 50:11
school
34:13,17
scrolling
50:21
season
13:23,23 24:14,19 25:6
  26:10 44:2
second
12:21
see
26:18 32:6 38:4 44:3
  47:7
seen
31:21 42:9,11 44:14 50:11
sell
33:1 34:1 40:3,4,6 41:13
selling
32:11,17,23
sells
34:1
send
21:11,21
sense
47:6
sent
39:9 41:19
serious
39:22 40:13
served
15:6 16:10
service
39:21
serviced
17:9
servicing
40:7
seven
15:1
sever
14:9
severed

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                                    http://www.TylerEaton.com

ARTHUR T. WATSON                                                                    JOSEPH PADGETT
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                                              May 8, 2008

14:11
share
41:15
sheet
47:13,13
shelf
32:13
Shorthand
1:22  2:8  4:2
show
18:10,12  25:21  26:13  42:7
showed
46:8
sign
36:6
signature
2:10
sir
7:8,16  8:5,14  14:21  15:11
  19:18  22:5  23:8  25:12
  27:3,18  33:9  34:8,10,15
  34:16,21  35:12,17,21
  36:22  38:19  40:8  41:21
  42:6,15,19  43:12  44:23
  51:8
Situation
36:11
six
50:12
sixty–two
37:15
small
16:6  45:6,7
smaller
15:20  17:8
Smith
38:6,18
sold
21:1  27:1  38:13  40:4
  50:5
somebody
19:8  21:17  28:17  32:7
  39:16  40:22  41:14
Sonora
7:15
sorry
8:19  29:11
sounds
11:23  15:17,19  22:11
south
7:18,18
Sparks
28:19  43:14,21
speak
45:1
spring
13:13,23  17:17  24:14,19
  26:2,10
Springs
9:22  18:17  19:17  21:15
  27:5  38:8  43:6

start
24:19  25:1
started
24:22
starting
23:10
state
4:4  5:7  52:4
stated
40:18
statement
21:2  26:1
States
1:1  4:7,23
station
9:19,21  10:14,22  11:12,14
  12:8  20:17  28:14  29:15
  29:19  32:2
stay
32:12  48:7
stayed
22:23
stenotypy
52:9
Stewart
19:2  21:23
STIPULATED
2:3
stipulation
4:9
stipulations
5:20
store
16:19  17:8  33:23
stores
15:2,20  36:20  49:10
styled
5:3
substantial
25:5
substantially
37:22
Sulligent
15:14
supervise
10:21  12:4,11  20:18
supervised
21:6
supervising
20:3
supervision
13:12  21:8  29:3  30:13
  32:20  42:17  45:10
  46:10  52:11
supervisor
9:14  19:12
supervisory
20:15
supposed
39:9
sure
271

16:8  18:11  19:6  27:15
  30:22  32:11  34:6  41:2
  45:2,8  46:12  47:12
  50:8
swear
5:12
sworn
5:16

|       T       |

T
1:7  2:1,1  5:3  52:1,1
take
11:2,6,8  19:1  33:22
taken
2:6  52:8
talk
21:5,18,22  45:6,7  48:22
taxing
27:15
tear
31:15
telephone
31:13,15
tell
6:22  15:5,9  30:9  38:2
  41:17  45:3  48:1  49:1,4
  49:8,21
telling
22:17
territory
9:8
Terry
6:3  13:11  21:6,11,21,23
  22:3  25:10,23  27:23
  28:7  30:13  31:2  32:1
  35:15  39:20  40:12,19
  41:18  42:16  43:16,20
  45:8  47:9  49:2,20
  50:17,21
testified
5:17
Thank
51:8
thereto
2:23  52:10
things
31:18
think
22:1  28:22  29:7  37:11,12
  39:5  40:13,18  41:3
  44:14  47:2  51:2
thirteen
8:11
thirty
29:8
Thomas
14:7  19:13  27:7
thought
11:18  41:10

thousand
16:16  29:8
three
11:8  18:1  21:20  46:1,12,14
  46:16,18,21  49:16,17
  50:23
time
2:21,22  8:13  10:13  21:5
  25:10  30:12,23  33:3,20
  48:22  49:5
times
6:8  11:11  30:2  46:16
  49:12
today
6:14  42:15  49:4
told
21:16  49:9,15
tomato
31:22
top
26:11  30:1
total
29:9
Tower
3:14  4:11
town
16:6
transcript
52:13
transfer
42:16
transferred
42:18,21
transportation
22:16
trial
2:21  48:22,23  49:5
trip
44:13
truck
11:14  22:18,19  23:2  45:21
  45:22  46:2,11,15,22
  49:16  50:20
true
23:1  52:12
try
6:23  48:6
trying
17:11  24:2,6
twelve
8:11
twenty
7:18  29:7
twenty–eight
38:22,23
twenty–five
37:15
Twice
6:9
two
11:6  12:1,9,19  13:7  15:1

18:1  35:1  42:11,14  44:11
  46:2
typewriting
52:11

|       U       |

U
2:1
uh–huh
6:18  15:13  19:3  30:5
  31:8  32:15  44:23
unaware
41:22
understand
6:21,22  13:1  33:3  37:5
  45:17  49:6
understood
7:3  13:21
Union
9:22  18:17  19:17  21:15
  27:5  38:8  43:5
United
1:1  4:7,23
unload
45:22  46:23
unsatisfactory
35:7  36:16
Usual
5:19

|       V       |

varies
11:3
Vernon
15:14
versus
5:3
vice
27:10
video
1:16  2:5
videotape
4:19
visiting
49:10
volume
32:5
voluntarily
14:15  39:5
vs
1:9

|       W       |

Wachovia
3:14  4:11
waived
2:12
Wal–Mart
16:20,21  17:2
want

Tyler Eaton Morgan Nichols & Pritchett, Inc.
Toll Free 800.458.6031                                                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOSEPH PADGETT
May 8, 2008

12:21  15:9  21:5  32:12
48:5  49:20
**warning**
7:5
**wasn't**
22:11  25:6  39:21  47:9
48:8  49:10  50:19
**Watson**
1:7  4:22  5:3  6:3  13:11
21:6,21  26:7  27:1  28:1
32:1  35:16  36:19  37:9
39:20  40:12,19  41:18
42:16  43:16,20  44:1
45:9  49:2,20
**Watson's**
25:23  31:3  32:19
**way**
19:9
**week**
11:1  22:14  23:12  25:3,20
26:19,21,22  31:22
**went**
22:15  23:6  46:4
**weren't**
25:18
**We'll**
24:1  48:13
**we're**
31:18
**we've**
44:7
**Winfield**
15:8
**Winston**
16:22  50:10
**witness**
2:11  4:13  5:13  13:17  17:5
52:14
**words**
15:18
**work**
8:14  10:4  13:15  17:14,17
22:23  28:23  41:19  45:9
**worked**
13:11,22  17:20  18:1,10
23:9  24:13  26:16,23
28:1  30:13  32:20  33:4
38:5  42:3  45:10  46:9
49:16  50:15
**workers**
46:3
**working**
25:11  29:12  37:11,14
39:15,15,17  50:19
**works**
29:14
**wouldn't**
18:20,23  26:11,12  27:22
28:6
**write**
31:15  33:5,18  35:2,5

38:17  39:22  40:22
**write-up**
39:8
**writing**
30:21  33:6,9  36:3,20
**written**
31:2,12  33:19  35:15,19
39:1  40:14,19  41:11

---

**Y**
**yeah**
11:13  16:7,14  23:3,5
30:23  45:2,7  46:12
**year**
10:13  11:7,9  17:22,23
18:4  19:20  23:14,16
24:3  28:10  43:8,9
47:14  50:18
**years**
8:11  18:1  34:22  35:1
37:13,15,16  38:22  39:1
**yesterday**
50:6
**y'all**
9:16  24:13  34:3  44:16

---

**Z**
**zero**
15:1

---

**0**
**06**
23:13  24:11  25:17  29:8

---

**1**
**1**
25:23
**1:10**
48:16,18
**1:12**
48:18,20
**1:15**
51:8
**12:35**
4:13,20
**1999**
32:2

---

**2**
**2:07-CV-520-WHA**
1:5
**2005**
17:18  27:17
**2006**
13:10,13,23  25:1  26:2,10
28:1,3  47:8,11
**2007**
10:6,10  28:12,18  29:1
**2008**
1:19  4:12,20  8:2

278
52:23

---

**3**
3400
3:14  4:11
35203
3:15
35238
3:8
380487
3:7

---

**4**
4
42:8
4th
24:16

---

**5**
5
42:8

---

**8**
8
1:19  4:12
8th
4:20

---

**9**
95
8:9
96
8:22
99
10:14

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                    http://www.TylerEaton.com

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 7

In The Matter Of:

# ARTHUR T. WATSON
v.
# ALABAMA FARMERS COOPERATIVE, INC., ET AL.

## NO. 2:07-CV-520-WHA

---

## JOE STUART
## May 23, 2008

---



## TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

205.252.9152 • Toll-Free 800.458.6031 • Fax 205.252.0196
One Federal Place, Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
——————— www.TylerEaton.com ———————

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

---

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:07-CV-520-WHA

ARTHUR T. WATSON,
 Plaintiff,
vs.
ALABAMA FARMERS COOPERATIVE, INC.,
d/b/a BONNIE PLANT FARMS,
 Defendants.

VIDEO DEPOSITION
OF
JOE STUART
May 23, 2008

REPORTED BY: Gail B. Pritchett
 Certified Realtime Reporter,
 Registered Professional
 Reporter and Notary Public

---

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:
 Mr. Jerry Roberson
 Attorney at Law
 3765 Kinross Drive
 P. O. Box 380487
 Birmingham, Alabama 35238

FOR THE DEFENDANT:
 Mr. Graham W. Gerhardt
 Attorney at Law
 Burr & Forman LLP
 3400 Wachovia Tower
 Birmingham, Alabama 35203

---

Page 2

S T I P U L A T I O N

 IT IS STIPULATED AND AGREED,
by and between the parties, through their
respective counsel, that the deposition of
JOE STUART may be taken before Gail B.
Pritchett, Commissioner, Certified
Realtime Reporter, Registered Professional
Reporter and Notary Public;
 That the signature to and
reading of the deposition by the witness
is waived, the deposition to have the same
force and effect as if full compliance had
been had with all laws and rules of Court
relating to the taking of depositions;
 That it shall not be necessary
for any objections to be made by counsel
to any questions, except as to form or
leading questions, and that counsel for
the parties may make objections and assign
grounds at the time of trial, or at the
time said deposition is offered in
evidence, or prior thereto.

---

Page 4

I N D E X
PAGE:
EXAMINATION BY MR. ROBERSON          7

E X H I B I T S
PAGE:
Plaintiff's Exhibit 1      26
Plaintiff's Exhibit 2      27
Plaintiff's Exhibit 3      28
Plaintiff's Exhibit 4      30
Plaintiff's Exhibit 5      31
Plaintiff's Exhibit 6      31
Plaintiff's Exhibit 7      32
Plaintiff's Exhibit 8      32
Plaintiff's Exhibit 9      34
Plaintiff's Exhibit 10     36
Plaintiff's Exhibit 11     39
Plaintiff's Exhibit 12     40
Plaintiff's Exhibit 13     54
Plaintiff's Exhibit 14     63

---

1 (Pages 1 to 4)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

Page 5

1   I, Gail B. Pritchett, a
2   Certified Realtime Reporter and Registered
3   Professional Reporter of Birmingham,
4   Alabama, and a Notary Public for the State
5   of Alabama at Large, acting as
6   Commissioner, certify that on this date,
7   as provided by the Federal Rules of Civil
8   Procedure of the United States District
9   Court, and the foregoing stipulation of
10  counsel, there came before me at the law
11  offices of Burr & Forman, LLP, 3400
12  Wachovia Tower, Birmingham, Alabama, on
13  the 23rd day of May, 2008, commencing at
14  12:57 p.m., JOE STUART, witness in the
15  above cause, for oral examination,
16  whereupon the following proceedings were
17  had:
18
19        MR. ROBERSON:  All right.
20  This is the videotape deposition of Joe
21  Stuart.  It's being taken in the case
22  pending in the United States District
23  Court for the Middle District of Alabama,

Page 6

1   Northern Division, styled Arthur T.
2   Watson, that's Terry Watson, plaintiff,
3   versus Alabama Farmers Cooperative, Inc.,
4   doing business as Bonnie Plant Farms,
5   defendant, CV-07-520.
6        My name is Jerry Roberson.  I'm
7   the attorney for plaintiff Terry
8   Watson, and I'm also operating the video
9   camera.  I would ask all counsel of record
10  to state their name and the party they
11  represent.
12        MR. GERHARDT:  My name is
13  Graham Gerhardt, and I'm appearing on
14  behalf of the defendant.
15        MR. ROBERSON:  Would you swear
16  our witness, please, ma'am?
17
18        JOE STUART,
19  having been first duly sworn, was examined
20  and testified as follows:
21
22        THE COURT REPORTER:  Usual
23  stipulations?

Page 7

1        MR. ROBERSON:  Yes.
2        MR. GERHARDT:  Yes, ma'am.
3
4   EXAMINATION BY MR. ROBERSON:
5        Q.   Mr. Stuart, my name is Jerry
6   Roberson, we met just briefly before the
7   deposition.
8             Would you give me your full
9   name, please, sir?
10       A.   Joe Wheeler Stuart.
11       Q.   And your residence address,
12  including the zip code?
13       A.   17227 Highway 82, Union
14  Springs, Alabama 36089.
15       Q.   And are you employed with
16  Bonnie Plant Farms?
17       A.   Yes, sir.
18       Q.   In what capacity, Mr. Stuart?
19       A.   I'm a sales manager.
20       Q.   For the entire nation?
21       A.   Not now.  I'm the sales
22  manager for the -- basically west of the
23  Mississippi River.

Page 8

1        Q.   Okay.  So there is another
2   sales manager for the other side of the
3   river?
4        A.   There is now, yes.
5        Q.   Okay.  At one time before
6   y'all made that territorial division, were
7   you the sales manager for the whole U. S.?
8        A.   Yes, sir, I was.
9        Q.   Okay.  When did that stop?
10  When did y'all realign?
11       A.   Maybe two years ago.
12       Q.   All right, sir.  And what's
13  the extent of your education, Mr. Stuart?
14       A.   I went four years to Troy
15  State, did not graduate, and -- that's
16  basically it.
17       Q.   What was your course of study?
18  What were you majoring in?
19       A.   Geography.
20       Q.   Well, it's not hard to
21  understand how you got in the plant
22  business, then, if you were a geography
23  major.

2 (Pages 5 to 8)

Page 9

1      How long have you been in the
2 plant business, Mr. Stuart?
3      A.   Since I was nineteen years
4 old, and I'm presently sixty-five.
5      Q.   Okay. So you were working
6 while you were going to school?
7      A.   This is seasonal work. And
8 I'd go to school -- I actually went to
9 school six years, but seasonal work.
10      Q.   Okay. So in the spring season
11 you worked at Bonnie Plant, and you'd go
12 to school in the fall, is that the way it
13 worked?
14      A.   That's correct.
15      Q.   All right, sir. Now, you know
16 my client, Terry Watson?
17      A.   Yes, sir.
18      Q.   How long has he been working
19 for Bonnie Plant Farms, if you --
20 approximately, if you know?
21      A.   I would guess for Bonnie Plant
22 Farm he has been probably working for --
23 approximately fifteen years.

Page 10

1      Q.   Okay. Did he work in the
2 plant business before that?
3      A.   He worked about ten years for
4 me.
5      Q.   Okay. Well, maybe we need to
6 explain that.
7      When -- did you have a plant
8 company for a period of time?
9      A.   I did, for about twelve or
10 fifteen years.
11      Q.   And where was that business
12 located?
13      A.   In New Summerfield, Texas.
14      Q.   Okay. And what was the name
15 of it, sir?
16      A.   Joe Stuart & Company.
17      Q.   Okay. And was that business
18 acquired or merged in to Bonnie Plant
19 Farms?
20      A.   Yes, sir.
21      Q.   Okay. And approximately what
22 year did that take place?
23      A.   Around '92.

Page 11

1      Q.   So you have been knowing Terry
2 Watson for about thirty years?
3      A.   I knew Terry at Troy State
4 when we were in school together down
5 there, and then he -- we lost contact for
6 about fifteen years. And then he came to
7 me when I had my company in Texas and I
8 gave him a job working for me.
9      Q.   Okay. And he worked as a
10 route salesman for you?
11      A.   I took him to a route in south
12 Louisiana and opened up the route for him,
13 trained him on the route, and he continued
14 on the route as a salesman for it.
15      Q.   How long did he work as a
16 route salesman in Louisiana for you, for
17 your company, approximately?
18      A.   I would say six to eight
19 years. I don't know, really. Maybe ten,
20 I don't know.
21      Q.   And where was his route?
22      A.   South Louisiana, on I-10 down
23 in southern Louisiana.

Page 12

1      Q.   And then Bonnie Plant acquired
2 your company?
3      A.   Yes, sir.
4      Q.   Were you the only shareholder
5 in that company at --
6      A.   Yes, sir.
7      Q.   -- owned all of the stock?
8      A.   Yes, sir.
9      Q.   So they purchased your
10 company, and you went to work for Bonnie
11 Plant?
12      A.   Uh-huh.
13      Q.   Is that correct?
14      A.   Yes, sir.
15      Q.   Was that a part of the
16 purchase agreement, that you would go to
17 work for them? Or was that just something
18 that happened?
19      A.   I can't really remember if
20 that was part of the reason. I mean -- of
21 course, it was a monetary figure was the
22 main thing, but it could have been.
23      Q.   Okay. And when you operated

3 (Pages 9 to 12)

ARTHUR T. WATSON                                                    JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          May 23, 2008

---

Page 13

1  your plant business, where did you sell
2  plants? I mean, were you a nationwide
3  company too?
4      A.   No, no.  No, no.
5      Q.   You were smaller in area?
6      A.   Yeah, I was a regional type
7  company.  East Texas, Oklahoma, Arkansas,
8  western Kentucky, southern Illinois,
9  southern Missouri was basically my
10 territory.
11     Q.   Okay.  Now, when Terry went to
12 work for Bonnie Plant when they acquired
13 your company, did he remain a route
14 salesman in south Louisiana?
15     A.   Yes, he did, on the same route
16 that he was running for me.
17     Q.   Okay.  So really nothing
18 changed --
19     A.   Nothing changed.
20     Q.   -- from his standpoint other
21 than the name?
22     A.   That's correct.
23     Q.   Okay.  And a route salesman's

Page 14

1  job is just to sell plants, and they have
2  to stock them in the various locations,
3  correct?
4      A.   That's some of the things they
5  have to do.  There are a lot of other
6  things they have to do.
7      Q.   Okay.  Well, I have never
8  worked as a route salesman, so tell me
9  what they are required to do.
10     A.   Well, they have to load the
11 truck, get in and out of the truck, see
12 what kind of inventory they have, go in
13 and meet the customer with a pleasing
14 personality and a positive mental
15 attitude, shake their hands and establish
16 a relationship with them, and work the
17 route, pick up the old stuff, put them
18 back on the truck, carry them back to the
19 greenhouse location, unload the truck and
20 reload the truck back.
21     Q.   Okay.  And who -- who was the
22 station manager for Terry when he worked
23 at south Louisiana?  I suspect he had a

Page 15

1  couple, several.
2      A.   The station manager for Terry
3  when he worked for south Louisiana still
4  with Bonnie Plant Farms?
5      Q.   Yes.
6      A.   That would be Bill Reiner.
7      Q.   I'm sorry, Bill --
8      A.   Bill Reiner, R-e --
9  R-e-i-n-e-r, I think.
10     Q.   Is he still with the company?
11     A.   He is still the station
12 manager in Louisiana --
13     Q.   Okay.
14     A.   -- I mean, in Texas.
15     Q.   So the station for that
16 location in Louisiana was in Texas?
17     A.   Yes, sir, just right across
18 the line.
19     Q.   Okay.  Now, at some point, I
20 believe it was around 2003 or 2004, Terry
21 Watson initiated a transfer; do you -- do
22 I understand that correctly?
23     A.   He requested to go to a

Page 16

1  smaller route that didn't require as much
2  work.
3      Q.   Okay.  A shorter route?
4      A.   A shorter route and one that
5  did not have fall routes on it where he
6  wouldn't have to work in the fall.  So he
7  could draw his unemployment and not have
8  to work in the fall.
9      Q.   Okay.  And one of the reasons
10 for that was because he was under -- going
11 to undergo some surgery that would -- he
12 would undergo in the fall, correct?
13     A.   I did not know that.
14     Q.   Okay.  Well, you know now that
15 he did --
16     A.   I know now -- I know now that
17 he went through.  At the time I didn't
18 know that.
19     Q.   Okay.  Well, the point of my
20 question is that Terry -- this transfer
21 was initiated by Terry, correct?
22     A.   It was probably a fifty/fifty
23 deal between Butch Stuart and Terry

4 (Pages 13 to 16)

Page 17

1  Watson.  I don't know who actually said
2  let's see if we can do this first.  I
3  really don't know who said that first.
4      Q.   Okay.  But then -- both of the
5  salesmen wanted to swap routes; and
6  management, including you, agreed or
7  approved that swap, that transfer,
8  correct?
9      A.   We did.
10     Q.   Okay.  And I assume had --
11  Terry had remained employed for about
12  twenty-five years; I assume he was doing a
13  capable job or a satisfactory job as a
14  route salesman?
15     A.   Where?
16     Q.   In Louisiana.
17     A.   He was doing a satisfactory
18  job.
19     Q.   Okay.  Now, Mr. Stuart, did --
20  a lot of -- I've take -- I've represented
21  several salesmen, not plant salesmen, but
22  salesmen I've the past.  And normally the
23  salesmen I've represented on an annual

Page 18

1  basis receive a written job evaluation.
2  Did y'all do that at Bonnie Plant?
3      A.   No, sir, we didn't do that.
4      Q.   Okay.  So there aren't any
5  written job evaluations for any of your
6  salesmen?
7      A.   We have a salesman's job
8  description.  I think Tina Johnson wrote
9  one up this past year or two.
10     Q.   Just the job description.  But
11  as far as a form or a standardized way --
12     A.   No.
13     Q.   -- y'all evaluate salesmen --
14     A.   No, sir.
15     Q.   -- y'all don't have one of
16  those?
17     A.   We don't do that.
18     Q.   Okay.  I just wanted to make
19  sure.  But you know what I'm talking
20  about?
21     A.   Yeah.
22     Q.   All right.  Well -- and in
23  the -- I -- every salesman normally has a

Page 19

1  sales goal; do you understand what I'm
2  talking about?
3      A.   Sure.
4      Q.   Okay.  And at Bonnie Plant,
5  how do y'all arrive at a sales goal for a
6  particular territory?
7      A.   We would take a territory and
8  look back at the history of it of how it
9  has been selling.  And every route we
10  have, nearly every route has an increase
11  over the year before.  It's common -- it's
12  uncommon to have a decrease.  Something is
13  wrong if we have a decrease.  But every
14  route we have has an increase, so we base
15  that on our projected increase on each
16  route and establish a goal for that route.
17     Q.   All right.  I'm just going to
18  throw out a figure.  Let's say we sold
19  three hundred thousand dollars' worth of
20  plants in 2007, okay?
21     A.   Uh-huh.
22     Q.   Your sales goal for 2008 for
23  that route would be three hundred and what

Page 20

1  thousand?  How much of a percentage
2  increase would you expect or would you
3  hope for?
4      A.   Depending on how many
5  Wal-Marts and how many Home Depots or
6  something like that has opened up.  They
7  are opening up some all the time, and so
8  depending on what kind of new -- new
9  business was coming into the route or we
10  split the route up to try and increase our
11  service capabilities, I would say around a
12  seventy-five to a hundred thousand.
13     Q.   Of increase?
14     A.   Is what we expect.
15     Q.   So if you had a three hundred
16  thousand dollar route, you would expect to
17  have a four hundred thousand dollar --
18     A.   Three seventy-five to four
19  hundred, sure would.  Wal-Mart may do
20  twenty-five thousand.  Three Wal-Marts
21  open up and you have got that covered,
22  even if you didn't do better than what you
23  did the last year.

5 (Pages 17 to 20)

Page 21

1    Q.   Okay.  So your sales quota or
2  goal will depend in part on any new stores
3  that come on line on your route, is that a
4  fair statement?
5    A.   That's a fair statement.  And
6  the territory, the geographic territory
7  that we are working.  A route in New York
8  would be expected to make more than one in
9  Kansas, for population reasons.
10    Q.   Okay.  So how concentrated the
11  population is can cause a difference too?
12    A.   Yes, sir.
13    Q.   All right.  And -- now -- but
14  I understand that every year you realign
15  the routes to try to keep them equal or
16  balanced, is that correct?
17    A.   No, sir, that's not correct.
18    Q.   Okay.  Explain to me, do y'all
19  routinely make changes in the routes?
20    A.   Yes, sir.
21    Q.   Okay.  How do y'all change the
22  routes?
23    A.   We change the route due to the

Page 22

1  service capability on it.  The money is
2  not really a factor.  We have to satisfy
3  the customers.  And if we are a little lax
4  on doing some service work, we may take
5  some customers off of this route, add to
6  this truck, or create another route
7  altogether and put on another truck.  We
8  do that all the time all over the country.
9    Q.   Well, I apologize, I may have
10  misspoke, but the point I'm trying to make
11  is that your routes and the customers on
12  your routes also vary from year to year;
13  is that a fair statement?
14    A.   Yes.
15    Q.   I mean --
16    A.   The number of customers on the
17  route --
18    Q.   Right.
19    A.   -- can vary from year to year.
20    Q.   Okay.  So when we compare the
21  sales for one year, we have to be careful,
22  because that same route may have lost some
23  stores or may have added some stores,

Page 23

1  correct, from year to year?
2    A.   Repeat that question, please,
3  sir.
4    Q.   Okay.  When you compare your
5  sales on the route from one year to the
6  next, you have to be careful because you
7  are comparing apples to oranges if the
8  route has changed; do you agree with that?
9    MR. GERHARDT:  Object to the
10  form.
11    A.   Can you rephrase that
12  question?
13    Q.   Yeah.  You agree with me that
14  the routes change from year to year, the
15  number of stores and the locations that
16  are serviced?
17    A.   Some of our routes do change
18  from year to year.
19    Q.   Okay.  And if they change,
20  then you have to be careful when you
21  compare the sales from one year to the
22  sales -- just the figure for the sales the
23  following year, correct?

Page 24

1    A.   Careful to who?
2    Q.   Well, I may have lost a
3  Wal-Mart store or a large account in the
4  following year, it may have been
5  reassigned to another route or, as you
6  say, we may have created another route, so
7  my sales may actually go down even though
8  I sold more to everybody else?
9    A.   It's very rare that we have
10  sales that go down.
11    Q.   Okay.  Now, when Terry went to
12  -- is it Bells, Tennessee?
13    A.   Yes, sir, I guess.
14    Q.   Okay.  And he worked on that
15  route for two years, Butch's route?  They
16  swapped and he worked Butch's route?
17    A.   They swapped.
18    Q.   Did he do a satisfactory job
19  as a salesman up there in Tennessee?
20    A.   The first year?
21    Q.   At any time, however long he
22  was up there.
23    A.   I would say that his work was

Page 25

1  a little less than satisfactory.
2      Q.   And as the national sales
3  manager, would you -- would you talk to
4  the station managers from time to time?
5      A.   Yes.
6      Q.   Did you have any complaints
7  about Terry Watson from the station
8  manager?
9      A.   Yes.
10     Q.   What were those -- the nature
11 of those complaints, sir?
12     A.   Most of the complaints that
13 come from Terry is the fact that we deal
14 with a perishable product.  And a
15 perishable product, quick as you can get
16 it out on the route, the longer the shelf
17 life.  The longer the shelf life means
18 more dollars, better chance for it to
19 sell.  Terry was somewhat a little lax in
20 getting all of the customers worked on a
21 timely basis.
22     Q.   Okay.  Are there any written
23 documents in Bonnie Plant Farm documents

Page 26

1  that would indicate that, that would
2  corroborate that complaint, sir?
3          MR. GERHARDT:  Object to the
4  form.
5      Q.   You can answer.
6      A.   There are no documents that I
7  know of, because we don't keep written
8  documents -- or document things like that.
9      Q.   Mr. Stuart, I'm going to show
10 you some documents that have been made
11 available to me today by your attorney,
12 and I'm going to mark the first -- have
13 you had a chance to look at these before
14 the deposition?
15     A.   Before right now?
16     Q.   Yes, sir.
17     A.   I don't -- no, sir.
18         (Whereupon, Plaintiff's
19         Exhibit 1 was marked for
20         identification.)
21     Q.   Well, let me show you what
22 I've marked as Exhibit 1, and that looks
23 like just some kind of printout.  I assume

Page 27

1  it's a W-2 or something in the nature of
2  that for Terry Watson for the year 2000.
3          Is that what -- your
4  understanding of what that is?
5      A.   (Reviewing document.)  Yes,
6  that's what it looks like.
7      Q.   I mean, some type of earnings
8  statement for Terry Watson, correct?
9      A.   Yes, sir.
10     Q.   And in 2000 he would have been
11 working that south Louisiana route,
12 correct?
13     A.   Yes, sir, I think so.
14     Q.   All right.
15         (Whereupon, Plaintiff's
16         Exhibit 2 was marked for
17         identification.)
18     Q.   Now, I want to show you what
19 I'll marked as Exhibit 2, which is a W-2
20 form for 2001 for Terry Watson.
21         And can you read the writing on
22 there?  What -- what is reported as his
23 wages for that year?

Page 28

1      A.   In 2001?
2      Q.   Yes, sir.
3      A.   Let me see if I can find it
4  here.  (Reviewing document.)  Looks like
5  twenty-nine thousand five thirty-five
6  eighty.  Does that look right to you?
7  It's sort of crimped in there, you'll see
8  what I'm talking about.
9      Q.   Yeah, they have got -- they've
10 got wages of twenty-nine five thirty-five,
11 but then they have Social Security wages
12 of thirty-four nine fifty-four.  Now, do
13 you know why that is?
14     A.   No, sir.
15         (Whereupon, Plaintiff's
16         Exhibit 3 was marked for
17         identification.)
18     Q.   Well, if you would, I'll ask
19 you -- and if you will tell me what the
20 Social Security wages are for what I have
21 marked as Exhibit 3 which is for 2002 for
22 Terry Watson, the Social Security wages?
23     A.   (Reviewing document.)  Looks

7 (Pages 25 to 28)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

Page 29

1    like four thousand fifty-nine forty-one.
2    There is a little line in there, it's sort
3    of hard to read.
4        Q.   It's forty thousand four
5    hundred fifty-nine.
6        A.   Okay.  Okay.
7        Q.   All right.  And these guys
8    that work as route salesmen, what's
9    reported on their W-2, is that the money
10   that they earn after they pay all of their
11   expenses, you know, the -- their helpers
12   and everybody?
13       A.   It's my understanding that is.
14       Q.   Okay.  In other words, it's
15   lower than their commissions, they will
16   make more than that in commissions, but
17   out of the commissions on the route they
18   have to pay certain expenses, correct?
19       A.   Yes, sir.
20       Q.   And what expenses do they have
21   to pay?
22       A.   Motel rooms if they spend the
23   night on the road, a lot of them -- if

Page 30

1    it's a short route, you go back home every
2    night and you don't spend the night on the
3    road.  Some of them have long routes and
4    have to spend the night on the route and
5    stuff like that.
6        Q.   Okay.  So motel, their helper,
7    and anything else?
8        A.   That's basically about it.
9        Q.   Okay.  All right.  And then
10   let me show you what I will mark as
11   Exhibit 4, which is his -- again, he's
12   still working south Louisiana during this
13   time period.  I believe he went to Bells,
14   Tennessee in 2004, but he has testified
15   about that, so --
16            (Whereupon, Plaintiff's
17             Exhibit 4 was marked for
18             identification.)
19       Q.   This is -- this is his W-2 --
20   what are his wages in 2003, his Social
21   Security wages in 2003?
22       A.   Twenty-eight something ninety
23   point nineteen.  I can't read that little

Page 31

1    line there.  Do you see what I'm talking
2    about?
3        Q.   Yeah, it looks like
4    twenty-eight four ninety.  Twenty-eight
5    forty ninety.  All right.
6            (Whereupon, Plaintiff's
7             Exhibit 5 was marked for
8             identification.)
9        Q.   And Exhibit 5, his wages --
10   his W-2 in 2004, his Social Security wages
11   are twenty-three oh twelve, is that
12   correct?
13       A.   Yes, sir, that looks right.  I
14   can see that figure.
15           (Whereupon, Plaintiff's
16            Exhibit 6 was marked for
17            identification.)
18       Q.   Let me show you Exhibit 6,
19   which is W-2 for 2005.  And do you agree
20   with me that his Social Security wages are
21   listed at twenty-four thousand five
22   eighty-eight?
23       A.   Yes, sir, that's what it looks

Page 32

1    like.
2            (Whereupon, Plaintiff's
3             Exhibit 7 was marked for
4             identification.)
5        Q.   2006, his Social Security
6    wages are forty-five nine twelve?
7        A.   Yes, sir.
8            (Whereupon, Plaintiff's
9             Exhibit 8 was marked for
10            identification.)
11       Q.   And in 2007, his Social
12   Security wages are eighteen oh
13   seventy-nine?
14       A.   Yes, sir, that looks correct.
15       Q.   Okay.  Now, after Terry Watson
16   worked the spring of 2005, did you have
17   any contact with him after his surgery,
18   his knee surgery?
19       A.   I don't think so.
20       Q.   Well, do you know why he
21   wasn't returned to his route in Bells,
22   Louis -- Bells, Tennessee in 2006?
23       A.   Why he wasn't returned there?

8 (Pages 29 to 32)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON  
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART  
May 23, 2008

---

Page 33

Q.   Yeah.
2  A.   Because the station manager,
3  Mr. Adam Alley, requested that he not --
4  that he didn't want to fool with him
5  again. It has been my experience and my
6  history to -- if any of the station
7  managers that -- who is the salesman's
8  immediate supervisor requests that they do
9  not want someone back the next year, I
10 have always gone along with that. I don't
11 want to create an atmosphere that's not
12 conducive to a good salesmanship. And I
13 felt like a situation where one man
14 doesn't want another one back would create
15 a problem, so that's why he was not.
16 Q.   And when did Mr. Alley have a
17 conversation with you about he didn't want
18 Terry back?
19 A.   It was something -- it was
20 after the season was over. I can't
21 remember exactly when it was.
22 Q.   And so you knew Terry wasn't
23 going back to that route, correct?

---

Page 34

A.   I hadn't -- I hadn't told
2  Terry about that at that time, but I think
3  I -- sometime in the early fall or
4  something -- I don't really remember when
5  I told Terry, but I did tell Terry.
6  Q.   Well, where did you tell Terry
7  he was going to work?
8  A.   I told him I would try to find
9  him something and try to help him out
10 where he could stay on the insurance.
11 That's what he requested he wanted to do,
12 that he was just working for the
13 insurance, and I said well, I will try to
14 find him something, so -- and that's how
15 we tried to create a route down in
16 Donaldsonville, Louisiana, just so Terry
17 would have a job.
18 Q.   Well, let me show you what I
19 have marked -- what I will mark as Exhibit
20 9.
21      (Whereupon, Plaintiff's
22      Exhibit 9 was marked for
23      identification.)

---

Page 35

Q.   And this is a letter that
2  Terry Watson gave to Tate Gatlin, who is
3  your -- Tate is -- what do you call him,
4  your --
5  A.   I think you would call him the
6  safety director.
7  Q.   Safety director. In other
8  words, all your route salesmen drive a
9  truck, correct?
10 A.   Yes, sir.
11 Q.   And as part -- in order to be
12 a route salesman, they have to be approved
13 as a driver by DOT, correct?
14 A.   Correct.
15 Q.   So they have to have a bi --
16 is it biannual physical or something?
17 They have to have some kind of card?
18 A.   Or annual physical.
19 Q.   Annual physical, okay. So
20 this is the letter Terry gave Tate on
21 January 10th, 2006. And apparently as of
22 that date, no one had told Terry where he
23 was working. Would you look at Exhibit 9?

---

Page 36

MR. GERHARDT: Let me object
2  to the form of that statement.
3  Q.   Have you seen that document
4  before today?
5  A.   I have not seen this. I
6  couldn't -- I don't remember seeing this.
7      (Whereupon, Plaintiff's
8      Exhibit 10 was marked for
9      identification.)
10 Q.   Well, let me show you Exhibit
11 10. Well, after Tate got that letter, did
12 he call you?
13 A.   I don't remember him calling
14 me.
15 Q.   Well, what would Tate do -- if
16 he got a complaint of age discrimination,
17 what would he do?
18 MR. GERHARDT: Object to the
19 form.
20 A.   I don't know what Tate would
21 do.
22 Q.   I see. Well, do y'all have a
23 policy in writing out there at Bonnie

9 (Pages 33 to 36)

---

ARTHUR T. WATSON                                                    JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          May 23, 2008

---

Page 37

1  Plant Farms about age discrimination?
2      A.   A policy in writing?  We are
3  aware of all types of discrimination, and
4  I don't know if it's in writing out there,
5  but we -- we are aware of that.
6      Q.   Well, do you know how old
7  Terry Watson was on January 10th, 2006?
8      A.   Well, I'll just have to use
9  simple arithmetic.  If he is sixty-two
10  years now and that was two years ago, how
11  about sixty?
12      Q.   Sixty.  He is sixty -- he is
13  actually going to turn sixty-one on
14  January 12th, two days later.  And he had
15  had a knee replacement and he's asking for
16  a job.  He wanted the job in Tennessee,
17  and he did not understand why he had not
18  been allowed to return to his route.
19          Did you have a conversation
20  with Terry about this time?
21          MR. GERHARDT:  Object to the
22  form.
23      A.   I don't even know if Terry was

Page 38

1  physically able to work at that time.  And
2  I may have had a conversation with him,
3  but I told him I -- and I don't know the
4  timetable of that, when it actually
5  occurred, but I do remember telling him I
6  would find him something.
7      Q.   Okay.  Well, let me show you
8  what I marked as Exhibit 10, which is a
9  letter dated February 2nd.  It's to Tate,
10  but it's copied to you, to Joe Stuart.
11          Did you receive that letter?
12      A.   (Reviewing document.)  I don't
13  remember seeing this letter, sir.
14      Q.   Well, did you take any action
15  after this letter was sent to Tate and to
16  you?
17      A.   Well, I don't remember seeing
18  the letter, but -- somewhere after that
19  period there, but I don't remember seeing
20  that letter, I did find -- try to create
21  an opening in Donaldsonville, Louisiana
22  for Terry.
23      Q.   Well, were all your routes

Page 39

1  filled in January of 2006?  Did you have
2  any open routes?
3      A.   I think at that time we didn't
4  have any open routes.
5      Q.   You did or did not?
6      A.   Did not.
7      Q.   Let me show you what I will
8  mark as Exhibit 11.
9          (Whereupon, Plaintiff's
10          Exhibit 11 was marked for
11          identification.)
12      Q.   Y'all recently started some
13  policy where y'all have your drivers seen
14  by a -- some type of therapist or
15  something, physical therapist?
16      A.   Have we recently started that?
17      Q.   Yeah, a wellness group?
18      A.   I think Tate may have
19  something like that going.  But he and I
20  are separate, I don't know what all he may
21  have going on there.
22      Q.   Let me show you what has been
23  marked as Exhibit 11 and ask you if you

Page 40

1  have ever seen that document?
2      A.   (Reviewing document.)  No,
3  sir, I don't remember seeing that before.
4          (Whereupon, Plaintiff's
5          Exhibit 12 was marked for
6          identification.)
7      Q.   Well, I will show you what
8  I've marked as Exhibit 12 and ask you if
9  you have ever seen this document.  It's a
10  release statement from Terry Watson's
11  physician dated January 26, 2006.
12      A.   (Reviewing document.)  I
13  didn't even know he was in this kind of
14  shape.  I haven't seen that before.
15      Q.   So none of the actions you
16  took were because of Terry Watson's
17  health, that is to create him a position?
18      A.   No, the actions I took was
19  because of his -- not because of his
20  health or his age.
21          (Brief interruption.)
22          MR. ROBERSON:  Excuse me, I
23  meant to turn that off.  I apologize.

10 (Pages 37 to 40)

ARTHUR T. WATSON                                                           JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                                May 23, 2008

---

Page 41

1  Q.   (BY MR. ROBERSON:)  So you
2  weren't aware of any restrictions that
3  Terry Watson had as concerns his work in
4  the spring season of 2006?
5  A.   I wasn't concerned with any
6  health issues that he had at that time.  I
7  was just concerned with the complaints
8  that we had gotten on the route.
9  Q.   And the complaint coming from
10  his station manager, Mr. Alley?
11  A.   Station manager, and I had
12  some customers call me personally and tell
13  me that the man is asleep in the truck and
14  he is not working the route properly.
15  Q.   Who called you?
16  A.   I think I had one in
17  Summerville, Tennessee.  Boswell Feed &
18  Seed, Mr. Frank Boswell, I started him up
19  myself, he is an old friend of mine.  I
20  also had another one from the Farmers
21  Co-Op in Selmer, Tennessee.
22  Q.   All right.  Who -- what's the
23  name of the individual that called you

Page 42

1  from Summerville, Tennessee?
2  A.   His name is -- Boswell Feed &
3  Seed is the name of his store.
4  Q.   And do you know who called
5  you?
6  A.   I think it was Frank Boswell
7  himself, but I'm not for sure which one of
8  the people at the store called me.
9  Q.   And when was this --
10  A.   One of the -- one of the
11  employees at the store called me.
12  Q.   When was this?
13  A.   This was in -- at -- toward
14  the middle to the end of the season in
15  Bells in -- whatever his second trip was
16  up there.
17  Q.   2005?
18  A.   I guess.
19  Q.   And why wouldn't they call Mr.
20  Alley?
21  A.   Well, they had called Mr.
22  Alley, I guess.  He had told me about some
23  similar complaints that he had.  Those are

Page 43

1  just two that I personally got.
2  Q.   Who -- who is the other one?
3  A.   Farmers Co-Op in Selmer,
4  Tennessee.  I don't know who called from
5  the store.
6  Q.   Selma?
7  A.   S-e-l-m-e-r.
8  Q.   And it was service complaints
9  or lack of service complaints?
10  A.   Lack of service, yes, sir.
11  Q.   Well, have you ever received
12  any calls like that on any other route
13  salesmen?
14  A.   I have occasionally.  Not many
15  times, but occasionally.
16  Q.   And did you transfer them?
17  A.   On occasions, on one or --
18  once or twice I might have.
19  Q.   Can you give me the names of
20  anybody you transferred?
21  A.   I usually -- sir?
22  Q.   Can you give me the names of
23  anybody you have transferred after

Page 44

1  receiving a complaint like that?
2  A.   Well, let's see here.  Let me
3  stop and think here.  Removed -- removed a
4  boy from Salt Lake City this year and sent
5  him to Plainville, Kansas.  He later was
6  caught with liquor in his truck and we
7  fired him --
8  (Reporter interruption.)
9  A.   He later was caught with
10  liquor in his truck and we had to fire
11  him.  Moved a boy from Milton, Wisconsin
12  to Kennedyville, Maryland.
13  Q.   Do you know either of those
14  individuals' names?
15  A.   That man -- that boy's name is
16  Nick Reeder.
17  Q.   Nick?
18  A.   Nick Reeder, R-e-e-d-e-r.  And
19  that guy in Kansas we fired, I don't
20  remember his name.
21  Q.   This route that Terry -- so
22  for almost thirty years the only transfer
23  Terry Watson had was one that he

11 (Pages 41 to 44)

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

---

Page 45

1  initiated, correct?
2      A.   One that him and the other
3  salesman collabor -- collaborated on.
4      Q.   Okay.  And since his two
5  letters to you -- or two letters, one to
6  Tate Gatlin and one to you and Tate
7  Gatlin, and his complaint of age
8  discrimination, beginning in the spring of
9  2006, how many different routes has Terry
10  held?
11      MR. GERHARDT:  Object to the
12  form.
13      Q.   You sent him to --
14      A.   Where was he at?
15      Q.   He was in Bells, Tennessee and
16  you sent him to Donaldsonville, Louisiana.
17      A.   He didn't stay there but --
18      Q.   A couple of weeks?
19      A.   Two weeks, two or three weeks.
20      Q.   All right.  And then he went
21  to Jasper?
22      A.   We had a route to come open,
23  it would make more money for Terry, a

Page 46

1  chance to do better.  Since we really
2  didn't really have a route for him in
3  Donaldsonville, I moved him to that route.
4  And he was very appreciative of it, too,
5  by the way.
6      Q.   And that was the route that --
7  you sent him to Donaldsonville, will you
8  agree with that?
9      A.   To try to create a job for
10  him.
11      Q.   Okay.  And you sent him to
12  Jasper?
13      A.   Where there was a route
14  already available.
15      Q.   Okay.
16      A.   He was tickled to death with
17  it.
18      Q.   What route is he on now?
19      A.   He is on a route in Beeville,
20  Texas.
21      Q.   So that's three routes,
22  correct?
23      A.   Yes, sir.  But -- no, it's

Page 47

1  just two routes.  He never had a route in
2  Donaldsonville, Louisiana.
3      Q.   Okay.  It was a job, but it
4  wasn't a route?
5      A.   Right.
6      Q.   All right.  And that job, he
7  didn't receive any commissions, he just
8  got a draw, correct?
9      A.   He got -- he -- he has been on
10  the draw for fifteen years from us, never
11  been cut off at all, always been on the
12  insurance.
13      Q.   Okay.  And when he worked in
14  Jasper, his draw exceeded his commissions,
15  correct?
16      A.   I think that's what the
17  records show.
18      Q.   Okay.
19      A.   But I don't deal in that.
20      Q.   And in -- in Texas -- is he
21  going back to that route next year in
22  Beeville, Texas?
23      A.   In Beeville?

Page 48

1      Q.   Yes, sir.
2      A.   If the station manager down
3  there says they want him back, then I will
4  certainly put him back down there, unless
5  I can find him a better route somewhere.
6  And I will try to find him a better route,
7  try to help him every way I can.
8      Q.   Who held the route in Jasper
9  before Terry, what's the gentleman's name
10  that left that route?
11      A.   I don't remember.  We have got
12  four hundred and sixty-two salesmen, and
13  each one of them has got a helper, so --
14      Q.   Who took Terry's route, Leslie
15  Braun in Tennessee?
16      A.   Les Braun took over Bonnie's
17  route in Tennessee.
18      Q.   And how old is he, do you
19  know?
20      A.   He is in his thirties.  I
21  don't know how old he is.
22      Q.   Early thirties?
23      A.   I guess.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

Page 49

1    Q.   Mr. Stuart, is Terry Watson a
2    good employee?
3        MR. GERHARDT:  Object to the
4    form.
5        A.   He has been a good employee,
6    yes, sir.
7        Q.   Can't really be a bad employee
8    for thirty years, can you?
9        MR. GERHARDT:  Object to the
10    form.
11        A.   Can you be a bad employee for
12    thirty years.  Reword that to me.
13        Q.   Well, if he wasn't doing an
14    adequate job, he wouldn't have been there
15    for thirty years, would he?
16        MR. GERHARDT:  Object to the
17    form.
18        A.   Not particularly.  I tried to
19    help Big Terry because he has been my
20    friend, and even though I -- he wasn't
21    doing a good job, I still tried to cover
22    up for him and find him a job.
23        Q.   So it's your testimony that

Page 50

1    you were covering up for Terry Watson in
2    the last two years?
3        A.   No, sir, that's not my
4    testimony.
5        Q.   Oh.  I'm sorry, I
6    misunderstood you.  Well, how -- when did
7    you cover up for him?
8        A.   I never have covered up for
9    him, but I tried to always find him a job
10    where he could stay on the payroll and
11    keep working and everything.
12        Q.   Well, do you like him?
13        A.   Sir?
14        Q.   Do you like Terry?
15        A.   Yes, sir.
16        Q.   Do the customers seem to like
17    him?
18        MR. GERHARDT:  Object to the
19    form.
20        A.   Well, some customers liked him
21    and some probably didn't like him.
22    That's -- that can be said about a lot of
23    our salesmen, though, I suppose.  It all

Page 51

1    depends on the service.  If you give good
2    service, they are going to like you.  And
3    you have got a quality product, of course.
4        Q.   And does Terry know the job,
5    know what needs to be done?
6        A.   I would think he should, yes,
7    sir.
8        Q.   And has he demonstrated that
9    he is capable of doing it?
10        MR. GERHARDT:  Object to the
11    form.
12        Q.   You can answer.
13        A.   At times he has destrim --
14    demonstrated that, yes, sir.
15        Q.   How old is Adam Alley?
16        A.   You know, I don't really know,
17    I would say -- I would just guess and say
18    early forties, but I do not know.
19        Q.   Now, when y'all hire a new
20    salesperson to work as a route salesman
21    out there, is that a decision that you are
22    involved in normally, at least if it's on
23    your side of the Mississippi?

Page 52

1        A.   Well, I was involved in it a
2    lot more than I am now, but now we have
3    someone else who pretty well strictly gets
4    involved in the interviewing and checking
5    prospective salesmen out and stuff like
6    that.  I used to do a good bit of that.
7        Q.   Who does it now?
8        A.   Tim Trussell and Dan Jacobsen.
9        Q.   Well, are you made aware when
10    they hire a new person?
11        A.   Not in every instance, no.
12        Q.   I'm sorry?
13        A.   Not in every instance.
14        Q.   Well, to your knowledge, in
15    the past five years, has Bonnie Plant
16    Farms hired a salesman who was age sixty
17    or over at the time that they hired him?
18        A.   Yes, sir.
19        Q.   Who was that, please, sir?
20        A.   We have a man on a route right
21    now in Kansas who is seventy-one years
22    old, Earl Ledbetter.
23        Q.   When did they hire Mr.

13 (Pages 49 to 52)

Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON                                                          JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                              May 23, 2008

---

Page 53

Ledbetter?

2  A.    Earl Ledbetter has been
3  working for us for about thirty years.
4  Q.    No, you misunderstood my
5  question, or I didn't make it clear.
6      Have y'all hired a salesman who
7  at the time you hired him he was sixty
8  years old?
9  A.    I think we hired -- we've got
10 a man in North Dakota now, I think his
11 name is -- ah -- it's Dana Edwards or Dana
12 something or other, and I think he's
13 sixty-one.
14 Q.    When was he hired?
15 A.    This year.  First year he
16 worked for us.
17 Q.    So he was hired after Terry
18 Watson's lawsuit alleged age
19 discrimination, correct?
20 A.    Yeah, but before that I had
21 hired a guy before I even knew anything
22 about Terry, Doodle Barnett was his name,
23 he was sixty-eight years old.  I actually

---

Page 54

1  didn't know he was sixty-eight, but he was
2  sixty-eight, and done a pretty good job.
3  Q.    Do you think folks can make
4  valuable contributions to the work force
5  regardless of their age?
6  A.    I certainly do.
7  Q.    Some folks won't work worth a
8  crap and they are under age forty, right?
9  A.    I'm certain that's true.
10 Q.    Well, did you get Mr. Watson's
11 EEOC charge?
12 A.    Did I get what?
13 Q.    Terry Watson filed an EEOC
14 charge.  Are you aware of that?
15 A.    I am now, of course.
16 Q.    When were you first made aware
17 of it, sir?
18 A.    I believe I was informed by
19 Tina Johnson, and I really don't remember
20 exactly when she told me that.
21     (Whereupon, Plaintiff's
22     Exhibit 13 was marked for
23     identification.)

---

Page 55

1  Q.    Let me show you what I've
2  marked as Plaintiff's Exhibit 13.  This is
3  Terry Watson's EEOC charge, and it was
4  received by the EEOC on June the 2nd --
5  I'm sorry, June 6th of 2006, and it should
6  have been forwarded to Bonnie Plant Farms
7  shortly thereafter.
8  A.    (Reviewing document.)
9  Q.    Have you seen that document
10 before today?
11 A.    No, sir.
12 Q.    Well, who responds to EEOC
13 charges for Bonnie Plant Farms?
14 A.    I think Tina Johnson --
15     MR. GERHARDT:  Object to the
16 form.
17 A.    I think Tina Johnson at AFC
18 does that.
19 Q.    What is her position, sir?
20 A.    She's in charge of human
21 resources, I believe.  I'm not sure about
22 that.  I don't know.
23 Q.    Well, if they have a

---

Page 56

1  salesperson making a complaint, a charge
2  of age discrimination, would they come and
3  talk to you about it?
4  A.    She called and told me about
5  that.
6  Q.    So you were aware of it after
7  -- shortly after Bonnie Plant --
8  A.    Not -- you asked me if I had
9  seen that.  I was aware when Tina called
10 me.  I don't remember when she called.
11 Q.    Okay.  She didn't show you the
12 document?
13 A.    No, sir.
14 Q.    When Terry sent that second
15 letter in February of 2006, did he come
16 and meet with you?
17 A.    What was the time frame of
18 that?
19 Q.    Somewhere sounds like
20 approximately February of 2006.
21 A.    I think he did.  And that's
22 where I said I found him something in
23 Donaldsonville, Louisiana, if I have got

14 (Pages 53 to 56)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

---

Page 57

1 the right time period here.
2     Q.   Did he tell you he thought he
3 was being discriminated against at that
4 meeting?
5     A.   I think he did, sir.  And I
6 told him we had people out here already
7 older than you, Terry.
8     Q.   Well, did you tell him that
9 Adam Alley didn't want him back?
10     A.   At that time, yes, sir.
11     Q.   That's what you said to him?
12     A.   I said that Adam has requested
13 that he not get you back and I'm going to
14 find you something else, and I did.
15     Q.   Do you agree with me that
16 Terry Watson has made less money in his
17 subsequent routes than he was making in
18 Tennessee?
19     MR. GERHARDT:  Object to the
20 form.
21     Q.   You can answer.
22     A.   Do I agree that he has made
23 less money?

---

Page 58

1     Q.   Yeah, he has had less sales,
2 less commissions and made less money?
3     A.   I agree that he had less
4 sales, but some of it was his own fault
5 for having less sales.
6     Q.   Well, the route that you
7 assigned to him after his complaint of age
8 discrimination, did it have more sales
9 than the Bells, Tennessee route in 2004
10 and '5, sir?
11     A.   He did not have more sales,
12 but it could have had.
13     Q.   Well, Terry Watson wasn't
14 working there then, was he?
15     A.   Working where?
16     Q.   On these other routes in 2004
17 to 2005.  So you knew that you were
18 transferring Terry Watson to a route that
19 had less sales than the one he came from,
20 correct?
21     A.   Well, I knew that the route he
22 was transferring to would have less sales,
23 but I thought the potential of this other

---

Page 59

1 route could pick it up to where he would
2 actually have more sales if he was a good
3 hustler than what he had in the one he was
4 moving from.
5     Q.   And you agree with me that
6 Terry told you at your meeting in February
7 that he believed he was being
8 discriminated against, correct?
9     MR. GERHARDT:  Object to the
10 form.
11     Q.   Correct?
12     A.   When did Terry do what, now?
13     Q.   Terry Watson met with you and
14 made a complaint of age discrimination,
15 correct?
16     A.   He didn't -- he didn't really
17 make a complaint of age discrimination,
18 but -- yeah, he met with me and I told him
19 about the new route in Donaldsonville,
20 Louisiana, of a new -- a chance for him to
21 stay on the payroll in Donaldsonville,
22 Louisiana.
23     Q.   And, in fact, the only routes

---

Page 60

1 he has been assigned by you have been long
2 routes, correct?
3     A.   No, sir, that is not correct.
4     Q.   Is the route he is on now a
5 long route?
6     A.   The route he is on now is
7 longer than the one that he was on, but
8 the route that he had in Jasper was
9 probably shorter than the one he was on.
10     Q.   Well, why did you move him
11 from Jasper to Texas?
12     A.   I moved him from Jasper
13 because Joey Padgett had hired someone
14 else the next -- the next year to run the
15 route and really expressed somewhat
16 interest that he would prefer that he
17 didn't hire Terry back -- or that Terry
18 didn't come back.
19     Q.   Is there anything in writing
20 about that?
21     A.   No, sir.
22     Q.   Who is the station manager
23 that Terry is working for now?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

---

Page 61

1     A.   I believe his name is Chris
2   Hall.
3     Q.   Have you had any discussions
4   with Chris about the job Terry is doing?
5     A.   Early in the year we did, but
6   that --
7     Q.   And what kind of job is he
8   doing?
9     A.   We had some complaints for him
10   earlier.  And we documented these
11   complaints this time around.
12     Q.   How did you document them?
13     A.   We got phone calls from
14   customers, Chris Hall did, and he had a
15   little phone call and he would write in
16   the complaints and the telephone number of
17   the person that called.  And so that's how
18   he did that, to my knowledge.
19     Q.   Did y'all do that for anybody
20   besides Terry Watson?
21     A.   Oh, yeah, we try to -- we
22   don't -- we don't document everything, but
23   we -- now we try to -- or now -- we always

Page 62

1   have done it to a certain extent.  If we
2   get a complaint, we try to write it down
3   on a notepad and pass it on to the
4   salesman, this is what this store says, et
5   cetera.
6     Q.   Can you name any salesmen
7   other than Terry Watson that you have done
8   that for?
9     A.   That we have --
10     Q.   Yeah, that you have documented
11   a complaint and given it to them.
12     A.   Yes, sir, I can.
13     Q.   Who?
14     A.   Billy Ross.
15     Q.   You have four hundred
16   salesmen --
17     A.   Station manager in Oklahoma
18   would be Billy Ross.  Another one would be
19   up in -- Brandon Davis in Morehead,
20   Kentucky.  Another one would be Nick
21   Reeder in Milton, Wisconsin.  And another
22   one would be Chris Terrell in south Utah.
23   And another one would be Dan Howard or

Page 63

1   Ryan Howard in Terra Bella, California.
2     Q.   I tell you what, Mr. Stuart,
3   let's go off the record.  I need to change
4   my tape.  We will take a break for about
5   five minutes, and we will finish up in the
6   next hour, okay?
7     A.   All right.
8       MR. ROBERSON:  Let's go off
9   the record.  Going off the record at 1:52.
10       (Whereupon, a break was had
11       from 1:52 p.m. until 2:01 p.m.)
12       MR. ROBERSON:  This is tape
13   two of the videotape deposition of Joe
14   Stuart.
15     Q.   (BY MR. ROBERSON:)  Mr.
16   Stuart, we are back on the record at 2:00.
17       (Whereupon, Plaintiff's
18       Exhibit 14 was marked for
19       identification.)
20     Q.   I'm going to show you what I
21   have marked as Exhibit 14.  This is the
22   commission statement for 2007 for Terry
23   Watson; do you see that?

Page 64

1     And is it true that his draw
2   has exceeded his commissions earned for
3   2007?
4     A.   Yes, sir, that's what this
5   looks like.
6     Q.   And so he owes you money,
7   according to this document?
8     A.   According to this document, he
9   owes the company money, but he is not the
10   only one that has been in this situation.
11   And we have never collected this money and
12   he has continued to be on the payroll.
13   And we are not going to ask him for this
14   money back even before -- without any kind
15   of lawsuit.  And we have some other people
16   in the same boat.
17     Q.   Now, when Terry came to see
18   you in February of 2006, that was a new
19   season, right?  The spring season of 2006,
20   correct?
21     A.   Beginning a new season, yes,
22   sir.
23     Q.   When do salesmen report to

16 (Pages 61 to 64)

ARTHUR T. WATSON                                                    JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          May 23, 2008

---

Page 65

1  work normally?
2      A.   Depending on the geographic
3  place that they are in.  The northern
4  route may not go until the middle of
5  March, the southern route may go middle of
6  January.
7      Q.   Well, did Terry Watson have a
8  route in February?
9      A.   That's when we -- when I
10 assigned him a route.  Actually, let me
11 get away from that.  That's when I tried
12 to create a route for him down in
13 Donaldsonville, Louisiana.
14     Q.   Okay.  Well, you'd known since
15 2005 after talking to Mr. Alley that he
16 wasn't going back to Bells, Tennessee, so
17 what route did you assign him before then?
18     A.   There wasn't a route available
19 before then.  I had to try to create him
20 one.
21     Q.   Well, Les Braun, he was
22 working for you in 2005, wasn't he?
23     A.   Yes, sir.

Page 66

1      Q.   He had to come from a route to
2  take Terry's route, correct?
3      A.   And Adam had already hired
4  somebody to replace Les Braun, who was
5  incidentally about sixty years old.
6      Q.   Well, why would you hire
7  somebody before -- if you were going to
8  retain the employee, why would you hire
9  somebody to replace them before you found
10 him a route, sir?
11     A.   I didn't hire him.  Mr. Alley
12 -- Mr. Alley hired this man to replace Les
13 Braun in southern Illinois.
14     Q.   And when was he hired --
15     A.   This -- I don't know exactly.
16 This man was about sixty years old that he
17 hired.
18     Q.   I see.  What's his name?
19     A.   I don't know.  We can look it
20 up.
21     Q.   Well, so Terry Watson didn't
22 have a job when he came to see you, did
23 he?

Page 67

1      A.   Oh, I was going to get him a
2  job.
3      Q.   Well, it's a good thing he
4  made a complaint of age discrimination,
5  then --
6          MR. GERHARDT:  Object to the
7  form.
8      Q.   -- correct?
9      A.   No, sir, that's not correct.
10     Q.   Well, after he made his
11 complaint, you created him a job, correct?
12         MR. GERHARDT:  Object to the
13 form.
14     A.   No, sir, that's not the way it
15 was.
16     Q.   Had you created him a job
17 before he made the complaint?
18     A.   When he came to see me in
19 February, that is not the same visit that
20 evidently he came to see Tate with.  I
21 never saw Big Terry when he came to see
22 Tate, nor did I receive any letter or
23 anything about that.

Page 68

1      Q.   Are y'all both in the same
2  location?
3      A.   I travel a lot.  I'm in and
4  out of my office two and three days every
5  week, so --
6      Q.   Is Tate's office in Union
7  Springs?
8      A.   Yes, sir.
9      Q.   Is your office in Union
10 Springs?
11     A.   Yes, sir.
12     Q.   So y'all are -- are they both
13 on the same piece of property?
14     A.   Yes, sir.
15     Q.   You were here for Terry
16 Watson's deposition, correct?
17     A.   Yes, sir.
18     Q.   Why?
19     A.   I hadn't seen Terry in two
20 years, I wanted a chance to see him again.
21     Q.   Do you remember cursing him
22 and storming out of the deposition?
23     A.   I did -- I did not curse

17 (Pages 65 to 68)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

---

Page 69

Terry.
2  MR. GERHARDT:  Object to the
3  form.
4      A.    I cursed, but I didn't curse
5  at Terry.
6      Q.    Okay, I apologize.  You said
7  you didn't have to listen to this BS,
8  slammed your book and walked out, correct?
9      A.    That's correct.  I wasn't -- I
10  wasn't under oath, I wasn't required to be
11  here, so I left.
12      Q.    What upset you?
13      A.    I wasn't really upset.
14      Q.    Do you normally behave that
15  way?
16      A.    No, sir.
17      Q.    Well, what angered you?
18      A.    I don't think I was all that
19  angry, to tell you the truth.  I think I
20  acted more angry than what I really was.
21      Q.    It was --
22      A.    I apologize -- I apologize for
23  acting angry.

---

Page 70

1      Q.    It was just a show?
2          MR. GERHARDT:  Object to the
3  form.
4      A.    I wouldn't say that.
5      Q.    Just trying to impress me?
6      A.    No, I wasn't trying to impress
7  you.
8      Q.    It didn't work.
9      A.    If I was trying to do that,
10  I'm sure it didn't.
11      Q.    Well, have you had any
12  conversations later with Terry's station
13  manager about his job performance?
14      A.    No, sir.
15      Q.    Have you had any complaints
16  about Terry Watson's job performance
17  lately from any source, customers or
18  anybody?
19      A.    Could you clarify lately?
20      Q.    Well, when was the last time
21  you got one?
22      A.    I would say the latter part of
March or maybe first of April.

---

Page 71

1      Q.    And who was that complaint
2  from?
3      A.    I don't know.  But Mr. Hall
4  has that, I don't have that.
5      Q.    When you owned your own
6  company, did you sell plants?  Were you a
7  salesman?
8      A.    Yes, sir.
9      Q.    You had a route?
10      A.    I ran a route most of the
11  time.
12      Q.    Where was it?
13      A.    I was sort of a fill-in man.
14  If he wasn't doing his job, then I went
15  and ran the route and tried to catch it
16  up.  I moved from route to route.  That's
17  why I knew all of my accounts and all of
18  my customers on a personal basis.
19      Q.    Has anybody ever called you
20  and said we are out of flowers?
21      A.    Has anybody ever called me and
22  said we are out of plants or something?
23      Q.    Yeah.

---

Page 72

1      A.    Oh, yes, sir.
2      Q.    That happens sometimes?
3      A.    We would hope something like
4  that happens.  If nobody calls you and
5  tells you we are out --
6      Q.    That's a good thing?
7      A.    -- then that means we are not
8  selling nothing.
9      Q.    Exactly.
10      A.    But --
11      Q.    Sometimes, and it's a good
12  thing, your customers can sell more than
13  anyone would reasonably anticipate, can't
14  they?
15      A.    Reword that for me.
16      Q.    Well, there is a difference
17  between a customer calling you and saying
18  I ain't seen my salesman in six weeks and
19  a customer calling you and saying we are
20  out of plants, we are out of some
21  vegetable or something?
22          MR. GERHARDT:  Object to the
23  form.

---

18 (Pages 69 to 72)

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

Page 73

1    Q.    There is a difference in those
2 two complaints, isn't there?
3    A.    To a certain extent there is a
4 difference in those two complaints.
5    Q.    I mean, you can sell out of
6 plants in three days, it may take you
7 longer than three days to work your route,
8 to visit all of your stores on your route,
9 right?
10    A.    We try not to have any route
11 that takes longer than three days.  We try
12 to deliver our plants in two-day periods.
13    Q.    You mean you can work your
14 route from one end to the other in two
15 days?
16    A.    If we rerouted our routes and
17 properly assigned the territory, and
18 that's why we redo routes, where we can
19 try to work it in two days.  Some people
20 can work a route in a day.
21    Q.    The shorter your route, the
22 easier it is to work, right?
23    A.    And the longer you take

Page 74

1 loading and the longer you take, you know,
2 working the stores, and if you sleep in
3 front of the stores and take up a lot of
4 time, then the longer the -- the shorter
5 the shelf life, so less sales, yes, sir.
6    Q.    Well, Mr. Stuart, I don't get
7 to talk to you but this one occasion, and
8 I don't want you to come to court and tell
9 me something I haven't heard.  So do you
10 know anything else that's negative about
11 Terry Watson that you haven't told me
12 about today?
13    A.    Well, just like any people,
14 I'm sure there are some negative things
15 about Mr. Watson I'm leaving out, but we
16 will let that ride for today.  I will save
17 that for court.
18    Q.    Well, that's what I'm trying
19 to get you not to do, save it for court.
20    A.    I can't remember anything
21 right now, though.
22    Q.    All right.  Well, do you know
23 of anything positive about Terry Watson?

Page 75

1 He has been working for you for thirty
2 years.  Can you say anything good about
3 him?
4    A.    He is a pleasant, likable
5 person.  And he was a hell of a nose guard
6 on the football team.
7    Q.    Did he play at Troy State?
8    A.    (Nodding head affirmatively.)
9 He couldn't go laterally, but you couldn't
10 move him out of the middle either.
11    Q.    Let's say that Terry continues
12 to improve his sales performance and let's
13 say he doesn't have any complaints from
14 customers in the future; how long can
15 Terry work for y'all as a route salesman?
16 Do you have any mandatory retirement age?
17    A.    No, sir.  Like I say, we have
18 a salesman on the route now that's
19 seventy-one.  If there is improvement in
20 Terry, I would say Big Terry can work
21 until he wants to retire.  I can't
22 guarantee him what route he will be on,
23 but I can guarantee him a job.

Page 76

1    Q.    Well, are you trying to find
2 him a better route --
3    A.    Yes, sir, always looking --
4    Q.    -- shorter route?
5    A.    Always looking for something
6 to help him out.
7    MR. ROBERSON:  All right.  I
8 don't believe I have any further
9 questions, Mr. Stuart.
10    Do you have any questions?
11    MR. GERHARDT:  I don't have
12 any.
13    MR. ROBERSON:  All right.
14 That will conclude the deposition of Mr.
15 Stuart at 2:12.
16    I told you I would get you out
17 of here in time.
18    A.    All right.
19    MR. ROBERSON:  Off the record.
20
21    (Whereupon, the deposition of
22 Joe Stuart was concluded at
23 2:12 p.m. on the 23rd day of

19 (Pages 73 to 76)

Page 77

May, 2008.)

FURTHER THE DEPONENT SAITH NOT

Page 78

1  C E R T I F I C A T E

2

3

4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)

6

7      I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the questions
10  and answers thereto were reduced to
11  typewriting under my supervision, and that
12  the foregoing represents a true and
13  correct transcript of the deposition given
14  by said witness upon said hearing.
15      I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action, nor am I in anywise
18  interested in the result of said cause.

19

20

21

22

COMMISSIONER - NOTARY PUBLIC
ACCR LICENSE NO. 116

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

ARTHUR T. WATSON                                                    JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          May 23, 2008

## A

able
38:1
account
24:3
accounts
71:17
ACCR
78:23
acquired
10:18 12:1 13:12
acted
69:20
acting
5:5 69:23
action
1:5 38:14 78:17
actions
40:15,18
Adam
33:3 51:15 57:9,12 66:3
add
22:5
added
22:23
address
7:11
adequate
49:14
AFC
55:17
affirmatively
75:8
age
36:16 37:1 40:20 45:7
52:16 53:18 54:5,8
56:2 58:7 59:14,17
67:4 75:16
ago
8:11 37:10
agree
23:8,13 31:19 46:8 57:15
57:22 58:3 59:5
agreed
2:3 17:6
agreement
12:16
ah
53:11
ain't
72:18
Alabama
1:2,10 3:8,15 5:4,5,12,23
6:3 7:14 78:4
alleged
53:18
Alley
33:3,16 41:10 42:20,22
51:15 57:9 65:15 66:11
66:12

allowed
37:18
altogether
22:7
angered
69:17
angry
69:19,20,23
annual
17:23 35:18,19
answer
26:5 51:12 57:21
answers
78:10
anticipate
72:13
anybody
43:20,23 61:19 70:18
71:19,21
anywise
78:17
apologize
22:9 40:23 69:6,22,22
apparently
35:21
appearing
6:13
apples
23:7
appreciative
46:4
approved
17:7 35:12
approximately
9:20,23 10:21 11:17
56:20
April
70:23
area
13:5
arithmetic
37:9
Arkansas
13:7
arrive
19:5
Arthur
1:7 6:1
asked
56:8
asking
37:15
asleep
41:13
assign
2:20 65:17
assigned
58:7 60:1 65:10 73:17
assume
17:10,12 26:23
atmosphere

33:11
attitude
14:15
attorney
3:5,12 6:7 26:11
available
26:11 46:14 65:18
aware
37:3,5 41:2 52:9 54:14
54:16 56:6,9

## B

B
1:20 2:6 4:5 5:1
back
14:18,18,20 19:8 30:1
33:9,14,18,23 47:21
48:3,4 57:9,13 60:17,18
63:16 64:14 65:16
bad
49:7,11
balanced
21:16
Barnett
53:22
base
19:14
basically
7:22 8:16 13:9 30:8
basis
18:1 25:21 71:18
Beeville
46:19 47:22,23
beginning
45:8 64:21
behalf
6:14
behave
69:14
believe
15:20 30:13 54:18 55:21
61:1 76:8
believed
59:7
Bella
63:1
Bells
24:12 30:13 32:21,22
42:15 45:15 58:9 65:16
better
20:22 25:18 46:1 48:5,6
76:2
bi
35:15
biannual
35:16
Big
49:19 67:21 75:20
Bill
15:6,7,8
atmosphere

Billy
62:14,18
Birmingham
3:8,15 5:3,12
bit
52:6
boat
64:16
Bonnie
1:11 6:4 7:16 9:11,19,21
10:18 12:1,10 13:12 15:4
18:2 19:4 25:23 36:23
52:15 55:6,13 56:7
Bonnie's
48:16
book
69:8
Boswell
41:17,18 42:2,6
Box
3:7
boy
44:4,11
boy's
44:15
Brandon
62:19
Braun
48:15,16 65:21 66:4,13
break
63:4,10
Brief
40:21
briefly
7:6
BS
69:7
Burr
3:13 5:11
business
6:4 8:22 9:2 10:2,11,17
13:1 20:9
Butch
16:23
Butch's
24:15,16

## C

C
3:1 78:1,1
California
63:1
call
35:3,5 36:12 41:12 42:19
61:15
called
41:15,23 42:4,8,11,21
43:4 56:4,9,10 61:17
71:19,21
calling

calls
43:12 61:13 72:4
camera
6:9
capabilities
20:11
capability
22:1
capable
17:13 51:9
capacity
7:18
card
35:17
careful
22:21 23:6,20 24:1
carry
14:18
case
5:21
catch
71:15
caught
44:6,9
cause
5:15 21:11 78:18
certain
29:18 54:9 62:1 73:3
certainly
48:4 54:6
Certified
1:21 2:7 5:2
certify
5:6 78:7,15
cetera
62:5
chance
25:18 26:13 46:1 59:20
68:20
change
21:21,23 23:14,17,19 63:3
changed
13:18,19 23:8
changes
21:19
charge
54:11,15 55:3,20 56:1
charges
55:13
checking
52:4
Chris
61:1,4,14 62:22
City
44:4
Civil
1:5 5:7
clarify
70:19
clear
36:13 72:17,19

53:5
client
9:16
code
7:12
collabor
45:3
collaborated
45:3
collected
64:11
come
21:3  25:13  45:22  56:2,15
60:18  66:1  74:8
coming
20:9  41:9
commencing
5:13
commission
63:22
Commissioner
2:7  5:6  78:22
commissions
29:15,16,17  47:7,14  58:2
64:2
common
19:11
company
10:8,16  11:7,17  12:2,5,10
13:3,7,13  15:10  64:9
71:6
compare
22:20  23:4,21
comparing
23:7
complaint
26:2  36:16  41:9  44:1
45:7  56:1  58:7  59:14
59:17  62:2,11  67:4,11,17
71:1
complaints
25:6,11,12  41:7  42:23
43:8,9  61:9,11,16  70:15
73:2,4  75:13
compliance
2:13
concentrated
21:10
concerned
41:5,7
concerns
41:3
conclude
76:14
concluded
76:22
conducive
33:12
contact
11:5  32:17
continued

11:13  64:12
continues
75:11
contributions
54:4
conversation
33:17  37:19  38:2
conversations
70:12
Cooperative
1:10  6:3
copied
38:10
correct
9:14  12:13  13:22  14:3
16:12,21  17:8  21:16,17
23:1,23  27:8,12  29:18
31:12  32:14  33:23  35:9
35:13,14  45:1  46:22
47:8,15  53:19  58:20
59:8,11,15  60:2,3  64:20
66:2  67:8,9,11  68:16
69:8,9  78:13
correctly
15:22
corroborate
26:2
counsel
2:5,17,19  5:10  6:9  78:16
country
22:8
COUNTY
78:5
couple
15:1  45:18
course
8:17  12:21  51:3  54:15
court
1:1  2:14  5:9,23  6:22
74:8,17,19
cover
49:21  50:7
covered
20:21  50:8
covering
50:1
Co-Op
41:21  43:3
crap
54:8
create
22:6  33:11,14  34:15
38:20  40:17  46:9  65:12
65:19
created
24:6  67:11,16
crimped
28:7
curse
68:23  69:4
cursed

69:4
cursing
68:21
customer
14:13  72:17,19
customers
22:3,5,11,16  25:20  41:12
50:16,20  61:14  70:17
71:18  72:12  75:14
cut
47:11
CV-07-520
6:5

D

D
4:1
Dakota
53:10
Dan
52:8  62:23
Dana
53:11,11
date
5:6  35:22
dated
38:9  40:11
Davis
62:19
day
5:13  73:20  76:23
days
37:14  68:4  73:6,7,11,15
73:19
deal
16:23  25:13  47:19
death
46:16
decision
51:21
decrease
19:12,13
defendant
3:10  6:5,14
Defendants
1:12
deliver
73:12
demonstrated
51:8,14
depend
21:2
depending
20:4,8  65:2
depends
51:1
DEPONENT
77:3
deposition
1:15  2:5,11,12,22  5:20

7:7  26:14  63:13  68:16
68:22  76:14,21  78:8,13
depositions
2:15
Depots
20:5
description
18:8,10
destrim
51:13
difference
21:11  72:16  73:1,4
different
45:9
director
35:6,7
discriminated
57:3  59:8
discrimination
36:16  37:1,3  45:8  53:19
56:2  58:8  59:14,17
67:4
discussions
61:3
District
1:1,2  5:8,22,23
division
1:3  6:1  8:6
document
26:8  27:5  28:4,23  36:3
38:12  40:1,2,9,12  55:8
55:9  56:12  61:12,22
64:7,8
documented
61:10  62:10
documents
25:23,23  26:6,8,10
doing
6:4  17:12,17  22:4  49:13
49:21  51:9  61:4,8  71:14
dollar
20:16,17
dollars
19:19  25:18
Donaldsonville
34:16  38:21  45:16  46:3,7
47:2  56:23  59:19,21
65:13
Doodle
53:22
DOT
35:13
draw
16:7  47:8,10,14  64:1
drive
3:6  35:8
driver
35:13
drivers
39:13
due

21:23
duly
6:19
d/b/a
1:11

E

E
3:1,1  4:1,5  78:1,1
Earl
52:22  53:2
earlier
61:10
early
34:3  48:22  51:18  61:5
earn
29:10
earned
64:2
earnings
27:7
easier
73:22
East
13:7
education
8:13
Edwards
53:11
EEOC
54:11,13  55:3,4,12
effect
2:13
eight
11:18
eighteen
32:12
eighty
28:6
eighty-eight
31:22
either
44:13  75:10
employed
7:15  17:11
employee
49:2,5,7,11  66:8
employees
42:11
entire
7:20
equal
21:15
establish
14:15  19:16
et
62:4
evaluate
18:13
evaluation

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

18:1
evaluations
18:5
everybody
24:8 29:12
evidence
2:23
evidently
67:20
exactly
33:21 54:20 66:15 72:9
examination
4:3 5:15 7:4
examined
6:19
exceeded
47:14 64:2
Excuse
40:22
Exhibit
4:7,8,9,10,11,12,13,14,15
16:17,18,19,20 26:19
26:22 27:16,19 28:16,21
30:11,17 31:7,9,16,18
32:3,9 34:19,22 35:23
36:8,10 38:8 39:8,10
39:23 40:5,8 54:22
55:2 63:18,21
expect
20:2,14,16
expected
21:8
expenses
29:11,18,20
experience
33:5
explain
10:6 21:18
expressed
60:15
extent
8:13 62:1 73:3

**F**

F
78:1
fact
25:13 59:23
factor
22:2
fair
21:4,5 22:13
fall
9:12 16:5,6,8,12 34:3
far
18:11
Farm
9:22 25:23
Farmers
1:10 6:3 41:20 43:3

Farms
1:11 6:4 7:16 9:19 10:19
15:4 37:1 52:16 55:6,13
fault
58:4
February
38:9 56:15,20 59:6 64:18
65:8 67:19
Federal
5:7
Feed
41:17 42:2
felt
33:13
fifteen
9:23 10:10 11:6 47:10
fifty-four
28:12
fifty-nine
29:1,5
fifty/fifty
16:22
figure
12:21 19:18 23:22 31:14
filed
54:13
filled
39:1
fill-in
71:13
find
28:3 34:8,14 38:6,20
48:5,6 49:22 50:9
57:14 76:1
finish
63:5
fire
44:10
fired
44:7,19
first
6:19 17:2,3 24:20 26:12
53:15 54:16 70:23
five
28:5,10 31:21 52:15 63:5
flowers
71:20
folks
54:3,7
following
5:16 23:23 24:4
follows
6:20
fool
33:4
football
75:6
force
2:13 54:4
foregoing
5:9 78:8,12

form
2:18 18:11 23:10 26:4
27:20 36:2,19 37:22
45:12 49:4,10,17 50:19
51:11 55:16 57:20
59:10 67:7,13 69:3
70:3 72:23
Forman
3:13 5:11
forties
51:18
forty
29:4 31:5 54:8
forty-five
32:6
forty-one
29:1
forwarded
55:6
found
56:22 66:9
four
8:14 20:17,18 29:1,4 31:4
48:12 62:15
frame
56:17
Frank
41:18 42:6
friend
41:19 49:20
front
74:3
full
2:13 7:8
further
76:8 77:3 78:15
future
75:14

**G**

Gail
1:20 2:6 5:1
Gatlin
35:2 45:6,7
gentleman's
48:9
geographic
21:6 65:2
geography
8:19,22
Gerhardt
3:11 6:12,13 7:2 23:19
26:3 36:1,18 37:21
45:11 49:3,9,16 50:18
51:10 55:15 57:19 59:9
67:6,12 69:2 70:2
72:22 76:11
getting
25:20
give

7:8 43:19,22 51:1
given
62:11 78:13
go
9:8,11 12:16 14:12 15:23
24:7,10 30:1 63:3,8
65:4,5 75:9
goal
19:1,5,16,22 21:2
going
9:6 16:10 19:17 26:9,12
33:23 34:7 37:13 39:19
39:21 47:21 51:2 57:13
63:9,20 64:13 65:16
66:7 67:1
good
33:12 49:2,5,21 51:1 52:6
54:2 59:2 67:3 72:6,11
75:2
gotten
41:8
graduate
8:15
Graham
3:11 6:13
greenhouse
14:19
grounds
2:21
group
39:17
guarantee
75:22,23
guard
75:5
guess
9:21 24:13 42:18,22
48:23 51:17
guy
44:19 53:21
guys
29:7

**H**

H
4:5
Hall
61:2,14 71:3
hands
14:15
happened
12:18
happens
72:2,4
hard
8:20 29:3
head
75:8
health
40:17,20 41:6

heard
74:9
hearing
78:14
held
45:10 48:8
hell
75:5
help
34:9 48:7 49:19 76:6
helper
30:6 48:13
helpers
29:11
Highway
7:13
hire
51:19 52:10,23 60:17
66:6,8,11
hired
52:16,17 53:6,7,9,14,17,21
60:13 66:3,12,14,17
history
19:8 33:6
home
20:5 30:1
hope
20:3 72:3
hour
63:6
Howard
62:23 63:1
human
55:20
hundred
19:19,23 20:12,15,17,19
29:5 48:12 62:15
hustler
59:3

**I**

identification
26:20 27:17 28:17 30:18
31:8,17 32:4,10 34:23
36:9 39:11 40:6 54:23
63:19
Illinois
13:8 66:13
immediate
33:8
impress
70:5,6
improve
75:12
improvement
75:19
incidentally
66:5
including
7:12 17:6

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031          http://www.TylerEaton.com

increase
19:10,14,15  20:2,10,13
indicate
26:1
individual
41:23
individuals
44:14
informed
54:18
initiated
15:21  16:21  45:1
instance
52:11,13
insurance
34:10,13  47:12
interest
60:16
interested
78:18
interruption
40:21  44:8
interviewing
52:4
inventory
14:12
involved
51:22  52:1,4
issues
41:6
I-10
11:22

_____

**J**

Jacobsen
52:8
January
35:21  37:7,14  39:1  40:11
65:6
Jasper
45:21  46:12  47:14  48:8
60:8,11,12
JEFFERSON
78:5
Jerry
3:4  6:6  7:5
job
11:8  14:1  17:13,13,18  18:1
18:5,7,10  24:18  34:17
37:16,16  46:9  47:3,6
49:14,21,22  50:9  51:4
54:2  61:4,7  66:22  67:2
67:11,16  70:13,16  71:14
75:23
Joe
1:17  2:6  5:14,20  6:18
7:10  10:16  38:10  63:13
76:22
Joey
60:13

Johnson
18:8  54:19  55:14,17
June
55:4,5

_____

**K**

Kansas
21:9  44:5,19  52:21
keep
21:15  26:7  50:11
Kennedyville
44:12
Kentucky
13:8  62:20
kin
78:16
kind
14:12  20:8  26:23  35:17
40:13  61:7  64:14
Kinross
3:6
knee
32:18  37:15
knew
11:3  33:22  53:21  58:17,21
71:17
know
9:15,20  11:19,20  16:13,14
16:16,16,18  17:1,3  18:19
26:7  28:13  29:11  32:20
36:20  37:4,6,23  38:3
39:20  40:13  42:4  43:4
44:13  48:19,21  51:4,5
51:16,16,18  54:1  55:22
66:15,19  71:3  74:1,10
74:22
knowing
11:1
knowledge
52:14  61:18
known
65:14

_____

**L**

L
2:1
lack
43:9,10
Lake
44:4
large
5:5  24:3
lately
70:17,19
laterally
75:9
law
3:5,12  5:10
laws
2:14

lawsuit
53:18  64:15
lax
22:3  25:19
leading
2:19
leaving
74:15
Ledbetter
52:22  53:1,2
left
48:10  69:11
Les
48:16  65:21  66:4,12
Leslie
48:14
letter
35:1,20  36:11  38:9,11,13
38:15,18,20  56:15
67:22
letters
45:5,5
let's
17:2  19:18  44:2  63:3,8
75:11,12
LICENSE
78:23
life
25:17,17  74:5
likable
75:4
liked
50:20
line
15:18  21:3  29:2  31:1
liquor
44:6,10
listed
31:21
listen
69:7
little
22:3  25:1,19  29:2  30:23
61:15
LLP
3:13  5:11
load
14:10
loading
74:1
located
10:12
location
14:19  15:16  68:2
locations
14:2  23:15
long
9:1,18  11:15  24:21  30:3
60:1,5  75:14
longer
25:16,17  60:7  73:7,11,23

74:1,4
look
19:8  26:13  28:6  35:23
66:19
looking
76:3,5
looks
26:22  27:6  28:4,23  31:3
31:13,23  32:14  64:5
lost
11:5  22:22  24:2
lot
14:5  17:20  29:23  50:22
52:2  68:3  74:3
Louis
32:22
Louisiana
11:12,16,22,23  13:14  14:23
15:3,12,16  17:16  27:11
30:12  34:16  38:21
45:16  47:2  56:23
59:20,22  65:13
lower
29:15

_____

**M**

main
12:22
major
8:23
majoring
8:18
making
56:1  57:17
man
33:13  41:13  44:15  52:20
53:10  66:12,16  71:13
management
17:6
manager
7:19,22  8:2,7  14:22  15:2
15:12  25:3,8  33:2  41:10
41:11  48:2  60:22  62:17
70:13
managers
25:4  33:7
mandatory
75:16
March
65:5  70:23
mark
26:12  30:10  34:19  39:8
marked
26:19,22  27:16,19  28:16
28:21  30:17  31:7,16
32:3,9  34:19,22  36:8
38:8  39:10,23  40:5,8
54:22  55:2  63:18,21
Maryland
44:12

ma'am
6:16  7:2
mean
12:20  13:2  15:14  22:15
27:7  73:5,13
means
25:17  72:7
meant
40:23
meet
14:13  56:16
meeting
57:4  59:6
mental
14:14
merged
10:18
met
7:6  59:13,18
middle
1:2  5:23  42:14  65:4,5
75:10
Milton
44:11  62:21
mine
41:19
minutes
63:5
Mississippi
7:23  51:23
Missouri
13:9
misspoke
22:10
misunderstood
50:6  53:4
monetary
12:21
money
22:1  29:9  45:23  57:16,23
58:2  64:6,9,11,14
Morehead
62:19
motel
29:22  30:6
move
60:10  75:10
moved
44:11  46:3  60:12  71:16
moving
59:4

_____

**N**

N
2:1  3:1  4:1
name
6:6,10,12  7:5,9  10:14
13:21  41:23  42:2,3
44:15,20  48:9  53:11,22
61:1  62:6  66:18

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

names
43:19,22 44:14
nation
7:20
national
25:2
nationwide
13:2
nature
25:10 27:1
nearly
19:10
necessary
2:16
need
10:5 63:3
needs
51:5
negative
74:10,14
neither
78:16
never
14:7 47:1,10 50:8 64:11
67:21
new
10:13 20:8,8 21:2,7 51:19
52:10 59:19,20 64:18,21
Nick
44:16,17,18 62:20
night
29:23 30:2,2,4
nine
28:12 32:6
nineteen
9:3 30:23
ninety
30:22 31:4,5
Nodding
75:8
normally
17:22 18:23 51:22 65:1
69:14
North
53:10
northern
1:3 6:1 65:3
nose
75:5
Notary
1:23 2:9 5:4 78:22
notepad
62:3
number
22:16 23:15 61:16

___ O ___

O
2:1 3:7
oath

69:10
object
23:9 26:3 36:1,18 37:21
45:11 49:3,9,16 50:18
51:10 55:15 57:19 59:9
67:6,12 69:2 70:2
72:22
objections
2:17,20
occasion
74:7
occasionally
43:14,15
occasions
43:17
occurred
38:5
offered
2:22
office
68:4,6,9
offices
5:11
oh
31:11 32:12 50:5 61:21
67:1 72:1
okay
8:1,5,9 9:5,10 10:1,5,14
10:17,21 11:9 12:23
13:11,17,23 14:7,21
15:13,19 16:3,9,14,19
17:4,10,19 18:4,18 19:4
19:20 21:1,10,18,21
22:20 23:4,19 24:11,14
25:22 29:6,6,14 30:6,9
32:15 35:19 38:7 45:4
46:11,15 47:3,13,18
56:11 63:6 65:14 69:6
Oklahoma
13:7 62:17
old
9:4 14:17 37:6 41:19
48:18,21 51:15 52:22
53:8,23 66:5,16
older
57:7
once
43:18
open
20:21 39:2,4 45:22
opened
11:12 20:6
opening
20:7 38:21
operated
12:23
operating
6:8
oral
5:15
oranges

23:7
order
35:11
owes
64:6,9
owned
12:7 71:5

___ P ___

P
2:1 3:1,1,7
Padgett
60:13
PAGE
4:2,6
part
12:15,20 21:2 35:11 70:22
particular
19:6
particularly
49:18
parties
2:4,20 78:17
party
6:10
pass
62:3
pay
29:10,18,21
payroll
50:10 59:21 64:12
pending
5:22
people
42:8 57:6 64:15 73:19
74:13
percentage
20:1
performance
70:13,16 75:12
period
10:8 30:13 38:19 57:1
periods
73:12
perishable
25:14,15
person
52:10 61:17 75:5
personal
71:18
personality
14:14
personally
41:12 43:1
phone
61:13,15
physical
35:16,18,19 39:15
physically
38:1

physician
40:11
pick
14:17 59:1
piece
68:13
place
10:22 65:3
plaintiff
1:8 3:3 6:2,7
Plaintiff's
4:7,8,9,10,11,12,13,14,15
4:16,17,18,19,20 26:18
27:15 28:15 30:16 31:6
31:15 32:2,8 34:21
36:7 39:9 40:4 54:21
55:2 63:17
Plainville
44:5
plant
1:11 6:4 7:16 8:21 9:2,11
9:19,21 10:2,7,18 12:1
12:11 13:1,12 15:4 17:21
18:2 19:4 25:23 37:1
52:15 55:6,13 56:7
plants
13:2 14:1 19:20 71:6,22
72:20 73:6,12
play
75:7
pleasant
75:4
please
6:16 7:9 23:2 52:19
pleasing
14:13
point
15:19 16:19 22:10 30:23
policy
36:23 37:2 39:13
population
21:9,11
position
40:17 55:19
positive
14:14 74:23
potential
58:23
prefer
60:16
presently
9:4
pretty
52:3 54:2
printout
26:23
prior
2:23
Pritchett
1:20 2:7 5:1
probably

9:22 16:22 50:21 60:9
problem
33:15
Procedure
5:8
proceedings
5:16
product
25:14,15 51:3
Professional
1:22 2:8 5:3
projected
19:15
properly
41:14 73:17
property
68:13
prospective
52:5
provided
5:7
Public
1:23 2:9 5:4 78:22
purchase
12:16
purchased
12:9
put
14:17 22:7 48:4
p.m
5:14 63:11,11 76:23

___ Q ___

quality
51:3
question
16:20 23:2,12 53:5
questions
2:18,19 76:9,10 78:9
quick
25:15
quota
21:1

___ R ___

R
3:1 78:1
ran
71:10,15
rare
24:9
read
27:21 29:3 30:23
reading
2:11
realign
8:10 21:14
really
11:19 12:19 13:17 17:3
22:2 34:4 46:1,2 49:7

ARTHUR T. WATSON                                                    JOE STUART
ALABAMA FARMERS COOPERATIVE, INC., ET AL.                          May 23, 2008

51:16  54:19  59:16
60:15  69:13,20
Realtime
1:21  2:8  5:2
reason
12:20
reasonably
72:13
reasons
16:9  21:9
reassigned
24:5
receive
18:1  38:11  47:7  67:22
received
43:11  55:4
receiving
44:1
record
6:9  63:3,9,9,16  76:19
records
47:17
redo
73:18
reduced
78:10
Reeder
44:16,18  62:21
regardless
54:5
regional
13:6
Registered
1:22  2:8  5:2
Reiner
15:6,8
relating
2:15
relationship
14:16
release
40:10
reload
14:20
remain
13:13
remained
17:11
remember
12:19  33:21  34:4  36:6,13
38:5,13,17,19  40:3
44:20  48:11  54:19
56:10  68:21  74:20
removed
44:3,3
Repeat
23:2
rephrase
23:11
replace
66:4,9,12

replacement
37:15
report
64:23
reported
1:20  27:22  29:9
Reporter
1:21,23  2:8,9  5:2,3  6:22
44:8
represent
6:11
represented
17:20,23
represents
78:12
requested
15:23  33:3  34:11  57:12
requests
33:8
require
16:1
required
14:9  69:10
rerouted
73:16
residence
7:11
resources
55:21
respective
2:5
responds
55:12
restrictions
41:2
result
78:18
retain
66:8
retire
75:21
retirement
75:16
return
37:18
returned
32:21,23
Reviewing
27:5  28:4,23  38:12  40:2
40:12  55:8
Reword
49:12  72:15
ride
74:16
right
5:19  8:12  9:15  15:17
18:22  19:17  21:13  22:18
26:15  27:14  28:6  29:7
30:9  31:5,13  41:22
45:20  47:5,6  52:20
54:8  57:1  63:7  64:19

73:9,22  74:21,22  76:7
76:13,18
river
7:23  8:3
road
29:23  30:3
Roberson
3:4  4:3  5:19  6:6,15  7:1,4
7:6  40:22  41:1  63:8,12
63:15  76:7,13,19
rooms
29:22
Ross
62:14,18
route
11:10,11,12,13,14,16,21
13:13,15,23  14:8,17  16:1
16:3,4  17:14  19:9,10,14
19:16,16,23  20:9,10,16
21:3,7,23  22:5,6,17,22
23:5,8  24:5,6,15,15,16
25:16  27:11  29:8,17
30:1,4  32:21  33:23
34:15  35:8,12  37:18
41:8,14  43:12  44:21
45:22  46:2,3,6,13,18,19
47:1,4,21  48:5,6,8,10,14
48:17  51:20  52:20  58:6
58:9,18,21  59:1,19  60:4
60:5,6,8,15  65:4,5,8,10
65:12,17,18  66:1,2,10
71:9,10,15,16,16  73:7,8
73:10,14,20,21  75:15,18
75:22  76:2,4
routes
16:5  17:5  21:15,19,22
22:11,12  23:14,17  30:3
38:23  39:2,4  45:9
46:21  47:1  57:17  58:16
59:23  60:2  73:16,18
routinely
21:19
rules
2:14  5:7
run
60:14
running
13:16
Ryan
63:1
R-e
15:8
R-e-e-d-e-r
44:18
R-e-i-n-e-r
15:9
_____
S
_____
S
2:1  3:1  4:5  8:7

safety
35:6,7
SAITH
77:3
sales
7:19,21  8:2,7  19:1,5,22
21:1  22:21  23:5,21,22
23:22  24:7,10  25:2
58:1,4,5,8,11,19,22  59:2
74:5  75:12
salesman
11:10,14,16  13:14  14:8
17:14  18:23  24:19  35:12
45:3  51:20  52:16  53:6
62:4  71:7  72:18  75:15
75:18
salesmanship
33:12
salesman's
13:23  18:7  33:7
salesmen
17:5,21,21,22,23  18:6,13
29:8  35:8  43:13  48:12
50:23  52:5  62:6,16
64:23
salesperson
51:20  56:1
Salt
44:4
satisfactory
17:13,17  24:18  25:1
satisfy
22:2
save
74:16,19
saw
67:21
saying
72:17,19
says
48:3  62:4
school
9:6,8,9,12  11:4
season
9:10  33:20  41:4  42:14
64:19,19,21
seasonal
9:7,9
second
42:15  56:14
Security
28:11,20,22  30:21  31:10
31:20  32:5,12
see
14:11  17:2  28:3,7  31:1,14
36:22  44:2  63:23
64:17  66:18,22  67:18
67:20,21  68:20
Seed
41:18  42:3
seeing

36:6  38:13,17,19  40:3
seen
36:3,5  39:13  40:1,9,14
55:9  56:9  68:19  72:18
sell
13:1  14:11  25:19  71:6
72:12  73:5
selling
19:9  72:8
Selma
43:6
Selmer
41:21  43:3
sent
38:15  44:4  45:13,16  46:7
46:11  56:14
separate
39:20
service
20:11  22:1,4  43:8,9,10
51:1,2
serviced
23:16
seventy-five
20:12,18
seventy-nine
32:13
seventy-one
52:21  75:19
shake
14:15
shape
40:14
shareholder
12:4
shelf
25:16,17  74:5
short
30:1
shorter
16:3,4  60:9  73:21  74:4
76:4
shortly
55:7  56:7
show
26:9,21  27:18  30:10  31:18
34:18  36:10  38:7  39:7
39:22  40:7  47:17  55:1
56:11  63:20  70:1
side
8:2  51:23
signature
2:10
similar
42:23
simple
37:9
sir
7:9,17  8:8,12  9:15,17
10:15,20  12:3,6,8,14
15:17  18:3,14  21:12,17

21:20 23:3 24:13 25:11
26:2,16,17 27:9,13 28:2
28:14 29:19 31:13,23
32:7,14 35:10 38:13
40:3 43:10,21 46:23
48:1 49:6 50:3,13,15
51:7,14 52:18,19 54:17
55:11,19 56:13 57:5,10
58:10 60:3,21 62:12
64:4,22 65:23 66:10
67:9,14 68:8,11,14,17
69:16 70:14 71:8 72:1
74:5 75:17 76:3
situation
33:13 64:10
six
9:9 11:18 72:18
sixty
37:11,12,12 52:16 53:7
66:5,16
sixty-eight
53:23 54:1,2
sixty-five
9:4
sixty-one
37:13 53:13
sixty-two
37:9 48:12
slammed
69:8
sleep
74:2
smaller
13:5 16:1
Social
28:11,20,22 30:20 31:10
31:20 32:5,11
sold
19:18 24:8
somebody
66:4,7,9
somewhat
25:19 60:15
sorry
15:7 50:5 52:12 55:5
sort
28:7 29:2 71:13
sounds
56:19
source
70:17
south
11:11,22 13:14 14:23 15:3
27:11 30:12 62:22
southern
11:23 13:8,9 65:5 66:13
spend
29:22 30:2,4
split
20:10
spring

9:10 32:16 41:4 45:8
64:19
Springs
7:14 68:7,10
standardized
18:11
standpoint
13:20
started
39:12,16 41:18
state
5:4 6:10 8:15 11:3 75:7
78:4
statement
21:4,5 22:13 27:8 36:2
40:10 63:22
States
1:1 5:8,22
station
14:22 15:2,11,15 25:4,7
33:2,6 41:10,11 48:2
60:22 62:17 70:12
stay
34:10 45:17 50:10 59:21
stenotypy
78:9
STIPULATED
2:3
stipulation
5:9
stipulations
6:23
stock
12:7 14:2
stop
8:9 44:3
store
24:3 42:3,8,11 43:5 62:4
stores
21:2 22:23,23 23:15 73:8
74:2,3
storming
68:22
strictly
52:3
Stuart
1:17 2:6 5:14,21 6:18 7:5
7:10,18 8:13 9:2 10:16
16:23 17:19 26:9 38:10
49:1 63:2,14,16 74:6
76:9,15,22
study
8:17
stuff
14:17 30:5 52:5
styled
6:1
subsequent
57:17
Summerfield
10:13

Summerville
41:17 42:1
supervision
78:11
supervisor
33:8
suppose
50:23
sure
18:19 19:3 20:19 42:7
55:21 70:10 74:14
surgery
16:11 32:17,18
suspect
14:23
swap
17:5,7
swapped
24:16,17
swear
6:15
sworn
6:19
S-e-l-m-e-r
43:7

_____
|            T           |
_____

T
1:7 2:1,1 4:5 6:1 78:1,1
take
10:22 17:20 19:7 22:4
38:14 63:4 66:2 73:6
73:23 74:1,3
taken
2:6 5:21 78:8
takes
73:11
talk
25:3 56:3 74:7
talking
18:19 19:2 28:8 31:1
65:15
tape
63:4,12
Tate
35:2,3,20 36:11,15,20
38:9,15 39:18 45:6,6
67:20,22
Tate's
68:6
team
75:6
telephone
61:16
tell
14:8 28:19 34:5,6 41:12
57:2,8 63:2 69:19 74:8
telling
38:5
tells

72:5
ten
10:3 11:19
Tennessee
24:12,19 30:14 32:22
37:16 41:17,21 42:1
43:4 45:15 48:15,17
57:18 58:9 65:16
Terra
63:1
Terrell
62:22
territorial
8:6
territory
13:10 19:6,7 21:6,6 73:17
Terry
6:2,7 9:16 11:1,3 13:11
14:22 15:2,20 16:20,21
16:23 17:11 24:11 25:7
25:13,19 27:2,8,20
28:22 32:15 33:18,22
34:2,5,5,6,16 35:2,20
35:22 37:7,20,23 38:22
40:10,16 41:3 44:21,23
45:9,23 48:9 49:1,19
50:1,14 51:4 53:17,22
54:13 55:3 56:14 57:7
57:16 58:13,18 59:6,12
59:13 60:17,17,23 61:4
61:20 62:7 63:22 64:17
65:7 66:21 67:21 68:15
68:19 69:1,5 70:16
74:11,23 75:11,15,20,20
Terry's
48:14 66:2 70:12
testified
6:20 30:14
testimony
49:23 50:4
Texas
10:13 11:7 13:7 15:14,16
46:20 47:20,22 60:11
therapist
39:14,15
thereto
2:23 78:10
thing
12:22 67:3 72:6,12
things
14:4,6 26:8 74:14
think
15:9 18:8 27:13 32:19
34:2 35:5 39:15,18
41:16 42:6 44:3 47:16
51:6 53:9,10,12 54:3
55:14,17 56:21 57:5
69:18,19
thirties
48:20,22
thirty

11:2 44:22 49:8,12,15
53:3 75:1
thirty-five
28:5,10
thirty-four
28:12
thought
57:2 58:23
thousand
19:19 20:1,12,16,17,20
28:5 29:1,4 31:21
three
19:19,23 20:15,18,20
45:19 46:21 68:4 73:6
73:7,11
throw
19:18
tickled
46:16
Tim
52:8
time
2:21,22 8:5 10:8 16:17
20:7 22:8 24:21 25:4,4
30:13 34:2 37:20 38:1
39:3 41:6 52:17 53:7
56:17 57:1,10 61:11
70:20 71:11 74:4 76:17
timely
25:21
times
43:15 51:13
timetable
38:4
Tina
18:8 54:19 55:14,17 56:9
today
26:11 36:4 55:10 74:12,16
told
34:1,5,8 35:22 38:3
42:22 54:20 56:4 57:6
59:6,18 74:11 76:16
Tower
3:14 5:12
trained
11:13
transcript
78:13
transfer
15:21 16:20 17:7 43:16
44:22
transferred
43:20,23
transferring
58:18,22
travel
68:3
trial
2:21
tried
34:15 49:18,21 50:9 65:11

ARTHUR T. WATSON
ALABAMA FARMERS COOPERATIVE, INC., ET AL.

JOE STUART
May 23, 2008

71:15
trip
42:15
Troy
8:14  11:3  75:7
truck
14:11,11,18,19,20  22:6,7
35:9  41:13  44:6,10
true
54:9  64:1  78:12
Trussell
52:8
truth
69:19
try
20:10  21:15  34:8,9,13
38:20  46:9  48:6,7
61:21,23  62:2  65:19
73:10,11,19
trying
22:10  70:5,6,9  74:18
76:1
turn
37:13  40:23
twelve
10:9  31:11  32:6
twenty-eight
30:22  31:4,4
twenty-five
17:12  20:20
twenty-four
31:21
twenty-nine
28:5,10
twenty-three
31:11
twice
43:18
two
8:11  18:9  24:15  37:10,14
43:1  45:4,5,19,19  47:1
50:2  63:13  68:4,19
73:2,4,14,19
two-day
73:12
type
13:6  27:7  39:14
types
37:3
typewriting
78:11

**U**

U
2:1  8:7
Uh-huh
12:12  19:21
uncommon
19:12
undergo

16:11,12
understand
8:21  15:22  19:1  21:14
37:17
understanding
27:4  29:13
unemployment
16:7
Union
7:13  68:6,9
United
1:1  5:8,22
unload
14:19
upset
69:12,13
use
37:8
Usual
6:22
usually
43:21
Utah
62:22

**V**

valuable
54:4
various
14:2
vary
22:12,19
vegetable
72:21
versus
6:3
video
1:15  6:8
videotape
5:20  63:13
visit
67:19  73:8
vs
1:9

**W**

W
3:11
Wachovia
3:14  5:12
wages
27:23  28:10,11,20,22
30:20,21  31:9,10,20
32:6,12
waived
2:12
walked
69:8
Wal-Mart
20:19  24:3

Wal-Marts
20:5,20
want
27:18  33:4,9,11,14,17
48:3  57:9  74:8
wanted
17:5  18:18  34:11  37:16
68:20
wants
75:21
wasn't
32:21,23  33:22  41:5  47:4
49:13,20  58:13  65:16,18
65:22  69:9,10,10,13
70:6  71:14
Watson
1:7  6:2,2,8  9:16  11:2
15:21  17:1  25:7  27:2,8
27:20  28:22  32:15
35:2  37:7  41:3  44:23
49:1  50:1  54:13  57:16
58:13,18  59:13  61:20
62:7  63:23  65:7  66:21
74:11,15,23
Watson's
40:10,16  53:18  54:10
55:3  68:16  70:16
way
9:12  18:11  46:5  48:7
67:14  69:15
week
68:5
weeks
45:18,19,19  72:18
wellness
39:17
went
8:14  9:8  12:10  13:11
16:17  24:11  30:13
45:20  71:14
weren't
41:2
west
7:22
western
13:8
we've
53:9
Wheeler
7:10
Wisconsin
44:11  62:21
witness
2:11  5:14  6:16  78:14
words
29:14  35:8
work
9:7,9  10:1  11:15  12:10,17
13:12  14:16  16:2,6,8
22:4  24:23  29:8  34:7
38:1  41:3  51:20  54:4,7

65:1  70:8  73:7,13,19,20
73:22  75:15,20
worked
9:11,13  10:3  11:9  14:8,22
15:3  24:14,16  25:20
32:16  47:13  53:16
working
9:5,18,22  11:8  21:7  27:11
30:12  34:12  35:23
41:14  50:11  53:3  58:14
58:15  60:23  65:22
74:2  75:1
worth
19:19  54:7
wouldn't
16:6  42:19  49:14  70:4
write
61:15  62:2
writing
27:21  36:23  37:2,4  60:19
written
18:1,5  25:22  26:7
wrong
19:13
wrote
18:8
W-2
27:1,19  29:9  30:19  31:10
31:19

**X**

X
4:1,5

**Y**

yeah
13:6  18:21  23:13  28:9
31:3  33:1  39:17  53:20
58:1  59:18  61:21  62:10
71:23
year
10:22  18:9  19:11  20:23
21:14  22:12,12,19,19,21
23:1,1,5,14,14,18,18,21
23:23  24:4,20  27:2,23
33:9  44:4  47:21  53:15
53:15  60:14  61:5
years
8:11,14  9:3,9,23  10:3,10
11:2,6,19  17:12  24:15
37:10,10  44:22  47:10
49:8,12,15  50:2  52:5
52:21  53:3,8,23  66:5,16
68:20  75:2
York
21:7
y'all
8:6,10  18:2,13,15  19:5
21:18,21  36:22  39:12,13
51:19  53:6  61:19  68:1

68:12  75:15

**Z**

zip
7:12

**1**

1
4:7  26:19,22
1:52
63:9,11
10
4:16  36:8,11  38:8
10th
35:21  37:7
11
4:17  39:8,10,23
116
78:23
12
4:18  40:5,8
12th
37:14
12:57
5:14
13
4:19  54:22  55:2
14
4:20  63:18,21
17227
7:13

**2**

2
4:8  27:16,19
2nd
38:9  55:4
2:00
63:16
2:01
63:11
2:07-CV-520-WHA
1:5
2:12
76:15,23
2000
27:2,10
2001
27:20  28:1
2002
28:21
2003
15:20  30:20,21
2004
15:20  30:14  31:10  58:9
58:16
2005
31:19  32:16  42:17  58:17
65:15,22
2006

Page 86

32:5,22  35:21  37:7
39:1  40:11  41:4  45:9
55:5  56:15,20  64:18,19
**2007**
19:20  32:11  63:22  64:3
**2008**
1:18  5:13  19:22  77:1
**23**
1:18
**23rd**
5:13  76:23
**26**
4:7  40:11
**27**
4:8
**28**
4:9

---
### 3
**3**
4:9  28:16,21
**30**
4:10
**31**
4:11,12
**32**
4:13,14
**34**
4:15
**3400**
3:14  5:11
**35203**
3:15
**35238**
3:8
**36**
4:16
**36089**
7:14
**3765**
3:6
**380487**
3:7
**39**
4:17

---
### 4
**4**
4:10  30:11,17
**40**
4:18

---
### 5
**5**
4:11  31:7,9  58:10
**54**
4:19

---
### 6
**6**

4:12  31:16,18
**6th**
55:5
**63**
4:20

---
### 7
**7**
4:3,13  32:3

---
### 8
**8**
4:14  32:9
**82**
7:13

---
### 9
**9**
4:15  34:20,22  35:23
**92**
10:23

**Tyler Eaton Morgan Nichols & Pritchett, Inc.**

Toll Free 800.458.6031                    http://www.TylerEaton.com

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 8

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA<br>☒ EEOC | 420-2006-03095 |

and EEOC

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Arthur Terrell Watson | Cell: (731) 267-6430 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| P.O. Box 106 | Glenwood, Alabama 36034 | 01/12/1945 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Bonnie Plant Farms, a division of AFC, Inc. | Over 300 | (334) 738-3102 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1727 Highway 223 | Union Springs, Alabama 36089 | Bullock |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST (ADEA/EPA)       LATEST (ALL) |
|---|---|
| ☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☒ AGE<br>☐ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify) | January, 2006 through today<br><br>☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**See Attachment A**

RECEIVED
EEOC

JUN  6 2006

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Arthur Terrell Watson* | SIGNATURE OF COMPLAINANT<br><br>*Arthur Terrell Watson*<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)<br>6/2/06 |
| Date                    Charging Party (Signature) | |

EEOC FORM 5 (10/94)

## EXHIBIT A
## CHARGE OF DISCRIMINATION

I have worked for a route salesman for Bonnie Plant Farms for fifteen (15) years. I have only had two routes assigned to me before January of 2006.

The route I was working in 2005 was in Bells, Tennessee. I developed that territory into a very lucrative route as I increased my business every year that I worked it. I underwent surgery to have my knee replaced and I lost 40 lbs.

When I returned in January of 2006, I was not put back to work. I brought my supervisor, Tate, this letter dated January 10, 2006. In it I complained of age discrimination. (See Exhibit 1). On February 2, 2006, I brought Tate another letter stating that I was released to return to work without restrictions. (Exhibit 2). I requested to be reassigned to my Tennessee route. I was not assigned to that route, but was given another route in Donaldsonville, Louisiana. I believe this assignment was made in retaliation for my complaint of age discrimination.

The Louisiana route was salary only. I made $500.00 a week. I had made $45,000.00 in Tennessee. I have increased the sales on my Louisiana route, but I still will make substantially less than on my Tennessee route. Now I have recently been assigned another route in the Jasper, Alabama. I continue to be assigned to routes where I do not have as much opportunity to succeed financially.

I believe I have been discriminated against because of my age sixty-one (61), in violation of the Age Discrimination and Employment act (ADEA), as amended. I also believe I have been retaliated against because of my complaints of age discrimination.

*Arthur Znell Watson*

6 - 2 - 0 6

RECEIVED
EEOC

JUN  6 2006

BIRMINGHAM DISTRICT OFFICE

January 10, 2006

Dear Tate;

As you know I have worked for Bonnie as a route salesman for 15 years. I have only had two routes the whole time I worked here. I was involved in an accident on the job in December, 2002 and suffered some back and neck problems. I have continued to work and do my job. I increased my route sales and made every incentive bonus the company offered last year. I have always enjoyed my job and tried to do it to the best of my ability.

I cannot understand why my Tennessee route is being given to some one else, unless it is because I turn 61 years old on January 12, 2006. I was able to do my job last year and now I am being told that I cannot perform my job. Actually my health is better now than the last two years. I have lost 40 pounds and had a bad right knee replaced.

I love my job and all I want is to continue to do a good job. I need my job and my health insurance. Please don't take my job away from me.

Terry Watson

RECEIVED
EEOC

JUN  6 2006

BIRMINGHAM DISTRICT OFFICE

Watson v. Ala. Farmers
029

February 2, 2006

Dear Tate;

     I brought you a letter on January 10, 2006 which you have not responded to yet. I am bringing you a letter today from my doctor saying I am able to work without restrictions. I am ready, willing and able to go to work. Please put me to work on my Tennessee route. If you do not put me to work, I am going to find a lawyer because I believe you are discriminating against me because of my age.

Terry Watson

cc:   Joe Stewart

RECEIVED
EEOC
JUN 6 2006
BIRMINGHAM

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 9**

## RESPONSE TO EXHIBIT A

## CHARGE OF DISCRIMINATION

I have worked for a route salesman for Bonnie Plant Farms for fifteen (15) years. I have only had two routes assigned to me before January of 2006.

**Response:  Mr. Watson worked in New Summerfield, Texas through 2003. At the beginning of season of 2004, Mr. Watson and a salesman stationed in Bells, Tennessee approached Bonnie Plant Farm asking to exchange routes. Mr. Watson wished to exchange routes due to his health condition not allowing him to operate the longer route in Texas. Mr. Watson's request for an exchange was granted and he worked the Bells, Tennessee route until January 2006. In January 2006, Mr. Watson was assigned a route in Louisiana, which later changed to Jasper, Alabama.**

The route I was working in 2005 was in Bells, Tennessee. I developed that territory into a very lucrative route as I increased my business every year that I worked it. I underwent surgery to have my knee replaced and I lost 40 lbs.

When I returned in January of 2006, I was not put back to work. I brought my supervisor, Tate, this letter dated January 10, 2006. In it I complained of age discrimination. (See Exhibit 1). On February 2, 2006, I brought Tate another letter stating that I was released to return to work without restrictions. (Exhibit 2). I requested to be reassigned to my Tennessee route. I was not assigned to that route, but was given another route in Donaldsonville, Louisiana. I believe this assignment was made in retaliation for my complaint of age discrimination.

**Response:  Tate is the Safety Director, not Mr. Watson's supervisor. In Mr. Watson's letter dated February 2, 2006, he was threatening that if not placed back on his Tennessee route that he was going to find a lawyer because he believed he was being discriminated against because of his age. Routes are assigned to salesmen as the routes begin opening and salesmen are able to run the routes for which they are assigned. Bonnie Plant Farm holds and annual sales meeting each year in which the assigning of routes begin taking place. Mr. Watson did not attend the 2005 sales meeting in November 2005 for which routes began being assigned for the 2006 season.    Therefore Bonnie Plant Farm assigned the Bells, Tennessee route to another salesman and Mr. Watson was assigned to the Donaldsonville, Louisiana route. Bonnie Plant Farm assigns routes to salesmen on the basis of which they feel will be most lucrative for the company and the salesmen. The assigning of routes has nothing to do with a salesman's age.**

The Louisiana route was salary only. I made $500.00 a week. I had made $45,000.00 in Tennessee. I have increased the sales on my Louisiana route, but I still will make substantially less than on my Tennessee route. Now I have recently been assigned another route in the Jasper, Alabama. I continue to be assigned to routes where I do not have as much opportunity to succeed financially.

Response: Bonnie Plant Farm opened a route in Donaldsonville, Louisiana in 2006. Mr. Watson was temporarily assigned to Donaldsonville, Louisiana where worked as a laborer and was paid a salary before his route was developed. Mr. Watson was originally assigned to Donaldsonville, Louisiana because of Donaldsonville being a new station and needing experienced salesmen to run the routes. On April 10, 2006, Mr. Watson began his route in Jasper, Alabama. Mr. Watson was assigned to Jasper, Alabama because it was an opportunity for Mr. Watson to operate a route closer to his home. Salesmen are paid on commission of sales, not on salary only basis. All salesmen receive a bi-weekly draw of $1,000.00 that is deducted from the commission check that is paid at the end of the season. Mr. Watson has increase on his Jasper, Alabama route over his Bells, Tennessee route of last year.

Mr. Watson's sales for the routes that he has ran fall routes are as follows:

| | |
|---|---|
| 2000 - $233,852 | New Summerfield, TX |
| 2001 - $258,807 | New Summerfield, TX |
| 2002 - $296,564 | New Summerfield, TX |
| 2003 - $298,997 | New Summerfield, TX |
| 2004 - $255,586 | Bells, TN |
| 2005 - $306,890 | Bells, TN |
| 2006 – $383,987 | Jasper, AL |

The 2006 sales are estimated according to deliveries. (Sales are not complete at this point and a total for fall routes can not yet be determined.) Return amounts are deducted from the delivery amount to compute the total in sales.

I believe I have been discriminated against because of my age sixty-one (61), in violation of the Age Discrimination and Employment Act (ADEA), as amended. I also believe I have been retaliated against because of my complaints of age discrimination.

Response: Mr. Watson has in no shape form or fashion has been discriminated against due to his age or complaint of age discrimination. He was simply assigned another route by the company on the basis of what the company believes to be a lucrative business decision.

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 10

STATE OF ALABAMA

BARBOUR COUNTY

### DECLARATION OF ARTHUR TERRELL WATSON

"My name is Arthur Terrell Watson. I reside at Glenwood, Alabama. I am an adult over the age of nineteen. I have personal knowledge of the facts set forth below.

I have been employed by Bonnie Plant Farm as a Route salesman for over fifteen years. I was formerly a route salesman working out of the Bells, Tennessee station.

I first went to the Bells Tennessee Station in 2004. I do not know what stores were on the route when Joe Stewart's brother, Luther Stewart ran the route in the 2003 season. In 2004, my route contained a Walmart and a Kmart both located in Germantown, Tennessee. Both of the stores were very good accounts and accounted for a good percentage of my sales. In 2005, both of these stores were removed from my route by Adam Alley and Joe Stewart. After losing these two stores, I was still able to increase my sales.

I have never received a write up or a counseling form because of any complaints about my job performance. Adam Alley never spoke to me concerning my job performance. I was never made aware of any complaint by Adam Alley, if there were any concerning my job performance. Adam Alley never told me that "if my job performance did not improve, he would request that I not be brought back to Bells the following season."

In Spring of 2006 I was moved to Donaldsonville, Louisiana. I worked there for approximately 3 weeks. This area had been devastated by hurricane Katrina a few months prior to my arrival. Sales there were lower because of all the hurricane damage that occurred along the Louisiana Gulf coast. Many of the stores had not reopened.

I was moved to Jasper, Alabama in the middle of the 2006 season. Station manager Joey Padgett never wrote me up. Joey Padgett occasionally gave me notes where customers had called in requesting that I leave specific varieties of plants. No one ever called and complained about my job performance to my knowledge. Chris

Sparks sales comparison in 2007 to my 2006 sales is based on me only working half of the season there and is inaccurate. The only way to accurately compare sales performance is to compare store to store and not route number by route number because stores are added to and deleted from routes each year."

I make the above declaration under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing is true and correct and based upon my personal knowledge.

Executed on this _14th_ day of July, 2008.

_Arthur Terrell Watson_
Arthur Terrell Watson

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 11

January 10, 2006

Dear Tate;

    As you know I have worked for Bonnie as a route salesman for 15 years.  I have only had two routes the whole time I worked here.  I was involved in an accident on the job in December, 2002 and suffered some back and neck problems.  I have continued to work and do my job.  I increased my route sales and made every incentive bonus the company offered last year.  I have always enjoyed my job and tried to do it to the best of my ability.

    I cannot understand why my Tennessee route is being given to some one else, unless it is because I turn 61 years old on January 12, 2006.   I was able to do my job last year and now I am being told that I cannot perform my job.  Actually my health is better now than the last two years.  I have lost 40 pounds and had a bad right knee replaced.

    I love my job and all I want is to continue to do a good job.   I need my job and my health insurance.  Please don't take my job away from me.


Terry Watson

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 12

February 2, 2006

Dear Tate;

I brought you a letter on January 10, 2006 which you have not responded to yet. I am bringing you a letter today from my doctor saying I am able to work without restrictions. I am ready, willing and able to go to work. Please put me to work on my Tennessee route. If you do not put me to work, I am going to find a lawyer because I believe you are discriminating against me because of my age.

Terry Watson

cc:    Joe Stewart

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 13**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ARTHUR T. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: |
| | ) | |
| v. | ) | 2:07-cv-520-WHA |
| | ) | |
| ALABAMA FARMERS | ) | |
| COOPERATIVE, INC. d/b/a | ) | |
| BONNIE PLANT FARMS, | ) | |
| | ) | |
| Defendant. | | |

<u>DECLARATION OF BOBBY WINDERS</u>

My name is Bobby Winders. I work at the Farmers Cooperative in Selmer, Tennessee. The business address is 581 Mulberry Avenue, Selmer, Tennessee 38375. I am giving this declaration of my own free will and under penalty of perjury. I have personal knowledge of the below stated facts.

I have worked here for seven years and I have been the retail sales manager for the last four years. As part of my responsibility, I deal with the route drivers who work for Bonnie Plant Farms. They deliver plants and vegetables which we sell to our customers. I would be the person with the responsibility for the Bonnie Plant drivers. I have never telephoned Bonnie Plant to complain of the job performance of any driver. I specifically have never called Bonnie Plant Farms to complain about the job performance of Terry Watson.

I have reviewed pages 41-44 of the Deposition of Joe Stuart. I do not have any personal knowledge of anything that would support Mr. Stuart's testimony. I also do not know of anyone at the Farmers Cooperative in Selmer who has called to make a complaint.

No one has advised me and it would be my personal responsibility to make management aware of any problem with service or deliveries.

At all times while he worked for Bonnie Plant in 2004 and 2005 on this route, Terry Watson's job performance was satisfactory to me.

I have read the above statement and I declare that it is true and correct under penalty of perjury.

Signed this the __9__ day of July, 2008.

_Bobby Winders_

Bobby Winders

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 14**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ARTHUR T. WATSON,                    )
                                     )
      Plaintiff,                    )        Civil Action No.:
                                     )
v.                                   )        2:07-cv-520-WHA
                                     )
ALABAMA FARMERS                      )
COOPERATIVE, INC. d/b/a              )
BONNIE PLANT FARMS,                  )
                                     )
      Defendant.

## DECLARATION OF DAVID BOSWELL

My name is David Boswell.  My father is Frank Boswell.  Frank is 81 years old. Together we run an independent farm supply store in Somerville, Tennessee.  I am giving this declaration of my own free will and under penalty of perjury.  I have personal knowledge of the below stated facts.

We are supplied some of our plants and vegetables by route salesman employed with Bonnie Plant Farms.  Until last year, my father dealt primarily with the route salesman. Unfortunately, he was involved in a serious accident which has required him to be hospitalized for quite some period of time and has now been transferred to an assisted living facility. As part of my father's injuries, he has a diminished memory.

In the years 2004 and 2005 our Bonnie Plant representative was Terry Watson. Terry's job performance as a route salesman was no better and was no worse than any of our other salesman.  From time to time, we have run out of plants and have called Bonnie Plant Farms to get more.  That has happened before and after Terry Watson worked here.

I have read the above statement and I declare that it is true and correct under penalty of perjury.

Signed this the _11th_ day of July, 2008.

David Boswell

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 15

-----Original Message-----
From: wellnessgroupinc@aol.com [mailto:wellnessgroupinc@aol.com]
Sent: Wednesday, January 04, 2006 4:41
To: tate@ustconline.net
Subject: Watson Screening Results today

Tate:
A. Terry Watson's agility screen was limited by his reported MD
restrictions to not do any material handling which involves stooping or
"bending over" due to his neck condition.  He states he has told Bonnie
P about this before.  He also would not do repeated or sustained
overhead reaching due to the same neck problem as he states this flares
up his neck/nerve problem.
He also could not do repeated step test due to his knees/total knee
replacement in july 05.  So his current work restrictions would
include:  No material handling, no repeated climbing/jumping, no
repeated or sustained stooping, no repeated or sustained overhead
reaching/tasks.  He is at risk for falls if he were to work on a ladder
or at heights as his single leg stance test results were only 3-4
seconds R leg, and only 10-12 seconds L leg - compared to the minimal
goal of 30 seconds w/out loss of balance.   He is fine to drive, get
in/out of truck, maybe help carry items/plants at waist to knuckle
level and to shoulder level but not overhead.

He is also borderline w/ his blood pressure, even though he had BP med
ajustment about 2 months ago by his MD in Luverne - Dr. Tompkins.  He
states he will go back and follow-up re this.

From a functional LE strength/flexibility, work fitness standpoint, I'm
going to send letter to Dr. DiChiara recommending a customized
fitness/therapy program to improve his climbing, balance, flexibility
for better work functions of in/out truck, loading or unloading
functions, etc. - but only then w/ medical records re his neck problem
received from his Hughston clinic MD.  He also states he is seeking to
go to pain mgt MD at Hughston clinic re meds/treatment, etc.  A full
spine/obesity and balance/fitness type therapy program coordinated w/
all MDs is not a bad idea for him if he will participate.  He states he
has lost about 40 lbs in past year, is walking better than for over a
year, is more able to work now than 1 year ago vs. his job, and
epxresses motivation to lose weight - 5 lbs/ month, get more fit, etc.

Mark

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 16**



## ATTENDING PHYSICIAN STATEMENT

DATE:  January 26, 2006

CHART NUMBER:  926602
PATIENT NAME:  Arthur Watson
DOB:  01/12/45

DIAGNOSIS:  Cervical Spine Degeneration, Diffuse Idiopathic Skeletal Hypertrophy
HOSPITAL: Hughston Sports Medicine Hospital
ADMISSION:                      DISCHARGE:

RETURN TO WORK:  1/26/06

RESTRICTIONS:  None

Next Appointment:  As needed

Comments:  Mr. Watson was last seen on 12/14/05.  He was released with no
restrictions.

J. Kenneth Burkus, M.D.
Tax I.D.# 58-1155460

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 17

08-25-03 11:00:25    FROM: AFC Fax          TO: 308-5650 PAYROLL FA PAGE  15
08/25/2003  10:45    3347383141          BONNIE PLANT FARM              PAGE  15

**BONNIE PLANT FARM**
**COMMISSION FOR SPRING OF 2003**

DATE          22-Aug-03

NAME      LUTHER L. STUART                              RT. NO.  +18-3
S.S.#     ▓▓▓▓▓▓▓▓

| | | | | |
|---|---|---|---|---|
| 1 | SALES | | $263,171.61 | $260,000.00 |
| 2 | | 15% of 1st $200,000 | $200,000.00 | $30,000.00 |
| 3 | | 23% of all over $200,000 | $60,000.00 | $13,800.00 |
| 4 | | 1.0% of Deliveries | $348,171.30 | $3,481.71 |
| 5 | | 1% of Sales for Yrs./Age | $260,000.00 | $2,600.00 |
| 6 | | 0.33% FOR A/S/P | $0.00 | $0.00 |
| 7 | | -1% for less than 97% consigned (locals) | | $0.00 |
| 8 | Chain Store Fines and/or Accident Fines | | | -$850.00 |
| 9 | TOTAL GROSS COMMISSION | | | $49,031.71 |
| 10 | Route Labor (can't be less than 2½ to 3½% of Sales) | | | -$8,291.10 |
| 11 | Misc. Labor | | | $0.00 |
| 12 | COMMISSION LESS LABOR | | | $40,740.61 |
| 13 | Company Assessment (if line 12 is over $30,000) | | | -$1,500.00 |
| 14 | Credit Card | | | -$1,201.73 |
| 15 | Racks & Signs | | | -$2,500.00 |
| 16 | Misc          (lumber, etc) | | | $0.00 |
| 17 | COMMISSION DUE TO DATE | | | $35,538.88 |
| 18 | Commission Already Paid | | | -$17,000.00 |
| 19 | Commission To Be Paid Bi-Weekly | | | -$13,000.00 |
| 20 | NET COMMISSION DUE BEFORE ADVANCE | | | $5,538.88 |
| | (Taxes will be taken out of line 20) | | | |
| 21 | ADVANCES | | | -$3,050.00 |
| 22 | COMMISSION DUE BEFORE TAXES | | | $2,488.88 |

CONFIDENTIAL                    AFC 00548

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 18**

BONNIE PLANT FARM
COMMISSION FOR SPRING OF 2004

DATE       19-Dec-05

NAME     ARTHUR T. WATSON
S.S.#
RT. NO.   18-03

| | | Sales | Collected | | 90% of Sales |
|---|---|---|---|---|---|
| SALES | FALL 2003 | $37,187.44 | $36,453.22 | | |
| | SPRING 2004 | $255,586.88 | $253,704.27 | | $0.00 |
| | TOTAL | $292,774.32 | $290,157.49 | | $263,496.89 |

| | Collected | | 90% of Sales |
|---|---|---|---|
| 16.00% of collected Sales | $290,157.49 | | $46,425.20 |
| 1.00% for age and years | $0.00 | ..... | $0.00 |
| 2.00% for sales of $300,000 | $0.00 | ..... | $0.00 |
| 2.25% for sales of $325,000 | $0.00 | ..... | $0.00 |
| 2.50% for sales of $350,000 | $0.00 | ..... | $0.00 |
| 2.75% for sales of $375,000 | $0.00 | ..... | $0.00 |
| 3.00% for sales of $400,000 | $0.00 | ..... | $0.00 |
| 3.25% for sales of $425,000 | $0.00 | ..... | $0.00 |
| 3.50% for sales of $450,000 | $0.00 | ..... | $0.00 |
| 3.75% for sales of $475,000 | $0.00 | ..... | $0.00 |
| 4.00% for sales of $500,000 | $0.00 | ..... | $0.00 |
| 4.25% for sales of $550,000 | $0.00 | ..... | $0.00 |
| 4.50% for sales of $600,000 | $0.00 | ..... | $0.00 |
| 5.00% for sales of $650,000 | $0.00 | ..... | $0.00 |
| 1.00% for 4% sales increase | $0.00 | ..... | $0.00 |
| 2.00% for 8% sales increase | $0.00 | ..... | $0.00 |
| 3.00% for 15% sales increase | $0.00 | ..... | $0.00 |
| 4.00% for 20% sales increase | $0.00 | ..... | $0.00 |
| 6.00% for 30% sales increase | $0.00 | ..... | $0.00 |
| 7.00% for 40% sales increase | $0.00 | ..... | $0.00 |
| 8.00% for 50% sales increase | $0.00 | ..... | $0.00 |
| 30.00% for sales collected on 94 | $4,239.54 | ..... | $1,271.86 |
| | Total | | $47,697.06 |

| | | |
|---|---|---|
| Chain Store Fines and/or Accident Fines | ..... | ($1,000.00) |
| Company Assessment | ..... | ($2,500.00) |
| Route Labor (can't be less than 2½ of Sales) | ..... | ($14,083.18) |
| Credit Card | ..... | ($24.24) |
| Misc     (lumber, etc) | ..... | ($880.00) |
| Racks & Signs | ..... | ($1,550.00) |
| | | |
| COMMISSION DUE TO DATE | ..... | $27,659.64 |
| Commission Already Paid | ..... | ($26,000.00) |
| Commission To Be Paid Bi-Weekly | ..... | $0.00 |
| NET COMMISSION DUE BEFORE ADVANCE | | $1,659.64 |

(Taxes will be taken out of the above line)

ADVANCES                   $0.00

COMMISSION DUE BEFORE TAXES    .....   $1,659.64

**PLAINTIFF ARTHUR WATSON'S**

**EVIDENTIARY SUBMISSIONS**

**EXHIBIT 19**

BONNIE PLANT FARM　　　　　　　　　COMMISSION FOR SPRING OF 2005
DATE　　　19-Dec-05
NAME　　　ARTHUR T. WATSON
　.#　　　�incomplete
RT. NO.　18-03-30-04

| SALES | | Sales | Collected | |
|---|---|---|---|---|
| | FALL 2004 ............. | $43,490.31 | $33,356.64 | |
| | SPRING 2005 ............. | $306,890.04 | $302,703.95 | |
| | TOTAL | $350,380.35 | $336,060.59 | |

| | | | |
|---|---|---|---|
| 12.00% of collected Sales | $336,060.59 | ..... | $40,327.27 |
| 1.00% for age and years | $0.00 | ..... | $0.00 |
| 1.50% for school program | $336,060.59 | | $5,040.91 |
| 1.50% for Wal-Mart increase | $336,060.59 | | $5,040.91 |
| 1.00% for rack and sign program | $336,060.59 | | $3,360.61 |
| 1.00% for having completed 5 of 11 | $336,060.59 | | $3,360.61 |
| 2.00% for $25,000 increase collected | $0.00 | | $0.00 |
| 2.00% for sales of $310,000 | $0.00 | ..... | $0.00 |
| 2.25% for sales of $335,000 | $336,060.59 | ..... | $7,561.36 |
| 2.50% for sales of $360,000 | $0.00 | ..... | $0.00 |
| 2.75% for sales of $385,000 | $0.00 | ..... | $0.00 |
| 3.00% for sales of $410,000 | $0.00 | ..... | $0.00 |
| 3.25% for sales of $435,000 | $0.00 | ..... | $0.00 |
| 3.50% for sales of $460,000 | $0.00 | ..... | $0.00 |
| 3.75% for sales of $485,000 | $0.00 | ..... | $0.00 |
| 4.00% for sales of $510,000 | $0.00 | ..... | $0.00 |
| 4.25% for sales of $560,000 | $0.00 | ..... | $0.00 |
| 4.50% for sales of $610,000 | $0.00 | ..... | $0.00 |
| 5.00% for sales of $660,000 | $0.00 | ..... | $0.00 |
| 6.00% for sales of $1,000,000 | $0.00 | | $0.00 |
| 1.00% for 5% sales increase | $0.00 | ..... | $0.00 |
| 2.00% for 10% sales increase | $0.00 | ..... | $0.00 |
| 3.00% for 15% sales increase | $336,060.59 | ..... | $10,081.82 |
| 4.00% for 20% sales increase | $0.00 | ..... | $0.00 |
| 5.00% for 25% sales increase | $0.00 | ..... | $0.00 |
| 6.00% for 30% sales increase | $0.00 | ..... | $0.00 |
| 7.00% for 40% sales increase | $0.00 | ..... | $0.00 |
| 8.00% for 50% sales increase | $0.00 | ..... | $0.00 |
| 25.00% for sales collected on 94 | $3,533.63 | ..... | $883.41 |
| 5.00% if a 5% increase on rt. 94 | $0.00 | | $0.00 |
| | Total | | $75,656.89 |
| Chain Store Fines and/or Accident Fines | | ..... | ($1,800.00) |
| Route Labor (can't be less than 3% of Sales) | | ..... | ($17,691.90) |
| Credit Card | | ..... | ($839.57) |
| Misc        (lumber, shirts, etc) | | ..... | ($300.00) |
| Racks & Signs | | ..... | ($2,500.00) |
| COMMISSION DUE TO DATE | | ..... | $52,525.42 |
| Commission Already Paid | | ..... | ($25,000.00) |
| Commission To Be Paid Bi-Weekly | | ..... | ($1,000.00) |
| NET COMMISSION DUE BEFORE ADVANCE  (Taxes will be taken out of this line) | | ..... | $26,525.42 |
| ADVANCES | | | ($2,750.00) |
| COMMISSION DUE BEFORE TAXES | | ..... | $23,775.42 |

Watson v. Ala. Farmers

073

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 20

BONNIE PLANT FARM                    COMMISSION FOR SPRING OF 2006

| DATE | 17-Mar-07 | | | |
|---|---|---|---|---|
| NAME | LESLIE H. BRANUM | | | |
| S.S.# | ▮▮▮▮▮▮▮ | | | |
| RT. NO. | 18-03 | Sales | Collected | 90% |
| SALES | SPRING 2006 TOTAL | $383,712.44 | $378,622.05 | $345,341.20 |

|  | | Sales/Collected | 90% |
|---|---|---|---|
| 13.00% of collected Sales | | $378,622.05 ...... | $49,220.87 |
| 1.50% for Wal-Mart increase | | $378,622.05 | $5,679.33 |
| 1.00% for Lowe's increase | | $378,622.05 | $3,786.22 |
| 1.00% for Home Depot increase | | $378,622.05 | $3,786.22 |
| 0.50% for K-Mart increase | | $0.00 | $0.00 |
| 0.50% Non-chain stores increase | | $378,622.05 | $1,893.11 |
| 0.50% for having completed a,b,c,d,e, | | $378,622.05 | $1,893.11 |
| 2.00% for $25,000 increase collected | | $0.00 | $0.00 |
| 2.00% for sales of $325,000 | | $0.00 ...... | $0.00 |
| 2.50% for sales of $360,000 | | $378,622.05 | $9,465.55 |
| 3.00% for sales of $410,000 | | $0.00 ...... | $0.00 |
| 3.50% for sales of $460,000 | | $0.00 ...... | $0.00 |
| 4.00% for sales of $510,000 | | $0.00 ...... | $0.00 |
| 5.00% for sales of $660,000 | | $0.00 ...... | $0.00 |
| 1.00% for10% sales increase | | $0.00 ...... | $0.00 |
| 2.00% for 15% sales increase | | $378,622.05 | $7,572.44 |
| 3.00% for 20% sales increase | | $0.00 ...... | $0.00 |
| 4.00% for 25% sales increase | | $0.00 | $0.00 |
| 6.00% for 40% sales increase | | $0.00 | $0.00 |
| 25.00% for sales collected on 94 | | $765.06 ...... | $191.27 |
| 5.00% if a 5% increase on rt. 94 | | $0.00 | $0.00 |
| Less 1% | No Route 94 Customers | $0.00 | $0.00 |
| Less 40% | not paid on Non-Chain Stores | $3,274.43 | ($1,309.77) |
| Less 1% | School Program Non-participation | $0.00 | $0.00 |
| | **GROSS COMM.** | | **$82,178.34** |

| | | | |
|---|---|---|---|
| Chain Store Skip Fines | | ...... | ($850.00) |
| DOT Fines | | | $0.00 |
| Route Labor (can't be less than 3% of Sales) | | ...... | ($12,736.85) |
| Credit Card | | ...... | ($62.00) |
| Misc        (lumber, shirts, etc) | shirts | ...... | ($192.08) |
| Unauthorized Credit Card Charges | $0.00          X3 | ...... | $0.00 |
| | **NET COMMISSION** | ...... | **$68,337.41** |
| Assessment | | | ($7,000.00) |
| Commission Already Paid | DRAWN THROUGH 11-17-06 | ...... | ($57,543.77) |
| Commission To Be Paid Bi-Weekly | TO DRAW THROUGH 2-02-07 | ...... | $0.00 |
| NET COMMISSION DUE BEFORE ADVANCE | (Taxes will be taken out of this line) | ...... | $3,793.64 |
| ADVANCES | | | $0.00 |
| COMMISSION DUE BEFORE TAXES | | ...... | $3,793.64 |

| | | |
|---|---|---|
| Commission Already Paid | $61,337.41 | |
| Commission Accrued | $0.00 | |

CONFIDENTIAL                    AFC 00626

# PLAINTIFF ARTHUR WATSON'S

# EVIDENTIARY SUBMISSIONS

# EXHIBIT 21

## Bonnie Plant Farm Commission for Spring of 2007

Date: February 29, 2008
Name: LESLIE H. BRANUM
Rt No: 18-3

| | | | Rate | Gross Collected Sales | Net Collected Sales |
|---|---|---|---|---|---|
| Spring 2007 Total | | | | 431,228.75 | 405,355.03 |
| Tiered Base | | | | | 41,446.15 |
| National Route Expense Allow | | | | | 6,080.33 |
| **Total Base Commission** | | | | | 47,526.48 |
| **Incentives** | | | | | |
| a) | Wal-Mart/Home Depot Increase | 405,355.03 X | 1% | | 4,053.55 |
| b) | Wal-Mart/Lowe's Increase | 405,355.03 X | 1% | | 4,053.55 |
| c) | Wal-Mart/Kmart/Non-chain | 405,355.03 X | 1% | | 4,053.55 |
| d) | Sales % Increase | 816.07 X | 6% | | 48.96 |
| e) | School Cabbage Program | 405,355.03 X | 1% | | 4,053.55 |
| f) | Final Route Run | 405,355.03 X | 1% | | 2,605.85 |
| g) | Racking and Signing | 405,355.03 X | 2% | | 8,107.10 |
| **Total Incentives** | | | | | 26,976.12 |
| **Gross Commissions** | | | | | 74,502.59 |
| **Deductions** | | | | | |
| a) | 70% Rule | | | | .00 |
| b) | Driver Helper/Labor | | | | 16,413.25 |
| c) | Credit Card/Hotel | | | | 86.96 |
| d) | Lumber | | | | 904.50 |
| e) | National Adv Exp | 405,355.03 X | 1.5% | | 6,080.33 |
| f) | Non-Chain A/R Collection | | | | .00 |
| g) | DOT Fines | | | | 25.00 |
| h) | Skip Fines | | | | .00 |
| i) | Credit Card Penalty | | | | .00 |
| **Total Deductions** | | | | | 23,510.04 |
| **Commission Earned** | | | | | 50,992.56 |
| Less: Draws Thru 9/7/07 | | | | | 22,500.00 |
| Less: Draw Remainder thru 2/8/07 | | | | | 18,705.71 |
| **Commission Due** | | | | | 9,786.85 |
| **Prior Settlements** | | | | | 6,763.67 |
| Collected Advances | | | | | 4,800.00 |
| **Commission Remaining** | | | | | 3,023.18 |
| Remaining Advances | | | | | .00 |